IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**UNITED STATES OF AMERICA,**
*Plaintiff/Appellee,*

**v.**

**ISAAC MARTINEZ-CHAVEZ,**
*Defendant/Appellant.*

On Appeal from the United States District Court
for the Western District of Virginia
Roanoke Division (Hon. Elizabeth K. Dillon)

**JOINT APPENDIX
VOLUME I of V
Pages 1-606**

| | |
|---|---|
| **ROBERT N. TRACCI** | **MARY MAGUIRE** |
| Acting United States Attorney for the Western District of Virginia | Federal Public Defender for the Western District of Virginia |
| **JONATHAN JONES** | **ERIN TRODDEN** |
| Assistant U.S. Attorney | Assistant Federal Public Defender |
| Counsel for the Appellee | Counsel for Appellant |
| 310 First Street, S.W., Suite 906 | 401 East Market Street, Suite 106 |
| Roanoke, VA 24011 | Charlottesville, VA 22902 |
| (540) 857-2250 | (434) 220-3380 |

# TABLE OF CONTENTS

## VOLUME I

**Page**

U.S. District Court Western District of Virginia .....................................1
    Criminal Docket for Case # 7:24-cr-00011-EKD-CKM-1

Government's Notice of Intent to Use Rule 404(b) Evidence .................17
    filed on October 28, 2024

Superseding Indictment ........................................................................20
    filed on November 7, 2024

Defendant's Motion to Dismiss Count One of the Indictment ..............23
    filed on December 13, 2024

Defendant's Motion to Seal Exhibit 2 to Motion to Dismiss ................118
    filed on December 13, 2024

Defendant's Motion to Suppress Evidence .............................................59
    filed on December 13, 2024

Defendant's Motion to Play Video During
Jury Instructions on Unconscious Bias .................................................163
    filed on December 16, 2024

Order Granting Defendant's Motion to Seal
Exhibit 2 to Motion to Dismiss ............................................................170
    entered on December 16, 2024

Government's Notice of Intent to Use Rule 404(b) Evidence ...............171
    filed on December 17, 2024

Government's Motion to Toll Speedy Trial
in order to Litigate Pending Motions.....................................................174
    filed on December 17, 2024

Defendant's Response to Government's Motion
to Toll Speedy Trial Act.........................................................................178
    filed on December 18, 2024

Defendant's Motion in limine to Exclude Proposed
Evidence Offered by the Government pursuant to
Rule 404(b) of the Federal Rules of Evidence ...................................... 186
     filed on December 19, 2024

Defendant's Motion for Adverse Jury Instruction
or Other Relief for Spoliation of Evidence ............................................ 195
     filed on December 23, 2024

Government's Opposition to Defendant's Motion to Suppress ............. 238
     filed on December 27, 2024

Government's Response to Defendant's Motion
in limine to Exclude Rule 404(b) Evidence ......................................... 242
     filed on December 27, 2024

Government's Response to Defendant's Motion to Suppress ............... 264
     filed on December 27, 2024

Government's Opposition to Defendant's
Unconscious Bias Jury Instruction ...................................................... 340
     filed on December 27, 2024

Memorandum Opinion and Order regarding Defendant's
Motion to Dismiss Count One and Government's
Motion to Toll Speedy Trial ................................................................. 349
     entered on December 27, 2024

Government's Response to Defendant's Motion for
an Adverse Jury Instruction Base [*sic]* on Spoliation ......................... 353
     filed on December 30, 2024

Defendant's Reply to Government's Response
to Defendant's Motion to Suppress Evidence ...................................... 396
     filed on January 2, 2025

Criminal Minutes – Motion Hearing ................................................... 418
     filed on January 3, 2025

Transcript of Motion Hearing before the
     Hon. Michael F. Urbanski (Excerpt 1 of 2) ................................. 420
     held on January 3, 2025

Transcript of Motion Hearing before the
 Hon. Michael F. Urbanski (Excerpt 2 of 2)...................................539
  held on January 3, 2025

Exhibit and Witness List – Motion Hearing.......................................601
  filed on January 3, 2025

  Exhibit 1 – Rocky Mount Sheriff's Report...................................602

## VOLUME II

Order Denying Defendant's Motion to Suppress..................................607
  entered on January 9, 2025

Government's Notice of Intent to Introduce
Spanish-Language Expert Testimony ...............................................608
  filed on January 10, 2025

Criminal Minutes – Pretrial Conference ...........................................613
  filed on January 10, 2025

Transcript of Pretrial Conference before the
 Hon. Elizabeth K. Dillon...............................................................614
  held on January 10, 2025

Memorandum Opinion regarding Defendant's Motion to Suppress....683
  filed on January 14, 2025

Government's Proposed Jury Instructions .........................................700
  filed on January 15, 2025

Defendant's Proposed Jury Instructions ...........................................723
  filed on January 15, 2025

Government's Objections to Defense Jury Instructions .....................731
  filed on January 16, 2025

Defendant's Motion in limine to Exclude Proposed
Government Expert Witness............................................................738
  filed on January 16, 2025

Memorandum Opinion and Order Denying Defendant's Motion for
Adverse Jury Instruction for Spoliation of Evidence ........................... 744

    entered on January 17, 2025

Defendant's Objections to
Government's Proposed Jury Instructions ........................................... 753

    filed on January 17, 2025

Government's Response to Defense's Objection to
Introduce Spanish-Language Expert Testimony ................................. 758

    filed on January 21, 2025

Criminal Minutes – Jury Trial Day 1 ................................................. 764

    filed on January 22, 2025

Transcript of Jury Trial Proceedings
    before the Hon. Elizabeth K. Dillon
    Volume 1 of 3 ................................................................................ 765

    held on January 22, 2025

    Testimony of Lt. Justin Hylton:

    Direct Examination by Mr. Vega ................................................. 793
    Cross Examination by Ms. Diehl ................................................. 826
    Redirect Examination by Mr. Vega ............................................. 866

    Testimony of Officer Trey Poulin:

    Direct Examination by Mr. Miller ............................................... 876
    Cross Examination by Ms. Diehl ................................................. 913
    Redirect Examination by Mr. Miller ........................................... 925

Criminal Minutes – Jury Trial Day 2 ................................................. 930

    filed on January 23, 2025

Transcript of Jury Trial Proceedings
    before the Hon. Elizabeth K. Dillon
    Volume 2 of 3 ................................................................................ 931

    held on January 23, 2025

Testimony of <u>Officer William Engle</u>:

Direct Examination by Mr. Miller ........................................................ 938
Cross-Examination by Ms. Bohn ......................................................... 969
Redirect Examination by Mr. Miller .................................................... 980

Testimony of <u>Special Agent Drew Effing</u>:

Direct Examination by Mr. Miller ........................................................ 986
Voir Dire Examination by Ms. Bohn ............................................ (991-996)
Cross-Examination by Ms. Bohn ....................................................... 1000
Redirect Examination by Mr. Miller .................................................. 1010

Testimony of <u>Special Agent Adam Moody</u>:

Direct Examination by Mr. Miller ...................................................... 1014
Cross-Examination by Ms. Diehl ....................................................... 1018
Redirect Examination by Mr. Miller .................................................. 1026
Recross-Examination by Ms. Diehl .................................................... 1027

Testimony of <u>Olman Said Vallejos Fugon</u> ................. *see* below, 1078

Testimony of <u>Deputy Edwin Alejandro</u>:

Direct Examination by Mr. Vega ........................................................ 1043
Cross-Examination by Ms. Diehl ....................................................... 1052
Redirect Examination by Mr. Vega .................................................... 1055
Recross-Examination by Ms. Diehl .................................................... 1064

Transcript of excerpt of Jury Trial Proceedings
    before the Hon. Elizabeth K. Dillon .............................................. 1076
held on January 23, 2025

Testimony of <u>Olman Said Vallejos Fugon</u>:

Direct Examination by Ms. Bohn ....................................................... 1078
Cross-Examination by Mr. Vega ........................................................ 1112
Redirect Examination by Ms. Bohn .................................................... 1145
Recross-Examination by Mr. Vega ..................................................... 1149

Criminal Minutes – Jury Trial Day 3 ................................................. 1154
    filed on January 24, 2025

Transcript of Jury Trial Proceedings
    before the Hon. Elizabeth K. Dillon
    Volume 3 of 3 ................................................................. 1155
    held on January 24, 2025

## **VOLUME III**

Exhibit and Witness List – Jury Trial (1/22/2025-1/24/2025) ............ 1249
    filed on January 24, 2025

**No.**    **Description**

G-1C   Transcription and translation of Exhibit 1B ...................... 1251

G-2    Photo - Kia parked on grass ................................................. 1252

G-3    Stipulation re felony conviction and knowledge ................. 1253

G-4    Photo - Revolver Packaging Label......................................... 1254

G-5A   Photo - revolver side 1 ......................................................... 1255

G-5C   Photo - revolver serial number............................................ 1256

G-7    Photo - sawed-off rifle packaging label .............................. 1257

G-8    Photo - sawed-off rifle.......................................................... 1258

G-10   Stipulation re both guns are firearms................................. 1259

G-13   Photo - Kia front passenger floorboard .............................. 1260

G-14   Stipulation re Def and wife work as painters..................... 1261

G-15   Stipulation re Def drives Kia & Maria Castillo is
       common-law wife ................................................................. 1262

G-16   Photo - Kia front passenger seat ........................................ 1263

G-17   Photo - Kia rear seat area ................................................... 1264

G-20    NFRTR certifications........................................................ 1265

G-30    Photo - Riverside Minute Market..................................... 1267

G-32    Photo - Engle Rpt_Close up of barrel .............................. 1268

G-33    Photo - Engle Rpt_Firearm comparison 1......................... 1269

D-4    Screenshot of Martinez-Chavez on Back of Car ................ 1270

D-5    ATF Firearms Trace Summary ....................................... 1271

D-8    CFS Report ................................................................. 1272

D-9    CFS Report Certificate of Authenticity............................ 1278

D-10    Photos - Yellow Jacket.................................................. 1279

D-11    Google Maps............................................................... 1288

D-14    Photos – Guns ............................................................. 1289

D-15    Photo - Riverside Minute Market..................................... 1291

Jury Question .................................................................. 1292
    filed on January 24, 2025

Jury Instructions ............................................................. 1293
    filed on January 24, 2025

Jury Verdict .................................................................... 1338
    entered on January 24, 2025

Government's Sentencing Memorandum ................................ 1340
    filed on May 14, 2025

Defendant's Sentencing Memorandum .................................. 1356
    filed on May 14, 2025

Criminal Minutes - Sentencing Hearing ............................... 1394
    filed on May 21, 2025

Transcript of Sentencing Hearing before the
Hon. Elizabeth K. Dillon .................................................. 1396
held on May 21, 2025

Exhibit and Witness List – Sentencing ............................................. 1447
filed on May 21, 2025

Exhibit 1 – Letter of Support .................................................... 1448

Judgment ................................................................................. 1449
entered on May 28, 2025

Notice of Appeal .................................................................... 1458
filed on June 2, 2025

## VOLUME IV - DIGITAL MEDIA*

Exhibit 3 to Defendant's Motion to Suppress Evidence
Officer Hylton BWC ............................................................... 1460
filed on December 13, 2024

Exhibit 4 to Defendant's Motion to Suppress Evidence
Officer Poulin BWC ............................................................... 1461
filed on December 13, 2024

Trial Exhibit G-1B - Video - BWC 01012024_Clip 1_s ...................... 1462
admitted on January 22, 2025

Trial Exhibit G-12cr - Video - Off Poulin BWC Clip 3_ns .................. 1463
admitted on January 22, 2025

Trial Exhibit D-3A- Video - BWC 01012024_Clip 1_s ........................ 1464
admitted on January 22, 2025

*This Digital Media is compatible with Windows Media Player and contains 1 MP4 file. This media has been confirmed to be virus-free through Trend Micro Apex One Security Agent virus scan.*

## VOLUME V – SEALED

Exhibit 2 to Defendant's Motion to Dismiss Count 1 .......................... 1465
    filed on December 13, 2024

Initial Presentence Investigation Report .......................................... 1466
    prepared on April 8, 2025

Government's Objection to the Presentence Investigation Report .... 1497
    filed on April 30, 2025

Defendant's Objection to the Presentence Investigation Report ....... 1514
    filed on April 30, 2025

Revised Final Presentence Investigation Report .............................. 1520
    prepared on May 13, 2025

Statement of Reasons.................................................................... 1560
    filed on May 28, 2025

# U.S. District Court
## Western District of Virginia (Roanoke)
## CRIMINAL DOCKET FOR CASE #: 7:24-cr-00011-EKD-CKM-1

Case title: USA v. Martinez-Chavez

Date Filed: 03/14/2024

Date Terminated: 05/28/2025

Assigned to: Chief Judge Elizabeth K. Dillon
Referred to: Magistrate Judge C. Kailani Memmer

Appeals court case number: 25-4318 Fourth Circuit

### Defendant (1)

**Isaac Fidel Martinez-Chavez**
*TERMINATED: 05/28/2025*
*also known as*
Issac Fidel Martinez-Chavez
*TERMINATED: 05/28/2025*

represented by **Beatrice Diehl**
Office of the Federal Public Defender
Western District of Virginia
210 First Street SW, Suite 400
Roanoke, VA 24011
540-777-0891
Email: beatrice_diehl@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or Community Defender Appointment*

**Heidi Bohn**
Federal Public Defender's Office
Western District of Virginia
210 First Street, SW, Suite 400
Roanoke, VA 24011
915-630-7055
Email: heidi_bohn@fd.org
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or Community Defender Appointment*

### Pending Counts

18:922G.F - UNLAWFUL TRANSPORT OF FIREARMS, ETC. - 18:922(g)(1) - (1/1/2024)
(1s)

26:5841.F - REGISTRATION OF FIREARMS - 26:5841, 5845(a)(4), 5861(d),

### Disposition

CBOP: 59 months as to each of counts 1s and 2s, to be served concurrently; SR: 3 years as to each of counts 1s and 2s, to be served concurrently; SA: $200 ($100 each count); FINE: $100 ($50 each count)

CBOP: 59 months as to each of counts 1s and 2s, to be served concurrently; SR: 3

JA001

and 5871 - 1/1/2024)
(2s)

years as to each of counts 1s and 2s, to be served concurrently; SA: $200 ($100 each count); FINE: $100 ($50 each count)

## Highest Offense Level (Opening)

Felony

## Terminated Counts

18:922G.F - UNLAWFUL TRANSPORT OF FIREARMS, ETC. - 18:922(g)(1) - 1/1/2024
(1)

26:5841.F - REGISTRATION OF FIREARMS - 26:5841, 5845(a)(4), 5861(c), and 5871 - 1/1/2024
(2)

## Disposition

Superseding Indictment Filed

Superseding Indictment Filed

## Highest Offense Level (Terminated)

Felony

## Complaints

None

## Disposition

## Plaintiff

**USA**

represented by **Duty Assistant - Roanoke**
UNITED STATES ATTORNEYS OFFICE
PO BOX 1709
ROANOKE, VA 24008-1709
Email: USAVAW.ECFDutyRke@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: US Attorney*

**Juan L. Vega**
DOJ-USAO
310 First Street, SW, Room 906
Roanoke, VA 24011
540-676-2856
Email: juan.vega2@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: US Attorney*

**Matthew M. Miller**
United States Attorneys Office
310 First Street, S.W. Room 906
Roanoke, VA 24008
540-857-2250

JA002

Fax: 540-857-2614
Email: matthew.miller2@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: US Attorney*

**R. Andrew (Inactive Acct) Bassford**
United States Attorneys Office
310 First Street, S.W. Room 906
Roanoke, VA 24008
540-857-2935
Fax: 540-857-2614
Email: usavaw.ecfdutyrke@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: US Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/14/2024 | 1 | INDICTMENT as to Isaac Fidel Martinez-Chavez (1) counts 1, 2. (kpa) |
| 03/14/2024 | 2 | Sealed Document - Unredacted Indictment (Attachments: # 1 Criminal Cover Sheet)(kpa) |
| 03/14/2024 | 3 | Arrest Warrant Issued by Judge Elizabeth K. Dillon in case as to Isaac Fidel Martinez-Chavez. Filed as a Detainer with Western Virginia Regional Jail *(Location Other Started)* (kpa) |
| 04/22/2024 | | Arrest of Isaac Fidel Martinez-Chavez. (kds) |
| 04/22/2024 | 4 | NOTICE OF HEARING as to Isaac Fidel Martinez-Chavez (CUSTODY) **(FTR)** (Schedule an Interpreter - Spanish) NOTICE TO COUNSEL This hearing has been set for one hour. If you think the hearing will take longer than one hour please contact the Courtroom Deputy as soon as possible. Arraignment set for 4/24/2024 10:00 AM in Roanoke before Honorable C. Kailani Memmer. Initial Appearance set for 4/24/2024 10:00 AM in Roanoke before Honorable C. Kailani Memmer.(kds) |
| 04/23/2024 | 27 | **Spanish** Interpreter *Javier Yamil Castillo - javier@castillols.com* appointed in case as to Isaac Fidel Martinez-Chavez. Interpreter Scheduled for 4/24/2024 10:00 AM. (slt) (Entered: 05/02/2024) |
| 04/24/2024 | 5 | Arrest Warrant Returned Executed on 4/22/2024 in case as to Isaac Fidel Martinez-Chavez. (mlp) |
| 04/24/2024 | 6 | NOTICE OF ATTORNEY APPEARANCE: Beatrice Diehl appearing for Isaac Fidel Martinez-Chavez (Diehl, Beatrice) |
| 04/24/2024 | 7 | Minute Entry for proceedings held before Honorable C. Kailani Memmer:Arraignment as to Isaac Fidel Martinez-Chavez (1) Count 1,2 held on 4/24/2024, Initial Appearance as to Isaac Fidel Martinez-Chavez held on 4/24/2024. Defendant remanded to Custody. (Interpreter: Javier Castillo) (FTR Operator: K.Saville)(kds) |
| 04/24/2024 | 8 | FTR Log Notes as to Isaac Fidel Martinez-Chavez for Arraignment in the Roanoke Division in CR4 held before Judge C. Kailani Memmer on 4/24/2024. In accordance with 28 USC 753(b), I certify that I monitored the digital recording of this proceeding and that it is a true and correct record, that it is sufficiently intelligible when played on the FTR (For the Record) Player, and that it can be transcribed without undue difficulty. FTR Operator: K.Saville (kds) |

JA003

| 04/24/2024 | 9 | CJA 23 Financial Affidavit as to Isaac Fidel Martinez-Chavez. (kds) |
|---|---|---|
| 04/24/2024 | 10 | ORAL ORDER APPOINTING FEDERAL PUBLIC DEFENDER as to Isaac Fidel Martinez-Chavez. Entered by Honorable C. Kailani Memmer on 4/24/2024. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.*(kds) |
| 04/24/2024 | 11 | ORAL ORDER as to Isaac Fidel Martinez-Chavez that pursuant to Federal Rule of Criminal Procedure 5(f) and the Due Process Protections Act, Pub. L. No. 116-182, 134 Stat. 894 (Oct. 21, 2020), the court ORDERS the United States to adhere to the disclosure obligations set forth in Brady v. Maryland, 373 U.S. 83(1963), and its progeny. Entered by Honorable C. Kailani Memmer on 4/24/2024. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.*(kds) |
| 04/24/2024 | 12 | ORDER as to Isaac Fidel Martinez-Chavez that pursuant to Federal Rule of Criminal Procedure 5(f) and the Due Process Protections Act, Pub. L. No. 116-182, 134 Stat. 894 (Oct. 21, 2020), the court ORDERS the United States to adhere to the disclosure obligations set forth in Brady v. Maryland, 373 U.S. 83(1963), and its progeny.. Signed by Honorable C. Kailani Memmer on 4/24/2024.(kds) |
| 04/24/2024 | 13 | NOTICE of Mandatory Notification of Consular Officer by Isaac Fidel Martinez-Chavez. (kds) |
| 04/24/2024 | 14 | ORDER OF TEMPORARY DETENTION as to Isaac Fidel Martinez-Chavez. Signed by Honorable C. Kailani Memmer on 4/24/2024.(kds) |
| 04/24/2024 | 15 | NOTICE OF HEARING as to Isaac Fidel Martinez-Chavez (CUSTODY) **(FTR)** (Schedule an Interpreter - Spanish) NOTICE TO COUNSEL This hearing has been set for one hour. If you think the hearing will take longer than one hour please contact the Courtroom Deputy as soon as possible. Detention Hearing set for 4/29/2024 12:30 PM in Roanoke before Honorable C. Kailani Memmer.(kds) |
| 04/26/2024 | 16 | First MOTION for Protective Order by USA as to Isaac Fidel Martinez-Chavez. Motions referred to Judge C. Kailani Memmer. (Attachments: # 1 Text of Proposed Order)(Vega, Juan) |
| 04/26/2024 | 17 | NOTICE OF HEARING as to Isaac Fidel Martinez-Chavez (CUSTODY) **(CR)** (Schedule an Interpreter - Spanish) Jury Trial set for 6/28/2024 at 9:00 AM in Roanoke before Judge Elizabeth K. Dillon. **Counsel must contact the Clerk's Office no later than five (5) business days before the scheduled trial date for your technology needs.**(kpa) |
| 04/29/2024 | 18 | Notice Rescheduling Hearing **(FTR)** previously set for 4/29/2024 at 12:30 pm before Judge Memmer in Roanoke as to Isaac Fidel Martinez-Chavez (CUSTODY). *(TIPS cancelled)* **(Reschedule an Interpreter.)** NOTICE TO COUNSEL This hearing has been set for one hour. If you think the hearing will take longer than one hour please contact the Courtroom Deputy as soon as possible. Detention Hearing set for 4/30/2024 03:00 PM in Roanoke before Honorable C. Kailani Memmer.(kds) |
| 04/29/2024 | 19 | **SEALED** Pretrial Bail Report as to Isaac Fidel Martinez-Chavez. (jlc) |
| 04/29/2024 | 20 | ORDER granting 16 Motion for Protective Order as to Isaac Fidel Martinez-Chavez (1). Signed by Honorable C. Kailani Memmer on 4/29/2024. (mlp) |
| 04/29/2024 | 28 | **Spanish** Interpreter *Javier Yamil Castillo - javier@castillols.com* appointed in case as to Isaac Fidel Martinez-Chavez. Interpreter Scheduled for 4/29/2024 03:00 PM. (slt) (Entered: 05/02/2024) |

| | | |
|---|---|---|
| 04/30/2024 | 21 | Minute Entry for proceedings held before Honorable C. Kailani Memmer:Bond Hearing as to Isaac Fidel Martinez-Chavez held on 4/30/2024. Defendant remanded to Custody. (Interpreter: Javier Castillo) (FTR Operator: K.Saville)(kds) (Entered: 05/01/2024) |
| 04/30/2024 | 22 | FTR Log Notes as to Isaac Fidel Martinez-Chavez for Detention Hearing in the Roanoke Division in CR4 held before Judge C. Kailani Memmer on 4/30/2024. In accordance with 28 USC 753(b), I certify that I monitored the digital recording of this proceeding and that it is a true and correct record, that it is sufficiently intelligible when played on the FTR (For the Record) Player, and that it can be transcribed without undue difficulty. FTR Operator: K.Saville (kds) (Entered: 05/01/2024) |
| 04/30/2024 | 23 | EXHIBIT LIST as to Isaac Fidel Martinez-Chavez. (Attachments: # 1 Exhibit Govt exhibit 1)(kds) (Entered: 05/01/2024) |
| 04/30/2024 | 24 | ORAL Motion for Detention by USA as to Isaac Fidel Martinez-Chavez. (kds) (Entered: 05/01/2024) |
| 04/30/2024 | 25 | ORAL ORDER granting 24 Motion for Detention as to Isaac Fidel Martinez-Chavez (1). Entered by Honorable C. Kailani Memmer on 4/30/2024. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.*(kds) (Entered: 05/01/2024) |
| 04/30/2024 | 26 | ORDER OF DETENTION PENDING TRIAL as to Isaac Fidel Martinez-Chavez. Signed by Honorable C. Kailani Memmer on 4/30/2024.(kds) (Entered: 05/01/2024) |
| 05/09/2024 | 29 | Pretrial Order as to Isaac Fidel Martinez-Chavez. Signed by Judge Elizabeth K. Dillon on 5/9/2024.(kpa) |
| 05/14/2024 | 30 | First MOTION to Continue-Ends of Justice for Jury Trial by Isaac Fidel Martinez-Chavez. (Diehl, Beatrice) |
| 05/14/2024 | 31 | TRANSCRIPT REQUEST (14 calendar days Service) by Isaac Fidel Martinez-Chavez for Detention Hearing held on **4/30/2024** reported by Court Reporter FTR before Judge C. Kailani Memmer. *Transcript Due Deadline will be set when Financial Arrangements are made.* (Diehl, Beatrice) |
| 05/15/2024 | 32 | **Financial arrangements made** (Original) (14 calendar days Service) re 31 Transcript Request, as to Isaac Fidel Martinez-Chavez **Transcript due by 5/29/2024.** (mb) |
| 05/20/2024 | 33 | TRANSCRIPT of Proceedings as to Isaac Fidel Martinez-Chavez for Bond Hearing held on **4/30/2024** before Judge Memmer. Court Reporter/Transcriber: Mary J. Butenschoen, Telephone number 540-857-5100 Ext 5312 **NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vawd.uscourts.gov** Transcript may be viewed at the court public terminal or purchased through Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER unless a Redacted Transcript has been filed. Redaction Request due 6/10/2024. Redacted Transcript Deadline set for 6/20/2024. Release of Transcript Restriction set for 8/19/2024. (mb) |
| 05/23/2024 | 34 | Notice Rescheduling Hearing **(CR)** previously set for 5/28/2024 at 9:00 AM before Judge Dillon in Roanoke as to Isaac Fidel Martinez-Chavez (CUSTODY). **(Reschedule an Interpreter.)** Jury Trial reset for 8/20/2024 - 8/21/2024 at 9:00 AM in Roanoke before Judge Elizabeth K. Dillon. **Counsel must contact the Clerk's Office no later than five (5) business days before the scheduled trial date for your technology needs.**(kpa) |

| | | |
|---|---|---|
| 05/29/2024 | 35 | ORDER granting 30 Motion to Continue-Ends of Justice for Jury Trial or Guilty Plea as to Isaac Fidel Martinez-Chavez (1). Signed by Judge Elizabeth K. Dillon on 5/29/2024. (kpa) |
| 07/17/2024 | 36 | NOTICE OF ATTORNEY APPEARANCE Matthew M. Miller appearing for USA. (Miller, Matthew) |
| 07/22/2024 | 37 | NOTICE *Regarding Forfeiture* by USA as to Isaac Fidel Martinez-Chavez (Miller, Matthew) |
| 07/30/2024 | 38 | Notice of Cancellation **(CR)** of Jury Trial as to Isaac Fidel Martinez-Chavez (CUSTODY) previously set for 8/20/2024 - 8/21/2024 at 9:00 AM before Judge Dillon in Roanoke *(Spanish cancelled)* (kpa) |
| 07/30/2024 | 39 | NOTICE OF HEARING as to Isaac Fidel Martinez-Chavez (CUSTODY) **(CR)** (Schedule an Interpreter - Spanish) NOTICE TO COUNSEL This hearing has been set for one hour. If you think the hearing will take longer than one hour please contact the Courtroom Deputy as soon as possible. Change of Plea Hearing set for 8/20/2024 at 10:00 AM in Roanoke before Chief District Judge Elizabeth K. Dillon.(kpa) |
| 08/01/2024 | 40 | **Spanish** Interpreter ***Manuel Prado - maprak@yahoo.com*** appointed in case as to Isaac Fidel Martinez-Chavez. Interpreter Scheduled for 8/20/2024 10:00 AM. (slt) |
| 08/20/2024 | 41 | Minute Entry for proceedings held before Chief District Judge Elizabeth K. Dillon: Court Hearing as to Isaac Fidel Martinez-Chavez held on 8/20/2024. Defendant remanded to Custody. (Interpreter: Manuel Prado) (Court Reporter: Judy Webb) (kpa) |
| 08/20/2024 | 42 | NOTICE OF HEARING as to Isaac Fidel Martinez-Chavez (CUSTODY) **(CR)** (Schedule an Interpreter - Spanish) Jury Trial set for 1/22/2025 - 1/24/2025 at 9:00 AM in Roanoke before Chief District Judge Elizabeth K. Dillon. **Counsel must contact the Clerk's Office no later than five (5) business days before the scheduled trial date for your technology needs.**(kpa) |
| 08/22/2024 | 43 | ORDER TO CONTINUE - Ends of Justice as to Isaac Fidel Martinez-Chavez Time excluded from 8/20/2024 until 1/22/2025. Signed by Chief District Judge Elizabeth K. Dillon on 8/22/2024.(kpa) |
| 10/28/2024 | 44 | NOTICE *Intent to Introduce Cooke Towing Business Record* by USA as to Isaac Fidel Martinez-Chavez (Vega, Juan) |
| 10/28/2024 | 45 | NOTICE *Intent to Use 404(b) Evidence* by USA as to Isaac Fidel Martinez-Chavez (Vega, Juan) |
| 10/28/2024 | 46 | NOTICE *Intent to Introduce Firearms Experts Testimony* by USA as to Isaac Fidel Martinez-Chavez (Vega, Juan) |
| 10/30/2024 | 47 | NOTICE OF ATTORNEY APPEARANCE: Heidi Bohn appearing for Isaac Fidel Martinez-Chavez(Bohn, Heidi) |
| 11/06/2024 | 48 | NOTICE *Intent to introduce DMV records* by USA as to Isaac Fidel Martinez-Chavez (Vega, Juan) |
| 11/07/2024 | 49 | SUPERSEDING INDICTMENT as to Isaac Fidel Martinez-Chavez (1) counts 1s, 2s. (kpa) |
| 11/07/2024 | 50 | Sealed Document - Unredacted Superseding Indictment (Attachments: # 1 Criminal Cover Sheet)(kpa) |
| 11/13/2024 | 51 | TRANSCRIPT REQUEST (Ordinary-30 calendar days Service) by USA as to Isaac Fidel Martinez-Chavez for Guilty Plea Hearing held on **August 20, 2024** reported by Court |

| | | |
|---|---|---|
| | | Reporter Judy Webb before Judge Elizabeth K. Dillon. *Transcript Due Deadline will be set when Financial Arrangements are made.* (Vega, Juan) |
| 11/15/2024 | 52 | NOTICE OF HEARING as to Isaac Fidel Martinez-Chavez (CUSTODY) **(FTR)** (Schedule an Interpreter - Spanish) NOTICE TO COUNSEL This hearing has been set for one hour. If you think the hearing will take longer than one hour please contact the Courtroom Deputy as soon as possible. Arraignment set for 12/2/2024 02:00 PM in Roanoke before Magistrate Judge C. Kailani Memmer.(kds) |
| 12/02/2024 | 53 | Minute Entry for proceedings held before Magistrate Judge C. Kailani Memmer:Arraignment as to Isaac Fidel Martinez-Chavez (1) Count 1s,2s held on 12/2/2024 Defendant remanded to Custody. (Interpreter: Javier Castillo) (FTR Operator: K.Saville)(kds) |
| 12/02/2024 | 54 | FTR Log Notes as to Isaac Fidel Martinez-Chavez for Arraignment in the Roanoke Division in CR4 held before Judge C. Kailani Memmer on 12/2/2024. In accordance with 28 USC 753(b), I certify that I monitored the digital recording of this proceeding and that it is a true and correct record, that it is sufficiently intelligible when played on the FTR (For the Record) Player, and that it can be transcribed without undue difficulty. FTR Operator: K.Saville (kds) |
| 12/02/2024 | 56 | **Financial arrangements made** (Original) (Ordinary-30 calendar days Service) re 51 Transcript Request, as to Isaac Fidel Martinez-Chavez **Transcript due by 12/13/2024.** Information provided by J. Webb, Retire OCR. (slt) (Entered: 12/06/2024) |
| 12/05/2024 | 55 | NOTICE *of intent to introduce NFRTR records* by USA as to Isaac Fidel Martinez-Chavez (Vega, Juan) |
| 12/13/2024 | 57 | MOTION to Dismiss *Count One of The Indictment* by Isaac Fidel Martinez-Chavez. (Attachments: # 1 Text of Proposed Order, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit)(Diehl, Beatrice) Modified on 12/17/2024 Sealed attachments as to DE 63 granting to seal exhibits (kds). |
| 12/13/2024 | 58 | MOTION to Seal by Isaac Fidel Martinez-Chavez. Motions referred to Judge C. Kailani Memmer. (Diehl, Beatrice) |
| 12/13/2024 | 59 | MOTION to Suppress by Isaac Fidel Martinez-Chavez. (Attachments: # 1 Text of Proposed Order, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit)(Diehl, Beatrice) |
| 12/16/2024 | 60 | First MOTION for Extension of Time to File Response/Reply *to Defense suppression and Bruen motions* by USA as to Isaac Fidel Martinez-Chavez. (Vega, Juan) Modified on 12/16/2024 Removed referral language (kpa). |
| 12/16/2024 | 61 | ORDER granting 60 Motion for Extension of Time to File Response/Reply as to Isaac Fidel Martinez-Chavez (1). Signed by Chief District Judge Elizabeth K. Dillon on 12/16/2024. (kpa) |
| 12/16/2024 | 62 | Motion to Play Video During Jury instructions on Unconscious Bias by Isaac Fidel Martinez-Chavez (Diehl, Beatrice) Modified on 12/27/2024 Docket text was modified to reflect the correct docket entry (kpa). |
| 12/16/2024 | 63 | ORDER granting 58 Motion to Seal as to Isaac Fidel Martinez-Chavez (1). Signed by Magistrate Judge C. Kailani Memmer on 12/16/2024. (kds) (Entered: 12/17/2024) |
| 12/16/2024 | 64 | TRANSCRIPT of Proceedings as to Isaac Fidel Martinez-Chavez for Court Hearing held on **8/20/2024** before Judge Elizabeth K. Dillon. Court Reporter/Transcriber: Judy Webb, Retired OCR, Telephone number 540-520-3632 **NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) calendar days to file with the Court a** |

| | | |
|---|---|---|
| | | **Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vawd.uscourts.gov** Transcript may be viewed at the court public terminal or purchased through Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER unless a Redacted Transcript has been filed. Redaction Request due 1/6/2025. Redacted Transcript Deadline set for 1/16/2025. Release of Transcript Restriction set for 3/17/2025. (slt) (Entered: 12/17/2024) |
| 12/17/2024 | 65 | NOTICE *of intent to use 404(b) evidence (chemical analysis report)* by USA as to Isaac Fidel Martinez-Chavez (Vega, Juan) |
| 12/17/2024 | 66 | First MOTION for Speedy Trial *Tolling* by USA as to Isaac Fidel Martinez-Chavez. (Vega, Juan) |
| 12/18/2024 | 67 | First RESPONSE to Motion by Isaac Fidel Martinez-Chavez re 66 First MOTION for Speedy Trial *Tolling* (Diehl, Beatrice) |
| 12/19/2024 | 68 | First MOTION in Limine *Exclude 404b Evidence* by Isaac Fidel Martinez-Chavez. (Attachments: # 1 Exhibit)(Diehl, Beatrice) |
| 12/19/2024 | 69 | TRANSCRIPT REQUEST (14 calendar days Service) by Isaac Fidel Martinez-Chavez for Change of Plea Hearing held on **08/20/2024** reported by Court Reporter Judy Webb before Judge Elizabeth K. Dillon. *Transcript Due Deadline will be set when Financial Arrangements are made.* (Bohn, Heidi) |
| 12/23/2024 | 70 | ORAL ORDER Referring 59 Motion to Suppress as to Isaac Fidel Martinez-Chavez (1) to Senior Judge Michael F. Urbanski. Entered by Chief District Judge Elizabeth K. Dillon on December 23, 2024. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.*(mc) |
| 12/23/2024 | 71 | NOTICE OF HEARING ON MOTION 59 MOTION to Suppress in case as to Isaac Fidel Martinez-Chavez (CUSTODY) **(CR)** **(Schedule an Interpreter - Spanish)** NOTICE TO COUNSEL This hearing has been set for one hour. If you think the hearing will take longer than one hour please contact the Courtroom Deputy as soon as possible. Motion Hearing set for 1/3/2025 11:30 AM in Roanoke before Senior Judge Michael F. Urbanski. (mka) |
| 12/23/2024 | 72 | MOTION *for Adverse Jury Instruction or Other Relief for Spoliation of Evidence* by Isaac Fidel Martinez-Chavez. Motions referred to Judge C. Kailani Memmer. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit)(Bohn, Heidi) Modified to remove referral language on 12/23/2024 (mlp). |
| 12/27/2024 | 73 | First RESPONSE in Opposition by USA as to Isaac Fidel Martinez-Chavez re 57 MOTION to Dismiss *Count One of The Indictment* (Vega, Juan) |
| 12/27/2024 | 74 | First RESPONSE in Opposition by USA as to Isaac Fidel Martinez-Chavez re 68 First MOTION in Limine *Exclude 404b Evidence* (Attachments: # 1 Exhibit DMV record, # 2 Exhibit MCSO police report, # 3 Exhibit Chemical analysis report)(Vega, Juan) Modified on 12/27/2024 Exhibits 1 and 2 were replaced with redacted versions (kpa). |
| 12/27/2024 | 75 | First RESPONSE in Opposition by USA as to Isaac Fidel Martinez-Chavez re 59 MOTION to Suppress (Attachments: # 1 Exhibit Lt Hylton police report, # 2 Exhibit Poulin, Gardner, Johnson reports, # 3 Exhibit Hylton interview, # 4 Exhibit Poulin interview, # 5 Exhibit DEA lab report, # 6 Exhibit Traffic enforcement-control policy, # 7 Exhibit Defendant's DMV record, # 8 Exhibit Photograph of firearms)(Vega, Juan) Modified on 12/27/2024 Exhibits 1, 2, and 7 were replaced with redacted versions (kpa). |

| | | |
|---|---|---|
| 12/27/2024 | 76 | NOTICE *(supplemental notice) of intent to introduce expert testimony regarding firearm* by USA as to Isaac Fidel Martinez-Chavez (Vega, Juan) |
| 12/27/2024 | 77 | First RESPONSE in Opposition by USA as to Isaac Fidel Martinez-Chavez re 62 MOTION (Vega, Juan) |
| 12/27/2024 | 78 | **Spanish** Interpreter *Peter Floyd - peterfloyd.nc@gmail.com* appointed in case as to Isaac Fidel Martinez-Chavez. Interpreter Scheduled for 1/3/2025 11:30 AM. (slt) |
| 12/27/2024 | 79 | MEMORANDUM OPINION AND ORDER Defendants Motion to Dismiss Count One of the [Superseding] Indictment (Dkt. No.57) is DENIED. The United States Motion to Toll the Speedy Trial in Order to Litigate Pending Motions (Dkt. No. 66) is DENIED AS MOOT. The jury trial is scheduled to begin on January 22, 2025, and will proceed as planned. Signed by Chief District Judge Elizabeth K. Dillon on 12/27/2024. (mlp) |
| 12/30/2024 | 80 | First Response , RESPONSE in Opposition by USA as to Isaac Fidel Martinez-Chavez re 72 MOTION *for Adverse Jury Instruction or Other Relief for Spoliation of Evidence* (Attachments: # 1 Exhibit Hylton police report, # 2 Exhibit Poulin, Gardner, Johnson reports, # 3 Exhibit Hylton interview, # 4 Exhibit Chemical analysis report, # 5 Exhibit Franklin Co charges, # 6 Exhibit Defense request for dispatch recordings, # 7 Exhibit Defendant's admission about firearms)(Vega, Juan) |
| 01/02/2025 | 81 | REPLY TO RESPONSE to Motion by Isaac Fidel Martinez-Chavez re 59 MOTION to Suppress (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit)(Bohn, Heidi) |
| 01/03/2025 | 82 | Minute Entry for proceedings held before Senior Judge Michael F. Urbanski:Motion Hearing as to Isaac Fidel Martinez-Chavez held on 1/3/2025 re 59 MOTION to Suppress filed by Isaac Fidel Martinez-Chavez Defendant remanded to Custody. (Interpreter: Peter Floyd, sworn and used) (Court Reporter: Mary Butenschoen) (mka) |
| 01/03/2025 | 83 | EXHIBIT LIST as to Isaac Fidel Martinez-Chavez (Attachments: # 1 D1)(mka) (Main Document 83 replaced on 1/13/2025 with corrected formatting) (mka). |
| 01/06/2025 | 84 | NOTICE OF HEARING as to Isaac Fidel Martinez-Chavez (CUSTODY) **(CR)** (Schedule an Interpreter - Spanish) NOTICE TO COUNSEL This hearing has been set for one hour. If you think the hearing will take longer than one hour please contact the Courtroom Deputy as soon as possible. Pretrial Conference set for 1/10/2025 at 12:00 PM in via Zoom before Chief District Judge Elizabeth K. Dillon.(kpa) |
| 01/06/2025 | 85 | TRANSCRIPT REQUEST (3 Day Service) by USA as to Isaac Fidel Martinez-Chavez for Motion Hearing held on **January 3, 2025** reported by Court Reporter Mary Butenschoen before Judge Michael F. Urbanski. *Transcript Due Deadline will be set when Financial Arrangements are made.* (Miller, Matthew) |
| 01/06/2025 | 86 | **Spanish** Interpreter *Luis Del Rio - intospanish@gmail.com* appointed in case as to Isaac Fidel Martinez-Chavez. Interpreter Scheduled for 1/10/2025 12:00 PM via ZOOM. (slt) |
| 01/06/2025 | 87 | NOTICE OF HEARING as to Isaac Fidel Martinez-Chavez (CUSTODY) **(CR)** (Schedule an Interpreter - Spanish) NOTICE TO COUNSEL This hearing has been set for one hour. If you think the hearing will take longer than one hour please contact the Courtroom Deputy as soon as possible. (Click on this link for guidance for participation via Zoom and Click on this link for instructions on how to listen to public hearings) Pretrial Conference set for 1/14/2025 at 12:00 PM via Zoom before Chief District Judge Elizabeth K. Dillon.(kpa) |
| 01/06/2025 | 88 | **Financial arrangements made** (Original) (3 Days Service) re 85 Transcript Request, as to Isaac Fidel Martinez-Chavez **Transcript due by 1/9/2025.** (mb) |

| 01/07/2025 | 89 | **Spanish** Interpreter *Manuela Crisp <crisp.interpreting@verizon.net>* appointed in case as to Isaac Fidel Martinez-Chavez. Interpreter Scheduled for 1/14/2025 12:00 PM. (slt) |
|---|---|---|
| 01/08/2025 | 90 | Notice Rescheduling Hearing **(CR)** previously set for 1/10/2025 at 12:00 PM before Judge Dillon via zoom as to Isaac Fidel Martinez-Chavez (CUSTODY). **(Reschedule an Interpreter.)** Pretrial Conference reset for **1/10/2025 at 12:00 PM in Roanoke** before Chief District Judge Elizabeth K. Dillon. CHANGE IN LOCATION ONLY. Date and time remain the same (kpa) |
| 01/09/2025 | 91 | ORDER denying 59 Motion to Suppress as to Isaac Fidel Martinez-Chavez (1). Signed by Senior Judge Michael F. Urbanski on 1/6/25. (smw) |
| 01/09/2025 | 92 | **Spanish** Interpreter *Luis Del Rio - intospanish@gmail.com* appointed in case as to Isaac Fidel Martinez-Chavez. Interpreter Re-Scheduled for 1/10/2025 12:00 PM in Roanoke. (slt) |
| 01/09/2025 | 93 | TRANSCRIPT of Proceedings as to Isaac Fidel Martinez-Chavez for Motion Hearing - (Excerpt to include testimony and Court's Ruling) held on **01/03/2025** before Judge Urbanski. Court Reporter/Transcriber: Mary J. Butenschoen, Telephone number 540-857-5100 Ext 5312 **NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vawd.uscourts.gov** Transcript may be viewed at the court public terminal or purchased through Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER unless a Redacted Transcript has been filed. Redaction Request due 1/30/2025. Redacted Transcript Deadline set for 2/10/2025. Release of Transcript Restriction set for 4/9/2025. (mb) |
| 01/10/2025 | 94 | **Spanish** Interpreter *Maria Teresa Roman-Torres - Teresa.Roman@gmail.com* appointed in case as to Isaac Fidel Martinez-Chavez. Interpreter Scheduled for (JT) 1/22/2025-1/24/2025 09:00 AM. (slt) |
| 01/10/2025 | 95 | **Spanish** Interpreter *Katherine Raftopoulos <neongoulart@gmail.com>* appointed in case as to Isaac Fidel Martinez-Chavez. Interpreter Scheduled for (JT) 1/22/2025-1/24/2025 09:00 AM. (slt) |
| 01/10/2025 | 96 | NOTICE *Of Intent to Introduce Spanish-Language Expert Testimony* by USA as to Isaac Fidel Martinez-Chavez (Vega, Juan) |
| 01/10/2025 | 97 | Minute Order for proceedings held before Chief District Judge Elizabeth K. Dillon: denying 62 Defendant's Motion to Play Video During Jury Instructions of Unconscious Bias; finding as moot in part as to the license plate and denying without prejudice in part as to the chemical analysis report 68 Defendant's First Motion in Limine to Exclude 404b Evidence. Pretrial Conference as to Isaac Fidel Martinez-Chavez held on 1/10/2025. Defendant remanded to Custody. (Interpreter: Luis Del Rio) (Court Reporter: Mary Butenschoen) (kpa) |
| 01/10/2025 | 98 | Notice of Cancellation **(CR)** of Pretrial Conference Hearing as to Isaac Fidel Martinez-Chavez (CUSTODY) previously set for 1/14/2025 at 12:00 PM before Judge Dillon via zoom. (kpa) |
| 01/13/2025 | 99 | TRIAL ORDER as to Isaac Fidel Martinez-Chavez. Signed by Chief District Judge Elizabeth K. Dillon on 1/13/2025.(mlp) (Additional attachment(s) added on 1/13/2025: # 1 Exhibit : Instructions for Box.com) (mlp). |

| 01/14/2025 | 100 | MEMORANDUM OPINION re 59 Motion to Suppress. Signed by Senior Judge Michael F. Urbanski on 1/13/25.(smw) Modified docket text on 1/15/24. |
|---|---|---|
| 01/15/2025 | 101 | Proposed Jury Instructions by USA as to Isaac Fidel Martinez-Chavez (Attachments: # 1 Unredacted Jury Verdict verdict form, # 2 stipulation (felon), # 3 stipulation (firearms)) (Vega, Juan) |
| 01/15/2025 | 102 | Proposed Jury Instructions by Isaac Fidel Martinez-Chavez (Diehl, Beatrice) |
| 01/15/2025 | 103 | **Maria Teresa Roman-Torres - Teresa.Roman@gmail.com** (JT) 1/22/2025-1/24/2025 09:00 AM *CANCELLED* in case as to Isaac Fidel Martinez-Chavez. (slt) |
| 01/15/2025 | 104 | **Spanish** Interpreter *Maria Salazar-Espiridion <msalazar_espiridion@languagedion.com>* appointed in case as to Isaac Fidel Martinez-Chavez. Interpreter Scheduled for (JT) 1/22/2025-1/24/2025 09:00 AM. (slt) Modified on 1/15/2025-Corrected spelling of interpreter's name. (slt). Modified on 1/17/2025-Corrected spelling of interpreter's last name in docket text.(slt). |
| 01/16/2025 | 105 | NOTICE *of Intent to Introduce CFS Report* by Isaac Fidel Martinez-Chavez (Diehl, Beatrice) |
| 01/16/2025 | 106 | Objections by Plaintiff USA re 102 Proposed Jury Instructions by Isaac Fidel Martinez-Chavez (Diehl, Beatrice) (Attachments: # 1 Exhibit)(Vega, Juan) |
| 01/16/2025 | 107 | APPLICATION for Writ of HABEAS CORPUS AD TESTIFICANDUM as to Isaac Fidel Martinez-Chavez (Attachments: # 1 Text of Proposed Order, # 2 Summons Issued)(Diehl, Beatrice) Modified on 1/17/2025 to restrict documents due to containing personal identifiers (rb). |
| 01/16/2025 | 108 | MOTION in Limine *Exclude Expert Testimony* by Isaac Fidel Martinez-Chavez. (Diehl, Beatrice) |
| 01/17/2025 | 109 | MEMORANDUM OPINION AND ORDER denying 72 Motion as to Isaac Fidel Martinez-Chavez (1). Signed by Chief District Judge Elizabeth K. Dillon on 1/17/25. (smw) Modified on 1/21/2025 to add "MEMORANDUM OPINION" to docket text (smw). |
| 01/17/2025 | 110 | Amended Petition for Writ of Habeas Corpus ad testificandum by Isaac Fidel Martinez-Chavez. (Attachments: # 1 Proposed Order, # 2 Proposed Summons)(kpa) |
| 01/17/2025 | 111 | ORDER granting 110 Motion for Writ of Habeas Corpus ad testificandum (USMS to provide copy to facility) as to Isaac Fidel Martinez-Chavez (1). Signed by Chief District Judge Elizabeth K. Dillon on 1/17/2025. (Attachments: # 1 Unredacted Order) (kpa) |
| 01/17/2025 | 112 | Objections by Defendant Isaac Fidel Martinez-Chavez re 101 Proposed Jury Instructions by USA as to Isaac Fidel Martinez-Chavez (Attachments: # 1 Unredacted Jury Verdict verdict form, # 2 stipulation (felon), # 3 stipulation (firearms))(Vega, Juan) (Diehl, Beatrice) |
| 01/21/2025 | 113 | First RESPONSE in Opposition by USA as to Isaac Fidel Martinez-Chavez re 108 MOTION in Limine *Exclude Expert Testimony (Spanish-language expert)* (Vega, Juan) |
| 01/22/2025 | 114 | Minute Entry for proceedings held before Chief District Judge Elizabeth K. Dillon: Jury Trial Day 1 as to Isaac Fidel Martinez-Chavez held on 1/22/2025. Defendant remanded to Custody. (Interpreter: Katherine Raftopoulos, Mara Salazar-Espiridon)(Court Reporter: Mary Butenschoen) (kpa) |
| 01/23/2025 | 116 | Minute Entry for proceedings held before Chief District Judge Elizabeth K. Dillon: Jury Trial Day 2 as to Isaac Fidel Martinez-Chavez held on 1/23/2025 Defendant remanded to |

| | | |
|---|---|---|
| | | Custody. (Interpreter: Katherine Raftopoulos, Mara Salazar-Espiridon, Mercedes Avalos) (Court Reporter: Mary Butenschoen) (kpa) |
| 01/24/2025 | 117 | Minute Entry for proceedings held before Chief District Judge Elizabeth K. Dillon: Jury Trial Day 3 as to Isaac Fidel Martinez-Chavez held on 1/24/2025. Defendant remanded to Custody. (Interpreter: Katherine Raftopoulos, Mercedes Avalos) (Court Reporter: Mary Butenschoen) (kpa) |
| 01/24/2025 | 118 | EXHIBIT LIST Jury Trial 1/22/2025 - 1/24/2025 as to Isaac Fidel Martinez-Chavez. NOTE: Some exhibits are not available for viewing online (Attachments: # 1 Gov Exhibit 1c, # 2 Gov Exhibit 2, # 3 Gov Exhibit 3, # 4 Gov Exhibit 4, # 5 Gov Exhibit 5a, # 6 Gov Exhibit 5c, # 7 Gov Exhibit 7, # 8 Gov Exhibit 8, # 9 Gov Exhibit10, # 10 Gov Exhibit 13, # 11 Gov Exhibit 14, # 12 Gov Exhibit 15, # 13 Gov Exhibit 16, # 14 Gov Exhibit 17, # 15 Gov Exhibit 20, # 16 Gov Exhibit 30, # 17 Gov Exhibit 32, # 18 Gov Exhibit 33, # 19 Def Exhibit 4, # 20 Def Exhibit 5, # 21 Def Exhibit 8, # 22 Def Exhibit 9, # 23 Def Exhibit 10, # 24 Def Exhibit 11, # 25 Def Exhibit 14, # 26 Def Exhibit 15)(kpa) |
| 01/24/2025 | 119 | ORAL Oral Order directing the clerk to provide meals to deliberating jurors as to Isaac Fidel Martinez-Chavez. Entered by Chief District Judge Elizabeth K. Dillon on 1/24/2025. *This Notice of Electronic Filing is the Official ORDER for this entry. No document is attached.*(kpa) |
| 01/24/2025 | 120 | Return of Exhibits to Government as to Isaac Fidel Martinez-Chavez (kpa) |
| 01/24/2025 | 121 | Return of Exhibits to Defendant as to Isaac Fidel Martinez-Chavez (kpa) |
| 01/24/2025 | 123 | Jury Questions as to Isaac Fidel Martinez-Chavez (kpa) |
| 01/24/2025 | 124 | Jury Instructions as to Isaac Fidel Martinez-Chavez (kpa) |
| 01/24/2025 | 125 | Jury Verdict as to Isaac Fidel Martinez-Chavez (1) Guilty on Counts 1s,2s. (Attachments: # 1 Unredacted Jury Verdict)(kpa) |
| 02/20/2025 | 126 | NOTICE OF HEARING as to Isaac Fidel Martinez-Chavez (CUSTODY) **(CR)** (Schedule an Interpreter - Spanish) NOTICE TO COUNSEL This hearing has been set for one hour. If you think the hearing will take longer than one hour please contact the Courtroom Deputy as soon as possible. Sentencing set for **5/21/2025 at 1:00 PM** in Roanoke before Chief District Judge Elizabeth K. Dillon.(kpa) |
| 02/20/2025 | 127 | Judge Dillon Sentencing Scheduling Order as to Isaac Fidel Martinez-Chavez. Signed by Chief District Judge Elizabeth K. Dillon on 2/20/2025. (kpa). Modified on 2/20/2025 Replaced order with file stamped copy (kpa). |
| 03/03/2025 | 128 | TRANSCRIPT REQUEST (Ordinary-30 calendar days Service) by USA as to Isaac Fidel Martinez-Chavez for Witness Testimony from Jury Trial held on **January 23, 2025** reported by Court Reporter Mary Butenschoen before Judge Elizabeth Dillon. *Transcript Due Deadline will be set when Financial Arrangements are made.* (Vega, Juan) |
| 03/03/2025 | 129 | **Financial arrangements made** (Original) (Ordinary-30 calendar days Service) re 128 Transcript Request, as to Isaac Fidel Martinez-Chavez **Transcript due by 4/2/2025.** (mb) |
| 03/24/2025 | 130 | PRELIMINARY ORDER OF FORFEITURE as to Isaac Fidel Martinez-Chavez.Signed by Chief District Judge Elizabeth K. Dillon on 3/24/25.(smw) |
| 03/25/2025 | 131 | TRANSCRIPT of Proceedings as to Isaac Fidel Martinez-Chavez for Excerpt from Day 2 of Jury Trial - Testimony of Olman Said Vallejos Fugon - held on **1/23/2025** before Judge Dillon. Court Reporter/Transcriber: Mary Butenschoen, Telephone number 540-857-5100 Ext 5312 **NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of** |

| | | |
|---|---|---|
| | | this transcript. **If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vawd.uscourts.gov** Transcript may be viewed at the court public terminal or purchased through Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER unless a Redacted Transcript has been filed. Redaction Request due 4/15/2025. Redacted Transcript Deadline set for 4/25/2025. Release of Transcript Restriction set for 6/23/2025. (mb) |
| 04/16/2025 | 132 | **SEALED** PRESENTENCE INVESTIGATION REPORT - **INITIAL** as to Isaac Fidel Martinez-Chavez. The parties shall docket any initial objections or corrections to the Presentence Investigation Report by 04/30/2025. (jb) |
| 04/30/2025 | 133 | **SEALED** *Government* Objections to PSR - Notice to Probation and Opposing Counsel only as to Isaac Fidel Martinez-Chavez. (Attachments: # 1 Exhibit ROI Vallejos interview, # 2 Exhibit FPD Vallejos interview)(Vega, Juan) |
| 04/30/2025 | 134 | **SEALED** Objections to PSR re 132 - Notice to Probation and Opposing Counsel only as to Isaac Fidel Martinez-Chavez. (Diehl, Beatrice) |
| 05/08/2025 | 135 | **Spanish** Interpreter *Javier Yamil Castillo - javier@castillols.com* appointed in case as to Isaac Fidel Martinez-Chavez. Interpreter Scheduled for 5/21/2025 01:00 PM. (slt) |
| 05/13/2025 | 136 | **SEALED** PRESENTENCE INVESTIGATION REPORT - **REVISED FINAL** re 132 SEALED PSR - Initial, 133 SEALED Objections to PSR - Notice to Probation and Opposing Counsel Only, 134 SEALED Objections to PSR - Notice to Probation and Opposing Counsel Only as to Isaac Fidel Martinez-Chavez. (jB) |
| 05/14/2025 | 137 | SENTENCING MEMORANDUM by USA as to Isaac Fidel Martinez-Chavez (Vega, Juan) |
| 05/14/2025 | 138 | SENTENCING MEMORANDUM by Isaac Fidel Martinez-Chavez (Attachments: # 1 Exhibit, # 2 Exhibit)(Diehl, Beatrice) |
| 05/21/2025 | 139 | Minute Entry for proceedings held before Chief Judge Elizabeth K. Dillon: Sentencing held on 5/21/2025 for Isaac Fidel Martinez-Chavez (1), Counts 1s, 2s, CBOP:59 months as to each of counts 1s and 2s, to be served concurrently; SR: 3 years as to each of counts 1s and 2s, to be served concurrently; SA: $200 ($100 each count); FINE: $100 ($50 each count)CBOP:59 months as to each of counts 1s and 2s, to be served concurrently; SR: 3 years as to each of counts 1s and 2s, to be served concurrently; SA: $200 ($100 each count); FINE: $100 ($50 each count); Counts 1, 2, Superseding Indictment Filed. Defendant remanded to Custody. (Interpreter: Javier Castillo) (Court Reporter: Frank Austin) (kpa) Modified on 5/23/2025 Docket text was modified to correct disposition on counts 1 and 2 (kpa). (Entered: 05/22/2025) |
| 05/21/2025 | 140 | EXHIBIT LIST 5/21/2025 Hearing as to Isaac Fidel Martinez-Chavez (Attachments: # 1 Def Exhibit 1)(kpa) (Entered: 05/22/2025) |
| 05/23/2025 | 141 | **SEALED** PRESENTENCE INVESTIGATION REPORT - **FINAL AMENDED** re 132 SEALED PSR - Initial, 133 SEALED Objections & Responses to Objections to PSR, 136 SEALED PSR - Revised Final, 134 SEALED Objections & Responses to Objections to PSR as to Isaac Fidel Martinez-Chavez. (jb) |
| 05/28/2025 | 142 | JUDGMENT as to Isaac Fidel Martinez-Chavez (1), Counts 1s, 2s, CBOP: 59 months as to each of counts 1s and 2s, to be served concurrently; SR: 3 years as to each of counts 1s and 2s, to be served concurrently; SA: $200 ($100 each count); FINE: $100 ($50 each count); Counts 1, 2, Superseding Indictment Filed. Signed by Chief Judge Elizabeth K. Dillon on 5/28/2025.(kpa) |

| | | |
|---|---|---|
| 06/02/2025 | 143 | NOTICE OF APPEAL - Final Judgment to 4CCA by Isaac Fidel Martinez-Chavez re 142 Judgment, (Diehl, Beatrice) |
| 06/03/2025 | 144 | Transmittal of Notice of Appeal as to Isaac Fidel Martinez-Chavez to 4CCA re 143 Notice of Appeal - Final Judgment to 4CCA<br>NOTE: The Docketing Statement and Transcript Order Form are available on the 4th Circuit Court of Appeals website at www.ca4.uscourts.gov. If CJA24 forms(s) are applicable, you must submit a separate Auth-24 for each court reporter from whom you wish to order a transcript through the District Court's eVoucher system. (bsm) |
| 06/04/2025 | 145 | USCA Notice of Appellate Case Opening as to Isaac Fidel Martinez-Chavez re 143 Notice of Appeal - Final Judgment to 4CCA filed by Isaac Fidel Martinez-Chavez. **USCA Case Number 25-4318**. Case Manager: Jeffrey S. Neal. (smw) |
| 06/04/2025 | 146 | USCA Order Appointing *Federal Defender for the Western District of Virginia* counsel in 4CCA as to Isaac Fidel Martinez-Chavez re 143 Notice of Appeal - Final Judgment to 4CCA filed by Isaac Fidel Martinez-Chavez. (smw) |
| 06/18/2025 | 147 | USCA Appeal Transcript Order Acknowledgment as to Isaac Fidel Martinez-Chavez re 117 Jury Trial, 116 Jury Trial, 82 Motion Hearing, 114 Jury Trial, 97 Order on Motion for Miscellaneous Relief, Order on Motion in Limine, Pretrial Conference, 143 Notice of Appeal - Final Judgment to 4CCA. Court Reporter: Mary Butenschoen. **Appeal Transcript due by 7/25/2025.** (slt) |
| 06/18/2025 | 148 | USCA Appeal Transcript Order Acknowledgment as to Isaac Fidel Martinez-Chavez re 139 Sentencing, 143 Notice of Appeal - Final Judgment to 4CCA. Court Reporter: Frank Austin. **Appeal Transcript due by 7/25/2025.** (slt) |
| 07/22/2025 | 149 | Appeal Transcript filed as to Isaac Fidel Martinez-Chavez for Sentencing for dates of **05/21/2025** before Judge Elizabeth Dillon, re 148 USCA Appeal Transcript Order Acknowledgment, Court Reporter/Transcriber: Frank R Austin, Telephone number 540.926.0092. NOTICE RE REDACTION OF TRANSCRIPTS:The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vawd.uscourts.gov *Does this satisfy all appellate orders for this reporter? Yes* **Transcript may be viewed at the court public terminal or purchased through Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER unless a Redacted Transcript has been filed. Redaction Request due 8/12/2025. Redacted Transcript Deadline set for 8/22/2025. Release of Transcript Restriction set for 10/20/2025.** (fra) |
| 07/24/2025 | 150 | Appeal Transcript filed as to Isaac Fidel Martinez-Chavez for Motion Hearing (Excerpt 2) for dates of **1/03/2025** before Judge Urbanski, re 147 USCA Appeal Transcript Order Acknowledgment, NOTICE RE REDACTION OF TRANSCRIPTS:The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vawd.uscourts.gov *Does this satisfy all appellate orders for this reporter? No* **Transcript may be viewed at the court public terminal or purchased through Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER unless a Redacted Transcript has been filed. Redaction Request due 8/14/2025. Redacted Transcript Deadline set for 8/25/2025. Release of Transcript Restriction set for 10/22/2025.** (mb) |

| 07/24/2025 | 151 | Appeal Transcript filed as to Isaac Fidel Martinez-Chavez for Pretrial Conference and Motions Hearing for dates of **1/10/2025** before Judge Dillon, re 147 USCA Appeal Transcript Order Acknowledgment, **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vawd.uscourts.gov** *Does this satisfy all appellate orders for this reporter? No* **Transcript may be viewed at the court public terminal or purchased through Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER unless a Redacted Transcript has been filed. Redaction Request due 8/14/2025. Redacted Transcript Deadline set for 8/25/2025. Release of Transcript Restriction set for 10/22/2025. (mb)** |
|---|---|---|
| 07/24/2025 | 152 | Appeal Transcript filed as to Isaac Fidel Martinez-Chavez for Day 1 of Jury Trial for dates of **1/22/2025** before Judge Dillon, re 147 USCA Appeal Transcript Order Acknowledgment, **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vawd.uscourts.gov** *Does this satisfy all appellate orders for this reporter? No* **Transcript may be viewed at the court public terminal or purchased through Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER unless a Redacted Transcript has been filed. Redaction Request due 8/14/2025. Redacted Transcript Deadline set for 8/25/2025. Release of Transcript Restriction set for 10/22/2025. (mb)** |
| 07/24/2025 | 153 | Appeal Transcript filed as to Isaac Fidel Martinez-Chavez for Day 2 of Jury Trial for dates of **1/23/2025** before Judge Dillon, re 147 USCA Appeal Transcript Order Acknowledgment, **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vawd.uscourts.gov** *Does this satisfy all appellate orders for this reporter? No* **Transcript may be viewed at the court public terminal or purchased through Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER unless a Redacted Transcript has been filed. Redaction Request due 8/14/2025. Redacted Transcript Deadline set for 8/25/2025. Release of Transcript Restriction set for 10/22/2025. (mb)** |
| 07/24/2025 | 154 | Appeal Transcript filed as to Isaac Fidel Martinez-Chavez for Day 3 of Jury Trial for dates of **1/24/2025** before Judge Dillon, re 147 USCA Appeal Transcript Order Acknowledgment, **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vawd.uscourts.gov** *Does this satisfy all appellate orders for this reporter? Yes* **Transcript may be viewed at the court public terminal or purchased through Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER unless a Redacted Transcript has been filed. Redaction Request due 8/14/2025. Redacted Transcript Deadline set for 8/25/2025. Release of Transcript Restriction set for 10/22/2025. (mb)** |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 08/04/2025 15:19:54 | | | |
| **PACER Login:** | aj0753bc | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 7:24-cr-00011-EKD-CKM |
| **Billable Pages:** | 16 | **Cost:** | 1.60 |
| **Exempt flag:** | Exempt | **Exempt reason:** | Always |

JA016

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**ROANOKE DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No.: 7:24-CR-11 |
| ISAAC FIDEL MARTINEZ-CHAVEZ | ) | |
| | ) | |

**<u>NOTICE OF INTENT TO USE RULE 404(b) EVIDENCE</u>**

The United States of America, by counsel, hereby notifies the Defendant of its intent to introduce evidence that could be considered "other acts evidence" under Rule 404(b) of the Federal Rules of Evidence. By providing this notice, the United States does not concede that Rule 404(b) is the sole basis for its admission. Nevertheless, the Government provides this notice out of an abundance of caution and reserves its right to supplement this notice as necessary. In support of this notice, the Government states as follows:

**I.  FACTUAL BACKGROUND**

On January 1, 2024, officers found two firearms in a 2007 Kia the Defendant was driving, which his girlfriend purchased on September 23, 2022. The Defendant was driving the Kia with the wrong license plate. The correct license plate is **UJB6018**. On August 29, 2022, Deputy Jesse East of the Montgomery County Sheriff's Office (MCSO) conducted a traffic stop of a Mercury SUV driven by the Defendant and bearing license plate **UJB6018**.

**II.  ARGUMENT**

The fact that the Defendant was associated with, and exercised dominion and control over the Kia and its license plates, for a longer period of time tends to make it more probable that the Defendant knew of the firearms present in the Kia on January 1, 2024, he intentionally possessed

1

JA017

the firearms at that time, he had an opportunity to remove the firearms, and the presence of the firearms in the vehicle was not related to a mistake, accident, or some similar incident.  At trial, the United States intends to offer evidence that on or about August 29, 2022, the Defendant was driving a car whose license plate (**UJB6018**) belonged to the car he was driving on January 1, 2024, the date of the traffic stop in the case at bar.  The Government will offer this evidence to prove knowledge, intent, opportunity, absence of mistake, and lack of accident. Together with other evidence, this prior act tends to make a fact of consequence more probable than it would be without the evidence.

Additionally, at the scene the Defendant stated that the guns were not his.  To the extent that the Defendant's statement relates to a lack of knowledge (as compared to a statement regarding ownership) the information about the prior traffic stop would be appropriate evidence to rebut this statement or the inference that the Defendant was unaware of the firearms until the officers found them.  Again, the fact that in 2022, the Defendant was driving a Mercury SUV with the Kia's license plates makes it more likely that the Defendant exercised dominion and control over the Kia (and its license plate) such that he knew of the presence of the firearms, intended to possess them, and had the opportunity to remove them before driving.  Similarly, the prior traffic stop makes it less likely that firearms were the result of an accident or mistake, and it rebuts any inference that the firearms were planted or covertly placed in the Kia as well.

The Government has no intention of eliciting testimony or other evidence about the presence of drugs or the resulting felony conviction of Possession of a Schedule I or II Controlled Substance from the August 29, 2002, incident in its case-in-chief, but please note that this information could become relevant as the case proceeds.  As examples, the fact of the prior conviction would become relevant should the Defendant elect not to stipulate to this fact, and

2

JA018

depending on the Defendant's testimony at trial, should he elect to testify, the traffic stop would likely be an appropriate subject for cross-examination.

Respectfully submitted,

CHRISTOPHER R. KAVANAUGH
United States Attorney

Date: October 28, 2024.

*s/Juan L. Vega*
Special Assistant United States Attorney
VA State Bar No. 79165
U.S. Attorney's Office
310 First St., S.W., Ste. 906
Roanoke, Virginia 24011
540-857-2250 (phone)
540-857-2614 (fax)
Juan.vega2@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on October 28, 2024, I caused the foregoing Notice to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel for defendant.

*s/Juan L. Vega*
Special Assistant United States Attorney

JA019

CLERK'S OFFICE
U.S. DISTRICT COURT
AT ROANOKE, VIRGINIA
**FILED**

November 07, 2024

Laura A. Austin, Clerk
By: s/ *Kelly Anglim*
Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION
## NOVEMBER 2024 SESSION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **Case No. 7:24-CR-11** |
| | ) | |
| ISAAC FIDEL MARTINEZ-CHAVEZ, | ) | In violation of: |
| a/k/a Issac Fidel Martinez- | ) | 18 U.S.C. § 922(g)(1) |
| Chavez, | ) | 26 U.S.C. § 5861(d) |
| | ) | |
| Defendant. | ) | |

### SUPERSEDING INDICTMENT

### COUNT ONE

The Grand Jury charges:

1.    On or about January 1, 2024, in the Western District of Virginia, the defendant, ISAAC FIDEL MARTINEZ-CHAVEZ, a/k/a Issac Fidel Martinez-Chavez, knowing that he had been previously convicted of a crime punishable by imprisonment for a term exceeding one year, did knowingly possess one or more firearms which had previously been shipped and transported in interstate or foreign commerce, to wit: (a) an RG Industries .22 caliber revolver and (b) a Marlin ("MAR") Firearms Co., .22 caliber bolt action rifle.

2.    All in violation of Title 18, United States Code, Section 922(g)(1).

### COUNT TWO

The Grand Jury further charges:

3.    On or about January 1, 2024, in the Western District of Virginia, the defendant, ISAAC FIDEL MARTINEZ-CHAVEZ, a/k/a Issac Fidel Martinez-Chavez, did knowingly possess a firearm not registered to him in the National Firearms Registration and Transfer Record,

JA020

to wit: a weapon made from a Marlin ("MAR") Firearms Co., .22 caliber bolt action rifle, having a barrel length of less than 16 inches and an overall length of less than 26 inches.

4.     All in violation of Title 26, United States Code, Sections 5841, 5845(a)(4), 5861(d), and 5871.

## NOTICE OF FORFEITURE

1.     Upon conviction of the felony offenses alleged in this Superseding Indictment, the defendant shall forfeit to the United States any firearms and ammunition involved or used in the commission of said offenses, or possessed in violation thereof, pursuant to 18 U.S.C. § 924(d), 28 U.S.C. § 2461(c), and 26 U.S.C. § 5872.

2.     The property to be forfeited to the United States includes but is not limited to the following property:

    a.  **Firearms**

        1)  An RG Industries .22 caliber revolver, serial number: L699622.
        2)  A weapon made from a Marlin ("MAR") Firearms Co., .22 caliber bolt action rifle, having a barrel length of less than 16 inches and an overall length of less than 26 inches.
        3)  All ammunition, magazines, and accessories associated with these firearms.

3.     If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

    a.  cannot be located upon the exercise of due diligence;
    b.  has been transferred or sold to, or deposited with a third person;
    c.  has been placed beyond the jurisdiction of the Court;
    d.  has been substantially diminished in value; or
    e.  has been commingled with other property which cannot be subdivided without difficulty;

JA021

it is the intent of the United States to seek forfeiture of any other property of the defendant up to

the value of the above-described forfeitable property, pursuant to 21 U.S.C. § 853(p).

A TRUE BILL this 7th day of November 2024.

/s/ Foreperson
FOREPERSON

CHRISTOPHER R. KAVANAUGH
UNITED STATES ATTORNEY

3

JA022

IN THE UNITED STATES DISTRICT
COURT FOR THE WESTERN DISTRICT OF
VIRGINIA ROANOKE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | Criminal No. 7:24-cr-00011 |
| | ) | |
| | ) | |
| ISAAC FIDEL MARTINEZ-CHAVEZ | ) | |

<u>DEFENDANT'S MOTION TO DISMISS COUNT ONE OF THE INDICTMENT</u>

Isaac Martinez-Chavez ("Mr. Martinez"), the defendant, by counsel, moves this Honorable Court to dismiss Count One of his indictment pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B).

In support of this motion, counsel states:

**I.      Background**

On January 1, 2024, Deputy Hylton of the Franklin County Sheriff's Office followed Mr. Martinez as he was driving and approached him after he pulled off the road.[1] ("Report of Investigation 1," attached as Exhibit 1, at p. 2.) Officers found a .22 caliber revolver and a suspected weapon made from a rifle in the car. *Id.* at p. 1.

On March 14, 2024, the Government indicted Mr. Martinez on one count of Felon-in-Possession under 18 U.S.C. § 922(g)(1) and one count of Receive or Possess a Firearm Made in Violation of the National Firearms Act (NFA) under 26 U.S.C. § 5861(c). (ECF No. 1.) The

---

[1] The facts of the case are taken from discovery documents supplied by the Government. Mr. Martinez does not admit to the Government's characterizations of the events in this case but will use its rendition of the facts for the purposes of this motion only.

JA023

Government filed a superseding indictment on November 7, 2024, charging Martinez with one count of Felon-in-Possession under 18 U.S.C. § 922(g)(1) and one count of Possess a Firearm not Registered in the NFA Registration and Transfer Record under 26 U.S.C. § 5861(d). (ECF No. 49.)

ATF Agent Adam Moody testified to the Grand Jury that he reviewed two certified felony convictions for Mr. Martinez. (Grand Jury Tr., p. 10, March 10, 2024, attached as Exhibit 2.) In discovery, the Government produced a Report of Investigation referencing Mr. Martinez's prior felony convictions. ("Report of Investigation 2," attached as Exhibit 3.) The Report lists a February 6, 2023, felony conviction for Possession of a Schedule II Controlled Substance under Va. Code § 18.2-250 (A, a) and a December 20, 2018, felony conviction for Leave the Scene of an Accident Involving Injury under Va. Code § 46.2-894. *Id.* at p. 1, 3, 9.[2]

Mr. Martinez received a sentence of three years with two years and ten months suspended for his felony conviction for Possession of a Controlled Substance. *Id.* at p. 4. He received a sentence of four years with three years and six months suspended for his felony conviction for Failure to Stop Accident/Felony Injury. *Id.* at p. 13.

This case is scheduled for a jury trial on January 22-24, 2025. (ECF No. 43.)

## II.    Legal Standard

Federal Rule of Criminal Procedure 12 provides that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue." FED. R. CRIM. P. 12(b)(1). Pursuant to Federal Rule of Criminal Procedure

---

[2] Mr. Martinez's misdemeanor convictions and conduct not resulting in convictions are not properly considered as part of this analysis, because his disarmament under § 922(g)(1) is based only on his felony convictions.

JA024

12(b)(3)(B), the district court may, at any time during the pendency of a case, hear a defendant's claim that an indictment fails to state an offense or is otherwise defective. *See United States v. Stanley*, 109 U.S. 3, 8-9 (1883). A court should dismiss an indictment "where there is an infirmity of law in the prosecution," such as an unconstitutional statute. *United States v. Engle*, 676 F.3d 405, 415 (4th Cir. 2012).

### III.   <u>Argument</u>

A. <u>The lifetime prohibition on Mr. Martinez's right to bear arms on account of his prior felony convictions for Va. Codes § 46.2-894 and § 18.2-250 violates the Second Amendment.</u>

18 U.S.C. § 922(g)(1) criminalizes firearm possession for any person who has been convicted of a crime punishable for a term exceeding one year. Under the new framework announced in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), § 922(g)(1) violates the Second Amendment as applied to Mr. Martinez.

"As-applied challenges are the basic building blocks of constitutional adjudication[.]" *Gonzalez v. Carhart*, 550 U.S. 124, 168 (2007). An as-applied challenge raises the question of whether a law with some permissible uses "is nonetheless unconstitutional as applied to [the defendant's] activity. *Spence v. Washington*, 418 U.S. 405, 414 (1974). Courts generally consider the constitutionality of a statute as-applied before determining its facial constitutionality, to avoid striking down the statute in its entirety. *United States v. Vuitch*, 402 U.S. 62, 70 (1971); *Renne v. Geary*, 501 U.S. 312, 324 (1991).

The Second Amendment to the United States Constitution mandates that a "well regulated militia, being necessary to the security of a free state, the right of the people to keep and bear arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*,

JA025

the Supreme Court held that the Second Amendment codified the individual right to possess and carry weapons, the core purpose of which is self-defense in the home. 554 U.S. 570, 628 (2008); *see also McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010) (holding "that individual self-defense is the central component of the Second Amendment right").

In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2156 (2022), the Supreme Court reaffirmed that the Second Amendment right to bear arms is not a second-class right. The *Bruen* Court rejected decades of "judicial deference to legislative interest balancing" in the form of means-end scrutiny in Second Amendment jurisprudence. *Id.* at 2131. Instead, *Bruen* instructs courts to ask only: (1) whether the Second Amendment's plain text covers the conduct, and (2) whether the Government can show the law is consistent with historical firearms regulations. *Id.* at 2126.

After *Bruen*, in *United States v. Rahimi*, 144 S. Ct. 1889 (2024), the Supreme Court upheld 18 U.S.C. § 922(g)(8) as constitutional because "[a]n individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment" 144 S. Ct. at 1903 (finding Section 922(g)(8)(C)(i) "relevantly similar" to founding era regimes like the surety regimes and going armed laws). The *Rahimi* Court expressly criticized the Fifth Circuit for unduly relying on stray language about "responsible" citizens. *See id.* Justice Thomas made this point clear in a portion of his dissent that was *not* disputed by the majority:

> The Government, for its part, tries to rewrite the Second Amendment to salvage its case. It argues that the Second Amendment allows Congress to disarm anyone who is not 'responsible' and 'law-abiding." Not a single Member of the Court adopts the Government's theory. Indeed, the Court disposes of it in half a page – and for good reason. *Ante*, at __. The Government's argument lacks any basis in our precedents and would eviscerate the Second Amendment

altogether.

> The Government's position is a bald attempt to refashion this Court's doctrine. … The Government's claim that the Court already held [in *Heller* and *Bruen*] the Second Amendment protects only 'law-abiding, responsible citizens' is specious at best. …

> [T]he Government's 'law-abiding, dangerous citizen' test – and indeed any similar, principle-based approach – would hollow out the Second Amendment of any substance. Congress could impose any firearm regulation so long as it targets "unfit" persons.

144 S. Ct. at 1945-46. As one district court has recognized post-*Rahimi*, the Supreme Court's rejection of "responsible" is equally applicable to the term "law-abiding." *See United States v. Johnston*, No. 3:23-cr-76-GMG-RWT, ECF 51 at 3 n.1 (N.D.W.Va. August 5, 2024).

*Rahimi* "turned on the necessary existence in cases under § 922(g)(8) of an *individualized finding* that the defendant posed a threat to the physical safety of another." *United States v. Morales*, No. 24 CR 84 (PAE), 2024 WL 3345982, at *2 (S.D.N.Y. July 8, 2024) (emphasis added); *United States v. Baldon*, No. 2:20-CR-00346-GMN-EJY-1, 2024 WL 3459017, at *1 (D. Nev. July 19, 2024) (similar); *Suarez v. Paris*, No. 1:21-CV-710, 2024 WL 3521517, at *12 (M.D. Pa. July 24, 2024) (similar). *Rahimi* left open the door to as-applied challenges especially where, as in Mr. Martinez's case, no individualized finding of dangerousness exists. *See Rahimi*, 144 S. Ct. at 1909 ("Our resolution of Mr. Rahimi's facial challenge to § 922(g)(8) necessarily leaves open the question whether the statute might be unconstitutional as applied in 'particular circumstances.'") (Gorsuch, J., concurring).

In *United States v. Canada*, 103 F.4th 257 (4th Cir. 2024) (remanded by *United States v. Canada*, 2024 U.S. LEXIS 4496, No. 24-5391 (November 4, 2024)), the Fourth Circuit addressed the constitutionality of Section 922(g)(1) for the first time since the Supreme Court's

JA027

decision in *Bruen*. The *Canada* Court held that 18 U.S.C. § 922(g)(1) may be constitutionally applied to people "convicted of a drive-by-shooting, carjacking, armed bank robbery, or even assassinating the President of the United States." *Canada* 103 F.4th at 258. However, the Court indicated that "there is *some* room for as-applied challenges" to Section 922(g)(1) (quoting *United States v. Gay*, 98 F.4th 843, 846 (7th Cir. 2024) for the proposition that there is *some* room for as-applied challenges to 18 U.S.C. § 922(g)(1) post-*Bruen*).

While the Supreme Court remanded *United States v. Canada* for further consideration in light of *Rahimi*, the Fourt Circuit re-adopted and re-issued its previous decision in relevant part in *United States v. Canada*, 2024 U.S. App. LEXIS 30900 (4th Cir., Dec. 6, 2024).

**1. The Second Amendment's plain text covers the conduct prohibited by § 922(g)(1).**

The Second Amendment protects "the right of the people to keep and bear Arms …" U.S. Const. amend II. The plain text, "keep and bear arms," means possessing and carrying weapons. *Heller*, 554 U.S. at 583-92. The Court in *Bruen* clarified that the core right to possess and carry a firearm for self-defense, identified in *Heller* and *McDonald*, extends outside the home. *Bruen*, 142 S. Ct. at 2122. Section 922(g)(1) is a complete ban on all firearm possession, with no limitations on type or use. It, therefore, impacts the core Second Amendment right to possess a firearm for self-defense. *See McDonald*, 561 U.S. at 767; *see also generally Bruen*, 142 S. Ct. 2111.[3]

The sole question at this stage of the *Bruen* analysis is whether "conduct" is covered by

---

[3] Legislative history suggests that Congress, in passing the modern version of § 922(g)(1), acknowledged that it would infringe an individual's right to bear arms, but wrongly concluded that the Second Amendment does not confer an individual right to bear arms. *See*, *e.g.*, S. Rep. 90-1097 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2169; *see also Heller*, 554 U.S. at 628.

JA028

the plain text of the Second Amendment. *Id.* at 17; *United States v. Bullock*, ___ F.Supp.3d ___, No. 3:18-cr-165, 2023 WL 4232309, at *20 (S.D. Miss. June 28, 2023) ("*Bruen* step one requires us to look at the 'conduct' being regulated, not the status of the person performing the conduct."). Because firearm possession is conduct covered by the Second Amendment, it is presumptively protected.

*Rahimi* forecloses the argument that Mr. Martinez does not come within the Second Amendment's "plain text" because "the people," as used in that amendment, is limited to law-abiding, responsible citizens. In *Rahimi*, the government asserted that "responsible" is simply a synonym for "dangerous" and that § 922(g)(8) was constitutional because it accorded with America's tradition of disarming dangerous groups. *United States v. Rahimi*, No. 22-915, Brief for the United States 6. The Supreme Court rejected the government's contention that Rahimi could be disarmed simply because he is not 'responsible." *Rahimi*, 144 S. Ct. 1889, 1903 (2024).

**2. The Government cannot show that § 922(g)(1) is "consistent with the Nation's historical tradition of firearms regulation."**

Because the plain text of the Second Amendment covers § 922(g)(1), the burden shifts to the Government to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. When the Second Amendment's plain text protects certain conduct, the government can regulate such conduct only if it can "affirmatively prove that its firearm regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127. Otherwise, the court must conclude that the individual's firearm-related conduct is protected because it falls within the Second Amendment's "unqualified command." *Id.* at 2126 (internal quotations omitted).

The government can succeed under *Bruen*'s "straightforward historical inquiry" if it can identify a "distinctly similar historical regulation" addressing a "general societal problem that has persisted since the 18th century. *Id.* at 2131. On the other hand, where a "distinctly modern" regulation is at issue, the government must offer a historical regulation that is "relevantly similar." *Id.* at 2132. Pursuant to this inquiry, this court must determine whether historical regulations "impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified" as the burden imposed by § 922(g)(1). *Id.* at 2133.

The Government cannot meet its burden to show that disarming those with felony records like Mr. Martinez's is consistent with the Nation's historical traditions. *See id.* at 2130. There is no such tradition that supports lifetime removal of one's Second Amendment right to bear arms for someone convicted of possessing drug residue or failure to report an accident.

*Mr. Martinez's § 18.2-250 conviction*

Mr. Martinez has a prior conviction for Possession of a Schedule II Controlled Substance. *See* Exhibit 3, at p. 1 and "Plea Agreement Possession Conviction," attached as Exhibit 4.

In Virginia, a person can be convicted for Possession of a Controlled Substance under Virginia Code § 18.2-250 when an item with drug residue on it is found in the vehicle they have been driving. *See, e.g., McCollum v. Commonwealth*, No. 0437-05-3, 2006 Va. App. LEXIS 240 (Va. App. May 30, 2006).

In Mr. Martinez's Possession case, the police report shows that police found only residue in the vehicle he was driving. *See* "Police Report, Possession Conviction," attached as Exhibit 5 at pages 1-2.

*Mr. Martinez's § 46.2-894 conviction*

Mr. Martinez has a prior conviction for Leaving the Scene of an Accident Involving Injury. *See* Exhibit 3, at p. 1.

The Supreme Court of Virginia has stated that to convict a defendant of a violation of Va. Code Ann. § 46.2-894, a fact finder must find:

> (1) That the defendant was the driver of a vehicle that he knew was involved in an accident; and (2) that the accident caused property damage or bodily injury; and (3) that the defendant knew or should have known that the property was damaged by the accident; *and* (4) that the defendant failed to do any of the following: (a) stop immediately, (b) render reasonably necessary assistance, or (c) report his identification information to law enforcement or the other person involved in the accident.

*Clarke v. Galdamez*, 789 S.E.2d 106, 109-110 (Va. 2016) (emphasis in original).

Virginia law does not require knowledge that the accident resulted in injury or damage to sustain a conviction under Va. Code § 46.2-894. *See Clarke v. Galdamez*, 292 Va. 228 (Va. 2016) (noting that the failure-to-stop statute requires that the "defendant knew or should have known that property was damaged by the accident.") The Supreme Court of Virginia has made clear that it is possible for a defendant to be guilty of violating Va. Code Ann. § 46.2-894 for merely failing to satisfy the reporting requirements in the statute, even if the defendant remained at the scene of the accident. *Butcher v. Commonwealth*, 838 S.E.2d 538 (Va. 2020).

In sum, § 46.2-894 requires no culpable mental state or reprehensible conduct.

Mr. Martinez's predicate felony convictions do not suggest that he is subject to firearm restrictions like those targeted at the founding. There is no historical evidence supporting disarming individuals with criminal records like Mr. Martinez's. Because the Government cannot show that restricting firearms for those with criminal histories like Mr. Martinez's –

JA031

who was convicted of a felony because drug residue was found in a car he was driving and convicted of another felony for failure to report an accident – is consistent with the Nation's historical traditions, § 922(g)(1) violates the Second Amendment as applied to Martinez. *See Bruen*, 142 S. Ct. at 2126. Furthermore, neither of Mr. Martinez's felony convictions even remotely rises to the level of severity as "drive-by-shooting, carjacking, armed bank robbery, or even assassinating the President of the United States," so as to justify his permanent disarmament under *Canada*, 103 F.4th at 258.

    B.  <u>Mr. Martinez preserves the argument that 18 U.S.C. § 922(g)(1) violates the Second Amendment on its face</u>.

Mr. Martinez recognizes that the Fourt Circuit has rejected the argument that 18 U.S.C. § 922(g)(1) is unconstitutional on its face. Most recently, in *United States v. Canada*, the Court of Appeals for the Fourth Circuit held that Section 922(g)(1) is facially constitutional because it "has a plainly legitimate sweep" and may constitutionally be applied in at least some "set of circumstances." 103 F.4th 257, 258 (4th Cir. 2024) (quoting *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008) (remanded by *United States v. Canada*, 2024 U.S. LEXIS 4496, No. 24-5391 (November 4, 2024) (re-adopted and re-issued in relevant part in *United States v. Canada*, 2024 U.S. App. LEXIS 30900 (4th Cir., Dec. 6, 2024)).

Nevertheless, the *Canada* Court noted that the law of the Second Amendment is in flux in the wake of *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). *Canada*, 103 F.4th at 258.

Furthermore, *Canda* was decided before the Supreme Court's holding in *Rahimi*.[4] The

---

[4] While the Fourt Circuit re-adopted and re-issued its decision in relevant part in *United States v. Canada*, 2024 U.S. App. LEXIS 30900 (4th Cir., Dec. 6, 2024) after *Rahimi*, its re-adopted and re-issued

Fourth Circuit in *Canada* identified four possible bases on which § 922(g)(1)'s facial constitutionality might be sustained: (1) at *Bruen* step one, "the people" in the Second Amendment's plain text refers to some (unspecified) subset of Americans that excludes felons; (2) at *Bruen* step two, there exists a "tradition of disarming dangerous people"; (3) in *Bruen* and *Heller*, the Supreme Court referred, respectively, to " 'law-abiding citizens' and 'longstanding prohibitions on the possession of firearms by felons'" and (4) *Bruen* did not abrogate post-*Heller* Fourth Circuit cases holding § 922(g)(1) is consistent with the Second Amendment. *Canada*, 103 F.4th at 258. But the *Canada* panel expressly declined to say whether any of these theories was correct, writing that it "need not – and thus d[id] not – resolve" those questions. *Id.* Instead, the court concluded that "[n]o matter which analytical path" it chose, § 922(g)(1) could constitutionally be applied to defendants convicted of certain crimes – "a drive-by-shooting, carjacking, armed bank robbery, or even assassinating the President of the United States." *Id.*

As explained above, it is clear following *Rahimi* that "the people" in the Second Amendment means "all Americans," *Bruen*, 597 U.S. at 70, not just "law-abiding, responsible citizens." At least one of the theories identified in *Canada* (theory (1)) is therefore incapable of justifying § 922(g)(1). And because the Fourth Circuit expressly refused to endorse any of *Canada*'s remaining theories, that opinion no longer establishes § 922(g)(1)'s facial constitutionality.

Regardless, *Rahimi* undermines all of *Canada*'s other theories as well. *Rahimi*'s rejection

---

decision failed to address how *Rahimi* undermined the four potential bases it presented for facially constitutionality of § 922(g)(1).

of the government's "responsible" category entails a rejection of the supposed "dangerous" category as well, as the government argued the two categories were the same. In addition, terms like "dangerous" are just as vague as the term "responsible," which *Rahimi* deemed too indeterminate to define a historical tradition. *See* 2024 WL 3074728, at \*11. *Canada* theory (2) is therefore invalid.

As for theory (3), *Rahimi* faulted the government for concluding the Supreme Court's prior cases had already held legislatures may disarm "irresponsible" people. That question, the Court explained in *Rahimi*, "was simply not presented" in *Heller* or *Bruen*. *Id*. In other words, *Rahimi* teaches that lower courts should not carve out exceptions to the Second Amendment by relying on passing statements in previous Supreme Court opinions regarding questions that were not at issue in those cases. The question of "prohibitions on the possession of firearms by felons," *Heller*, 554 U.S. at 626, was "simply not presented" in *Heller*, and so under *Rahimi*, *Heller*'s dictum on that topic cannot justify excluding felons from the right to keep and bear arms, 2024 WL 3074728, at \*11.

Finally, the Fourt Circuit's "post-*Heller* but pre-*Bruen* holdings rejecting constitutional challenges to [§ 922(g)(1)]," *Canada*, 103 F.4th at 258, were based entirely on *Heller*'s statement that felon-disarmament laws were "presumptively lawful." If *Rahimi* abrogated reliance on *Heller*'s dictum, then it necessarily also abrogated reliance on the Fourt Circuit's pre-*Bruen* cases upholding § 922(g)(1). Accordingly, *Canada* theory (4) does not survive *Rahimi*.

Acknowledging that this Court is bound by *Canada*, Mr. Martinez raises his argument that § 922(g)(1) is facially invalid because there is no historical tradition, particularly from the founding era, of disarming all felons, for further review. Felons were, in fact, likely <u>required</u> to

JA034

keep firearms at the founding. This duty to bear arms was reflected in federal and state laws requiring most citizens to keep firearms as part of militia service. *See, e.g.*, Second Militia Act, § 1, 1 Stat. 271 (May 8, 1792). These laws "exempted" certain classes of people, but not felons. *Id.* § 2, 1 Stat. 272.

Historical categorical disarmament was limited to disempowered minority communities – e.g., enslaved persons, freed Black Americans, and Native Americans – and those who evidenced disloyalty to the government. *See* Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 261-65 (2020). Many of these types of categorical restrictions were rejected by the Second Amendment and courts have cautioned against citing to such "historical travesties to support taking someone's Second Amendment rights today." *See United States v. Hicks*, __ F. Supp. 3d __, No. 6:21-cr-0060-ADA, 2023 WL 164170, at *6 (W.D. Tex. Jan. 9, 2023). It is unsurprising that communities of color, which have historically been subjected to reprehensible Second Amendment and other constitutional deprivations, are disproportionately impacted by statutes like § 922(g)(1). *See generally* Royce de R. Barondes, *The Odious Intellectual Company of Authority Restricting Second Amendment Rights to the "Virtuous"*, 25 Tex. Rev. L. & Pol. 245, 278 (2021).

But even those examples of historical categorical disarmament of arguable historical relevance do not "impose a comparable burden on the right" and are not "comparably justified" to § 922(g)(1)'s categorical disarmament of felons. *See Bruen*, 142 S. Ct. at 2133 (explaining metrics of comparing "relevantly similar" analogues). The frequently cited history of disarming "dangerous," "irresponsible," or "unvirtuous" people lacks historical support and is insufficient to demonstrate a historical tradition of regulations "relevantly similar" to §

JA035

922(g)(1), as required by *Bruen*. Furthermore, categorical disarmament on the basis of vague notions of unlawfulness was rejected by the Supreme Court in *Rahimi*, 144 S. Ct. at 1903.

The Government cannot show historical evidence distinctly or relevantly similar to § 922(g)(1) that would illustrate a tradition of categorically disarming felons. It, therefore, cannot overcome the presumption that § 922(g)(1) violates the Second Amendment. *See Bruen*, 142 S. Ct. at 2126. The statute is facially unconstitutional.

## IV.    Conclusion

WHEREFORE, for the foregoing reasons, Mr. Martinez requests that the Court dismiss Count One of the indictment.

<div align="center">Respectfully Submitted,</div>

MARY MAGUIRE
Federal Public Defender
for the Western District of Virginia

*Heidi I. Bohn*
HEIDI I. BOHN
Virginia Bar No. 98916
Office of the Federal Public Defender
for the Western District of Virginia
210 First Street SW, Suite 400
Roanoke, VA 24011
(540) 525-8273

*Counsel for Isaac Martinez-Chavez*

<div align="center">JA036</div>

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing document was electronically filed and will be forwarded to the Office of the United States Attorney this 13th day of December, 2024.

_Heidi I. Bohn_
HEIDI I. BOHN

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION


UNITED STATES OF AMERICA )
)
)
v. ) Criminal No. 7:24-cr-00011
)
)
ISAAC FIDEL MARTINEZ-CHAVEZ )


## ORDER

On this day, the Court considered Defendant's Motion to Dismiss Count One of the

Indictment, and the Court is of the opinion that the motion should be GRANTED. Accordingly,

it is hereby:

ORDERED that Count One of the Indictment in this cause is DISMISSED.

SIGNED this ____ day of _____, 2024.


_____
ELIZABETH K. DILLON
CHIEF UNITED STATES DISTRICT JUDGE


JA038

| Title of Investigation: | Investigation Number: | Report Number: |
|---|---|---|
| MARTINEZ-CHAVEZ, Issac (Franklin County, VA) | 24-06817 | 1 |

## SUMMARY OF EVENT:

Case opening against Issac MARTINEZ-CHAVEZ regarding the prohibited possession of a firearm and suspected weapon made from a rifle, regulated under the National Firearms Act (NFA), while being a previous convicted felon. The investigation was initiated pursuant to a traffic stop conducted by Franklin County Sheriff's Office (FCSO), in Rocky Mount, Virginia, on 01/01/2024.

## NARRATIVE:

1. On 01/01/2024, Isaac MARTINEZ-CHAVEZ (DOB: 09/16/1986; SSN 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; FB# 60663TC0), a previously convicted felon, was arrested by Franklin County Sheriff's Office (FCSO), in Rocky Mount, Virginia. MARTINEZ was determined to have been in possession of two (2) firearms, an RG Industries, model RG 14, .22 caliber revolver, S/N: L699622, and a .22 caliber, suspected weapon made form a rifle (NFA). Along with a suspected controlled substance. The following is a summation of the traffic stop and arrest. For a full account, see the associated recordings and the attached FCSO report #2024-000003.

2. Law enforcement (LE) personnel involved in the investigation on 01/01/2024 were as follows:

    a. Franklin County Sheriff's Office (FCSO)
       i. Lieutenant (Lt.) Deputy J. Hylton
      ii. Deputy Z. Wade
     iii. Deputy M. Cawood

    b. Rocky Mount Police Department (RMPD)
       i. Sergeant C. Johnson
      ii. Officer T. Poulin
     iii. Officer J. Gardner

| Prepared by: | Title: | Signature: | Date: |
|---|---|---|---|
| Adam Moody | Special Agent | *[signature]* | 02/04/2024 |
| Authorized by: | Title: | Signature: | Date: |
| Keith Teehan | RAC | *[signature]* | 02/04/2024 |
| Second Level Reviewer (optional): | Title: | Signature: | Date: |
| | | | |

ATF EF 3120.2 (10-2004)
For Official Use Only

Exhibit 1, page 1 of 10

JA039

3. On 01/01/2024, at approx. 0005 hours, Lt. Hylton observed a silver KIA traveling 60 miles per hour, in a posted 45 miles per hour zone. Lt. Hylton followed the vehicle and noted that it accelerated when it turned off South Main Street and onto Scuffling Hill Road. The vehicle lights turned off while still traveling on the roadway. Lt. Hylton initiated a traffic stop. The target vehicle made an abrupt right turn on Highview Terrace, off Scuffling Hill Road, and pulled into a yard located at 30 Highview Terrace. The driver was observed leaning into the passenger side of the vehicle, Lt. Hylton drew his service weapon, maintained cover, and gave the driver verbal commands. The driver hesitantly complied with commands.

4. The driver was detained and identified as MARTINEZ-CHAVEZ. He was determined to be the sole occupant of the vehicle. The vehicle was identified bearing Virginia registration VYC3195. Additional deputies and officer arrived on scene to assist.

5. Dispatch advised deputies that MARTINEZ-CHAVEZ was not licensed and had outstanding warrants out of Montgomery County, Virginia. MARTINEZ-CHAVEZ was advised he was under arrest. Deputy Wade searched him incident to arrest, a glass smoking device was located on his person.

6. Officer Poulin advised the others on scene that he had located a firearm in plain view on the passenger floorboard of the vehicle. The firearm was retrieved by Officer Poulin and Officer Gardner. Their initial assessment of the firearm was a .22 caliber bolt action style rifle, with obvious signs that it was altered from its original design, the barrel appeared to be sawed off. There did not appear to be a serial number readily visible on the firearm. *(Note: The firearm was later measured by Special Agent (SA) Moody, on 02/01/2024, and appeared to have an approx. 10.5" barrel and an overall measurement of approx. 20.5", see photo attached).*

7. The vehicle was subsequently searched and another firearm, (RG, model RG 14, .22 caliber revolver, S/N: L699622) was located in the passenger compartment as well as additional .22 caliber rounds. Both firearms were found to be loaded and were then unloaded, by officers on scene, for safety.

8. The vehicle, which had been determined to be improperly register, was subsequently towed. The registration (VA Tag: VYC3195) was run through dispatch and did not return to the same vehicle. *Note: VA Tag: VYC 3159 was registered with the Virginia Department of Motor Vehicle (DMV) on a four (4) door Lexis, to a William and Bonnie PRILLAMAN, at 3812 Bandy Rd. Roanoke, Virginia with a disposition of sold.*

9. Deputy Wade transported MARTINEZ-CHAVEZ to the FCSO Jail where he was served on the outstanding Montgomery County, Virgina probation violation, felony warrant. MARTINEZ-CHAVEZ was also charged, at that time in Franklin County, with two counts of possession of a firearm by felon and one count of possess of a sawed-off rifle. The case remained active as additional charges were pending.

10. Evidence seized by LE was secured at the FCSO Property and Evidence Section.

ATF EF 3120.2 (10-2004)
For Official Use Only

JA040

| Title of Investigation: | Investigation Number: | Report Number: |
|---|---|---|
| MARTINEZ-CHAVEZ, Issac (Franklin County, VA) | 24-06817 | 1 |

**ATTACHMENT(S):**

    a. Copy, FCSO Report #2024-000003

    b. Copy, Photographs of firearms

# Franklin County Sheriff's Office
## PRELIMINARY INVESTIGATIVE REPORT

D.S.P. 102 - M

| Code Number | Reported By | | Origin | Date | Time | Case Number |
|---|---|---|---|---|---|---|
| VA0330000 | 0855 - Lt. Justin D. Hylton | Page No. 1 | 01 - Sheriff/Deputy Sheriff | 01/01/2024 | 0:11 | 2024-000003 |

**C O M P**

| Comp No | NAME Last, First Middle | Residence Phone | Business Phone |
|---|---|---|---|

| ADDRESS Number/Street City | State | Zip | Race | Sex | Date of Birth | SSAN |
|---|---|---|---|---|---|---|

**V I C T I M**

| Vic No | NAME Last, First Middle | Residence Phone | Business Phone |
|---|---|---|---|
| 1 | COMMONWEALTH OF VIRGINIA | | |

| ADDRESS Number/Street | Race | Sex | Resident Status | Date of Birth |
|---|---|---|---|---|

| City | State | Zip | Ethnic | SSAN |
|---|---|---|---|---|

| Victim Related Events | ■#1 ■#3 □#5 □#7 □#9   ■#2 □#4 □#6 □#8 □#10 | Victim Injury | Victim Relation to Acc/Susp 1 2 3 4 5 6 7 8 9 10 | Justifiable Homicide |
|---|---|---|---|---|

| Vic No | NAME Last, First Middle | Residence Phone | Business Phone |
|---|---|---|---|

| ADDRESS Number/Street | Race | Sex | Resident Status | Date of Birth |
|---|---|---|---|---|

| City | State | Zip | Ethnic | SSAN |
|---|---|---|---|---|

| Victim Related Events | □#1 □#3 □#5 □#7 □#9   □#2 □#4 □#6 □#8 □#10 | Victim Injury | Victim Relation to Acc/Susp 1 2 3 4 5 6 7 8 9 10 | Justifiable Homicide |
|---|---|---|---|---|

| Event No | Event | Code No | (A) Attempted / ■(C) Completed | # Premises Entered | Type Security |
|---|---|---|---|---|---|
| 1 | Weapon Law Violations | 520 | | | |

| | Mo | Day | Yr | Time | Day of Week | And | Mo | Day | Yr | Time | Day of Week | Acc/Susp Used | Criminal Activity | Hate Crime |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Occurred □ On / ■ Between | 01 | 01 | 2024 | 0:11 | MON | | 01 | 01 | 2024 | 2:00 | MON | D | P | 88 - None (No Bias) |

| Event No | Event | Code No | (A) Attempted / ■(C) Completed | # Premises Entered | Type Security |
|---|---|---|---|---|---|
| 2 | Drug Equipment Violations | 35B | | | |

| ADDRESS | Acc/Susp Used | Criminal Activity | Hate Crime |
|---|---|---|---|
| 30 HIGHVIEW TER, BEGIN | D | P | 88 - None (No Bias) |

| City | State | Zip | Type Location |
|---|---|---|---|
| ROCKY MOUNT | VA | | 13 - Highway/Road/Alley |

**A C C . S U S P . O T H E R**

| ASO No | | NAME Last, First Middle | Alias AKA | Residence Phone | Business Phone |
|---|---|---|---|---|---|
| 1 | ■A □S □O | MARTINEZ-CHAVEZ, ISSAC FIDEL | MARTINEZ, ISSAC FIDEL ; MARTINEZ, ISSAC FIDEL | | |

| ADDRESS Number/Street | Occupation | Race | Sex | Date of Birth |
|---|---|---|---|---|
| 175 SAMUEL LN | PAINTER | W | M | 09/16/1986 |

| City | State | Zip | Arrest Number | SSAN |
|---|---|---|---|---|
| ROCKY MOUNT | VA | 24151- | 2024-000003 - 1 | 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 |

| Height | Weight | Hair Color | Eye Color | Hairstyle | ARMED | Marks/Scars Location |
|---|---|---|---|---|---|---|
| 5'07" | 180 | BLK - Black | BRO - Brown | STR - Straight | Yes X / No / Unk   LH / RH / AB | Tattoo - Left - Elbow ; Tattoo - Left - Elbow |

| ASO No | | NAME Last, First Middle | Alias AKA | Residence Phone | Business Phone |
|---|---|---|---|---|---|
| 1 | □A ■S □O | MARTINEZ-CHAVEZ, ISSAC FIDEL | MARTINEZ, ISSAC FIDEL | | |

| ADDRESS Number/Street | Occupation | Race | Sex | Date of Birth |
|---|---|---|---|---|
| 175 SAMUEL LN | PAINTER | W | M | 09/16/1986 |

| City | State | Zip | Arrest Number | SSAN |
|---|---|---|---|---|
| ROCKY MOUNT | VA | 24151- | | 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 |

| Height | Weight | Hair Color | Eye Color | Hairstyle | ARMED | Marks/Scars Location |
|---|---|---|---|---|---|---|
| 5'07" | 180 | BLK - Black | BRO - Brown | STR - Straight | Yes X / No / Unk   LH / RH / AB | Tattoo - Left - Elbow |

**V E H**

| Veh No | Year | Make | Model | Type | License Number | Year | State | Teletype Number |
|---|---|---|---|---|---|---|---|---|
| 1 | 2007 | KIA | | P - Passenger car | VYC3195 | 2025 | VA | |

| VIN | Owner's Name | Address |
|---|---|---|
| KNAFG526477112089 | 01 - MARTINEZ-CHAVEZ, ISSAC FIDEL | 175 SAMUEL LN, ROCKY MOUNT, VA 24151 |

| Released to Owner Date | Stored - Name | Address | Stolen | Involved X |
|---|---|---|---|---|
| | | | Recovered | Other |

**D R U G**

| Type | Whole Quantity | Fractional Quantity | Measurement | Estimated Value |
|---|---|---|---|---|
| L - Amphetamines/Methamphetamine | 0 | .1 | GM - Gram | $1.00 |
| | | | | |
| | | | | |

Exhibit 1, page 4 of 10

JA042

# Franklin County Sheriff's Office

CONFIDENTIAL  **PRELIMINARY INVESTIGATIVE REPORT**  D.S.P. 102 - M

Page No.  2

| Scene Processed By | | Prints Found ☐ Yes ■ No Photographed ☐ Yes ■ No | | Type Evidence Taken | | | When Stored Initially |

**ARSON**

| Loss Data | Value | | Loss | | Origin of Fire | | Bomb Data | |
|---|---|---|---|---|---|---|---|---|
| Structures | | | | | Incendiary ☐ | Explosive Data _____ | | |
| Contents | | | | | Undetermined ☐ | Incendiary Device _____ | | |
| Fixtures | | | | | Accidental ☐ | Threat _____ | | |
| Vehicles | | | | | Suspicious ☐ | Other _____ | | |
| Miscellaneous | | | | | | | | |

**PROPERTY**

| Event Code | Prop. Code | Quantity | Description | Make/Model | Serial Number | P Loss | Value | Recov. Date |
|---|---|---|---|---|---|---|---|---|
| 520 | 13 | 1 | Firearms (.22 Cal sawed off rifle) | unknown / unknown | none | 6 | | 01/01/2024 |
| 520 | 13 | 1 | Firearms (.22 cal revolver) | RG | L699622 | 6 | | 01/01/2024 |
| 358 | 11 | 2 | Glass Smoking Device | | | 6 | 2.00 | 01/01/2024 |
| 520 | 59 | | Firearm Accessories (.22 cal ammunition) | | | | | 01/01/2024 |

| Jurisdiction Stolen | Jurisdiction Recovered | Number of Motor Vehicles Stolen | Number of Motor Vehicles Recovered |
|---|---|---|---|
| | | | |

**DEATH**

| Next of Kin Notified Name | Address | Relationship | Physician Pronouncing Death(Name) | |
|---|---|---|---|---|
| Attending Physician Name | Address | Reason for Treatment | Pronounced Death-Date | Time |
| Last Person to See Subject Alive Name | Address | | Date | Time |
| Rescue Unit at Scene Name | Address | Medical Examiner | Type Death | |

Summary

On January 1, 2024 at approximately 00:05 while heading South on South Main Street near the intersection of Eastover Drive in Rocky Mount, I saw a vehicle headed North that appeared to be travelling faster than the posted 45 speed limit. After releasing the beam of my radar I obtained a reading of 60 miles per hour. I saw the target vehicle was a silver KIA. I decided to turn and follow the vehicle as I was looking for any DUI violators due to the holiday. As I turned and started approaching the target car, I noticed it had picked up speed as I saw it had turned off South Main Street and onto Scuffling Hill Road. I continued to close distance on the car and as the car approached the second Knollwood Drive on Scuffling Hill, the target vehicles headlights and tail lights went out while still travelling. I made the decision to initiate a traffic stop based on that driving behavior and activated my emergency lights. The target vehicle made an abrupt right turn on Highview Terrace off Scuffling Hill Road and pulled into a yard a 30 Highview Terrace where I pulled in behind the car with my emergency lights actviated. The drivers side door came open and

Solvability Factors

| YES NO | | YES NO | | Exceptional Clearance (Status 8) |
|---|---|---|---|---|
| ☐ ■ | a. Can a suspect be named? | ☐ ■ | g. Was there a unique or unusual M.O. employed? | ☐ (A) Death of Offender |
| ☐ ■ | b. Is the suspect known? | ☐ ■ | h. Was there significant evidence? | ☐ (B) Prosecution Declined |
| ☐ ■ | c. Can the suspect be identified? | ☐ ■ | i. Is property traceable? | ☐ (C) Extradition Declined |
| ☐ ■ | d. Has the suspect been seen before? | ☐ ■ | j. Was there a minimum delay in reporting? | ☐ (D) Refuse to Cooperate |
| ☐ ■ | e. Was there a witness to the crime? | ☐ ■ | k. Is there a significant reason to believe crime may be solved | ☐ (E) Juvenile, No Custody |
| ☐ ■ | f. Can the suspect vehicle be identified? | | with a reasonable amount of investigative effort? | ■ (N) Not Applicable |

| CASE STATUS (Check One) | | | Case Closed (Status 4 or 8) ☐ Juvenile ■ Adult | Negative File Number |
|---|---|---|---|---|
| ☐ 1 Active | ☐ 5 Inactive | ■ 4 Closed Arrest | Ref. Other Case Number | |
| ☐ 2 Active - TOT O/A | ☐ 6 Inactive WOF | ☐ 8 Closed Exception | | |
| ☐ 3 Unfounded | ☐ 7 Closed Service | | | |

| Date/Time Notified 01/01/2024 0:11 | Date/Time Arrived at Scene 01/01/2024 0:11 | Date/Time Cleared Scene 01/01/2024 1:44 | Original Report ☐ Supplemental Report ☐ |
|---|---|---|---|

| Information Copies Furnished to: | Approving Supervisor 3825 - Lt. Jeffery A. McCarty | Date 01/17/2024 | Date Report Submitted 01/01/2024 |
|---|---|---|---|

Exhibit 1, page 5 of 10

JA043

| Code Number | Reported By | | Origin | Date | Time | Case Number |
|---|---|---|---|---|---|---|
| VA0330000 | 0855 - Lt. Justin D. Hylton | Page No. 3 | 01 - Sheriff/Deputy Sheriff | 01/01/2024 | 0:11 | 2024-000003 |

Summary

as I positioned my spot light in the car I saw the driver leaning into the passenger side of the car with arms extended, apparently reaching for something. I quickly exited my patrol car, drew my service weapon to high ready position, and using the door to my patrol vehicle as cover, began giving the driver commands to exit the vehicle and show me their hands. The driver was the only occupant I could see in the vehicle. I notified dispatch of my location, the tag of the car (VYC-3195) and that I had the driver had gunpoint.

After a brief moment the driver stood out of the door of the car and ,what appeared to be hesitantly, complied with my commands. I kept insisting on seeing the drivers hands while the driver would face me, turn away and look at the car, and put his hands in his pockets. I warned the driver that if he did not listen to what I was telling him to do that he could be shot. The driver finally complied and he was detained at that time. He was advised then that he was only detained and not under arrest.

After the driver was detained, he was patted down for weapons with none found. He advised his identification was in his wallet. He was idenitifed by a Mexico identification as Issac Fidel Martinez- Chavez by his name and date of birth. During this time additional officers to include, Dep. Z. Wade (FCSO), Ofc. T. Poulin (RMPD), Ofc. J. Gardner (RMPD, Sgt. C. Johnson (RMPD), and Dep. M. Cawood (FCSO), arrived on scene to assist. A moment later, dispatch advised that Martinez-Chavez was not licensed and had outstanding warrants out of Montgomery County, Virginia. The tag I had ran through dispatch did not return to the KIA. Chavez was advised by Dep. Wade of the warrants and that he was under arrest. Dep. Wade searched Martinez-Chavez and found a glass smoking device on his person. Dep. Wade will supplement this report.

Upon knowledge of Chavez's warrants, I returned to the KIA to begin securing it for towing due to Chavez going to jail and the car not being registered properly. As Ofc. T. Poulin approached the passenger side of the car he alerted that he saw a firearm in the passenger floorboard. The firearm was retrieved by Ofc. Poulin and Ofc. Gardner and confirmed to be a .22 caliber bolt action rifle. The barrel had been sawn off to 10.5 inches long and there did not appear to be a serial number on the gun. The vehicle was subsequently searched where another firearm, a .22 Caliber RG revolver was located in the passenger compartment as well as additional .22 cal rounds. Ofc. Poulin stayed with the car until it was towed.

The evidence and Martinez- Chavez was transported to the Sheriff's Office by Dep. Wade where Dep. Wade placed the evidence into temporary storage until I processed it. The following is the list of evidence

#1 .22 cal bolt rifle with sawed off 10.5 inch barrel

#2 .22 cal RG revolver SN L699622

#3 Glass smoking device found in Martinez-Chavez possession

#4 .22 cal ammo removed from firarms and vehicel.

#5 Glass smoking device from backpack in trunk of car.

Items #1,2,3 have been processed for submission to the Department of Forensic Science for testing.

Item #4 will be held for court.

Item #5 was marked for destruction.

# Franklin County Sheriff's Office
## PRELIMINARY INVESTIGATIVE REPORT
### NARRATIVE (CONTINUATION)

| Code Number | Reported By | | Origin | Date | Time | Case Number |
|---|---|---|---|---|---|---|
| VA0330000 | 0855 - Lt. Justin D. Hylton | Page No. 4 | 01 - Sheriff/Deputy Sheriff | 01/01/2024 | 0:11 | 2024-000003 |

**Summary**

Martinez-Chavez was served on outstanding Montgomery County warrants as well as two counts of possession of firearm by felon and one count possess sawed off rifle obtained by this officer. Case will remain active as additional charges are pending lab analysis.

SUPPLEMENT #2    Lt. Justin D. Hylton - 0855    01/17/2024    10:05

After several attempts to locate data transfer from worn body camera, there have been issues in recovering the footage. Notification was made in refernce to the issues in the system. I have reached out to Sgt. C. Johnson with RMPD regarding accesibility to body cam data from Ofc. Poulin and Gardner and being able to provide that to SA Moody, ATF

SUPPLEMENT #4    ET Chad R. Sacra - 4147    02/01/2024    11:30

On 02012024, I, CRSacra, met with Adam Moody from the ATF to allow for the examination of Item 1,2 in this case. I retrieved both Items from the evidence room and opened them for Moody. Moody removed both Items and manipulated them for the purpose of documenting caliber and measurements and identifying parts. I replaced both items to the original packages and sealed them initialing my seal with initials and date once complete.

Moody advised he will present information to the Federal prosecutors for the purpose of adopting and if so retrieve this evidence for federal followup if so adopted.

CONFIDENTIAL

# Franklin County Sheriff's Office
## PRELIMINARY INVESTIGATIVE REPORT
### (CONTINUATION)

D.S.P. 102 - M

| Code Number | Reported By | | Origin | Date | Time | Case Number |
|---|---|---|---|---|---|---|
| VA0330000 | 0855 - Lt. Justin D. Hylton | Page No.  5 | 01 - Sheriff/Deputy Sheriff | 01/01/2024 | 0:11 | 2024-000003 |

## Offense(s)

| Event No | Event | Code No | (A) Attempted / ■ (C) Completed | # Premises Entered | Type Security |
|---|---|---|---|---|---|
| 3 | Drug/Narcotic Violations | 35A | | | |

| Type Location | Acc/Susp Used | Criminal Activity | Hate Crime |
|---|---|---|---|
| 13 - Highway/Road/Alley | D | P | 88 - None (No Bias) |





Exhibit 1, page 10 of 10

JA048

| Title of Investigation: | Investigation Number: | Report Number: |
|---|---|---|
| MARTINEZ-CHAVEZ, Issac (Franklin County, VA) | 24-06817 | 2 |

## SUMMARY OF EVENT:

Certified court documents obtained in reference to prior felony convictions, sustained by Issac MARTINEZ-CHAVEZ, and query of clemency and restoration of firearm rights.

## NARRATIVE:

1. On January 29th, 2024, ATF-Roanoke, Special Agent (SA) Adam Moody received certified records pertaining to Issac MARTINEZ-CHAVEZ (DOB: 09/16/1986; SSN 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; FB# 60663TC0) from the Montgomery Couty, Virginia, Circuit Court Clerk's Office. These documents recorded that MARTINEZ-CHAVEZ was convicted and sentenced by the court for the below felony offense.

| Date of Conviction | Offense |
|---|---|
| 02/06/2023 | (F) Possess Schedule II Controlled Substance |
| | Case No. CR22001411-1412-00 (Offense Date 08/29/2022) |

2. On February 1st, 2024, SA Moody received certified records pertaining to STANTON from the Franklin County, Virginia, Circuit Court Clerk's Office. These documents recorded that MARTINEZ-CHAVEZ was convicted and sentenced by the court for the below felony offenses.

| Date of Conviction | Offense |
|---|---|
| 12/20/2018 | (F) Leave the Scene of an Accident Involving Injury |
| | Case No. CR18059735-00 (Offense Date 05/02/2018) |

**Probation Revocation Order**

| 10/28/2021 | Case No. CR18059735-01 |
|---|---|

| Prepared by: | Title: | Signature: | Date: |
|---|---|---|---|
| Adam Moody | Special Agent | | 02/04/2024 |
| Authorized by: | Title: | Signature: | Date: |
| Keith Teehan | RAC | | 02/04/2024 |
| Second Level Reviewer (optional): | Title: | Signature: | Date: |

Exhibit 3, page 1 of 62

JA049

09/14/2022        Case No. CR18059735-02

01/17/2023        Case No. CR 18059735-03

3. SA Moody conducted an online search query of clemency with the Virginia Secretary of the Commonwealth, Restoration of Rights, which resulting with, no record found.

4. SA Moody conducted a query with the Franklin County Circuit Court Clerk system which revealed that MARTINEZ-CHAVEZ had not had his firearms rights restored.

**ATTACHMENTS:**

a. Certified Copy, Montgomery County, Virginia, Circuit Court,

Case No. CR22001411-1412-00

b. Certified Copy, Franklin County, Virginia, Circuit Court,

Case No. CR18059735-00, CR18059735-01, CR18059735-02, CR18059735-03

ATF EF 3120.2 (10-2004)
For Official Use Only

JA050

2023002640.001

**AMENDED CONVICTION AND SENTENCING ORDER**

VIRGINIA:   IN THE CIRCUIT COURT OF MONTGOMERY COUNTY
FEDERAL INFORMATION PROCESSING
STANDARDS CODE: 121C

Hearing Date: February 6, 2023

No.: CR22001411-1412-00                    Judge: Robert M. D. Turk

COMMONWEALTH OF VIRGINIA

V.

ISSAC FIDEL MARTINEZ-CHAVEZ, DEFENDANT

This day came the defendant, Isaac Fidel Martinez-Chavez, who appeared in person with his attorney Brandon Ratliff. The Commonwealth was represented by Nicholas Lauer.

Whereupon the defendant waived his right to have the indictments presented before a Grand Jury and agreed to proceed on the felony and misdemeanor warrants. The defendant also waived arraignment, as charged in the felony and misdemeanor warrants, and after being advised by his counsel pleaded GUILTY to the felony and misdemeanor warrants, which pleas were tendered by the defendant in person, and after being first advised by his counsel and by the Court of his right to trial by jury, the defendant in person, knowingly and voluntarily waived trial by jury, and with the concurrence of the Attorney for the Commonwealth and of the Court, the Court proceeded to hear the case without the intervention of a jury as provided by law.

The parties tendered a written plea agreement to the court that was endorsed by the defendant and counsel. The court reviewed and accepted the terms thereof.

Having heard the evidence and the argument of counsel, the Court finds the defendant guilty of the following offenses:

| CASE NUMBER TRACKING | OFFENSE DESCRIPTION AND INDICATOR (F/M) | OFFENSE DATE | VA. CODE SECTION | VIRGINIA CRIME CODE REFERENCE |
|---|---|---|---|---|
| CR22001411-00 | POSSESS SCHEDULE II CONTROLLED SUBSTANCE (F) | 08/29/2022 | 18.2-250(A,a) | NAR-3022-F5 |
| CR22001412-00 | DUI-D 2ND OR SUBSEQUENT WITHIN 5 YEARS (M) | 08/29/2022 | 18.2-266 | DWI-5464-S9 |

Pursuant to the provisions of Virginia Code § 19.2-298.01, the Court has considered and reviewed the applicable discretionary sentencing guidelines and the guidelines worksheets. The sentencing guidelines worksheets and the written explanation of any departure from the guidelines are ordered filed as a part of the record in this case.

Before pronouncing the sentence, the Court inquired if the defendant desired to make a statement and if the defendant desired to advance any reason why judgment should not be pronounced.

2023002640

2023002640.002

The Court **SENTENCES** the defendant, pursuant to the plea agreement, to:

Incarceration with the **Virginia Department of Corrections** for the term of 3 years on CR22001411-00 and with the Jail of this County for the term of 60 days on CR22001412-00. The total sentence imposed is 3 years (F) 60 days (M).

**Fine:** The defendant is ordered to pay a fine in the amount of $250.00 on CR22001411-00 and a $1,000.00 on CR22001412-00. $500.00 of the $1,000.00 fine imposed on CR22001412-00 shall be suspended ($500.00 being the mandatory minimum).

The Court **SUSPENDS** 2 years 10 months (F) 40 days (M) **(serve 2 months on CR22001411-00 and serve 20 days on CR22001412-00, which is mandatory minimum)** of the sentence for a period of 3 years, for a total suspension of 2 years 10 months (F), 40 days (M) upon the following conditions:

**Good Behavior:** The defendant shall be of good behavior.

**Supervised probation:** On POSSESS SCHEDULE II CONTROLLED SUBSTANCE, the defendant is placed on probation under the supervision of a probation officer for 3 years, or unless sooner released by the Court or by the probation officer. The defendant shall comply with all the rules and requirements set by the probation officer. Probation may include substance abuse counseling and/or testing as prescribed by the Probation Officer.

On DUI-D 2ND OR SUBSEQUENT WITHIN 5 YEARS, the defendant is placed on supervised probation for a period of 12 months through New River Valley ASAP, unless modified by the Court.

IF APPLICABLE:
The defendant shall complete any substance abuse screening, assessment, testing, and treatment as directed by the Department of Corrections.

The defendant is subject to payment of any fees associated with substance abuse treatment or intervention as required by the treatment or intervention program on an ability to pay basis.

**Costs:** The defendant shall pay costs.

**Special Conditions: 1)** The defendant shall not possess or use any illegal narcotics **2)** The defendant agrees to waive his rights concerning search and seizure under the 4th Amendment to the U.S. Constitution during the period of his suspended sentence under this agreement and, as a condition of any suspended sentences, probation, or post release supervision period. **3)** The defendant agrees that he will not possess, purchase, or attempt to possess or purchase a drug or product containing pseudoephedrine during the period of his suspended sentence under this agreement and, as a condition of any suspended

JA052

sentences, probation or post-release supervision period. 4) The defendant shall submit to HIV and Hepatitis C testing pursuant to Va. Code §18.2-346.1 (see separate order). 5) The defendant is to pay $50.00 to the Trauma Center Fund on CR22001412-00. 6) The defendant's driver's license and/or privilege to drive in the Commonwealth of Virginia shall be suspended for three (3) years on CR22001412-00. The defendant is eligible for a restricted license after four (4) months.

**Credit for time served.** The defendant shall be given credit for time spent in confinement while awaiting trial pursuant to Code § 53.1-187.

4/19/23
DATE

ENTER: _____
Robert M.D. Turk, Judge

**DEFENDANT IDENTIFICATION:**

ALIAS:     N/A                    SSN:     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

DOB:       09/16/1986            SEX:     MALE

**SENTENCING SUMMARY:**

TOTAL SENTENCE IMPOSED:     3 YEARS (F) 60 DAYS (M)

TOTAL SENTENCE SUSPENDED: 2 YEARS 10 MONTHS (F) 40 DAYS (M)

A Copy – Teste:
Tiffany M. Couch, Clerk
Circuit Court Montgomery County, Virginia
By: _____, Deputy Clerk

2023002640.001

**AMENDED CONVICTION AND SENTENCING ORDER**

VIRGINIA:   IN THE CIRCUIT COURT OF MONTGOMERY COUNTY
FEDERAL INFORMATION PROCESSING
STANDARDS CODE: 121C

Hearing Date: February 6, 2023

No.: CR22001411-1412-00                    Judge: Robert M. D. Turk

COMMONWEALTH OF VIRGINIA

V.

ISSAC FIDEL MARTINEZ-CHAVEZ, DEFENDANT

     This day came the defendant, Isaac Fidel Martinez-Chavez, who appeared in person with his attorney Brandon Ratliff. The Commonwealth was represented by Nicholas Lauer.
     Whereupon the defendant waived his right to have the indictments presented before a Grand Jury and agreed to proceed on the felony and misdemeanor warrants. The defendant also waived arraignment, as charged in the felony and misdemeanor warrants, and after being advised by his counsel pleaded GUILTY to the felony and misdemeanor warrants, which pleas were tendered by the defendant in person, and after being first advised by his counsel and by the Court of his right to trial by jury, the defendant in person, knowingly and voluntarily waived trial by jury, and with the concurrence of the Attorney for the Commonwealth and of the Court, the Court proceeded to hear the case without the intervention of a jury as provided by law.
     The parties tendered a written plea agreement to the court that was endorsed by the defendant and counsel. The court reviewed and accepted the terms thereof.
     Having heard the evidence and the argument of counsel, the Court finds the defendant guilty of the following offenses:

| CASE NUMBER TRACKING | OFFENSE DESCRIPTION AND INDICATOR (F/M) | OFFENSE DATE | VA. CODE SECTION | VIRGINIA CRIME CODE REFERENCE |
|---|---|---|---|---|
| CR22001411-00 | POSSESS SCHEDULE II CONTROLLED SUBSTANCE (F) | 08/29/2022 | 18.2-250(A,a) | NAR-3022-F5 |
| CR22001412-00 | DUI-D 2ND OR SUBSEQUENT WITHIN 5 YEARS (M) | 08/29/2022 | 18.2-266 | DWI-5464-S9 |

     Pursuant to the provisions of Virginia Code § 19.2-298.01, the Court has considered and reviewed the applicable discretionary sentencing guidelines and the guidelines worksheets. The sentencing guidelines worksheets and the written explanation of any departure from the guidelines are ordered filed as a part of the record in this case.
     Before pronouncing the sentence, the Court inquired if the defendant desired to make a statement and if the defendant desired to advance any reason why judgment should not be pronounced.

2023002640

JA054

2023002640.002

The Court **SENTENCES** the defendant, pursuant to the plea agreement, to:

Incarceration with the **Virginia Department of Corrections** for the term of 3 years on CR22001411-00 and with the Jail of this County for the term of 60 days on CR22001412-00. The total sentence imposed is 3 years (F) 60 days (M).

**Fine:** The defendant is ordered to pay a fine in the amount of $250.00 on CR22001411-00 and a $1,000.00 on CR22001412-00. $500.00 of the $1,000.00 fine imposed on CR22001412-00 shall be suspended ($500.00 being the mandatory minimum).

The Court **SUSPENDS** 2 years 10 months (F) 40 days (M) **(serve 2 months on CR22001411-00 and serve 20 days on CR22001412-00, which is mandatory minimum)** of the sentence for a period of 3 years, for a total suspension of 2 years 10 months (F), 40 days (M) upon the following conditions:

**Good Behavior:** The defendant shall be of good behavior.

**Supervised probation:** On POSSESS SCHEDULE II CONTROLLED SUBSTANCE, the defendant is placed on probation under the supervision of a probation officer for 3 years, or unless sooner released by the Court or by the probation officer. The defendant shall comply with all the rules and requirements set by the probation officer. Probation may include substance abuse counseling and/or testing as prescribed by the Probation Officer.

On DUI-D 2ND OR SUBSEQUENT WITHIN 5 YEARS, the defendant is placed on supervised probation for a period of 12 months through New River Valley ASAP, unless modified by the Court.

IF APPLICABLE:
The defendant shall complete any substance abuse screening, assessment, testing, and treatment as directed by the Department of Corrections.

The defendant is subject to payment of any fees associated with substance abuse treatment or intervention as required by the treatment or intervention program on an ability to pay basis.

**Costs:** The defendant shall pay costs.

**Special Conditions: 1)** The defendant shall not possess or use any illegal narcotics **2)** The defendant agrees to waive his rights concerning search and seizure under the 4th Amendment to the U.S. Constitution during the period of his suspended sentence under this agreement and, as a condition of any suspended sentences, probation, or post release supervision period. **3)** The defendant agrees that he will not possess, purchase, or attempt to possess or purchase a drug or product containing pseudoephedrine during the period of his suspended sentence under this agreement and, as a condition of any suspended

JA055

sentences, probation or post-release supervision period. 4) The defendant shall submit to HIV and Hepatitis C testing pursuant to Va. Code §18.2-346.1 (see separate order). 5) The defendant is to pay $50.00 to the Trauma Center Fund on CR22001412-00. 6) The defendant's driver's license and/or privilege to drive in the Commonwealth of Virginia shall be suspended for three (3) years on CR22001412-00. The defendant is eligible for a restricted license after four (4) months.

**Credit for time served.** The defendant shall be given credit for time spent in confinement while awaiting trial pursuant to Code § 53.1-187.

4/19/23
DATE

ENTER: _____
Robert M.D. Turk, Judge

**DEFENDANT IDENTIFICATION:**

ALIAS:      N/A                    SSN:      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

DOB:        09/16/1986             SEX:      MALE

**SENTENCING SUMMARY:**

TOTAL SENTENCE IMPOSED:      3 YEARS (F) 60 DAYS (M)

TOTAL SENTENCE SUSPENDED: 2 YEARS 10 MONTHS (F) 40 DAYS (M)

A Copy – Teste:
Tiffany M. Couch, Clerk
Circuit Court Montgomery County, Virginia
By: _____, Deputy Clerk

VIRGINIA:

IN THE CIRCUIT COURT OF FRANKLIN COUNTY

COMMONWEALTH OF VIRGINIA

v.                              CASE NOS. **18 05 9735** and **18 01 1311**

**ISSAC FIDEL MARTINEZ-CHAVEZ**, DEFENDANT

**Social Security Number:** NONE          **Date of Birth:** SEPTEMBER 16, 1986
**Hearing Date:** DECEMBER 20, 2018
**Judge:** HONORABLE STACEY W. MOREAU
**Hearing Type:** TRIAL
**Attorney for the Commonwealth:** ASHLEY NEESE
**Attorney for Defendant:** HUNTER W. NAFF, appointed

**(1) Original Charge Description:** LEAVE THE SCENE OF AN ACCIDENT INVOLVING PERSONAL INJURY (F)
                                                        **Case No. 18 05 9735**
**Statute/Ordinance Violation Charged:** §46.2-894          **VCC Code: HIT6608F5**
**Offense Description if Convicted:** LEAVE THE SCENE OF AN ACCIDENT INVOLVING PERSONAL INJURY (F)

**Statute/Ordinance of Conviction:** §46.2-894 (F)
**Alleged Offense Date:** MAY 2, 2018                              **OTN: 067GM1800002716**

**(2) Original Charge Description:** DRIVE A MOTOR VEHICLE WITHOUT HAVING OBTAINED LICENSE (M)
                                                        **Case No. 18 01 1311**
**Statute/Ordinance Violation Charged:** §46.2-300          **VCC Code: LIC6808M2**
**Offense Description if Convicted:** DRIVE A MOTOR VEHICLE WITHOUT HAVING OBTAINED LICENSE (M)

**Statute/Ordinance of Conviction:** §46.2-300(M)
**Alleged Offense Date:** MAY 2, 2018                              **OTN: 067GM1800002717**

**Commencing Status of Defendant:** IN CUSTODY

On December 20, 2018, came Ashley Neese, assistant attorney for the

Commonwealth, the defendant, Issac Fidel Martinez-Chavez, led to the bar in the

custody of the jailer of this county, and came also, Hunter W. Naff, his attorney, previously

appointed. Also present and duly sworn was Jeremy S. Manuel, Spanish language

interpreter.

The accused waived arraignment, and after private consultation with and being

advised by counsel, entered pleas of not guilty to the indictments, which pleas were

Exhibit 3, page 9 of 62

tendered by the accused in person. After being advised by counsel and by the Court of right to trial by jury, the accused knowingly and voluntarily waived trial by a jury, and with the concurrence of the attorney for the Commonwealth and of the Court, here entered of record, the Court proceeded to hear and determine these cases without a jury as provided by law.

At the conclusion of the Commonwealth's evidence, the attorney for the defendant moved the Court to strike the Commonwealth's evidence on grounds stated to the record, which motion the Court overruled.

At the conclusion of all the evidence, the attorney for the defendant renewed his motion to strike the Commonwealth's evidence on grounds stated to the record, which motion the Court again overruled, and noted the objection of counsel for the defendant to the Court's ruling.

After hearing all the evidence and argument of counsel, the Court finds the defendant guilty of the following offenses:

| CASE NUMBER | OFFENSE DESCRIPTION & INDICATOR (F/M) | OFFENSE DATE | VA. CODE SECTION | VCC CODE | OFFENSE TRACKING NUMBER |
|---|---|---|---|---|---|
| 18 05 9735 | LEAVE THE SCENE OF AN ACCIDENT INVOLVING PERSONAL INJURY (F) | 05/02/2018 | §46.2-894 | HIT6608F5 | 067GM1800002716 |
| 18 01 1311 | OPERATE A MOTOR VEHICLE WITHOUT HAVING OBTAINED A LICENSE (M) | 05/02/2018 | §46.2-300 | LIC6808M2 | 067GM1800002717 |

Before fixing punishment or imposing sentence, the Court directs the Probation Officer of this Court to thoroughly investigate and report to the Court as provided by law. The defendant shall undergo a substance abuse screening and, if the screening indicates a substance abuse or dependence problem, an assessment as directed by the Probation

Officer. The results of the screening and assessment, if indicated, shall be included in the pre-sentence report.

The defendant was remanded to jail pending sentencing.

These cases are continued to **March 27, 2019 at 3:00 p.m.** for sentencing.

The Clerk of this Court shall mail or deliver certified copies of this Order to Hunter W. Naff, Esquire, to Probation and Parole, and to the attorney for the Commonwealth.

ENTER: 1-1-019

STACEY W. MOREAU, JUDGE

14107H

I CERTIFY THAT THE DOCUMENT TO WHICH THIS AUTHENTICATION IS AFFIXED IS A TRUE COPY OF A RECORD IN THE FRANKLIN COUNTY CIRCUIT COURT CLERK'S OFFICE, AND THAT I AM THE CUSTODIAN AND HAVE CUSTODY OF THE RECORD.
Date 2-1-24
_____ Clerk _____ Deputy Clerk

# SENTENCING ORDER

VIRGINIA: IN THE CIRCUIT COURT OF FRANKLIN

FEDERAL INFORMATION PROCESSING
STANDARDS CODE: 067C

Hearing Date: APRIL 4, 2019
Judge: STACEY W. MOREAU

COMMONWEALTH OF VIRGINIA   v.  ISSAC FIDEL MARTINEZ-CHAVEZ                    , Defendant

This case came before the Court for sentencing of the defendant, who appeared in person with his
attorney,  NAFF, HUNTER W,  APPOINTED                                                              .

The Commonwealth was represented by ASHLEY B. NEESE                                             .

On  DECEMBER 20, 2018      the defendant was found guilty of the following offenses:

| Offense Tracking Number | Virginia Crime Code (For Administrative Use Only) | Code Section | Case Number |
|---|---|---|---|
| 067GM1800002716 | HIT-6608-F5 | E.46.2-894 | CR18059735-00 |
| Offense Date: 05/02/2018 | Description: FAIL STOP ACCIDENT/FEL INJURY | | FELONY |
| 067GM1800002717 | LIC-6808-M2 | 46.2-300 | CR18011311-00 |
| Offense Date: 05/02/2018 | Description: NO DRIVERS LICENSE | | MISDEMEANOR |
| Offense Date: | Description: | | |
| Offense Date: | Description: | | |
| Offense Date: | Description: | | |
| Offense Date: | Description: | | |
| Offense Date: | Description: | | |
| Offense Date: | Description: | | |
| Offense Date: | Description: | | |
| Offense Date: | Description: | | |
| Offense Date: | Description: | | |
| Offense Date: | Description: | | |

2019 MAY 23  AM 10:40  RECEIVED & FILED
FRANKLIN COUNTY CLERK OF CIRCUIT COURT TERESA J. BROWN, CLERK

[X] The presentence report was considered and is ordered filed as a part of the record in this case in accordance
with the provisions of Code § 19.2-299.

[  ] No presentence report was ordered.

Pursuant to the provisions of Code § 19.2-298.01, the Court has considered and reviewed the applicable
discretionary sentencing guidelines and the guidelines worksheets. The sentencing guidelines worksheets and
the written explanation of any departure from the guidelines are ordered filed as a part of the record in this case.

Before pronouncing the sentence, the Court inquired if the defendant desired to make a statement and if the
defendant desired to advance any reason why judgment should not be pronounced.

5-23-19
Scan
CA
HWN
Jail(2)
VSG
File

FORM CC-1393 MASTER 7/07                    Page 1 of 4

Exhibit 3, page 12 of 62

JA060

COMMONWEALTH OF VIRGINIA   v.   ISSAC FIDEL MARTINEZ-CHAVEZ ................................, Defendant

The court **SENTENCES** the defendant to:

Case No. .......... CR18059735-00 ..........   Description  FAIL STOP ACCIDENT/FEL INJURY ........................

[X] Incarceration with the Virginia Department of Corrections for the term of: ......4..... years ............... months ........... days

[ ] FINE.        The defendant is ordered to pay fine(s) in the amount of $ ................................

[X] COSTS.     The defendant is ordered to pay all costs of this case.

[ ] RESTITUTION.   The defendant is ordered to make restitution as set forth in the ORDER FOR RESTITUTION.

[ ] DRIVER'S LICENSE SUSPENSION: The defendant's license has been suspended

    [ ] for a period of ............... years ................... months ............... days    [ ] indefinitely.

[ ] RESTRICTED DRIVER'S LICENSE: A restricted driver's license was issued by separate order.

[X] The court **SUSPENDS** ........3..... years ..........6..... months ................... days of incarceration ........................... fine for a
    period of ................4 YEARS................. upon the condition(s) specified in Suspended Sentence Conditions.

---

Case No. .......... CR18011311-00 ..........   Description  NO DRIVERS LICENSE ........................

[ ] Incarceration with the Virginia Department of Corrections for the term of: ............ years ............... months ............... days

[X] FINE.        The defendant is ordered to pay fine(s) in the amount of $ ..........50.00..........

[X] COSTS.     The defendant is ordered to pay all costs of this case.

[ ] RESTITUTION.   The defendant is ordered to make restitution as set forth in the ORDER FOR RESTITUTION.

[X] DRIVER'S LICENSE SUSPENSION: The defendant's license has been suspended

    [X] for a period of ............... years ................... months ...90... days    [ ] indefinitely.

[ ] RESTRICTED DRIVER'S LICENSE: A restricted driver's license was issued by separate order.

[X] The court **SUSPENDS** .................... years ............... months ................... days of incarceration ......$50.00...... fine for a
    period of ................................. upon the condition(s) specified in Suspended Sentence Conditions.

---

Case No. ................................   Description ................................

[ ] Incarceration with the Virginia Department of Corrections for the term of: ........... years ............... months ........... days

[ ] FINE.        The defendant is ordered to pay fine(s) in the amount of $ ................................

[ ] COSTS.     The defendant is ordered to pay all costs of this case.

[ ] RESTITUTION.   The defendant is ordered to make restitution as set forth in the ORDER FOR RESTITUTION.

[ ] DRIVER'S LICENSE SUSPENSION: The defendant's license has been suspended

    [ ] for a period of ............... years ................... months ............... days    [ ] indefinitely.

[ ] RESTRICTED DRIVER'S LICENSE: A restricted driver's license was issued by separate order.

[ ] The court **SUSPENDS** .................... years ............... months ................... days of incarceration ........................... fine for a
    period of ................................. upon the condition(s) specified in Suspended Sentence Conditions.

Exhibit 3, page 13 of 62

JA061

COMMONWEALTH OF VIRGINIA  v. ISSAC FIDEL MARTINEZ-CHAVEZ ..........................................., Defendant

**Consecutive/concurrent:**

[X] These sentences shall run consecutively with all other sentences.

[ ] These sentences shall run concurrently with all other sentences.

[ ] These sentences shall run consecutively/concurrently as described:

**Suspended Sentence Conditions:**

[X] **Good Behavior:** The defendant shall be of good behavior for ......4...... years ............... months from the defendant's release from confinement [ ] .....................................................................................................

[X] **Supervised Probation:** The defendant is placed on probation under the supervision of a Probation Officer to commence [ ] upon sentencing [X] upon release from incarceration for ..................... years ......18......... months ..................... days [ ] indefinite or unless sooner released by the court or by the Probation Officer. The defendant shall comply with all the rules and requirements set by the Probation Officer. Probation shall include substance abuse counseling and/or testing as prescribed by the Probation Officer.

[ ] **Community-Based Corrections System Program pursuant to Virginia Code § 19.2-316.2 or 19.2-316.3:** The defendant shall successfully complete the ...............................................................................................................

program. Successful completion of the program shall be followed by a period of intensive probation of

........................................................................................................, followed by a period of supervised probation

of ........................................................................................ .

[ ] The defendant shall remain in custody until program entry.

[ ] Registration pursuant to Code § 9.1-903 for offenses defined in § 9.1-902 is required.

[X] The defendant shall provide a DNA sample and legible fingerprints as directed.

[X] **Special conditions:**

SHALL NOT POSSESS OR USE ALCOHOL, SHALL NOT POSSESS FIREARMS, SHALL MAKE MONTHLY PAYMENTS IN THE AMOUNT OF $50.00 TOWARDS COURT COST AND SHALL COMPLY WITH SUBSTANCE ABUSE COUNSELING AND/OR TESTING AS PRESCRIBED BY PROBATION OFFICER.

[ ] The defendant shall make restitution as set forth in the ORDER FOR RESTITUTION.

Exhibit 3, page 14 of 62

JA062

COMMONWEALTH OF VIRGINIA    v.   ISSAC FIDEL MARTINEZ-CHAVEZ _____, Defendant

**Post-incarceration supervision following felony conviction pursuant to Virginia Code § 18.2-10 and 19.2-295.2:**

[ ] **Post-Incarceration Supervised Probation:** The defendant is placed on supervised probation to commence upon release from incarceration for a period of _____, unless released earlier by the court. The defendant shall comply with all the rules and requirements set by the Probation Officer.

[ ] **Post-Incarceration Post-Release Supervision:** In addition to the above sentence of incarceration, the court imposes an additional term of _____ of incarceration.  This term is suspended and a period of post-release supervision of _____, is imposed which is to commence upon release from incarceration. The defendant shall comply with all the rules and requirements set by the Probation Officer.

[ ]

[X] The defendant was remanded to the custody of the sheriff.    [ ] The defendant was allowed to depart.

The defendant shall be given credit for time spent in confinement while awaiting trial pursuant to Virginia Code § 53.1-187.

ENTER this _22__ day of ___May 249___

_____ Judge

**DEFENDANT IDENTIFICATION:**

Name: ISSAC FIDEL MARTINEZ-CHAVEZ _____

Alias: _____

SSN: 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 ___ DOB: 09 / 16 / 1986  Sex: M

**SENTENCE SUMMARY:**

Total Incarceration Sentence Imposed:  4 YEARS _____

Total Sentence Suspended:        3 YEARS  6 MONTHS _____

Total Supervised Probation Term:   18 MONTHS _____

Total Postrelease Term Imposed and Suspended: _____

Total Fine Imposed $_____. Total Fine Suspended $_____

**FOR CLERK'S USE ONLY:**

[ ] Conviction reported to applicable Board _____, Clerk

.....................................
DATE

By: _____, Deputy Clerk

I CERTIFY THAT THE DOCUMENT TO WHICH THIS AUTHENTICATION IS AFFIXED IS A TRUE COPY OF A RECORD IN THE FINAN... COUNTY CIRCUIT CLERK'S OFFICE, A... ...M THE ... HAVE CUSTODY OF THE RECORD.

Custodian ___
Date 2-1-24
_____ Deputy Clerk

FORM CC-1393 MASTER 1/09          Page 4 of 4

Exhibit 3, page 15 of 62

JA063

VIRGINIA:

IN THE CIRCUIT COURT FOR FRANKLIN COUNTY

**PROBATION REVOCATION ORDER**

FIPS CODE: 067

**HEARING DATE:** OCTOBER 28, 2021
**JUDGE:** HONORABLE TIMOTHY W. ALLEN

COMMONWEALTH OF VIRGINIA

v.                                    CASE NO. **18 05 9735-01**

**ISSAC FIDEL MARTINEZ-CHAVEZ**, DEFENDANT

This case came before the Court for the revocation of probation hearing of the defendant, Issac Fidel Martinez-Chavez, who appeared via video conference, and came also, Hunter W. Naff, his attorney, previously appointed. Ashley B. Neese represented the Commonwealth.

On **December 20, 2018**, the defendant entered a plea of not guilty, and was found guilty of the following offenses:

| CASE NUMBER | OFFENSE DESCRIPTION & INDICATOR (F/M) | OFFENSE DATE | VA. CODE SECTION | VCC CODE | OFFENSE TRACKING NUMBER |
|---|---|---|---|---|---|
| 18 05 9735 | LEAVE THE SCENE OF AN ACCIDENT INVOLVING PERSONAL INJURY (F) | 05/02/2018 | §46.2-894 | HIT6608F5 | 067GM1800002716 |
| 18 01 1311 | NO DRIVERS LICENSE | 05/02/2018 | §46.2-300 | LIC6808M2 | 067GM1800002717 |

On **April 4, 2019**, the defendant was sentenced to confinement with the **Virginia Department of Corrections** for a term of four years on **Indictment 19 05 9735**, with the execution of three years six months being suspended, leaving six months to serve. The Court imposed a $50.00 fine on **Indictment 18 01 1311**, with the fine being suspended. The conditions of the suspended sentence were that defendant keep the peace and be of good behavior for a period of four years, be placed on supervised

Exhibit 3, page 16 of 62

JA064

probation for a term of eighteen months, and upon payment of $1,154.00 Court costs. The defendant's privilege to drive was suspended for a period of ninety days on **Indictment 18 01 1311**. The Court imposed the further special conditions of probation that defendant shall not possess or use alcohol, possess firearms, shall make monthly payments in the amount of $50.00 towards Court cost and comply with substance abuse counseling and/or treatment as prescribed by probation officer.

And on **October 28, 2021**, the defendant appeared before this Court for a revocation of probation hearing. The Court received and considered the evidence of the major violation report, to-wit: violation of condition #8, use, possess or distribute controlled substances or related paraphernalia. The defendant and counsel were given the right to present any additional facts bearing upon the matter as they desired to present.

Having heard and taken into consideration all the evidence and argument of counsel, the Court demanded of the defendant whether he desired to make a statement or advance any reason why judgment should not be pronounced against him according to law. Nothing being offered or alleged in delay of judgment, the Court finds that the defendant has violated the terms and conditions of probation, revokes the suspension of the remainder of the original four-year sentence and **re-suspends** the execution of the sentence upon the following conditions:

**GOOD BEHAVIOR**: The defendant is **ORDERED** to keep the peace and be of good behavior for a period of four years from October 28, 2021.

**SUPERVISED PROBATION**: The defendant is continued on supervised probation to re-commence upon release from confinement, under the supervision of a Probation Officer, for a period of eighteen months, unless released sooner by the

Court or by the Probation Officer. The defendant shall comply with all the rules and requirements set by the Probation Officer, and previously adopted by this Court. Probation shall include substance abuse counseling and/or testing as prescribed by the Probation Officer. This probation period will not expire while a major violation of probation is pending.

**COURT COSTS:** The defendant is **ORDERED** to pay Court costs in the amount of $502.00, due immediately, payment of costs to be monitored by the Probation Officer. If defendant is not financially able to pay Court costs as required by the Court, the Court **ORDERS** that the defendant be allowed to perform community service under the supervision of the Probation Officer, in lieu of monetary payment of costs, to be compensated at the rate of $9.50 credit per hour worked. If defendant petitions for installment payments and fails to pay as agreed, collection will be handled through the Virginia Department of Taxation.

The Court certifies that at all times during this hearing, the defendant was present via video conference and the attorney was personally present.

The Court **ORDERS** that defendant be given credit for time spent in confinement while awaiting this hearing pursuant to Virginia Code §53.1-187.

DATE ___12/2/21___     ENTER: ___7. W. all___

<div align="center">JUDGE</div>

**DEFENDANT IDENTIFICATION:**
ALIAS:
DOB: SEPTEMBER 16, 1986          SSN: NONE/UNKNOWN          SEX: M
**SENTENCING SUMMARY:**
TOTAL ORIGINAL SENTENCE IMPOSED: FOUR YEARS
TOTAL SENTENCE PREVIOUSLY SERVED: SIX MONTHS
TOTAL SENTENCE IMPOSED THIS DAY: THREE YEARS SIX MONTHS
TOTAL SENTENCE RE-SUSPENDED THIS DAY: THREE YEARS SIX MONTHS
0707w

I CERTIFY THAT THE DOCUMENT TO WHICH THIS AUTHENTICATED IS AFFIXED IS A TRUE COPY OF A HEARING IN THE FRANKLIN COUNTY CIRCUIT COURT CLERK'S OFFICE AND THAT I AM THE CUSTODIAN AND HAVE CUSTODY OF THE RECORD.
Date ___2-1-24___
_Jessica Lambert_
Clerk ____ Deputy Clerk

VIRGINIA:

IN THE CIRCUIT COURT FOR FRANKLIN COUNTY

**PROBATION REVOCATION ORDER**

FIPS CODE: 067

**HEARING DATE:** SEPTEMBER 14, 2022
**JUDGE:** HONORABLE TIMOTHY W. ALLEN

COMMONWEALTH OF VIRGINIA

v.                CASE NO. **18 05 9735-02**

**ISSAC FIDEL MARTINEZ-CHAVEZ**, DEFENDANT

This case came before the Court for the revocation of probation hearing of the

defendant, Issac Fidel Martinez-Chavez, who appeared via video conference, and

came also, Hunter W. Naff, his attorney, previously appointed. W. Cooper Brown

represented the Commonwealth.

On **December 20, 2018**, the defendant entered pleas of not guilty, and was

found guilty of the following offenses:

9-26-22
SCAN
CA
PO
HWN
Jail (2)

| CASE NUMBER | OFFENSE DESCRIPTION & INDICATOR (F/M) | OFFENSE DATE | VA. CODE SECTION | VCC CODE | OFFENSE TRACKING NUMBER |
|---|---|---|---|---|---|
| 18 05 9735 | LEAVE THE SCENE OF AN ACCIDENT INVOLVING PERSONAL INJURY (F) | 05/02/2018 | §46.2-894 | HIT6608F5 | 067GM1800002716 |
| 18 01 1311 | NO DRIVERS LICENSE (M) | 05/02/2018 | §46.2-300 | LIC6808M2 | 067GM1800002717 |

On **April 4, 2019**, the defendant was sentenced to confinement with the

**Virginia Department of Corrections** for a term of four years on **Indictment 19 05 9735**,

with the execution of three years six months being suspended, leaving six months to

serve. The Court imposed a fine in the amount of $50.00 on **Indictment 18 01 1311**,

with the fine being suspended. The conditions of the suspended sentence were that

defendant keep the peace and be of good behavior for a period of four years, be

Exhibit 3, page 19 of 62

JA067

placed on supervised probation for a term of eighteen months, and upon payment of $1,154.00 Court costs. The defendant's privilege to drive was suspended for a period of ninety days on Indictment 18 01 1311. The Court imposed the further special conditions of probation that defendant shall not possess or use alcohol, possess no firearms, shall make monthly payments in the amount of $50.00 towards Court cost and comply with substance abuse counseling and/or treatment as prescribed by probation officer.

On **October 28, 2021**, the defendant appeared before this Court for a revocation of probation hearing. The Court found that the defendant had violated the terms and conditions of probation and revoked the suspension of the remainder of the original four-year sentence and re-suspended the execution of the sentence upon the conditions that he keep peace and be of good behavior for a period of four years and continue on supervised probation for a period of eighteen months. Court costs in the amount of $502.00 were assessed for this hearing.

And on **September 14, 2022**, the defendant again appeared before this Court for a revocation of probation hearing. The Court received and considered the evidence of the major violation report and addendum, to-wit: violation of condition #4, fail to report as instructed, condition #10, change residence or leave State of Virginia without permission and condition #11, abscond from supervision. The defendant and counsel were given the right to present any additional facts bearing upon the matter as they desired to present.

Having heard and taken into consideration all the evidence and argument of counsel, the Court demanded of the defendant whether he desired to make a statement or advance any reason why judgment should not be pronounced against

him according to law. Nothing being offered or alleged in delay of judgment, the Court finds that the defendant has violated the terms and conditions of probation, revokes the suspension of one month of the original four-year sentence, and

The Court **SENTENCES** the defendant to:

Incarceration with the **Virginia Department of Corrections** for the term of one month on indictment **18 05 9735**.

This sentence shall run consecutively with any other sentences the defendant may have to serve.

The Court **RE-SUSPENDS** the execution of the remaining three-year five-month sentence upon the following conditions:

**GOOD BEHAVIOR:** The defendant is **ORDERED** to keep the peace and be of good behavior for a period of four years from September 14, 2022.

**SUPERVISED PROBATION:** The defendant is continued on supervised probation to re-commence upon release from confinement, under the supervision of a Probation Officer, for a period of eighteen months, unless released sooner by the Court or by the Probation Officer. The defendant shall comply with all the rules and requirements set by the Probation Officer, and previously adopted by this Court. Probation shall include substance abuse counseling and/or testing as prescribed by the Probation Officer. This probation period will not expire while a major violation of probation is pending. The defendant shall report to the probation office within 24 hours upon his release from confinement.

**COURT COSTS:** The defendant is **ORDERED** to pay Court costs in the amount of $666.00, upon release from confinement, payment of costs to be monitored by the Probation Officer. If defendant is not financially able to pay Court costs as required

Exhibit 3, page 21 of 62

JA069

by the Court, the Court **ORDERS** that the defendant be allowed to perform community service under the supervision of the Probation Officer, in lieu of monetary payment of costs, to be compensated at the rate of $11.00 credit per hour worked. If defendant petitions for installment payments and fails to pay as agreed, collection will be handled through the Virginia Department of Taxation.

The Court certifies that at all times during this hearing, the defendant was present via video conference and the attorney was personally present.

The Court **ORDERS** that defendant be given credit for time spent in confinement while awaiting this hearing pursuant to Virginia Code §53.1-187.

DATE_____9/26/22_____ ENTER: _____T. Wall_____

JUDGE

**DEFENDANT IDENTIFICATION:**
ALIAS:
DOB: SEPTEMBER 16, 1986          SSN: 673 72 4673          SEX: M
**SENTENCING SUMMARY:**
TOTAL ORIGINAL SENTENCE IMPOSED:  FOUR YEARS
TOTAL SENTENCE PREVIOUSLY SERVED:  SIX MONTHS
TOTAL SENTENCE IMPOSED THIS DAY:  ONE MONTH
TOTAL SENTENCE RE-SUSPENDED THIS DAY:  THREE YEARS FIVE MONTHS
9462E

I CERTIFY THAT THE DOCUMENT TO WHICH THIS
A... ...CATION IS ... ... IS A TRUE COPY
O... ... THE FRANKLIN COUNTY CIRCUIT
C... ... ...CE, AND THAT ...
CUSTO... ... ...STODY OF THE ...ARD.
Date 2-1-24          Jessica Lambert
          Clerk ___ Deputy Clerk

VIRGINIA:

IN THE CIRCUIT COURT FOR FRANKLIN COUNTY

**PROBATION REVOCATION ORDER**

FIPS CODE: 067

**HEARING DATE:** JANUARY 17, 2023
**JUDGE:** HONORABLE JAMES J. REYNOLDS

COMMONWEALTH OF VIRGINIA

v.                                         CASE NO. **18 05 9735-03**

**ISSAC FIDEL MARTINEZ-CHAVEZ**, DEFENDANT

This case came before the Court for the revocation of probation hearing of the

defendant, Issac Fidel Martinez-Chavez, who was led to the bar in the custody of the

jailer of this county, and came also, Hunter W. Naff, his attorney, previously appointed.

Aimee Lucas represented the Commonwealth.

On **December 20, 2018**, the defendant entered pleas of not guilty, and was

found guilty of the following offenses:

| CASE NUMBER | OFFENSE DESCRIPTION & INDICATOR (F/M) | OFFENSE DATE | VA. CODE SECTION | VCC CODE | OFFENSE TRACKING NUMBER |
|---|---|---|---|---|---|
| 18 05 9735 | LEAVE THE SCENE OF AN ACCIDENT INVOLVING PERSONAL INJURY (F) | 05/02/2018 | §46.2-894 | HIT6608F5 | 067GM1800002716 |
| 18 01 1311 | NO DRIVERS LICENSE (M) | 05/02/2018 | §46.2-300 | LIC6808M2 | 067GM1800002717 |

On **April 4, 2019**, the defendant was sentenced to confinement with the **Virginia**

**Department of Corrections** for a term of four years on **Indictment 19 05 9735**, with the

execution of three years six months being suspended, leaving six months to serve. The

Court imposed a fine in the amount of $50.00 on **Indictment 18 01 1311**, with the fine

being suspended. The conditions of the suspended sentence were that defendant

keep the peace and be of good behavior for a period of four years, be placed on

supervised probation for a term of eighteen months, and upon payment of $1,154.00 Court costs. The defendant's privilege to drive was suspended for a period of ninety days on Indictment 18 01 1311. The Court imposed the further special conditions of probation that defendant shall not possess or use alcohol, possess no firearms, shall make monthly payments in the amount of $50.00 towards Court cost and comply with substance abuse counseling and/or treatment as prescribed by probation officer.

On **October 28, 2021**, the defendant appeared before this Court for a revocation of probation hearing. The Court found that the defendant had violated the terms and conditions of probation and revoked the suspension of the remainder of the original four-year sentence and re-suspended the execution of the sentence upon the conditions that he keep peace and be of good behavior for a period of four years and continue on supervised probation for a period of eighteen months. Court costs in the amount of $502.00 were assessed for this hearing.

On **September 14, 2022**, the defendant appeared before this Court for a revocation of probation hearing. The Court found the defendant had violated the terms and conditions of probation, revoked the suspension of one month of the original four-year sentence and resuspended the remaining three years five months upon conditions the defendant keep the peace and be of good behavior for a period of four years and continue on supervised probation for a period of eighteen months. Court costs in the amount of $666.00 were assessed for this hearing.

And on **January 12, 2023**, the defendant again appeared before this Court for a revocation of probation hearing. The Court received and considered the evidence of the major violation report, to-wit: violation of condition #8, use, possess, distribute controlled substances or paraphernalia. The defendant and counsel were given the

right to present any additional facts bearing upon the matter as they desired to present.

Having heard and taken into consideration all the evidence and argument of counsel, the Court demanded of the defendant whether he desired to make a statement or advance any reason why judgment should not be pronounced against him according to law. Nothing being offered or alleged in delay of judgment, the Court finds that the defendant has violated the terms and conditions of probation, revokes the suspension of twelve months of the original four-year sentence, and

The Court **SENTENCES** the defendant to:

Incarceration with the **Virginia Department of Corrections** for the term of twelve months on Indictment **18 05 9735**.

This sentence shall run consecutively with any other sentences the defendant may have to serve.

The Court **RE-SUSPENDS** the execution of the remaining two years five months sentence upon the following conditions:

**GOOD BEHAVIOR:** The defendant is **ORDERED** to keep the peace and be of good behavior for a period of three years from January 12, 2023.

**SUPERVISED PROBATION:** The defendant is **terminated** from supervised probation.

**COURT COSTS:** The defendant is **ORDERED** to pay Court costs in the amount of $666.00, upon release from confinement. If defendant is not financially able to pay Court costs as required by the Court, the Court **ORDERS** that the defendant be allowed to perform community service, in lieu of monetary payment of costs, to be compensated at the rate of $12.00 credit per hour worked. If defendant petitions for

installment payments and fails to pay as agreed, collection will be handled through the Virginia Department of Taxation.

The Court certifies that at all times during this hearing, the defendant was present via video conference and the attorney was personally present.

The Court **ORDERS** that defendant be given credit for time spent in confinement while awaiting this hearing pursuant to Virginia Code §53.1-187.

DATE 1/30/2023    ENTER: _____
                                   JUDGE

**DEFENDANT IDENTIFICATION:**
ALIAS:
DOB: SEPTEMBER 16, 1986        SSN: 673 72 4673        SEX: M
**SENTENCING SUMMARY:**
TOTAL ORIGINAL SENTENCE IMPOSED: FOUR YEARS
TOTAL SENTENCE PREVIOUSLY SERVED: SEVEN MONTHS
TOTAL SENTENCE IMPOSED THIS DAY: TWELVE MONTHS
TOTAL SENTENCE RE-SUSPENDED THIS DAY: TWO YEARS FIVE MONTHS
4633c

I CERTIFY THAT THE DOCUMENT TO WHICH THIS AUTHENTICATION IS ... COPY OF A RECORD IN T... COURT CLERK'S O... ...IT CUSTODIAN AND HAVE ...

Date 2-1-24       _____ Clerk _____ Deputy Clerk

VIRGINIA:

## IN THE CIRCUIT COURT OF FRANKLIN COUNTY

COMMONWEALTH OF VIRGINIA

v.                                        CASE NOS. **18 05 9735** and **18 01 1311**

**ISSAC FIDEL MARTINEZ-CHAVEZ**, DEFENDANT

**Social Security Number:** NONE        **Date of Birth:** SEPTEMBER 16, 1986
**Hearing Date:** DECEMBER 20, 2018
**Judge:** HONORABLE STACEY W. MOREAU
**Hearing Type:** TRIAL
**Attorney for the Commonwealth:** ASHLEY NEESE
**Attorney for Defendant:** HUNTER W. NAFF, appointed

**(1) Original Charge Description:** LEAVE THE SCENE OF AN ACCIDENT INVOLVING PERSONAL INJURY (F)
                                                                        **Case No. 18 05 9735**
**Statute/Ordinance Violation Charged:** §46.2-894        **VCC Code: HIT6608F5**
**Offense Description if Convicted:** LEAVE THE SCENE OF AN ACCIDENT INVOLVING PERSONAL INJURY (F)

**Statute/Ordinance of Conviction:** §46.2-894 (F)
**Alleged Offense Date:** MAY 2, 2018                                **OTN: 067GM1800002716**

**(2) Original Charge Description:** DRIVE A MOTOR VEHICLE WITHOUT HAVING OBTAINED LICENSE (M)
                                                                        **Case No. 18 01 1311**
**Statute/Ordinance Violation Charged:** §46.2-300        **VCC Code: LIC6808M2**
**Offense Description if Convicted:** DRIVE A MOTOR VEHICLE WITHOUT HAVING OBTAINED LICENSE (M)

**Statute/Ordinance of Conviction:** §46.2-300(M)
**Alleged Offense Date:** MAY 2, 2018                                **OTN: 067GM1800002717**

**Commencing Status of Defendant:** IN CUSTODY

On December 20, 2018, came Ashley Neese, assistant attorney for the

Commonwealth, the defendant, Issac Fidel Martinez-Chavez, led to the bar in the

custody of the jailer of this county, and came also, Hunter W. Naff, his attorney, previously

appointed. Also present and duly sworn was Jeremy S. Manuel, Spanish language

interpreter.

The accused waived arraignment, and after private consultation with and being

advised by counsel, entered pleas of not guilty to the indictments, which pleas were

Exhibit 3, page 27 of 62

RECEIVED & FILED
2019 JAN 14 PM 3:32
FRANKLIN COUNTY
CLERK OF CIRCUIT COURT
TERESA J. BROWN, CLERK

1.14.19
SCAN
CA
PO
HWN
FILE-1

tendered by the accused in person. After being advised by counsel and by the Court of right to trial by jury, the accused knowingly and voluntarily waived trial by a jury, and with the concurrence of the attorney for the Commonwealth and of the Court, here entered of record, the Court proceeded to hear and determine these cases without a jury as provided by law.

At the conclusion of the Commonwealth's evidence, the attorney for the defendant moved the Court to strike the Commonwealth's evidence on grounds stated to the record, which motion the Court overruled.

At the conclusion of all the evidence, the attorney for the defendant renewed his motion to strike the Commonwealth's evidence on grounds stated to the record, which motion the Court again overruled, and noted the objection of counsel for the defendant to the Court's ruling.

After hearing all the evidence and argument of counsel, the Court finds the defendant guilty of the following offenses:

| CASE NUMBER | OFFENSE DESCRIPTION & INDICATOR (F/M) | OFFENSE DATE | VA. CODE SECTION | VCC CODE | OFFENSE TRACKING NUMBER |
|---|---|---|---|---|---|
| 18 05 9735 | LEAVE THE SCENE OF AN ACCIDENT INVOLVING PERSONAL INJURY (F) | 05/02/2018 | §46.2-894 | HIT6608F5 | 067GM1800002716 |
| 18 01 1311 | OPERATE A MOTOR VEHICLE WITHOUT HAVING OBTAINED A LICENSE (M) | 05/02/2018 | §46.2-300 | LIC6808M2 | 067GM1800002717 |

Before fixing punishment or imposing sentence, the Court directs the Probation Officer of this Court to thoroughly investigate and report to the Court as provided by law. The defendant shall undergo a substance abuse screening and, if the screening indicates a substance abuse or dependence problem, an assessment as directed by the Probation

Officer. The results of the screening and assessment, if indicated, shall be included in the pre-sentence report.

The defendant was remanded to jail pending sentencing.

These cases are continued to **March 27, 2019 at 3:00 p.m.** for sentencing.

The Clerk of this Court shall mail or deliver certified copies of this Order to Hunter W. Naff, Esquire, to Probation and Parole, and to the attorney for the Commonwealth.

ENTER: 1-1-19

STACEY W. MOREAU, JUDGE

14107H

I CERTIFY THAT THE DOCUMENT TO WHICH THIS AUTHENTICATION IS AFFIXED IS A TRUE COPY OF A RECORD IN THE FRANKLIN COUNTY CIRCUIT COURT CLERK'S OFFICE, AND THAT I AM THE CUSTODIAN AND HAVE CUSTODY OF THE RECORD.
Date 2-1-24

_____ Clerk _____ Deputy Clerk

VIRGINIA:

IN THE CIRCUIT COURT FOR FRANKLIN COUNTY

**PROBATION REVOCATION ORDER**

FIPS CODE: 067

**HEARING DATE:** OCTOBER 28, 2021
**JUDGE:** HONORABLE TIMOTHY W. ALLEN

COMMONWEALTH OF VIRGINIA

v.                                                     CASE NO. **18 05 9735-01**

**ISSAC FIDEL MARTINEZ-CHAVEZ**, DEFENDANT

This case came before the Court for the revocation of probation hearing of the defendant, Issac Fidel Martinez-Chavez, who appeared via video conference, and came also, Hunter W. Naff, his attorney, previously appointed. Ashley B. Neese represented the Commonwealth.

On **December 20, 2018**, the defendant entered a plea of not guilty, and was found guilty of the following offenses:

| CASE NUMBER | OFFENSE DESCRIPTION & INDICATOR (F/M) | OFFENSE DATE | VA. CODE SECTION | VCC CODE | OFFENSE TRACKING NUMBER |
|---|---|---|---|---|---|
| 18 05 9735 | LEAVE THE SCENE OF AN ACCIDENT INVOLVING PERSONAL INJURY (F) | 05/02/2018 | §46.2-894 | HIT6608F5 | 067GM1800002716 |
| 18 01 1311 | NO DRIVERS LICENSE | 05/02/2018 | §46.2-300 | LIC6808M2 | 067GM1800002717 |

On **April 4, 2019**, the defendant was sentenced to confinement with the **Virginia Department of Corrections** for a term of four years on **Indictment 19 05 9735**, with the execution of three years six months being suspended, leaving six months to serve. The Court imposed a $50.00 fine on **Indictment 18 01 1311**, with the fine being suspended. The conditions of the suspended sentence were that defendant keep the peace and be of good behavior for a period of four years, be placed on supervised

probation for a term of eighteen months, and upon payment of $1,154.00 Court costs. The defendant's privilege to drive was suspended for a period of ninety days on **Indictment 18 01 1311**. The Court imposed the further special conditions of probation that defendant shall not possess or use alcohol, possess firearms, shall make monthly payments in the amount of $50.00 towards Court cost and comply with substance abuse counseling and/or treatment as prescribed by probation officer.

And on **October 28, 2021**, the defendant appeared before this Court for a revocation of probation hearing. The Court received and considered the evidence of the major violation report, to-wit: violation of condition #8, use, possess or distribute controlled substances or related paraphernalia. The defendant and counsel were given the right to present any additional facts bearing upon the matter as they desired to present.

Having heard and taken into consideration all the evidence and argument of counsel, the Court demanded of the defendant whether he desired to make a statement or advance any reason why judgment should not be pronounced against him according to law. Nothing being offered or alleged in delay of judgment, the Court finds that the defendant has violated the terms and conditions of probation, revokes the suspension of the remainder of the original four-year sentence and **re-suspends** the execution of the sentence upon the following conditions:

**GOOD BEHAVIOR**: The defendant is **ORDERED** to keep the peace and be of good behavior for a period of four years from October 28, 2021.

**SUPERVISED PROBATION**: The defendant is continued on supervised probation to re-commence upon release from confinement, under the supervision of a Probation Officer, for a period of eighteen months, unless released sooner by the

Court or by the Probation Officer. The defendant shall comply with all the rules and requirements set by the Probation Officer, and previously adopted by this Court. Probation shall include substance abuse counseling and/or testing as prescribed by the Probation Officer. This probation period will not expire while a major violation of probation is pending.

**COURT COSTS:** The defendant is **ORDERED** to pay Court costs in the amount of $502.00, due immediately, payment of costs to be monitored by the Probation Officer. If defendant is not financially able to pay Court costs as required by the Court, the Court **ORDERS** that the defendant be allowed to perform community service under the supervision of the Probation Officer, in lieu of monetary payment of costs, to be compensated at the rate of $9.50 credit per hour worked. If defendant petitions for installment payments and fails to pay as agreed, collection will be handled through the Virginia Department of Taxation.

The Court certifies that at all times during this hearing, the defendant was present via video conference and the attorney was personally present.

The Court **ORDERS** that defendant be given credit for time spent in confinement while awaiting this hearing pursuant to Virginia Code §53.1-187.

DATE ___12/2/21___     ENTER: ___7. W. all___

JUDGE

**DEFENDANT IDENTIFICATION:**
ALIAS:
DOB: SEPTEMBER 16, 1986          SSN: NONE/UNKNOWN          SEX: M
**SENTENCING SUMMARY:**
TOTAL ORIGINAL SENTENCE IMPOSED: FOUR YEARS
TOTAL SENTENCE PREVIOUSLY SERVED: SIX MONTHS
TOTAL SENTENCE IMPOSED THIS DAY: THREE YEARS SIX MONTHS
TOTAL SENTENCE RE-SUSPENDED THIS DAY: THREE YEARS SIX MONTHS
0707w

I CERTIFY THAT THE DOCUMENT TO WHICH THIS AUTH... ... IS AFFIXED ... ... COPY ... IN THE FRANKLIN CO... ...IRCUIT COURT CLERKS OFFICE ... THAT I AM ... CUSTODIAN AND HAVE ... ... OF THE RECORD.

Date ___2-1-24___     _Jessica Lambert_
Clerk ___ Deputy Clerk

VIRGINIA:

### IN THE CIRCUIT COURT FOR FRANKLIN COUNTY
### **PROBATION REVOCATION ORDER**

FIPS CODE: 067

**HEARING DATE:** SEPTEMBER 14, 2022
**JUDGE:** HONORABLE TIMOTHY W. ALLEN

COMMONWEALTH OF VIRGINIA

v.                          CASE NO. **18 05 9735-02**

**ISSAC FIDEL MARTINEZ-CHAVEZ**, DEFENDANT

This case came before the Court for the revocation of probation hearing of the

defendant, Issac Fidel Martinez-Chavez, who appeared via video conference, and

came also, Hunter W. Naff, his attorney, previously appointed. W. Cooper Brown

represented the Commonwealth.

On **December 20, 2018**, the defendant entered pleas of not guilty, and was

found guilty of the following offenses:

| CASE NUMBER | OFFENSE DESCRIPTION & INDICATOR (F/M) | OFFENSE DATE | VA. CODE SECTION | VCC CODE | OFFENSE TRACKING NUMBER |
|---|---|---|---|---|---|
| 18 05 9735 | LEAVE THE SCENE OF AN ACCIDENT INVOLVING PERSONAL INJURY (F) | 05/02/2018 | §46.2-894 | HIT6608F5 | 067GM1800002716 |
| 18 01 1311 | NO DRIVERS LICENSE (M) | 05/02/2018 | §46.2-300 | LIC6808M2 | 067GM1800002717 |

On **April 4, 2019**, the defendant was sentenced to confinement with the

**Virginia Department of Corrections** for a term of four years on **Indictment 19 05 9735**,

with the execution of three years six months being suspended, leaving six months to

serve. The Court imposed a fine in the amount of $50.00 on **Indictment 18 01 1311**,

with the fine being suspended. The conditions of the suspended sentence were that

defendant keep the peace and be of good behavior for a period of four years, be

JA081

placed on supervised probation for a term of eighteen months, and upon payment of $1,154.00 Court costs. The defendant's privilege to drive was suspended for a period of ninety days on Indictment 18 01 1311. The Court imposed the further special conditions of probation that defendant shall not possess or use alcohol, possess no firearms, shall make monthly payments in the amount of $50.00 towards Court cost and comply with substance abuse counseling and/or treatment as prescribed by probation officer.

On **October 28, 2021**, the defendant appeared before this Court for a revocation of probation hearing. The Court found that the defendant had violated the terms and conditions of probation and revoked the suspension of the remainder of the original four-year sentence and re-suspended the execution of the sentence upon the conditions that he keep peace and be of good behavior for a period of four years and continue on supervised probation for a period of eighteen months. Court costs in the amount of $502.00 were assessed for this hearing.

And on **September 14, 2022**, the defendant again appeared before this Court for a revocation of probation hearing. The Court received and considered the evidence of the major violation report and addendum, to-wit: violation of condition #4, fail to report as instructed, condition #10, change residence or leave State of Virginia without permission and condition #11, abscond from supervision. The defendant and counsel were given the right to present any additional facts bearing upon the matter as they desired to present.

Having heard and taken into consideration all the evidence and argument of counsel, the Court demanded of the defendant whether he desired to make a statement or advance any reason why judgment should not be pronounced against

him according to law. Nothing being offered or alleged in delay of judgment, the Court finds that the defendant has violated the terms and conditions of probation, revokes the suspension of one month of the original four-year sentence, and

The Court **SENTENCES** the defendant to:

Incarceration with the **Virginia Department of Corrections** for the term of one month on indictment **18 05 9735**.

This sentence shall run consecutively with any other sentences the defendant may have to serve.

The Court **RE-SUSPENDS** the execution of the remaining three-year five-month sentence upon the following conditions:

**GOOD BEHAVIOR:** The defendant is **ORDERED** to keep the peace and be of good behavior for a period of four years from September 14, 2022.

**SUPERVISED PROBATION:** The defendant is continued on supervised probation to re-commence upon release from confinement, under the supervision of a Probation Officer, for a period of eighteen months, unless released sooner by the Court or by the Probation Officer. The defendant shall comply with all the rules and requirements set by the Probation Officer, and previously adopted by this Court. Probation shall include substance abuse counseling and/or testing as prescribed by the Probation Officer. This probation period will not expire while a major violation of probation is pending. The defendant shall report to the probation office within 24 hours upon his release from confinement.

**COURT COSTS:** The defendant is **ORDERED** to pay Court costs in the amount of $666.00, upon release from confinement, payment of costs to be monitored by the Probation Officer. If defendant is not financially able to pay Court costs as required

by the Court, the Court **ORDERS** that the defendant be allowed to perform community service under the supervision of the Probation Officer, in lieu of monetary payment of costs, to be compensated at the rate of $11.00 credit per hour worked. If defendant petitions for installment payments and fails to pay as agreed, collection will be handled through the Virginia Department of Taxation.

The Court certifies that at all times during this hearing, the defendant was present via video conference and the attorney was personally present.

The Court **ORDERS** that defendant be given credit for time spent in confinement while awaiting this hearing pursuant to Virginia Code §53.1-187.

DATE _9/20/22_ ENTER: _T. Wall_

JUDGE

**DEFENDANT IDENTIFICATION:**
ALIAS:
DOB: SEPTEMBER 16, 1986          SSN: 673 72 4673          SEX: M
**SENTENCING SUMMARY:**
TOTAL ORIGINAL SENTENCE IMPOSED:  FOUR YEARS
TOTAL SENTENCE PREVIOUSLY SERVED: SIX MONTHS
TOTAL SENTENCE IMPOSED THIS DAY:  ONE MONTH
TOTAL SENTENCE RE-SUSPENDED THIS DAY: THREE YEARS FIVE MONTHS
9462E

I CERTIFY THAT THE DOCUMENT TO WHICH THIS
A...ICATION IS... IS A TRUE COPY
O...THE FRANKLIN COUNTY CIRCUIT
C... OF, AND THA...
CUSTOD... ...STODY OF THE RECORD.
Date _2-1-24_          _Jessica Lambert_
Clerk _____ Deputy Clerk

JA084

VIRGINIA:

IN THE CIRCUIT COURT FOR FRANKLIN COUNTY

**PROBATION REVOCATION ORDER**

FIPS CODE: 067

**HEARING DATE:** JANUARY 17, 2023
**JUDGE:** HONORABLE JAMES J. REYNOLDS

COMMONWEALTH OF VIRGINIA

v.                              CASE NO. **18 05 9735-03**

**ISSAC FIDEL MARTINEZ-CHAVEZ**, DEFENDANT

This case came before the Court for the revocation of probation hearing of the

defendant, Issac Fidel Martinez-Chavez, who was led to the bar in the custody of the

jailer of this county, and came also, Hunter W. Naff, his attorney, previously appointed.

Aimee Lucas represented the Commonwealth.

On **December 20, 2018**, the defendant entered pleas of not guilty, and was

found guilty of the following offenses:

| CASE NUMBER | OFFENSE DESCRIPTION & INDICATOR (F/M) | OFFENSE DATE | VA. CODE SECTION | VCC CODE | OFFENSE TRACKING NUMBER |
|---|---|---|---|---|---|
| 18 05 9735 | LEAVE THE SCENE OF AN ACCIDENT INVOLVING PERSONAL INJURY (F) | 05/02/2018 | §46.2-894 | HIT6608F5 | 067GM1800002716 |
| 18 01 1311 | NO DRIVERS LICENSE (M) | 05/02/2018 | §46.2-300 | LIC6808M2 | 067GM1800002717 |

On **April 4, 2019**, the defendant was sentenced to confinement with the **Virginia**

**Department of Corrections** for a term of four years on **Indictment 19 05 9735**, with the

execution of three years six months being suspended, leaving six months to serve. The

Court imposed a fine in the amount of $50.00 on **Indictment 18 01 1311**, with the fine

being suspended. The conditions of the suspended sentence were that defendant

keep the peace and be of good behavior for a period of four years, be placed on

1-30-23
SCAN
CA
PO
HWN
JAIL

supervised probation for a term of eighteen months, and upon payment of $1,154.00 Court costs. The defendant's privilege to drive was suspended for a period of ninety days on Indictment 18 01 1311. The Court imposed the further special conditions of probation that defendant shall not possess or use alcohol, possess no firearms, shall make monthly payments in the amount of $50.00 towards Court cost and comply with substance abuse counseling and/or treatment as prescribed by probation officer.

On **October 28, 2021**, the defendant appeared before this Court for a revocation of probation hearing. The Court found that the defendant had violated the terms and conditions of probation and revoked the suspension of the remainder of the original four-year sentence and re-suspended the execution of the sentence upon the conditions that he keep peace and be of good behavior for a period of four years and continue on supervised probation for a period of eighteen months. Court costs in the amount of $502.00 were assessed for this hearing.

On **September 14, 2022**, the defendant appeared before this Court for a revocation of probation hearing. The Court found the defendant had violated the terms and conditions of probation, revoked the suspension of one month of the original four-year sentence and resuspended the remaining three years five months upon conditions the defendant keep the peace and be of good behavior for a period of four years and continue on supervised probation for a period of eighteen months. Court costs in the amount of $666.00 were assessed for this hearing.

And on **January 12, 2023**, the defendant again appeared before this Court for a revocation of probation hearing. The Court received and considered the evidence of the major violation report, to-wit: violation of condition #8, use, possess, distribute controlled substances or paraphernalia. The defendant and counsel were given the

right to present any additional facts bearing upon the matter as they desired to present.

Having heard and taken into consideration all the evidence and argument of counsel, the Court demanded of the defendant whether he desired to make a statement or advance any reason why judgment should not be pronounced against him according to law. Nothing being offered or alleged in delay of judgment, the Court finds that the defendant has violated the terms and conditions of probation, revokes the suspension of twelve months of the original four-year sentence, and

The Court **SENTENCES** the defendant to:

Incarceration with the **Virginia Department of Corrections** for the term of twelve months on Indictment **18 05 9735**.

This sentence shall run consecutively with any other sentences the defendant may have to serve.

The Court **RE-SUSPENDS** the execution of the remaining two years five months sentence upon the following conditions:

**GOOD BEHAVIOR:** The defendant is **ORDERED** to keep the peace and be of good behavior for a period of three years from January 12, 2023.

**SUPERVISED PROBATION:** The defendant is **terminated** from supervised probation.

**COURT COSTS:** The defendant is **ORDERED** to pay Court costs in the amount of $666.00, upon release from confinement. If defendant is not financially able to pay Court costs as required by the Court, the Court **ORDERS** that the defendant be allowed to perform community service, in lieu of monetary payment of costs, to be compensated at the rate of $12.00 credit per hour worked. If defendant petitions for

installment payments and fails to pay as agreed, collection will be handled through the Virginia Department of Taxation.

The Court certifies that at all times during this hearing, the defendant was present via video conference and the attorney was personally present.

The Court **ORDERS** that defendant be given credit for time spent in confinement while awaiting this hearing pursuant to Virginia Code §53.1-187.

DATE __1/30/2023__     ENTER: _____
                                              JUDGE

**DEFENDANT IDENTIFICATION:**
ALIAS:
DOB: SEPTEMBER 16, 1986          SSN: 673 72 4673          SEX: M
**SENTENCING SUMMARY:**
TOTAL ORIGINAL SENTENCE IMPOSED:  FOUR YEARS
TOTAL SENTENCE PREVIOUSLY SERVED:  SEVEN MONTHS
TOTAL SENTENCE IMPOSED THIS DAY:  TWELVE MONTHS
TOTAL SENTENCE RE-SUSPENDED THIS DAY:  TWO YEARS FIVE MONTHS
4633c

I CERTIFY THAT THE DOCUMENT TO WHICH THIS AUTHENTICATION IS ... COPY OF A RECORD IN T... COURT CLERK'S O... ...IT CUSTODIAN AND HAVE CUSTODY OF THE RECORD.
Date 2-1-24          _____ Clerk _____ Deputy Clerk

# SENTENCING ORDER

VIRGINIA: IN THE CIRCUIT COURT OF FRANKLIN

FEDERAL INFORMATION PROCESSING
STANDARDS CODE: 067C

Hearing Date: APRIL 4, 2019
Judge: STACEY W. MOREAU

COMMONWEALTH OF VIRGINIA    v.  ISSAC FIDEL MARTINEZ-CHAVEZ                    , Defendant

This case came before the Court for sentencing of the defendant, who appeared in person with his
attorney,  NAFF, HUNTER W.  APPOINTED                                                    .

The Commonwealth was represented by ASHLEY B. NEESE                                        .

On   DECEMBER 20, 2018      the defendant was found guilty of the following offenses:

| Offense Tracking Number | Virginia Crime Code (For Administrative Use Only) | Code Section | Case Number |
|---|---|---|---|
| 067GM1800002716 | HIT-6608-F5 | E.46.2-894 | CR18059735-00 |
| Offense Date: 05/02/2018 | Description: FAIL STOP ACCIDENT/FEL INJURY | | FELONY |
| 067GM1800002717 | LIC-6808-M2 | 46.2-300 | CR18011311-00 |
| Offense Date: 05/02/2018 | Description: NO DRIVERS LICENSE | | MISDEMEANOR |
| Offense Date: | Description: | | |
| Offense Date: | Description: | | |
| Offense Date: | Description: | | |
| Offense Date: | Description: | | |
| Offense Date: | Description: | | |
| Offense Date: | Description: | | |
| Offense Date: | Description: | | |
| Offense Date: | Description: | | |
| Offense Date: | Description: | | |
| Offense Date: | Description: | | |

[X] The presentence report was considered and is ordered filed as a part of the record in this case in accordance
with the provisions of Code § 19.2-299.

[  ] No presentence report was ordered.

Pursuant to the provisions of Code § 19.2-298.01, the Court has considered and reviewed the applicable
discretionary sentencing guidelines and the guidelines worksheets. The sentencing guidelines worksheets and
the written explanation of any departure from the guidelines are ordered filed as a part of the record in this case.

Before pronouncing the sentence, the Court inquired if the defendant desired to make a statement and if the
defendant desired to advance any reason why judgment should not be pronounced.

RECEIVED & FILED
2019 MAY 23  AM 10:40
FRANKLIN COUNTY
CLERK OF CIRCUIT COURT
TERESA J. BROWN, CLERK

5-23-19
Scan
CA
HWN
Jail(2)
VSG
file

COMMONWEALTH OF VIRGINIA   v.   ISSAC FIDEL MARTINEZ-CHAVEZ ............................., Defendant

The court **SENTENCES** the defendant to:

Case No. ........ CR18059735-00 ........   Description   FAIL STOP ACCIDENT/FEL INJURY ..........

[X] Incarceration with the Virginia Department of Corrections for the term of: ....4.... years ........... months ........... days

[ ] FINE.       The defendant is ordered to pay fine(s) in the amount of $ ..........................

[X] COSTS.     The defendant is ordered to pay all costs of this case.

[ ] RESTITUTION.   The defendant is ordered to make restitution as set forth in the ORDER FOR RESTITUTION.

[ ] DRIVER'S LICENSE SUSPENSION: The defendant's license has been suspended

    [ ] for a period of .............. years ................ months ............. days   [ ] indefinitely.

[ ] RESTRICTED DRIVER'S LICENSE: A restricted driver's license was issued by separate order.

[X] The court **SUSPENDS** ......3..... years .......6..... months ................ days of incarceration ..................... fine for a
    period of ............... 4 YEARS ............... upon the condition(s) specified in Suspended Sentence Conditions.

Case No. ........ CR18011311-00 ........   Description   NO DRIVERS LICENSE .................

[ ] Incarceration with the Virginia Department of Corrections for the term of: .......... years ........... months ........... days

[X] FINE.       The defendant is ordered to pay fine(s) in the amount of $ .......50.00.......

[X] COSTS.     The defendant is ordered to pay all costs of this case.

[ ] RESTITUTION.   The defendant is ordered to make restitution as set forth in the ORDER FOR RESTITUTION.

[X] DRIVER'S LICENSE SUSPENSION: The defendant's license has been suspended

    [X] for a period of .............. years ................ months ....90.... days   [ ] indefinitely.

[ ] RESTRICTED DRIVER'S LICENSE: A restricted driver's license was issued by separate order.

[X] The court **SUSPENDS** ............... years ............ months ............. days of incarceration ....$50.00.... fine for a
    period of ................................ upon the condition(s) specified in Suspended Sentence Conditions.

Case No. ...................................   Description ...................................

[ ] Incarceration with the Virginia Department of Corrections for the term of: .......... years ........... months ........... days

[ ] FINE.       The defendant is ordered to pay fine(s) in the amount of $ ..........................

[ ] COSTS.     The defendant is ordered to pay all costs of this case.

[ ] RESTITUTION.   The defendant is ordered to make restitution as set forth in the ORDER FOR RESTITUTION.

[ ] DRIVER'S LICENSE SUSPENSION: The defendant's license has been suspended

    [ ] for a period of .............. years ................ months ............. days   [ ] indefinitely.

[ ] RESTRICTED DRIVER'S LICENSE: A restricted driver's license was issued by separate order.

[ ] The court **SUSPENDS** ............... years ............ months ............. days of incarceration ..................... fine for a
    period of ................................ upon the condition(s) specified in Suspended Sentence Conditions.

Exhibit 3, page 42 of 62

JA090

COMMONWEALTH OF VIRGINIA   v. ISSAC FIDEL MARTINEZ-CHAVEZ ..................................................., Defendant

**Consecutive/concurrent:**

[X] These sentences shall run consecutively with all other sentences.

[ ] These sentences shall run concurrently with all other sentences.

[ ] These sentences shall run consecutively/concurrently as described:

**Suspended Sentence Conditions:**

[X] **Good Behavior:** The defendant shall be of good behavior for ......4........ years ............... months from the defendant's release from confinement [ ] ..............................................................................................

[X] **Supervised Probation:** The defendant is placed on probation under the supervision of a Probation Officer to commence [ ] upon sentencing [X] upon release from incarceration for ..................... years ......18........... months ...................... days [ ] indefinite or unless sooner released by the court or by the Probation Officer. The defendant shall comply with all the rules and requirements set by the Probation Officer. Probation shall include substance abuse counseling and/or testing as prescribed by the Probation Officer.

[ ] **Community-Based Corrections System Program pursuant to Virginia Code § 19.2-316.2 or 19.2-316.3:** The defendant shall successfully complete the ............................................................................................................... program. Successful completion of the program shall be followed by a period of intensive probation of .................................................................................................................., followed by a period of supervised probation of ................................................................................................. .

[ ] The defendant shall remain in custody until program entry.

[ ] Registration pursuant to Code § 9.1-903 for offenses defined in § 9.1-902 is required.

[X] The defendant shall provide a DNA sample and legible fingerprints as directed.

[X] **Special conditions:**

SHALL NOT POSSESS OR USE ALCOHOL, SHALL NOT POSSESS FIREARMS, SHALL MAKE MONTHLY PAYMENTS IN THE AMOUNT OF $50.00 TOWARDS COURT COST AND SHALL COMPLY WITH SUBSTANCE ABUSE COUNSELING AND/OR TESTING AS PRESCRIBED BY PROBATION OFFICER.

[ ] The defendant shall make restitution as set forth in the ORDER FOR RESTITUTION.

Exhibit 3, page 43 of 62

JA091

COMMONWEALTH OF VIRGINIA    v.  ISSAC FIDEL MARTINEZ-CHAVEZ_____, Defendant

**Post-incarceration supervision following felony conviction pursuant to Virginia Code § 18.2-10 and 19.2-295.2:**

[ ] **Post-Incarceration Supervised Probation:** The defendant is placed on supervised probation to commence upon release from incarceration for a period of _____, unless released earlier by the court. The defendant shall comply with all the rules and requirements set by the Probation Officer.

[ ] **Post-Incarceration Post-Release Supervision:** In addition to the above sentence of incarceration, the court imposes an additional term of _____ of incarceration. This term is suspended and a period of post-release supervision of _____, is imposed which is to commence upon release from incarceration. The defendant shall comply with all the rules and requirements set by the Probation Officer.

[ ]

[X] The defendant was remanded to the custody of the sheriff.    [ ] The defendant was allowed to depart.

The defendant shall be given credit for time spent in confinement while awaiting trial pursuant to Virginia Code § 53.1-187.

ENTER this 22 day of May 2017.

_____, Judge

**DEFENDANT IDENTIFICATION:**

Name: ISSAC FIDEL MARTINEZ-CHAVEZ_____

Alias: _____

SSN: 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    DOB: 09 / 16 / 1986  Sex: M

**SENTENCE SUMMARY:**

Total Incarceration Sentence Imposed:  4 YEARS_____

Total Sentence Suspended:        3 YEARS  6 MONTHS_____

Total Supervised Probation Term:     18 MONTHS_____

Total Postrelease Term Imposed and Suspended: _____

Total Fine Imposed $_____. Total Fine Suspended $_____

**FOR CLERK'S USE ONLY:**
[ ] Conviction reported to applicable Board _____, Clerk

.............................
DATE

By: _____, Deputy Clerk

I CERTIFY THAT THE DOCUMENT TO WHICH THIS AUTHENTICATION IS AFFIXED IS A TRUE COPY ... COUNTY CIRCUIT ... RECORD IN THE FINAN... ... THE ...CORD IN THE ... OFFICE, A... ...RECORD. CUSTO... ... HAVE CUSTODY ...
Date 2-1-24
Jessica Jamler
Deputy Clerk

VIRGINIA:

IN THE CIRCUIT COURT OF FRANKLIN COUNTY

COMMONWEALTH OF VIRGINIA

v.                              CASE NOS. **18 05 9735** and **18 01 1311**

**ISSAC FIDEL MARTINEZ-CHAVEZ**, DEFENDANT

**Social Security Number:** NONE      **Date of Birth:** SEPTEMBER 16, 1986
**Hearing Date:** DECEMBER 20, 2018
**Judge:** HONORABLE STACEY W. MOREAU
**Hearing Type:** TRIAL
**Attorney for the Commonwealth:** ASHLEY NEESE
**Attorney for Defendant:** HUNTER W. NAFF, appointed

**(1) Original Charge Description:** LEAVE THE SCENE OF AN ACCIDENT INVOLVING PERSONAL INJURY (F)
                                                               **Case No. 18 05 9735**
**Statute/Ordinance Violation Charged:** §46.2-894              **VCC Code: HIT6608F5**
**Offense Description if Convicted:** LEAVE THE SCENE OF AN ACCIDENT INVOLVING PERSONAL INJURY (F)

**Statute/Ordinance of Conviction:** §46.2-894 (F)
**Alleged Offense Date:** MAY 2, 2018                          **OTN: 067GM1800002716**

**(2) Original Charge Description:** DRIVE A MOTOR VEHICLE WITHOUT HAVING OBTAINED LICENSE (M)
                                                               **Case No. 18 01 1311**
**Statute/Ordinance Violation Charged:** §46.2-300             **VCC Code: LIC6808M2**
**Offense Description if Convicted:** DRIVE A MOTOR VEHICLE WITHOUT HAVING OBTAINED LICENSE (M)

**Statute/Ordinance of Conviction:** §46.2-300(M)
**Alleged Offense Date:** MAY 2, 2018                          **OTN: 067GM1800002717**

**Commencing Status of Defendant:** IN CUSTODY

On December 20, 2018, came Ashley Neese, assistant attorney for the

Commonwealth, the defendant, Issac Fidel Martinez-Chavez, led to the bar in the

custody of the jailer of this county, and came also, Hunter W. Naff, his attorney, previously

appointed. Also present and duly sworn was Jeremy S. Manuel, Spanish language

interpreter.

The accused waived arraignment, and after private consultation with and being

advised by counsel, entered pleas of not guilty to the indictments, which pleas were

Exhibit 3, page 45 of 62

JA093

RECEIVED & FILED
2019 JAN 14 PM 3:32
FRANKLIN COUNTY
CLERK OF CIRCUIT COURT
TERESA J. BROWN, CLERK

1.14.19
SCAN
CA
PO
HWN
FILE-1

tendered by the accused in person. After being advised by counsel and by the Court of right to trial by jury, the accused knowingly and voluntarily waived trial by a jury, and with the concurrence of the attorney for the Commonwealth and of the Court, here entered of record, the Court proceeded to hear and determine these cases without a jury as provided by law.

At the conclusion of the Commonwealth's evidence, the attorney for the defendant moved the Court to strike the Commonwealth's evidence on grounds stated to the record, which motion the Court overruled.

At the conclusion of all the evidence, the attorney for the defendant renewed his motion to strike the Commonwealth's evidence on grounds stated to the record, which motion the Court again overruled, and noted the objection of counsel for the defendant to the Court's ruling.

After hearing all the evidence and argument of counsel, the Court finds the defendant guilty of the following offenses:

| CASE NUMBER | OFFENSE DESCRIPTION & INDICATOR (F/M) | OFFENSE DATE | VA. CODE SECTION | VCC CODE | OFFENSE TRACKING NUMBER |
|---|---|---|---|---|---|
| 18 05 9735 | LEAVE THE SCENE OF AN ACCIDENT INVOLVING PERSONAL INJURY (F) | 05/02/2018 | §46.2-894 | HIT6608F5 | 067GM1800002716 |
| 18 01 1311 | OPERATE A MOTOR VEHICLE WITHOUT HAVING OBTAINED A LICENSE (M) | 05/02/2018 | §46.2-300 | LIC6808M2 | 067GM1800002717 |

Before fixing punishment or imposing sentence, the Court directs the Probation Officer of this Court to thoroughly investigate and report to the Court as provided by law. The defendant shall undergo a substance abuse screening and, if the screening indicates a substance abuse or dependence problem, an assessment as directed by the Probation

Officer. The results of the screening and assessment, if indicated, shall be included in the pre-sentence report.

The defendant was remanded to jail pending sentencing.

These cases are continued to **March 27, 2019 at 3:00 p.m.** for sentencing.

The Clerk of this Court shall mail or deliver certified copies of this Order to Hunter W. Naff, Esquire, to Probation and Parole, and to the attorney for the Commonwealth.

ENTER: 1-1-019

STACEY W. MOREAU, JUDGE

14107H

I CERTIFY THAT THE DOCUMENT TO WHICH THIS AUTHENTICATION IS AFFIXED IS A TRUE COPY OF A RECORD IN THE FRANKLIN COUNTY CIRCUIT COURT CLERK'S OFFICE, AND THAT I AM THE CUSTODIAN AND HAVE CUSTODY OF THE RECORD.
Date 2-1-24
_____ Clerk _____ Deputy Clerk

# SENTENCING ORDER

VIRGINIA: IN THE CIRCUIT COURT OF FRANKLIN

FEDERAL INFORMATION PROCESSING
STANDARDS CODE: 067C

Hearing Date: APRIL 4, 2019
Judge: STACEY W. MOREAU

COMMONWEALTH OF VIRGINIA   v.   ISSAC FIDEL MARTINEZ-CHAVEZ                    , Defendant

This case came before the Court for sentencing of the defendant, who appeared in person with his
attorney,   NAFF, HUNTER W.  APPOINTED                                                        .

The Commonwealth was represented by ASHLEY B. NEESE                                          .

On   DECEMBER 20, 2018        the defendant was found guilty of the following offenses:

| Offense Tracking Number | Virginia Crime Code (For Administrative Use Only) | Code Section | Case Number |
|---|---|---|---|
| 067GM1800002716 | HIT-6608-F5 | E.46.2-894 | CR18059735-00 |
| Offense Date: 05/02/2018 | Description: FAIL STOP ACCIDENT/FEL INJURY | | FELONY |
| 067GM1800002717 | LIC-6808-M2 | 46.2-300 | CR18011311-00 |
| Offense Date: 05/02/2018 | Description: NO DRIVERS LICENSE | | MISDEMEANOR |
| Offense Date: | Description: | | |
| Offense Date: | Description: | | |
| Offense Date: | Description: | | |
| Offense Date: | Description: | | |
| Offense Date: | Description: | | |
| Offense Date: | Description: | | |
| Offense Date: | Description: | | |
| Offense Date: | Description: | | |
| Offense Date: | Description: | | |
| Offense Date: | Description: | | |

[X] The presentence report was considered and is ordered filed as a part of the record in this case in accordance
with the provisions of Code § 19.2-299.

[ ] No presentence report was ordered.

Pursuant to the provisions of Code § 19.2-298.01, the Court has considered and reviewed the applicable
discretionary sentencing guidelines and the guidelines worksheets. The sentencing guidelines worksheets and
the written explanation of any departure from the guidelines are ordered filed as a part of the record in this case.

Before pronouncing the sentence, the Court inquired if the defendant desired to make a statement and if the
defendant desired to advance any reason why judgment should not be pronounced.

COMMONWEALTH OF VIRGINIA v. ISSAC FIDEL MARTINEZ-CHAVEZ , Defendant

The court **SENTENCES** the defendant to:

Case No. CR18059735-00 Description FAIL STOP ACCIDENT/FEL INJURY

[X] Incarceration with the Virginia Department of Corrections for the term of: 4 years ............... months ............. days

[ ] FINE. The defendant is ordered to pay fine(s) in the amount of $ ............................

[X] COSTS. The defendant is ordered to pay all costs of this case.

[ ] RESTITUTION. The defendant is ordered to make restitution as set forth in the ORDER FOR RESTITUTION.

[ ] DRIVER'S LICENSE SUSPENSION: The defendant's license has been suspended

 [ ] for a period of ............... years ................... months ............. days [ ] indefinitely.

[ ] RESTRICTED DRIVER'S LICENSE: A restricted driver's license was issued by separate order.

[X] The court **SUSPENDS** 3 years 6 months ................... days of incarceration ........................... fine for a
period of 4 YEARS upon the condition(s) specified in Suspended Sentence Conditions.

Case No. CR18011311-00 Description NO DRIVERS LICENSE

[ ] Incarceration with the Virginia Department of Corrections for the term of: ............ years ............... months ............. days

[X] FINE. The defendant is ordered to pay fine(s) in the amount of $ 50.00 .

[X] COSTS. The defendant is ordered to pay all costs of this case.

[ ] RESTITUTION. The defendant is ordered to make restitution as set forth in the ORDER FOR RESTITUTION.

[X] DRIVER'S LICENSE SUSPENSION: The defendant's license has been suspended

 [X] for a period of ............... years ................... months 90 days [ ] indefinitely.

[ ] RESTRICTED DRIVER'S LICENSE: A restricted driver's license was issued by separate order.

[X] The court **SUSPENDS** ................... years ............... months ................... days of incarceration $50.00 fine for a
period of ......................................................... upon the condition(s) specified in Suspended Sentence Conditions.

Case No. .......................................................... Description .................................................................................................

[ ] Incarceration with the Virginia Department of Corrections for the term of: ............ years ............... months ............. days

[ ] FINE. The defendant is ordered to pay fine(s) in the amount of $ ............................

[ ] COSTS. The defendant is ordered to pay all costs of this case.

[ ] RESTITUTION. The defendant is ordered to make restitution as set forth in the ORDER FOR RESTITUTION.

[ ] DRIVER'S LICENSE SUSPENSION: The defendant's license has been suspended

 [ ] for a period of ............... years ................... months ............. days [ ] indefinitely.

[ ] RESTRICTED DRIVER'S LICENSE: A restricted driver's license was issued by separate order.

[ ] The court **SUSPENDS** ................... years ............... months ................... days of incarceration ........................... fine for a
period of ......................................................... upon the condition(s) specified in Suspended Sentence Conditions.

COMMONWEALTH OF VIRGINIA   v. ISSAC FIDEL MARTINEZ-CHAVEZ ......................................, Defendant

**Consecutive/concurrent:**

[X] These sentences shall run consecutively with all other sentences.

[ ] These sentences shall run concurrently with all other sentences.

[ ] These sentences shall run consecutively/concurrently as described:

**Suspended Sentence Conditions:**

[X] **Good Behavior:** The defendant shall be of good behavior for ......4...... years .............. months from the
defendant's release from confinement [ ] ...............................................................................

[X] **Supervised Probation:** The defendant is placed on probation under the supervision of a Probation Officer to
commence [ ] upon sentencing [X] upon release from incarceration
for ................... years ......18......... months .................... days [ ] indefinite or unless sooner released by the court
or by the Probation Officer. The defendant shall comply with all the rules and requirements set by the Probation
Officer. Probation shall include substance abuse counseling and/or testing as prescribed by the Probation Officer.

[ ] **Community-Based Corrections System Program pursuant to Virginia Code § 19.2-316.2 or 19.2-316.3:**
The defendant shall successfully complete the .....................................................................................

program. Successful completion of the program shall be followed by a period of intensive probation of

................................................................................, followed by a period of supervised probation

of ........................................................ .

[ ] The defendant shall remain in custody until program entry.

[ ] Registration pursuant to Code § 9.1-903 for offenses defined in § 9.1-902 is required.

[X] The defendant shall provide a DNA sample and legible fingerprints as directed.

[X] **Special conditions:**

SHALL NOT POSSESS OR USE ALCOHOL, SHALL NOT POSSESS FIREARMS, SHALL
MAKE MONTHLY PAYMENTS IN THE AMOUNT OF $50.00 TOWARDS COURT COST AND
SHALL COMPLY WITH SUBSTANCE ABUSE COUNSELING AND/OR TESTING AS
PRESCRIBED BY PROBATION OFFICER.

[ ] The defendant shall make restitution as set forth in the ORDER FOR RESTITUTION.

Exhibit 3, page 50 of 62

JA098

**Post-incarceration supervision following felony conviction pursuant to Virginia Code § 18.2-10 and 19.2-295.2:**

[ ] **Post-Incarceration Supervised Probation:** The defendant is placed on supervised probation to commence upon release from incarceration for a period of _____, unless released earlier by the court. The defendant shall comply with all the rules and requirements set by the Probation Officer.

[ ] **Post-Incarceration Post-Release Supervision:** In addition to the above sentence of incarceration, the court imposes an additional term of _____ of incarceration. This term is suspended and a period of post-release supervision of _____, is imposed which is to commence upon release from incarceration. The defendant shall comply with all the rules and requirements set by the Probation Officer.

[ ]

[X] The defendant was remanded to the custody of the sheriff.   [ ] The defendant was allowed to depart.

The defendant shall be given credit for time spent in confinement while awaiting trial pursuant to Virginia Code § 53.1-187.

ENTER this _22__ day of _May 2019_.

_____ Judge

**DEFENDANT IDENTIFICATION:**

Name: ISSAC FIDEL MARTINEZ-CHAVEZ _____

Alias: _____

SSN: 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 ___   DOB: _09_ / _16_ / _1986_  Sex: _M_

**SENTENCE SUMMARY:**

Total Incarceration Sentence Imposed: _4 YEARS_ _____

Total Sentence Suspended:        _3 YEARS  6 MONTHS_ _____

Total Supervised Probation Term:   _18 MONTHS_ _____

Total Postrelease Term Imposed and Suspended: _____

Total Fine Imposed $_____. Total Fine Suspended $_____

**FOR CLERK'S USE ONLY:**

[ ] Conviction reported to applicable Board _____, Clerk

.............................................
DATE

By: _____, Deputy Clerk

I CERTIFY THAT THE DOCUMENT TO WHICH THIS AUTHENTICATION IS AFFIXED IS A TRUE COPY OF A RECORD IN THE FINANCE... COUNTY CIRCUIT COURT CLERK'S OFFICE, A... ... THE RECORD. ... HAVE CUSTODY OF THE RECORD.
CUSTODIAN ...
Date 2-1-24
Jessica Jan...
Deputy Clerk

VIRGINIA:

<div align="center">IN THE CIRCUIT COURT FOR FRANKLIN COUNTY

**PROBATION REVOCATION ORDER**

FIPS CODE: 067</div>

**HEARING DATE:** OCTOBER 28, 2021
**JUDGE:** HONORABLE TIMOTHY W. ALLEN

COMMONWEALTH OF VIRGINIA

     v.                  CASE NO. **18 05 9735-01**

**ISSAC FIDEL MARTINEZ-CHAVEZ**, DEFENDANT

This case came before the Court for the revocation of probation hearing of the defendant, Issac Fidel Martinez-Chavez, who appeared via video conference, and came also, Hunter W. Naff, his attorney, previously appointed. Ashley B. Neese represented the Commonwealth.

On **December 20, 2018**, the defendant entered a plea of not guilty, and was found guilty of the following offenses:

| CASE NUMBER | OFFENSE DESCRIPTION & INDICATOR (F/M) | OFFENSE DATE | VA. CODE SECTION | VCC CODE | OFFENSE TRACKING NUMBER |
|---|---|---|---|---|---|
| 18 05 9735 | LEAVE THE SCENE OF AN ACCIDENT INVOLVING PERSONAL INJURY (F) | 05/02/2018 | §46.2-894 | HIT6608F5 | 067GM1800002716 |
| 18 01 1311 | NO DRIVERS LICENSE | 05/02/2018 | §46.2-300 | LIC6808M2 | 067GM1800002717 |

On **April 4, 2019**, the defendant was sentenced to confinement with the **Virginia Department of Corrections** for a term of four years on **Indictment 19 05 9735**, with the execution of three years six months being suspended, leaving six months to serve. The Court imposed a $50.00 fine on **Indictment 18 01 1311**, with the fine being suspended. The conditions of the suspended sentence were that defendant keep the peace and be of good behavior for a period of four years, be placed on supervised

<div align="center">Exhibit 3, page 52 of 62</div>

<div align="center">JA100</div>

probation for a term of eighteen months, and upon payment of $1,154.00 Court costs. The defendant's privilege to drive was suspended for a period of ninety days on **Indictment 18 01 1311**. The Court imposed the further special conditions of probation that defendant shall not possess or use alcohol, possess firearms, shall make monthly payments in the amount of $50.00 towards Court cost and comply with substance abuse counseling and/or treatment as prescribed by probation officer.

And on **October 28, 2021**, the defendant appeared before this Court for a revocation of probation hearing. The Court received and considered the evidence of the major violation report, to-wit: violation of condition #8, use, possess or distribute controlled substances or related paraphernalia. The defendant and counsel were given the right to present any additional facts bearing upon the matter as they desired to present.

Having heard and taken into consideration all the evidence and argument of counsel, the Court demanded of the defendant whether he desired to make a statement or advance any reason why judgment should not be pronounced against him according to law. Nothing being offered or alleged in delay of judgment, the Court finds that the defendant has violated the terms and conditions of probation, revokes the suspension of the remainder of the original four-year sentence and **re-suspends** the execution of the sentence upon the following conditions:

**GOOD BEHAVIOR**: The defendant is **ORDERED** to keep the peace and be of good behavior for a period of four years from October 28, 2021.

**SUPERVISED PROBATION**: The defendant is continued on supervised probation to re-commence upon release from confinement, under the supervision of a Probation Officer, for a period of eighteen months, unless released sooner by the

Court or by the Probation Officer. The defendant shall comply with all the rules and requirements set by the Probation Officer, and previously adopted by this Court. Probation shall include substance abuse counseling and/or testing as prescribed by the Probation Officer. This probation period will not expire while a major violation of probation is pending.

**COURT COSTS:** The defendant is **ORDERED** to pay Court costs in the amount of $502.00, due immediately, payment of costs to be monitored by the Probation Officer. If defendant is not financially able to pay Court costs as required by the Court, the Court **ORDERS** that the defendant be allowed to perform community service under the supervision of the Probation Officer, in lieu of monetary payment of costs, to be compensated at the rate of $9.50 credit per hour worked. If defendant petitions for installment payments and fails to pay as agreed, collection will be handled through the Virginia Department of Taxation.

The Court certifies that at all times during this hearing, the defendant was present via video conference and the attorney was personally present.

The Court **ORDERS** that defendant be given credit for time spent in confinement while awaiting this hearing pursuant to Virginia Code §53.1-187.

DATE 12/2/21 ENTER: 7. W. all

JUDGE

**DEFENDANT IDENTIFICATION:**
ALIAS:
DOB: SEPTEMBER 16, 1986      SSN: NONE/UNKNOWN      SEX: M
**SENTENCING SUMMARY:**
TOTAL ORIGINAL SENTENCE IMPOSED: FOUR YEARS
TOTAL SENTENCE PREVIOUSLY SERVED: SIX MONTHS
TOTAL SENTENCE IMPOSED THIS DAY: THREE YEARS SIX MONTHS
TOTAL SENTENCE RE-SUSPENDED THIS DAY: THREE YEARS SIX MONTHS
0707w

I CERTIFY THAT THE DOCUMENT TO WHICH THIS AUTH... C AFFIXED ... COPY OF A ... IN THE FRANKLIN CO... CIRCUIT COURT CLERKS OFFICE ... THAT I AM ... CUSTODIAN AND HAV... ... OF THE RECORD.
Date 2-1-24      Jessica Lambert
Clerk _____ Deputy Clerk

VIRGINIA:

<div align="center">IN THE CIRCUIT COURT FOR FRANKLIN COUNTY</div>

<div align="center">**PROBATION REVOCATION ORDER**</div>

<div align="right">FIPS CODE: 067</div>

**HEARING DATE:** SEPTEMBER 14, 2022
**JUDGE:** HONORABLE TIMOTHY W. ALLEN

COMMONWEALTH OF VIRGINIA

    v.                       CASE NO. **18 05 9735-02**

**ISSAC FIDEL MARTINEZ-CHAVEZ**, DEFENDANT

This case came before the Court for the revocation of probation hearing of the

defendant, Issac Fidel Martinez-Chavez, who appeared via video conference, and

came also, Hunter W. Naff, his attorney, previously appointed. W. Cooper Brown

represented the Commonwealth.

On **December 20, 2018**, the defendant entered pleas of not guilty, and was

found guilty of the following offenses:

| CASE NUMBER | OFFENSE DESCRIPTION & INDICATOR (F/M) | OFFENSE DATE | VA. CODE SECTION | VCC CODE | OFFENSE TRACKING NUMBER |
|---|---|---|---|---|---|
| 18 05 9735 | LEAVE THE SCENE OF AN ACCIDENT INVOLVING PERSONAL INJURY (F) | 05/02/2018 | §46.2-894 | HIT6608F5 | 067GM1800002716 |
| 18 01 1311 | NO DRIVERS LICENSE (M) | 05/02/2018 | §46.2-300 | LIC6808M2 | 067GM1800002717 |

On **April 4, 2019**, the defendant was sentenced to confinement with the

**Virginia Department of Corrections** for a term of four years on **Indictment 19 05 9735**,

with the execution of three years six months being suspended, leaving six months to

serve. The Court imposed a fine in the amount of $50.00 on **Indictment 18 01 1311**,

with the fine being suspended. The conditions of the suspended sentence were that

defendant keep the peace and be of good behavior for a period of four years, be

<div align="center">Exhibit 3, page 55 of 62</div>

<div align="center">JA103</div>

9-26-22
SCAN
CA
PO
HWN
Jail (2)

placed on supervised probation for a term of eighteen months, and upon payment of $1,154.00 Court costs. The defendant's privilege to drive was suspended for a period of ninety days on Indictment 18 01 1311. The Court imposed the further special conditions of probation that defendant shall not possess or use alcohol, possess no firearms, shall make monthly payments in the amount of $50.00 towards Court cost and comply with substance abuse counseling and/or treatment as prescribed by probation officer.

On **October 28, 2021**, the defendant appeared before this Court for a revocation of probation hearing. The Court found that the defendant had violated the terms and conditions of probation and revoked the suspension of the remainder of the original four-year sentence and re-suspended the execution of the sentence upon the conditions that he keep peace and be of good behavior for a period of four years and continue on supervised probation for a period of eighteen months. Court costs in the amount of $502.00 were assessed for this hearing.

And on **September 14, 2022**, the defendant again appeared before this Court for a revocation of probation hearing. The Court received and considered the evidence of the major violation report and addendum, to-wit: violation of condition #4, fail to report as instructed, condition #10, change residence or leave State of Virginia without permission and condition #11, abscond from supervision. The defendant and counsel were given the right to present any additional facts bearing upon the matter as they desired to present.

Having heard and taken into consideration all the evidence and argument of counsel, the Court demanded of the defendant whether he desired to make a statement or advance any reason why judgment should not be pronounced against

him according to law. Nothing being offered or alleged in delay of judgment, the Court finds that the defendant has violated the terms and conditions of probation, revokes the suspension of one month of the original four-year sentence, and

The Court **SENTENCES** the defendant to:

Incarceration with the **Virginia Department of Corrections** for the term of one month on indictment **18 05 9735**.

This sentence shall run consecutively with any other sentences the defendant may have to serve.

The Court **RE-SUSPENDS** the execution of the remaining three-year five-month sentence upon the following conditions:

**GOOD BEHAVIOR:** The defendant is **ORDERED** to keep the peace and be of good behavior for a period of four years from September 14, 2022.

**SUPERVISED PROBATION:** The defendant is continued on supervised probation to re-commence upon release from confinement, under the supervision of a Probation Officer, for a period of eighteen months, unless released sooner by the Court or by the Probation Officer. The defendant shall comply with all the rules and requirements set by the Probation Officer, and previously adopted by this Court. Probation shall include substance abuse counseling and/or testing as prescribed by the Probation Officer. This probation period will not expire while a major violation of probation is pending. The defendant shall report to the probation office within 24 hours upon his release from confinement.

**COURT COSTS:** The defendant is **ORDERED** to pay Court costs in the amount of $666.00, upon release from confinement, payment of costs to be monitored by the Probation Officer. If defendant is not financially able to pay Court costs as required

by the Court, the Court **ORDERS** that the defendant be allowed to perform community service under the supervision of the Probation Officer, in lieu of monetary payment of costs, to be compensated at the rate of $11.00 credit per hour worked. If defendant petitions for installment payments and fails to pay as agreed, collection will be handled through the Virginia Department of Taxation.

The Court certifies that at all times during this hearing, the defendant was present via video conference and the attorney was personally present.

The Court **ORDERS** that defendant be given credit for time spent in confinement while awaiting this hearing pursuant to Virginia Code §53.1-187.

DATE _____9/26/22_____ ENTER: _____T. Wall_____

<div align="center">JUDGE</div>

**DEFENDANT IDENTIFICATION:**
ALIAS:
DOB: SEPTEMBER 16, 1986          SSN: 673 72 4673          SEX: M
**SENTENCING SUMMARY:**
TOTAL ORIGINAL SENTENCE IMPOSED: FOUR YEARS
TOTAL SENTENCE PREVIOUSLY SERVED: SIX MONTHS
TOTAL SENTENCE IMPOSED THIS DAY: ONE MONTH
TOTAL SENTENCE RE-SUSPENDED THIS DAY: THREE YEARS FIVE MONTHS
9462E

I CERTIFY THAT THE DOCUMENT TO WHICH THIS
AU... CATION IS ... ... IS A TRUE COPY
O... ... THE FRANKLIN COUNTY CIRCUIT
CO... ... OF, AND THAT ...
CUSTO... ... STODY OF ... ...
Date 2-1-24        Jessica Lanlere
_____ Clerk _____ Deputy Clerk

VIRGINIA:

IN THE CIRCUIT COURT FOR FRANKLIN COUNTY

**PROBATION REVOCATION ORDER**

FIPS CODE: 067

**HEARING DATE:** JANUARY 17, 2023
**JUDGE:** HONORABLE JAMES J. REYNOLDS

COMMONWEALTH OF VIRGINIA

v.                                    CASE NO. **18 05 9735-03**

**ISSAC FIDEL MARTINEZ-CHAVEZ**, DEFENDANT


This case came before the Court for the revocation of probation hearing of the

defendant, Issac Fidel Martinez-Chavez, who was led to the bar in the custody of the

jailer of this county, and came also, Hunter W. Naff, his attorney, previously appointed.

Aimee Lucas represented the Commonwealth.

On **December 20, 2018**, the defendant entered pleas of not guilty, and was

found guilty of the following offenses:

| CASE NUMBER | OFFENSE DESCRIPTION & INDICATOR (F/M) | OFFENSE DATE | VA. CODE SECTION | VCC CODE | OFFENSE TRACKING NUMBER |
|---|---|---|---|---|---|
| 18 05 9735 | LEAVE THE SCENE OF AN ACCIDENT INVOLVING PERSONAL INJURY (F) | 05/02/2018 | §46.2-894 | HIT6608F5 | 067GM1800002716 |
| 18 01 1311 | NO DRIVERS LICENSE (M) | 05/02/2018 | §46.2-300 | LIC6808M2 | 067GM1800002717 |

On **April 4, 2019**, the defendant was sentenced to confinement with the **Virginia**

**Department of Corrections** for a term of four years on **Indictment 19 05 9735**, with the

execution of three years six months being suspended, leaving six months to serve. The

Court imposed a fine in the amount of $50.00 on **Indictment 18 01 1311**, with the fine

being suspended. The conditions of the suspended sentence were that defendant

keep the peace and be of good behavior for a period of four years, be placed on

1-30-23
SCAN
CA
PO
HWN
JAIL

supervised probation for a term of eighteen months, and upon payment of $1,154.00

Court costs. The defendant's privilege to drive was suspended for a period of ninety

days on Indictment 18 01 1311. The Court imposed the further special conditions of

probation that defendant shall not possess or use alcohol, possess no firearms, shall

make monthly payments in the amount of $50.00 towards Court cost and comply with

substance abuse counseling and/or treatment as prescribed by probation officer.

On **October 28, 2021**, the defendant appeared before this Court for a

revocation of probation hearing. The Court found that the defendant had violated the

terms and conditions of probation and revoked the suspension of the remainder of the

original four-year sentence and re-suspended the execution of the sentence upon the

conditions that he keep peace and be of good behavior for a period of four years and

continue on supervised probation for a period of eighteen months. Court costs in the

amount of $502.00 were assessed for this hearing.

On **September 14, 2022**, the defendant appeared before this Court for a

revocation of probation hearing. The Court found the defendant had violated the

terms and conditions of probation, revoked the suspension of one month of the original

four-year sentence and resuspended the remaining three years five months upon

conditions the defendant keep the peace and be of good behavior for a period of

four years and continue on supervised probation for a period of eighteen months.

Court costs in the amount of $666.00 were assessed for this hearing.

And on **January 12, 2023**, the defendant again appeared before this Court for a

revocation of probation hearing. The Court received and considered the evidence of

the major violation report, to-wit: violation of condition #8, use, possess, distribute

controlled substances or paraphernalia. The defendant and counsel were given the

Exhibit 3, page 60 of 62

JA108

right to present any additional facts bearing upon the matter as they desired to present.

Having heard and taken into consideration all the evidence and argument of counsel, the Court demanded of the defendant whether he desired to make a statement or advance any reason why judgment should not be pronounced against him according to law. Nothing being offered or alleged in delay of judgment, the Court finds that the defendant has violated the terms and conditions of probation, revokes the suspension of twelve months of the original four-year sentence, and

The Court **SENTENCES** the defendant to:

Incarceration with the **Virginia Department of Corrections** for the term of twelve months on Indictment **18 05 9735**.

This sentence shall run consecutively with any other sentences the defendant may have to serve.

The Court **RE-SUSPENDS** the execution of the remaining two years five months sentence upon the following conditions:

**GOOD BEHAVIOR:** The defendant is **ORDERED** to keep the peace and be of good behavior for a period of three years from January 12, 2023.

**SUPERVISED PROBATION:** The defendant is **terminated** from supervised probation.

**COURT COSTS:** The defendant is **ORDERED** to pay Court costs in the amount of $666.00, upon release from confinement. If defendant is not financially able to pay Court costs as required by the Court, the Court **ORDERS** that the defendant be allowed to perform community service, in lieu of monetary payment of costs, to be compensated at the rate of $12.00 credit per hour worked. If defendant petitions for

installment payments and fails to pay as agreed, collection will be handled through the Virginia Department of Taxation.

The Court certifies that at all times during this hearing, the defendant was present via video conference and the attorney was personally present.

The Court **ORDERS** that defendant be given credit for time spent in confinement while awaiting this hearing pursuant to Virginia Code §53.1-187.

DATE _1/30/2023_    ENTER: _____

                                                   JUDGE

**DEFENDANT IDENTIFICATION:**
ALIAS:
DOB: SEPTEMBER 16, 1986              SSN: 673 72 4673           SEX: M
**SENTENCING SUMMARY:**
TOTAL ORIGINAL SENTENCE IMPOSED: FOUR YEARS
TOTAL SENTENCE PREVIOUSLY SERVED: SEVEN MONTHS
TOTAL SENTENCE IMPOSED THIS DAY: TWELVE MONTHS
TOTAL SENTENCE RE-SUSPENDED THIS DAY: TWO YEARS FIVE MONTHS
4633c

I CERTIFY THAT THE DOCUMENT TO WHICH THIS
AUTHENTICATION IS ... COPY
OF A RECORD IN T...
COURT CLERK'S O... CUIT
CUSTODIAN AND HAVE CUSTODY OF ... RD.
Date _2-1-24_     _Jessica Lambert_
                  Clerk _✓_ Deputy Clerk

# *VIRGINIA:*

## IN THE CIRCUIT COURT OF MONTGOMERY COUNTY

| | |
|---|---|
| **COMMONWEALTH OF VIRGINIA**<br>Plaintiff | ***PLEA AGREEMENT*** |
| | CHARGEs: |
| **v.**     Case Nos. <u>CR22001411 & 1412</u> | ***Possess Schedule II Cont Sub***<br>***(VCC: NAR-3022-F5)*** |
| **ISSAC FIDEL MARTINEZ-CHAVEZ**<br>Defendant   16 84<br>  DOB: 09/ /19   SSN: 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<br>      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 | ***DUI-D 2nd or sub w/in 5 years***<br>***(VCC: DWI-5464-S9)*** |

This **PLEA AGREEMENT** is entered into between the Defendant, *ISSAC FIDEL MARTINEZ-CHAVEZ,* his attorney, *BRANDON RATLIFF,* and the *COMMONWEALTH'S ATTORNEY* of Montgomery County, or one of her assistants, in accordance with Rule 3A: 8(c) of the Rules of the Supreme Court of Virginia.

1. This PLEA AGREEMENT covers the below offenses in which the defendant has **WAIVED** being indicted by the Montgomery County Grand Jury and proceeds on warrants:

| Case Number | Offense/Indicator | Code § | Offense Date | Punishment |
|---|---|---|---|---|
| CR22001411 | Poss. Sch II Cont Sub/F | 18.2-250(A,a) | 08/29/22 | 1-10 yrs (NAR-3022-F5) |
| CR22001412 | DUI-D 2nd or sub w/in 5yrs/m | 18.2-266 | 08/29/22 | 1 mo-1 yr (DWI-5464-S9)<br>**20 days mandatory min |

2. The Defendant agrees to *plead guilty* to the *above offenses* and stipulates that the evidence would be sufficient for a finding of guilt.

3. The **Defendant** further **agrees not to petition** the Court **for a modification** or additional suspension **of any sentence** imposed in compliance with this PLEA AGREEMENT.

4. Upon the Defendant's plea and his other promises contained in this AGREEMENT, the

1

**Commonwealth agrees** to move the Court that the following **specific sentence** shall be the appropriate disposition:

| Offense | Sentence | Fine |
|---|---|---|
| *Poss. Sch II Cont Sub/F* (CR22001411) | *3 years prison* | *$250* |
| *DUI-D 2nd or sub w/in 5 yrs, misd* (CR22001412) | *60 days jail* | *$1,000* |

**The prison sentences imposed shall run **consecutively.**

**Suspension of Sentence:**
After **serving 2 months on Poss Sch II #22-1411 and 20 days [**which is mandatory min]** on DUI-D 2nd or sub w/in 5yrs** the execution of the **balance** of the prison and jail sentences shall be suspended for a period of 3 years.

**$500 of the $1,000 fine imposed on the DUI-D 2nd or sub #22-1412 shall be suspended [**$500 being mandatory min]**

**Probation (Poss. Sch. II C/S/F):**
Defendant shall be on **probation for 3 years, which** shall be **supervised through Adult Probation**, unless modified by the Court.

**Probation (DUID 2nd/m):**
Defendant shall be on **probation for 12 months, which** shall be **supervised through New River Valley ASAP**, unless modified by the Court.

**Special Conditions**
- Defendant shall not **possession or use of illegal narcotics**.
- Defendant **waives 4th amendment rights** through periods of probation and suspended sentence.
- **The Defendant agrees that he will not possess, purchase or attempt to possess or purchase a drug or product containing pseudoephedrine during the period of his suspended sentence under this agreement and, as a condition of any suspended sentences, probation or post-release supervision period.**
- Defendant shall **submit to HIV & Hepatitis C testing** pursuant to 18.2-346.1.[#22-1411]
- Defendant shall **keep the peace and be of good behavior** during probation and suspended sentence.
- Defendant shall **pay $50 to Trauma Center** Fund [on DUI-D 2nd or sub #22-1412]
- Defendant's driver's license and/or privilege to drive in Virginia shall be suspended for three (3) years - restricted license possible after 4 months [on DUI-D 2nd or sub #22-1412]
- Commonwealth shall recover her **costs.**

2

Exhibit 4, page 2 of 5

JA112

**SENTENCE SUMMARY (total for *all* offenses as listed above):**

| | |
|---|---|
| **INCARCERATION:** | 3 years prison/F;  60 days jail/m |
| -Time to Serve | 2 months/F; 20 days/m  **mand min on DUI 2nd |
| -Time Suspended | 2 years 10 months/F;  40 days/m |
| **FINE:** | $1,250   [$1000 DUI-D #22-1412; $250 Poss #22-1411] |
| -Fine to Pay | $ 750   [$500 DUI-D #22-1412; $250 Poss #22-1411] |
| -Fine Suspended | $ 500   [DUI-D 2nd #22-1412] |
| **PERIOD OF SUSPENSION** | 3 years |
| **PROBATION:** | 3 years |
| -Supervised Probation | 3 years thru ~~ASAP~~ *Adult Probation* |
| **COMMUNITY SERVICE:** | None *ML* *JBK* |
| **DL FORFEITURE/SUSPENSION:** | 3 years [on DUI-D 2nd #22-1412] |
| **RESTITUTION:** | $50 to Trauma Center Fund [DUI-D 2nd #22-1412] |
| **OTHER:** | **See ALL above SPECIAL CONDITIONS; Pay costs |

**SENTENCING GUIDELINE RECOMMENDATION:**

| |
|---|
| *Incarceration 1 day to 3 months* <br> ***20 days mandatory min {DUI-D 2nd or sub w/in 5 yrs]* |

5. The Defendant agrees to **waive his rights concerning search and seizure under the 4th Amendment** to the U.S. Constitution and Article I of the Virginia Constitution during the period of his suspended sentence under this agreement and, as a **condition of any suspended sentences, probation, or post-release supervision period, to consent** to any request by a law enforcement or probation officer to search his person, belongings, motor vehicle(s), residence, or any such property in his possession and control, for illegal drugs, contraband and weapons.

6. It is understood by the Defendant that the Court may accept or reject this PLEA AGREEMENT, or postpone its decision to accept or reject it until there has been an opportunity to consider a pre-sentence report of his background and previous criminal history.

7. The Defendant understands that if the Court rejects this PLEA AGREEMENT then neither party shall be bound by the agreement and the Defendant shall have the right to withdraw his plea of guilty; that if he does not withdraw his plea, the disposition of the case may be less favorable than that provided for by this agreement as the Court may impose any sentence permitted by law for the

3

Exhibit 4, page 3 of 5

JA113

offenses involved; and that if he does withdraw his plea, this case will be heard by another judge, unless the parties otherwise agree, and that the plea entered under this agreement shall not be admissible against him.

8. The Court has not participated in any way in the discussions leading to this PLEA AGREEMENT.

9. The Defendant acknowledges and understands that by entering into this PLEA AGREEMENT and pleading guilty to the charge:

- He waives his right to a jury trial;

- He waives his right not to incriminate himself;

- He waives his right to confront and cross-examine his accusers;

- He waives his right to defend himself and to compulsory process to have evidence and/or witnesses presented on his behalf;

- He may waive his right to appeal the decision of the Court;

- He cannot be promised how much time he will be confined to serve a particular sentence;

- He cannot be promised where he will be confined to serve his sentence, and

- He will receive credit for any time spent in jail awaiting trial of this charge if such time has not already been credited to another sentence.

10. The Defendant acknowledges that:

- He has received a copy of the indictment and discussed it with his attorney;

- His attorney has discussed with, and explained to him, the nature of the charge, the elements of the offense, and punishment if convicted;

- He has discussed with his attorney the facts and circumstances of the case, as known to the Defendant, and any defense he may have to the offense;

- Each and every particular of this PLEA AGREEMENT and the effects thereof

4

Exhibit 4, page 4 of 5

JA114

have been fully explained to him by his counsel;

- He has had ample time to discuss any defense to the charge and to decide what his plea should be, and

- He has entered into this agreement freely and voluntarily and without promise or threat from any source, and that he respectfully asks the Court to accept this PLEA AGREEMENT.

11. The Defendant, his counsel, and the Commonwealth Attorney agree that this written PLEA AGREEMENT contains all the terms of the agreement between them and that the Court has not participated in any way in the discussions leading to this PLEA AGREEMENT.

ENTERED INTO this _6_ day of ___FEB.___, 2023 by and between:


_ISAAC Fidel Martinez Chavez_
**ISSAC FIDEL MARTINEZ-CHAVEZ**, Defendant


_____
**BRANDON RATLIFF**, Counsel for Defendant

COMMONWEALTH OF VIRGINIA

By: _____
**NICHOLAS M. LAUER**
Assistant Commonwealth's Attorney
Montgomery County


The COURT, being of the opinion that the Defendant's plea of guilty and waiver of trial by jury are freely and voluntarily made, that he understands the nature of the charge and the consequences of his plea and the terms of this PLEA AGREEMENT, accepts the Defendant's plea and this PLEA AGREEMENT and its terms this _6_ day of ___FEB.___, 2023.


_____
**JUDGE**

5

Exhibit 4, page 5 of 5

JA115

# INCIDENT REPORT
COMMONWEALTH OF VIRGINIA

## VEHICLE / AD

| 173-PAGE # | 174-DATE | 175‡-INCIDENT # | 176-REPORTING OFFICER | 177-CODE # | 178-VICTIM NAME |
|---|---|---|---|---|---|
| 3 | 08/29/2022 | 2022-019786 | Deputy Jesse P. East | E070 | COMMONWEALTH OF, VIRGINIA **US |

| 179-YEAR | 180-MAKE | 181-MODEL | 182-STYLE | 183-VIN | 184-LICENSE NUMBER | 185-STATE |
|---|---|---|---|---|---|---|
| | Mecury | SUV | | | UJB6018 | VA |

| 186-OWNER'S NAME | 187-ADDRESS |
|---|---|
| Martinez-Chevez, Issac Fidel | 3919 Oliver Rd., Roanoke, VA 24012 |

| 188-TOP/SOLID COLOR | 189-SECOND COLOR | 190-DISPOSITION OF RECOVERY: | 192-SUSP. VEHICLE? | 193-TELETYPE NUMBER |
|---|---|---|---|---|
| | | ☐ (I) Impounded    ☐ (R) Rel. To Owner | ☑ Y    ☐ N | |

| 179-YEAR | 180-MAKE | 181-MODEL | 182-STYLE | 183-VIN | 184-LICENSE NUMBER | 185-STATE |
|---|---|---|---|---|---|---|
| | | | | | | |

| 186-OWNER'S NAME | 187-ADDRESS |
|---|---|
| | |

| 188-TOP/SOLID COLOR | 189-SECOND COLOR | 190-DISPOSITION OF RECOVERY: | 192-SUSP. VEHICLE? | 193-TELETYPE NUMBER |
|---|---|---|---|---|
| | | ☐ (I) Impounded    ☐ (R) Rel. To Owner | ☐ Y    ☐ N | |

## PROPERTY

| 209-OF. CODE | 210-P. LOSS | 211-P. DES. | 212-QTY. | 213-DESCRIPTION (Include serial number, size, color, etc.) | 214-OWNER | 215-ITEM VALUE | 216-RECOV. DATE |
|---|---|---|---|---|---|---|---|
| 90D | 6 | 70 | | Legal Blood Draw Kit | O1 | | |
| 90D | 6 | 10 | | Glass Smoking device containg a white crystal like substance | O1 | | |
| 90D | 6 | 10 | | Black scale displaying 0.01 covered in a white crystal like residue | O1 | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

| 217-TOTAL NUMBER VEHICLES STOLEN: | 218-TOTAL NUMBER VEHICLES RECOVERED: | 219-TOTAL VALUE STOLEN: | 220-TOTAL VALUE RECOVERED: |
|---|---|---|---|
| | | | |

## PROPERTY CODES

**210-PROPERTY LOSS:**   (1) None   (2) Burned   (3) Counterfeited/Forged   (4) Damaged/Destroyed/Vandalized   (5) Recovered   (6) Seized   (7) Stolen, etc.   (8) Unk.

**211-PROPERTY DESCRIPTION:**

- (01) Aircraft
- (02) Alcohol
- (03) Automobiles
- (04) Bicycles
- (05) Buses
- (06) Cloths/Furs
- (07) Computer Hardware/Software
- (08) Consumable Goods
- (09) Credit Cards/Debit Cards
- (10) Drugs/Narcotics
- (11) Drug/Narc. Equipment
- (12) Farm Equipment
- (13) Firearms
- (14) Gambling Equipment
- (15) Heavy Equipment-Construction/Industry
- (16) Household Goods
- (17) Jewelry/Precious Metals
- (18) Livestock
- (19) Merchandise
- (20) Money
- (21) Negotiable Instruments
- (22) Nonnegotiable Instruments
- (23) Office-Type Equipment
- (24) Other Motor Vehicles
- (25) Purses/Handbags/Wallets
- (26) Radios/TVs/VCRs
- (27) Recordings-Audio/Visual
- (28) Recreational Vehicles
- (29) Structures-Single Occupancy
- (30) Structures-Other Dwellings
- (31) Structures-Commercial/Business
- (32) Structures-Industrial/Manufacture
- (33) Structures-Public/Community
- (34) Structures-Storage
- (35) Structures-Other
- (36) Tools-Power/Hand
- (37) Trucks
- (38) Vehicle Parts/Accessories
- (39) Watercraft
- (77) Other
- (88) Pending Inventory (of Property)
- (99) Special Category

## DRUG INFO.

| 222-DRUG TYPE | 223-WHOLE DRUG QUANTITY | 224-FRACTIONAL DRUG QUANTITY | 225-DRUG MEASUREMENT |
|---|---|---|---|
| L | 1 | | GM |
| L | 1 | | GM |
| | | | |

**225-TYPE DRUG MEASUREMENT:**

WEIGHT
(GM) Gram
(KG) Kilogram
(OZ) Ounce
(LB) Pound

CAPACITY
(ML) Milliliter
(LT) Liter
(FO) Fluid Ounce
(GL) Gallon

UNITS
(DU) Dosage Unit (Pills, etc.)
(NP) Number of Plants

**222-DRUG TYPE:**

- (A) "Crack" Cocaine
- (B) Cocaine
- (C) Hashish
- (D) Heroin
- (E) Marijuana
- (F) Morphine
- (G) Opium
- (H) Other Narcotics
- (I) LSD
- (J) PSP
- (K) Other Hallucinogens
- (L) Amphetamines/Methamphetamines
- (M) Other Stimulants
- (N) Barbiturates
- (O) Other Depressants
- (P) Other Drugs
- (U) Unknown Type Drug
- (X) Over 3 Drug Types

## COMPLNT.

| NAME:   Last,   First,   Middle | SEX: ☐ (M) Male  ☐ (F) Female  ☐ (U) Unk. | AGE: _____ ☐ (00) Unknown | RACE: ☐ (W) White  ☐ (B) Black  ☐ (I) American Indian  ☐ (A) Asian/Pacific Islander  ☐ (U) Unknown |
|---|---|---|---|
| RESIDENT ADDRESS:   Street   City   State   Zip | RESIDENT PHONE   EMPLOY'T. PHONE | | |

# CONFIDENTIAL SUPPLEMENT NARRATIVE CONTINUATION

| 226-PAGE # | 227-DATE | 228-INCIDENT NUMBER | 229-REPORTING OFFICER | 230-CODE # | 231-VICTIM NAME |
|---|---|---|---|---|---|
| 5 | 08/29/2022 | 2022-019786 | Deputy Jesse P. East | E070 | COMMONWEALTH OF, VIRGINIA **USE THI |

NARRATIVE:

One Leg Stand

The third test I conducted was the one leg stand test. I instructed, explained, and demonstrated this test for Mr. Chavez. Mr. Chavez stated he understood the test before beginning the test. At approximately the ten second mark, Mr. Chavez lifted his arms up to catch his balance and fell backward letting his foot touch the ground in order to keep his balance. Mr. Chavez then picked up the opposite foot at approximately the eighteen second mark. Throughout the test Mr. Chavez was actively swaying back and forth as if he could not catch his balance.

Counting

The next test I conducted was the counting test. I asked Mr. Chavez to count backward from 73 to 48. Mr. Chavez stated, "73, 72, 71, 70, 69, 68, 67, 66, 65, 64, 63, 62, 61, 60, 59, 58, 57, 56, 55, 56, 56, 55, 54, 53, 52, 51, 50, 49, 48, 47, You said 47 right?".

Sergeant Dunford then administered some advanced impairment detection tests.

I advised Mr. Chavez of his preliminary breath test rights and offered him a preliminary breath test to which he agreed. The result of the breath test was 0.00 BAC.

At this time, I placed Mr. Chavez under arrest for DUI.

I then conducted an inventory search of the vehicle before it was towed. All things of value were notated in my body camera footage. During my inventory search I located a black scale inside of a white backpack in the front seat. Upon further investigation the scale was covered in a white crystal-like substance. I then conducted a probable cause search of the vehicle. during my PC search I located a glass smoking device containing a white crystal-like residue in the sun roof of the vehicle. Both items were seized and will be sent off to be tested.

I transported Mr. Chavez to Lewis Gale Montgomery Hospital (3700 South Main Street) for a legal blood draw. I read Mr. Chavez the implied consent form and he agreed to give a sample of blood.

I then transported Mr. Chavez to the Magistrate's office and obtained charges for 18.2-266 (DUI) and 18.2-250 (Possession of Schedule I or II drugs).

I transported Mr. Chavez to the jail and released him into the custody of the jail.

The blood sample Mr. Chavez provided is being sent off to the lab.

My body camera was active and recording.

Nothing further.

SUPPLEMENT #4    Deputy Jesse P. East - E070    09/02/2022    05:51

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION


| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) Case No. 7:24CR00011 |
| v. | ) |
| | ) |
| ISAAC FIDEL MARTINEZ-CHAVEZ | ) |

<u>MOTION TO SEAL</u>

Comes now, counsel for the defendant, moving this Honorable Court to place

under seal Exhibits 2 of the Defendant's Motion to Dismiss. In support hereof, the

counsel avers that the exhibit is a grand jury transcript.

Respectfully submitted,

Isaac Fidel Martinez-Chavez

By: /s/  Beatrice Diehl
Of Counsel

Beatrice F. Diehl, Esquire
Florida State Bar No. 0124667
Federal Public Defender's Office
210 First Street SW, Room 400
Roanoke, Virginia  24011
Ph. (540) 777-0880
Fax (540) 777-0890


<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 13th day of December, 2024, I caused the
foregoing Motion to Seal to be filed electronically with Laura A. Austin, Clerk,
United States District Court, Western District of Virginia and served by electronic
filing on the United States Attorney's Office for the Western District of Virginia.


/s/ Beatrice Diehl
Beatrice Diehl


JA118

IN THE UNITED STATES DISTRICT
COURT FOR THE WESTERN DISTRICT OF
VIRGINIA ROANOKE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| | ) |
| v. | ) Criminal No. 7:24-cr-00011 |
| | ) |
| | ) |
| ISAAC FIDEL MARTINEZ-CHAVEZ | ) |

<u>DEFENDANT'S MOTION TO SUPPRESS EVIDENCE</u>

Isaac Martinez-Chavez ("Mr. Martinez"), the defendant, by counsel, moves this Honorable Court to suppress the following evidence recovered from the warrantless search of the car he was driving on January 1, 2024, because it was obtained in violation of the Fourth Amendment:

1. An RG Industries .22 caliber revolver; and

2. A Marlin ("MAR") Firearms Co., .22 caliber bolt action rifle; and

3. All ammunition, magazines, and accessories.

In support of this motion, counsel states:

## I.    Background[1]

On January 1, 2024, Lieutenant Justin Hylton ("Hylton") of the Franklin County Sheriff's Office initiated a traffic stop of a silver KIA based on the driver turning off the

---

[1] For the purposes of this motion, the facts are taken from the Government's discovery disclosures and Mr. Martinez does not admit to them.

JA119

vehicle lights as it pulled into a yard. *See* "Recommendation for Prosecution," attached as Exhibit 1, at p. 2 and "Hylton Police Report," attached as Exhibit 2, at p. 2. Hylton's vehicle did not have a dash camera that captured the traffic stop or any of Mr. Martinez's driving behavior. Nor was a traffic citation generated indicating Mr. Martinez's speed.

Hylton's body camera footage begins by showing Mr. Martinez standing behind the silver KIA with his hands on the back of the vehicle under Hylton's control. *See* "Hylton's Body Worn Camera Recording," provided to the Court as Exhibit 3, at 0:00:06. The KIA was parked next to a red truck in front of a residence. *Id.* Hylton appeared to deactivate his body worn camera and approach Mr. Martinez from behind. *Id.*

Eventually, Hylton turned his body camera back on. *Id.* at 0:02:20. At that point, Mr. Martinez stood handcuffed next to Hylton's police vehicle a few feet behind the KIA. *Id.* Hylton went through the contents of Martinez's wallet on the hood of his patrol car and asked Mr. Martinez for identification; Mr. Martinez pointed to his identification in the wallet. *Id.* at 0:02:29. Mr. Martinez explained that he pulled into the yard "because my family stays here," motioning to the house behind him. *Id.* at 0:02:48.

Hylton observed that Mr. Martinez was the only occupant in the vehicle. He detained Mr. Martinez and patted him down for weapons, but none were found. Exhibit 2, at p. 3.

Officer Trey Poulin ("Poulin") drove to the scene. *See* "Poulin's Body Worn Camera Recording," provided to the Court as Exhibit 4, at 0:00:00:46. On his drive, dispatch reported to Hylton that the license plate check showed the KIA Martinez was driving was registered to Maria Julia Chavez Mendoza. Hylton asked dispatch to double check that finding and the dispatch officer confirmed. *Id.* at 0:00:56-0:01:09. This is seen because Poulin's body worn camera

3

JA120

turned on upon activation of the emergency lights.

Poulin arrived to assist Hylton. Exhibit 3 at 0:03:36. Hylton explained to Poulin that he observed Mr. Martinez speed earlier and that he didn't pull him over, instead giving him time, but that Mr. Martinez then "turned off his lights and come up in here real quick." *Id.* at 0:04:09. When an officer asked Hylton where he stopped Mr. Martinez, Hylton replied that he didn't stop him because he was "trying to catch up to him." *Id.* at 0:19:54. Hylton and Poulin left Mr. Martinez handcuffed by Hylton's patrol vehicle and approached the KIA with their flashlights. *Id.* 0:04:15.

Mr. Martinez attempted to speak to the officers, "sir, sir -" but they would not stop. *Id.* Hylton used his flashlight to search the back of the car behind on the driver's side and then the driver's side of the KIA through the windows. *Id.* at 0:04:15. "Who was in the car? Do you mind?" Poulin asked as he approached the KIA to search it with his flashlight. *Id.* at 0:04:18. Mr. Martinez objected and said, "Nobody. There is no one in the car, sir, sir-" *Id.* at 0:04:19. Poulin yelled at Mr. Martinez for him to be quiet and lean against the patrol car. *Id.* at 0:04:25. Hylton and Poulin continued to look into the car with their flashlights, and Poulin said, "There's a fucking gun in here; open the car up." *Id.* at 0:04:32. Hylton then opened the KIA's driver side door, and, for the first time, announced, "yeah he was reaching for something," and unlocked the car for Poulin. *Id.* at 0:04:37. Poulin opened the passenger side door, and officers began a complete search of the vehicle. *Id.* at 0:04:38. *See also* Exhibit 4 at 0:08:37 (Poulin remarked, "I'm gonna search this whole fucking car, man," and began tossing items from the glove compartment.)

Later, on Hylton's body camera, Poulin can be heard asking, "Hey, is he a felon?"

JA121

Exhibit 3 at 0:05:46. At this, Hylton radioed dispatch and asked, "If you've got his information run his criminal history too, I've got a firearm." *Id.* at 0:05:51.

At 0:06:28, one of the officers asked Poulin where he found the gun, and he said, "it was right underneath the seat."

On Poulin's body worn camera, dispatch can be heard saying they are still searching for Mr. Martinez's criminal history. Exhibit 4 at 0:15:30. Poulin responded, "Oh, he's a felon. If he's not, he is now." *Id.* at 0:15:32. Later, an officer again asked dispatch if they had Mr. Martinez's criminal history, and dispatch responded, "Yes, sir, we've got it printed." *Id.* at 0:18:32.[2]

The gun Poulin claimed to see in plain view was later determined to be a .22 caliber bolt action rifle. *See* Exhibit 2, at p. 3. (At the time of the search, Poulin can be heard saying, "I'll grab that gun, or that shotgun, I don't know what the fuck it is, a .22 maybe?" *See* Exhibit 3, at 0:06:49-56.)

At 0:18:05-26, Hylton told the other officers, "It doesn't matter to me. I mean we can charge him with the guns tonight anyway. I mean I can't do anything as far as him turning, I got him for reckless driving, he turned his lights off at the road, but I didn't turn the lights on him then … I mean he was going for a gun." Another officer replied, "He would have been screwed, I mean there was no live one in the chamber."

Officers located a second gun determined to be a .22 Caliber RG revolver, ammunition,

---

[2] Although dispatch does not relay the requested criminal history information on the body worn camera recording, Hylton called dispatch on his drive away from the scene and asked that all the information he requested be printed out for him to come and pick up. Exhibit 3, at 0:23:41.

and a glass smoking device in the vehicle. *See* Exhibit 2, at p. 3. Officers searched Mr. Martinez and found a glass smoking device on his person. *Id.*

On March 14, 2024, the Government indicted Mr. Martinez on one count of Felon-in-Possession under 18 U.S.C. § 922(g)(1) and one count of Receive or Possess a Firearm Made in Violation of the National Firearms Act (NFA) under 26 U.S.C. § 5861(c). (ECF No. 1.) The Government filed a superseding indictment on November 7, 2024, charging Mr. Martinez with one count of Felon-in-Possession under 18 U.S.C. § 922(g)(1) and one count of Possess a Firearm not Registered in the NFA Registration and Transfer Record under 26 U.S.C. § 5861(d). (ECF No. 49.)

This case is scheduled for a jury trial on January 22-24, 2025. (ECF No. 43.)

## II.    <u>Legal Standard</u>

The Fourth Amendment to the United States Constitution protects people against unreasonable searches and seizures. U.S. Const. amend. IV. Warrantless searches and seizures are presumptively unreasonable and violative of the Fourth Amendment, subject to limited exceptions. *Katz v. United States*, 389 U.S. 347, 357 (1967). Evidence obtained from an unreasonable search is therefore inadmissible absent an exception that would allow the government to introduce it. *See Elkins v. United States*, 364 U.S. 206, 212-13 (1960). The Supreme Court has identified a limited number of exceptions that may permit the government to conduct a warrantless search. Absent one of these exigencies or specific exceptions, evidence seized during an unreasonable warrantless search must be suppressed under the exclusionary rule. *United States v. Calandra*, 414 U.S. 338, 347 (1974).

The Supreme Court has repeatedly emphasized that "'searches conducted outside the

JA123

judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). Exceptions to the Fourth Amendment's warrant requirement must be "jealously and carefully drawn," accompanied by "a showing by those who seek exemption that the exigencies of the situation made that course imperative." *Coolidge v. New Hampshire*, 403 U.S. 443, 455 (1971). "Over and over again," the Supreme Court has "emphasized that the mandate of the Fourth Amendment requires adherence to judicial processes." *Katz*, 389 U.S. at 357.

An exception construed so broadly that it serves "no purpose except to prove a police entitlement" is "anathema to the Fourth Amendment." *Gant*, 556 U.S. at 347. "Evidence gathered as fruit of an unreasonable search or seizure is generally inadmissible against a defendant." *United States v. Brown*, 401 F.3d 588, 592 (4th Cir. 2005) (citing *Taylor v. Alabama*, 457 U.S. 687, 694 (1982); *Wong Sun v. United States*, 371 U.S. 471, 484-86 (1963)).

A.  Propriety of a Traffic Stop

In determining the propriety of a traffic stop, the Fourth Circuit analyzes 1) whether the police officer's action was justified at its inception, and 2) whether the police officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop. *United States v. Digiovanni*, 650 F.3d 498, 506 (4th Cir. 2011).

If the initial traffic stop was illegal or the officers exceeded the stop's proper scope, contraband seized from the vehicle is excluded under the "fruit of the poisonous tree doctrine." *United States v. Rusher*, 966 F.2d 868, 875 (4th Cir. 1992) (citing *Wong Sun v. United*

*States*, 371 U.S. 471, 484 (1963); *United States v. Durant*, 730 F.2d 1180, 1182 (8th Cir.), cert. denied, 469 U.S. 843 (1984)).

B. The Plain View Doctrine

The plain view doctrine allows for a warrantless seizure of evidence if: (1) [t]he officer is lawfully in a place to plainly view the object; (2) the officer has a lawful right of access to the object itself; and (3) the incriminating character of the evidence is "immediately apparent." *Horton v. California*, 496 U.S. 128 (1990). An object's incriminating character is "immediately apparent" if a police officer, upon seeing it, has probable cause to believe it is "evidence of a crime or is contraband." *Arizona v. Hicks*, 480 U.S. 321, 326-27 (1987). However, "[i]f … the police lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object," then its incriminating nature is not immediately apparent, and "the plain-view doctrine cannot justify its seizure." *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993). Entering the interior of a truck to obtain a better vantage point to see a concealed area is unquestionably a search beyond the plain view exception. *United States v. Stanfield*, 109 F.3d 976, 981 (4th Cir. 1997).

C. Protective Sweep

There is no dispute that for officer safety, law enforcement officers may ask the occupants of a vehicle to exit the vehicle pursuant to a lawful traffic stop. *Maryland v. Wilson*, 519 U.S. 408, 415 (1997); *Ohio v. Robinette*, 519 U.S. 33, 38-39 (1996). However, the justification for a limited search following removal is officer safety.

In *Arizona v. Gant*, 556 U.S. 332 (2009), the Supreme Court held that a warrantless sweep of a vehicle after the defendant and other occupants were removed from the car and

secured out of reach of the passenger compartment was unreasonable. 556 U.S. at 336. The Court held that this type of search could only be conducted under two specific circumstances: (1) when the vehicle's occupants are "unsecured and within reaching distance of the passenger compartment at the time of the search", or (2) "when it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle." *Id.* at 343. As the Supreme Court noted in *Arizona v. Grant*, the second circumstance is irrelevant when it involves a traffic violation, as there is no additional conceivable evidence of that type of violation in the car. *Id.*

The Fourth Circuit has been critical of utilizing supposed furtive movements as primary evidence of suspicious behavior. *See, e.g., United States v. Massenburg*, 654 F.3d 480, 491 (4th Cir. 2011); *United States v. Foster*, 634 F.3d 243, 246-47 (4th Cir. 2011).

### III.    Argument

Officers searched the car Mr. Martinez was driving without a warrant or consent, violating Mr. Martinez's Fourth Amendment rights.

1. Hylton Did Not Conduct a Valid Traffic Stop.

As seen in his BWC, Hylton told officers at the scene that he decided not to stop Mr. Martinez for speeding because he was looking for something bigger to start the new year, like a DUI. Hylton also told the other officers that Mr. Martinez turned his lights off when he was driving, prior to his turn into the yard. However, Hylton told them that he never stopped Mr. Martinez because he was trying to catch up with him. By the time Hylton reached Mr. Martinez, Mr. Martinez had exited the vehicle and Hylton "pulled him out a gunpoint." Exhibit 3 at 0:19:57.

9

JA126

The body worn camera shows that Mr. Martinez parked the car he was driving next to the driveway where a truck and several other vehicles were parked. There was nothing unusual about how or where Martinez parked, because he parked where all the other vehicles also parked for the New Year's gathering at his friends' house. It is not a traffic violation to turn off your lights when you pull into a driveway on private property and is a common practice to do so to avoid shining lights into a residence.

Hylton did not call dispatch to report a possible DUI, nor did he pursue any kind of DUI investigation. He never performed an investigation into a traffic violation of any kind, nor did he ever write a ticket or summons for a traffic violation. For these reasons, Hylton's seizure of Mr. Martinez was not based on a valid traffic stop nor was it justified as a *Terry* stop, because Hylton did not have reasonable suspicion of some other crime.

According to Mr. Martinez, he did not turn off the car's lights until he was on his friends' property pulling in by the driveway to park. This factual dispute requires an evidentiary hearing.

2. <u>The Plain View Exception to the Warrant Requirement Does Not Apply</u>.

**Nothing Unlawful Was "Immediately Apparent" from Officer Poulin's View Outside the Car**

Poulin claimed to see a gun under the passenger seat of the KIA from outside the vehicle. It is not clear whether the gun was in plain view from Poulin's alleged vantage point, because he did not photograph or otherwise document his view of the gun from outside of the vehicle. Instead, he opened the passenger door on the basis that he had spotted a gun and searched the entire vehicle on that basis as well. Even if Poulin did see a gun in plain view from outside the car, there is nothing under Virginia law that makes the mere presence of a

10

JA127

firearm in a vehicle inherently unlawful, such that it would be immediately recognizable as contraband. Officers cannot simply seize a firearm in plain view, during a warrantless search, for the sole purpose of determining whether it is contraband. Otherwise, the final prong of the plain view analysis would be rendered meaningless.

First, the body worn camera footage shows that Poulin did not know what kind of gun he saw in plain view. Poulin tells the other officers, "I'll grab that gun, or that shotgun, I don't know what the fuck it is, a .22 maybe?" *See* Exhibit 3, at 0:06:49-56. It is not immediately clear to Poulin what kind of gun he is seeing, let alone whether it is contraband.

Second, even though Poulin speculated that what he saw was a "sawed-off shotgun" (Exhibit 4, at 0:03:48) – which it was not – ownership of a sawed-off shotgun is also not inherently illegal under Virginia law.

Virginia Code § 18.2-300 criminalizes the possession of a "sawed-off" shotgun or rifle only if (1) it is used "in the perpetration or attempted perpetration of a crime of violence," or (2) it is possessed in violation of federal law. *See* Va. Code § 18.2-300 and § 18.2-303.1. (Possession of such a weapon is also permitted for scientific purposes, or, if unusable, as a curiosity, ornament, or keepsake. *See id.* At the time Poulin spotted the gun, he did not have (1) evidence indicating it was possessed in violation of federal law, i.e. that it had not been registered; (2) evidence that it was functional and not a curiosity; or (3) evidence that it was not in use for scientific reasons or owned for other lawful purposes.

Third, ownership of a sawed-off shotgun (or rifle) is also not illegal under federal law. A person may lawfully own such a gun so long is it is registered with the National Firearm Registration and Transfer Record. It was not immediately apparent that the gun had not been

11

JA128

registered at the time Poulin found it.

Officers had to remove the gun from the car to measure it and determine whether the barrel and overall length of the gun had dimensions actually requiring it to be registered under federal law. *See* Exhibit 5. An analysis conducted over a month after Mr. Martinez's arrest showed the gun likely traveled in interstate commerce. *See* Exhibit 6. A records search was conducted two months after Mr. Martinez's arrest to ascertain whether or not the gun had been registered to Mr. Martinez. *See* Exhibit 7. It took ATF nearly three months from the time of Mr. Martinez's arrest to complete an analysis on the gun to determine what it was. *See* Exhibit 8. At that point, ATF determined the gun was functional, built from a rifle manufactured in 1961, prior to the requirement that guns have serial numbers, and that it needed to be registered on account of it having an overall length of 26 inches and a barrel of less than 16 inches. *Id.*

In short, it took the Government several months to determine that the gun Poulin saw in the vehicle was likely contraband if possessed by Mr. Martinez. It was unlawful for officers to remove the gun Poulin saw in the vehicle because they did not have a lawful right of access to the gun and the incriminating character of the gun was not immediately apparent. To determine if the gun was contraband required "some further search of the object," making the plain view doctrine inapplicable under *Minnesota*, 508 U.S. at 375.

Additionally, Poulin appeared to conclude that the gun he found was contraband because he assumed Mr. Martinez was a felon. Before the officers asked for dispatch to do a criminal history check on Mr. Martinez, they had already located the firearm in the vehicle. Having completed a search of the entire car and found two apparent firearms and ammunition,

JA129

Poulin remarked, "Oh, he's a felon. If not, he is now," in response to dispatch's communication that they were still looking up Mr. Martinez's criminal history. *See* Exhibit 4 at 0:15:32.

An officer's assumption that a suspect is a felon is not enough to make a weapon in plain view evidence that he is a felon-in-possession. *See, e.g., United States v. Wells*, 98 F.3d 808 (4th Cir. 1996) (holding that an officer's discovery of a weapon in plain view during the execution of a properly-issued search warrant was sufficient to find probable cause that the defendant was a felon-in-possession because officers had reviewed defendant's criminal history and knew he was a felon *prior* to execution of the search warrant).

3. Officers' Search of the Car was not Justified as a Protective Sweep.

Officers were not entitled to conduct a protective sweep at the time they seized the firearm. There are no facts to indicate the firearm posed an immediate threat to officer or public safety at the time it was seized. The body camera video and police report show that Hylton had secured Mr. Martinez in handcuffs at gun point and that he was being detained several feet behind his vehicle at the time Hylton and Poulin searched it. Prior to their search of the vehicle, Hylton had already patted Mr. Martinez down for weapons and determined that there were no other people in the vehicle.

Poulin sounded as though he was going to ask Mr. Martinez's consent to search the vehicle, "Do you mind?" he stated as he approached the KIA with his flashlight, but then, when Mr. Martinez tried to stop him verbally, Poulin told Mr. Martinez to shut up and lean against the patrol vehicle. *See* Exhibit 3 at 0:04:18.

Officers' warrantless sweep of the vehicle, after Mr. Martinez was removed from the

13

JA130

car and secured out of reach of the passenger compartment, was unreasonable under *Arizona v. Gant*, 556 U.S. at 336. Officers' search of the car did not fall under the second exception in *Gant* – allowing for a search when it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle – because that exception does not apply in the context of a traffic violation. *Id.* at 343. Therefore, officers' search of the vehicle was not justified as a protective sweep or for officer safety.

Only after Poulin discovered the gun and he and Hylton decided to search the entire vehicle on that basis, did Hylton assert for the first time on the body camera that Mr. Martinez appeared to be reaching for something on the passenger side of the car when Hylton pulled him over. Exhibit 3 at 0:04:37. That story is undermined by 1) the fact that Hylton did not mention Mr. Martinez reaching for something in the exact location where Poulin found the gun until Poulin found a gun there, 2) Hylton never alerts Poulin to be on alert for a dangerous weapon, and 3) Hylton did not search for anything on the passenger side of the vehicle when he conducted his visual inspection with a flashlight. Rather, he searched the back of the vehicle and the driver's side of the vehicle with his flashlight. *Id.* at 0:04:15. Despite claiming, after the fact, that he saw Mr. Martinez reaching for something, he himself did not immediately go to the area where he believed Mr. Martinez was reaching for something.

Moreover, any alleged furtive movements Hylton suddenly remembered after he found the gun are insufficient evidence of suspicious behavior in the Fourth Circuit under *Massenburg*, 654 F.3d at 491 and *Foster*, 634 F.3d at 246-47. Additionally, because Mr. Martinez was secured in handcuffs behind the vehicle, there was no need to look for weapons because

14

JA131

Mr. Martinez was not a security risk and there were no other passengers in the vehicle. Once Mr. Martinez was out of the vehicle, restrained and / or kept away from the cabin of the vehicle, he no longer posed any conceivable threat. Therefore, because any reasonable concern for officer safety was neutralized, no justification for a protective sweep of the vehicle existed.

4. <u>Hylton Misrepresented in His Police Report that Officers Located the Gun Poulin Saw Outside of the Vehicle During the Course of Securing the Vehicle for Towing.</u>

In his police report, Hylton wrote,

Upon knowledge of Chavez's warrants, I returned to the KIA to being security it for towing due to Chavez going to jail and the car not being registered properly. As Ofc. T. Poulin approached the passenger side of the car he alerted that he saw a firearm in the passenger floorboard.

Exhibit 2, at p. 3. However, Hylton's body camera shows that he and Poulin found the gun and searched the car before Hylton found out Mr. Martinez had any warrants or that the car wasn't properly registered. *See* Exhibit 3, at 0:04:15-0:04:38 (showing Hylton and Poulin looking into the car with flashlights over Mr. Martinez's objection and finding the gun, then beginning a complete search of the vehicle on that basis); *see id.* at 0:05:10-:38 (showing dispatch returning warrants check); *see* Exhibit 4 at 0:00:56-0:01:09 (showing the car was validly registered to Maria Julia Chavez Mendoza). This justification after the fact is not supported by the record.

The several discrepancies between Hylton's report and his actual body camera footage raises serious questions about his credibility requiring an evidentiary hearing.

**IV.    <u>Conclusion</u>**

Mr. Martinez's initial seizure was never justified from its inception. Furthermore, no

JA132

legal justification existed for the search of the vehicle he was driving. That search and subsequent seizure of the guns and ammunition violated Mr. Martinez's rights under the Fourth Amendment. Therefore, the evidence seized must be suppressed.

To the extent that the Court does not grant this Motion to Suppress based upon this Motion and its exhibits, Mr. Martinez respectfully requests an evidentiary hearing to resolve factual issues.

In connection with the requested evidentiary hearing, Mr. Martinez requests, pursuant to Rule 26.2 of the Federal Rules of Criminal Procedure, that the Government disclose to defense counsel at least forty-eight hours prior to the hearing any statements of suppression hearing witnesses. Mr. Martinez further requests that the Government disclose any *Brady* or *Giglio* materials within this time frame. This request is made in order to avoid delays in conducting the hearing. Mr. Martinez expressly requests the right to raise any other motions based on the facts and evidence that may arise during any evidentiary hearings in this case, and the right to file a supplemental brief more fully addressing the testimony given at the hearing and the applicable law.

WHERETOFORE, Mr. Martinez prays that the Court grant this Motion to Suppress, or, to the extent it deems necessary, set this motion for an evidentiary hearing. Mr. Martinez further requests advance discovery as set forth above and that the Cout grant him leave to file such further briefing of the issues herein as may appear necessary after any evidentiary hearing.

Respectfully Submitted,

MARY MAGUIRE
Federal Public Defender
for the Western District of Virginia

16

JA133

*Heidi I. Bohn*
HEIDI I. BOHN
Virginia Bar No. 98916
Office of the Federal Public Defender
for the Western District of Virginia
210 First Street SW, Suite 400
Roanoke, VA 24011
(540) 525-8273

*Counsel for Isaac Martinez-Chavez*

Beatrice F. Diehl, Esquire
Florida State Bar No. 0124667
Federal Public Defender's Office 210 First Street
SW, Room 400
Roanoke, Virginia 24011
Ph. (540) 777-0880
Fax (540) 777-0890
*Counsel for defendant Isaac Martinez-Chavez*

17

JA134

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing document was electronically filed and

will be forwarded to the Office of the United States Attorney this 13th day of December,

2024.

*Heidi I. Bohn*
HEIDI I. BOHN

JA135

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | Criminal No. 7:24-cr-00011 |
| | ) | |
| | ) | |
| ISAAC FIDEL MARTINEZ-CHAVEZ | ) | |

**ORDER**

On this day, the Court considered Defendant's Motion to Suppress Evidence, and the

Court is of the opinion that the motion should be GRANTED. Accordingly, it is hereby

ORDERED that the following evidence shall be excluded from the trial in this case:

1. An RG Industries .22 caliber revolver; and

2. A Marlin ("MAR") Firearms Co., .22 caliber bolt action rifle; and

3. All ammunition, magazines, and accessories located in the KIA Mr. Martinez was

   driving on January 1, 2024.

SIGNED this ____ day of _____, 2024.

_____
ELIZABETH K. DILLON
CHIEF UNITED STATES DISTRICT JUDGE

19

JA136

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | Criminal No. 7:24-cr-00011 |
| | ) | |
| | ) | |
| ISAAC FIDEL MARTINEZ-CHAVEZ | ) | |

**ORDER**

On this day, the Court considered Defendant's Motion to Suppress Evidence, and the

Court is of the opinion that the motion should be GRANTED. Accordingly, it is hereby

ORDERED that the following evidence shall be excluded from the trial in this case:

1. An RG Industries .22 caliber revolver; and

2. A Marlin ("MAR") Firearms Co., .22 caliber bolt action rifle; and

3. All ammunition, magazines, and accessories located in the KIA Mr. Martinez was

    driving on January 1, 2024.

SIGNED this ____ day of _____, 2024.

_____

ELIZABETH K. DILLON
CHIEF UNITED STATES DISTRICT JUDGE

19

JA137



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

www.atf.gov

**Case Number:  ATF 24-06817**

This recommendation for prosecution relates to alleged violations of the Federal firearms laws by Isaac MARTINEZ-CHAVEZ who, on or about January 1st, 2024:  Illegally Possessed a Firearm After Having Been Previously Convicted of a Felony. MARTINEZ-CHAVEZ was also in prohibited possession of a suspected weapon made from a rifle, regulated under the National Firearms Act (NFA). These offenses occurred in the City of Roanoke, in the Western Judicial District of Virginia.

## DEFENDANT AND ARREST STATUS

Isaac MARTINEZ-CHAVEZ – Arrested on State Charges, to be Indicted

## STATUTES VIOLATED

| | |
|---|---|
| 18 U.S.C. Section 922(g)(1) | Possession of a firearm after being convicted of a felony |
| 26 U.S.C. Section 5861 (c) | Receive or possess a firearm made in violation of the provisions of the National Firearms Act (NFA) |

## FORFEITURE POTENTIAL

**Description of Property Seized**

1. RG Industries, model RG 14, .22 caliber revolver, S/N: L699622
2. Suspected weapon made from a rifle (NFA)
3. Miscellaneous ammunition

**Statutory Forfeiture Authority**

- Title 18 USC Section 924 (d)(1) – any firearm or ammunition involved in a knowing violation of the Gun Control Act, Title 18 USC Chapter 44.

ATF 24-06817

- Title 26 USC Section 5872 – any firearm involved in any violation of the provisions of this chapter shall be subject to seizure and forfeiture.


### DOCUMENTS SUBMITTED IN SUPPORT OF PROSECUTION


1. Criminal History for: Isaac MARTINEZ-CHAVEZ (DOB: 09/16/1986; SSN 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; FB# 60663TC0

2. ATF Report of Investigation (ROI) 1, "Case opening against Isaac MARTINEZ-CHAVEZ regarding the prohibited possession of a firearm and suspected weapon made from a rifle, regulated under the National Firearms Act (NFA), while being a previous convicted felon. The investigation was initiated pursuant to a traffic stop conducted by Franklin County Sheriff's Office (FCSO), in Rocky Mount, Virginia, on 01/01/2024."

   Attachments:
   a. Copy, FCSO Report #2024-000003
   b. Copy, Photographs of firearms


3. ATF ROI 2, "Certified court documents obtained in reference to prior felony convictions, sustained by Isaac MARTINEZ-CHAVEZ, and query of clemency and restoration of firearms rights."

   Attachments:
   a. Certified Copy, Montgomery County, Virginia, Circuit Court, Case No. CR22001411-1412-00
   b. Certified Copy, Franklin County, Virginia, Circuit Court, Case No. CR18059735-00, CR18059735-01, CR18059735-02, CR18059735-03


4. ATF ROI 3, "Interview of Commonwealth of Virginia, Probation and Parole District #37, Probation and Parole Officer T.J. Agee, regarding supervision of Isaac MARTINEZ-CHAVEZ."

   Attachments:
   a. Copy, Conditions of Probation Supervision
   b. Copy, Validation Photo of MARTINEZ-CHAVEZ

**ATF 24-06817**

## <u>DOCUMENTS SUBMITTED IN SUPPORT OF PROSECUTION (Con't)</u>

5.  ROI 4, "On February 4, 2024, ATF Special Agent (SA) Drew Effing received information regarding one firearm from ATF SA Adam Moody for purposes of determining classification under Title 18 U.S.C., Chapter 44 and whether it had moved in interstate and/or foreign commerce."

*NOTE: All original exhibits, certifications, and records will be presented upon request.*

3

Exhibit 1, page 3 of 3

JA140

# Franklin County Sheriff's Office

**CONFIDENTIAL**                    **PRELIMINARY INVESTIGATIVE REPORT**                    **D.S.P. 102 - M**

| Code Number | Reported By | | Origin | Date | Time | Case Number |
|---|---|---|---|---|---|---|
| VA0330000 | 0855 - Lt. Justin D. Hylton | Page No. 1 | 01 - Sheriff/Deputy Sheriff | 01/01/2024 | 0:11 | 2024-000003 |

**C O M P**

| Comp No | NAME  Last,  First  Middle | Residence Phone | Business Phone |
|---|---|---|---|

| ADDRESS  Number/Street  City | State | Zip | Race | Sex | Date of Birth | SSAN |
|---|---|---|---|---|---|---|

**V I C T I M**

| Vic No 1 | NAME  Last,  First  Middle  COMMONWEALTH OF VIRGINIA | Residence Phone | Business Phone |
|---|---|---|---|

| ADDRESS  Number/Street | Race | Sex | Resident Status | Date of Birth |
|---|---|---|---|---|

| City | State | Zip | Ethnic | SSAN |
|---|---|---|---|---|

| Victim Related Events | ■#1  ■#3  ☐#5  ☐#7  ☐#9 <br> ■#2  ☐#4  ☐#6  ☐#8  ☐#10 | Victim Injury | Victim Relation to Acc/Susp | 1  2  3  4  5  6  7  8  9  10 | Justifiable Homicide |
|---|---|---|---|---|---|

| Vic No | NAME  Last,  First  Middle | Residence Phone | Business Phone |
|---|---|---|---|

| ADDRESS  Number/Street | Race | Sex | Resident Status | Date of Birth |
|---|---|---|---|---|

| City | State | Zip | Ethnic | SSAN |
|---|---|---|---|---|

| Victim Related Events | ☐#1  ☐#3  ☐#5  ☐#7  ☐#9 <br> ☐#2  ☐#4  ☐#6  ☐#8  ☐#10 | Victim Injury | Victim Relation to Acc/Susp | 1  2  3  4  5  6  7  8  9  10 | Justifiable Homicide |
|---|---|---|---|---|---|

| Event No 1 | Event  Weapon Law Violations | Code No 520 | ☐ (A) Attempted  ■ (C) Completed | # Premises Entered | Type Security |
|---|---|---|---|---|---|

| ☐ Occurred On <br> ■ Between | Mo 01 | Day 01 | Yr 2024 | Time 0:11 | Day of Week MON | And | Mo 01 | Day 01 | Yr 2024 | Time 2:00 | Day of Week MON | Acc/Susp Used  D | Criminal Activity  P | Hate Crime 88 - None (No Bias) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| Event No 2 | Event  Drug Equipment Violations | Code No 35B | ☐ (A) Attempted  ■ (C) Completed | # Premises Entered | Type Security |
|---|---|---|---|---|---|

| ADDRESS  30 HIGHVIEW TER, BEGIN | | | Acc/Susp Used  D | Criminal Activity  P | Hate Crime 88 - None (No Bias) |
|---|---|---|---|---|---|

| City  ROCKY MOUNT | State VA | Zip | Type Location 13 - Highway/Road/Alley |
|---|---|---|---|

**A C C . S U S P . O T H E R**

| ASO No 1 | ■A ☐S ☐O | NAME  Last,  First  Middle  MARTINEZ-CHAVEZ, ISSAC FIDEL | Alias AKA  MARTINEZ, ISSAC FIDEL ; MARTINEZ, ISSAC FIDEL | Residence Phone | Business Phone |
|---|---|---|---|---|---|

| ADDRESS  Number/Street  175 SAMUEL LN | Occupation  PAINTER | Race W | Sex M | Date of Birth 09/16/1986 |
|---|---|---|---|---|

| City  ROCKY MOUNT | State VA | Zip 24151- | Arrest Number  2024-000003 - 1 | SSAN 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 |
|---|---|---|---|---|

| Height 5'07" | Weight 180 | Hair Color  BLK - Black | Eye Color  BRO - Brown | Hairstyle  STR - Straight | ARMED: Yes X | No | Unk | LH  RH  AB | Marks/Scars Location  Tattoo - Left - Elbow ; Tattoo - Left - Elbow |
|---|---|---|---|---|---|---|---|---|---|

| ASO No 1 | ☐A ■S ☐O | NAME  Last,  First  Middle  MARTINEZ-CHAVEZ, ISSAC FIDEL | Alias AKA  MARTINEZ, ISSAC FIDEL | Residence Phone | Business Phone |
|---|---|---|---|---|---|

| ADDRESS  Number/Street  175 SAMUEL LN | Occupation  PAINTER | Race W | Sex M | Date of Birth 09/16/1986 |
|---|---|---|---|---|

| City  ROCKY MOUNT | State VA | Zip 24151- | Arrest Number | SSAN 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 |
|---|---|---|---|---|

| Height 5'07" | Weight 180 | Hair Color  BLK - Black | Eye Color  BRO - Brown | Hairstyle  STR - Straight | ARMED: Yes X | No | Unk | LH  RH  AB | Marks/Scars Location  Tattoo - Left - Elbow |
|---|---|---|---|---|---|---|---|---|---|

**V E H**

| Veh No 1 | Year 2007 | Make  KIA | Model | Type  P - Passenger car | License Number  VYC3195 | Year 2025 | State VA | Teletype Number |
|---|---|---|---|---|---|---|---|---|

| VIN  KNAFG526477112089 | Owner's Name  O1 - MARTINEZ-CHAVEZ, ISSAC FIDEL | Address  175 SAMUEL LN, ROCKY MOUNT, VA 24151 |
|---|---|---|

| Released to Owner  Date | Stored - Name | Address | Stolen <br> Recovered | Involved  X <br> Other |
|---|---|---|---|---|

**D R U G**

| Type  L - Amphetamines/Methamphetamine | Whole Quantity 0 | Fractional Quantity .1 | Measurement  GM - Gram | Estimated Value $1.00 |
|---|---|---|---|---|

Exhibit 2, page 1 of 5

JA141

# Franklin County Sheriff's Office

CONFIDENTIAL                    PRELIMINARY INVESTIGATIVE REPORT                    D.S.P. 102 - M

Page No. 2

| Scene Processed By | | | | Prints Found ☐ Yes ■ No | | Type Evidence Taken | | | When Stored Initially |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Photographed ☐ Yes ■ No | | | | | |

<table>
<tr><td rowspan="5">A R S O N</td><td>Loss Data</td><td>Value</td><td colspan="2">Loss</td><td colspan="2">Origin of Fire</td><td colspan="4">Bomb Data</td></tr>
<tr><td>Structures</td><td></td><td colspan="2"></td><td>Incendiary</td><td>☐</td><td colspan="2">Explosive Data</td><td colspan="2"></td></tr>
<tr><td>Contents</td><td></td><td colspan="2"></td><td>Undetermined</td><td>☐</td><td colspan="2">Incendiary Device</td><td colspan="2"></td></tr>
<tr><td>Fixtures</td><td></td><td colspan="2"></td><td>Accidental</td><td>☐</td><td colspan="2">Threat</td><td colspan="2"></td></tr>
<tr><td>Vehicles</td><td></td><td colspan="2"></td><td rowspan="2">Suspicious</td><td rowspan="2">☐</td><td colspan="2">Other</td><td colspan="2"></td></tr>
<tr><td>Miscellaneous</td><td></td><td colspan="2"></td><td colspan="2"></td><td colspan="2"></td></tr>
</table>

| | Event Code | Prop. Code | Quantity | Description | Make Model | Serial Number | P Loss | Value | Recov. Date |
|---|---|---|---|---|---|---|---|---|---|
| **P** | 520 | 13 | 1 | Firearms (.22 Cal sawed off rifle) | unknown / unknown | none | 6 | | 01/01/2024 |
| **R O** | 520 | 13 | 1 | Firearms (.22 cal revolver) | RG | L699622 | 6 | | 01/01/2024 |
| **P E** | 358 | 11 | 2 | Glass Smoking Device | | | 6 | 2.00 | 01/01/2024 |
| **R T** | 520 | 59 | | Firearm Accessories (.22 cal ammunition) | | | | | 01/01/2024 |
| **Y** | | | | | | | | | |

| Jurisdiction Stolen | Jurisdiction Recovered | Number of Motor Vehicles Stolen | Number of Motor Vehicles Recovered |
|---|---|---|---|
| | | | |

<table>
<tr><td rowspan="5">D E A T H</td><td>Next of Kin Notified Name</td><td>Address</td><td>Relationship</td><td colspan="2">Physician Pronouncing Death(Name)</td></tr>
<tr><td>Attending Physician Name</td><td>Address</td><td>Reason for Treatment</td><td>Pronounced Death-Date</td><td>Time</td></tr>
<tr><td>Last Person to See Subject Alive Name</td><td>Address</td><td></td><td>Date</td><td>Time</td></tr>
<tr><td>Rescue Unit at Scene Name</td><td>Address</td><td>Medical Examiner</td><td colspan="2">Type Death</td></tr>
</table>

**Summary**

On January 1, 2024 at approximately 00:05 while heading South on South Main Street near the intersection of Eastover Drive in Rocky Mount, I saw a vehicle headed North that appeared to be travelling faster than the posted 45 speed limit. After releasing the beam of my radar I obtained a reading of 60 miles per hour. I saw the target vehicle was a silver KIA. I decided to turn and follow the vehicle as I was looking for any DUI violators due to the holiday. As I turned and started approaching the target car, I noticed it had picked up speed as I saw it had turned off South Main Street and onto Scuffling Hill Road. I continued to close distance on the car and as the car approached the second Knollwood Drive on Scuffling Hill, the target vehicles headlights and tail lights went out while still travelling. I made the decision to initiate a traffic stop based on that driving behavior and activated my emergency lights. The target vehicle made an abrupt right turn on Highview Terrace off Scuffling Hill Road and pulled into a yard a 30 Highview Terrace where I pulled in behind the car with my emergency lights actviated. The drivers side door came open and

**Solvability Factors**

| YES NO | | | YES NO | | | Exceptional Clearance (Status 8) |
|---|---|---|---|---|---|---|
| ☐ ■ | a. | Can a suspect be named? | ☐ ■ | g. | Was there a unique or unusual M.O. employed? | ☐ (A) Death of Offender |
| ☐ ■ | b. | Is the suspect known? | ☐ ■ | h. | Was there significant evidence? | ☐ (B) Prosecution Declined |
| ☐ ■ | c. | Can the suspect be identified? | ☐ ■ | i. | Is property traceable? | ☐ (C) Extradition Declined |
| ☐ ■ | d. | Has the suspect been seen before? | ☐ ■ | j. | Was there a minimum delay in reporting? | ☐ (D) Refuse to Cooperate |
| ☐ ■ | e. | Was there a witness to the crime? | ☐ ■ | k. | Is there a significant reason to believe crime may be solved | ☐ (E) Juvenile, No Custody |
| ☐ ■ | f. | Can the suspect vehicle be identified? | | | with a reasonable amount of investigative effort? | ■ (N) Not Applicable |

| CASE STATUS (Check One) | | | Case Closed (Status 4 or 8) | Negative File Number |
|---|---|---|---|---|
| ☐ 1 Active | ☐ 5 Inactive | ■ 4 Closed Arrest | ☐ Juvenile ■ Adult | |
| ☐ 2 Active - TOT O/A | ☐ 6 Inactive WOF | ☐ 8 Closed Exception | Ref. Other Case Number | |
| ☐ 3 Unfounded | ☐ 7 Closed Service | | | |

| Date/Time Notified | Date/Time Arrived at Scene | Date/Time Cleared Scene | Original Report ☐ |
|---|---|---|---|
| 01/01/2024  0:11 | 01/01/2024  0:11 | 01/01/2024  1:44 | Supplemental Report ☐ |

| Information Copies Furnished to: | Approving Supervisor | Date | Date Report Submitted |
|---|---|---|---|
| | 3825 - Lt. Jeffery A. McCarty | 01/17/2024 | 01/01/2024 |

Exhibit 2, page 2 of 5

JA142

**Franklin County Sheriff's Office**

CONFIDENTIAL                    PRELIMINARY INVESTIGATIVE REPORT                    D.S.P. 102 - M

NARRATIVE (CONTINUATION)

| Code Number VA0330000 | Reported By 0855 - Lt. Justin D. Hylton | Page No. 3 | Origin 01 - Sheriff/Deputy Sheriff | Date 01/01/2024 | Time 0:11 | Case Number 2024-000003 |
|---|---|---|---|---|---|---|

Summary

as I positioned my spot light in the car I saw the driver leaning into the passenger side of the car with arms extended, apparently reaching for something. I quickly exited my patrol car, drew my service weapon to high ready position, and using the door to my patrol vehicle as cover, began giving the driver commands to exit the vehicle and show me their hands. The driver was the only occupant I could see in the vehicle. I notified dispatch of my location, the tag of the car (VYC-3195) and that I had the driver had gunpoint.

After a brief moment the driver stood out of the door of the car and ,what appeared to be hesitantly, complied with my commands. I kept insisting on seeing the drivers hands while the driver would face me, turn away and look at the car, and put his hands in his pockets. I warned the driver that if he did not listen to what I was telling him to do that he could be shot. The driver finally complied and he was detained at that time. He was advised then that he was only detained and not under arrest.

After the driver was detained, he was patted down for weapons with none found. He advised his identification was in his wallet. He was idenitifed by a Mexico identification as Issac Fidel Martinez- Chavez by his name and date of birth. During this time additional officers to include, Dep. Z. Wade (FCSO), Ofc. T. Poulin (RMPD), Ofc. J. Gardner (RMPD, Sgt. C. Johnson (RMPD), and Dep. M. Cawood (FCSO), arrived on scene to assist. A moment later, dispatch advised that Martinez-Chavez was not licensed and had outstanding warrants out of Montgomery County, Virginia. The tag I had ran through dispatch did not return to the KIA. Chavez was advised by Dep. Wade of the warrants and that he was under arrest. Dep. Wade searched Martinez-Chavez and found a glass smoking device on his person. Dep. Wade will supplement this report.

Upon knowledge of Chavez's warrants, I returned to the KIA to begin securing it for towing due to Chavez going to jail and the car not being registered properly. As Ofc. T. Poulin approached the passenger side of the car he alerted that he saw a firearm in the passenger floorboard. The firearm was retrieved by Ofc. Poulin and Ofc. Gardner and confirmed to be a .22 caliber bolt action rifle. The barrel had been sawn off to 10.5 inches long and there did not appear to be a serial number on the gun. The vehicle was subsequently searched where another firearm, a .22 Caliber RG revolver was located in the passenger compartment as well as additional .22 cal rounds. Ofc. Poulin stayed with the car until it was towed.

The evidence and Martinez- Chavez was transported to the Sheriff's Office by Dep. Wade where Dep. Wade placed the evidence into temporary storage until I processed it. The following is the list of evidence

#1 .22 cal bolt rifle with sawed off 10.5 inch barrel

#2 .22 cal RG revolver SN L699622

#3 Glass smoking device found in Martinez-Chavez possession

#4 .22 cal ammo removed from firarms and vehicel.

#5 Glass smoking device from backpack in trunk of car.

Items #1,2,3 have been processed for submission to the Department of Forensic Science for testing.

Item #4 will be held for court.

Item #5 was marked for destruction.

Exhibit 2, page 3 of 5

# Franklin County Sheriff's Office

CONFIDENTIAL   PRELIMINARY INVESTIGATIVE REPORT   D.S.P. 102 - M

## NARRATIVE (CONTINUATION)

| Code Number<br>VA0330000 | Reported By<br>0855 - Lt. Justin D. Hylton | Page No.  4 | Origin<br>01 - Sheriff/Deputy Sheriff | Date<br>01/01/2024 | Time<br>0:11 | Case Number<br>2024-000003 |
|---|---|---|---|---|---|---|

**Summary**

Martinez-Chavez was served on outstanding Montgomery County warrants as well as two counts of possession of firearm by felon and one count possess sawed off rifle obtained by this officer. Case will remain active as additional charges are pending lab analysis.

SUPPLEMENT #2 Lt. Justin D. Hylton - 0855 01/17/2024 10:05

After several attempts to locate data transfer from worn body camera, there have been issues in recovering the footage. Notification was made in refernce to the issues in the system. I have reached out to Sgt. C. Johnson with RMPD regarding accesibility to body cam data from Ofc. Poulin and Gardner and being able to provide that to SA Moody, ATF

SUPPLEMENT #4 ET Chad R. Sacra - 4147 02/01/2024 11:30

On 02012024, I, CRSacra, met with Adam Moody from the ATF to allow for the examination of Item 1,2 in this case. I retrieved both Items from the evidence room and opened them for Moody. Moody removed both Items and manipulated them for the purpose of documenting caliber and measurements and identifying parts. I replaced both items to the original packages and sealed them initialing my seal with initials and date once complete.

Moody advised he will present information to the Federal prosecutors for the purpose of adopting and if so retrieve this evidence for federal followup if so adopted.

Exhibit 2, page 4 of 5

JA144

## Franklin County Sheriff's Office

CONFIDENTIAL

### PRELIMINARY INVESTIGATIVE REPORT
### (CONTINUATION)

D.S.P. 102 - M

| Code Number VA0330000 | Reported By 0855 - Lt. Justin D. Hylton | Page No. 5 | Origin 01 - Sheriff/Deputy Sheriff | Date 01/01/2024 | Time 0:11 | Case Number 2024-000003 |
|---|---|---|---|---|---|---|

## Offense(s)

| Event No 3 | Event Drug/Narcotic Violations | Code No 35A | ☐ (A) Attempted ■ (C) Completed | # Premises Entered | Type Security |
|---|---|---|---|---|---|
| Type Location 13 - Highway/Road/Alley | | Acc/Susp Used D | Criminal Activity P | Hate Crime 88 - None (No Bias) | |

Exhibit 2, page 5 of 5

JA145

# Exhibit 3 Officer Hylton's BWC

Exhibit 4 Officer Poulin's BWC

JA147

 

Exhibit 6

Exhibit 5
JA148

**U.S. Department of Justice**
Bureau of Alcohol, Tobacco, Firearms and Explosives

## Report of Investigation

| Title of Investigation: | Investigation Number: | Report Number: |
|---|---|---|
| MARTINEZ-CHAVEZ, Issac (Franklin County, VA) | 24-06817 | 4 |

### SUMMARY OF EVENT:

On February 4, 2024, ATF Special Agent (SA) Drew Effing received information regarding one firearm from ATF SA Adam Moody for purposes of determining classification under Title 18 U.S.C., Chapter 44 and whether it had moved in interstate and/or foreign commerce.

### NARRATIVE:

1. On February 9, 2024, SA Effing reviewed information regarding the following firearm's markings which may include, but are not limited to, the serial number, name          of the manufacturer, model, caliber or gauge, and also, when applicable, the importer. The information of the firearm is described as follows:

   - Exhibit 1: RG Industries, model RG-14, .22 caliber revolver, serial number L699622

2. Utilizing the information above, this firearm was researched by referencing the Bureau of Alcohol, Tobacco, Firearms, & Explosives internal documents and other industry related reference material which is widely known and used by both law enforcement and civilian firearms experts to obtain information about firearms and their respective manufacturers, including a firearm's place of manufacture and other matters of interest related to firearms. These references are routinely relied upon to determine the place of manufacture of firearms.

### CONCLUSION:

1. Based upon the firearm's information provided, in conjunction with the research, knowledge and experience of SA Effing, it is SA Effing's opinion that:

   - Exhibit 1 is a firearm as defined in Title 18, United States Code, Chapter 44, Section 921(a)(3) and was not manufactured in the Commonwealth of Virginia.

### OPINION:

It is the opinion of SA Effing that if this firearm was received and/or possessed in the Commonwealth of Virginia, it has traveled in or affected interstate and/or foreign commerce.

| Prepared by: | Title: | Signature: | Date: |
|---|---|---|---|
| 6291 | Special Agent | 6291 | 02/09/2024 |
| Authorized by: | Title: | Signature: | Date: |
| Keith Teehan | RAC | K9Teeha | 02/12/2024 |
| Second Level Reviewer (optional): | Title: | Signature: | Date: |
|  |  |  |  |

ATF EF 3120.2 (10-2004)
For Official Use Only

Exhibit 6

JA149

| Title of Investigation: | Investigation Number: | Report Number: |
|---|---|---|
| MARTINEZ-CHAVEZ, Issac (Franklin County, VA) | 24-06817 | 4 |

**NOTE**:

The above is based solely on photographs of the aforementioned exhibit provided by the case agent.  Prior to any court testimony by the Interstate Nexus Agent, a physical examination of the exhibit must be performed in order to verify the above findings.

ATF EF 3120.2 (10-2004)
For Official Use Only

Exhibit 6

JA150



# NATIONAL FIREARM REGISTRATION AND TRANSFER RECORD

| | Date: |
|---|---|
| | 01-MAR-2024 |
| **Record Search** | Time: |
| | 09:14:42 |
| | Page 1 of 1 |

**Look Up Number:** 20241163                          **Search Type:** URGENT

## Requestor

| **Badge Number** | **Last Name** | **First Name** | **MI** |
|---|---|---|---|
| 6337 | MOODY | ADAM | |
| **FTS Number** | **Fax Phone** | **Fax Date Time** | |
| 5405569328 | 8047754201 | | |

**Address Line 1**  310 FIRST STREET SW, SUITE 500

**Address Line 2**

**City:** ROANOKE                   **State:** VA                   **Zip:** 24011

## Administration

| **Received By Last Name** | **Received By First Name** | **MI** | **Received Date Time** |
|---|---|---|---|
| FRUSHOUR | JASON | M | 01-MAR-2024 09:11:00 |
| **Sent By Last Name** | **Sent By First Name** | **MI** | **Msg Sent Date Time** |
| FRUSHOUR | JASON | M | 01-MAR-2024 09:11:00 |

**Comment:** NO RECORDS FOUND

| **Cemis Number** | **Trial Date** | **Charges** |
|---|---|---|
| 24-06817 | | POSSESSION |

## Weapon Description

| **Serial Number** | **Type** | **Mfg** | **Model** | **Caliber** | **Barrel Length** | **Overall Length** |
|---|---|---|---|---|---|---|
| | SR | MAR | 103.229 | 22 | 10.5 | 20.5 |

## Names To Be Searched

| **Last Name** | **First Name** | **MI** | **Birth Date** | **SSN** | **Trade Name** | **City** | **State** |
|---|---|---|---|---|---|---|---|
| MARTINEZ-CHAVEZ | ISAAC | F | 16-SEP-1986 | | | | |

*********** For Official Use Only ***********

Exhibit 7

JA151

**U.S. Department of Justice**
Bureau of Alcohol, Tobacco, Firearms and Explosives

**Firearms & Ammunition Technology
Division, Field Response Branch
Report of Technical Examination**

|  |  |
|---|---|
|  | **244 Needy Road #1600**<br>**Martinsburg, WV 25405**<br><br>**Phone: 304-616-4300**<br>**Fax: 304-616-4301** |

| **To:** | **CASE#:** 768045-24-06817 |
|---|---|
| Special Agent Adam Moody<br>Bureau of Alcohol, Tobacco, Firearms and Explosives<br>310 First Street SW<br>Suite 500<br>Roanoke, Virginia 24011 | **RE:** MARTINEZ-CHAVEZ,<br>Isaac<br><br>**FRB#:** 2024-445-FG<br>330352 |

| **Date Exhibit Received:** March 20, 2024 | **Type of Examination Requested:** |
|---|---|
| **Delivered By:** FedEx 7755 8765 7178 | Examination, Test, Classification |

**Exhibit:**

2. Modified, J.C.Higgins, Model 103.229, .22 Short, Long and Long Rifle caliber, bolt-action firearm, bearing no serial number (suspected weapon made from a rifle).

**Pertinent Authority:**

Title 28 of the United States Code (U.S.C.) provides the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) the authority to investigate criminal and regulatory violations of Federal firearms law at the direction of the Attorney General. Under the corresponding Federal regulation at 28 C.F.R. 0.130 the Attorney General provides ATF with the authority to investigate, administer, and enforce the laws related to firearms, in relevant part, under 18 U.S.C. Chapter 44 (Gun Control Act) and 26 U.S.C. Chapter 53 (National Firearms Act). Pursuant to the aforementioned statutory and regulatory authority, the ATF Firearms and Ammunition Technology Division (FATD) provides expert technical support on firearms and ammunition to federal, state, and local law enforcement agencies regarding the Gun Control Act and the National Firearms Act.

The Gun Control Act of 1968 (GCA), 18 U.S.C. § 921(a)(3), defines the term "**firearm**" as follows:

*"(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm."*

The GCA, 18 U.S.C. § 921(a)(7), defines the term "**rifle**" as follows:

*"A weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of an explosive to fire only a single projectile through a rifled bore for each single pull of the trigger."*

ATF Form    3311.2
Revised September 2014

Special Agent Adam Moody

768045-24-06817
2024-445-FG
Page 2

The National Firearms Act (NFA), 26 U.S.C. § 5845(a), defines "**firearm**" as:

*"(1) a shotgun having a barrel or barrels of less than 18 inches in length; (2) a weapon made from a shotgun if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 18inches in length; (3) a rifle having a barrel or barrels of less than 16 inches in length; (4) a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length; (5) any other weapon, as defined in subsection (e); (6) a machinegun; (7) any silencer (as defined in 18 U.S.C. § 921); and (8) a destructive device. The term "firearm" shall not include an antique firearm or any device (other than a machinegun or destructive device) which, although designed as a weapon, the [Attorney General] finds by reason of the date of its manufacture, value, design, and other characteristics is primarily a collector's item and is not likely to be used as a weapon."*

Further, the NFA, 26 U.S.C. § 5842, "**Identification of firearms**" states:

*"(a) Identification of firearms other than destructive devices. - Each manufacturer and importer and anyone making a firearm shall identify each firearm, other than a destructive device, manufactured, imported, or made by a serial number which may not be readily removed, obliterated, or altered, the name of the manufacturer, importer, or maker, and such other identification as the [Attorney General] may by regulations prescribe. (b) Firearms without serial number. - Any person who possesses a firearm, other than a destructive device, which does not bear the serial number and other information required by subsection (a) of this section shall identify the firearm with a serial number assigned by the [Attorney General] and any other information the [Attorney General] may by regulations prescribe."*

**Findings:**

**Exhibit 2** is a .22 LR caliber firearm that was originally manufactured as a J.C. Higgins, Model 103.229, bolt-action rifle with a 22-inch rifled barrel by Marlin Firearms Co., in New Haven, Connecticut and distributed by Sears, Roebuck and Co. of Chicago, Illinois.  Exhibit 2 does not have a serial number.

As received, Exhibit 2 is approximately 20-1/8 inches in overall length, and incorporates a rifled barrel approximately 10-1/4 inches in length.  I measured the overall length of Exhibit 2 by placing it on a flat surface and measuring the distance between the extreme ends along a line parallel to the centerline of the bore. Additionally, I measured the barrel by placing the Exhibit on a flat surface and closing the bolt.  I then inserted a cylindrical scale into the muzzle of the barrel until it touched the breech face.

During my examination, I observed the following external markings on Exhibit 2:

Top of barrel:

- **J./.H/GGINS MODEL** *[Partially Obliterated]*
- **L10/.229 – 22 CAL** *[Partially Obliterated]*
- **/EARS RO/BUCK & COMPANY – S-L-LR** *[Partially Obliterated]*

Research indicates J.C. Higgins, Model 103.229, rifles were manufactured circa 1961 and did not have a serial number, as serial numbers were not a requirement for .22 caliber rifles and shotguns until the enactment of the Gun Control Act of 1968.  Further, these rifles were originally manufactured with barrel lengths exceeding 16 inches, were equipped with a one-piece shoulder stock and an 18-round tubular magazine.

ATF Form    3311.2
Revised September 2014

Special Agent Adam Moody                                                                       768045-24-06817
                                                                                               2024-445-FG
                                                                                               Page 3

My examination of Exhibit 2 revealed that the original shoulder stock has been modified having material removed, and leaving only a pistol grip; therefore, the weapon is no longer designed and intended to be fired from the shoulder.  Two metal hose clamps have been used to secure the barreled receiver to the stock.  The barrel has been crudely cut down to 10-1/4 inches in length, is missing a front sight and is cracked along the entire length of the bottom, from the chamber to the muzzle (see attached photographs).  The 18-round magazine tube has been cut down in length and will only accept a total of 10 rounds of .22 LR.  Exhibit 2 bears partially obliterated manufacturer's markings of identification and bears no NFA markings or identification or serial number as required by 26 U.S.C. § 5842.

Exhibit 2, in its current modified condition, is no longer designed to be fired from the shoulder; therefore, Exhibit 2 is not a "**rifle**" as defined.  Exhibit 2 is a "**weapon made from a rifle**" having an overall length of less than 26 inches and a barrel less than 16 inches; therefore, Exhibit 2 is a "**firearm**" as defined in 26 U.S.C. § 5845(a)(4).

To demonstrate Exhibit 2 is capable of expelling a projectile by the action of an explosive, I test-fired Exhibit 2 on March 26, 2024, at the ATF test range in Martinsburg, West Virginia, using commercially available, Aguila brand, .22 Super Colibri caliber ammunition.  I inserted one round of ammunition into the chamber and closed the bolt, placed the safety to the rear, "fire" position, and pulled the trigger.  Exhibit 2 successfully expelled a projectile by the action of an explosive.  I repeated this method of test-fire two additional times, achieving the same results.

Three casings were retrieved for NIBIN submission and returned with Exhibit 2.

**Conclusions:**

**Exhibit 2** is a weapon which will expel a projectile by the action of an explosive and incorporates the receiver of such a weapon; therefore, Exhibit 2 is a "**firearm**" as defined in 18 U.S.C. § 921(a)(3)(A)&(B).

Exhibit 2 is a "**weapon made from a rifle**" which, as modified, has an overall length of less than 26 inches and a barrel of less than 16 inches in length; therefore, Exhibit 2 is a "**firearm**" as defined in 26 U.S.C. § 5845(a)(4).

Exhibit 2 bears no NFA manufacturer's markings of identification or serial number as required by 26 U.S.C. § 5842.

ATF Form    3311.2
Revised September 2014

Special Agent Adam Moody

768045-24-06817
2024-445-FG
Page 4

Examined by:


_____

Feliks Golicz
Firearms Enforcement Officer
Field Response Branch – East




Approved by:


_____

Christopher B. Cochran
Firearms Enforcement Officer, Acting Chief
Field Response Branch – East


Attachment:  Seven pages bearing photographs.


**This Field Response Branch report is provided in response to your request for assistance.  Please be aware that these documents may constitute "taxpayer return information" that is subject to the strict disclosure limitations provided in 26 U.S.C. § 6103.  Exceptions to the non-disclosure provisions that permit the disclosure internally within ATF are set forth in 26 U.S.C. §§ 6103(h)(2)(C) and (o)(1).  Any further disclosure of these reports is strictly limited and must be reviewed and approved by the Office of Chief Counsel prior to any information dissemination.  Failure to adhere to the disclosure limitations provided in 26 U.S.C. § 6103 could result in civil and/or criminal liability.**

ATF Form    3311.2
Revised September 2014

24-06817
2024-445-FG
Page 1 of 7

# Exhibit 2

## As Received :



Exhibit 8, page 5 of 11

JA156

24-06817
2024-445-FG
Page 1 of 7



# Exhibit 2
## Measurements:









Exhibit 8, page 6 of 11

JA157

24-06817
2024-445-FG
Page 1 of 7

## Exhibit 2

Partly obliterated Identification markings:



Exhibit 8, page 7 of 11

JA158

24-06817
2024-445-FG
Page 1 of 7



## Exhibit 2
Modifications:





Exhibit 8, page 8 of 11

JA159

24-06817
2024-445-FG
Page 1 of 7

# Exhibit 2

## Comparison to unaltered NFC Reference:







Exhibit 8, page 9 of 11

JA160

24-06817
2024-445-FG
Page 1 of 7

# Exhibit 2

## Comparison to unaltered NFC Reference:



Exhibit 8, page 10 of 11

JA161

24-06817
2024-445-FG
Page 1 of 7

# Exhibit 2

Cracked Barrel:



Exhibit 8, page 11 of 11

JA162

**IN THE UNITED STATES DISTRICT
COURT FOR THE WESTERN DISTRICT
OF VIRGINIA
ROANOKE DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**ISAAC FIDEL<br>MARTINEZ- CHAVEZ** | **Criminal No. 7:24-CR-00011** |

## DEFENDANTS MOTION  TO PLAY VIDEO DURING JURY INSTRUCTIONS ON UNCONSCIOUS BIAS

Isaac Martinez-Chavez ("Mr. Martinez"), the defendant, by counsel moves this Honorable

Court to instruct the jury on the topic of unconscious bias in the form of showing a video from the

United States Court, Western District Washington.  The requested video can be found at

http://www.wawd.uscourts.gov/jury/unconscious-bias and will be provided to the court as a

separate enclosure.  Defense specifically requests this 10-minute video be played during the

preliminary instructions prior to the beginning of voir dire by the Court and counsel.

### I.    Background

On January 1, 2024, Deputy Hylton of the Franklin County Sheriff's Office

followed Mr. Martinez as he was driving and approached him after he pulled off the road.[1] ("Report

of Investigation 1," attached as Exhibit 1, at p. 2.) Officers found a .22 caliber revolver and a

suspected weapon made from a rifle in the car. *Id.* at p. 1.

On March 14, 2024, the Government indicted Mr. Martinez on one count of Felon-in-

---

[1] The facts of the case are taken from discovery documents supplied by the Government. Mr. Martinez does not admit to the Government's characterizations of the events in this case but will use its rendition of the facts for the purposes of this motion only.

1

JA163

Possession under 18 U.S.C. § 922(g)(1) and one count of Receive or Possess a Firearm Made in Violation of the National Firearms Act (NFA) under 26 U.S.C. § 5861(c). (ECF No. 1.) The Government filed a superseding indictment on November 7, 2024, charging Martinez with one count of Felon-in-Possession under 18 U.S.C. § 922(g)(1) and one count of Possess a Firearm not Registered in the NFA Registration and Transfer Record under 26 U.S.C. § 5861(d). (ECF No. 49.)

Mr. Martinez is a Mexican national who speaks only limited English. At the time of his arrest he spoke to LT Hylton in short, English expressions, but it is clear that it is not a language he speaks well. Mr. Martinez will need the assistance of an interpreter during his trial.

Biases are explicit when they are consciously endorsed by the individual. Implicit biases operate outside of conscious thought. They are referred to variously as hidden, cognitive or automatic. They are not consciously accessible by the individuals who hold the bias. The biases often occur even in individuals who explicitly reject bias or discrimination. Social scientists have long recognized and repeatedly measured the existence of implicit biases. Social science research confirms that implicit biases often lead to unconscious discriminatory action and can affect decision making.

## II.    Legal Standard

Federal Rule of Criminal Procedure 30 allows "[a]ny party may request in writing that the court instruct the jury on the law as specified in the request." "[I]n all criminal prosecutions, the accused shall enjoy the right to. . .and impartial jury." U.S. Const. amend. VI. "[T]his right is partially protected by jury selection, during which a trial judge "ensur[es] that jurors have 'no bias or prejudice that would prevent them from returning a verdict according to the law and evidence.'" *United States v. Bowman*, 106 F.4th 293, 301-302 (4th Cir. 2024) (citing *United States v. Tsarnaev*, 595 U.S. 302, 312 (2022) (internal citations omitted))). "Determining whether a juror is biased is

<center>2</center>

<center>JA164</center>

difficult…because the juror may be unaware of his bias or may actively conceal it." *Bennett v. Stirling*, 170 F.Supp. 3d 851, 867-868 (D.S.C. 2016). Questions in voir dire, particularly those meant to root out instances of racial bias are within the discretion of the trial judge. See *United States v. Council*, 77 F.4th 240, 253 (4th Cir. 2023) (citing *Turner v. Murray*, 476 U.S. 28, 30-31 (1986)). The entire purpose of voire dire is "to protect [the right to an impartial trier of fact] by exposing possible biases, both known and unknown. . ." *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 554 (1984).

"[B]ias is largely unconscious and often at odds with conscious belief."[2]  One may strongly believe that all people should be treated equally and yet still suffer from an implicit bias against certain ethnic groups.[3]  This kind of implicit bias is pervasive in our society.[4] It has been identified, tested and confirmed repeatedly by social scientists.[5]

Patricia Devine is credited with identifying the phenomenon of implicit bias as early as 1989.[6]  In one portion of her study, Professor Devine asked white participants to watch a  screen. The screen was programmed to display words so rapidly that they would be undetectable to the naked eye.  Some participants were primed with 80% of the words stereotypically associated with

---

[2] Cynthia Lee, *A New Approach to Voir Dire on Racial Bias*, 5 U.C. IRVINE L. REV. 843 (2015)(citing Laurie A. Rudman et al., *"Unlearning" Automatic Biases: The Malleability of Implicit Prejudice and Stereotypes*, 81 J. PERSONALITY & SO. PSYCHOL. 856, 856 (2001).

[3] *See* Judge Mark W. Bennett, *Unraveling the Gordian Knot of Implicit Bias in Jury Selection: The Problems of Judge-Dominated Voir Dire, the Failed Promise of* Batson*, and Proposed Solutions*, 4 HARV. L. REV. 149 (2010)  for a discussion about how Judge Bennett—serving now his 20th year as a judge on the U.S. District Court in the Northern District of Iowa—discovered his own implicit racial bias after a career as a civil rights lawyer and how he implements corrective measures for himself and his jurors at trial.

[4] Kristin A. Lane, Jerry Kang & Mazarin R. Banaji, *Implicit Social Cognition and Law*, 3 ANN. REV. L. & SOC. SCI. 427, 437 (2007).

[5] For a survey of confirmatory studies *see* Kang, Bennett, Carbado et al. 59 UCLA  L. REV. 1124 (2012); *see also* Jost, Rudman, et al., *The Existence of Implicit Bias is Beyond a Reasonable Doubt*, Research in Organizational Behavior 29 (2009) 36-69.

[6] *See* Bennett*, supra* note 2 at 154.

3

JA165

African Americans—words like slavery, jazz, basketball. For the other participants, only 20% of the flashing words fell into this category. Next, all participants were asked to read a narrative and to judge the actions of the subject described in the narrative. The participants in the 80% group—primed with words related to African Americans—turned out to judge the subject of the mock scenario more harshly than the other participants. What is more, Professor Devine discovered that this behavior occurred regardless of how high or low the participants had rated on measures of explicit bias.[7]

Time and time again, scientific studies have demonstrated that implicit bias predicts discriminatory behavior towards individuals.[8] These studies show that implicit bias affects how people interpret data.[9] Perhaps most relevant to the fact-finding process of a criminal trial, social scientists have found that this phenomenon is particularly pronounced when people are evaluating data under conditions of uncertainty. These studies have described this behavior in terms of "mental shortcuts" and it includes situations wherein "the appropriate factual material may be inaccessible, it may not be gathered together in time to bear on the decision, or it may be too voluminous to be properly organized and utilized in a judgment task."[10] These conditions are arguably guaranteed at a criminal trial.

### III.    Argument

Implicit bias may occur in any situations: situations involving race, gender, religion, or

---

[7] Patricia G. Devine, *Stereotypes and Prejudice: Their Automatic and Controlled Components*, 56 J. PERSONALITY AND SOC. PSYCHOL. 5 (1989).

[8] For an overview of these studies s*ee* Jerry Kang, *Trojan Horses of Race*, 118 HARVARD. L. REV. 1489, 1515-19 (2005).

[9] *Id.*

[10] *See* Dale Larson, *Fair and Implicitly Impartial Jury*: *An Argument for Administering the Implicit Association Test During Voir Dire*, 3 DEPAUL J. SOC. JUST. 139 (2010)(quoting Shelley E. Taylor, *The Availability Bias in Social Perception and Interaction, in* JUDGMENT UNDER UNCERTAINTY: HEURISTICS AND BIASES 190, 191 (Daniel Kahneman et al. eds. 1982).

4

political beliefs; but also, in situations beyond those categories. It is imperative to Mr. Martinez's due process rights to have a jury free from bias or partiality. Implicit bias, however, is more difficult to reveal than outright prejudices. Mr. Martinez is Mexican; he does not speak English and is an immigrant. The jury will become explicitly aware of some of these facts when an interpreter must be present for the entirety of the trial, if the Government shows certain Body-Worn Camera evidence, if the Government elicits the fact that Mr. Martinez's ID shown on the date of the alleged crime was a Mexican ID, and certainly if Mr. Martinez chooses to take the stand.

While Mr. Martinez's Mexican identity is not explicitly part of the case, it will undeniably come out, and should a juror believe, explicitly or ***implicitly***, that Hispanic males or immigrants, are more likely to be violent, break the law, or carry guns, that juror should not sit on Mr. Martinez's case. See *Council*, 77 F. 4th at 252-253 (finding persuasive the argument that "[i]n a case involving 'a dark-skinned dreadlocked Black man with an affinity for flashy cars and movies about rap-music gangsters…' it would have been wise to ask prospective jurors if they believe Black people are prone to violence." However, the Court ultimately found the trial court did not abuse its discretion as it provided a supplemental jury questionnaire with at least 6 questions revolving around race).

Here, Mr. Martinez is a Mexican immigrant and a felon, who spoke incredibly limited English when arrested and was found with drug residue and a pipe on his person and guns in his car. Today's political/social discourse can be described in the very least as aggressive towards immigrants, often describing them as violent and more importantly, as lawbreakers. Given this environment is likely that potential jurors will have opinions or preconceived notions about immigrants, particularly those from Mexico. Defense, however, is not asking that the Court go even as far as the trial court did in *Council*, merely that the Court play the video listed above to inform the potential jurors of the role of unconscious bias and to examine these potential biases to

5

JA167

truthfully and fully answer the Court and counsel's questions.

The proposed video is a neutral explanation of the concept of unconscious bias and how to overcome it. It teaches the potential jury about the concept and allows them to have an open and candid conversation with the Court and counsel during voir dire. This will better allow for both Government and Defense to determine if an individual has an actual or implied bias.

## IV.    Conclusion

Ultimately, showing this video to potential jurors prior to voir dire would be invaluable to ensure a fair and impartial jury for Mr. Martinez, as required by the U.S. Constitution. WHEREFORE, for the foregoing reasons, Mr. Martinez respectfully requests this Court to play the video from the United States Federal District Court, Western District of Washington prior to the voir dire process.

Respectfully Submitted,
MARY MAGUIRE
Federal Public Defender
for the Western District of Virginia

_____
Beatrice F. Diehl, Esquire
Florida State Bar No. 0124667
Federal Public Defender's Office
210 First Street SW, Room 400
Roanoke, Virginia 24011
Ph. (540) 777-0880
Fax (540) 777-0890

*Counsel for defendant Isaac Martinez-Chavez*

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing document was electronically filed and will be forwarded to the Office of the United States Attorney this 16th day of December 2024.

JA168

_Beatrice Diehl_

7

CLERKS OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

12/16/2024

LAURA A. AUSTIN, CLERK
BY: s/ K. SAVILLE
DEPUTY CLERK

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Case No.  7:24-cr-11 |
| | ) | |
| ISAAC FIDEL MARTINEZ-CHAVEZ, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

The defendant, by counsel, moved the court to seal Exhibit 2 to the defendant's Motion to Dismiss, ECF No. 57, because the document is a grand jury transcript. ECF No. 58. Pursuant to Local Rule 9(c)(1)(e), the defendant's motion is GRANTED and the Clerk's Office is DIRECTED to file Defendant's Exhibit 2 under seal until further order of the Court.

Exhibits 1, 3, and 4 to the defendant's Motion to Dismiss contain sensitive, personal identifying information, such as the defendant's social security number and date of birth. Pursuant to Local Rule 9(c)(1)(a), the Clerk's Office is DIRECTED to place Defendant's Exhibits 1, 3, and 4 under seal until further order of the Court. The defendant may file redacted copies of these Exhibits for the public record.

ENTERED this December 16, 2024.

_____
HON. C. KAILANI MEMMER
UNITED STATES MAGISTRATE JUDGE

JA170

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No.: 7:24-CR-11 |
| ISAAC FIDEL MARTINEZ-CHAVEZ | ) | |
| | ) | |

**NOTICE OF INTENT TO USE RULE 404(b) EVIDENCE**

The United States of America, by counsel, hereby notifies the Defendant of its intent to introduce evidence that could be considered "other acts evidence" under Rule 404(b) of the Federal Rules of Evidence, at trial *if and only if* the Defendant elects to testify. Please note that this evidence would also be admissible for limited purposes during the litigation of the pending motion to suppress. By providing this notice, the United States does not concede that Rule 404(b) is the sole basis for its admission. Nevertheless, the Government provides this notice out of an abundance of caution and reserves its right to supplement this notice as necessary. In support of this notice, the Government states as follows:

**I. FACTUAL BACKGROUND**

On January 1, 2024, officers found two firearms in a car the Defendant was driving. In a search subsequent to arrest, Deputy Zion Wade of the Franklin County Sheriff's Office found a glass smoking device on the Defendant's person. The Mid-Atlantic Laboratory of the Drug Enforcement Administration (DEA) accepted what it labeled a pipe on March 25, 2024, but the DEA examiner received it only on December 5, 2024. On December 13, 2024, a forensic chemist concluded that the pipe contained methamphetamine residue.

1

JA171

## II.  PURPOSE

If the Defendant testifies at trial, his ability to perceive events during the incident will be at issue.  His recollection of them will also be at issue. The fact that the Defendant had on his person a smoking device that contained only residue tends to indicate that he recently ingested the substance.  Therefore, in the event the Defendant elects to testify in his own defense, evidence and information related to the Defendant's possession of a pipe containing methamphetamine, found on his person during the stop, would be admissible to test the Defendant's memory, perception of events, and his state of mind during the stop and immediately after.  Additionally, the presence of a pipe containing methamphetamine residue may also explain the defendant's intentions when he took action to avoid the initial traffic stop.

Encl.

Respectfully submitted,

CHRISTOPHER R. KAVANAUGH
United States Attorney

Date: December 17, 2024.

*s/Juan L. Vega*
Special Assistant United States Attorney
VA State Bar No. 79165
U.S. Attorney's Office
310 First St., S.W., Ste. 906
Roanoke, Virginia 24011
540-857-2250 (phone)
540-857-2614 (fax)
Juan.vega2@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on December 17, 2024, I caused the foregoing Notice to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel for defendant.

*s/Juan L. Vega*
Special Assistant United States Attorney

2

JA172



**U.S. Department of Justice**
**Drug Enforcement Administration**

Mid-Atlantic Laboratory

Largo, MD

**Chemical Analysis Report**

ATF - Roanoke Office
310 First Street, Suite 500
Roanoke, VA 24011

**Case Number:** 24-06817
**LIMS Number:** 2024-SFL3-01972

## Observations, Results and Conclusions:

| Exhibit | Substance(s) Identified | Net Weight | Substance Purity | Amount Pure Substance |
|---|---|---|---|---|
| 4 | Methamphetamine | Residue | ---- | ---- |

**Remarks:**

The net weight represents the weight of all material, excluding the packaging.

## Exhibit Details:

**Date Accepted by Laboratory:** 03/25/2024     **Gross Weight:** 150.7 g     **Date Received by Examiner:** 12/05/2024

| Exhibit | No. Units | Pkg. (Inner) | Form | Reserve Wt. |
|---|---|---|---|---|
| 4 | 1 | Pipe | Residue | Residue |

**Remarks:**

## Exhibit Analysis:

**Sampling:**

Methamphetamine identified in 1 unit(s) tested.

| Exhibit | Summary of Test(s) |
|---|---|
| 4 | Gas Chromatography/Mass Spectrometry, Marquis Color Test |

The following summary of testimony is provided as required by Federal Rule of Criminal Procedure 16(a)(1)(G) and is a complete statement of my opinions, which are exclusive to and address only the exhibit(s) identified in this summary. I am employed by the U.S. Department of Justice, Drug Enforcement Administration (DEA) and was so employed when I conducted the examinations and analyses of the above referenced LIMS number. My qualifications to conduct the examinations and analyses, and to express an opinion as to the identity of the material contained in the exhibit(s) described above, are based on my knowledge, skill, experience, training, and education. See my Curriculum Vitae (which will be provided prior to the close of expert discovery) for additional information regarding my qualifications, including previous testimony offered in the last four years and any publications authored in the last ten years. The opinions described are based on the listed chemical, physical, and instrumental analyses, the results generated by those analyses, and my interpretation of those results set forth in the laboratory report and analyst notes. The manner and process by which I performed the analyses were, to the best of my knowledge, in accordance with the publicly available Analysis of Drugs Manual (ADM) and Laboratory Operations Manual (LOM), in effect at the time of analysis. These are generally available at: https://www.dea.gov/resources/documents?f%5B0%5D=publication_type%3A2596, or were otherwise disclosed upon request. I analyzed the material contained in the exhibit(s) which were submitted for analysis in the above referenced LIMS number. Refer to this laboratory report associated with the subject LIMS number. The analytical methods used in these analyses are validated and verified according to our quality assurance policy to ensure the methods are reliable and fit-for-purpose and the techniques utilized are widely accepted and employed in the scientific and forensic community. Summaries of instrumental methods are available at: https://www.dea.gov/resources/documents?f%5B0%5D=publication_type%3A2596. This report, its attachments, and the referenced documents are not an exhaustive or complete recitation of testimony that I may offer. In addition, I may offer opinions in response to questions posed during trial. Pursuant to Fed. R. Crim. P. 16(a)(1)(G)(v), I, the analyst, approve the foregoing disclosure, and reserve the right to amend as necessary to comply with Rule 16's obligations.

The terminology used in the preparation of this report is consistent with the current Department of Justice Uniform Language for Testimony and Reports for General Forensic Chemistry and Seized Drug Examinations.

**Analyzed By:** /S/ Rebecca J. Wang, Senior Forensic Chemist     **Date:** 12/12/2024
**Approved By:** /S/ Christine A. Haddix, Senior Forensic Chemist     **Date:** 12/13/2024

DEA Form 113 November 2024     Page 1 of 1

JA173

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No.: 7:24-CR-11 |
| ISAAC FIDEL MARTINEZ-CHAVEZ | ) | |
| | ) | |

## GOVERNMENT'S MOTION TO TOLL SPEEDY TRIAL IN ORDER TO LITIGATE PENDING MOTIONS

The United States of America, by counsel, hereby requests that the court toll the Speedy clock pursuant to 18 U.S.C. § 3161(h)(1)(D), as "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion[.]"  Additionally, the Government requests an extension of time to respond to the filed motions.  In support of this request, the Government states as follows:

The Defendant filed two substantive motions on Friday, December 13, 2024.  ECF #57, #59.  On Monday December 15, 2024, after reviewing these motions, counsel for the Government requested and received an extension of time to respond to these two motions to December 27, 2024.  ECF #60, #61.  Also on Monday December 15, 2024, but after the extension was granted, the Defendant filed a third motion.  ECF #62.  All three motions are substantive in nature and will require significant legal research, preparation, and witness coordination.  At least one of them, the motion to suppress, will require a lengthy evidentiary hearing followed by extensive findings of fact and conclusions of law by the court.

The first motion filed by the Defendant is an "as applied" challenge under _Bruen_ alleging the unconstitutionality of one of the statutes the Government asserts the Defendant violated.  ECF #57.   Because this is an "as applied" challenge, it is more fact intensive than prior _Bruen_

1

JA174

challenges.  It is fair to say that this sort of legal challenge is also novel.  As such, it will require more legal work and possibly result in a longer motions hearing.

The second defense motion is a motion to suppress the evidence in this case.  ECF #59. The Defendant alleges multiple violations, both constitutional and legal, including a claim that the initial traffic stop was illegal, the search of the Defendant's vehicle was illegal, and the seizure of the firearms was illegal.  This motion alone will require substantial legal work, but more significantly, litigating this motion will require the testimony of at least two law-enforcement officers, each of whom will likely be required to testify for at least an hour, and perhaps longer depending on the length of cross-examination.  Their testimony will also likely require the repeated playing and pausing of the video footage of their body worn cameras, which will certainly prolong the hearing. Additionally, it seems likely that the court will require some amount of time *after* the evidentiary hearing to make findings of fact and legal rulings on the various issues raised by the Defendant and countered by the Government.  The Government notes that should the Defendant elect to testify at the evidentiary hearing, that would require the assistance of a translator and increase the duration of the hearing. Some of the facts in the Defendant's motion are not in any police report. The Government can only conclude that the Defendant himself provided them. If the Defendant intends to rely on those facts in furtherance of his motion to suppress, he will have to testify or have other (possibly non-English speaking) witnesses testify.

The third motion, ECF #62, is essentially a request to show the jury venire some sort of video on implicit bias.  As of the morning of December 17, 2024, Government counsel in this case has not yet had an opportunity to review the requested video, much less assess the legal propriety of the Defendant's request, nor analyzed the Defendant's request in light of existing Department of Justice policies.  All of this together suggests to the Government that a competent, professional

JA175

response to these three motions will require more time to prepare and litigate than is currently allocated.

Additionally, counsel understands that the court's availability to conduct an extensive evidentiary hearing on the motion to suppress, as well as a hearing on the other two motions, is currently limited. Given all of the above, the Government requests an extension of time to prepare and file responses to the Defendant's motions until January 15, 2025. Then, instead of initiating a jury trial on January 22, 2025, the Government recommends that the court set aside that day to hold the evidentiary hearing on the motion to suppress and to hear argument on the remaining motions. The Government has already served subpoenas on the relevant officers for January 22. Finally, the Government requests the court to toll Speedy Trial from December 13, 2024, until final disposition of these motions, pursuant to 18 U.S.C. § 3161(h)(1)(D).

On December 16, 2024, counsel for the Government consulted by email with counsel for the Defendant. Counsel for the Defendant **objected** to the Government's request for additional time to respond to their motions and made it clear that the Defendant intends to proceed to trial on January 22, 2025.

Respectfully submitted,

CHRISTOPHER R. KAVANAUGH
United States Attorney

Date: December 17, 2024

*s/Juan L. Vega*
Special Assistant United States Attorney
VA State Bar No. 79165
U.S. Attorney's Office
310 First St., S.W., Ste. 906
Roanoke, Virginia 24011
540-857-2250 (phone)
540-857-2614 (fax)
Juan.vega2@usdoj.gov

3

JA176

**CERTIFICATE OF SERVICE**

I hereby certify that on December 17, 2024, I caused the foregoing Notice to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel for Defendant.

<div align="right">

*s/Juan L. Vega*
Special Assistant United States Attorney

</div>

IN THE UNITED STATES DISTRICT
COURT FOR THE WESTERN DISTRICT OF
VIRGINIA ROANOKE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | Criminal No. 7:24-cr-00011 |
| | ) | |
| | ) | |
| ISAAC FIDEL MARTINEZ-CHAVEZ | ) | |

DEFENDANT'S RESPONSE TO GOVERNMENT'S MOTION TO TOLL SPEEDY
TRIAL ACT

Isaac Martinez-Chavez ("Mr. Martinez"), the defendant, by counsel, responds to the

Government's Motion to Toll Speedy Trial in Order to Litigate Pending Motions (ECF No. 66).

According to the Court's Criminal Pretrial Order (ECF No. 29), all pretrial motions must

be filed no later than twenty-one days prior to trial, or by January 1, 2025, in this case. *Id.* at p. 2.

Furthermore, "[i]t is expected that motions to suppress and motions in limine generally will be

heard at the final pretrial conference." *Id.* at p. 1. In addition, the deadline for filing proposed

substantive jury instructions is seven days before trial, or by January 15, 2025. *Id.* at p. 2.

The jury trial in this case is scheduled to begin on January 22, 2025. *See* "Order to

Continue," (ECF No. 43). The initial pretrial conference in this case is scheduled for January 3,

2025, and the final pretrial conference is scheduled for January 10, 2025.

Mr. Martinez filed two pretrial motions on December 13, 2024, nineteen days before it

JA178

was required to do so. (ECF Nos. 57 and 59.)[1] Mr. Martinez filed a Motion to Play an

Unconscious Bias Jury Instruction on December 15, 2025, thirty-one days before it was required

to do so. (ECF No. 62.) The Government had seven days to respond to those motions. Therefore,

the Government had until December 20, 2024, to respond to the Defendant's Motion to Dismiss

and Motion to Suppress and until December 22, 2024, to respond to Defendant's Motion for

Unconscious Bias Jury Instruction. However, the Government asked for an extension of time –

until December 27 – to file responses to the Defendant's Motion to Dismiss and Motion to

Suppress. As a courtesy, the defense agreed to this extension, and the Court granted that extension

on December 15, 2024. (ECF No. 63.)

On December 17, 2024, the Government produced new discovery consisting of police

reports from the date of Mr. Martinez's arrest on January 1, 2024. *See* Exhibit 1, "Government's

Discovery Production," attached as Exhibit 1, after assurances by the Government that they had

produced all the police reports that exist in this case, and several months after Mr. Martinez sent

the Government his Requests for Discovery.[2]

The Government now requests an extension of time to respond to the Defendant's

motions until January 15, 2025, and a request for an evidentiary hearing on the motion to suppress

until January 22, 2025, requiring the Court to reschedule the jury trial in this case and requiring an

indefinite waiver of Mr. Martinez's speedy trial rights until the jury trial can be rescheduled. *See*

---

[1] Of note, Defense does plan on filing two additional minor motions. Originally these were to be filed Tuesday, but personal issues intervened, and thus they will be filed December 19, 2024, two weeks prior to the deadline. One will be a 404(b) motion, which Defense believes will actually be moot upon trial and another involved Government's designated expert and is not requesting a *Daubert* or any specialized healing beyond argument.

[2] Defense is not claiming anything inappropriate on behalf of Government Counsel. Indeed, Mr. Vega ensured that Defense received the new discovery just minutes after he received it himself, which Defense appreciates. Mr. Vega has acted with professionalism and courtesy – but the Government team includes the local police.

JA179

"Government's Motion to toll Speedy Trial in Order to Litigate Pending Motions." (ECF No. 66).

The Government's arguments in support of its request for an extension of time requiring the Court to reschedule the jury trial include: (1) the Defendant's Motion to Dismiss is an "as applied" challenge, making it more fact intensive and novel than prior *Bruen* motions; (2) Defendant's Motion to Suppress alleges multiple Fourth Amendment violations, requiring "substantial legal work" and an evidentiary hearing; (3) Defendant's Motion for an Implicit Bias Jury Instruction will require the Government to review the proposed video and analyze the request "in light of existing Department of Justice policies." (*See id.* at pp. 1-2.)

"As-applied" *Bruen* challenges are not novel. Such a challenge was even recently raised by defense counsel before this very court in *United States v. Robert Overstreet,* 7:23-CR-0001. Most *Bruen* challenges in this district include "as-applied" challenges that are fact specific. Indeed, the U.S. Attorney's Office has specific appellate counsel who assist with these arguments. Defendant's Motion to Suppress raises standard Fourth Amendment challenges to the stop and search of Mr. Martinez's car based on the Constitution and traditional case law dating back to the 1960s. *See, generally*, "Defendant's Motion to Suppress." (ECF No. 59.) Mr. Miller, co-counsel on the Government's side is well-known and highly experienced and respected within the U.S. Attorney's Office, who has certainly worked numerous Motion to Suppress issues.

While the defense requested discovery in this case months ago, it was only after it filed the Motion to Suppress that the Government produced an additional police report that the local police wrote back on January 1, 2024. Despite the late production, which includes new facts and statements, Defense will not request an extension to address them. While the defense has

3

JA180

requested an evidentiary hearing on its Motion to Suppress, the Court's Pretrial Order indicates it generally hears arguments on motions to suppress at the final pretrial conference. Should the Court determine an evidentiary hearing is required, there is still over a month during which such a hearing can take place. No hearing is necessary on Defendant's Motion to Dismiss, which the Court can rule on as a matter of law. The Court generally hears argument on jury instructions seven days before trial, so surely the Government has time to watch the 11-minute implicit bias jury instruction within the next month at some point and can raise objections and argument at one of the two pretrial conferences. Whatever Justice policies the Government needs to review to determine whether Mr. Martinez ought to receive an implicit bias jury instruction should not involve significant time. As the video and attendant instructions are given commonly in the Western District of Washington, surely the U.S. Attorney's Office in that district can advise their office in this district as to their policies. The defense routinely proposes an implicit bias jury instruction, and such an instruction is included in the standard jury instructions in some circuits.

Mr. Martinez does not object to the tolling of the speedy trial act beginning on the date he submitted his first motion, on December 13, 2024, under the exception provided by 18 U.S.C. § 3161(h)(1)(D) for "delay resulting from any pretrial motion." Section 3161(h)(1)(D) allows for such a tolling from the filing of a pretrial motion through the conclusion of a hearing on, "or other prompt disposition of, such motion." *Id.* The statute only permits exclusion of time for the prompt resolution of pretrial motions and the Pretrial Order directs that the litigation of such motions ends at the final pretrial conference, here, on January 10, 2025. Therefore, the tolling of the Speedy Trial Act should only encompass the period of time between December 13, 2024, and January 10, 2025.

JA181

Pursuant to this District's Standing Order Number 06-03, no motion for a continuance in a criminal case should be granted unless the movant's motion states a valid basis for a continuance under the provisions of 18 U.S.C. § 3161(h). The Government has failed to show that "the ends of justice" served by taking such action outweigh the best interest of the public and the defendant in a speedy trial, as required under 18 U.S.C. § 3161(h)(1)(7)(A). Its general request to litigate the motions in this case on the date of Mr. Martinez's scheduled jury trial should therefore be denied. The Government's request for such a general extension, without a specific trial date, amounts to something akin to the kind of blanket waiver the Supreme Court rejected in *Zedner v. United States*, 126 S. Ct. 1976 (2006). The Government's speculation that the Court's availability to hear the motions is limited is precluded as a justification for tolling time under the Speedy Trial Act. ("No continuance under subparagraph (A) of this paragraph shall be granted because of general congestion of the court's calendar, or lack of diligent preparation or failure to obtain available witnesses on the part of the attorney for the Government." 18 U.S.C. 3161(h)(1)(7)(C)).

However, should the Court believe that the Government needs more time for pre-trial motion preparation, Mr. Martinez would request to be released on bond for the remainder of his pre-trial wait or at the very least be given an additional bond hearing. "There may well be a point at which extended pretrial detention runs afoul of due process rights that on their own could justify revisiting the issue of pretrial detention even where the Court decided that continued tolling of the Speedy Trial Act is appropriate." *United States v. Bowers*, 2024 U.S. Dist. LEXIS 163249, *5 (D. Md. 2024). Mr. Martinez has been in jail for almost a year and will have been for over a year by the time of the trial date, all without ever having been found guilty. Should Government's

5

JA182

request be granted, Mr. Martinez ask that he be released to join his family, work with his Defense team, and focus on treatment. Staying behind bars, while still being presumed innocence, runs afoul of his due process rights.

For the foregoing reasons, Mr. Martinez submits that the time from the filing of his motions until their resolution be excluded for tolling purposes under the Speedy Trial Act, for the time period of December 13, 2024, through January 10, 2025. However, the Government's general request for more time to litigate motions – beyond what is contemplated by the local rules, the Pretrial Order, and the Speedy Trial Act, including supplanting the jury trial with a motions' hearing and continuing the trial at some point in the future – should be denied.

Respectfully Submitted,

MARY MAGUIRE
Federal Public Defender
for the Western District of Virginia

*Heidi I. Bohn*

HEIDI I. BOHN
Virginia Bar No. 98916
Office of the Federal Public Defender
for the Western District of Virginia
210 First Street SW, Suite 400
Roanoke, VA 24011
(540) 525-8273

*Counsel for Isaac Martinez-Chavez*

6

JA183

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the foregoing document was electronically filed and will be forwarded to the Office of the United States Attorney this 18th day of December, 2024.

_Heidi I. Bohn_
HEIDI I. BOHN

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | Criminal No. 7:24-cr-00011 |
| | ) | |
| | ) | |
| ISAAC FIDEL MARTINEZ-CHAVEZ | ) | |

## <u>ORDER</u>

On this day, the Court considered Defendant's Motion to Dismiss the Indictment, and the Court is of the opinion that the motion should be GRANTED. Accordingly, it is hereby Ordered that the time period between the filing of Defendant's motions on December 13, 2024, through their resolution on January 10, 2025, be excluded from the calculation of time under the Speedy Trial Act. The Government's request for an extension beyond the one already granted by this Court on December 15, 2024, permitting the Government additional time until December 27, 2024, is hereby DENIED.

SIGNED this _____ day of _____, 2024.

_____

ELIZABETH K. DILLON
CHIEF UNITED STATES DISTRICT JUDGE

JA185

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Roanoke Division**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | )    **Case No. 7:24-CR-00011** |
| | ) |
| ISAAC FIDEL MARTINEZ-CHAVES, | ) |
| | ) |
| Defendant. | ) |

<u>**DEFENDANT'S MOTION IN LIMINE TO EXCLUDE PROPOSED EVIDENCE
OFFERED BY THE GOVERNMENT PURSUANT TO RULE 404(b) OF THE FEDERAL
RULES OF EVIDENCE**</u>

Issac Martinez-Chavez, the defendant, by counsel, moves this Honorable Court to

exclude Federal Rule of Evidence 404(b) testimony and evidence offered by the Government in

ECF No. 45 and 65.

In support of this motion, counsel states:

**I.    <u>Background</u>**

Mr. Martinez-Chavez was pulled over while driving a 2007 Kia by the Franklin County

Sheriff's Office on January 1, 2024. Upon a search of the vehicle, Officers found a .22 caliber

revolver and a suspected "sawed-off" rifle. On March 27, 2024, Mr. Olmansaid Vallejos spoke

with the Franklin County Sheriff's Office and ATF agents, informing them that he was in the car

with Mr. Martinez-Chavez on the night of the alleged incident. ("Report of Investigation 5,"

attached as Exhibit 1). Mr. Vallejos told police that he had the guns in his jacket, left them in the

car upon being dropped off by Mr. Martinez-Chavez, and Mr. Martinez-Chavez did not know

that the guns were in the car.

On October 28, 2024, Government filed a notice of intent to use Fed. R. Evid. 404(b)

evidence that in August 2022, Mr. Martinez-Chavez was stopped while driving a Mercury SUV

JA186

with the same license that was on the 2007 Kia in which Mr. Martinez-Chavez was pulled over

in during the instant offense. ECF No. 45.

On December 17, 2024, Government filed a second notice of intent to use Fed. R. Evid.

404(b) evidence that a glass smoking device was found on Mr. Martinez-Chavez at the time of

the offense. ECF No. 65. The intend to introduce this only if Mr. Martinez-Chavez chooses to

testify. *Id*.

## II.    **Legal Standard**

Federal Rule of Evidence 404(a) prohibits the use of evidence of a character trait "to

prove that on a particular occasion the person acted in accordance with the character or trait."

Moreover, the Rule prohibits "[e]vidence of any other crime, wrong, or act" when it is used

solely "to prove a person's character in order to show that on a particular occasion the person

acted in accordance with the character.  Fed. R. Evid. 404(b)(1).  Federal Rule of Evidence

404(b) goes on to limit the admission of evidence of certain acts extrinsic to the one charged to

purposes that include "proving motive, opportunity, intent, preparation, plan, knowledge,

identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b)(2); see *also Huddleston

v. United States*, 485 U.S. 681, 685 (1988).

Although a "rule of inclusion," Fed. R. Evid. 404(b) was created to ensure that a

defendant is not convicted solely for "having a bad character," to protect "[a]gainst juries

becoming confused by the purposes of the admitted acts and using the acts improperly in arriving

at a verdict," and prevents someone from having to defend against every act that has occurred in

one's lifetime. *United States v. Queen*, 132 F.3d 991, 995-996 (4th Cir. 1997).

The Fourth Circuit has articulated a four-part test for the admissibility of Rule 404(b)

prior acts evidence: (1) it must be relevant to an issue other than character; (2) it must be

necessary to prove an element of the crime charged; (3) it must be reliable; and (4) its probative

value must not be substantially outweighed by its prejudicial nature. *United States v. Adair*, 227

F.Supp. 2d 586 (W.D. Va. 2002). "[E]vidence of uncharged conduct is not 'other crimes'

evidence subject to Rule 404 if the uncharged conduct arose out of the same series of

transactions as the charged offense, or if evidence of the uncharged conduct is necessary to

complete the story of the crime on trial." *United States v. Siegel*, 536 F.3d 306, 316 (4th Cir.

2008) (internal quotation marks and alterations omitted). In *Siegel*, the Court found that evidence

of prior fraud and acts against a former husband were necessary to understand the context of the

crime before the Court – by showing that the Accused defrauded a former husband was

necessary to show why she murdered current husband. *Id*. It is intensely fact specific. However,

if the evidence is not crucial to understanding the complete story it may still be admitted as

extrinsic evidence to prove some of the factors listed in the rule.

Under the Fourth Circuit's test, in determining whether a prior act is relevant, the Court

must find it "sufficiently related to the charged offense." *United States v. Hall*, 858 F.3d 254,

267 (4th Cir. 2017) (citing *United States v. McBride*, 676 F.3d 385, 397 (4th Cir. 2012)).

When using other acts to show intent, the Court must look to "[h]ow closely 'the prior act

is related to the charged conduct in time, pattern, or state of mind.'" *Id* at 272. For example, in

*Hall*, the Court found that the nexus between an Accused's previous possession convictions and

current possession with intent to distribute charge was not sufficient to show evidence of intent.

*Id*.

"[I]n a case 'where a defendant is charged with unlawful possession of something,

evidence that he possessed the same or similar things at other times is often quite relevant to his

knowledge and intent with regard to the crime charged.'" *United States v. Carter*, 2024 U.S.

3

JA188

Dist. LEXIS 92652, *9 (S.D.W.Va. 2024) (citing *United States v. Brown*, 398 F.App'x 915, 917 (4th Cir. 2010)). In *Carter*, testimony that a witness previously observed guns in a camper where the Defendant was located, was allowed to show the Defendant had constructive possession of a camper (in which guns were found) and had knowledge of the firearms within. *Id.*

### III.    Argument

Using the words of the rule; "knowledge, intent, opportunity, absence of mistake, and lack of accident," is not a magic wand of admissibility. In fact, the military courts are instructive as they have long found "broad talismanic incantations of words such as intent, plan, or modus operandi" do not promise admissibility. See, e.g., *United States v. Brannan*, 18 M.J. 181, 185 (C.M.A. 1984). Yet the Government uses such incantations to argue the admissibility of Mr. Martinez's previous traffic stop in 2022 of a different car when no guns were found.

The Government's theory of admissibility is thus: Mr. Martinez-Chavez, a year prior was pulled over driving a Mercury SUV with the same license plate that was on the Kia in the instant offense. There were no guns found during that previous stop. Therefore, it is more likely that Mr. Martinez-Chavez knew about the guns in a different car in this case. This does not make sense on its face.

The behavior between the two, other than being pulled over in a car, is even more remote than that in *Hall*. Driving a different car with the same license plate has no bearing on whether Mr. Martinez-Chavez intended to possess firearms. Similarly, this does not show knowledge. Unlike in *Carter*, there were no guns in the previous stop nor was it the same car – the previous stop in no way shows that Mr. Martinez-Chavez knew the guns were in the car. If this were a case involving altered or forged license plates, then perhaps the previous stop would be relevant to knowledge. However, it is not.

4

JA189

Like most trials, it is unlikely a surprise to the Government as to what the Defense's theory shall be. Defense's theory makes the proffered Fed. R. Evid. 404(b) even further irrelevant and moot. The theory that the firearms in the car belonged to a passenger, Mr. Vallejos, who was dropped off prior to the traffic stop makes Mr. Martinez-Chavez's previous "dominion and control" over the license plates that were on the Kia irrelevant. Mr. Martinez-Chavez is not arguing that he was not driving the Kia, that he was not in control of the Kia at the time of his arrest, nor that he did not have permission to drive the Kia. The firearms belonged to a passenger of the car, and he was not aware that they were there until the police arrested him. Thus, Mr. Martinez-Chavez's driving of a different car with the same plates does nothing to show his opportunity, lack of mistake or accident because the previous stop was entirely dissimilar from the instant offense and the previous stop does nothing to contradict whether or not a passenger in the vehicle actually owned the guns. It is irrelevant then that at some point in time he was pulled over previously driving a car with the same plates.

Regarding Government's second notice, Mr. Martinez-Chavez has an absolute right to decide whether or not to testify up until the last minute of such a decision is required. Thus, the argument on either side is likely not ripe. However, should Mr. Martinez-Chavez choose to testify, Defense objects to such evidence as it is irrelevant and substantially more prejudicial than probative.

That a pipe with trace amounts of methamphetamine was found on Mr. Martinez-Chavez's person does not mean that he was under the influence of methamphetamine at the time of the stop. The Government has produced no evidence other than the pipe itself showing Mr. Martinez-Chavez was under the influence. It would require several assumptions and leaps to argue that Mr. Martinez-Chavez *might* have been under the influence of methamphetamine (How

JA190

much? How strong? When did he smoke? Etc.) during the stop and therefore it *might* affect his memory and perception of events. This argument would also likely require an expert to testify as to the effects of methamphetamine and how it changes someone's perception and memory, which would be a waste of the Court's time given this peripheral issue. Mr. Martinez-Chavez's "state of mind" during the stop is also irrelevant even if he were to testify – it makes no fact at issue more or less probable.

Finally, even if such evidence had minimal probative value, it is substantially outweighed by its prejudicial effect. The jury will now hear that Mr. Martinez-Chavez possessed methamphetamine paraphernalia and it is highly likely that will cast aspersions on his character as simply a "criminal," tainting the deliberative process regarding his role in possessing the firearms. Should the Government wish to impeach Mr. Martinez-Chavez's (should he choose to testify) memory or perception of events they can do so through live body-worn camera of the event in question without resorting to such prejudicial evidence.

### IV.    <u>Conclusion</u>

WHEREFORE, for the foregoing reasons, Mr. Martinez-Chavez respectfully requests tha the Court exclude this evidence.

Respectfully Submitted,
MARY MAGUIRE
Federal Public Defender
for the Western District of Virginia

Beatrice F. Diehl, Esquire
Florida State Bar No. 0124667
Federal Public Defender's Office
210 First Street SW, Room 400

6

JA191

Roanoke, Virginia 24011
Ph. (540) 777-0880
Fax (540) 777-0890

*Counsel for defendant Isaac Martinez-Chavez*

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing document was electronically filed and will be forwarded to the Office of the United States Attorney this 19th day of December 2024.

*Beatrice Diehl*
_____

7

JA192

**U.S. Department of Justice**
Bureau of Alcohol, Tobacco, Firearms and Explosives

**Report of Investigation**

| Title of Investigation: | Investigation Number: | Report Number: |
|---|---|---|
| MARTINEZ-CHAVEZ, Issac (Franklin County, VA) | 24-06817 | 6 |

## SUMMARY OF EVENT:

The consensual interview of Olmansaid Vallejos Fugoh, regarding information pertaining to Issac MARTINEZ-CHAVEZ, on 03/27/2024.

## NARRATIVE:

1. On 03/27/2024, ATF-Roanoke Special Agent (SA) Adam Moody and Franklin County Sheriff's Office (FCSO) Deputy Edwin Alehandro interviewed Olman Said VALLEJOS Fugoh (w/m, DOB 09/09/1991) at the ATF-Roanoke Filed Office, located at 310 First Street, SW, Roanoke, VA. VALLEJOS had reached out to law enforcement prior to the interview and requested to speak with them in reference to an incident involving Isaac MARTINEZ-CHAVEZ.

2. *Note: VALLEJOS indicated that he did not speak English, Deputy Alehandro spoke with VALLEJOS in Spanish, and summarized the information with SA Moody.*

3. Below is a summary of the interview, as understood by SA Moody, and not represented as a verbatim account. See associated recording for a full account.

   a. VALLEJOS said that he was in the vehicle with CHAVEZ when the police went to stop it.

   b. VALLEJOS was concerned about the marijuana that he was in possession of at the time police were behind them. When he pated the pockets of the jacket he was wearing he noticed there where two firearms inside the pockets. VALLEJOS said the jacket belonged to their Boss, Jose LOPEZ, and VALLEJOS believed LOPEZ put the firearms in the pockets to set them (CHAVEZ/VALLEJOS) up. VALLEJOS said LOPEZ had given him the jacket early that morning at work.

| Prepared by: | Title: | Signature: | Date: |
|---|---|---|---|
| Adam Moody | Special Agent | | 04/02/2024 |
| Authorized by: | Title: | Signature: | Date: |
| Keith Teehan | RAC | | 04/02/2024 |
| Second Level Reviewer (optional): | Title: | Signature: | Date: |
| | | | |

ATF EF 3120.2 (10-2004)
For Official Use Only

JA193

| Title of Investigation: | Investigation Number: | Report Number: |
|---|---|---|
| MARTINEZ-CHAVEZ, Issac (Franklin County, VA) | 24-06817 | 6 |

   c. CHAVEZ pulled over near a gas station and let VALLEJOS out of the vehicle. VALLEJOS hid the firearms under the seat and CHAVEZ drove off with the vehicle by himself. VALLEJOS said CHAVEZ, while being pursued by police, called his girlfriend to come pick VALLEJOS up because he did not have a phone with him.

   d. VALLEJOS said CHAVEZ was pursued by police and later stopped. The police located the firearms, which VALLEJOS said CHAVEZ knew nothing about.

   e. VALLEJOS described the firearms as:
     i. small revolver
     ii. black, Glock-like pistol, 9mm, similar to what police carry

   f. VALLEJOS confirmed both were small handguns and gestured with his hands confirming approx. 5-7 inches in length.

   g. VALLEJOS said he and CHAVEZ had done drugs together and both had smoking devices with them that day.

   h. VALLEJOS said LOPEZ was threating him at work when VALLEJOS told him that CHAVEZ was caught with LOPEZ's firearms. LOPEZ's told the other guys in the shop that he would pay anyone who would get rid of him.

   i. VALLEJOS said he no longer works for LOPEZ and was not currently being threatened.

4. VALLEJOS was asked if everything he told LE was the truth and further advised that it was a crime to lie to LE. VALLEJOS confirmed that he told the truth.

5. A copy of the recording was secured as evidence in the ATF-Roanoke evidence vault.

ATF EF 3120.2 (10-2004)
For Official Use Only

JA194

**IN THE UNITED STATES DISTRICT
COURT FOR THE WESTERN DISTRICT
OF VIRGINIA
ROANOKE DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA** <br><br> **v.** <br><br> **ISAAC FIDEL MARTINEZ- CHAVEZ** | **Criminal No. 7:24-CR-00011** |

## DEFENDANTS MOTION FOR ADVERSE JURY INSTRUCTION OR OTHER RELIEF FOR SPOLIATION OF EVIDENCE

Isaac Martinez-Chavez ("Mr. Martinez"), the defendant, by counsel moves this Honorable Court to provide an adverse jury instruction or other relief the Court finds reasonable based on the spoliation of evidence. Specifically, the recordings of the radio traffic of the Officers involved in the arrest of Mr. Martinez between each other and with dispatch have been destroyed.

### I.      Background

Mr. Martinez was arrested by state authorities on January 1, 2024, for the crimes alleged in his indictment. His federal arrest warrant was executed on April 22, 2024. ECF No. 5. On April 29, 2024, a detention hearing was held, with a government witness, ATF Agent Adam Moody testifying to the underlying facts of the case. ECF No. 21. Mr. Martinez was held. *Id.* On May 1, 2024, the Court granted the government's motion for a protective order and voluntary disclosure of grand jury and other materials in discovery. ECF No. 20. That same day, defense sent government a discovery request to include a request for documents and tangible evidence. Exhibit 1. On October 24, 2024, defense counsel sent the government an email indicating additional discovery requests to include "The radio runs (or dispatch calls) made by LT Hylton or any others regarding Mr. Martinez-Chavez that evening." Exhibit 2. A formal discovery request was inadvertently never sent

1

JA195

to the government, outside the email request, however, government still diligently endeavored to look for the dispatch call/radio recordings requested but found that they were "probably destroyed" in line with the VA Retention Schedule. Exhibit 3 and 4.

A CFS report was created on the day of January 1, 2024, the day of the alleged incident. Exhibit 5. The comment and notes on this document seem to indicate a narrative of the events of Mr. Martinez's arrest, but the times are out of order, confusing, and do not align with officer Body Worn Camera on the night of the incident.

The VA Retention Schedule states that "Dispatch (Communications) and Emergency Call Recordings" are not retained as evidence and are thus destroyed 6 months after the event. Exhibit 4 at *8. However, later in the document "Investigative Case Files: Less Serious Offenses – Unresolved" is listed, and includes "Dispatch/Communication Recordings," listing the retention period as 5 years. *Id* at * 15. For unresolved, "serious" crimes the retention period is 100 years. *Id* at 17.

## II.    Legal Standard

Unlike with *Brady* violations, the destruction of ***potentially*** useful evidence requires a showing of bad faith on behalf of the police or opposing party in order to prove that the destruction of such evidence was a due process violation. *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). In *Youngblood*, the Court found that the failure of the police to preserve DNA samples by refrigerating clothing and testing semen samples (making it impossible to test for DNA later) was not done with bad faith and therefore, was not violative of Mr. Youngblood's due process rights. *Id*.[1]

---

[1] Interestingly, although this did not violate his due process rights, 18 years later Mr. Youngblood was exonerated and set free. See Barbara Whitaker, *DNA Frees Inmate Years After Justices Reject Plea*, N.Y. Times A12 (August 11, 2000).

However, "[e]ven absent a due process violation, a criminal defendant may be entitled to an adverse inference instruction pursuant to the spoilation of evidence rule. Under that evidentiary rule, 'an adverse inference may be drawn against a party who [loses or] destroys relevant evidence.'" *United States v. Jonson*, 996 F.3d 200, 206 (4th Cir. 2021) (citing *Vodusek v. Bayline Marine Corp.*, 71 F.3d 148, 155 (4th Cir. 1995)).

Spoliation is "the destruction or material alteration of evidence or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation. *Boone v. Everett*, 751 Fed. Appx. 400, 401 (4th Cir. 2019) (citing *Silvestri v. General Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001)).

"A party seeking sanctions based on the spoliation of evidence must establish, inter alia, that the alleged spoliator had a duty to preserve material evidence. This duty arises 'not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation.'" *Turner v. United States*, 736 F.3d 274, 282 (4th Cir. 2013) (citing *Silvestri*, 271 F.3d. at 591)). To provide such an instruction, the Court must find that a party knew the evidence was relevant to an issue at trial and that there was willful conduct destroying the evidence. *Id*. There need not be bad faith to make such an adverse inference, but that there was intentional conduct by a party which contributed to the loss or destruction of evidence. *United States v. Wagoner*, 2024 U.S. App. LEXIS 26938, *2-3 (citing *Vodusek*, 71 F.3d at 155).

When a party has a duty to preserve evidence and the destruction was done intentionally, the Court must then determine whether evidence was relevant and the destruction of the evidence is prejudicial. *Genuine Dubmax, Inc. v. Greektown LLC*, 2021 U.S. Dist. LEXIS 65632, *10-11. "When the party alleging spoliation shows that the other party acted willfully in failing to preserve evidence, the relevance of that evidence is presumed in the Fourth

3

JA197

Circuit. *Id* (citing *Sampson v. City of Cambridge*, 251 F.R. 172, 179 (D. Md. 2008)).

> In general, 'courts find prejudice when spoliation compromises a party's ability to present its case.' 'The moving party cannot be expected to demonstrate with certainty that content of the lost evidence, but the moving party must demonstrate a likelihood that the lost evidence would have been favorable to the moving party's case.' The degree of prejudice that a party suffered from spoliation of evidence 'ranges along a continuum from an inability to prove claims or defenses to little or no impact on the presentation of proof.

*C.G. v. Cabell Cnty. Bd. of Educ.*, 2024 U.S. Dist. LEXIS 109051, *15-16 (internal citations omitted).

### III.    Argument

The dispatch calls or "radio runs" as they are colloquially known, are important evidence for the defense and were destroyed.

As evidenced by Mr. Martinez's motion to suppress, part of the defense's theory and preparation for this case involves an allegation that the police officers involved in Mr. Martinez's arrest, specifically LT Hylton, have been purposefully inaccurate in their account of pulling Mr. Martinez's car over and the sequence of events in his arrest. There is ***no*** evidence, outside LT Hylton's testimony, that Mr. Martinez was speeding, that he turned his lights off prior to being pulled over, or that LT Hylton turned on his emergency lights prior to pulling over Mr. Martinez. There is no dash cam. LT Hylton's body worn camera is not turned on until Mr. Martinez is already handcuffed, outside of his vehicle. LT Hylton claims he thought he saw Mr. Martinez reaching for something, but this is not documented in the CFS Report. Indeed, the report lists "suspicious person" as the call type, and does not list "suspicious vehicle," the entire reason LT Hylton allegedly pulls over Mr. Martinez, until 40 minutes after Mr. Martinez is pulled over and cuffed. The CFS report at time stamp 00:52:10 (after Mr. Martinez is already handcuffed and at the police vehicle) states "11 confirmed one @ gunpoint." Exhibit 4 at *4. However, there is no other evidence of this use of force.

4

JA198

Clearly, the timing of the reports is off. It is unclear what happened prior to when the Body Worn Camera of LT Hylton is turned on. These precious minutes are absolutely crucial to defense's theory and preparation of the case. Did LT Hylton actually turn on his lights to pull over Mr. Martinez? How was Mr. Martinez driving? What did Mr. Martinez do when LT Hylton was finally behind him and they were both stopped? Did LT Hylton ever tell dispatch *at the time* that he had Mr. Martinez at gunpoint, that Mr. Martinez was speeding/turned off his lights, or that Mr. Martinez made furtive movements or was this all after the fact? If LT Hylton did not do so, the government's star witness's credibility would be substantially diminished. To prove this, the dispatch calls and radio runs are a necessity, as LT Hylton's body worn camera does not show any of this.

Clearly, the local police (here, the Rocky Mount Police Department and Franklin County Sheriff's Office) had a duty to preserve such evidence. Indeed, this is recognized by the VA retention schedule. They arrested Mr. Martinez on the day of the alleged incident, at the scene, and clearly intended this to be a criminal case – knowing this was going to be litigated. The VA retention schedule dictates that evidence part of a case file must be retained for years. That was not done here. Even if the evidence is properly destroyed under the most generous terms for the government, at 6 months, because for some reason the dispatch calls were not considered "part of the investigative case file," this case had a trial date set as early as May 1, 2024. Defense's first discovery request, although not explicitly listing the dispatch calls, was sent that same day, 2 months before the calls and recordings should have been destroyed.

The only way to destroy this evidence is by doing so intentionally. Unlike DNA, as in *Youngblood*, the evidence was not accidentally destroyed during testing. It was done proactively.

These calls are clearly relevant as they relate to the arrest of Mr. Martinez, the actions that spurned this entire investigation, and the credibility of the government's main witness, LT Hylton.

5

JA199

However, as this was done willfully, the relevance is presumed. Defense is now left without the best impeachment material for LT Hylton or at the very least, recordings which would clarify the CFS report and the timing. Again, there is *no* other evidence documenting what exactly happened before Mr. Martinez was in handcuffs other than LT Hylton's words. This effectively handcuffs the Defense in its preparation of its case and Mr. Martinez is therefore prejudiced.

## IV.    Conclusion

The destruction of the dispatch calls and radio runs by the local police when they had a duty to preserve such evidence was intentional and willful, the evidence was relevant to Mr. Martinez's defense, and he is prejudiced without such evidence. WHEREFORE, for the foregoing reasons, Mr. Martinez respectfully requests this Court to provide the jury an adverse inference instruction.

Respectfully Submitted,
MARY MAGUIRE
Federal Public Defender
for the Western District of Virginia


_____
Beatrice F. Diehl, Esquire
Florida State Bar No. 0124667
Federal Public Defender's Office
210 First Street SW, Room 400
Roanoke, Virginia 24011
Ph. (540) 777-0880
Fax (540) 777-0890

*Counsel for defendant Isaac Martinez-Chavez*

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing document was electronically filed and will be forwarded to the Office of the United States Attorney this 23rd day of December 2024.

_____

6

JA200

FEDERAL PUBLIC DEFENDER
WESTERN DISTRICT OF VIRGINIA
210 FIRST STREET, SW, SUITE 400
ROANOKE, VIRGINIA 24011
(540) 777-0880
FAX: (540) 777-0890

Beatrice Diehl                                             Mary E. Maguire
Assistant Federal Public Defender                          Federal Public Defender
(540) 777-0891 (Direct)                                    (540) 777-0895

May 1, 2024
Dear AUSA Juan Vega
Via email to ████████████████
Re: *United States v. Isaac Fidel Martinez-Chavez*

 I am writing you to formally request all discovery pursuant to Rule 16 of the Federal Rules of Criminal Procedure, as well as all materials which are discoverable pursuant to other statutes and case law, *Brady v. Maryland*, 373 U.S. 83 (1963) and *United States v. Giglio*, 405 U.S. 150 (1982), and their progeny, and 18 U.S.C. § 3500.

 This request encompasses information both within the possession of federal agents, and within the possession of state agents, agencies, and offices with whom you or your agents have been working in the course of the investigation of this matter.

### I. Mr. Isaac Fidel Martinez-Chavez's Statements

Please provide any relevant written or recorded statement Mr. Isaac Fidel Martinez-Chavez made, within the government's possession, custody, or control, the existence of which is known or by the exercise of due diligence may become known, to you or any other government attorney. Fed. R. Crim. P. 16(a)(1)(B)(i).

 Please provide that portion of any written record containing the substance of any relevant oral statement Mr. Isaac Fidel Martinez-Chavez made whether before or after arrest in response to interrogation by an individual Mr. Isaac Fidel Martinez-Chavez knew to be a government agent at that time. Fed. R. Crim. P. 16(a)(1)(B)(ii).

 Please provide any oral statement Mr. Isaac Fidel Martinez-Chavez made whether before or after arrest in response to interrogation by an individual he knew to be a government agent at the time if the government intends to use the statement at trial, including for impeachment or during rebuttal. Fed. R. Crim. P. 16(a)(1)(A).

 Please provide a copy of Mr. Isaac Fidel Martinez-Chavez's grand jury testimony, if any exists, related to the charged offense. Fed. R. Crim. P. 16(a)(1)(B)(iii).

JA201

## II.    Mr. Isaac Fidel Martinez-Chavez's Prior Record

Please provide a copy of Mr. Isaac Fidel Martinez-Chavez's prior criminal record, arrests, and convictions, if any, which are in the government's possession, custody, or control, if the government knows or through due diligence could know exist.

## III.    Documents and Tangible Evidence

Please provide any books, papers, documents, notes, photographs, tangible objects, copies or portions thereof, or make available for my inspection any buildings or places, which are in the government's possession, custody, or control and which are material to the preparation of Mr. Isaac Fidel Martinez-Chavez's defense, or if the government intends to use the evidence in its case-in-chief at trial, or the government obtained from or that belong to Mr. Isaac Fidel Martinez-Chavez. Fed. R. Crim. P. 16(a)(1)(E).

## IV.    Reports of Examinations and Tests

Please provide or make available any reports of examinations and tests. Specifically, I request the results or reports of any physical or mental examination of any scientific test or experiment, or copies thereof, which are in the government's possession, custody, or control, the existence of which is known, or by the exercise of due diligence may become known, to you or to any other attorneys for the government, and which are material to Mr. Isaac Fidel Martinez-Chavez's defense or which the government intends to introduce in its case-in-chief at trial. Fed. R. Crim. P. 16(a)(1)(F).

If any of these materials are created at a later time, please provide them as soon as they are complete, and in sufficient time for us to incorporate the material into our trial preparation, including the possible need to seek alternative testing or the assistance of experts to examine the material provided or to testify about the material provided.

## V.    Expert Witnesses

Please provide me a written summary of any testimony that the government intends to use in its case-in-chief under Federal Rule of Evidence 702, 703, or 705. The summary must describe the expert's opinions, the bases and reasons for those opinions, and the expert's qualifications to comply with the rules. Fed. R. Crim. P. 16(a)(1)(G).

## VI.    *Jenks* Material

I understand that the government does not have an obligation to provide me with the statements of its witnesses until those witnesses have testified in court. However, please allow this letter to notify you that I intend to ask for the statements of all witnesses you call at any hearing. Further, it is not enough that you provide me with any statements you have if you have not made an affirmative attempt to collect the witness's statements. I am requesting that you do so and provide those statements prior to any hearing governed by Rule 26.2 or 18 USC § 3500 or, at a minimum, after such a witness has testified. If, however, we receive statements after a direct examination, I will request a continuance or

JA202

recess to review the material.

### VII.   *Brady* and *Giglio* material

I am specifically requesting any information that would tend to negate the government's evidence or help to impeach any witness, including information that demonstrates bias, and any other information favorable toward guilt or innocence or that may lead to the discovery of any such information.

As you undoubtedly are aware, *Brady* material is in the possession of the government even when it is held by any another agency which has been involved in the investigation. *United States v. Robinson*, 627 F.3d 941, 951 (4th Cir. 2010). "[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419 (1995). The prosecutor's discovery obligations extend to documents and information in the control of government agencies both within and outside of this district where "the prosecutor has knowledge and access to" such materials. *United States v. Bryan*, 868 F.2d 1032 (9th Cir. 1989); *United States v. Rawle*, 927 F.2d 597, (4th Cir. 1991) (Table Opinion) (citing *Bryan* with favor); *Walker v. Lockhart*, 763 F.2d 942, 958 (8th Cir. 1985) ("Police are treated as an arm of the prosecution for Brady purposes"); *see also United States v. Perdomo*, 929 F.2d 967 (3d Cir. 1991) (prosecutor must search local records for information about key witness' background). The prosecution must make a "reasonable effort" to aid the defense in obtaining such information which relates to favorable evidence and witnesses. *United States v. Hernandez-Gonzalez*, 608 F.2d 1240, 1246 (9th Cir. 1979).

When the defense makes a specific request for *Brady* information, and there is a "substantial basis for claiming [the information requested is] material[ ]" . . . "the failure to make any response is seldom, if ever excusable." *See United States v. Agurs*, 427 U.S. 97, 106 (1976). If you disagree that any of the requested information should be disclosed, we respectfully request that you submit the information to the Court for in camera review. See *Pennsylvania v. Ritchie*, 480 U.S. 39, 54 (1987).

As you know, it is not enough for the government merely to collect information from its agents or witnesses and pass that on to the defense. Prosecutors have an affirmative duty to seek out *Brady* and *Giglio* information and provide it. *See Kyles v. Whitley*, 514 U.S. 419, 432 – 33 (1995); USAM 9-5.001(B)(2) ([i]t is the obligation of federal prosecutors . . . to seek all exculpatory and impeachment information from all the members of the prosecution team [which includes] federal, state, and local law enforcement officers and other government officials participating in the investigation and prosecution of the criminal case against the defendant").

As this case continues, I will request additional discovery pursuant to the Rules and to *Brady* and *Giglio* to ask for items specifically favorable to my client. The following types of information, however, are *nearly always* exculpatory and I am specifically requesting to be provided with them:

1) Favorable witness statements, including negative exculpatory statements (statements that fail to mention my client being responsible or culpable with respect the charges).

JA203

2) The existence of witnesses favorable to the defense.
3) Test results that do not implicate my client as being responsible or culpable with respect to the charged offenses.
4) Any information that tends to cast doubt on a witness's credibility, including:
   a. Lies told by the witness.
   b. Prior inconsistent statements of the witness.
   c. Evidence that the witness may be hostile to the defense.
   d. Evidence that casts doubt on the ability of the witness to observe, recall, or recount any observations the witness made.
   e. Evidence that is inconsistent with any witness's testimony.
   f. Any evidence that a witness was offered a reward, whether formally or informally, in exchange for the witness's testimony.
   g. Information concerning any bad acts committed by the witness that may relate to the witness's credibility.
   h. Prior convictions of the witness.
   i. Any presentence reports of witnesses or codefendants that include exculpatory information.
   j. Reports of polygraph examinations performed on any government witnesses.
   k. Records of any psychiatric treatment a witness may have received.
   l. Information that a witness is on probation or parole.
   m. Information suggesting any witness is or was acting as an informant or is or was in a witness protection program.
   n. Any threats made in relation to a witness's testimony.
   o. Any informant witness's tax returns.
   p. Information that a witness is the target or subject of any investigation.
   q. Information within personnel files of government witnesses that relates to the witness's credibility, ability to perceive, recall, and recount evidence, or any information that the witnesses has been reprimanded or punished for official misconduct.
5) The names and contact information for people the government does not intend to call as witnesses but may have knowledge of the charged offenses.
6) Physical evidence inconsistent with the government's theory.
7) Any evidence of other crimes not attributed to my client which may raise an inference that another individual(s) is responsible for the charged offenses.
8) Because *Brady* material also relates to potential punishment, please provide any information that might help to reduce any potential sentence my client receives, whether pursuant to 18 USC 3553(a) or any guideline provision, including:
   a. Evidence suggesting my client has a mitigating role in the offense.
   b. Any evidence suggesting any counts should be grouped.
   c. Any evidence showing my client has accepted responsibility.
   d. Any evidence suggesting my client's criminal record substantially over- represents the seriousness of his history or likelihood of recidivism.
   e. Any evidence that suggests my client may be eligible for the safety-

JA204

valve provision.

f.  Any evidence that my client provided substantial assistance to authorities.

g.  Any mitigating evidence not otherwise adequately considered under the guidelines.

h.  Any evidence suggesting my client's actions were provoked by any victim's unlawful conduct.

i.  Any evidence suggesting my client may have committed the offense to avoid a perceived greater harm.

j.  Any evidence suggesting my client acted under coercion or duress.

k.  Any evidence of my client's diminished capacity.

l.  Any voluntary disclosure of the offense. And,

m.  Any evidence suggesting my client's actions were aberrant behavior.

Thank you for your attention to these requests. If you do not believe any of the requested material is discoverable or disclosable, please let me know and provide any responsive material to the court to consider for *in camera* review. *See United States v. Abdallah*, 911 F.3d 201, 217 – 19 (4th Cir. 2018).

Please consider this request to continue for the duration of my client's case—including during any pending appeal—and please consider the request for exculpatory information to continue indefinitely.

Beatrice Diehl

Counsel for Mr. Isaac Fidel Martinez-Chavez

JA205

| | |
|---|---|
| **From:** | Beatrice Diehl |
| **To:** | "Vega, Juan (USAVAW)" |
| **Cc:** | Keekee Womack; Heidi Bohn |
| **Subject:** | Martinez-Chavez Co-Counsel and Discovery |
| **Date:** | Thursday, October 24, 2024 3:42:00 PM |

Juan,

Good afternoon! I hope you're doing well. I'm writing for two reasons:

1. Heidi Bohn, our newest, fearless attorney, has joined as co-counsel on this case, so I wanted to virtually introduce you two and ask that she be on any future emails.
2. I plan on sending a formal discovery letter, but our server is down right now and our letterheads are on it! But I wanted to let you know that we will be requesting just a couple of additional pieces of discovery:
   - The CAD sheets for that night (Computer-aided dispatch)
   - The radio runs (or dispatch calls) made by LT Hylton or any others regarding Mr. Martinez-Chavez that evening
   - And finally, in LT Hylton's report he mentions a potential body cam footage issue, so any documentation of that. (As soon as our server is back up I will draft the letter and have the specific BATES and language regarding this for you).

As always, thank you for your patience and effort! Please let me know if you need anything from our end.

Very Respectfully,
Beatrice F. Diehl (she/her)
Assistant Federal Public Defender
Office of the Federal Public Defender
for the Western District of Virginia
210 First Street, SW, Suite 400
Roanoke, Virginia 24011

Telephone (540) 777-0891

JA206

| | |
|---|---|
| **From:** | Vega, Juan (USAVAW) |
| **To:** | Beatrice Diehl; Heidi Bohn |
| **Cc:** | Keekee Womack; Vega, Juan (USAVAW); Miller, Matthew (USAVAW) |
| **Subject:** | RE: Martinez-Chavez Co-Counsel and Discovery |
| **Date:** | Thursday, December 12, 2024 11:53:46 AM |

Beatrice and Heidi,
I just sent you Discovery via USAfx. Let me know if you do not receive the link.

You should have already received everything in it through ECF filings. The only new item is the "Library of VA Retention Schedule." Beatrice had indicated that she was going to send a Discovery letter for dispatch calls. In anticipation of the Discovery letter (which I never received), I had SA Moody look into it. He confirmed that there are no dispatch call/radio recordings because they were probably destroyed pursuant to the Retention Schedule. He then sent me that schedule.

Very Respectfully,

**Juan Vega**
Special Assistant U.S. Attorney
United States Attorney's Office
Western District of Virginia

---

**From:** Vega, Juan (USAVAW) ███████████████
**Sent:** Monday, October 28, 2024 11:37 AM
**To:** Beatrice Diehl ███████████████
**Cc:** Keekee Womack ███████████████ ; Heidi Bohn ███████████████ ; Vega, Juan (USAVAW) ███████████████
**Subject:** RE: Martinez-Chavez Co-Counsel and Discovery

Good morning,
SA Adam Moody sent me this message about your upcoming Discovery request:

1. CAD sheet is already included on ROI 9, Attachment (b).
2. I'll see what I can do with the radio recording.

Juan Vega

---

**From:** Beatrice Diehl ███████████████
**Sent:** Thursday, October 24, 2024 3:48 PM
**To:** Vega, Juan (USAVAW) ███████████████
**Cc:** Keekee Womack ███████████████ ; Heidi Bohn ███████████████
**Subject:** [EXTERNAL] RE: Martinez-Chavez Co-Counsel and Discovery

JA207

Juan,

Got it! I wasn't sure if he was referring to the same thing – if he is, you're absolutely right; that was covered. Just wanted to cover my bases. Thanks!

**Very Respectfully,**
Beatrice F. Diehl (she/her)
Assistant Federal Public Defender
Office of the Federal Public Defender
for the Western District of Virginia
210 First Street, SW, Suite 400
Roanoke, Virginia 24011

Telephone (540) 777-0891

---

**From:** Vega, Juan (USAVAW) ████████████████
**Sent:** Thursday, October 24, 2024 3:47 PM
**To:** Beatrice Diehl ██████████████████
**Cc:** Keekee Womack ████████████████████ ; Heidi Bohn ████████████████
**Subject:** RE: Martinez-Chavez Co-Counsel and Discovery

Heidi,
Nice to meet you!
I'll look for the letter and see if ATF SA Adam Moody can get these items.
I thought the BWC issue was explained. Because of the issue, one or more officers could not retrieve the BWC footage, but then they fixed it, and I sent them all to you. Please look through our email communications.

Juan Vega

---

**From:** Beatrice Diehl ████████████████
**Sent:** Thursday, October 24, 2024 3:42 PM
**To:** Vega, Juan (USAVAW) ██████████████
**Cc:** Keekee Womack ████████████████████ ; Heidi Bohn ████████████████
**Subject:** [EXTERNAL] Martinez-Chavez Co-Counsel and Discovery

Juan,

Good afternoon! I hope you're doing well. I'm writing for two reasons:

JA208

1. Heidi Bohn, our newest, fearless attorney, has joined as co-counsel on this case, so I wanted to virtually introduce you two and ask that she be on any future emails.
2. I plan on sending a formal discovery letter, but our server is down right now and our letterheads are on it! But I wanted to let you know that we will be requesting just a couple of additional pieces of discovery:
   * The CAD sheets for that night (Computer-aided dispatch)
   * The radio runs (or dispatch calls) made by LT Hylton or any others regarding Mr. Martinez-Chavez that evening
   * And finally, in LT Hylton's report he mentions a potential body cam footage issue, so any documentation of that. (As soon as our server is back up I will draft the letter and have the specific BATES and language regarding this for you).

As always, thank you for your patience and effort! Please let me know if you need anything from our end.

Very Respectfully,
Beatrice F. Diehl (she/her)
Assistant Federal Public Defender
Office of the Federal Public Defender
for the Western District of Virginia
210 First Street, SW, Suite 400
Roanoke, Virginia 24011

Telephone (540) 777-0891

JA209



## LIBRARY OF VIRGINIA

Archives, Records, and Collections Services
800 E. Broad St., Richmond VA 23219
(804) 692-3600

RECORDS RETENTION AND DISPOSITION SCHEDULE

GENERAL SCHEDULE NO. GS-17

COUNTY AND MUNICIPAL GOVERNMENTS

Law Enforcement, Fire and Emergency Services

The schedule on the attached page(s) is approved with agreement to follow the records retention and disposition policies listed below:

APPROVED: _Sandra G. Treadway_____

EFFECTIVE SCHEDULE DATE: 8/13/2015

### POLICIES FOR RECORDS RETENTION AND DISPOSITION

1. This schedule is continuing authority under the provisions of the Virginia Public Records Act, § 42.1-76, et seq. of the Code of Virginia for the retention and disposition of the records as stated on the attached page(s).
2. This schedule supersedes previously approved applicable schedules.
3. This schedule is used in conjunction with the Certificate of Records Destruction (RM-3 Form). A signed RM-3 Form must be approved by the designated records officer and on file in the agency or locality before records can be destroyed. After the records are destroyed, the original signed RM-3 Form must be sent to Library of Virginia (LVA).
4. Any records created prior to 1913 must be offered, in writing, to LVA before applying these disposition instructions. Offered records can be destroyed 60 days after date of the offer if no response is received from LVA. A copy of the offer must be attached to the RM-3 Form when it is submitted to LVA.
5. All known audits and audit discrepancies regarding the listed records must be settled before the records can be destroyed.
6. All known investigations or court cases involving the listed records must be resolved before the records can be destroyed. Knowledge of subpoenas, investigations, or litigation that reasonably may involve the listed records suspends any disposal or reformatting processes until all issues are resolved.

7. The retentions and dispositions listed on the attached page(s) apply regardless of physical format, i.e., paper, microfilm, electronic storage, optical imaging, etc. Unless prohibited by law, records may be reformatted at agency or locality discretion. Microfilming must be done in accordance with 17VAC15-20-10, et seq. of the Virginia Administrative Code, "Standards for the Microfilming of Public Records for Archival Retention." All records must be accessible throughout their retention period in analog or digital format. Whether the required preservation is through prolongation of appropriate hardware and/or software, reformatting, or migration, it is the obligation of the agency or locality to do so.
8. Custodians of records must ensure that information in confidential or privacy-protected records is protected from unauthorized disclosure through the ultimate destruction of the information. Ultimate destruction is accomplished through shredding, pulping, burning, and overwriting or physically destroying media. Deletion of confidential or privacy-protected information in computer files or other electronic storage media is not acceptable. Records containing Social Security numbers must be destroyed in compliance with 17VAC15-120-30.
9. Under the Virginia Public Records Act, § 42.1-79, LVA is the official custodian and trustee of all state agency records transferred to the Archives, Library of Virginia. LVA may purge select records in accordance with professional archival practices in order to ensure efficient access.
10. Unless otherwise directed, files are closed out at the end of each calendar or fiscal year as appropriate. Retention periods start at that time.



**LIBRARY OF VIRGINIA**

Archives, Records, and Collections Services
800 E. Broad St., Richmond VA 23219
(804) 692-3600

RECORDS RETENTION AND DISPOSITION SCHEDULE

GENERAL SCHEDULE NO. GS-17

COUNTY AND MUNICIPAL GOVERNMENTS

Law Enforcement, Fire and Emergency Services

EFFECTIVE SCHEDULE DATE: 8/13/2015

| RECORD SERIES AND DESCRIPTION | SERIES NUMBER | SCHEDULED RETENTION PERIOD | DISPOSITION METHOD |
|---|---|---|---|
| <u>Abandoned/Impounded Vehicles</u><br><br>This series documents the identification, retrieval, processing, return, or disposal of abandoned or impounded vehicles. This series may consist of, but is not limited to: tow sheet and disposition form. | 100812 | 3 Years after equipment, facility, or property sold or no longer in use | Non-confidential Destruction |
| <u>Accreditation Records: Supporting documentation - Commission on Accreditation for Law Enforcement Agencies (CALEA)</u><br><br>This series documents compliance with the Commission on Accreditation for Law Enforcement Agencies (CALEA) accreditation program standards. This series may include, but is not limited to: accreditation standard-file content and annual compliance reports. | 200141 | 6 Years after creation | Non-confidential Destruction |
| <u>Accreditation Records: Supporting documentation - Virginia Law Enforcement Professional Standards Commission (VLEPSC)</u><br><br>This series documents compliance with the Virginia Law Enforcement Professional Standards Commission (VLEPSC) accreditation program standards. This series may include, but is not limited to: accreditation standard-file content and annual compliance reports. | 100814 | 8 Years after creation | Non-confidential Destruction |
| <u>Alarm: Security - Activated</u><br><br>This series documents the activation of a home or business security alarm system linked to the law enforcement agency's response system, the notification to the agency, the investigation into the cause, and the findings (including billable false alarms).  This series may include, but is not limited to: incident reports, dispatch notes, and false-alarm logs. | 100706 | 1 Year after closed | Non-confidential Destruction |



**LIBRARY OF VIRGINIA**

Archives, Records, and Collections Services
800 E. Broad St., Richmond VA 23219
(804) 692-3600

RECORDS RETENTION AND DISPOSITION SCHEDULE

GENERAL SCHEDULE NO. GS-17

COUNTY AND MUNICIPAL GOVERNMENTS

Law Enforcement, Fire and Emergency Services

EFFECTIVE SCHEDULE DATE: 8/13/2015

| RECORD SERIES AND DESCRIPTION | SERIES NUMBER | SCHEDULED RETENTION PERIOD | DISPOSITION METHOD |
|---|---|---|---|
| Alarm: Security - Permit/Registration<br><br>This series documents the process required to link a home or business security alarm systems to a law enforcement agency's response system, as well as the information needed to respond to a system activation and invoice for billable false alarms.  This series may consist of, but is not limited to: the application and supporting documentation, owner-contact information, and alarm-system data. | 100707 | 1 Year after superseded, obsolete, or rescinded | Non-confidential Destruction |
| Alcoholic Beverage Control (ABC) Permit Files<br><br>This series documents local review and/or approval of ABC permits. This series may include, but is not limited to: Application, background checks, and supporting documentation. | 100708 | 1 Year after last action | Non-confidential Destruction |
| Animal Control Files<br><br>This series documents law enforcement's participation in local animal control.  This series may include, but is not limited to: Complaints, investigations, custody and disposition records, and animal bite records. COV 3.2-6557(B) | 100711 | 5 Years after last action | Confidential Destruction |
| Arrest Files: Adult<br><br>This series documents the cumulative history of arrests of a particular individual. This series may consist of, but is not limited to: warrants, finger prints, summonses, photographs, court disposition, and Central Criminal Records Exchange data. | 100713 | 100 Years after birth | Confidential Destruction |
| Arrest Files: Adult - Death Notification<br><br>This series documents the cumulative history of arrests of a particular individual about whose death the department has been notified. This series may consist of, but is not limited to: warrants, finger prints, summonses, photographs, court disposition, and Central Criminal Records Exchange data. | 200150 | 1 Year after notification | Confidential Destruction |

JA212



**LIBRARY OF VIRGINIA**

Archives, Records, and Collections Services
800 E. Broad St., Richmond VA 23219
(804) 692-3600

RECORDS RETENTION AND DISPOSITION SCHEDULE

GENERAL SCHEDULE NO. GS-17

COUNTY AND MUNICIPAL GOVERNMENTS

Law Enforcement, Fire and Emergency Services

EFFECTIVE SCHEDULE DATE: 8/13/2015

| RECORD SERIES AND DESCRIPTION | SERIES NUMBER | SCHEDULED RETENTION PERIOD | DISPOSITION METHOD |
|---|---|---|---|
| Arrest Files: Juvenile<br><br>This series documents the cumulative history of arrests of a particular juvenile. This series may consist of, but is not limited to: warrants, finger prints, summonses, photographs, court disposition, and Central Criminal Records Exchange data. | 100714 | 23 Years after birth | Confidential Destruction |
| Arrest Logs/Books<br><br>This series documents the cumulative arrests by an agency in chronological order. This series may consist of, but is not limited to: log books. | 100718 | 5 Years after last action | Confidential Destruction |
| Arrestee Personal Property Inventory<br><br>This series documents a law enforcement agency's inventory of personal effects removed from an arrestee before transfer to a regional lockup or jail. This series may include, but is not limited to: logs, registers, and inventory forms. | 200444 | 3 Years after creation | Non-confidential Destruction |
| Automotive Operations: Radar Equipment Files<br><br>This series documents the cumulative maintenance and repair history of radar speed-limit enforcement equipment, including but not limited to radar and LIDAR. This series may consist of, but is not limited to: service records. | 100721 | 0 Years after equipment, facility, or property sold or no longer in use | Non-confidential Destruction |
| Automotive Operations: Speed-limit Enforcement Equipment Calibrations<br><br>This series documents the routine, timely, and effective calibration of radar, LIDAR, tuning forks, speedometers, and all other speed-enforcement equipment. This series may consist of, but is not limited to: current and expired calibration-vendor's certificate. | 100720 | 1 Year after expiration | Non-confidential Destruction |



**LIBRARY OF VIRGINIA**

Archives, Records, and Collections Services
800 E. Broad St., Richmond VA 23219
(804) 692-3600

RECORDS RETENTION AND DISPOSITION SCHEDULE

GENERAL SCHEDULE NO. GS-17

COUNTY AND MUNICIPAL GOVERNMENTS

Law Enforcement, Fire and Emergency Services

EFFECTIVE SCHEDULE DATE: 8/13/2015

| RECORD SERIES AND DESCRIPTION | SERIES NUMBER | SCHEDULED RETENTION PERIOD | DISPOSITION METHOD |
|---|---|---|---|
| Background Checks<br><br>This series documents the request for, performance of, and submission of results from background checks/investigations on individuals as requested by courts, employers, and other persons in matters not involving an active investigative case. This series may include, but is not limited to: Special Conservator of the Peace application files; interview notes; birth, school, or military records; references; and the summarized results. COV 19.2-13 (A) | 100772 | 3 Years after submission | Confidential Destruction |
| Breath/Alcohol or Drug Testing Records<br><br>This series documents the collection and testing of breath/alcohol or drug tests on vehicle operators.  This series may consist of, but is not limited to: logs and reports not included in case files. | 005664 | 3 Years after event | Confidential Destruction |
| Building Plans<br><br>This series documents buildings and other structures including, but not limited to floor plans, and the layout of plumbing, electrical, and other internal systems, as required by the Virginia Fire Prevention Code and the Virginia Uniform Statewide Building Code.  This series may include, but is not limited to: blueprints, building plans, permitting and inspection information, and supporting documentation. | 007045 | 0 Years after equipment, facility, or property sold or no longer in use | Confidential Destruction |
| Community Crime Prevention Program Files<br><br>This series documents law enforcement's effort to develop and assist community based crime prevention programs. This series may consist of, but is not limited to: neighborhood watch, national night out, and similar program documentation. | 100726 | 0 Years after superseded, obsolete, or rescinded | Non-confidential Destruction |

# LIBRARY OF VIRGINIA

Archives, Records, and Collections Services
800 E. Broad St., Richmond VA 23219
(804) 692-3600

RECORDS RETENTION AND DISPOSITION SCHEDULE

GENERAL SCHEDULE NO. GS-17

COUNTY AND MUNICIPAL GOVERNMENTS

Law Enforcement, Fire and Emergency Services

EFFECTIVE SCHEDULE DATE: 8/13/2015

| RECORD SERIES AND DESCRIPTION | SERIES NUMBER | SCHEDULED RETENTION PERIOD | DISPOSITION METHOD |
|---|---|---|---|
| Community Educational Programs<br><br>This series documents law enforcement participation in citizen education programs. This series may include, but is not limited to: citizen and youth Police Academies and substance abuse/gang awareness programs. | 100746 | 0 Years after superseded, obsolete, or rescinded | Non-confidential Destruction |
| Compensation Board Certification Program Records<br><br>This series documents compliance with the Compensation Board's standards for the Career Development Program for Sheriffs. This series includes, but it not limited to: compliance forms, standards, proofs, and audit reports. | 200132 | 4 Years after audit | Confidential Destruction |
| Concealed Handgun Permit Checks or Logs<br><br>This series documents the information or consultation provided to the court regarding concealed handgun permit applicants, as well as any notice received from the court on permits granted, denied, or appealed.  This series may include, but is not limited to: reports and notices.  COV 18.2-308(D) | 100727 | 2 Years after expiration | Confidential Destruction |
| Confidential Informant Files<br><br>This series documents the identity of, contacts with, and reliability of confidential informants. This series may include, but is not limited to: photographs, identification number, and background notes. | 100728 | 75 Years after birth | Confidential Destruction |
| Confiscated or Surrendered Firearms Files<br><br>This series documents the confiscation of or acceptance of surrendered firearms by or to law enforcement authorities and the disposition of the firearm. This series may include, but is not limited to: description of firearm, court order, disposition, and other documentation. | 100729 | 75 Years after last action | Non-confidential Destruction |



**LIBRARY OF VIRGINIA**

Archives, Records, and Collections Services
800 E. Broad St., Richmond VA 23219
(804) 692-3600

RECORDS RETENTION AND DISPOSITION SCHEDULE

GENERAL SCHEDULE NO. GS-17

COUNTY AND MUNICIPAL GOVERNMENTS

Law Enforcement, Fire and Emergency Services

EFFECTIVE SCHEDULE DATE: 8/13/2015

| RECORD SERIES AND DESCRIPTION | SERIES NUMBER | SCHEDULED RETENTION PERIOD | DISPOSITION METHOD |
|---|---|---|---|
| Court Appearance Files<br><br>This series documents the scheduling and/or appearance of law enforcement officers or support staff in court proceedings in the course of law enforcement activities. This series may include, but is not limited to: Overtime cards, time sheets, supplemental incident reports, and logs. | 100733 | 2 Years after event | Non-confidential Destruction |
| Court Ordered and Other Process Records<br><br>This series documents the receipt and execution of, or failure to execute, court orders and/or other processes that include Extraditions, Hit Retentions, Subpoenas, Summons, Copies/jackets of Executed Warrants, Warning Tickets, Affidavits, Eviction Notices, Levies to Foreclose, Seize and/or Sell Property, Parking Ticket Summons, Virginia Uniform Summons, and other legal action against an individual, family, firm or other entity. This series may include, but is not limited to: logs, registers, copies of orders, and other tracking documentation. COV 19.2-84 - 118 | 200142 | 1 Year after last action | Non-confidential Destruction |
| Court Ordered Process Records: Protective Orders<br><br>This series documents the receipt and execution of, or failure to execute, court orders and/or other processes that include Adult Protective Orders, Child Protective Orders, Emergency Protective Orders, and Juvenile Detention Orders. This series may include, but is not limited to: logs, registers, copies of orders, and other tracking documentation. COV 16.1-251 to 254; 63.2-1606 to 1613 | 200143 | 1 Year after last action | Confidential Destruction |
| Court Ordered Process Records: Residence Verification Records<br><br>This series documents the receipt and execution of, or failure to execute, court orders for residence verifications. This series may include, but is not limited to: logs, registers, copies of orders, and other tracking documentation. | 100669 | 1 Year after last action | Confidential Destruction |

**LIBRARY OF VIRGINIA**

Archives, Records, and Collections Services
800 E. Broad St., Richmond VA 23219
(804) 692-3600

RECORDS RETENTION AND DISPOSITION SCHEDULE

GENERAL SCHEDULE NO. GS-17

COUNTY AND MUNICIPAL GOVERNMENTS

Law Enforcement, Fire and Emergency Services

EFFECTIVE SCHEDULE DATE: 8/13/2015

| RECORD SERIES AND DESCRIPTION | SERIES NUMBER | SCHEDULED RETENTION PERIOD | DISPOSITION METHOD |
|---|---|---|---|
| Crime Analysis Files<br><br>This series documents the formal and/or informal analysis of crimes, patterns of crimes, and the reporting of the analysis. This series may include, but is not limited to: PIN maps, criminal activity statistics, and profiles of criminal activity. | 100735 | 0 Years after superseded, obsolete, or rescinded | Non-confidential Destruction |
| Criminal History Records: Local Information Requests and Challenges<br><br>This series documents the process by which local law enforcement offices receive requests from local individuals regarding their information contained in the local law enforcement records (including their criminal histories), any challenges to that information or history, the investigation conducted, the response, and the documentation indicating the close of the inquiry or challenge.  This series may include, but is not limited to: request forms, correspondence, and research notes. COV 9.1-132; 6VAC20-120-50 (B.5.) | 100739 | 2 Years after closed | Confidential Destruction |
| Dangerous Dog Records<br><br>This series documents any complaints, investigations, or incidents involving dogs that are determined to be dangerous or vicious. COV 3.2-6540 | 000342 | 5 Years after closed | Confidential Destruction |
| Dispatch (Communications) and Emergency Call Recordings: Not Retained as Evidence<br><br>This series documents the radio communications between dispatch/central communications and officers in the field.  This series also documents the recording of incoming calls (including Next Generation 911) for fire, police, and rescue services, and the actions taken in response. This series may include, but is not limited to: audio recordings, video recordings, text messages, and photographs. | 200163 | 6 Months after event | Confidential Destruction |



**LIBRARY OF VIRGINIA**

Archives, Records, and Collections Services
800 E. Broad St., Richmond VA 23219
(804) 692-3600

RECORDS RETENTION AND DISPOSITION SCHEDULE

GENERAL SCHEDULE NO. GS-17

COUNTY AND MUNICIPAL GOVERNMENTS

Law Enforcement, Fire and Emergency Services

EFFECTIVE SCHEDULE DATE: 8/13/2015

| RECORD SERIES AND DESCRIPTION | SERIES NUMBER | SCHEDULED RETENTION PERIOD | DISPOSITION METHOD |
|---|---|---|---|
| Dispatch (Communications) and Emergency Call Records: Supporting Documentation<br><br>This series documents the recording of radio communications at law enforcement dispatch centers and incoming calls for fire, police and rescue services, and the actions taken in response. This series may include, but is not limited to: logs, reports, and supporting documentation including Computer Aided Dispatch software and Calls-for-Service reports. | 200164 | 10 Years after creation | Non-confidential Destruction |
| Duty Rosters<br><br>This series documents the work days, work hours, jobs, tasks, patrol areas, equipment, weapons, and other duties assigned to law enforcement officers. This series may include, but is not limited to: logs, rolls, rosters, and registers. | 100745 | 1 Year after last action | Non-confidential Destruction |
| Expungements<br><br>This series documents the process of destroying law enforcement records, including all copies thereof and references thereto, that have been ordered expunged and sealed by the court. This series may include, but is not limited to: expunged records, court orders, and indexes/finding aids. 6VAC20-120-80; COV 19.2-392.2 | 000121 | 3 Years after order | Confidential Destruction |
| FCC License Records<br><br>This series documents the initial/renewed licensing of radio communication sites. This series may include, but is not limited to: FCC license and supporting documentation. | 200445 | 3 Years after event | Non-confidential Destruction |
| Field Notes: Not Retained as Evidence<br><br>This series documents and consists of the notes made from contacts and interviews conducted in the field with known/suspected law breakers by a law enforcement agent in regards to investigations, modus operandi, and/or complaint resolution. 28CFR23.20(h) | 000344 | 5 Years after last action | Non-confidential Destruction |

JA218

**LIBRARY OF VIRGINIA**

Archives, Records, and Collections Services
800 E. Broad St., Richmond VA 23219
(804) 692-3600

RECORDS RETENTION AND DISPOSITION SCHEDULE

GENERAL SCHEDULE NO. GS-17

COUNTY AND MUNICIPAL GOVERNMENTS

Law Enforcement, Fire and Emergency Services

EFFECTIVE SCHEDULE DATE: 8/13/2015

| RECORD SERIES AND DESCRIPTION | SERIES NUMBER | SCHEDULED RETENTION PERIOD | DISPOSITION METHOD |
|---|---|---|---|
| Fingerprints and Photographs<br><br>This series documents and consists of the fingerprints and photographs (mug shots) of adults and juveniles taken during the booking process and made available to the Central Criminal Records Exchange. COV 16.1-299 (B); COV 19.2-392 (A) | 200144 | 100 Years after birth | Confidential Destruction |
| Fingerprints and Photographs: Juvenile - No Warrant or Petition Filed<br><br>This series documents and consists of the fingerprints and photographs taken of a juvenile in connection with an alleged violation of law, but against whom no warrant or petition was subsequently filed. COV 16.1-299(C) | 100758 | 60 Days after creation | Confidential Destruction |
| Fire Code Compliance Inspection Reports<br><br>This series documents Virginia Fire Prevention Code compliance inspections and all other mandated fire inspections carried out by emergency services personnel.  This series includes, but is not limited to: inspection reports, photographs, notices of violation, and supporting documentation. | 007043 | 10 Years after submission | Non-confidential Destruction |
| Fire Training: Class Records<br><br>This series documents all aspects of firefighter training classes. This series may include, but is not limited to: rosters, intern sheets, lesson plans and curriculum information, instructor information, attendance records, and course and instructor evaluations. | 200392 | 5 Years after end of calendar year | Confidential Destruction |
| Firearms Qualifications<br><br>This series documents an officer's qualifications and proficiency in the use of selected types of firearms through scheduled testing. This series may include, but is not limited to: testing criteria, test results, and certifications. | 100761 | 5 Years after event | Non-confidential Destruction |

**LIBRARY OF VIRGINIA**

Archives, Records, and Collections Services
800 E. Broad St., Richmond VA 23219
(804) 692-3600

RECORDS RETENTION AND DISPOSITION SCHEDULE

GENERAL SCHEDULE NO. GS-17

COUNTY AND MUNICIPAL GOVERNMENTS

Law Enforcement, Fire and Emergency Services

EFFECTIVE SCHEDULE DATE: 8/13/2015

| RECORD SERIES AND DESCRIPTION | SERIES NUMBER | SCHEDULED RETENTION PERIOD | DISPOSITION METHOD |
|---|---|---|---|
| General Orders and Regulations<br><br>This series documents the local and internal orders, rules, and regulations for law enforcement activities. This series may include, but is not limited to registers, logs, and other policy documentation. | 100765 | 0 Years after no longer administratively useful | Non-confidential Destruction |
| Hazardous Materials Files<br><br>This series documents incidents that involve hazardous materials that are responded to by qualified and/or certified personnel and/or emergency response personnel.  Incidents may include hazardous material spills, releases, leaks, dump sites, and explosions.  This series includes, but is not limited to: hazardous materials incident report, memoranda, lab reports, samples, and supporting documentation. | 007100 | 50 Years after event | Non-confidential Destruction |
| House Watch Checklists and Reports<br><br>This series documents the performance and/or completion of a house watch. This series may include, but is not limited to: citizen request form,  property description, and officer-response verification. | 100767 | 0 Years after no longer administratively useful | Confidential Destruction |
| Incident Reports: Emergency Services, Fire and Rescue<br><br>This series documents incidents to which emergency services and/or fire and rescue staff respond and may include address, units and personnel responding, hospital transportation information, summaries, and time stamps.  This series may include, but is not limited to: reports and station or unit logs. | 007037 | 6 Years after event | Confidential Destruction |
| Internal Affairs Complaints<br><br>This series documents internal, confidential, administrative investigations based on complaints against law enforcement officers and/or offices, and include founded and un-founded cases. This series may include, but is not limited to: complaint documentation, notes, findings, and reports. | 100770 | 0 Years after no longer administratively useful | Confidential Destruction |



**LIBRARY OF VIRGINIA**

Archives, Records, and Collections Services
800 E. Broad St., Richmond VA 23219
(804) 692-3600

RECORDS RETENTION AND DISPOSITION SCHEDULE

GENERAL SCHEDULE NO. GS-17

COUNTY AND MUNICIPAL GOVERNMENTS

Law Enforcement, Fire and Emergency Services

EFFECTIVE SCHEDULE DATE: 8/13/2015

| RECORD SERIES AND DESCRIPTION | SERIES NUMBER | SCHEDULED RETENTION PERIOD | DISPOSITION METHOD |
|---|---|---|---|
| Investigative Case Files: Historically Significant<br><br>This series documents the processes and results of any systematic investigations, inquiries, or examinations into criminal or suspected criminal acts, and that local law enforcement determines to have historical value. | 000345 | | Permanent, In Agency |
| Investigative Case Files: Less Serious Offenses - Resolved<br><br>This series documents the processes and results of any systematic investigations, inquiries, or examinations into criminal or suspected criminal acts that have been committed, are being committed, or are about to be committed; and may be related to, but not limited to: assault, burglary, deaths, destruction of property, drug/narcotic offenses, extortion, gambling, identity theft, Intimidation, larceny, pornography, prostitution, robbery, arson, suicide, vandalism, and weapons law violations. This series may include, but is not limited to records pertaining to: Breath Alcohol, Confiscated (non-weapon) Property, City-wide/In-car Surveillance/ Monitoring Recordings, Controlled Substance Seizures, Dispatch/ Communications Recordings, Emergency Calls, Evidence (including receipts and requests for), Field Notes, Fingerprints (including latents), Incident Reports, Lab Requests/ Reports/ Certificates of Analysis, Photographs, Polygraphs, Release (Waiver) Forms, Summons, and Virginia Criminal Information Network/ National Crime Information Center (VCIN/NCIC) entries. | 200146 | 30 Years after closed | Confidential Destruction |



**LIBRARY OF VIRGINIA**

Archives, Records, and Collections Services
800 E. Broad St., Richmond VA 23219
(804) 692-3600

RECORDS RETENTION AND DISPOSITION SCHEDULE

GENERAL SCHEDULE NO. GS-17

COUNTY AND MUNICIPAL GOVERNMENTS

Law Enforcement, Fire and Emergency Services

EFFECTIVE SCHEDULE DATE: 8/13/2015

| RECORD SERIES AND DESCRIPTION | SERIES NUMBER | SCHEDULED RETENTION PERIOD | DISPOSITION METHOD |
|---|---|---|---|
| Investigative Case Files: Less Serious Offenses - Unresolved | 200147 | 50 Years after creation | Confidential Destruction |

This series documents the processes and results of any systematic investigations, inquiries, or examinations into criminal or suspected criminal acts that have been committed, are being committed, or are about to be committed; and may be related to, but not limited to: assault, burglary, deaths, destruction of property, drug/narcotic offenses, extortion, gambling, identity theft, Intimidation, larceny, pornography, prostitution, robbery, arson, suicide, vandalism, and weapons law violations. This series may include, but is not limited to records pertaining to: Breath Alcohol, Confiscated (non-weapon) Property, City-wide/In-car Surveillance/ Monitoring Recordings, Controlled Substance Seizures, Dispatch/ Communications Recordings, Emergency Calls, Evidence (including receipts and requests for), Field Notes, Fingerprints (including latents), Incident Reports, Lab Requests/ Reports/ Certificates of Analysis, Photographs, Polygraphs, Release (Waiver) Forms, Summons, and Virginia Criminal Information Network/ National Crime Information Center (VCIN/NCIC) entries.



**LIBRARY OF VIRGINIA**

Archives, Records, and Collections Services
800 E. Broad St., Richmond VA 23219
(804) 692-3600

RECORDS RETENTION AND DISPOSITION SCHEDULE

GENERAL SCHEDULE NO. GS-17

COUNTY AND MUNICIPAL GOVERNMENTS

Law Enforcement, Fire and Emergency Services

---

EFFECTIVE SCHEDULE DATE: 8/13/2015

| RECORD SERIES AND DESCRIPTION | SERIES NUMBER | SCHEDULED RETENTION PERIOD | DISPOSITION METHOD |
|---|---|---|---|
| <u>Investigative Case Files: Non-Serious Offenses - Resolved</u><br><br>This series documents the processes and results of any systematic investigations, inquiries, or examinations into criminal or suspected criminal acts that have been committed, are being committed, or are about to be committed; and may be related to, but not limited to: blackmail, bribery, counterfeiting, curfew, destruction of property, disorderly conduct, drug/narcotic offenses, DUI, embezzlement, extortion, forgery, fraud, gambling, identity theft, intimidation, larceny, loitering, peeping tom, pornography, prostitution, runaway, simple assault, thefts, trespassing, vagrancy, vandalism, arson and weapons law violations. This series may include, but is not limited to records pertaining to: Breath Alcohol, Confiscated (non-weapon) Property, City-wide/In-car Surveillance/ Monitoring Recordings, Controlled Substance Seizures, Dispatch/ Communications Recordings, Emergency Calls, Evidence (including receipts and requests for), Field Notes, Fingerprints (including latents), Incident Reports, Lab Requests/ Reports/ Certificates of Analysis, Photographs, Polygraphs, Release (Waiver) Forms, Summons, and Virginia Criminal Information Network/ National Crime Information Center (VCIN/NCIC) entries. | 000266 | 10 Years after closed | Confidential Destruction |

JA223



**LIBRARY OF VIRGINIA**

Archives, Records, and Collections Services
800 E. Broad St., Richmond VA 23219
(804) 692-3600

RECORDS RETENTION AND DISPOSITION SCHEDULE

GENERAL SCHEDULE NO. GS-17

COUNTY AND MUNICIPAL GOVERNMENTS

Law Enforcement, Fire and Emergency Services

EFFECTIVE SCHEDULE DATE: 8/13/2015

| RECORD SERIES AND DESCRIPTION | SERIES NUMBER | SCHEDULED RETENTION PERIOD | DISPOSITION METHOD |
|---|---|---|---|
| Investigative Case Files: Non-Serious Offenses - Unresolved | 200148 | 5 Years after creation | Confidential Destruction |

This series documents the processes and results of any
systematic investigations, inquiries, or examinations into
criminal or suspected criminal acts that have been committed,
are being committed, or are about to be committed; and may be
related to, but not limited to: blackmail, bribery, counterfeiting,
curfew, destruction of property, disorderly conduct,
drug/narcotic offenses, DUI, embezzlement, extortion, forgery,
fraud, gambling, identity theft, intimidation, larceny, loitering,
peeping tom, pornography, prostitution, runaway, simple
assault, thefts, trespassing, vagrancy, vandalism, arson and
weapons law violations. This series may include, but is not
limited to records pertaining to: Breath Alcohol, Confiscated
(non-weapon) Property, City-wide/In-car Surveillance/
Monitoring Recordings, Controlled Substance Seizures,
Dispatch/ Communications Recordings, Emergency Calls,
Evidence (including receipts and requests for), Field Notes,
Fingerprints (including latents), Incident Reports, Lab Requests/
Reports/ Certificates of Analysis, Photographs, Polygraphs,
Release (Waiver) Forms, Summons, and Virginia Criminal
Information Network/ National Crime Information Center
(VCIN/NCIC) entries.

JA224



**LIBRARY OF VIRGINIA**

Archives, Records, and Collections Services
800 E. Broad St., Richmond VA 23219
(804) 692-3600

RECORDS RETENTION AND DISPOSITION SCHEDULE

GENERAL SCHEDULE NO. GS-17

COUNTY AND MUNICIPAL GOVERNMENTS

Law Enforcement, Fire and Emergency Services

EFFECTIVE SCHEDULE DATE: 8/13/2015

| RECORD SERIES AND DESCRIPTION | SERIES NUMBER | SCHEDULED RETENTION PERIOD | DISPOSITION METHOD |
|---|---|---|---|
| Investigative Case Files: Serious Offenses - Resolved | 100771 | 75 Years after closed | Confidential Destruction |

This series documents the processes and results of any systematic investigations, inquiries, or examinations into criminal or suspected criminal acts that have been committed, are being committed, or are about to be committed; and may be related to, but not limited to: homicide, murder, manslaughter, kidnapping, abduction, robbery, aggravated assault, sex crimes, rape, incest, or crimes against children. This series may include, but is not limited to records pertaining to: Breath Alcohol, Confiscated (non-weapon) Property, City-wide/In-car Surveillance/ Monitoring Recordings, Controlled Substance Seizures, Dispatch/ Communications Recordings, Emergency Calls, Evidence (including receipts and requests for), Field Notes, Fingerprints (including latents), Incident Reports, Lab Requests/ Reports/ Certificates of Analysis, Photographs, Polygraphs, Release (Waiver) Forms, Summons, and Virginia Criminal Information Network/ National Crime Information Center (VCIN/NCIC) entries.

JA225

**LIBRARY OF VIRGINIA**

Archives, Records, and Collections Services
800 E. Broad St., Richmond VA 23219
(804) 692-3600

RECORDS RETENTION AND DISPOSITION SCHEDULE

GENERAL SCHEDULE NO. GS-17

COUNTY AND MUNICIPAL GOVERNMENTS

Law Enforcement, Fire and Emergency Services

EFFECTIVE SCHEDULE DATE: 8/13/2015

| RECORD SERIES AND DESCRIPTION | SERIES NUMBER | SCHEDULED RETENTION PERIOD | DISPOSITION METHOD |
|---|---|---|---|
| Investigative Case Files: Serious Offenses - Unresolved<br><br>This series documents the processes and results of any systematic investigations, inquiries, or examinations into criminal or suspected criminal acts that have been committed, are being committed, or are about to be committed; and may be related to, but not limited to: homicide, murder, manslaughter, kidnapping, abduction, arson, robbery, aggravated assault, sex crimes, rape, incest, or crimes against children. This series may include, but is not limited to records pertaining to: Breath Alcohol, Confiscated (non-weapon) Property, City-wide/In-car Surveillance/ Monitoring Recordings, Controlled Substance Seizures, Dispatch/ Communications Recordings, Emergency Calls, Evidence (including receipts and requests for), Field Notes, Fingerprints (including latents), Incident Reports, Lab Requests/ Reports/ Certificates of Analysis, Photographs, Polygraphs, Release (Waiver) Forms, Summons, and Virginia Criminal Information Network/ National Crime Information Center (VCIN/NCIC) entries. | 200145 | 100 Years after creation | Confidential Destruction |
| K-9/Horse Management Records<br><br>This series documents the management of dogs  (K-9s) and horses in the service of law enforcement. This series may include, but is not limited to history, status, health, and training records. | 100775 | 3 Years after separation | Non-confidential Destruction |
| License Plate Tag Reader Records: Not Used as Evidence<br><br>This series documents the surveillance and recording of license plate tag numbers. This series may include, but is not limited to: video recordings, digital images and photographs. | 200186 | 0 Years after decision | Non-confidential Destruction |
| Logs<br><br>This series consists of key-control and all other law enforcement logs not listed elsewhere on this schedule. | 005666 | 2 Years after closed | Non-confidential Destruction |

**LIBRARY OF VIRGINIA**

Archives, Records, and Collections Services
800 E. Broad St., Richmond VA 23219
(804) 692-3600

RECORDS RETENTION AND DISPOSITION SCHEDULE

GENERAL SCHEDULE NO. GS-17

COUNTY AND MUNICIPAL GOVERNMENTS

Law Enforcement, Fire and Emergency Services

EFFECTIVE SCHEDULE DATE: 8/13/2015

| RECORD SERIES AND DESCRIPTION | SERIES NUMBER | SCHEDULED RETENTION PERIOD | DISPOSITION METHOD |
|---|---|---|---|
| Master Name File<br><br>This series documents legal names and aliases used by a suspected or convicted law breaker.  This series may include, but is not limited to: AKAs (Also Known As), nicknames, last known and previous addresses, as well as alternate birth dates, social security numbers, and other identifiers. | 200149 | 100 Years after birth | Confidential Destruction |
| Missing Persons Files<br><br>This series documents the receipt of notification of missing persons and runaways, and actions taken in response by law enforcement. This series may include, but is not limited to: initial report, photographs, witness statements, and investigative records. | 100780 | 75 Years after creation | Confidential Destruction |
| Missing Persons: Resolved<br><br>This series documents the receipt of notification of missing persons and runaways, and actions taken in response by law enforcement. This series may include, but is not limited to: initial report, photographs, witness statements, and investigative records. | 100779 | 1 Year after closed | Confidential Destruction |
| Missing Persons: With History - Resolved<br><br>This series documents the receipt of and actions taken in response to repeated notifications of a particular missing person or runaway, and the location(s) where missing person was previously found. This series may include, but is not limited to: initial report, photographs, witness statements, and investigative records. | 100755 | 5 Years after closed | Confidential Destruction |
| Parking Tickets<br><br>This series documents the issuance of a citation and fine for violating parking regulations. This series may include, but is not limited to: parking tickets. | 100783 | 3 Years after issuance | Non-confidential Destruction |



**LIBRARY OF VIRGINIA**

Archives, Records, and Collections Services
800 E. Broad St., Richmond VA 23219
(804) 692-3600

RECORDS RETENTION AND DISPOSITION SCHEDULE

GENERAL SCHEDULE NO. GS-17

COUNTY AND MUNICIPAL GOVERNMENTS

Law Enforcement, Fire and Emergency Services

EFFECTIVE SCHEDULE DATE: 8/13/2015

| RECORD SERIES AND DESCRIPTION | SERIES NUMBER | SCHEDULED RETENTION PERIOD | DISPOSITION METHOD |
|---|---|---|---|
| Pawnshop and Precious Metals Dealers: History Files<br><br>This series documents the location and licensing of pawnshops and precious metals dealers.   This series may include, but is not limited to: application, fingerprints, and photos. | 100785 | 0 Years after superseded, obsolete, or rescinded | Non-confidential Destruction |
| Pawnshop and Precious Metals Dealers: Reports<br><br>This series documents the submission of item description, serial number, value, and seller ID data related to items pawned and sold, as required by local ordinance. This series may include, but is not limited to: reports. | 005667 | 3 Years after submission | Non-confidential Destruction |
| Permit Review and Investigation Files<br><br>This series documents the request for and the results of an investigation of permit applicants, not otherwise listed on this schedule.  This series may include, but is not limited to: investigation notes and final report. | 005668 | 3 Years after closed | Confidential Destruction |
| Permits: Operational<br><br>This series documents the issuance of permits to allow bonfires, the use explosives, fireworks, fumigation, and tents at functions.  This series may include, but is not limited to: application, approved permit, and supporting documentation. | 007103 | 2 Years after expiration | Non-confidential Destruction |
| Permits: Parade<br><br>This series documents the permitting of parades, parade routes, and related traffic control activities.   This series may include, but is not limited to: application, supporting documentation, and letter of approval/denial. | 100786 | 6 Months after expiration | Non-confidential Destruction |
| Photographs and Evidence: Traffic Tickets<br><br>This series documents the collection evidence of traffic violations (not including automatic cameras at intersections). This series may include, but is not limited to: photographs and audio/visual recordings. | 100791 | 1 Year after last action | Non-confidential Destruction |



**LIBRARY OF VIRGINIA**

Archives, Records, and Collections Services
800 E. Broad St., Richmond VA 23219
(804) 692-3600

RECORDS RETENTION AND DISPOSITION SCHEDULE

GENERAL SCHEDULE NO. GS-17

COUNTY AND MUNICIPAL GOVERNMENTS

Law Enforcement, Fire and Emergency Services

EFFECTIVE SCHEDULE DATE: 8/13/2015

| RECORD SERIES AND DESCRIPTION | SERIES NUMBER | SCHEDULED RETENTION PERIOD | DISPOSITION METHOD |
|---|---|---|---|
| Pre-hospital Patient Care Reports<br><br>This series documents medical care provided by emergency services personnel and is used to summarize the facts and events of an emergency medical incident and any treatment provided. This series may include, but is not limited to: reports and related supplements or addenda. 12VAC5-31-530; 12VAC5-31-1140 | 007046 | 6 Years after event | Confidential Destruction |
| Recording, Surveillance, or Monitoring Systems:  Not Used as Evidence<br><br>This series documents the surveillance of an area and the actions of law enforcement officers, suspects, and bystanders, including in-car monitoring of officers.  This series may include, but is not limited to: audio and video recordings. | 100796 | 30 Days after event | Non-confidential Destruction |
| Recording, Surveillance, or Monitoring Systems: Locality-Wide - Not used as evidence<br><br>This series documents the surveillance of large areas of a locality, other than traffic corridors, using cameras mounted at fixed locations. | 000187 | 7 Days after event | Non-confidential Destruction |
| Recording, Surveillance, or Monitoring Systems: Traffic Light Signals - Not used as evidence<br><br>This series documents the failure of motorists to comply with traffic light signals (red lights), but the decision is made not to issue a summons. This series may include, but is not limited to: photographs and video recordings. COV 15.2-968.1 (H) | 200151 | 2 Days after decision | Non-confidential Destruction |
| Recording, Surveillance, or Monitoring Systems: Traffic Light Signals - Used as evidence<br><br>This series documents the failure of motorists to comply with traffic light signals (red lights) and the collection of civil penalty payments. This series may include, but is not limited to: photographs and video recordings. COV 15.2-968.1 (H) | 200152 | 60 Days after final payment | Non-confidential Destruction |

JA229



**LIBRARY OF VIRGINIA**

Archives, Records, and Collections Services
800 E. Broad St., Richmond VA 23219
(804) 692-3600

RECORDS RETENTION AND DISPOSITION SCHEDULE

GENERAL SCHEDULE NO. GS-17

COUNTY AND MUNICIPAL GOVERNMENTS

Law Enforcement, Fire and Emergency Services

EFFECTIVE SCHEDULE DATE: 8/13/2015

| RECORD SERIES AND DESCRIPTION | SERIES NUMBER | SCHEDULED RETENTION PERIOD | DISPOSITION METHOD |
|---|---|---|---|
| Reports: No Investigative Value<br><br>This series documents non-criminal incidents and occurrences such as accidental deaths, suicides, lost and found property, and other occurrences that have been determined not to require further investigation. This series may include, but is not limited to: incident reports, tracking records, property receipts, and investigative files. 28CFR23.20(h); COV 15.2-1722 | 100800 | 5 Years after closed | Confidential Destruction |
| Reports: Traffic Accident/Crash - Citizen<br><br>This series documents the investigation into and reporting of motor vehicle accidents/crashes that involve non-law enforcement vehicles. This series may include, but is not limited to: notes, reports, photographs, evidence, and other supporting documentation. | 100781 | 3 Years after event | Confidential Destruction |
| Reports: Traffic Accident/Crash - Law Enforcement<br><br>This series documents the investigation into and reporting of motor vehicle accidents/crashes that involve law enforcement vehicles. This series may include, but is not limited to: notes, reports, photographs, evidence, and other supporting documentation. | 005670 | 3 Years after closed | Confidential Destruction |
| Roll Call Files<br><br>This series documents officer attendance at meetings, briefings, inspections and other law enforcement activities, as well as any training received at these meetings. This series may include, but is not limited to: logs, rolls, rosters, and registers. | 100802 | 1 Year after event | Non-confidential Destruction |
| Special Assignment Records<br><br>This series documents assignments for activities such as dignitary visits, demonstrations, and other special events. This series may include, but is not limited to: operational and security plans, traffic control documentation, and logs. | 200446 | 2 Years after project completion | Confidential Destruction |

JA230

**LIBRARY OF VIRGINIA**

Archives, Records, and Collections Services
800 E. Broad St., Richmond VA 23219
(804) 692-3600

RECORDS RETENTION AND DISPOSITION SCHEDULE

GENERAL SCHEDULE NO. GS-17

COUNTY AND MUNICIPAL GOVERNMENTS

Law Enforcement, Fire and Emergency Services

EFFECTIVE SCHEDULE DATE: 8/13/2015

| RECORD SERIES AND DESCRIPTION | SERIES NUMBER | SCHEDULED RETENTION PERIOD | DISPOSITION METHOD |
|---|---|---|---|
| Taxi Records<br><br>This series documents the registration and/or permitting of taxi cabs and/or cab drivers.  This series may include, but is not limited to: vehicle identification, rate cards, driver's identification, fingerprint cards, and driving records. | 100804 | 3 Years after expiration | Non-confidential Destruction |
| Towed Vehicle Files<br><br>This series documents law enforcement's actions in towing, or having towed, abandoned or damaged vehicles, vehicles involved in accidents or parking violations, and vehicles not in compliance with state or local laws. This series may include, but is not limited to: tow sheets. | 100805 | 3 Years after event | Non-confidential Destruction |
| Towing Company Records<br><br>This series documents the registration of tow and recovery operators.  This series may include, but is not limited to: vehicle identification, rate cards, driver identification, fingerprint cards, Tow Truck Driver Authorization Document Registration, and driving records. | 000347 | 3 Years after event | Confidential Destruction |
| Traffic Management and Control<br><br>This series documents information requested, compiled, and delivered for the investigation and resolution of traffic control problems.   This series may include, but is not limited to: crash report and traffic safety check point statistics. | 100806 | 1 Year after last action | Non-confidential Destruction |
| Virginia Criminal Information Network (VCIN/NCIC): Administrative Messages: Not part of an Investigative Case File<br><br>This series documents the sending of messages to/through or receipt of messages from/through the Virginia Criminal Information Network (VCIN) or the National Crime Information Center (NCIC), and are not made part of an Investigative Case File.  This series consists of, but is not limited to correspondence. 52-25 | 005673 | 2 Years after end of calendar year | Confidential Destruction |



**LIBRARY OF VIRGINIA**

Archives, Records, and Collections Services
800 E. Broad St., Richmond VA 23219
(804) 692-3600

RECORDS RETENTION AND DISPOSITION SCHEDULE

GENERAL SCHEDULE NO. GS-17

COUNTY AND MUNICIPAL GOVERNMENTS

Law Enforcement, Fire and Emergency Services

EFFECTIVE SCHEDULE DATE: 8/13/2015

| RECORD SERIES AND DESCRIPTION | SERIES NUMBER | SCHEDULED RETENTION PERIOD | DISPOSITION METHOD |
|---|---|---|---|
| <u>Virginia Criminal Information Network (VCIN/NCIC): NCIC Validation Records</u><br><br>This series documents the monthly verification of valid entries and the removal of outdated and/or invalid entries, per the State Police-communicated list of entries from the National Crime Information Center (NCIC) database. 28CFR20.37 | 005675 | 2 Years after event | Confidential Destruction |
| <u>Virginia Criminal Information Network (VCIN/NCIC): Original Entry Printouts or Worksheets: Not related to an Investigative Case File</u><br><br>This series consists of original entry printouts or worksheets, if used, that exist solely to assist with data entry into the VCIN/NCIC system or to verify removal of entries from system. 52-25 | 005674 | 0 Years after closed | Confidential Destruction |
| <u>Warrants: Unexecuted</u><br><br>This series documents the criminal processes in the possession of a police or sheriff's department that have not been executed within, from date of issue, seven years if a felony warrant or three years if a misdemeanor warrant; or because they were issued for a now deceased person, issued based on mistaken identity, or issued as a result of technical or legal error; and have been ordered destroyed by the court. This series may include, but is not limited to: arrest warrants, summonses, capiases, and other unexecuted criminal processes. COV 19.2-76.1 | 200153 | 0 Years after order | Confidential Destruction |
| <u>Weapons: Internal Assignments</u><br><br>This series documents the assignment of weapons of all types to personnel for law enforcement use. This series may include, but is not limited to: logs, registers, and rosters. | 100762 | 5 Years after equipment, facility, or property sold or no longer in use | Non-confidential Destruction |

**LIBRARY OF VIRGINIA**

Archives, Records, and Collections Services
800 E. Broad St., Richmond VA 23219
(804) 692-3600

RECORDS RETENTION AND DISPOSITION SCHEDULE

GENERAL SCHEDULE NO. GS-17

COUNTY AND MUNICIPAL GOVERNMENTS

Law Enforcement, Fire and Emergency Services

EFFECTIVE SCHEDULE DATE: 8/13/2015

| RECORD SERIES AND DESCRIPTION | SERIES NUMBER | SCHEDULED RETENTION PERIOD | DISPOSITION METHOD |
|---|---|---|---|
| Weapons: Inventory<br><br>This series documents the inventory and asset control of weapons and ammunition.  This series includes, but is not limited to: logs and lists. | 100635 | 0 Years after no longer administratively useful | Non-confidential Destruction |

JA233

| Call Taker | CFS Report |
|---|---|
| 03 BLewis | CFS # - 2024-000003 |

## Base Information

Call When 01/01/2024 00:10:09 Create When 01/01/2024 00:11:31 Close When 01/01/2024 02:59:41 Disposition ARREST

| Priority | | Alarm 1 | Disciplines L | Assigned Disciplines L | Assigned Disciplines NP L |
|---|---|---|---|---|---|
| CallType SUSPICIOUS VEHICLE | EDL | | FDL | LDL | Primary Unit 11 |

## Location of Occurrence

| Address | HIGHVIEW TER / SCUFFLING HILL RD \| 30 HIGHVIEW TER BEGIN, ROCKY MOUNT | Zip | | County | |
|---|---|---|---|---|---|
| Landmark | | ESN 1575 | Map Grid | | |

| EMS/Rescue M2 | | Fire DP1 | | Law | ROCKY MOUNT | |
|---|---|---|---|---|---|---|
| Area | District | | EMS Tract | CD-1-2-4 | Fire Tract | DP1-006 |
| Grid | Law Tract | RMPD | Report Tract | | Work Area | |

Cross Street High    DEAD END                    Cross Street Low  SCUFFLING HILL RD

From-To Directions

## Caller

| Address | 30 HIGHVIEW TER BEGIN, ROCKY MOUNT | Landmark | |
|---|---|---|---|
| Name | 11 | Caller Phone | How Received   OFFICER INITIATED |

## OCA Numbers

| Department | OCA Number | Unit | Note | Department | OCA Number | Unit | Note |
|---|---|---|---|---|---|---|---|
| ROCKY MOUNT POLICE DEPARTMENT | 2024-00036 | | | 1 SHERIFFS OFFICE PATROL | 2024-000003 | | |

## Dispositions

| Disposition | Assigned When | User | InActive | While Closed |
|---|---|---|---|---|
| INCIDENT REPORT | 01/01/2024 02:59:41 | BLewis | ☐ | ☐ |
| ARREST | 01/01/2024 02:59:41 | BLewis | ☐ | ☐ |

## Call Types

| Call Type | Assigned When | User | Assigned While Closed | InActive |
|---|---|---|---|---|
| SUSPICIOUS VEHICLE | 01/01/2024 00:52:22 | BLewis | ☐ | ☐ |
| SUSPICIOUS PERSON | 01/01/2024 00:11:31 | BLewis | ☐ | ☐ |

## Unit Times

| Unit | Department | Unit Type | When | Status \| Notes | User |
|---|---|---|---|---|---|
| 11 (HYLTON, JUSTIN D) | 1 SHERIFFS OFFICE PATROL | DEPUTY | 01/01/2024 00:11:31 | ON SCENE | BLewis |
| 36 (MOORMAN, MICHAEL A) | 1 SHERIFFS OFFICE PATROL | DEPUTY | 01/01/2024 00:11:35 | ENROUTE | BLewis |
| 62 (WADE, ZION T) | 1 SHERIFFS OFFICE PATROL | DEPUTY | 01/01/2024 00:11:36 | ENROUTE | BLewis |
| 124 (POULIN, TREY A) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 00:14:06 | ENROUTE | SSimms |

JA234

Case 7:24-cr-00011-EKD-CKM    Document 72-5    Filed 12/23/24    Page 2 of 4    Pageid#: 447

| Call Taker | CFS Report | | | |
|---|---|---|---|---|
| 03  BLewis | CFS # - 2024-000003 | | | |

| | | | | | |
|---|---|---|---|---|---|
| 107 (JOHNSON, CALEB A) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 00:14:06 | ENROUTE | SSimms |
| 124 (POULIN, TREY A) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 00:14:11 | ON SCENE | SSimms |
| 107 (JOHNSON, CALEB A) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 00:14:14 | ON SCENE | SSimms |
| 36 (MOORMAN, MICHAEL A) | 1 SHERIFFS OFFICE PATROL | DEPUTY | 01/01/2024 00:14:17 | ON SCENE | SSimms |
| 62 (WADE, ZION T) | 1 SHERIFFS OFFICE PATROL | DEPUTY | 01/01/2024 00:14:20 | ON SCENE | SSimms |
| 117 (GARDNER, JOSEPH R) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 00:14:51 | ENROUTE | SSimms |
| 117 (GARDNER, JOSEPH R) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 00:14:59 | ON SCENE | SSimms |
| 11 (HYLTON, JUSTIN D) | 1 SHERIFFS OFFICE PATROL | DEPUTY | 01/01/2024 00:16:36 | SAFETY CHECK | SSimms |
| 36 (MOORMAN, MICHAEL A) | 1 SHERIFFS OFFICE PATROL | DEPUTY | 01/01/2024 00:19:46 | CLEAR | MU |
| 124 (POULIN, TREY A) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 00:21:22 | SAFETY CHECK | SSimms |
| 124 (POULIN, TREY A) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 00:21:23 | SAFETY CHECK | BLewis |
| 107 (JOHNSON, CALEB A) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 00:21:23 | SAFETY CHECK | BLewis |
| 117 (GARDNER, JOSEPH R) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 00:21:23 | SAFETY CHECK | BLewis |
| 62 (WADE, ZION T) | 1 SHERIFFS OFFICE PATROL | DEPUTY | 01/01/2024 00:21:23 | SAFETY CHECK | BLewis |
| 107 (JOHNSON, CALEB A) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 00:21:23 | SAFETY CHECK | SSimms |
| 11 (HYLTON, JUSTIN D) | 1 SHERIFFS OFFICE PATROL | DEPUTY | 01/01/2024 00:22:41 | SAFETY CHECK | SSimms |
| 62 (WADE, ZION T) | 1 SHERIFFS OFFICE PATROL | DEPUTY | 01/01/2024 00:22:49 | IN CUSTODY | BLewis |
| 11 (HYLTON, JUSTIN D) | 1 SHERIFFS OFFICE PATROL | DEPUTY | 01/01/2024 00:25:23 | SAFETY CHECK | BLewis |
| 124 (POULIN, TREY A) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 00:25:23 | SAFETY CHECK | BLewis |
| 107 (JOHNSON, CALEB A) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 00:25:23 | SAFETY CHECK | BLewis |
| 117 (GARDNER, JOSEPH R) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 00:25:23 | SAFETY CHECK | BLewis |
| 11 (HYLTON, JUSTIN D) | 1 SHERIFFS OFFICE PATROL | DEPUTY | 01/01/2024 00:30:41 | SAFETY CHECK | BLewis |
| 107 (JOHNSON, CALEB A) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 00:30:41 | SAFETY CHECK | BLewis |
| 124 (POULIN, TREY A) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 00:30:41 | SAFETY CHECK | BLewis |
| 117 (GARDNER, JOSEPH R) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 00:30:41 | SAFETY CHECK | BLewis |
| 62 (WADE, ZION T) | 1 SHERIFFS OFFICE PATROL | DEPUTY | 01/01/2024 00:33:44 | LEFT SCENE\|TO MAG W/ 1 MALE | BLewis |
| 62 (WADE, ZION T) | 1 SHERIFFS OFFICE PATROL | DEPUTY | 01/01/2024 00:36:07 | ARRIVED DEST\|MAG OFFICE | BLewis |
| 11 (HYLTON, JUSTIN D) | 1 SHERIFFS OFFICE PATROL | DEPUTY | 01/01/2024 00:37:26 | SAFETY CHECK | BLewis |
| 107 (JOHNSON, CALEB A) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 00:37:27 | SAFETY CHECK | BLewis |
| 124 (POULIN, TREY A) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 00:37:27 | SAFETY CHECK | BLewis |
| 117 (GARDNER, JOSEPH R) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 00:37:27 | SAFETY CHECK | BLewis |
| 11 (HYLTON, JUSTIN D) | 1 SHERIFFS OFFICE PATROL | DEPUTY | 01/01/2024 00:40:03 | ARRIVED DEST\|MAG OFFICE | BLewis |
| 107 (JOHNSON, CALEB A) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 00:42:53 | SAFETY CHECK | BLewis |

JA235

| Call Taker 03 BLewis | | | CFS Report CFS # - 2024-000003 | |
|---|---|---|---|---|
| 124 (POULIN, TREY A) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 00:42:53 SAFETY CHECK | BLewis |
| 117 (GARDNER, JOSEPH R) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 00:42:53 SAFETY CHECK | BLewis |
| 124 (POULIN, TREY A) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 00:48:44 SAFETY CHECK | BLewis |
| 107 (JOHNSON, CALEB A) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 00:48:44 SAFETY CHECK | BLewis |
| 117 (GARDNER, JOSEPH R) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 00:48:44 SAFETY CHECK | BLewis |
| 107 (JOHNSON, CALEB A) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 00:53:31 CLEAR | MU |
| 124 (POULIN, TREY A) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 00:54:39 SAFETY CHECK | BLewis |
| 117 (GARDNER, JOSEPH R) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 00:54:39 SAFETY CHECK | BLewis |
| 117 (GARDNER, JOSEPH R) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 00:55:43 CLEAR | SSimms |
| 124 (POULIN, TREY A) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 01:00:16 SAFETY CHECK | SSimms |
| 124 (POULIN, TREY A) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 01:05:39 SAFETY CHECK | SSimms |
| 124 (POULIN, TREY A) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 01:05:47 CLEAR | BLewis |
| 62 (WADE, ZION T) | 1 SHERIFFS OFFICE PATROL | DEPUTY | 01/01/2024 01:44:14 |STACK ADD | BLewis |
| 62 (WADE, ZION T) | 1 SHERIFFS OFFICE PATROL | DEPUTY | 01/01/2024 01:44:14 CLEAR\|Placing Unit On CFS 2024-000015 | BLewis |
| 62 (WADE, ZION T) | 1 SHERIFFS OFFICE PATROL | DEPUTY | 01/01/2024 01:44:55 |STACK CLEAR | BLewis |
| 11 (HYLTON, JUSTIN D) | 1 SHERIFFS OFFICE PATROL | DEPUTY | 01/01/2024 02:59:41 CLEAR | BLewis |

## Incident Locations

**Address:** HIGHVIEW TER / SCUFFLING HILL RD     **User:** BLewis

**When:** 01/01/2024 00:11:31   **Latitude:**   **Longitude:**   **Source:** None_Unknown   **InActive:** ☐

## Vehicle|Person Information

| Name | | Eye | Hair | Hgt | Wgt | Race | Sex | Discipline L |
|---|---|---|---|---|---|---|---|---|
| DOB | OLN VA | | | OID | | Unit 11 | | |
| Location | | | Description | | | | Phone | |
| | | | SERIAL NUMBER | | | | | |
| Type | Tag VA | | Tag Year 2024 | Tag Type | | User BLewis | When 01/01/2024 00:11:31 | |
| Make/Model/Year/Color/VIN/Desc | / / / / / | | | | | | Searched ☐ Consented ☐ | |

K-9 UtilizationCONTACT

| Name | | Eye | Hair | Hgt | Wgt | Race | Sex | Discipline L |
|---|---|---|---|---|---|---|---|---|
| DOB | OLN VA | | | OID | | Unit | | |
| Location | | | Description | | | | Phone | |
| | | | SERIAL NUMBER | | | | | |
| Type | Tag VA | VYC3195 | Tag Year 2024 | Tag Type PC | | User BLewis | When 01/01/2024 00:12:47 | |
| Make/Model/Year/Color/VIN/Desc | 2001 / / 2001 / WHI / 4S3BH645617306249 /VALID, NEG OUTSTANDING. / | | | | | | Searched ☐ Consented ☐ | |

K-9 UtilizationCONTACT

JA236

Case 7:24-cr-00011-EKD-CKM     Document 72-5     Filed 12/23/24     Page 4 of 4
Pageid#: 449

| Call Taker | | | | | CFS Report | | | |
| 03 BLewis | | | | | CFS # - 2024-000003 | | | |

| Name | | Eye | Hair | Hgt | Wgt | Race | Sex | Discipline L |
|---|---|---|---|---|---|---|---|---|
| DOB | OLN VA | | | | OID L699622 | | Unit | |
| Location | | | Description .22 REVOLVER | | | | Phone | |
| | | | SERIAL NUMBER | | | | | |
| Type | Tag VA | | Tag Year 2024 Tag Type | | User BLewis | | When 01/01/2024 00:35:20 | |
| Make/Model/Year/Color/VIN/Desc | / / / / / | | | | | Searched ☐ Consented ☐ | | |
| | | | K-9 UtilizationCONTACT | | | | | |

| Name | | Eye | Hair | Hgt | Wgt | Race | Sex | Discipline L |
|---|---|---|---|---|---|---|---|---|
| DOB | OLN VA | | | | OID | | Unit | |
| Location | | | Description | | | | Phone | |
| | | | SERIAL NUMBER | | | | | |
| Type | Tag VA UJB6018 | | Tag Year 2024 Tag Type PC | | User BLewis | | When 01/01/2024 00:35:59 | |
| Make/Model/Year/Color/VIN/Desc | KIA / / 2007 / SIL / KNAFG526477112089 /EXP 9/30/23 NEG OUTSTANDING / | | | | | Searched ☐ Consented ☐ | | |
| | | | K-9 UtilizationCONTACT | | | | | |

| Name MARTINEZ-CHAVEZ, ISSAC F | | Eye | Hair | Hgt | Wgt | Race | Sex M | Discipline L |
|---|---|---|---|---|---|---|---|---|
| DOB 09/16/1986 | OLN VA | | | | OID | | Unit | |
| Location | | | Description | | | | Phone | |
| | | | SERIAL NUMBER | | | | | |
| Type | Tag VA | | Tag Year 2024 Tag Type | | User BLewis | | When 01/01/2024 01:45:50 | |
| Make/Model/Year/Color/VIN/Desc | / / / / / | | | | | Searched ☐ Consented ☐ | | |
| | | | K-9 UtilizationCONTACT | | | | | |

## Wrecker(s)

| When: 01/01/2024 00:20:23 | User: BLewis | Wrecker: COOKE TOWING AND RECOVERY LLC | Reason: |
|---|---|---|---|
| Tag: | ☑ Responded ☐ Cancelled ☐ Hold | Make: | Model: |
| Description: | | Tow To: | |
| Notes: | | | |

## Comment
01/01/2024 00:52:10   01/01/2024 00:52:10

124 ADV HE HAD VEH GOING SCUFFLING HILL TO FRANKLIN ST POSS HONDA TRYING TO GET AWAY FROM HIM - 11 ADV THEY BLACKED OUT AND TURNED ON HIGHVIEW TERRACE - 36 ADV THINKS 11 HAS ONE AT GUNPOINT - 11 CONFIRMED ONE @ GUNPOINT - VYC3195

## Notes

**BLewis 01/01/2024 00:20:27  L,O**

30 MINS COOKS TOWING

**BLewis 01/01/2024 00:21:12  L,O**

.22 REVOLVER - 117

**BLewis 01/01/2024 00:22:59  L,O**

62 ADV 1 IN CUSTODY IN HIS VEH

**BLewis 01/01/2024 00:33:33  L,O**

62 ADV SIG 3 ENROUTE TO MAGISTRATE

**BLewis 01/01/2024 00:37:34  L,O**

LATE NOTE: SENT MONTGOMERY CO HIT & RECD REPLY

**BLewis 01/01/2024 00:37:39  L,O**

RECD PPWK VIA FAX

**BLewis 01/01/2024 00:40:24  L,O**

JA237

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
**ROANOKE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 7:24-CR-00011** |
| | : | |
| **ISAAC MARTINEZ-CHAVEZ** | : | |

**UNITED STATES' OPPOSITION TO**
**DEFENDANT'S MOTION TO DISMISS**

The United States opposes Isaac Martinez-Chavez's motion to dismiss Count One of the indictment, which charges him with unlawfully possessing a handgun and an unregistered sawed-off rifle, in violation of 18 U.S.C. § 922(g)(1). Mr. Martinez-Chavez claims that § 922(g)(1) is unconstitutional, both facially and as applied to him in light of *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022) and *United States v. Rahimi*, 602 U.S. 680 (2024). *See* Dkt. No. 57. But that request is wholly foreclosed by current and binding Fourth Circuit precedent, decided after *Bruen* and *Rahimi*. His motion should be denied.

\* \* \*

1.     Mr. Martinez-Chavez's facial challenge is barred (as he acknowledges) by *United States v. Canada*, No. 22-4519, 2024 WL 5002188 (4th Cir. Dec. 6, 2024), which held that § 922(g)(1) is facially constitutional. He still raises the argument so as to preserve the claim, but his criticisms of *Canada* are wrong, and the government briefly notes the following in response to his challenge: (1) The Supreme Court has repeatedly indicated that prohibitions on the possession of firearms by felons are

1

JA238

"presumptively lawful"; and contrary to Mr. Martinez-Chavez's claim that *Rahimi* "abrogated reliance" on those statements, the *Rahimi* Court deliberately repeated the earlier pronouncements about the propriety of felon-disarmament laws: "*Heller* stated that many such prohibitions, like those on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful.'" 602 U.S. at 682 (quoting *D.C. v. Heller*, 554 U.S. 570, 626, 627, n. 26 (2008)). (2) Because he's a felon rather than a law-abiding citizen, Mr. Martinez-Chavez's possession of firearms is not protected by the Second Amendment. *See United States v. Hunt*, No. 22-4525, Slip. Op. at 12 (4th Cir. Dec. 18, 2024) ("[T]he possession of firearms by felons . . . 'fall[s] outside the scope of the [Second Amendment] right as originally understood.'") (quoting *Bruen*, 597 U.S. at 18). And (3) there is a long historical tradition of disarming particular groups or classes of people, as the government set forth in exhaustive detail in prior filings.[1]

2.      Mr. Martinez-Chavez's as-applied challenge is barred by the recent decision in *United States v. Hunt*, No. 22-4525 (4th Cir. Dec. 18, 2024). To be fair to Mr. Martinez-Chavez and his counsel, that decision post-dates their motion, so they were necessarily unaware of it when they decided to ask the Court to dismiss Count One of the indictment. But the decision nonetheless entirely precludes his as-applied challenge. The court found that the Fourth Circuit's earlier cases foreclosing as-applied challenges to § 922(g)(1) remain good law, even in the wake of *Bruen* and *Rahimi*, and "'there is no need for felony-by-felony litigation regarding the

---

[1] *See*, *e.g.*, *United States v. King*, Case No. 7:23-cr-00034, Dkt. No. 48, at 15-37 (W.D. Va Jan. 11, 2024).

JA239

constitutionality of" Section 922(g)(1)[.]" *Id.* at Slip. Op. 2, 6-10 (quoting *United States v. Jackson*, 110 F.4th 1120, 1125 (8th Cir. 2024). And after canvasing the relevant historical sources, the court also found that categorically excluding all felons is consistent with this country's historical tradition of firearms regulations. *Id.* at Slip. Op. 12-17.

<div align="center">* * *</div>

This Court is bound by the Fourth Circuit's decisions in *Canada* and *Hunt*, which expressly foreclose the relief Mr. Martinez-Chavez seeks in his motion. Accordingly, his motion should be denied.

<div style="margin-left:40%">

Respectfully submitted,

ZACHARY T. LEE
Acting United States Attorney
</div>

Date: December 27, 2024.

<div style="margin-left:40%">

*s/Juan L. Vega*
Special Assistant United States Attorney
VA State Bar No. 79165
U.S. Attorney's Office
310 First St., S.W., Ste. 906
Roanoke, Virginia 24011
540-857-2250 (phone)
540-857-2614 (fax)
Juan.vega2@usdoj.gov

*s/Matthew M. Miller*
Assistant United States Attorney
VA State Bar No. 43034
U.S. Attorney's Office
310 First St., S.W., Ste. 906
Roanoke, Virginia 24011
540-857-2250 (phone)
540-857-2614 (fax)
Matthew.miller2@usdoj.gov
</div>

<div align="center">3</div>

<div align="center">JA240</div>

**CERTIFICATE OF SERVICE**

I hereby certify that on December 27, 2024, I caused the foregoing Notice to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel for defendant.

*s/Juan L. Vega*

Special Assistant United States Attorney

4

JA241

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No.: 7:24-CR-11 |
| ISAAC FIDEL MARTINEZ-CHAVEZ | ) | |
| | ) | |

GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION IN LIMINE TO
EXCLUDE RULE 404(b) EVIDENCE

The United States of America, by counsel, hereby responds to Defendant's motion *in limine* to exclude the following Rule 404(b) evidence:

1. On or about August 29, 2022, Deputy Jesse East of the Montgomery County Sheriff's Office (MCSO) conducted a traffic stop of a Mercury SUV driven by the Defendant, bearing license plates UJB6018.

2. On January 1, 2024, during a search of the Defendant's person incident to arrest, officers found a glass smoking device. A chemical analysis report revealed the presence of methamphetamine residue.

## I.  FACTUAL BACKGROUND

On January 1, 2024, officers found two firearms in a 2007 Kia the Defendant was driving. The Defendant was driving the Kia with the wrong license plates. The correct license plate is UJB6018.[1] On or about August 29, 2022, Deputy East conducted a traffic stop of a Mercury SUV driven by the Defendant, bearing license plates UJB6018.[2]

---

[1] Gov Exh 1, DMV record.
[2] Gov Exh 2, MCSO report.

1

JA242

On January 1, 2024, officers searched the Defendant's person, incident to arrest. They found a glass smoking device, which was tested by the Drug Enforcement Administration Mid-Atlantic Laboratory. The chemical analysis report indicates the presence of methamphetamine residue.[3]

## II.  LEGAL STANDARD

Per Federal Rules of Evidence 404(b) Other Crimes, Wrongs, or Acts:

> (1) **Prohibited Uses**. Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
> (2) **Permitted Uses**. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

Evidence is admissible under Rule 404(b) if: (1) it is relevant to an issue other than character; (2) it is necessary to prove an element of the crime charged; (3) it is reliable; and (4) its probative value is not substantially outweighed by its prejudicial nature. United States v. Adair, 227 F. Supp. 2d 586, 589 (W.D. Va. 2002)(citing United States v. Queen, 132 F.3d 991, 995 (4th Cir.1997). Evidence is necessary where it "is an essential part of the crime" *or "furnishes part of the context of the crime*." Id. at 590 (emphasis added). Evidence should be excluded because of its prejudicial effect "only in those instances where the trial judge believes that there is a genuine risk that the emotions of the jury will be excited to irrational behavior, and that this risk is disproportionate to the probative value of the offered evidence." Id. citing United States v. Powers, 59 F.3d 1460, 1467 (4th Cir.1995).

---

[3] Gov Exh 3, chemical analysis report.

**III.  ARGUMENT**

1. **August 29, 2022 traffic stop**

In its case-in-chief, the Government seeks to elicit testimony from Deputy East that on or about August 29, 2022, he conducted a traffic stop of a Mercury SUV driven by the Defendant, bearing the license plates UJB6018.

a.  <u>It is relevant to an issue other than character and it furnishes part of the context of the crime</u>.

Despite the Defendant's assertion that it is unlikely a surprise to the Government as to what the Defense's theory shall be, and absent any stipulation, the Government cannot know in advance whether the Defendant will in fact argue that the Kia the Defendant was driving belongs to someone else, that the Defendant has never driven it, or that the Defendant has no reason to know what is in the Kia at any given time.  In fact, even if the defense calls a witness to testify that the firearms found in the vehicle belonged to someone else, the government is permitted to present evidence contrary to this defense or present evidence that shows the Defendant constructively possessed the firearms.  The fact that the Defendant exercised dominion and control over the Kia's license plates two years before our incident tends to make it more probable than not that the Defendant is familiar with the Kia, that he drives it on a regular basis, and that he would be aware of what items are in it.

This, in turn, makes it more likely that the Defendant was aware that there were firearms in the Kia on January 1, 2024. Being aware of the firearms makes it more likely that he intentionally possessed them, that he had an opportunity to remove them, and that the presence of the firearms in his vehicle was not a mistake or accident. In short, this evidence tends to prove knowledge, intent, opportunity, absence of mistake, and lack of accident. Together with other

3

JA244

evidence, this prior act tends to make a fact of consequence more probable than it would be without the evidence.

    b. <u>It is reliable</u>.

Deputy East is still a law-enforcement officer with the MCSO. His report, which the Government shared with the Defendant, is available for him should he need to refresh his recollection and would also be admissible as a past recollection recorded. The license plate information that he recorded in his report is administrative information not subject to evaluation or independent judgment.

    c. <u>Its probative value is not substantially outweighed by its prejudicial nature</u>.

The Government has no intention of eliciting testimony or other evidence about the reason for the traffic stop, the presence of drugs in the car, or the resulting felony conviction of Possession of a Schedule I or II Controlled Substance from the August 29, 2002, incident in its case-in-chief. What the jury will hear is that the Defendant was driving a car with a particular license plate. This is an innocuous fact that is not prejudicial.

2. **The glass smoking device with methamphetamine residue**

If the Defendant elects to testify, his perception of events and his memory are fair game for cross-examination. If the Defendant testifies, the Government intends to cross-examine him about what impacts, if any, he was experiencing from the methamphetamine he recently smoked based upon the glass smoking device that officers found on the Defendant's person at the time of his arrest. The government has provided in discovery the laboratory results showing that the pipe found on his person had methamphetamine residue in it.

4

JA245

a. <u>It is relevant to an issue other than character and it furnishes part of the context of the crime</u>.

If the Defendant testifies at trial, his ability to perceive events during the incident will be at issue. His recollection of the events will also be at issue. The fact that the Defendant had on his person a smoking device that contained only residue tends to indicate that he recently ingested the substance. Evidence and information related to the Defendant's possession of a pipe containing methamphetamine, found on his person during the stop, would be admissible to test the Defendant's memory, perception of events, and his state of mind during the stop and immediately after. This is hardly the "broad talismanic incantation" that the Defendant alleges. His possible ingestion of mind-altering drugs is highly relevant for a jury that is charged with judging the credibility of each witness.

b. <u>It is reliable</u>.

Deputy Zion Wade of the Franklin County Sheriff's Office found a glass smoking device on the Defendant's person during a search incident to his arrest, a fact indicated in the police report. The DEA Mid-Atlantic Laboratory accepted what it labeled a pipe on March 25, 2024. The DEA examiner received it on December 5, 2024. On December 13, 2024, a forensic chemist concluded that the pipe contained methamphetamine residue.

c. <u>Its probative value is not substantially outweighed by its prejudicial nature</u>.

At issue is whether the Defendant knowingly possessed two firearms, not whether he possessed drugs. The jury will clearly see the distinction and will appreciate the limited use of this evidence. There is not a genuine risk that the emotions of the jury will be excited to irrational behavior based on a meth pipe with residue.

JA246

## IV.  CONCLUSION

For the reasons noted above, the Government asks that the Court deny the Defendant's

motion to exclude rule 404(b) evidence.

Respectfully submitted,

ZACHARY T. LEE
Acting United States Attorney

Date: December 27, 2024.

*s/Juan L. Vega*
Special Assistant United States Attorney
VA State Bar No. 79165
U.S. Attorney's Office
310 First St., S.W., Ste. 906
Roanoke, Virginia 24011
540-857-2250 (phone)
540-857-2614 (fax)
Juan.vega2@usdoj.gov

*s/Matthew M. Miller*
Assistant United States Attorney
VA State Bar No. 43034
U.S. Attorney's Office
310 First St., S.W., Ste. 906
Roanoke, Virginia 24011
540-857-2250 (phone)
540-857-2614 (fax)
Matthew.miller2@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on December 27, 2024, I caused the foregoing Notice to be

electronically filed with the Clerk of the Court using the CM/ECF system, which will send

notification of such filing to counsel for defendant.

*s/Juan L. Vega*
Special Assistant United States Attorney

6

JA247

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC PUBLIC RECORDS OF A REGULARLY CONDUCTED ACTIVITY PURSUANT TO FEDERAL RULES OF EVIDENCE 803(6), 803(8), 902(4), 902(11), AND 902(13)

I, **Kellie Powell**, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by the **Virginia Department of Motor Vehicles (DMV)**, and my title is **Captain**. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved and because I have been designated and authorized by the Commissioner of the **Virginia DMV** to perform such actions as are necessary for the purpose of attesting and certifying records. I state that the records attached hereto are true duplicates of the original records in the custody of the **Virginia DMV**. The attached records consist of:

(1) Application for Certificate of Title for 2007 Kia SDN, VIN KNAFG526477112089, (2) Certificate of Title, number 1909012427, (3) Kia vehicle inquiry printout, (4) application for Certificate of Title for 2001 Subaru SDN, VIN 4S3BH645617306249, (5) Certificate of Title, number 14014623893, and (6) Subaru vehicle inquiry printout.

I further state that:

a. The attached records are copies of official records, or copies of documents that were recorded or filed in a public office as authorized by law;

b. all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those

1

JA248

matters, they were kept in the ordinary course of the regularly conducted business activity of the **Virginia DMV**, and they were made by the **Virginia DMV** as a regular practice; and

c. such records were generated by the **Virginia DMV's** electronic process or system that produces an accurate result, to wit:

1. the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of the **Virginia DMV** in a manner to ensure that they are true duplicates of the original records; and

2. the process or system is regularly verified by the **Virginia DMV**, and at all times pertinent to the records certified here the process and system functioned properly and normally.

This certification is intended to satisfy Rules 803(6), 803(8), 902(4), 902(11), and 902(13) of the Federal Rules of Evidence.

I declare under penalty of perjury that the foregoing is true and correct. Executed on:

_10-31-2024_
Date

Signature    _Kellie Powell_

2

JA249

Federal and State law requires that you state the mileage in connection with the transfer of ownership. Failure to complete the odometer disclosure statement or providing a false statement may result in fines and/or imprisonment.

**B** — DEALER REASSIGNMENT

I am aware of the dealer's odometer certification.    Date of Sale _____    Sale Price _____

Buyer(s) Printed Name _____    Buyer(s) Signature _____

Buyer(s) Address _____    City _____    State _____    Zip Code _____

ODOMETER READING _____ (No Tenths)    I certify to the best of my knowledge that the odometer reading is:
☐ ACTUAL Mileage  ☐ NOT ACTUAL Mileage (odometer discrepancy)  ☐ IN EXCESS of Mechanical Limits
☐ Model year is 10 years or older and was exempt from odometer disclosure in prior state of title (applicant must present out-of-state title showing exemption)

Dealer(s) Signature _____    Dealer(s) Printed Name _____    Dealer Number _____    Licensing Jurisdiction _____

The dealer certifies that the vehicle described in this title was transferred to the above buyer and that the odometer reading has been disclosed to the buyer

**C** — DEALER REASSIGNMENT

I am aware of the dealer's odometer certification.    Date of Sale _____    Sale Price _____

Buyer(s) Printed Name _____    Buyer(s) Signature _____

Buyer(s) Address _____    City _____    State _____    Zip Code _____

ODOMETER READING _____ (No Tenths)    I certify to the best of my knowledge that the odometer reading is:
☐ ACTUAL Mileage  ☐ NOT ACTUAL Mileage (odometer discrepancy)  ☐ IN EXCESS of Mechanical Limits
☐ Model year is 10 years or older and was exempt from odometer disclosure in prior state of title (applicant must present out-of-state title showing exemption)

Dealer(s) Signature _____    Dealer(s) Printed Name _____    Dealer Number _____    Licensing Jurisdiction _____

The dealer certifies that the vehicle described in this title was transferred to the above buyer and that the odometer reading has been disclosed to the buyer.

**D** — DEALER REASSIGNMENT

I am aware of the dealer's odometer certification.    Date of Sale _____    Sale Price _____

Buyer(s) Printed Name _____    Buyer(s) Signature _____

Buyer(s) Address _____    City _____    State _____    Zip Code _____

ODOMETER READING _____ (No Tenths)    I certify to the best of my knowledge that the odometer reading is:
☐ ACTUAL Mileage  ☐ NOT ACTUAL Mileage (odometer discrepancy)  ☐ IN EXCESS of Mechanical Limits
☐ Model year is 10 years or older and was exempt from odometer disclosure in prior state of title (applicant must present out-of-state title showing exemption)

Dealer(s) Signature _____    Dealer(s) Printed Name _____    Dealer Number _____    Licensing Jurisdiction _____

The dealer certifies that the vehicle described in this title was transferred to the above buyer and that the odometer reading has been disclosed to the buyer.

**E** — PERSONAL PROPERTY TAX RELIEF

**DOES YOUR VEHICLE QUALIFY FOR CAR TAX RELIEF?**
If you can answer YES to any of the following questions, your motor vehicle is considered by State Law to have a business use and does NOT qualify for Personal Property Tax Relief.
- Is more than 50% of the vehicle's annual mileage used as a business expense for federal income tax purposes OR reimbursed by an employer?
- Is more than 50% of the depreciation associated with the vehicle deducted as a business expense for Federal Income Tax purposes?
- Is the cost of the vehicle expensed pursuant to Section 179 of the Internal Revenue Service Code?
- If the vehicle is leased by an individual, does the leasing company pay the tax without reimbursement from the individual?

This vehicle is for ☐ Personal Use    ☐ Business Use    Check one of the boxes.    See business use criteria above.

**F** — LIEN INF.

LIENOR'S NAME _____    LIENOR CODE _____    DATE OF LIEN _____

ADDRESS _____    CITY _____    STATE  ZIP _____

**G** — APPLICATION FOR REGISTRATION (LICENSE PLATES ISSUED)

VEHICLE COLOR Gry    REGISTRATION PERIOD: ☐ 1 YR  ☐ 2 YRS ($2 discount)  ☐ 3 YRS ($3 discount) (Emissions areas not eligible for 3 YR registration)

INSURANCE CERTIFICATION: A vehicle must be insured with liability coverage when it is registered, and it must remain insured while registered, whether or not it is operated, OR the uninsured motor vehicle fee must be paid. Penalties are severe for violation of this requirement.
I/We certify that (check one):
☑ This vehicle is insured by a liability policy issued through an insurance company licensed to do business in Virginia and it will remain insured while registered, whether or not it is operated.
☐ This vehicle is not insured; therefore, I am remitting the applicable uninsured motor vehicle fee. (This fee provides no insurance coverage.)

POWER OF ATTORNEY FOR NON-RESIDENT(S) AND CORPORATION(S) NOT DOMICILED IN VIRGINIA: Pursuant to the provisions of Virginia Code §46.2-601, I/we appoint the Commissioner of the Department of Motor Vehicles of the Commonwealth of Virginia, to be my/our true and legal agent upon whom all legal processes against me/us may be served in any legal proceeding arising from the operation and/or use of any motor vehicle registered in my/our name(s) in the Commonwealth of Virginia. I/we agree that any lawful process or notice to me/us which is served on the Commissioner shall have the same legal effect as if served on me/us within the Commonwealth of Virginia.

PRIVACY NOTICE: The information, including Social Security Number, is requested in accordance with Virginia Code §§46.2-623 and 46.2-629. Any person who refuses to supply the required information will be denied a certificate of title and/or registration. Title and registration records may be disseminated in accordance with §§46.2-208 through 46.2-214, to business, law enforcement or authorized government entities.

**H** — CERTIFICATION OF BUYER

**CERTIFICATION**

NO PAPER TITLE - Check this box ☐ if you do not want a paper title issued to you. An electronic Certificate of Title will remain on file for this vehicle at DMV.

If this application is for joint ownership, do you wish clear rights of ownership to be transferred to the surviving owner in the event of the death of either the owner or co-owner? ☐ YES ☐ NO

Are any of the vehicle owners on active military duty or service?    ☐ YES ☐ NO

I/We certify and affirm under penalty of perjury that the information contained in this application is true and correct to the best of my/our knowledge. I/We understand it is unlawful to knowingly make a false statement and any violation may be prosecuted as a felony as provided in Virginia law.

SIGNATURE OF APPLICANT _____    DATE _____
American Insurance Maria Rodriguez

SOCIAL SECURITY NUMBER/FEIN OR CUSTOMER IDENTIFIER OF APPLICANT ████    PHONE NUMBER ████

STREET ADDRESS ████    VA    STATE _____    ZIP 24151

EMAIL ADDRESS OF APPLICANT _____

SIGNATURE OF CO-APPLICANT _____    DATE _____

SOCIAL SECURITY NUMBER/FEIN OR CUSTOMER IDENTIFIER OF CO-APPLICANT    PHONE NUMBER _____

EMAIL ADDRESS OF CO-APPLICANT _____

VEHICLE PRINCIPALLY GARAGED IN CITY, TOWN, COUNTY OR STATE OF _____
☐ CITY OR TOWN OF _____    ☑ COUNTY OF Franklin

| DMV USE ONLY | WITH LIEN |
|---|---|
| SALE PRICE BEFORE TRADE IN ALLOWANCE $ 1000 | ☐ YES ☑ NO |
| | Proof of Address (specify proof document presented) |
| TAX $ 25 (MINIMUM TAX MAY APPLY) | |
| TITLE FEE $ 15 | CLERK STAMP |
| TRANSFER FEE $ _____ | |
| REG FEE $ 7 | |
| WT INCREASE FEE $ _____ | |
| PERSONALIZED PLATE FEE $ _____ | |
| UMV FEE $ _____ | |
| OTHER $ _____ | |
| TOTAL $ 90 | |

Stamp: Paid OCT 01 2022
RMT-1-668
RMT-668

Left margin (vertical): PURCHASER MUST SECURE A NEW TITLE, OR SURRENDER THIS ONE TO DMV WITHIN 30 DAYS OF SALE DATE.
Reassignment Form, Control No. (If applicable) ANY ALTERATIONS OR ERASURE WILL VOID THIS CERTIFICATE OF TITLE AND IT MUST THEN BE SURRENDERED TO SECURE A REPLACEMENT.

VSA3L (REV. 6/15)

Right margin (vertical): Log #  PLATE TYPE  PLATE NO.  EXPIRE DATE  ISSUED  TITLE NUMBER  DMV USE ONLY




# COMMONWEALTH OF VIRGINIA
## DEPARTMENT OF MOTOR VEHICLES

# CERTIFICATE OF TITLE FOR A VEHICLE
### KEEP IN SAFE PLACE - ANY ALTERATION OR ERASURE VOIDS THIS TITLE

THE DEPARTMENT OF MOTOR VEHICLES, COMMONWEALTH OF VIRGINIA, HEREBY CERTIFIES THAT AN APPLICATION FOR A CERTIFICATE OF TITLE HAS BEEN MADE FOR THE VEHICLE DESCRIBED HEREON PURSUANT TO THE PROVISIONS OF THE MOTOR VEHICLE LAWS OF THIS COMMONWEALTH; THAT THE APPLICANT NAMED ON THE FACE HEREON HAS BEEN DULY RECORDED AS THE LAWFUL OWNER OF SAID VEHICLE, AND, THAT, FROM THE STATEMENTS OF THE OWNER AND THE RECORDS ON FILE WITH THIS DEPARTMENT, THE HEREON DESCRIBED VEHICLE IS SUBJECT TO THE SECURITY INTEREST RECORDS ON FILE WITH THIS DEPARTMENT, AND AS DESCRIBED HEREON, IF ANY. THE MOTOR VEHICLE LAWS OF THIS COMMONWEALTH ALSO PROVIDE THAT ALL TITLE AND REGISTRATION INFORMATION IN THE OFFICE OF THE DEPARTMENT OF MOTOR VEHICLES IS PRIVILEGED AND, ONLY SUBJECT TO DISSEMINATION TO AUTHORIZED AGENCIES, BUSINESS ORGANIZATIONS OR AGENTS, GOVERNMENTAL ENTITIES AND INDIVIDUALS UNDER THE CONDITIONS SPECIFIED BY MOTOR VEHICLE CODE SECTIONS 46.2-208, 46.2-209 AND 46.2-210.

ESTABLISHED 07/06/17   668   DMVJP1   ORIGINAL

| VEHICLE IDENTIFICATION NO | YEAR | MAKE | VEHICLE BODY | TITLE NO |
|---|---|---|---|---|
| KNAEG52647711 2089 | 2007 | KIA | SDN | 1909012427 |

| EMPTY WGT | GROSS WGT | GVWR | GCWR | AXLES | FUEL | SALES TAX PAID | ODOMETER | DATE ISSUED |
|---|---|---|---|---|---|---|---|---|
| 3443 | | | | 2 | GAS | 75.00 | *162101* | 07/06/17 |

| OTHER PERTINENT DATA | ODOMETER BRAND | PRIOR TITLE NO |
|---|---|---|
| IND | ACTUAL | 86028429 |

**Name(s) and address(es) of vehicle owners**

███████████

ROCKY MOUNT, VA 24151-6651

NO LIENS

THIS IS NOT A TITLE NUMBER
G334293 40

---

**A** Federal and State law requires that you state the mileage in connection with the transfer of ownership. Failure to complete or providing a false statement may result in fines and/or imprisonment. The undersigned hereby certifies that the vehicle described in this title has been transferred to the following (printed name and address of Buyer(s)):

Buyer(s) Name: Maria Rodriguez

Street: ███████████   State, Zip: 24151

ODOMETER READING (No Tenths): 163,130

I certify to the best of my knowledge that the odometer reading is: ☑ ACTUAL Mileage ☐ NOT ACTUAL Mileage (odometer discrepancy) ☐ IN EXCESS of Mechanical Limits ☐ Model year is 10 years or older and was exempt from odometer disclosure in prior state of title. (applicant must present out-of-state title showing exemption)

DATE OF SALE: 9-23-06   SALE PRICE: 7,000

Signature of Seller(s): ███████████

Signature of Buyer(s): Maria Rodriguez
I am aware of the above odometer certification made by the Seller(s).

Printed Name of Buyer(s): Maria Rodriguez

I am aware of the above odometer certification made by the Seller(s).

VSA 3L   Dealer's No.   Licensing Jurisdiction

**VOID IF ALTERED**

VEHINQ - VEHICLE INQUIRY (PAGE 1)

10/10/24 11:50

```
  T#: T66855460___       NM: I / RODRIGUEZ CASTILLO,MARIA,_____
  ST#:                   NM:   /
ADDR:  ███████████████
CITY: ROCKY MOUNT                   ST: VA ZIP: 24151-4618 CTRY:    #OWNERS: 1
GAR JUR: FRANKLIN COUNTY        EX:        CHG DT:         MOVE DT: 09/23/22
TOT PRICE:             REB:             SALE:   1,000.00 TAX:        75.00
     VIN: KNAFG526477112089____   MKE: KIA              BDY: 4D SDN
PPTR: PERSONAL   YR: 2007 MODEL: RONDO        TAX RT:  4.15% FUEL: GAS
EMPTY WT:  3,443  GROSS WT:        RATED WT:        GCWR:            AXLE: 2
  TTL ODOM: 236730 ODOM CD: A CUR YR ODOM:         VEH TYP: PASS CARRY
NEW/USE/DMST: U TAX TTL:             GREY MKT:           DISP DT:
    TTL#: 2516025202        TTL EST DT: 10/01/22   LAST CHG DT: 01/05/24
  PRIOR TTL#: 1909012427    LAST TTL TYP: ORIGINAL   TTL DOC DT: 10/01/22
TTL HELD:   #LIENS: 0 EMIS CD:         TEST DT:        DUE DT:
VEH OWNRSHP: VIRGINIA                  EMIS OOS:    PURCH DT: 09/23/22
  #CURR PLTS: 1   #PLTS ISS: 1  VEH USE: P IRP EXMPT:   TEMP PLT#:
PLT#: UJB6018___   REG STAT: A  EFFECT DT: 01/05/24   TEMP PLT TYP:
   PLT TYP: PAVL_ STKR:        MT PLT DT: 09/01/20 TEMP EXP DT:
   PLT STAT: RENEWAL           EXPIRE DT: 01/31/25  TEMP PLT STAT:
   PLT IMAGE: UJB6018      REG PRD: 1 FULL YEAR   REG LOC/USER ID: 668 / DMVPAB
PF: 6=CUSINF 7=CMMENU 8=DRSTAT 9=EMSINF 10=VEHACT
```

JA252

Federal and State law requires that you state the mileage in connection with the transfer of ownership. Failure to complete the odometer disclosure statement or providing a false statement may result in fines and/or imprisonment.

**B** I am aware of the dealer's odometer certification. Date of Sale _____ Sale Price _____

Buyer(s) Printed Name _____  Buyer(s) Signature _____

Buyer(s) Address _____ City _____ State ___ / Zip Code _____

ODOMETER READING ___ (No Tenths) I certify to the best of my knowledge that the odometer reading is:
☐ ACTUAL Mileage ☐ NOT ACTUAL Mileage (odometer discrepancy) ☐ IN EXCESS of Mechanical Limits
☐ Model year is 10 years or older and was exempt from odometer disclosure in prior state of title (applicant must present out-of-state title showing exemption)

Dealer(s) Signature | Dealer(s) Printed Name | Dealer Number | Licensing Jurisdiction

The dealer certifies that the vehicle described in this title was transferred to the above buyer and that the odometer reading has been disclosed to the buyer.

**C** I am aware of the dealer's odometer certification. Date of Sale _____ Sale Price _____

Buyer(s) Printed Name _____  Buyer(s) Signature _____

Buyer(s) Address _____ City _____ State ___ Zip Code _____

ODOMETER READING ___ (No Tenths) I certify to the best of my knowledge that the odometer reading is:
☐ ACTUAL Mileage ☐ NOT ACTUAL Mileage (odometer discrepancy) ☐ IN EXCESS of Mechanical Limits
☐ Model year is 10 years or older and was exempt from odometer disclosure in prior state of title (applicant must present out-of-state title showing exemption)

Dealer(s) Signature | Dealer(s) Printed Name | Dealer Number | Licensing Jurisdiction

The dealer certifies that the vehicle described in this title was transferred to the above buyer and that the odometer reading has been disclosed to the buyer.

**D** I am aware of the dealer's odometer certification. Date of Sale _____ Sale Price _____

Buyer(s) Printed Name _____  Buyer(s) Signature _____

Buyer(s) Address _____ City _____ State ___ Zip Code _____

ODOMETER READING ___ (No Tenths) I certify to the best of my knowledge that the odometer reading is:
☐ ACTUAL Mileage ☐ NOT ACTUAL Mileage (odometer discrepancy) ☐ IN EXCESS of Mechanical Limits
☐ Model year is 10 years or older and was exempt from odometer disclosure in prior state of title (applicant must present out-of-state title showing exemption)

Dealer(s) Signature | Dealer(s) Printed Name | Dealer Number | Licensing Jurisdiction

The dealer certifies that the vehicle described in this title was transferred to the above buyer and that the odometer reading has been disclosed to the buyer.

**DOES YOUR VEHICLE QUALIFY FOR CAR TAX RELIEF?**

**E** If you can answer YES to any of the following questions, your motor vehicle is considered by State Law to have a business use and does NOT qualify for Personal Property Tax Relief.
• Is more than 50% of the vehicle's annual mileage used as a business expense for federal income tax purposes OR reimbursed by an employer?
• Is more than 50% of the depreciation associated with the vehicle deducted as a business expense for Federal Income Tax purposes?
• Is the cost of the vehicle expensed pursuant to Section 179 of the Internal Revenue Service Code?
• If the vehicle is leased by an individual, does the leasing company pay the tax without reimbursement from the Individual?
This vehicle is for ☐ Personal Use   ☐ Business Use   Check one of the boxes.   See business use criteria above.

**F** LIENOR'S NAME _____  LIENOR CODE _____  DATE OF LIEN _____
ADDRESS _____ CITY _____ STATE ZIP _____

**G** VEHICLE COLOR: _____ REGISTRATION PERIOD: ☐ 1 YR ☐ 2 YRS ($2 discount) ☐ 3 YRS ($3 discount) (Emissions areas not eligible for 3 YR registration)

INSURANCE CERTIFICATION: A vehicle must be insured with liability coverage when it is registered, and it must remain insured while registered, whether or not it is operated, OR the uninsured motor vehicle fee must be paid. Penalties are severe for violation of this requirement.
I/We certify that (check one):
☑ This vehicle is insured by a liability policy issued through an insurance company licensed to do business in Virginia and it will remain insured while registered, whether or not it is operated.
☐ This vehicle is not insured; therefore, I am remitting the applicable uninsured motor vehicle fee. (This fee provides no insurance coverage.)

POWER OF ATTORNEY FOR NON-RESIDENT(S) AND CORPORATION(S) NOT DOMICILED IN VIRGINIA: Pursuant to the provisions of Virginia Code §46.2-601, I/we appoint the Commissioner of the Department of Motor Vehicles of the Commonwealth of Virginia, to be my/our true and legal agent upon whom all legal processes against me/us may be served in any legal proceeding arising from the operation and/or use of any motor vehicle registered in my/our name(s) in the Commonwealth of Virginia. I/we agree that any lawful process or notice to me/us which is served on the Commissioner shall have the same legal effect as if served on me/us within the Commonwealth of Virginia.

PRIVACY NOTICE: The information, including Social Security Number, is requested in accordance with Virginia Code §§46.2-623 and 46.2-629. Any person who refuses to supply the required information will be denied a certificate of title and/or registration. Title and registration records may be disseminated in accordance with §§46.2-208 through 46.2-214, to business, law enforcement or authorized government entities.

**CERTIFICATION**
**H** NO PAPER TITLE - Check this box ☐ If you do not want a paper title issued to you. An electronic Certificate of Title will remain on the file for this vehicle at DMV.
If this application is for joint ownership, do you wish clear rights of ownership to be transferred to the surviving owner in the event of the death of either the owner or co-owner? ☐ YES ☐ NO
Are any of the vehicle owners on active military duty or service? ☐ YES ☐ NO
I/We certify and affirm under penalty of perjury that the information contained in this application is true and correct to the best of my/our knowledge. I/We understand it is unlawful to knowingly make a false statement and any violation may be prosecuted as a felony as provided in Virginia law.

SIGNATURE OF APPLICANT   DATE
Maria Julia Chevez
SOCIAL SECURITY NUMBER/FEIN OR CUSTOMER IDENTIFIER OF APPLICANT   PHONE NUMBER ( )
STREET ADDRESS _____ U A  24012
CITY Roanoke   STATE   ZIP
EMAIL ADDRESS OF APPLICANT
SIGNATURE OF CO-APPLICANT   DATE
SOCIAL SECURITY NUMBER/FEIN OR CUSTOMER IDENTIFIER OF CO-APPLICANT   PHONE NUMBER ( )
EMAIL ADDRESS OF CO-APPLICANT
VEHICLE PRINCIPALLY GARAGED IN CITY, TOWN, COUNTY OR STATE OF:
☑ CITY OR TOWN OF _____  ☐ COUNTY OF _____

DMV USE ONLY
SALE PRICE $ 1250.00
BEFORE TRADE IN ALLOWANCE
TAX $ 25.00 (MINIMUM TAX MAY APPLY)
TITLE FEE $ 10.00
TRANSFER FEE $ _____
REG FEE $ 79.50
WT INCREASE FEE $ _____
PERSONALIZED PLATE FEE $ _____
UMV FEE $ _____
OTHER $ _____
TOTAL $ 161.50

WITH LIEN
☐ YES ☑ NO
Proof of Address
CLERK STAMP
PAID DMV
SEP 20 2017
697-RNK

VSA3L (REV. 6/15)

JA253



VEHINQ - VEHICLE INQUIRY (PAGE 1)

10/10/24 11:5

T#: A69789730 ___      NM: I / CHAVEZ MENDOZA,MARIA,JULIA _____
CUST#:                 NM:   /
ADDR: ███████████████
CITY: ROANOKE                    ST: VA ZIP: 24012-3648 CTRY:    #OWNERS: 1
GAR JUR: ROANOKE CITY        EX:       CHG DT:        MOVE DT: 09/18/17
TOT PRICE:        REB:          SALE:   1,250.00 TAX:        75.00
      VIN: 4S3BH645617306249 ____   MKE: SUBARU          BDY: 4D SDN
PPTR: PERSONAL  YR: 2001 MODEL: LEGACY       TAX RT:  4.15% FUEL: GAS
EMPTY WT:  3,450  GROSS WT:        RATED WT:      GCWR:        AXLE: 2
  TTL ODOM: 168000 ODOM CD: A CUR YR ODOM:        VEH TYP: PASS CARRY
NEW/USE/DMST: U TAX TTL:          GREY MKT:        DISP DT:
      TTL#: 1303013334     TTL EST DT: 09/20/17   LAST CHG DT: 08/25/22
PRIOR TTL#: 1404623893   LAST TTL TYP: ORIGINAL   TTL DOC DT: 09/20/17
TTL HELD:  #LIENS: 0 EMIS CD:        TEST DT:      DUE DT:
VEH OWNRSHP: VIRGINIA              EMIS OOS:  PURCH DT: 09/18/17
 #CURR PLTS: 1  #PLTS ISS: 1  VEH USE: P IRP EXMPT:  TEMP PLT#:
PLT#: VYC3195 ___  REG STAT: A  EFFECT DT: 08/25/22   TEMP PLT TYP:
   PLT TYP: PAVL_ STKR:      MT PLT DT: 09/20/17 TEMP EXP DT:
   PLT STAT: RENEWAL      EXPIRE DT: 09/30/25  TEMP PLT STAT:
   PLT IMAGE: VYC3195    REG PRD: 3 FULL YEAR   REG LOC/USER ID: 697 / DMVHCB
PF: 6=CUSINF 7=CMMENU 8=DRSTAT 9=EMSINF 10=VEHACT 11=CUST NOTE
CUSTOMER NOTES EXIST - PRESS PF11 TO VIEW

JA255

# INCIDENT REPORT
## COMMONWEALTH OF VIRGINIA

**INCIDENT**

| 1-PAGE # | 2-ORI NUMBER |
|---|---|
| 1 | VA0600000 |

**3-INCIDENT NUMBER:** 2022-019786

**4-DATE(S) OF INCIDENT:** 08/29/2022    **5-R**

**7-TIME(S) OF INCIDENT:** 01:09 – 04:18

**8-DAY(S) OF INCIDENT:** Monday

**9-DISPATCHER**

**10-TIME RECEIVED:** 1:09  **11-TIME ARRIVED:** 1:09  **12-REPORTING AREA:** 20

**13-SOLVABILITY FACTORS:**
- (1) Suspect Named
- (2) Witness to Crime
- (3) Property Traceable ■
- (4) Unique M.O.
- (5) Suspect Identified ■
- (6) Susp. Vehicle Identified
- (7) Significant Evidence ■

**14-INTERNAL INCIDENT STATUS:**
- (1) Unfounded
- (2) Cleared by Arrest ■
- (3) Pending
- (4) Inactive

**16-EXCEPT. CLEAR. DATE**

**15-EXCEPTIONAL CLEARANCE STATUS:**
- (A) Death Of Offender
- (B) Prosecution Declined
- (C) Extradition Declined
- (D) Refused To Cooperate
- (E) Juvenile, No Custody
- (N) Not Applicable ■

**17-TEMP.:** 65° F

**18-WEATHER: (Max. 1)**
- (1) Clear ■  (2) Cloudy  (3) Rain
- (4) Snow  (5) Other  (6) Unk.

**OFFENSE**

| 19-OFFENSE # | 20-UCR CODE | 21-OFFENSE STATUS: |
|---|---|---|
| 1 | 35A | (A) Attempted  (C) Completed ■ |

**22-OFFENDER USED:** (N) Not Applicable  (A) Alcohol  (C) Cptr. Equip.  (D) Drugs ■

**23-Burglary (220) Location 14&19:** # PREMISES ENTERED?

**24-FORCED ENTRY?** Yes  No

**25-OFFENSE NAME:** POSSESSION OF SCHEDULE I,II CONTROLLED SUB

**26-ADDRESS OF OFFENSE:** 2000 North Franklin St., Christiansburg, VA 24073

**27-DIRECTION OF TRAVEL:** N  S  E  W  UNK.

**28-LOCATION CODE (Enter 1)**
- (01) Air/Bus/Train Terminal
- (02) Bank/Savings & Loan
- (03) Bar/Night Club
- (04) Church/Synagogue/Temple
- (05) Commercial/Office Building
- (06) Construction Site
- (07) Convenience Store
- (08) Department Discount Store
- (09) Drug Store/DR's Office/Hospital
- (10) Field/Woods
- (11) Government/Public Building
- (12) Grocery/Supermarket
- (13) Highway/Road/Alley ■
- (14) Hotel/Motel/Etc.
- (15) Jail/Penitentiary
- (16) Lake/Waterway
- (17) Liquor Store
- (18) Parking Lot/Garage
- (19) Rental/Storage Facility
- (20) Residence/Home
- (21) Restaurant
- (22) School/College
- (23) Service/Gas Station
- (24) Specialty Store (TV,Fur,Etc.)
- (25) Other/Unknown

**29-WEAPON FORCE: (Max. 3)**
*(For 11-15, place "A" in space next to box if weapon was an Automatic.)*
- (11) Firearm (Type not stated)
- (12) Handgun
- (13) Rifle
- (14) Shotgun
- (15) Other Firearm
- (20) Knife/Cutting Instru. (Ax, etc.)
- (30) Blunt Object (Club, etc.)
- (35) Motor Vehicle (As weapon)
- (40) Personal Weapons (Hands, etc.)
- (50) Poison
- (60) Explosives
- (65) Fire/Incendiary Device
- (70) Narcotics/Drugs/ Sleeping Pills
- (85) Asphyxiation
- (90) Other
- (95) Unknown
- (99) None

**30-TYPE CRIMINAL ACTIVITY: (Max. 3)**
- (B) Buying
- (C) Cultivate/Manufacture/Publish
- (D) Distributing/Selling
- (E) Exploiting Children
- (O) Operating/Promoting/Assisting
- (P) Possessing/Concealing ■
- (T) Transport/Transmit/Import
- (U) Using/Consuming

**31-TYPE SECURITY: (Max. 2)**
- (A) Alarm/Audio
- (B) Alarm/Silent
- (C) Bars/Grate
- (D) Camera
- (E) Dog
- (F) Dead Bolt
- (G) Locked
- (H) Unlocked
- (I) Ext. Lights
- (J) Int. Lights
- (K) Fence
- (L) Guard
- (M) Neighbrhd. Watch
- (N) Other
- (O) None

**32-ENTRY/EXIT: (Max. 2 entry, 2 exit)**
En Ex
- (01) Front
- (02) Rear
- (03) Side
- (04) Attic
- (05) Vent/A.C
- (06) Window
- (07) Door
- (08) Patio/Sliding Dr.
- (09) Balcony/Fire Escape
- (10) Attached Garage
- (11) Wall
- (12) Vehicle
- (13) Floor
- (14) Roof/Skylight
- (15) Hidden Within
- (16) Other
- (17) Unknown

**33-HOW LEFT SCENE: (enter 1)**
- (1) Auto
- (2) Truck
- (3) Van
- (4) Motorcycle
- (5) Bicycle
- (6) Foot
- (7) Moped
- (8) Other
- (9) Unknown

**34-WHICH OFFENDERS ARE RELATED TO THIS OFFENSE?: (mark offender #s):** #1 ■  #2  #3  #4  #5  #6  #7  #8  #9  #10 others:

**35-BIAS MOTIVATED CRIME:** 88 - None (No Bias)

**VICTIM**

| 36-VICTIM# | 37-NAME: Last, First, Middle | 38-SOC. SEC. NO. | 39-DATE OF BIRTH |
|---|---|---|---|
| 1 | COMMONWEALTH OF, VIRGINIA **USE THIS** | | |

**40-RESIDENT ADDRESS:** Street **USE THIS**  City  State  **41-ZIP**

**42-OCCUPATION**

**43-RESIDENT PHONE**

**44-EMPLOYMENT PHONE**

**45-SEX:** (M) Male  (F) Female  (U) Unknown

**46-ETHNIC:** (H) Hispanic  (N) Nonhispanic  (U) Unknown

**47-AGE:** Exact Age ____  Range __/__
- (NN) Under 24 Hrs. Old
- (NB) 1-6 Days Old
- (BB) 7-364 Days Old
- (99) Over 98 Yrs. Old
- (00) Unknown

**48-RACE:** (W) White  (I) American Indian  (U) Unknown  (B) Black  (A) Asian/Pacific Islander

**49-RES. STATUS:** (R) Resident  (N) Nonresident  (U) Unknown

**50-VICTIM TYPE:** (I) Individual  (B) Business  (F) Financial Institution  (U) Unknown  (G) Government  (R) Religious  (S) Society/Public ■  (O) Other  (L) L. E. Officer

**51-VICTIM INJURY: (Max. 5)**  (M) Apparent Minor Injury
- (N) None
- (B) Apparent Broken Bones
- (I) Possible Internal Injury
- (L) Severe Laceration
- (O) Other Major Injury
- (T) Loss of Teeth
- (U) Unconsciousness

**52-THIS VICTIM RELATED TO WHICH OFFENSES?** #1 ■  #2 ■  #3  #4  #5  #6  #7  #8  #9  #10 others:

**53-RELATIONSHIP OF THIS VICTIM TO OFFENDERS**
*(check relationship under appropriate offender number):*
#1 #2 #3 #4 #5 #6 #7 #8 #9 #10
- (SE) Spouse
- (CS) Common-Law Spouse
- (PA) Parent
- (SB) Sibling
- (CH) Child
- (GP) Grandparent
- (GC) Grandchild
- (IL) In-Law
- (SP) Stepparent
- (SC) Stepchild
- (SS) Stepsibling
- (OF) Other Family Member
- (AQ) Acquaintance
- (FR) Friend
- (NE) Neighbor
- (BE) Babysittee (baby)
- (BG) Boyfriend/Girlfriend
- (CF) Child of Boyfriend/Girlfriend
- (HR) Homosexual Relationship
- (XS) Ex-Spouse
- (EE) Employee
- (ER) Employer
- (OK) Otherwise Known
- (RU) Relationship Unknown
- (ST) Stranger
- (VO) Victim was Offender

**AGGRAVATED ASSAULT/HOMICIDE CIRCUMSTANCES**

**54-Aggravated Assault/Murder: (max. 2)**
- (01) Argument
- (02) Assault On Law Enf. Officer
- (03) Drug Dealing
- (04) Gangland
- (05) Juvenile Gang
- (06) Domestic Violence
- (07) Mercy Killing
- (08) Other Felony Involved
- (09) Other Circumstances
- (10) Unknown Circumstances

**54-Negligent Manslaughter: (enter 1)**
- (30) Child Playing With Weapon
- (31) Gun-Cleaning Accident
- (32) Hunting Accident
- (33) Other Negligent Weapon Handling
- (34) Other Negligent Killings

**54-Justifiable Homicide: (enter 1)**
- (20) Criminal Killed by Private Citizen
- (21) Criminal Killed by Police Officer

**57-ADDITIONAL JUSTIFIABLE HOMICIDE CIRC.: (enter 1)**
- (A) Criminal Attacked Police Officer
- (B) Criminal Attacked Fellow Police Officer
- (C) Criminal Attacked Civilian
- (D) Criminal Attempted Flight from a Crime
- (E) Criminal Killed in Commission of a Crime
- (F) Criminal Resisted Arrest
- (G) Unable to Determine/Not Enough Information

**ADM**

| 58-REPORT DATE | 59-DAY | 60-TIME (Military) | 61-REPORTING OFFICER | 62-CODE # | 63-APPROVING SUPERVISOR | 64-CODE # | 65-DATE APPROVED |
|---|---|---|---|---|---|---|---|
| 08/29/2022 | Mon | 5:55 | Deputy Jesse P. East | E070 | Captain Jeffrey A. Diggs | D531 | 09/30/2022 |

JA256

## INCIDENT REPORT
### COMMONWEALTH OF VIRGINIA

| 71-PAGE # | 72-DATE | 73-INCIDENT NUMBER | 74-OR# ("B") | 75-REPORTING OFFICER | 76-CODE # | 77-VICTIM NAME |
|---|---|---|---|---|---|---|
| 2 | 08/29/2022 | 2022-019786 | VA0600000 | Deputy Jesse P. East | E070 | COMMONWEALTH OF, VIRGINIA **USE T |

**OFFENDER / ARRESTEE**

| 78-ARRESTEE # | 79-NAME Last, | First, | Middle, | 80-AKA |
|---|---|---|---|---|
| 1 | | | | |

| 81-OFFENDER # | 82-RESIDENT ADDRESS Street | City | State | 83-Zip | 84-DATE OF BIRTH |
|---|---|---|---|---|---|
| 1 | | | | 24012 | |

| 85-RESIDENT PHONE | 86-EMPLOYMENT/SCHOOL PHONE | 87-DRIVER'S LICENSE | 88-DR. LI. STATE | 89-SSN |
|---|---|---|---|---|
| | | | | |

| 90-ARREST LOCATION | 91-OCCUPATION | 92-PLACE OF EMPLOYMENT | 93-ARREST TYPE: ☐ (O) On View Arrest ☐ (S) Summons/Cited ☐ (T) Taken Into Cust. |
|---|---|---|---|
| | | | |

- **94-SEX:** ■ (M) Male ☐ (F) Female ☐ (U) Unk.
- **95-ETHNIC:** ☐ (H) Hispanic ☐ (N) Nonhisp. ☐ (U) Unk.
- **96-RACE** ■ (W) White ☐ (B) Black ☐ (I) American Indian ☐ (A) Asian/Pacific Islander ☐ (U) Unknown
- **97-AGE: EXACT AGE** 35  **AGE RANGE:** ___ to ___  ☐ (99) Over 98 Yrs. Old  ☐ (00) Unknown
- **103-MULT. ARREST INDIC.:** ☐ (C) Count Arrestee
- **104-DISPOSITION OF JUVENILE:** ☐ (H) Handled within Department. ☐ (R) Referred outside Department
- ☐ (M) Multiple ☐ (N) N/A
- **105-WEAPONS AT ARREST:** (Max. 2) (Place "A" in blank if automatic) ☐ (01) Unarmed ☐ (11) Firearm ☐ (12) Handgun ☐ (13) Rifle ☐ (14) Shotgun ☐ (15) Other Firearm ☐ (16) Illegal Cutting Instr. ☐ (17) Club / Blackjack / Brass Kn.

| 98-RES. STATUS: ■ (R) Resident ☐ (N) Nonres. ☐ (U) Unknown | 99-UCR ARR. CODE | 100-OFFENSE NAME | 101-ARREST DATE | 102-ARREST TRANSACT. # |
|---|---|---|---|---|

**106-TYPE ARREST ACTIVITY: (Max. 3)**
- ☐ (B) Buying
- ☐ (C) Cultivate/Manufacture/Publish
- ☐ (D) Distributing/Selling
- ☐ (E) Exploiting Children
- ☐ (O) Operating/Promoting/Assisting
- ☐ (P) Possessing/Concealing
- ☐ (T) Transport/Transmit/Import
- ☐ (U) Using/Consuming

**107-AR. DRUG TYPE: (Max. 3)**
- ☐ (A) "Crack" Cocaine
- ☐ (B) Cocaine
- ☐ (C) Hashish
- ☐ (D) Heroin
- ☐ (E) Marijuana
- ☐ (F) Morphine
- ☐ (G) Opium
- ☐ (H) Other Narcotics
- ☐ (I) LSD
- ☐ (J) PCP
- ☐ (K) Other Hallucinogens
- ☐ (L) Amphetamines/Methamphetamines
- ☐ (M) Other Stimulants
- ☐ (N) Barbiturates
- ☐ (O) Other Depressants
- ☐ (P) Other Drugs
- ☐ (U) Unknown Type Drug
- ☐ (X) Over 3 Drug Types

| HEIGHT | WEIGHT | HANDEDNESS | BUILD | HAIR COLOR | HAIR STYLE | HAIR LENGTH | EYE COLOR | GLASSES | SKIN TONE |
|---|---|---|---|---|---|---|---|---|---|
| 5'08" | 160 | | | BLK - Black | | | | | |

**OFFENDER / ARRESTEE**

| 78-ARRESTEE # | 79-NAME Last, | First, | Middle, | 80-AKA |
|---|---|---|---|---|
| 1 | | | | |

| 81-OFFENDER # | 82-RESIDENT ADDRESS Street | City | State | 83-Zip | 84-DATE OF BIRTH |
|---|---|---|---|---|---|
| | Roanoke, VA | | | 24012 | |

| 85-RESIDENT PHONE | 86-EMPLOYMENT/SCHOOL PHONE | 87-DRIVER'S LICENSE | 88-DR. LI. STATE | 89-SSN |
|---|---|---|---|---|
| | | | | |

| 90-ARREST LOCATION | 91-OCCUPATION | 92-PLACE OF EMPLOYMENT | 93-ARREST TYPE: ■ (O) On View Arrest ☐ (S) Summons/Cited ☐ (T) Taken Into Cust. |
|---|---|---|---|
| 20 - Christiansburg | | | |

- **94-SEX:** ■ (M) Male ☐ (F) Female ☐ (U) Unk.
- **95-ETHNIC:** ☐ (H) Hispanic ☐ (N) Nonhisp. ☐ (U) Unk.
- **96-RACE** ■ (W) White ☐ (B) Black ☐ (I) American Indian ☐ (A) Asian/Pacific Islander ☐ (U) Unknown
- **97-AGE: EXACT AGE** 35  **AGE RANGE:** ___ to ___  ☐ (99) Over 98 Yrs. Old  ☐ (00) Unknown
- **103-MULT. ARREST INDIC.:** ☐ (C) Count Arrestee
- **104-DISPOSITION OF JUVENILE:** ☐ (H) Handled within Department. ■ (R) Referred outside Department
- ☐ (M) Multiple ■ (N) N/A
- **105-WEAPONS AT ARREST:** (Max. 2) (Place "A" in blank if automatic) ☐ (01) Unarmed ☐ (11) Firearm ☐ (12) Handgun ☐ (13) Rifle ☐ (14) Shotgun ☐ (15) Other Firearm ☐ (16) Illegal Cutting Instr. ☐ (17) Club / Blackjack / Brass Kn.

| 98-RES. STATUS: ■ (R) Resident ☐ (N) Nonres. ☐ (U) Unknown | 99-UCR ARR. CODE | 100-OFFENSE NAME | 101-ARREST DATE | 102-ARREST TRANSACT. # |
|---|---|---|---|---|
| | 90D | DRIVING UNDER THE INFLUENCE | 8/29/2022 | # 2022-019786 |

**106-TYPE ARREST ACTIVITY: (Max. 3)**
- ☐ (B) Buying
- ☐ (C) Cultivate/Manufacture/Publish
- ☐ (D) Distributing/Selling
- ☐ (E) Exploiting Children
- ☐ (O) Operating/Promoting/Assisting
- ■ (P) Possessing/Concealing
- ☐ (T) Transport/Transmit/Import
- ☐ (U) Using/Consuming

**107-AR. DRUG TYPE: (Max. 3)**
- ☐ (A) "Crack" Cocaine
- ☐ (B) Cocaine
- ☐ (C) Hashish
- ☐ (D) Heroin
- ☐ (E) Marijuana
- ☐ (F) Morphine
- ☐ (G) Opium
- ☐ (H) Other Narcotics
- ☐ (I) LSD
- ☐ (J) PCP
- ☐ (K) Other Hallucinogens
- ■ (L) Amphetamines/Methamphetamines
- ☐ (M) Other Stimulants
- ☐ (N) Barbiturates
- ☐ (O) Other Depressants
- ☐ (P) Other Drugs
- ☐ (U) Unknown Type Drug
- ☐ (X) Over 3 Drug Types

| HEIGHT | WEIGHT | HANDEDNESS | BUILD | HAIR COLOR | HAIR STYLE | HAIR LENGTH | EYE COLOR | GLASSES | SKIN TONE |
|---|---|---|---|---|---|---|---|---|---|
| 5'08" | 160 | | | BLK - Black | | | | | |

**SUBJECT DESCRIPTORS**

JA257

# INCIDENT REPORT
## COMMONWEALTH OF VIRGINIA

### VEHICLE LEAD

| 173-PAGE # | 174-DATE | 1754-INCIDENT # | 176-REPORTING OFFICER | | 177-CODE # | 178-VICTIM NAME |
|---|---|---|---|---|---|---|
| 3 | 08/29/2022 | 2022-019786 | Deputy Jesse P. East | | E070 | COMMONWEALTH OF, VIRGINIA **US |

| 179-YEAR | 180-MAKE | 181-MODEL | 182-STYLE | 183-VIN | 184-LICENSE NUMBER | 185-STATE |
|---|---|---|---|---|---|---|
| | Mecury | SUV | | | UJB6018 | VA |

| 186-OWNER'S NAME | 187-ADDRESS |
|---|---|
| ▮▮▮▮▮ | ▮▮▮▮▮ Roanoke, VA 24012 |

| 188-TOP/SOLID COLOR | 189-SECOND COLOR | 190-DISPOSITION OF RECOVERY: | 192-SUSP. VEHICLE? | 193-TELETYPE NUMBER |
|---|---|---|---|---|
| | | ☐ (I) Impounded  ☐ (R) Rel. To Owner | ■ Y  ☐ N | |

| 179-YEAR | 180-MAKE | 181-MODEL | 182-STYLE | 183-VIN | 184-LICENSE NUMBER | 185-STATE |
|---|---|---|---|---|---|---|
| | | | | | | |

| 186-OWNER'S NAME | 187-ADDRESS |
|---|---|
| | |

| 188-TOP/SOLID COLOR | 189-SECOND COLOR | 190-DISPOSITION OF RECOVERY: | 192-SUSP. VEHICLE? | 193-TELETYPE NUMBER |
|---|---|---|---|---|
| | | ☐ (I) Impounded  ☐ (R) Rel. To Owner | ☐ Y  ☐ N | |

### PROPERTY

| 209-OF. CODE | 210-P. LOSS | 211-P. DES. | 212-QTY. | 213-DESCRIPTION (Include serial number, size, color, etc.) | 214-OWNER | 215-ITEM VALUE | 216-RECOV. DATE |
|---|---|---|---|---|---|---|---|
| 90D | 6 | 70 | | Legal Blood Draw Kit | O1 | | |
| 90D | 6 | 10 | | Glass Smoking device containg a white crystal like substance | O1 | | |
| 90D | 6 | 10 | | Black scale displaying 0.01 covered in a white crystal like residue | O1 | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

| 217-TOTAL NUMBER VEHICLES STOLEN: | 218-TOTAL NUMBER VEHICLES RECOVERED: | 219-TOTAL VALUE STOLEN: | 220-TOTAL VALUE RECOVERED: |
|---|---|---|---|
| | | | |

### PROPERTY CODES

**210-PROPERTY LOSS:**  (1) None  (2) Burned  (3) Counterfeited/Forged  (4) Damaged/Destroyed/Vandalized  (5) Recovered  (6) Seized  (7) Stolen, etc.  (8) Unk.

**211-PROPERTY DESCRIPTION:**

| | | | |
|---|---|---|---|
| (01) Aircraft | (11) Drug/Narc. Equipment | (21) Negotiable Instruments | (32) Structures-Industrial/Manufacture |
| (02) Alcohol | (12) Farm Equipment | (22) Nonnegotiable Instruments | (33) Structures-Public/Community |
| (03) Automobiles | (13) Firearms | (23) Office-Type Equipment | (34) Structures-Storage |
| (04) Bicycles | (14) Gambling Equipment | (24) Other Motor Vehicles | (35) Structures-Other |
| (05) Buses | (15) Heavy Equipment-Construction/Industry | (25) Purses/Handbags/Wallets | (36) Tools-Power/Hand |
| (06) Cloths/Furs | (16) Household Goods | (26) Radios/TVs/VCRs | (37) Trucks |
| (07) Computer Hardware/Software | (17) Jewelry/Precious Metals | (27) Recordings-Audio/Visual | (38) Vehicle Parts/Accessories |
| (08) Consumable Goods | (18) Livestock | (28) Recreational Vehicles | (39) Watercraft |
| (09) Credit Cards/Debit Cards | (19) Merchandise | (29) Structures-Single Occupancy | (77) Other |
| (10) Drugs/Narcotics | (20) Money | (30) Structures-Other Dwellings | (88) Pending Inventory (of Property) |
| | | (31) Structures-Commercial/Business | (99) Special Category |

### DRUG INFO.

| 222-DRUG TYPE | 223-WHOLE DRUG QUANTITY | 224-FRACTIONAL DRUG QUANTITY | 225-DRUG MEASUREMENT |
|---|---|---|---|
| L | 1 | | GM |
| L | 1 | | GM |
| | | | |

**225-TYPE DRUG MEASUREMENT:**

WEIGHT
(GM) Gram
(KG) Kilogram
(OZ) Ounce
(LB) Pound

CAPACITY
(ML) Milliliter
(LT) Liter
(FO) Fluid Ounce
(GL) Gallon

UNITS
(DU) Dosage Unit (Pills, etc.)
(NP) Number of Plants

**222-DRUG TYPE:**

| | | | |
|---|---|---|---|
| (A) "Crack" Cocaine | (F) Morphine | (K) Other Hallucinogens | (O) Other Depressants |
| (B) Cocaine | (G) Opium | (L) Amphetamines/Methamphetamines | (P) Other Drugs |
| (C) Hashish | (H) Other Narcotics | (M) Other Stimulants | (U) Unknown Type Drug |
| (D) Heroin | (I) LSD | (N) Barbiturates | (X) Over 3 Drug Types |
| (E) Marijuana | (J) PSP | | |

### COMPLNT.

| NAME:   Last,   First,   Middle | SEX: | AGE: ____ | RACE: |
|---|---|---|---|
| | ☐ (M) Male  ☐ (F) Female  ☐ (U) Unk. | ☐ (00) Unknown | ☐ (W) White  ☐ (B) Black  ☐ (I) American Indian  ☐ (A) Asian/Pacific Islander  ☐ (U) Unknown |

| RESIDENT ADDRESS:   Street   City   State   Zip | RESIDENT PHONE | EMPLOY'T. PHONE | |
|---|---|---|---|
| | | | |

JA258

## CONFIDENTIAL SUPPLEMENT

| 226-PAGE # | 227-DATE | 228-INCIDENT NUMBER | 229-REPORTING OFFICER | | 230-CODE # | 231-VICTIM NAME |
|---|---|---|---|---|---|---|
| 4 | 08/29/2022 | 2022-019786 | Deputy Jesse P. East | | E070 | COMMONWEALTH OF, VIRGINIA **USE THI |

| 234–SCENE PROCESSED BY: | 236-PRINTS FOUND? ☐ Yes ☑ No | 238-EVIDENCE ☐ Yes |
|---|---|---|
| E070-Deputy Jesse P. East | 237-PHOTOGRAPHED? ☐ Yes ☑ No | OBTAINED? ☑ No |

| 239-APPROVING SUPERVISOR | 240-CODE # | 241-DATE APPROVED |
|---|---|---|
| Captain Jeffrey A. Diggs | D531 | 09/30/2022 |

**WITNESSES**

| 243-NAME: Last, First, Middle | 244-SEX: ☐ (U) Unk. ☐ (M) Male ☐ (F) Female | 245-AGE: ☐ (00) Unknown | 246-RACE: ☐ (U) Unk. ☐ (W) White ☐ (B) Black ☐ (I) American Indian |
|---|---|---|---|
| 247-RESIDENT ADDRESS: Street   City   State   248-Zip | 249-RESIDENT PHONE | 250-EMPL. PHONE | ☐ (A) Asian/Pacific Islander |
| 243-NAME: Last, First, Middle | 244-SEX: ☐ (U) Unk. ☐ (M) Male ☐ (F) Female | 245-AGE: ☐ (00) Unknown | 246-RACE: ☐ (U) Unk. ☐ (W) White ☐ (B) Black ☐ (I) American Indian |
| 247-RESIDENT ADDRESS: Street   City   State   248-Zip | 249-RESIDENT PHONE | 250-EMPL. PHONE | ☐ (A) Asian/Pacific Islander |

**NARRATIVE:**

On 08/29/2022 while on patrol in Montgomery County I, Deputy J.P. East, was conducting a routine patrol of Peppers Ferry Road when I observed a silver SUV traveling on Peppers Ferry Road toward Christiansburg. The vehicle on multiple occasions slowed down by approximately 10 mph and then would speed up quickly. The vehicle drove to the intersection of Peppers Ferry Road and North Franklin Street in the furthest right lane. The vehicle then did an improper right turn onto North Franklin Street. At this time, I initiated a traffic stop by activating my emergency blue lights. The vehicle came to a stop at 2000 North Franklin Street. I approached the vehicle and identified the driver as ███████ via his Mexico passport. I ran Mr. ██████ information through dispatch and they notified me that he was wanted out of Franklin County. I asked dispatch to confirm the paper work for Mr. ████.

I approached the vehicle a second time and asked Mr. ████ to step out of the vehicle. I told Mr. ████ to walk back to my vehicle. I began speaking with Mr. ████ and I was able to detect an odor of marijuana coming from his person. Mr. ████'s speech was slurred and his eyes were bloodshot and glassy. I asked Mr. ████ if he would do some tests for me to which he agreed. I asked Mr. ████ if he wore glasses or contacts and he stated that he did not. I asked Mr. ████ if he had any medical conditions such as diabetes to which he stated he did not. I asked Mr. ████ if he took any type of medication to which he stated he did not. I asked Mr. ████ if he had any physical ailments to affected him walking day to day and he stated he did not. I asked Mr. ████ how far he went in school and he stated that he finished high school.

Horizontal Gaze Nystagmus

The first test I conducted was the horizontal gaze nystagmus. I instructed and explained the test to Mr. ████. Mr. ████ stated he understood the test prior to performing it. I did not observe any resting nystagmus. I observed one clue in each eye for lack of smooth pursuit. I observed one clue in each eye for distinct and sustained nystagmus at maximum deviation. I observed one clue in each eye for onset of nystagmus prior to forty-five degrees. I did not observe any clues for vertical gaze nystagmus.

Walk and Turn

The next test I conducted was the walk and turn test. I instructed, explained, and demonstrated the test for Mr. ████. Mr. ████ stated he understood the test before beginning the test. Mr. ████ failed to count out loud as instructed for the first nine steps. Mr. ████ took ten steps instead of nine and did an improper turn by pivoting in place. On step three on the way back, Mr. ████ failed to step heel to toe. Mr. ████ did ten steps instead of nine.

JA259

## CONFIDENTIAL SUPPLEMENT NARRATIVE CONTINUATION

| 226-PAGE # | 227-DATE | 228-INCIDENT NUMBER | 229-REPORTING OFFICER | 230-CODE # | 231-VICTIM NAME |
|---|---|---|---|---|---|
| 5 | 08/29/2022 | 2022-019786 | Deputy Jesse P. East | E070 | COMMONWEALTH OF, VIRGINIA **USE THI |

**NARRATIVE:**

One Leg Stand

The third test I conducted was the one leg stand test. I instructed, explained, and demonstrated this test for Mr. ████. Mr. ████ stated he understood the test before beginning the test. At approximately the ten second mark, Mr. ████ lifted his arms up to catch his balance and fell backward letting his foot touch the ground in order to keep his balance. Mr. ████ then picked up the opposite foot at approximately the eighteen second mark. Throughout the test Mr. ████ was actively swaying back and forth as if he could not catch his balance.

Counting

The next test I conducted was the counting test. I asked Mr. ████ to count backward from 73 to 48. Mr. Chavez stated, "73, 72, 71, 70, 69, 68, 67, 66, 65, 64, 63, 62, 61, 60, 59, 58, 57, 56, 55, 56, 56, 55, 54, 53, 52, 51, 50, 49, 48, 47, You said 47 right?".

Sergeant Dunford then administered some advanced impairment detection tests.

I advised Mr. ████ of his preliminary breath test rights and offered him a preliminary breath test to which he agreed. The result of the breath test was 0.00 BAC.

At this time, I placed Mr. ████ under arrest for DUI.

I then conducted an inventory search of the vehicle before it was towed. All things of value were noted in my body camera footage. During my inventory search I located a black scale inside of a white backpack in the front seat. Upon further investigation the scale was covered in a white crystal-like substance. I then conducted a probable cause search of the vehicle. during my PC search I located a glass smoking device containing a white crystal-like residue in the sun roof of the vehicle. Both items were seized and will be sent off to be tested.

I transported Mr. ████ to Lewis Gale Montgomery Hospital (3700 South Main Street) for a legal blood draw. I read Mr. ████ the implied consent form and he agreed to give a sample of blood.

I then transported Mr. ████ to the Magistrate's office and obtained charges for 18.2-266 (DUI) and 18.2-250 (Possession of Schedule I or II drugs).

I transported Mr. ████ to the jail and released him into the custody of the jail.

The blood sample Mr. ████ provided is being sent off to the lab.

My body camera was active and recording.

Nothing further.

SUPPLEMENT #4    Deputy Jesse P. East – E070    09/02/2022    05:51

## CONFIDENTIAL SUPPLEMENT NARRATIVE CONTINUATION

| 226-PAGE # | 227-DATE | 228-INCIDENT NUMBER | 229-REPORTING OFFICER | 230-CODE # | 231-VICTIM NAME |
|---|---|---|---|---|---|
| 6 | 08/29/2022 | 2022-019786 | Deputy Jesse P. East | E070 | COMMONWEALTH OF, VIRGINIA **USE THI |

NARRATIVE:

I have but copies of the warrants obtained in the IBR box.

Nothing further.

SUPPLEMENT #7   Sergeant Cody M. Dunford - D703   09/30/2022   05:25

On 08/29/22, I was assisting Deputy East on a DUI investigation involving ▮▮▮▮▮▮▮. I am certified in ARIDE (Advanced Roadside Impaired Driving Enforcement). I conducted three test, lack of convergence (LOC), Finger to nose, and the modified Romberg test.

On LOC, I observed lack of convergence in his right eye.

On the finger to nose test I explained and demonstrated the test to ▮▮▮▮. He stated he understood the instructions. During the test I observed him touch to the right of the tip of his nose instead of on the tip of his nose.

On the modified Romberg test, I explained to ▮▮▮▮ that I wanted him to close his eyes and think about the passing of 30 seconds. I explained that when he believed 30 seconds had passed I wanted him to open his eyes and say "done." I asked ▮▮▮▮ if he understood and he said yes. I told him to begin. ▮▮▮▮ remained with his eyes closed until 2:45 seconds. He stopped the test by asking if he was good and then I asked him if he was done to which he replied he was.  He told me he did not remember to say done when 30 seconds had passed.

My BWC was active throughout this encounter.

JA261

**CONTINUATION PAGE**

| 173-PAGE # | 174-DATE | 1754-INCIDENT # | 176-REPORTING OFFICER | 177-CODE # | 178-VICTIM NAME |
|---|---|---|---|---|---|
| 7 | 08/29/2022 | 2022-019786 | Deputy Jesse P. East | E070 | COMMONWEALTH OF, VIRGINIA **USE |

## Offense(s)

| 19-OFFENSE # | 20-UCR CODE | 21-OFFENSE STATUS: | 22-OFFENDER USED: ☐ (N) Not Applicable | 23-Burglary (220) Location 14&19: | 24-FORCED ENTRY? |
|---|---|---|---|---|---|
| 2 | 90D | ☐ (A) Attempted ■ (C) Completed | ☐ (A) Alcohol ☐ (C) Cptr. Equip. ■ (D) Drugs | # PREMISES ENTERED? | ☐ Yes ☐ No |

| 25-OFFENSE NAME | 26-ADDRESS OF OFFENSE | 27-DIRECTION OF TRAVEL: |
|---|---|---|
| DRIVING UNDER THE INFLUENCE OF ALCOHOL | 2000 North Franklin St., Christiansburg, VA 24073 | ☐N ☐S ☐E ☐W ☐UNK. |

**28-LOCATION CODE** (Enter 1)

- ☐ (01) Air/Bus/Train Terminal
- ☐ (02) Bank/Savings & Loan
- ☐ (03) Bar/Night Club
- ☐ (04) Church/Synagogue/Temple
- ☐ (05) Commercial/Office Building
- ☐ (06) Construction Site
- ☐ (07) Convenience Store
- ☐ (08) Department Discount Store
- ☐ (09) Drug Store/DR's Office/Hospital
- ☐ (10) Field/Woods
- ☐ (11) Government/Public Building
- ☐ (12) Grocery/Supermarket
- ■ (13) Highway/Road/Alley
- ☐ (14) Hotel/Motel/Etc.
- ☐ (15) Jail/Penitentiary
- ☐ (16) Lake/Waterway
- ☐ (17) Liquor Store
- ☐ (18) Parking Lot/Garage
- ☐ (19) Rental/Storage Facility
- ☐ (20) Residence/Home
- ☐ (21) Restaurant
- ☐ (22) School/College
- ☐ (23) Service/Gas Station
- ☐ (24) Specialty Store (TV,Fur,Etc.)
- ☐ (25) Other/Unknown ___ ___ ___

**29-WEAPON FORCE:** (Max. 3)
( For 11-15, place "A" in space next to box if weapon was an Automatic.)

- ___ ☐ (11) Firearm (Type not stated)
- ___ ☐ (12) Handgun
- ___ ☐ (13) Rifle
- ___ ☐ (14) Shotgun
- ___ ☐ (15) Other Firearm
- ☐ (20) Knife/Cutting Instru. (Ax, etc.)
- ☐ (30) Blunt Object (Club, etc.)
- ☐ (35) Motor Vehicle (As weapon)
- ☐ (40) Personal Weapons (Hands, etc.)
- ☐ (50) Poison
- ☐ (60) Explosives
- ☐ (65) Fire/Incendiary Device
- ☐ (70) Narcotics/Drugs/ Sleeping Pills
- ☐ (85) Asphyxiation
- ☐ (90) Other ___ ___ ___
- ☐ (95) Unknown
- ☐ (99) None

**30-TYPE CRIMINAL ACTIVITY:** (Max. 3)

- ☐ (B) Buying
- ☐ (C) Cultivate/Manufacture/Publish
- ☐ (D) Distributing/Selling
- ☐ (E) Exploiting Children
- ☐ (O) Operating/Promoting/Assisting
- ☐ (P) Possessing/Concealing
- ☐ (T) Transport/Transmit/Import
- ☐ (U) Using/Consuming

**31-TYPE SECURITY:** (Max. 2)

- ☐ (A) Alarm/Audio
- ☐ (B) Alarm/Silent
- ☐ (C) Bars/Grate
- ☐ (D) Camera
- ☐ (E) Dog
- ☐ (F) Dead Bolt
- ☐ (G) Locked
- ☐ (H) Unlocked
- ☐ (I) Ext. Lights
- ☐ (J) Int. Lights
- ☐ (K) Fence
- ☐ (L) Guard
- ☐ (M) Neighbrhd. Watch
- ☐ (N) Other ___
- ☐ (O) None

**32-ENTRY/EXIT:** (Max. 2 entry, 2 exit)

En Ex
- ☐☐ (01) Front
- ☐☐ (02) Rear
- ☐☐ (03) Side
- ☐☐ (04) Attic
- ☐☐ (05) Vent/A.C
- ☐☐ (06) Window
- ☐☐ (07) Door
- ☐☐ (08) Patio/Sliding Dr.
- ☐☐ (09) Balcony/Fire Escape

En Ex
- ☐☐ (10) Attached Garage
- ☐☐ (11) Wall
- ☐☐ (12) Vehicle
- ☐☐ (13) Floor
- ☐☐ (14) Roof/Skylight
- ☐☐ (15) Hidden Within
- ☐☐ (16) Other ___ ___
- ☐☐ (17) Unknown

**33-HOW LEFT SCENE:** (enter 1)
- ☐ (1) Auto
- ☐ (2) Truck
- ☐ (3) Van
- ☐ (4) Motorcycle
- ☐ (5) Bicycle
- ☐ (6) Foot
- ☐ (7) Moped
- ☐ (8) Other ___ ___
- ☐ (9) Unknown

**34-WHICH OFFENDERS ARE RELATED TO THIS OFFENSE?:** (mark offender #s):   32
■ #1 ☐ #2 ☐ #3 ☐ #4 ☐ #5 ☐ #6 ☐ #7 ☐ #8 ☐ #9 ☐ #10 others: ___

**35-BIAS MOTIVATED CRIME:**
88 - None (No Bias)

| 19-OFFENSE # | 20-UCR CODE | 21-OFFENSE STATUS: | 22-OFFENDER USED: ☐ (N) Not Applicable | 23-Burglary (220) Location 14&19: | 24-FORCED ENTRY? |
|---|---|---|---|---|---|
| 3 | 90Z-607H | ☐ (A) Attempted ■ (C) Completed | ☐ (A) Alcohol ☐ (C) Cptr. Equip. ■ (D) Drugs | # PREMISES ENTERED? | ☐ Yes ☐ No |

| 25-OFFENSE NAME | 26-ADDRESS OF OFFENSE | 27-DIRECTION OF TRAVEL: |
|---|---|---|
| Warrant Service | 2000 North Franklin St., Christiansburg, VA 24073 | ☐N ☐S ☐E ☐W ☐UNK. |

**28-LOCATION CODE** (Enter 1)

- ☐ (01) Air/Bus/Train Terminal
- ☐ (02) Bank/Savings & Loan
- ☐ (03) Bar/Night Club
- ☐ (04) Church/Synagogue/Temple
- ☐ (05) Commercial/Office Building
- ☐ (06) Construction Site
- ☐ (07) Convenience Store
- ☐ (08) Department Discount Store
- ☐ (09) Drug Store/DR's Office/Hospital
- ☐ (10) Field/Woods
- ☐ (11) Government/Public Building
- ☐ (12) Grocery/Supermarket
- ■ (13) Highway/Road/Alley
- ☐ (14) Hotel/Motel/Etc.
- ☐ (15) Jail/Penitentiary
- ☐ (16) Lake/Waterway
- ☐ (17) Liquor Store
- ☐ (18) Parking Lot/Garage
- ☐ (19) Rental/Storage Facility
- ☐ (20) Residence/Home
- ☐ (21) Restaurant
- ☐ (22) School/College
- ☐ (23) Service/Gas Station
- ☐ (24) Specialty Store (TV,Fur,Etc.)
- ☐ (25) Other/Unknown ___ ___ ___

**29-WEAPON FORCE:** (Max. 3)
( For 11-15, place "A" in space next to box if weapon was an Automatic.)

- ___ ☐ (11) Firearm (Type not stated)
- ___ ☐ (12) Handgun
- ___ ☐ (13) Rifle
- ___ ☐ (14) Shotgun
- ___ ☐ (15) Other Firearm
- ☐ (20) Knife/Cutting Instru. (Ax, etc.)
- ☐ (30) Blunt Object (Club, etc.)
- ☐ (35) Motor Vehicle (As weapon)
- ☐ (40) Personal Weapons (Hands, etc.)
- ☐ (50) Poison
- ☐ (60) Explosives
- ☐ (65) Fire/Incendiary Device
- ☐ (70) Narcotics/Drugs/ Sleeping Pills
- ☐ (85) Asphyxiation
- ☐ (90) Other ___ ___ ___
- ☐ (95) Unknown
- ☐ (99) None

**30-TYPE CRIMINAL ACTIVITY:** (Max. 3)

- ☐ (B) Buying
- ☐ (C) Cultivate/Manufacture/Publish
- ☐ (D) Distributing/Selling
- ☐ (E) Exploiting Children
- ☐ (O) Operating/Promoting/Assisting
- ☐ (P) Possessing/Concealing
- ☐ (T) Transport/Transmit/Import
- ☐ (U) Using/Consuming

**31-TYPE SECURITY:** (Max. 2)

- ☐ (A) Alarm/Audio
- ☐ (B) Alarm/Silent
- ☐ (C) Bars/Grate
- ☐ (D) Camera
- ☐ (E) Dog
- ☐ (F) Dead Bolt
- ☐ (G) Locked
- ☐ (H) Unlocked
- ☐ (I) Ext. Lights
- ☐ (J) Int. Lights
- ☐ (K) Fence
- ☐ (L) Guard
- ☐ (M) Neighbrhd. Watch
- ☐ (N) Other ___ ___
- ☐ (O) None

**32-ENTRY/EXIT:** (Max. 2 entry, 2 exit)

En Ex
- ☐☐ (01) Front
- ☐☐ (02) Rear
- ☐☐ (03) Side
- ☐☐ (04) Attic
- ☐☐ (05) Vent/A.C
- ☐☐ (06) Window
- ☐☐ (07) Door
- ☐☐ (08) Patio/Sliding Dr.
- ☐☐ (09) Balcony/Fire Escape

En Ex
- ☐☐ (10) Attached Garage
- ☐☐ (11) Wall
- ☐☐ (12) Vehicle
- ☐☐ (13) Floor
- ☐☐ (14) Roof/Skylight
- ☐☐ (15) Hidden Within
- ☐☐ (16) Other ___ ___
- ☐☐ (17) Unknown

**33-HOW LEFT SCENE:** (enter 1)
- ☐ (1) Auto
- ☐ (2) Truck
- ☐ (3) Van
- ☐ (4) Motorcycle
- ☐ (5) Bicycle
- ☐ (6) Foot
- ☐ (7) Moped
- ☐ (8) Other ___ ___
- ☐ (9) Unknown

**34-WHICH OFFENDERS ARE RELATED TO THIS OFFENSE?:** (mark offender #s):   33
■ #1 ☐ #2 ☐ #3 ☐ #4 ☐ #5 ☐ #6 ☐ #7 ☐ #8 ☐ #9 ☐ #10 others: ___

**35-BIAS MOTIVATED CRIME:**
88 - None (No Bias)

JA262



**U.S. Department of Justice**
**Drug Enforcement Administration**

Mid-Atlantic Laboratory
Largo, MD

## Chemical Analysis Report

ATF - Roanoke Office
310 First Street, Suite 500
Roanoke, VA 24011

**Case Number:** 24-06817
**LIMS Number:** 2024-SFL3-01972

**Observations, Results and Conclusions:**

| Exhibit | Substance(s) Identified | Net Weight | Substance Purity | Amount Pure Substance |
|---|---|---|---|---|
| 4 | Methamphetamine | Residue | ---- | ---- |

**Remarks:**

The net weight represents the weight of all material, excluding the packaging.

**Exhibit Details:**

**Date Accepted by Laboratory:** 03/25/2024     **Gross Weight:** 150.7 g     **Date Received by Examiner:** 12/05/2024

| Exhibit | No. Units | Pkg. (Inner) | Form | Reserve Wt. |
|---|---|---|---|---|
| 4 | 1 | Pipe | Residue | Residue |

**Remarks:**

**Exhibit Analysis:**

**Sampling:**

Methamphetamine identified in 1 unit(s) tested.

| Exhibit | Summary of Test(s) |
|---|---|
| 4 | Gas Chromatography/Mass Spectrometry, Marquis Color Test |

The following summary of testimony is provided as required by Federal Rule of Criminal Procedure 16(a)(1)(G) and is a complete statement of my opinions, which are exclusive to and address only the exhibit(s) identified in this summary. I am employed by the U.S. Department of Justice, Drug Enforcement Administration (DEA) and was so employed when I conducted the examinations and analyses of the above referenced LIMS number. My qualifications to conduct the examinations and analyses, and to express an opinion as to the identity of the material contained in the exhibit(s) described above, are based on my knowledge, skill, experience, training, and education. See my Curriculum Vitae (which will be provided prior to the close of expert discovery) for additional information regarding my qualifications, including previous testimony offered in the last four years and any publications authored in the last ten years. The opinions described are based on the listed chemical, physical, and instrumental analyses, the results generated by those analyses, and my interpretation of those results set forth in the laboratory report and analyst notes. The manner and process by which I performed the analyses were, to the best of my knowledge, in accordance with the publicly available Analysis of Drugs Manual (ADM) and Laboratory Operations Manual (LOM), in effect at the time of analysis. These are generally available at: https://www.dea.gov/resources/documents?f%5B0%5D=publication_type%3A2596, or were otherwise disclosed upon request. I analyzed the material contained in the exhibit(s) which were submitted for analysis in the above referenced LIMS number. Refer to this laboratory report associated with the subject LIMS number. The analytical methods used in these analyses are validated and verified according to our quality assurance policy to ensure the methods are reliable and fit-for-purpose and the techniques utilized are widely accepted and employed in the scientific and forensic community. Summaries of instrumental methods are available at: https://www.dea.gov/resources/documents?f%5B0%5D=publication_type%3A2596. This report, its attachments, and the referenced documents are not an exhaustive or complete recitation of testimony that I may offer. In addition, I may offer opinions in response to questions posed during trial. Pursuant to Fed. R. Crim. P. 16(a)(1)(G)(v), I, the analyst, approve the foregoing disclosure, and reserve the right to amend as necessary to comply with Rule 16's obligations.

The terminology used in the preparation of this report is consistent with the current Department of Justice Uniform Language for Testimony and Reports for General Forensic Chemistry and Seized Drug Examinations.

**Analyzed By:** /S/ Rebecca J. Wang, Senior Forensic Chemist     **Date:** 12/12/2024
**Approved By:** /S/ Christine A. Haddix, Senior Forensic Chemist     **Date:** 12/13/2024

DEA Form 113 November 2024

Page 1 of 1

JA263

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) Case No.: 7:24-CR-11 |
| ISAAC FIDEL MARTINEZ-CHAVEZ | ) |
| | ) |

**RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS**

**I.   INTRODUCTION**

The defendant, Isaac Fidel Martinez-Chavez ("Mr. Martinez-Chavez"), seeks to suppress both firearms and all ammunition, magazines, and accessories found by law enforcement officers in the car he was driving on January 1, 2024.  Mr. Martinez-Chavez alleges that officers did not conduct a valid traffic stop, that the plain view exception to the warrant requirement does not apply, and that the officers' search of the car was not justified.

A complete account of events reveals that officers had objective justifications for their actions. Officers properly attempted to initiate a traffic stop due to Mr. Martinez-Chavez speeding and driving with his lights off on public highways. Officers developed reasonable and articulable suspicion to conduct checks unrelated to the reason for the stop. Once officers saw the sawed-off rifle in plain view, they made the reasonable decision to secure it, given that at least three people came out of the residence where Mr. Martinez-Chavez had parked, and one of them even attempted to enter Mr. Martinez-Chavez's car while an officer had Mr. Martinez-Chavez in handcuffs.

Officers towed the car in accordance with their department's guidelines. Having seen the sawed-off rifle in plain view, they would have conducted an inventory search prior to towing and would have inevitably discovered both firearms and ammunition. Accordingly, the Court should deny Mr. Martinez-Chavez's motion to suppress.

1

JA264

## II.    FACTS

The following is a factual summary of the incident. The government expects to present additional supporting evidence during the hearing. Lieutenant Justin Hylton works for the Franklin County Sheriff's Office (FCSO). Per Lieutenant Hylton's police report[1], on January 1, 2024, around 12:05 a.m., Lieutenant Hylton was driving South on South Main Street in Rocky Mount when he saw a silver Kia, driven by Mr. Martinez-Chavez, travelling in the opposite direction faster than the posted 45 speed limit. He confirmed through radar that Mr. Martinez-Chavez was traveling at 60 MPH.  Lieutenant Hylton turned and followed the Kia. Because it was a holiday, he was looking for impaired drivers. As he approached the Kia, Mr. Martinez-Chavez "picked up speed," and turned onto Scuffling Hill Road. Lieutenant Hylton closed the distance. "As the car approached the second Knollwood Drive on Scuffling Hill [Road], the target vehicle[']s headlights and tail lights went out *while still travelling*."[2] (emphasis added).  Lieutenant Hylton decided to initiate a traffic stop "based on that driving behavior" and activated his emergency lights. With the Kia's lights still out, Mr. Martinez-Chavez made an "abrupt" right turn onto Highview Terrace off Scuffling Hill Road and pulled into a yard.  Lieutenant Hylton pulled in behind the car with his emergency lights still activated.[3] Mr. Martinez-Chavez traveled in the dark, with his car lights off, on Scuffling Hill Road and on Highview Terrace, both of which are public roads.[4]

Lieutenant Hylton maintained a visual of the Kia except for perhaps a couple of seconds as they turned corners. The car was continually in motion and travelling at a high rate of speed. It did not stop. Nobody was dropped off.[5]

---

[1] Gov Exh 1 - Lieutenant Hylton Police Report, at p. 2.
[2] Gov Exh 2 - Poulin, Gardner, Johnson Police Report, at 5 (Officer Poulin states that he was listening to radio traffic and heard Lieutenant Hylton "inform dispatch that the vehicle had *blacked out the lights while moving*." (emphasis added)
[3] Gov Exh 1 - Lieutenant Hylton Police Report, at p. 2.
[4] Gov Exh 3 - ATF ROI 10, Hylton interview, at para. 6.
[5] Id. at paras. 5 and 21.

2

JA265

Per Lieutenant Hylton's police report, Mr. Martinez-Chavez opened the driver's side door. As Lieutenant Hylton shone his spotlight into the Kia, he saw Mr. Martinez-Chavez "leaning into the passenger side of the car with arms extended, apparently reaching for something." Lieutenant Hylton drew his gun, took cover behind his car door, and ordered Mr. Martinez-Chavez to exit the Kia and to show his hands.[6]

Lieutenant Hylton is a Patrol Lieutenant who drives a marked patrol squad car without an in-car system. Squad cars equipped with the in-car system have cameras mounted in the cars. The system also immediately activates the BWC that the driver/officer is wearing. To record this incident, Lieutenant Hylton had to manually activate his BWC, which he did.[7]

Lieutenant Hylton noted that Mr. Martinez-Chavez was alone and notified dispatch that he had him at gunpoint. Lieutenant Hylton repeatedly told Mr. Martinez-Chavez to show him his hands. Mr. Martinez-Chavez would face Lieutenant Hylton, turn away, look back at the car, and put his hands back in his pockets. Lieutenant Hylton warned Mr. Martinez-Chavez that if he did not comply, he might be shot. Mr. Martinez-Chavez finally complied. Lieutenant Hylton detained him and told him that he was not under arrest.[8]

Lieutenant Hylton's BWC initially shows Lieutenant Hylton coming out from behind his car door from where he had taken cover. Mr. Martinez-Chavez has his hands up on the rear of the Kia.[9]



---

[6] Gov Exh 1 - Lieutenant Hylton Police Report, at p. 3.
[7] Gov Exh 3 – ATF ROI 10, Hylton interview, at para. 7.
[8] Gov Exh 1 - Lieutenant Hylton Police Report, at p. 3.
[9] Defense Exh 3, "Hylton's Body Worn Camera Recording," at 0:00.

3

JA266

At time 0:06, the BWC that Lieutenant Hylton had attached to his chest area fell to the ground. Lieutenant Hylton had not deactivated it. It kept recording video footage of the ground. The audio recording captured noise from the patrol car engine and a conversation between Lieutenant Hylton and Mr. Martinez-Chavez.[10] Lieutenant Hylton can be heard telling Mr. Martinez-Chavez to keep his hands on the car. (time 00:19). Lieutenant Hylton also asked Mr. Martinez-Chavez how much he had to drink to which Mr. Martinez-Chavez answered, "one beer." (time 01:00 – 01:04). Lieutenant Hylton then asked for Mr. Martinez-Chavez's identification. (time 01:10). Lieutenant Hylton picked his BWC off the ground at time 02:18. He and Mr. Martinez-Chavez proceeded to have a conversation is English about Mr. Martinez-Chavez's identification. At no time did Mr. Martinez-Chavez ask Lieutenant Hylton to repeat himself or to clarify a statement.[11] At time 02:40, Mr. Martinez-Chavez began to explain why he was driving fast by saying, "I really. I only coming fast like that because I—." Lieutenant Hylton interrupted Mr. Martinez-Chavez when he showed him the identification he pulled out of his wallet. Mr. Martinez-Chavez did not have a driver's license, nor did he have a state identification.[12]

At time 02:55, Mr. Martinez-Chavez called over a male acquaintance and told him something in Spanish. Although Lieutenant Hylton could not understand what Mr. Martinez-Chavez was saying, Mr. Martinez-Chavez's frantic statements to his friend caused Lieutenant Hylton to stop talking to dispatch and to forcefully order Mr. Martinez-Chavez's friend to "stay out of the car" to "stay back there," and to "not get involved." (time 03:14). Lieutenant Hylton had seen Mr. Martinez-Chavez's acquaintance try to get in the car through the driver's side door.[13]

---

[10] Gov Exh 3 - ATF ROI 10, Hylton interview, at para. 8.
[11] Id., at para. 12.
[12] Id., at para. 14.
[13] Defense Exh 3, "Hylton's Body Worn Camera Recording," at 06:10 (Lieutenant Hylton told officers that the Defendant's "buddy tried to get in the car.")

4

JA267

Concerned with safety, Lieutenant Hylton looked at the man's hands and noticed that he was not holding anything. Lieutenant Hylton observed that the male did not get in the car, nor did he remove or deposit anything in it.[14]

At time 3:10, Lieutenant Hylton gave dispatch Mr. Martinez-Chavez's identifying information. Officer Trey Poulin arrived at time 03:51. He was the first back-up officer to arrive. Lieutenant Hylton told him that he "had him at 60 coming up South Main." At time 04:00 Lieutenant Hylton told Officer Poulin that Mr. Martinez-Chavez "put the hammer on it" and "he turned his lights out right down here."

At time 04:18, less than 30 seconds after Officer Poulin arrived, Lieutenant Hylton left Mr. Martinez-Chavez with Sargeant Caleb Johnson, walked up to the driver's side window, and shone his flashlight inside the car. He aimed his light toward the front passenger area, where he had seen Mr. Martinez-Chavez leaning. From outside the driver's side window, Lieutenant Hylton could not see the guns on the front passenger floorboard.

At time 04:30, only five seconds after Lieutenant Hylton shone his flashlight into the passenger area, Officer Poulin can be heard on Lieutenant Hylton's BWC footage say, "hey, there's a fucking gun in here, man" then tells Lieutenant Hylton to open the car because the front passenger door was locked. Six seconds later, Lieutenant Hylton told Officer Poulin, "yeah, he was reaching for something." Before Officer Poulin opened the door, he identified the gun as a sawed-off shotgun.[15]

When Lieutenant Hylton first saw Mr. Martinez-Chavez leaning, with outstretched hands, toward the front passenger area, he did not know whether Mr. Martinez-Chavez had been hiding

---

[14] Gov Exh 3 - ATF ROI 10, Hylton interview, at para. 11.
[15] Gov Exh 2 - Poulin, Gardner, Johnson Police Report, at 5. (It turned out to be a sawed-off rifle, the possession of which is also illegal under Virginia Code 18.2-300, with limited exceptions under 18.2-303.1.)

5

something or retrieving something. He ordered Mr. Martinez-Chavez out of the car at gun point

because he did not want to take a chance that Mr. Martinez-Chavez was reaching for a gun. Later,

when Mr. Martinez-Chavez admitted to having consumed a beer, Lieutenant Hylton thought that

he might have also been hiding alcohol.[16]

At time 04:37, Lieutenant Hylton opened the driver's side door and unlocked the front

passenger door. At time 04:48, Officer Poulin opened the passenger side door and shone his

flashlight on the one gun that he had seen while standing outside the car. He did not see the revolver

that was lying next to the sawed-off rifle (circled in red, below). He did see the purple paint roller

next to the sawed-off rifle.[17]



Lieutenant Hylton's BWC, at time 04:48, shows that at the exact same time that Officer

Poulin opened the passenger side door, the dispatcher buzzed in with information and informed

the officers that *Mr. Martinez-Chavez is wanted by Montgomery County for a felony probation*

*violation*. Up to this point, no one had seen the revolver, and no one had touched either firearm.

No one had gained additional information by opening the door.[19] Officer Poulin and Lieutenant

---

[16] Gov Exh 3 - ATF ROI 10, Hylton interview, at para. 13.
[17] Gov Exh 4 - ATF ROI 11, Poulin interview, at para. 11.
[18] Gov Exh 8 - Photograph of Kia front passenger floorboard
[19] At time 05:45, Lieutenant Hylton asks dispatch to run a criminal history because he has a firearm.

6

Hylton both heard the dispatcher, and both concluded (correctly) that Mr. Martinez-Chavez was a convicted felon because of the felony probation violation arrest warrant. Officer Poulin later advised Lieutenant Hylton to get a record check for felony convictions out of an abundance of caution.[20] At approximately 04:55, after hearing that the officers found a gun, Mr. Martinez-Chavez said "sir, that's not mine . . . it's in the car, yeah I know."

Eventually, Officer Joe Gardner retrieved the revolver and Officer Poulin retrieved the sawed-off rifle along with a bag of ammunition that was near the firearm.[21] During a search of Mr. Martinez-Chavez incident to arrest, officers recovered a glass smoking device on his person, which contained methamphetamine residue.[22]

## III.    ARGUMENT

### A.    Lieutenant Hylton Conducted a Valid Traffic Stop Based on Driving Conduct.

"[T]he defendant bears the burden of proof on a motion to suppress."  United States v. Bowman, 106 F.4th 293, 300 (4th Cir.), cert. denied, No. 24-5591, 2024 WL 4529870 (2024). The Fourth Amendment's concern with "reasonableness" allows certain actions to be taken in certain circumstances, whatever the subjective intent of the officers. Whren v. United States, 517 U.S. 806, 813, 116 S. Ct. 1769, 1771-71, 135 L. Ed. 2d 89 (1996) (holding that held that the constitutional reasonableness of traffic stops does not depend on the actual motivations of the individual officers involved).

 Lieutenant Hylton had a valid objective reason for attempting to initiate a traffic stop of Mr. Martinez-Chavez. Per Lieutenant Hylton's report, he used radar to determine that Mr. Martinez-Chavez was driving 60 MPH in a 45 MPH zone. Mr. Martinez-Chavez admitted to

---

[20] Gov Exh 4 - ATF ROI 11, Poulin interview, para. 9.
[21] Gov Exh 2 - Poulin, Gardner, Johnson Police Report, at 5.
[22] Gov Exh 5 - DEA Chemical Lab Report.

speeding by saying "I really. I only coming fast like that because I—," before Lieutenant Hylton interrupted him.[23] It is irrelevant that Lieutenant Hylton did not immediately pull Mr. Martinez-Chavez over but instead chose to follow him in case he was impaired. It is also irrelevant (though understandable) that Lieutenant Hylton was concerned about impaired drivers on New Year's Eve. In fact, Lieutenant Hylton asked Mr. Martinez-Chavez how much he had to drink to which Mr. Martinez-Chavez answered, "one beer."[24] The bottom line is that Mr. Martinez-Chavez committed a traffic infraction by exceeding the posted speed limit and Lieutenant Hylton could have initiated a traffic stop at any time.

Mr. Martinez-Chavez gave Lieutenant Hylton additional objective reasons for attempting to stop him. Per Lieutenant Hylton's report, Mr. Martinez-Chavez picked up speed as he turned off South Main Street. As Lieutenant Hylton closed the distance, Mr. Martinez-Chavez's vehicle's "headlights and tail lights went out *while still travelling*." (emphasis added). Lieutenant Hylton "made the decision to initiate a traffic stop based on that driving behavior" and activated his emergency lights. While Mr. Martinez-Chavez still had his car lights out, he made an "abrupt" right turn on Highway Terrace off Scuffling Hill Road. Officer Poulin confirmed in his report that he was listening to radio traffic and heard Lieutenant Hylton "inform dispatch that the vehicle had *blacked out the lights while moving*." (emphasis added). Mr. Martinez-Chavez then pulled into a yard, where he parked at an angle on the grass, which is indicative of haste and consistent with a motorist trying to potentially hide or even flee.

---

[23] Defense Exh 3, "Hylton's Body Worn Camera Recording," at 02:40.
[24] Id., at 01:00.



**B.      The Plain View Exception Applies to the Seizure of Mr. Martinez-Chavez's firearms.**

The plain-view doctrine authorizes warrantless seizures of incriminating evidence when (1) the officer is lawfully in a place from which the object may be plainly viewed; (2) the officer has a lawful right of access to the object itself; and (3) the object's incriminating character is immediately apparent. See Horton, 496 U.S. at 136–37, 110 S.Ct. at 2307–08; United States v. Williams, 41 F.3d 192, 196 (4th Cir. 1994). Importantly, for the object's incriminating character to be "immediately apparent," there need not be absolute certainty. Texas v. Brown, 460 U.S. 730, 741 (1983). Instead, a probable cause standard applies—i.e., a reasonable basis for believing that "certain items may be contraband or stolen property or useful as evidence of a crime[.]" United States v. Runner, 43 F.4th 417, 421 (4th Cir. 2022).

There is no dispute that the first prong is satisfied, given that Officer Poulin was standing outside the car when he first saw the sawed-off rifle. Regarding the remaining prongs, Officer Poulin had a lawful right of access to the sawed-off rifle out of concern for officer safety and could lawfully seize it because its incriminating character was immediately apparent.

**1.   Officer Poulin knew Mr. Martinez-Chavez was a felon when he seized the firearms.**

The officers were entitled to seize both the sawed-off rifle and the pistol because, at the time they seized them, the officers knew Mr. Martinez-Chavez was a felon. There is little dispute that, after learning a person is a felon, the incriminating character of the firearms are immediately

9

JA272

apparent and law enforcement officers are entitled to seize the guns in plain view. See United States v. Wells, 98 F.3d 808, 810 (4th Cir. 1996).

The timing here is important. The government acknowledges that Officer Poulin saw the sawed-off rifle and opened the Kia's door before he knew Mr. Martinez-Chavez was a felon. But as he opened the door, and *before* he seized the guns, dispatch informed both officers that Mr. Martinez-Chavez was wanted on a *felony* probation violation, meaning they both knew that at that juncture that he had a prior felony conviction. And once they knew he was a felon, they had probable cause to believe the gun was contraband and evidence of a crime and could lawfully seize it.

Mr. Martinez-Chavez seems to suggest that Officer Poulin and Lieutenant Hylton merely assumed he was a felon, and he claims that is insufficient, citing Wells, 98 F.3d 808. See Mot. at 12-13. But Wells doesn't hold that; it explains instead that because the officers there knew he was a felon, they could lawfully seize the firearm at issue. Id. at 810. Nothing about the case suggests that where officers have a reasonable basis for concluding that a person is a felon, they still somehow lack a reasonable basis for believing that person's firearms amount to contraband. In any event, the fact that Mr. Martinez-Chavez was on felony probation (and, not for nothing, had absconded) definitively shows he has a prior felony conviction—so any concerns about assumptions are irrelevant here.

### 2. Officer Poulin could seize and secure the sawed-off rifle out of concern for safety.

Traffic stops "are inherently dangerous for police officers" particularly where a seized driver or passenger is armed "whether legally or illegally[.]" United States v. Robinson, 846 F.3d 694, 698 (4th Cir. 2017). Officers are allowed to take steps to control the scene and ensure their safety as they process the stop. For example, they can order all the occupants of a stopped vehicle

to get out. Maryland v. Wilson, 519 U.S. 408, 415 (1997). If they have a reasonable basis for suspecting a driver or passenger is "armed and therefore dangerous," they can pat him down, and secure any weapons they find. Robinson, 846 F.3d at 700 (emphasis omitted). And they can prevent passengers from leaving the scene until they've been able to determine they do not pose a risk to officer safety. Arizona v. Johnson, 555 U.S. 323, 333–34 (2009).

Moreover, officers may, as Mr. Martinez-Chavez notes, conduct a protective search of a vehicle "if they have a reasonable belief that the suspect is dangerous and may gain control of weapons inside the vehicle." United States v. Elston, 479 F.3d 314, 320 (4th Cir. 2007). And they're entitled to carry out that protective sweep, "even if the suspect is under police restraint at the time the search is conducted, because the suspect may be able to escape such restraint, or may later regain access to the vehicle if he is not arrested." Id. Consistent with that authority, where a weapon is visible, officers may "perform a protective search of the vehicle to secure the weapon." United States v. Carico, 311 F. App'x 572, 574 (4th Cir. 2008). The upshot is that officers can take necessary steps to defuse potentially dangerous situations and protect themselves during a traffic stop.

Here, the officers did not necessarily conduct a protective search of the vehicle in order to seize the firearms; they were visible from the window and subject to a plain-view seizure. But the officer's authority under the Fourth Amendment to conduct a protective search on the reasonable belief that there might be a gun in the vehicle—which they would be authorized to do even though Mr. Martinez-Chavez was handcuffed, Elston, 479 F.3d at 320—lays plain the constitutional propriety of seizing and securing a gun they *knew* was there because they saw it from *outside* the vehicle, even without conducting a protective search. Carico, 311 F. App'x at 574.

11

JA274

In addition, the scene here was uncertain and fraught with potential risks. Again, Mr. Martinez-Chavez himself, though handcuffed, was only a few feet away from the passenger side of the car and had been reaching towards the guns when Lieutenant Hylton first pulled up behind him. And one person, a seeming acquaintance, even tried to get in the car after Mr. Martinez-Chavez talked to him in a rapid and agitated fashion. This occurred while Lieutenant Hylton was processing the stop. Indeed, Lieutenant Hylton had to stop talking to dispatch to prevent this person from entering the car where the sawed-off rifle and the revolver were found and he forcefully ordered Mr. Martinez-Chavez's friend to "stay out of the car" to "stay back there," and to "not get involved." Shortly after, two more people came out of the residence and officers warned them to stay away[25]. Under those circumstances, officers were not constitutionally obligated to ignore the presence of a sawed-off rifle sitting on the floorboards of the car, and put themselves in harm's way. It was objectively reasonable for the officers to secure the firearms and, if necessary, to disarm them while they completed their investigation.

Mr. Martinez-Chavez disputes Lieutenant Hylton's claim that he (Hylton) saw Mr. Martinez-Chavez reaching for something in the passenger seat—though not on the basis of any actual evidence or persuasive logic. Instead, he faults Lieutenant Hylton for not immediately telling Officer Poulin, once he arrived on the scene, that Mr. Martinez-Chavez reached for something after being stopped, and for not immediately walking up the passenger side of the vehicle. Mot. at 13. But Lieutenant Hylton was still in the processing of detaining Mr. Martinez-Chavez when Officer Poulin arrived, and described the basis for the stop. It's hardly surprising that Lieutenant Hylton did not immediately offer *every* bit of potentially relevant information right as Officer Poulin arrives. Indeed, Officer Poulin's discovery of the guns on the passenger side is

---

[25] Defense Exh 3, "Hylton's Body Worn Camera Recording," at 08:55.

the most obvious point at which Lieutenant Hylton would tell him about that particular detail. And while Lieutenant Hylton didn't walk down the passenger side of the vehicle, Officer Poulin did, meaning there was no reason for Lieutenant Hylton to walk down the same side of the vehicle. And it's notable that although he walked down the driver's side, he tried to shine his flashlight into the passenger side—i.e., where he'd seen Mr. Martinez-Chavez reaching.

### 3. Possession of a sawed-off shotgun or sawed-off rifle is presumptively unlawful.

Aside from the need to ensure firearms weren't deployed against them during the stop and the propriety of seizing weapons from the vehicle of felon, the officers could seize the sawed-off rifle because its mere possession is illegal.

Virginia Code Section 18.2-300 (Possession or use of "sawed-off" shotgun or rifle) has two parts to it:

> A. Possession or use of a "sawed-off" shotgun or "sawed-off" rifle in the perpetration or attempted perpetration of a crime of violence is a Class 2 felony.
>
> B. Possession or use of a "sawed-off" shotgun or "sawed-off" rifle for any other purpose, except as permitted by this article and official use by those persons permitted possession by § 18.2-303, is a Class 4 felony.

Virginia Code Section 18.2-303.1 offers the following affirmative defense:

> Nothing contained in this article shall prohibit or interfere with the possession of a "sawed-off" shotgun or "sawed-off" rifle for scientific purposes, the possession of a "sawed-off" shotgun or "sawed-off" rifle possessed in compliance with federal law or the possession of a "sawed-off" shotgun or "sawed-off" rifle not usable as a firing weapon and possessed as a curiosity, ornament, or keepsake.

And as noted above, officers don't need absolute certainty that particular items are unlawful before carrying out a plain-view seizure; they need only have probable cause—or a reasonable basis for believing—that the item is contraband or evidence of a crime. Runner, 43 F.4th at 421; United States v. DeBardeleben, 823 F.2d 549 (4th Cir. 1987) (unpublished) ("A 'practical, nontechnical' probability that incriminating evidence is involved is all that is required.").

13

JA276

Accordingly, Officer Poulin was entitled to seize the sawed-off rifle as evidence of crime because, felon or not, Mr. Martinez-Chavez simply could not possess the sawed-off rifle. At a minimum, the officer could seize the sawed-off rifle until they completed their investigation. See, e.g., Brown, 460 U.S. at 742–43 (approving plain-view seizure of balloons, even though officer couldn't actually see the narcotics inside, because officer knew it was common for balloons to be used for packaging narcotics).

Mr. Martinez-Chavez insists the officers couldn't seize the firearm because they didn't know if it satisfied one of the § 18.2-303.1 exceptions—i.e., whether it was a keepsake or part of a science experiment—and hadn't officially measured it. See Mot. at 11-12. In other words, he claims its criminality was not "immediately apparent." Id. But that mistakes the applicable 'probable-cause' standard. The burden is on possessors to prove, by a preponderance of the evidence, that they possessed a sawed-off rifle for at least one of these purposes, and law enforcement officers need not disprove every potential affirmative defense or innocent explanation before developing probable cause. D.C. v. Wesby, 583 U.S. 48, 61 (2018) ("[P]robable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts."); Runner, 43 F.4th at 423 (plain-view seizure of glass stem pipe was appropriate even though "it may be put to innocent uses"); United States v. Hanton, 189 F. App'x 247, 252 (4th Cir. 2006) (Because felon defendant lived at the search location, officers were justified in plain-view seizure of firearms at the location, "regardless of who actually owned the residence or the firearms."). For comparison's sake, officers need not know for certain that a firearm has traveled in interstate commerce in order to develop probable cause to seize a firearm in a felon's possession. Id. (Knowledge that defendant was a felon "was more than sufficient to provide probable cause that the firearms were evidence that he was a felon in possession of firearms.") And given the factual circumstances here, it wasn't

14

JA277

hard to recognize—or have a reasonably basis for believing—that the sawed-off rifle was not possessed for a lawful purpose. After all, the officers could see that the gun had been sawed-off, and scientific equipment and keepsakes aren't normally tossed onto the dirty floorboards of a car.

Mr. Martinez-Chavez also argues that Officer Poulin didn't know what kind of gun it was—i.e, whether a shotgun or a .22 rifle—and so could not have known it was contraband. Mot. at 11. But as the Virginia statute (and even the relevant federal statute) makes clear, it doesn't matter whether it was a shotgun or rifle. Because Officer Poulin could immediately tell it was a sawed-off long gun, he had a lawful basis for seizing it.

### C. Officers Lawfully Searched the Entire Car.

Having found the sawed-off rifle and the pistol on the floorboard (and having learned that Mr. Martinez-Chavez was a felon), the officers had probable cause to search the car. If nothing else, seeing the two firearms suggested the possibility of ammunition or additional firearms in the car, which Mr. Martinez-Chavez could not lawfully possess. See, e.g., Carico, 311 F. App'x at 574 (multiple weapons and a large quantity of cash found during initial search of vehicle provided probable cause for search of the entire vehicle, including the trunk); United States v. Miller, 265 F. App'x 5, 8 (2d Cir. 2008) (loaded gun magazine in glove compartment provided probable cause to search the rest of the vehicle); United States v. Brown, 334 F.3d 1161, 1171 (D.C. Cir. 2003) ("First, the presence of a gun supported the possibility that the car contained ammunition, additional weapons, and/or other contraband."); United States v. Rochelle, 2009 WL 382745, at *7 (M.D.N.C. Feb. 12, 2009) ("The pistols and loaded and cocked crossbow found in the passenger compartment provided probable cause for the officers to search the trunk.").

Plus, the search of the remainder of the car did not turn up any additional evidence that the government plans to introduce at trial, so there is nothing to suppress. The only incriminating item

15

JA278

that officers found after searching the car was a glass smoking device in a backpack in the trunk, which the officers destroyed.

### D. Officers would have inevitably discovered the guns.

"The inevitable-discovery doctrine . . . allows the government to use information obtained from an otherwise unreasonable search if it can establish by a preponderance of the evidence that law enforcement would have 'ultimately or inevitably' discovered the evidence by 'lawful means.'" United States v. Bullette, 854 F.3d 261, 265 (4th Cir. 2017) (quoting Nix v. Williams, 467 U.S. 431, 444 (1984)).  That may include a later, lawful search supported by probable cause or a search warrant. United States v. Chanthavong, 191 F.3d 448, at *7 (4th Cir. 1999) (unpublished) (citing United States v. Allen, 159 F.3d 832, 841 (4th Cir. 1998)). Or it may involve "an inventory search, that would have inevitably uncovered the evidence in question." Bullette, 854 F.3d at 265.  "An inventory search of an automobile is lawful (1) where the circumstances reasonably justified seizure or impoundment, and (2) law enforcement conducts the inventory search according to routine and standard procedures designed to secure the vehicle or its contents." Id.

> The government need not provide a written inventory policy to prove that a law enforcement agency conducts its inventory searches according to routine and standard procedures so long as the district court has sufficient evidence to ensure that the practice conforms to our precedent.  We have held that an inventory search of *all* of a vehicle's contents is reasonable if the agent who conducted the search followed a practice to do so for all impounded vehicles.

*Id.* at 266 (internal citation omitted).

### 1. The disclosure of Mr. Martinez-Chavez's felony status would have provided probable cause to search the vehicle.

As Officer Poulin opened the car door, the dispatcher informed officers that ***Mr. Martinez-Chavez is wanted by Montgomery County for a felony probation violation***. From this statement, reasonable officers will conclude—and both Lieutenant Hylton and Officer Poulin did in fact

16

JA279

immediately conclude—that Mr. Martinez-Chavez is a convicted felon. But even assuming that is

insufficient, the officers later affirmatively confirmed that Mr. Martinez-Chavez was a felon. The

government expects Lieutenant Hylton to testify that after he arrested Mr. Martinez-Chavez for

possessing a sawed-off rifle, he printed his criminal record for the Magistrate. The criminal record

revealed Mr. Martinez-Chavez's felony convictions. Having seen the firearm, and with the

additional confirmation that Mr. Martinez-Chavez is a convicted felon, the officers would have

had probable cause to search the vehicle and would have found and seized both firearms.

### 2. The discovery of the meth pipe on Mr. Martinez-Chavez would have given officers probable cause to search the car.

During the course of the traffic stop, and after finding the guns and searching the car, an

officer searched Mr. Martinez-Chavez (incident to his arrest) and found a pipe that the DEA lab

later confirmed had methamphetamine residue.[26] Given that Mr. Martinez-Chavez had been

driving the Kia just minutes earlier and had the meth pipe on his person, that would have provided

probable cause to search the Kia—i.e., a reasonable basis for believing that the vehicle would

contain drug-related contraband or evidence. See, e.g., United States v. Wimer, 2021 WL 5985015,

at *2 (4th Cir. Dec. 16, 2021) ("[W]e have held that probable cause exists when a police officer

lawfully searches a vehicle's recent occupant and finds contraband on his person.") (internal

quotation marks omitted); United States v. Baker, 719 F.3d 313, 319 (4th Cir. 2013) ("[H]aving

found drugs, as well as other items indicating involvement in the drug trade, on Brown's person,

Nelson had probable cause to search the passenger compartment of the vehicle in which Brown

had just been sitting for additional contraband."); United States v. Newell, 2020 WL 8771861, at

*6 (W.D.N.C. Nov. 12, 2020) (glass pipe on front passenger floorboard provided probable cause

---

[26] Defense Exh 3, "Hylton's Body Worn Camera Recording," at 09:25.

to search the vehicle)[27]; <u>United States v. Valentine</u>, 517 F. Supp. 2d 816, 821 (W.D. Va. 2007) (Jones, J.) (finding probable cause to search defendant's vehicle where officers found glass pipe on defendant who appeared inebriated, and defendant gave suspicious answers and also had a large amount of cash). And the fact that the officers had already seen a firearm in the car simply reinforced the adequacy of any probable cause—particularly given the connection between firearms and drug trafficking.



So even if the officers had not opened the car door and carried out a plain-view seizure of the firearms, they necessarily would have developed probable cause to search the vehicle and seize the guns.

**3. Consistent with typical policy and practices, the officers would have searched the vehicle prior to it being towed.**

The circumstances reasonably justified seizure or impoundment of the vehicle.

First, the license plate that Hylton ran on the Kia belonged on a different car.[28] Officers cannot allow the car to be driven with incorrect license plates because it's against the law. Section 46.2-612. B of the Code of Virginia states, in relevant part, that no person shall ". . . display or

---

[27] *Report and recommendation adopted*, 2021 WL 329662 (W.D.N.C. Feb. 1, 2021)
[28] Gov Exh 1 - Hylton Police Report, at p. 3.

18

JA281

cause or permit to be displayed on any motor vehicle . . . any license plate or decal that he knows

is currently issued for another vehicle."

Second, the Traffic Enforcement/Control policy of the FCSO authorized officers to tow the

car.[29] Officers are authorized to tow cars when "[t]here is no one at the scene associated with the

person arrested to assume responsibility for the vehicle and the owner/operator does not delegate

the responsibility to a third person, nor authorize in writing for the deputy to leave the vehicle in

a designated area such as a parking lot."

In this case, there is no evidence that Mr. Martinez-Chavez requested that someone at the

scene associated with him assume responsibility for the car. Nor is there evidence that Mr.

Martinez-Chavez authorized officers in writing to leave the car where it was parked. Nothing in

the policy requires that officers knock on the door of the nearby residence to ask if anyone wanted

to assume responsibility for the silver Kia. Nothing in the policy requires officers to inform Mr.

Martinez-Chavez of his options or to assist him in finding someone.[30]

Third, the policy also authorizes towing when "the vehicle is subject to administrative

impoundment pursuant to §46.2-301.1." The relevant portion of Section A of this code section

states as follows:

> The motor vehicle being driven by any person (i) whose driver's license,
> learner's permit or privilege to drive a motor vehicle has been suspended or
> revoked for . . . driving while under the influence in violation of § 18.2-266,
> 46.2-341.24 or a substantially similar ordinance or law in any other
> jurisdiction; . . . shall be impounded or immobilized by the arresting law-
> enforcement officer at the time the person is arrested for driving after his
> driver's license, learner's permit or privilege to drive has been so revoked or
> suspended . . . .

---

[29] Gov Exh 6 - Traffic Enforcement/Control policy, at p. 29.

[30] The government (and through Discovery, the Defendant) are aware that in the squad car, Mr. Martinez-Chavez asked Officer Zion Wade if he could leave his car "over there." Officer Wade responded in the negative, telling Mr. Martinez-Chavez that it would be towed. Virginia Code §46.2-301.1 requires that the car be impounded.

19

JA282

Mr. Martinez-Chavez's DMV driving record indicates that his driver's license was revoked on February 22, 2023, based on a driving-under-the-influence-of-drugs conviction under VA Code 18.2-266 from February 6, 2023.[31] The period of revocation is three years, which covers the date of our incident.

Given that the vehicle would have been towed and impounded, the officers would have conducted an inventory search, which would have resulted in the seizure of the firearms. Indeed, according to the Traffic Enforcement/Control policy of the FCSO, officers must inventory "the entirety" of "all vehicles." If contraband such as guns are found, officers must submit them to the Evidence and Property Room.[32]

The government acknowledges that the officers did not actually carry out an inventory search on Mr. Martinez-Chavez's Kia. But it anticipates that Lieutenant Hylton will testify at the hearing that had they *not* opened the door and seized the sawed-off rifle they saw lying on the floorboard, he would have ensured that an inventory search was carried out before the car was towed. There's simply too great a risk in allowing a car to be towed where there's a sawed-off rifle lying on the floorboard in plain view, and, consistent with the applicable policy, the officers would have inventoried the car had they not already searched it and seized the firearms at the scene. In other words, if the allegedly unlawful officer conduct were eliminated—opening the door and seizing the firearm during the course of the traffic stop—the officers still would have recovered the firearm because an inventory search would have been necessary given the plain view sighting of the sawed-off rifle. And Lieutenant Hylton would have carried out an inventory search in accordance with the applicable policy prior to the vehicle being towed.

---

[31] Gov Exh 7 - Mr. Martinez-Chavez's DMV Record, at p. 1.
[32] Gov Exh 6 - Traffic Enforcement/Control policy, at p. 30-31.

20

JA283

Additionally, once the dispatcher informed the officers that there was a warrant for Mr. Martinez-Chavez's arrest, the officers would have (and did) take him into custody. The dispatcher later informed the officers that Montgomery County confirmed the warrant.[33] Having already seen the sawed-off rifle in plain view, the officers would have conducted an inventory search and would have inevitably recovered both firearms.

IV.    CONCLUSION

The complete statement of facts in this Response provides the Court a more accurate view of the incident. It shows that there is no merit to Mr. Martinez-Chavez's request for the suppression of evidence. Lieutenant Hylton conducted a valid traffic stop based on driving conduct. The plain view exception applies because the sawed-off rifle's incriminating character was immediately apparent, and its possession is presumptively unlawful. The officers lawfully seized the firearms out of concern for safety and because they knew Mr. Martinez-Chavez was a felon. The officers lawfully searched the car for safety reasons and because they had probable cause to do.

Additionally, the officers would have inevitably discovered the firearms. The officers would have eventually learned that Mr. Martinez-Chavez was a felon. The meth pipe on his person and his status as a felon would have given the officers probably cause to search the car, where they would have inevitably discovered both guns and ammunition. Lastly, having seen a sawed-off rifle in plain view, officers would have conducted an inventory search of the car before towing. The United States respectfully requests the Court deny Mr. Martinez-Chavez's motion to suppress.

---

[33] Defense Exh 3, "Hylton's Body Worn Camera Recording," at 21:16.

JA284

Respectfully submitted,

ZACHARY T. LEE
Acting United States Attorney

Date: December 27, 2024.

*s/Juan L. Vega*
Special Assistant United States Attorney
VA State Bar No. 79165
U.S. Attorney's Office
310 First St., S.W., Ste. 906
Roanoke, Virginia 24011
540-857-2250 (phone)
540-857-2614 (fax)
Juan.vega2@usdoj.gov

*s/Matthew M. Miller*
Assistant United States Attorney
VA State Bar No. 43034
U.S. Attorney's Office
310 First St., S.W., Ste. 906
Roanoke, Virginia 24011
540-857-2250 (phone)
540-857-2614 (fax)
Matthew.miller2@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on December 27, 2024, I caused the foregoing Notice to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel for defendant.

*s/Juan L. Vega*
Special Assistant United States Attorney

22

JA285

# Franklin County Sheriff's Office

**CONFIDENTIAL**                    PRELIMINARY INVESTIGATIVE REPORT                    **D.S.P. 102 - M**

| Code Number VA0330000 | Reported By 0855 - Lt. Justin D. Hylton | Page No. 1 | Origin 01 - Sheriff/Deputy Sheriff | Date 01/01/2024 | Time 0:11 | Case Number 2024-000003 |
|---|---|---|---|---|---|---|

**COMP**

| Comp No | NAME Last, First Middle | | Residence Phone | Business Phone |
|---|---|---|---|---|

| ADDRESS Number/Street | City | State | Zip | Race | Sex | Date of Birth | SSAN |
|---|---|---|---|---|---|---|---|

**VICTIM**

| Vic No 1 | NAME Last, First Middle COMMONWEALTH OF VIRGINIA | | Residence Phone | Business Phone |
|---|---|---|---|---|

| ADDRESS Number/Street | | Race | Sex | Resident Status | Date of Birth |
|---|---|---|---|---|---|

| City | State | Zip | Ethnic | SSAN |
|---|---|---|---|---|

| Victim Related Events | ■#1 ■#3 ☐#5 ☐#7 ☐#9 / ■#2 ☐#4 ☐#6 ☐#8 ☐#10 | Victim Injury | Victim Relation to Acc/Susp | 1 2 3 4 5 6 7 8 9 10 | Justifiable Homicide |
|---|---|---|---|---|---|

| Vic No | NAME Last, First Middle | | Residence Phone | Business Phone |
|---|---|---|---|---|

| ADDRESS Number/Street | | Race | Sex | Resident Status | Date of Birth |
|---|---|---|---|---|---|

| City | State | Zip | Ethnic | SSAN |
|---|---|---|---|---|

| Victim Related Events | ☐#1 ☐#3 ☐#5 ☐#7 ☐#9 / ☐#2 ☐#4 ☐#6 ☐#8 ☐#10 | Victim Injury | Victim Relation to Acc/Susp | 1 2 3 4 5 6 7 8 9 10 | Justifiable Homicide |
|---|---|---|---|---|---|

| Event No 1 | Event Weapon Law Violations | Code No 520 | ☐ (A) Attempted ■ (C) Completed | # Premises Entered | Type Security |
|---|---|---|---|---|---|

| Occurred ☐ On ■ Between | Mo 01 | Day 01 | Yr 2024 | Time 0:11 | Day of Week MON | And | Mo 01 | Day 01 | Yr 2024 | Time 2:00 | Day of Week MON | Acc/Susp Used D | Criminal Activity P | Hate Crime 88 - None (No Bias) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| Event No 2 | Event Drug Equipment Violations | Code No 35B | ☐ (A) Attempted ■ (C) Completed | # Premises Entered | Type Security |
|---|---|---|---|---|---|

| ADDRESS 30 HIGHVIEW TER, BEGIN | | Acc/Susp Used D | Criminal Activity P | Hate Crime 88 - None (No Bias) |
|---|---|---|---|---|

| City ROCKY MOUNT | State VA | Zip | Type Location 13 - Highway/Road/Alley |
|---|---|---|---|

**ACC. SUSP**

| ASO No 1 | ■ A ☐ S ☐ O | NAME Last, First Middle ▓▓▓▓▓ | Alias AKA ▓▓▓▓▓ | Residence Phone | Business Phone |
|---|---|---|---|---|---|

| ADDRESS Number/Street ▓▓▓▓▓ | Occupation PAINTER | Race W | Sex M | Date of Birth ▓▓▓▓ |
|---|---|---|---|---|

| City ROCKY MOUNT | State VA | Zip 24151- | Arrest Number 2024-000003 - 1 | SSAN ▓▓▓▓ |
|---|---|---|---|---|

| Height 5'07" | Weight 180 | Hair Color BLK - Black | Eye Color BRO - Brown | Hairstyle STR - Straight | ARMED Yes X No Unk LH RH AB | Marks/Scars Location Tattoo - Left - Elbow |
|---|---|---|---|---|---|---|

**OTHER**

| ASO No 1 | ☐ A ■ S ☐ O | NAME Last, First Middle ▓▓▓▓▓ | Alias AKA ▓▓▓▓▓ | Residence Phone | Business Phone |
|---|---|---|---|---|---|

| ADDRESS Number/Street ▓▓▓▓▓ | Occupation PAINTER | Race W | Sex M | Date of Birth ▓▓▓▓ |
|---|---|---|---|---|

| City ROCKY MOUNT | State VA | Zip 24151- | Arrest Number | SSAN ▓▓▓▓ |
|---|---|---|---|---|

| Height 5'07" | Weight 180 | Hair Color BLK - Black | Eye Color BRO - Brown | Hairstyle STR - Straight | ARMED Yes X No Unk LH RH AB | Marks/Scars Location Tattoo - Left - Elbow |
|---|---|---|---|---|---|---|

**VEH**

| Veh No 1 | Year 2007 | Make KIA | Model | Type P - Passenger car | License Number VYC3195 | Year 2025 | State VA | Teletype Number |
|---|---|---|---|---|---|---|---|---|

| VIN KNAFG526477112089 | Owner's Name O1 - ▓▓▓▓▓ | Address ▓▓▓▓▓, VA 24151 |
|---|---|---|

| Released to Owner Date | Stored - Name | Address | Stolen | Involved X |
|---|---|---|---|---|
| | | | Recovered | Other |

**DRUG**

| Type L - Amphetamines/Methamphetamine | Whole Quantity 0 | Fractional Quantity .1 | Measurement GM - Gram | Estimated Value $1.00 |
|---|---|---|---|---|

JA286

**Franklin County Sheriff's Office**

CONFIDENTIAL                    PRELIMINARY INVESTIGATIVE REPORT                    D.S.P. 102 - M

Page No. __2__

| Scene Processed By | | Prints Found ☐ Yes ■ No | Type Evidence Taken | When Stored Initially |
|---|---|---|---|---|
| | | Photographed ☐ Yes ■ No | | |

**ARSON**

| Loss Data | Value | Loss | Origin of Fire | Bomb Data |
|---|---|---|---|---|
| Structures | | | Incendiary ☐ | Explosive Data |
| Contents | | | Undetermined ☐ | Incendiary Device |
| Fixtures | | | Accidental ☐ | Threat |
| Vehicles | | | Suspicious ☐ | Other |
| Miscellaneous | | | | |

**PROPERTY**

| Event Code | Prop. Code | Quantity | Description | Make/Model | Serial Number | P. Loss | Value | Recov. Date |
|---|---|---|---|---|---|---|---|---|
| 520 | 13 | 1 | Firearms (.22 Cal sawed off rifle) | unknown / unknown | none | 6 | | 01/01/2024 |
| 520 | 13 | 1 | Firearms (.22 cal revolver) | RG | L699622 | 6 | | 01/01/2024 |
| 35B | 11 | 2 | Glass Smoking Device | | | 6 | 2.00 | 01/01/2024 |
| 520 | 59 | | Firearm Accessories (.22 cal ammunition) | | | | | 01/01/2024 |
| | | | | | | | | |

| Jurisdiction Stolen | Jurisdiction Recovered | Number of Motor Vehicles Stolen | Number of Motor Vehicles Recovered |
|---|---|---|---|
| | | | |

**DEATH**

| Next of Kin Notified Name | Address | Relationship | Physician Pronouncing Death(Name) | |
|---|---|---|---|---|
| Attending Physician Name | Address | Reason for Treatment | Pronounced Death-Date | Time |
| Last Person to See Subject Alive Name | Address | | Date | Time |
| Rescue Unit at Scene Name | Address | Medical Examiner | Type Death | |

Summary

On January 1, 2024 at approximately 00:05 while heading South on South Main Street near the intersection of Eastover Drive in Rocky Mount, I saw a vehicle headed North that appeared to be travelling faster than the posted 45 speed limit. After releasing the beam of my radar I obtained a reading of 60 miles per hour. I saw the target vehicle was a silver KIA. I decided to turn and follow the vehicle as I was looking for any DUI violators due to the holiday. As I turned and started approaching the target car, I noticed it had picked up speed as I saw it had turned off South Main Street and onto Scuffling Hill Road. I continued to close distance on the car and as the car approached the second Knollwood Drive on Scuffling Hill, the target vehicles headlights and tail lights went out while still travelling. I made the decision to initiate a traffic stop based on that driving behavior and activated my emergency lights. The target vehicle made an abrupt right turn on Highview Terrace off Scuffling Hill Road and pulled into a yard a 30 Highview Terrace where I pulled in behind the car with my emergency lights actviated. The drivers side door came open and

Solvability Factors

| YES NO | | YES NO | | Exceptional Clearance (Status 8) |
|---|---|---|---|---|
| ☐ ■ | a. Can a suspect be named? | ☐ ■ | g. Was there a unique or unusual M.O. employed? | ☐ (A) Death of Offender |
| ☐ ■ | b. Is the suspect known? | ☐ ■ | h. Was there significant evidence? | ☐ (B) Prosecution Declined |
| ☐ ■ | c. Can the suspect be identified? | ☐ ■ | i. Is property traceable? | ☐ (C) Extradition Declined |
| ☐ ■ | d. Has the suspect been seen before? | ☐ ■ | j. Was there a minimum delay in reporting? | ☐ (D) Refuse to Cooperate |
| ☐ ■ | e. Was there a witness to the crime? | ☐ ■ | k. Is there a significant reason to believe crime may be solved | ☐ (E) Juvenile, No Custody |
| ☐ ■ | f. Can the suspect vehicle be identified? | | with a reasonable amount of investigative effort? | ■ (N) Not Applicable |

| CASE STATUS (Check One) | | | Case Closed (Status 4 or 8) | Negative File Number |
|---|---|---|---|---|
| ■ 1 Active | ☐ 5 Inactive | ☐ 4 Closed Arrest | ☐ Juvenile ■ Adult | |
| ☐ 2 Active - TOT O/A | ☐ 6 Inactive WOF | ☐ 8 Closed Exception | Ref. Other Case Number | |
| ☐ 3 Unfounded | ☐ 7 Closed Service | | | |

| Date/Time Notified | Date/Time Arrived at Scene | Date/Time Cleared Scene | Original Report ☐ |
|---|---|---|---|
| 01/01/2024   0:11 | 01/01/2024   0:11 | 01/01/2024   1:44 | Supplemental Report ☐ |

| Information Copies Furnished to: | Approving Supervisor | Date | Date Report Submitted |
|---|---|---|---|
| | | | 01/01/2024 |

JA287

**Franklin County Sheriff's Office**

CONFIDENTIAL                          PRELIMINARY INVESTIGATIVE REPORT                          D.S.P. 102 - M

**NARRATIVE (CONTINUATION)**

| Code Number VA0330000 | Reported By 0855 - Lt. Justin D. Hylton | Page No. 3 | Origin 01 - Sheriff/Deputy Sheriff | Date 01/01/2024 | Time 0:11 | Case Number 2024-000003 |
|---|---|---|---|---|---|---|

Summary

as I positioned my spot light in the car I saw the driver leaning into the passenger side of the car with arms extended, apparently reaching for something. I quickly exited my patrol car, drew my service weapon to high ready position, and using the door to my patrol vehicle as cover, began giving the driver commands to exit the vehicle and show me their hands. The driver was the only occupant I could see in the vehicle. I notified dispatch of my location, the tag of the car (VYC-3195) and that I had the driver had gunpoint.

After a brief moment the driver stood out of the door of the car and ,what appeared to be hesitantly, complied with my commands. I kept insisting on seeing the drivers hands while the driver would face me, turn away and look at the car, and put his hands in his pockets. I warned the driver that if he did not listen to what I was telling him to do that he could be shot. The driver finally complied and he was detained at that time. He was advised then that he was only detained and not under arrest.

After the driver was detained, he was patted down for weapons with none found. He advised his identification was in his wallet. He was idenitifed by a Mexico identification as ████████ ████████████ by his name and date of birth. During this time additional officers to include, Dep. Z. Wade (FCSO), Ofc. T. Poulin (RMPD), Ofc. J. Gardner (RMPD, Sgt. C. Johnson (RMPD), and Dep. M. Cawood (FCSO), arrived on scene to assist. A moment later, dispatch advised that ████████ was not licensed and had outstanding warrants out of Montgomery County, Virginia. The tag I had ran through dispatch did not return to the KIA. ██████ was advised by Dep. Wade of the warrants and that he was under arrest. Dep. Wade searched ████████████ and found a glass smoking device on his person. Dep. Wade will supplement this report.

Upon knowledge of ██████'s warrants, I returned to the KIA to begin securing it for towing due to ██████ going to jail and the car not being registered properly. As Ofc. T. Poulin approached the passenger side of the car he alerted that he saw a firearm in the passenger floorboard. The firearm was retrieved by Ofc. Poulin and Ofc. Gardner and confirmed to be a .22 caliber bolt action rifle. The barrel had been sawn off to 10.5 inches long and there did not appear to be a serial number on the gun. The vehicle was subsequently searched where another firearm, a .22 Caliber RG revolver was located in the passenger compartment as well as additional .22 cal rounds. Ofc. Poulin stayed with the car until it was towed.

The evidence and ████████████ was transported to the Sheriff's Office by Dep. Wade where Dep. Wade placed the evidence into temporary storage until I processed it. The following is the list of evidence

#1 .22 cal bolt rifle with sawed off 10.5 inch barrel

#2 .22 cal RG revolver SN L699622

#3 Glass smoking device found in ████████████ possession

#4 .22 cal ammo removed from firarms and vehicel.

#5 Glass smoking device from backpack in trunk of car.

Items #1,2,3 have been processed for submission to the Department of Forensic Science for testing.

Item #4 will be held for court.

Item #5 was marked for destruction.

JA288

**Franklin County Sheriff's Office**

CONFIDENTIAL                    **PRELIMINARY INVESTIGATIVE REPORT**                    **D.S.P. 102 - M**

**NARRATIVE (CONTINUATION)**

| Code Number VA0330000 | Reported By 0855 - Lt. Justin D. Hylton | Page No. _4_ | Origin 01 - Sheriff/Deputy Sheriff | Date 01/01/2024 | Time 0:11 | Case Number 2024-000003 |
|---|---|---|---|---|---|---|

Summary

████████████ was served on outstanding Montgomery County warrants as well as two counts of possession of firearm by felon and one count possess sawed off rifle obtained by this officer. Case will remain active as additional charges are pending lab analysis.

SUPPLEMENT #2   Lt. Justin D. Hylton - 0855   01/17/2024   10:05

After several attempts to locate data transfer from worn body camera, there have been issues in recovering the footage. Notification was made in refernce to the issues in the system. I have reached out to Sgt. C. Johnson with RMPD regarding accesibility to body cam data from Ofc. Poulin and Gardner and being able to provide that to SA Moody, ATF

JA289

## Franklin County Sheriff's Office

CONFIDENTIAL                     PRELIMINARY INVESTIGATIVE REPORT                     D.S.P. 102 - M
                                            (CONTINUATION)

| Code Number | Reported By | | Origin | Date | Time | Case Number |
|---|---|---|---|---|---|---|
| VA0330000 | 0855 - Lt. Justin D. Hylton | Page No. __5__ | 01 - Sheriff/Deputy Sheriff | 01/01/2024 | 0:11 | 2024-000003 |

### Offense(s)

| Event No | Event | Code No | ☐ (A) Attempted ■ (C) Completed | # Premises Entered | Type Security |
|---|---|---|---|---|---|
| 3 | Drug/Narcotic Violations | 35A | | | |

| Type Location | Acc/Susp Used | | Criminal Activity | | | Hate Crime 88 - None (No Bias) |
|---|---|---|---|---|---|---|
| 13 - Highway/Road/Alley | D | | P | | | |

JA290

# INCIDENT REPORT
## COMMONWEALTH OF VIRGINIA

**INCIDENT**

| 1-PAGE # | 2-ORI NUMBER |
|---|---|
| 1 | VA0330100 |

**3-INCIDENT NUMBER**
2024-00036

**4-DATE(S) OF INCIDENT** 01/01/2024    **5-R**

**13-SOLVABILITY FACTORS:**
- ☐ (1) Suspect Named
- ☐ (2) Witness to Crime
- ☐ (3) Property Traceable
- ☐ (4) Unique M.O.
- ☐ (5) Suspect Identified
- ☐ (6) Susp. Vehicle Identified
- ☐ (7) Significant Evidence

**14-INTERNAL INCIDENT STATUS:**
- ☐ (1) Unfounded
- ☐ (2) Cleared by Arrest
- ☐ (3) Pending
- ■ (4) Inactive

**15-EXCEPTIONAL CLEARANCE STATUS:**
- ☐ (A) Death Of Offender
- ☐ (B) Prosecution Declined
- ■ (C) Extradition Declined
- ☐ (D) Refused To Cooperate
- ☐ (E) Juvenile, No Custody
- ☐ (N) Not Applicable

**16-EXCEPT. CLEAR. DATE**

**7-TIME(S) OF INCIDENT**
00:11 - 00:53

**8-DAY(S) OF INCIDENT**
Monday

**17-TEMP.:**

**18-WEATHER:** (Max. 1)
- ☐ (1) Clear  ☐ (2) Cloudy  ☐ (3) Rain
- ☐ (4) Snow  ☐ (5) Other  ☐ (6) Unk.

| 9-DISPATCHER | 10-TIME RECEIVED | 11-TIME ARRIVED | 12-REPORTING AREA |
|---|---|---|---|
| JWilliams - Williams, JoLacy | 0:14 | 0:14 | Town |

**OFFENSE**

| 19-OFFENSE # | 20-UCR CODE | 21-OFFENSE STATUS: | 22-OFFENDER USED: | 23-Burglary (220) Location 14&19: | 24-FORCED ENTRY? |
|---|---|---|---|---|---|
| 1 | 90Z | ☐ (A) Attempted  ■ (C) Completed | ☐ (N) Not Applicable  ☐ (A) Alcohol  ☐ (C) Cptr. Equip.  ☐ (D) Drugs | # PREMISES ENTERED? | ☐ Yes  ☐ No |

**25-OFFENSE NAME** All Other Offenses

**26-ADDRESS OF OFFENSE** 30 HIGHVIEW TER, BEGIN, ROCKY MOUNT, VA

**27-DIRECTION OF TRAVEL:** ☐ N  ☐ S  ☐ E  ☐ W  ☐ UNK.

**28-LOCATION CODE** (Enter 1)
- ☐ (01) Air/Bus/Train Terminal
- ☐ (02) Bank/Savings & Loan
- ☐ (03) Bar/Night Club
- ☐ (04) Church/Synagogue/Temple
- ☐ (05) Commercial/Office Building
- ☐ (06) Construction Site
- ☐ (07) Convenience Store
- ☐ (08) Department Discount Store
- ☐ (09) Drug Store/DR's Office/Hospital
- ☐ (10) Field/Woods
- ☐ (11) Government/Public Building
- ☐ (12) Grocery/Supermarket
- ☐ (13) Highway/Road/Alley
- ☐ (14) Hotel/Motel/Etc.
- ☐ (15) Jail/Penitentiary
- ☐ (16) Lake/Waterway
- ☐ (17) Liquor Store
- ☐ (18) Parking Lot/Garage
- ☐ (19) Rental/Storage Facility
- ☐ (20) Residence/Home
- ☐ (21) Restaurant
- ☐ (22) School/College
- ☐ (23) Service/Gas Station
- ☐ (24) Specialty Store (TV,Fur,Etc.)
- ☐ (25) Other/Unknown

**29-WEAPON FORCE:** (Max. 3)
( For 11-15, place "A" in space next to box if weapon was an Automatic.)
- ☐ (11) Firearm (Type not stated)
- ☐ (12) Handgun
- ☐ (13) Rifle
- ☐ (14) Shotgun
- ☐ (15) Other Firearm
- ☐ (20) Knife/Cutting Instru. (Ax, etc.)
- ☐ (30) Blunt Object (Club, etc.)
- ☐ (35) Motor Vehicle (As weapon)
- ☐ (40) Personal Weapons (Hands, etc.)
- ☐ (50) Poison
- ☐ (60) Explosives
- ☐ (65) Fire/Incendiary Device
- ☐ (70) Narcotics/Drugs/ Sleeping Pills
- ☐ (85) Asphyxiation
- ☐ (90) Other
- ☐ (95) Unknown
- ☐ (99) None

**30-TYPE CRIMINAL ACTIVITY:** (Max. 3)
- ☐ (B) Buying
- ☐ (C) Cultivate/Manufacture/Publish
- ☐ (D) Distributing/Selling
- ☐ (E) Exploiting Children
- ☐ (O) Operating/Promoting/Assisting
- ☐ (P) Possessing/Concealing
- ☐ (T) Transport/Transmit/Import
- ☐ (U) Using/Consuming

**31-TYPE SECURITY:** (Max. 2)
- ☐ (A) Alarm/Audio
- ☐ (B) Alarm/Silent
- ☐ (C) Bars/Grate
- ☐ (D) Camera
- ☐ (E) Dog
- ☐ (F) Dead Bolt
- ☐ (G) Locked
- ☐ (H) Unlocked
- ☐ (I) Ext. Lights
- ☐ (J) Int. Lights
- ☐ (K) Fence
- ☐ (L) Guard
- ☐ (M) Neighbrhd. Watch
- ☐ (N) Other
- ☐ (O) None

**32-ENTRY/EXIT:** (Max. 2 entry, 2 exit)
En Ex
- ☐☐ (01) Front
- ☐☐ (02) Rear
- ☐☐ (03) Side
- ☐☐ (04) Attic
- ☐☐ (05) Vent/A.C
- ☐☐ (06) Window
- ☐☐ (07) Door
- ☐☐ (08) Patio/Sliding Dr.
- ☐☐ (09) Balcony/Fire Escape
En Ex
- ☐☐ (10) Attached Garage
- ☐☐ (11) Wall
- ☐☐ (12) Vehicle
- ☐☐ (13) Floor
- ☐☐ (14) Roof/Skylight
- ☐☐ (15) Hidden Within
- ☐☐ (16) Other
- ☐☐ (17) Unknown

**33-HOW LEFT SCENE:** (enter 1)
- ☐ (1) Auto
- ☐ (2) Truck
- ☐ (3) Van
- ☐ (4) Motorcycle
- ☐ (5) Bicycle
- ☐ (6) Foot
- ☐ (7) Moped
- ☐ (8) Other
- ☐ (9) Unknown

**34-WHICH OFFENDERS ARE RELATED TO THIS OFFENSE?:** (mark offender #s):
☐ #1  ☐ #2  ☐ #3  ☐ #4  ☐ #5  ☐ #6  ☐ #7  ☐ #8  ☐ #9  ☐ #10 others:

**35-BIAS MOTIVATED CRIME:**
88 - None (No Bias)

**VICTIM**

| 36-VICTIM # | 37-NAME: Last, | First, | Middle | 38-SOC. SEC. NO. | 39-DATE OF BIRTH |
|---|---|---|---|---|---|
| 1 | | | | | |

**40-RESIDENT ADDRESS:** Street    City    State    **41-ZIP**

**42-OCCUPATION**    **43-RESIDENT PHONE**

**44-EMPLOYMENT PHONE**    **45-SEX:** ☐ (M) Male  ☐ (F) Female  ☐ (U) Unknown

**46-ETHNIC:** ☐ (H) Hispanic  ☐ (N) Nonhispanic  ☐ (U) Unknown

**47-AGE:** Exact Age _____  Range ___ / ___
- ☐ (NN) Under 24 Hrs. Old
- ☐ (NB) 1-6 Days Old
- ☐ (BB) 7-364 Days Old
- ☐ (99) Over 98 Yrs. Old
- ☐ (00) Unknown

**48-RACE:**
- ☐ (W) White  ☐ (I) American Indian  ☐ (U) Unknown
- ☐ (B) Black  ☐ (A) Asian/Pacific Islander

**49-RES. STATUS:** ☐ (R) Resident  ☐ (N) Nonresident  ☐ (U) Unknown

**50-VICTIM TYPE:** ☐ (I) Individual  ☐ (B) Business  ☐ (F) Financial Institution  ☐ (U) Unknown  ☐ (G) Government  ☐ (R) Religious  ■ (S) Society/Public  ☐ (O) Other  ☐ (L) L. E. Officer

**51-VICTIM INJURY:** (Max. 5)    ☐ (M) Apparent Minor Injury
- ☐ (N) None
- ☐ (B) Apparent Broken Bones
- ☐ (I) Possible Internal Injury
- ☐ (L) Severe Laceration
- ☐ (O) Other Major Injury
- ☐ (T) Loss of Teeth
- ☐ (U) Unconsciousness

**52-THIS VICTIM RELATED TO WHICH OFFENSES?**
☐ #1  ☐ #4  ☐ #7  ☐ #10
☐ #2  ☐ #5  ☐ #8  others:
☐ #3  ☐ #6  ☐ #9

**53-RELATIONSHIP OF THIS VICTIM TO OFFENDERS**
(check relationship under appropriate offender number):
#1 #2 #3 #4 #5 #6 #7 #8 #9 #10    VICTIM WAS:
- (SE) Spouse
- (CS) Common-Law Spouse
- (PA) Parent
- (SB) Sibling
- (CH) Child
- (GP) Grandparent
- (GC) Grandchild
- (IL) In-Law
- (SP) Stepparent
- (SC) Stepchild
- (SS) Stepsibling
- (OF) Other Family Member
- (AQ) Acquaintance
- (FR) Friend
- (NE) Neighbor
- (BE) Babysittee (baby)
- (BG) Boyfriend/Girlfriend
- (CF) Child of Boyfriend/Girlfriend
- (HR) Homosexual Relationship
- (XS) Ex-Spouse
- (EE) Employee
- (ER) Employer
- (OK) Otherwise Known
- (RU) Relationship Unknown
- (ST) Stranger
- (VO) Victim was Offender

**AGGRAVATED ASSAULT/HOMICIDE CIRCUMSTANCES**

**54-Aggravated Assault/Murder:** (max. 2)
- ☐ (01) Argument
- ☐ (02) Assault On Law Enf. Officer
- ☐ (03) Drug Dealing
- ☐ (04) Gangland
- ☐ (05) Juvenile Gang
- ☐ (06) Domestic Violence
- ☐ (07) Mercy Killing
- ☐ (08) Other Felony Involved
- ☐ (09) Other Circumstances
- ☐ (10) Unknown Circumstances

**54-Negligent Manslaughter:** (enter 1)
- ☐ (30) Child Playing With Weapon
- ☐ (31) Gun-Cleaning Accident
- ☐ (32) Hunting Accident
- ☐ (33) Other Negligent Weapon Handling
- ☐ (34) Other Negligent Killings

**54-Justifiable Homicide:** (enter 1)
- ☐ (20) Criminal Killed by Private Citizen
- ☐ (21) Criminal Killed by Police Officer

**57-ADDITIONAL JUSTIFIABLE HOMICIDE CIRC.:** (enter 1)
- ☐ (A) Criminal Attacked Police Officer
- ☐ (B) Criminal Attacked Fellow Police Officer
- ☐ (C) Criminal Attacked Civilian
- ☐ (D) Criminal Attempted Flight from a Crime
- ☐ (E) Criminal Killed in Commission of a Crime
- ☐ (F) Criminal Resisted Arrest
- ☐ (G) Unable to Determine/Not Enough Information

**ADM**

| 58-REPORT DATE | 59-DAY | 60-TIME (Military) | 61-REPORTING OFFICER | 62-CODE # | 63-APPROVING SUPERVISOR | 64-CODE # | 65-DATE APPROVED |
|---|---|---|---|---|---|---|---|
| 01/01/2024 | Mon | 0:11 | Sergeant Caleb A. Johnson | RM0049 | Sergeant Caleb A. Johnson | RM0049 | 01/17/2024 |

JA291

# INCIDENT REPORT
COMMONWEALTH OF VIRGINIA

## ARRESTEE / OFFENDER

| 71-PAGE # | 72-DATE | 73-INCIDENT NUMBER | 74-ORI# ("B") | 75-REPORTING OFFICER | 76-CODE # | 77-VICTIM NAME |
|---|---|---|---|---|---|---|
| 2 | 01/01/2024 | 2024-00036 | VA0330100 | Sergeant Caleb A. Johnson | RM0049 | |

**78-ARRESTEE #** | **79-NAME** Last, | First, | Middle, | **80-AKA** ▮▮▮▮

**81-OFFENDER #** 1 | **82-RESIDENT ADDRESS** Street ▮▮▮▮, VA | City | State | **83-Zip** 24012 | **84-DATE OF BIRTH** ▮▮▮▮

**85-RESIDENT PHONE** (540) ▮▮▮ | **86-EMPLOYMENT/SCHOOL PHONE** (540) ▮▮▮ | **87-DRIVER'S LICENSE** | **88-DR. LI. STATE** | **89-SSN**

**90-ARREST LOCATION** | **91-OCCUPATION** PAINTER | **92-PLACE OF EMPLOYMENT** | **93-ARREST TYPE:** ☐ (O) On View Arrest ☐ (S) Summons/Cited ☐ (T) Taken Into Cust.

**94-SEX:** ■ (M) Male ☐ (F) Female ☐ (U) Unk.
**95-ETHNIC:** ■ (H) Hispanic ☐ (N) Nonhisp. ☐ (U) Unk.
**96-RACE** ☐ (W) White ☐ (B) Black ☐ (I) American Indian ☐ (A) Asian/Pacific Islander ☐ (U) Unknown

**97-AGE:** EXACT AGE 37  AGE RANGE ___ to ___ ☐ (99) Over 98 Yrs. Old ☐ (00) Unknown

**103-MULT. ARREST INDIC.:** ☐ (C) Count Arrestee ☐ (M) Multiple ☐ (N) N/A
**104-DISPOSITION OF JUVENILE:** ☐ (H) Handled within Department. ☐ (R) Referred outside Departmen

**105-WEAPONS AT ARREST:** (Max. 2) *(Place "A" in blank if automatic)* ☐ (01) Unarmed ☐ (11) Firearm ☐ (12) Handgun ☐ (13) Rifle ☐ (14) Shotgun ☐ (15) Other Firearm ☐ (16) Illegal Cutting Instr. ☐ (17) Club / Blackjack / Brass Kn.

**98-RES. STATUS:** ☐ (R) Resident ☐ (N) Nonres. ☐ (U) Unknown | **99-UCR ARR. CODE** | **100-OFFENSE NAME** | **101-ARREST DATE** | **102-ARREST TRANSACT.** #

**106-TYPE ARREST ACTIVITY:(Max. 3)**
☐ (B) Buying ☐ (O) Operating/Promoting/Assisting
☐ (C) Cultivate/Manufacture/Publish ☐ (P) Possessing/Concealing
☐ (D) Distributing/Selling ☐ (T) Transport/Transmit/Import
☐ (E) Exploiting Children ☐ (U) Using/Consuming

**107-AR. DRUG TYPE: (Max. 3)**
☐ (A) "Crack" Cocaine ☐ (B) Cocaine ☐ (C) Hashish ☐ (D) Heroin
☐ (E) Marijuana ☐ (F) Morphine ☐ (G) Opium ☐ (H) Other Narcotics ☐ (I) LSD
☐ (J) PCP ☐ (K) Other Hallucinogens ☐ (L) Amphetamines/ Methamphetamines ☐ (M) Other Stimulants
☐ (N) Barbiturates ☐ (O) Other Depressants ☐ (P) Other Drugs ☐ (U) Unknown Type Drug ☐ (X) Over 3 Drug Types

| HEIGHT | WEIGHT | HANDEDNESS | BUILD | HAIR COLOR | HAIR STYLE | HAIR LENGTH | EYE COLOR | GLASSES | SKIN TONE |
|---|---|---|---|---|---|---|---|---|---|
| 5'05" | 175 | | MED - Medium | BLK - Black | STR - Straight | SRT - Short | BRO - Brown | | DBR - Dark Bro |

**78-ARRESTEE #** | **79-NAME** Last, | First, | Middle, | **80-AKA**

**81-OFFENDER #** | **82-RESIDENT ADDRESS** Street | City | State | **83-Zip** | **84-DATE OF BIRTH**

**85-RESIDENT PHONE** | **86-EMPLOYMENT/SCHOOL PHONE** | **87-DRIVER'S LICENSE** | **88-DR. LI. STATE** | **89-SSN**

**90-ARREST LOCATION** | **91-OCCUPATION** | **92-PLACE OF EMPLOYMENT** | **93-ARREST TYPE:** ☐ (O) On View Arrest ☐ (S) Summons/Cited ☐ (T) Taken Into Cust.

**94-SEX:** ☐ (M) Male ☐ (F) Female ☐ (U) Unk.
**95-ETHNIC:** ☐ (H) Hispanic ☐ (N) Nonhisp. ☐ (U) Unk.
**96-RACE** ☐ (W) White ☐ (B) Black ☐ (I) American Indian ☐ (A) Asian/Pacific Islander ☐ (U) Unknown

**97-AGE:** EXACT AGE ___  AGE RANGE ___ to ___ ☐ (99) Over 98 Yrs. Old ☐ (00) Unknown

**103-MULT. ARREST INDIC.:** ☐ (C) Count Arrestee ☐ (M) Multiple ☐ (N) N/A
**104-DISPOSITION OF JUVENILE:** ☐ (H) Handled within Department. ☐ (R) Referred outside Departmen

**105-WEAPONS AT ARREST:** (Max. 2) *(Place "A" in blank if automatic)* ☐ (01) Unarmed ☐ (11) Firearm ☐ (12) Handgun ☐ (13) Rifle ☐ (14) Shotgun ☐ (15) Other Firearm ☐ (16) Illegal Cutting Instr. ☐ (17) Club / Blackjack / Brass Kn.

**98-RES. STATUS:** ☐ (R) Resident ☐ (N) Nonres. ☐ (U) Unknown | **99-UCR ARR. CODE** | **100-OFFENSE NAME** | **101-ARREST DATE** | **102-ARREST TRANSACT.** #

**106-TYPE ARREST ACTIVITY:(Max. 3)**
☐ (B) Buying ☐ (O) Operating/Promoting/Assisting
☐ (C) Cultivate/Manufacture/Publish ☐ (P) Possessing/Concealing
☐ (D) Distributing/Selling ☐ (T) Transport/Transmit/Import
☐ (E) Exploiting Children ☐ (U) Using/Consuming

**107-AR. DRUG TYPE: (Max. 3)**
☐ (A) "Crack" Cocaine ☐ (B) Cocaine ☐ (C) Hashish ☐ (D) Heroin
☐ (E) Marijuana ☐ (F) Morphine ☐ (G) Opium ☐ (H) Other Narcotics ☐ (I) LSD
☐ (J) PCP ☐ (K) Other Hallucinogens ☐ (L) Amphetamines/ Methamphetamines ☐ (M) Other Stimulants
☐ (N) Barbiturates ☐ (O) Other Depressants ☐ (P) Other Drugs ☐ (U) Unknown Type Drug ☐ (X) Over 3 Drug Types

| HEIGHT | WEIGHT | HANDEDNESS | BUILD | HAIR COLOR | HAIR STYLE | HAIR LENGTH | EYE COLOR | GLASSES | SKIN TONE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |

## SUBJECT DESCRIPTORS

**OFFENDER #1:** Last, First, Middle ▮▮▮▮

| FEATURE: | LOCATION: | BODY PART: | FEATURE DESCRIPTION: |
|---|---|---|---|
| Tattoo | LEFT | ELBO | |
| Tattoo | RIGH | ELBO | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

JA292

# INCIDENT REPORT
COMMONWEALTH OF VIRGINIA

## VEHICLE LEAD / VEHICLE

| 173-PAGE # | 174-DATE | 1754-INCIDENT # | 176-REPORTING OFFICER | | 177-CODE # | 178-VICTIM NAME |
|---|---|---|---|---|---|---|
| 3 | 01/01/2024 | 2024-00036 | Sergeant Caleb A. Johnson | | RM0049 | |

| 179-YEAR | 180-MAKE | 181-MODEL | 182-STYLE | 183-VIN | 184-LICENSE NUMBER | 185-STATE |
|---|---|---|---|---|---|---|
| | | | | | | |

| 186-OWNER'S NAME | 187-ADDRESS |
|---|---|
| | |

| 188-TOP/SOLID COLOR | 189-SECOND COLOR | 190-DISPOSITION OF RECOVERY: ☐ (I) Impounded ☐ (R) Rel. To Owner | 192-SUSP. VEHICLE? ☐ Y ☐ N | 193-TELETYPE NUMBER |
|---|---|---|---|---|
| | | | | |

| 179-YEAR | 180-MAKE | 181-MODEL | 182-STYLE | 183-VIN | 184-LICENSE NUMBER | 185-STATE |
|---|---|---|---|---|---|---|
| | | | | | | |

| 186-OWNER'S NAME | 187-ADDRESS |
|---|---|
| | |

| 188-TOP/SOLID COLOR | 189-SECOND COLOR | 190-DISPOSITION OF RECOVERY: ☐ (I) Impounded ☐ (R) Rel. To Owner | 192-SUSP. VEHICLE? ☐ Y ☐ N | 193-TELETYPE NUMBER |
|---|---|---|---|---|
| | | | | |

## PROPERTY

| 209-OF. CODE | 210-P. LOSS | 211-P. DES. | 212-QTY. | 213-DESCRIPTION (Include serial number, size, color, etc.) | 214-OWNER | 215-ITEM VALUE | 216-RECOV. DATE |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

| 217-TOTAL NUMBER VEHICLES STOLEN: | 218-TOTAL NUMBER VEHICLES RECOVERED: | 219-TOTAL VALUE STOLEN: | 220-TOTAL VALUE RECOVERED: |
|---|---|---|---|
| | | | |

## PROPERTY CODES

**210-PROPERTY LOSS:**    (1) None    (2) Burned    (3) Counterfeited/Forged    (4) Damaged/Destroyed/Vandalized    (5) Recovered    (6) Seized    (7) Stolen, etc.    (8) Unk.

**211-PROPERTY DESCRIPTION:**

(01) Aircraft
(02) Alcohol
(03) Automobiles
(04) Bicycles
(05) Buses
(06) Cloths/Furs
(07) Computer Hardware/Software
(08) Consumable Goods
(09) Credit Cards/Debit Cards
(10) Drugs/Narcotics

(11) Drug/Narc. Equipment
(12) Farm Equipment
(13) Firearms
(14) Gambling Equipment
(15) Heavy Equipment-Construction/Industry
(16) Household Goods
(17) Jewelry/Precious Metals
(18) Livestock
(19) Merchandise
(20) Money

(21) Negotiable Instruments
(22) Nonnegotiable Instruments
(23) Office-Type Equipment
(24) Other Motor Vehicles
(25) Purses/Handbags/Wallets
(26) Radios/TVs/VCRs
(27) Recordings-Audio/Visual
(28) Recreational Vehicles
(29) Structures-Single Occupancy
(30) Structures-Other Dwellings
(31) Structures-Commercial/Business

(32) Structures-Industrial/Manufacture
(33) Structures-Public/Community
(34) Structures-Storage
(35) Structures-Other
(36) Tools-Power/Hand
(37) Trucks
(38) Vehicle Parts/Accessories
(39) Watercraft
(77) Other
(88) Pending Inventory (of Property)
(99) Special Category

## DRUG INFO.

| 222-DRUG TYPE | 223-WHOLE DRUG QUANTITY | 224-FRACTIONAL DRUG QUANTITY | 225-DRUG MEASUREMENT | 225-TYPE DRUG MEASUREMENT: |
|---|---|---|---|---|
| | | | | **WEIGHT** (GM) Gram (KG) Kilogram (OZ) Ounce (LB) Pound |
| | | | | **CAPACITY** (ML) Milliliter (LT) Liter (FO) Fluid Ounce (GL) Gallon |
| | | | | **UNITS** (DU) Dosage Unit (Pills, etc.) (NP) Number of Plants |

**222-DRUG TYPE:**

(A) "Crack" Cocaine
(B) Cocaine
(C) Hashish
(D) Heroin
(E) Marijuana

(F) Morphine
(G) Opium
(H) Other Narcotics
(I) LSD
(J) PSP

(K) Other Hallucinogens
(L) Amphetamines/Methamphetamines
(M) Other Stimulants
(N) Barbiturates

(O) Other Depressants
(P) Other Drugs
(U) Unknown Type Drug
(X) Over 3 Drug Types

## COMPLNT.

| NAME:    Last,              First,              Middle | SEX: ☐ (M) Male ☐ (F) Female ☐ (U) Unk. | AGE: _____ ☐ (00) Unknown | RACE: ☐ (W) White ☐ (B) Black ☐ (I) American Indian ☐ (A) Asian/Pacific Islander ☐ (U) Unknown |
|---|---|---|---|
| RESIDENT ADDRESS:    Street         City         State    Zip | RESIDENT PHONE | EMPLOY'T. PHONE | |

JA293

# CONFIDENTIAL SUPPLEMENT

| 226-PAGE # | 227-DATE | 228-INCIDENT NUMBER | 229-REPORTING OFFICER | 230-CODE # | 231-VICTIM NAME |
|---|---|---|---|---|---|
| 4 | 01/01/2024 | 2024-00036 | Sergeant Caleb A. Johnson | RM0049 | |

| 234–SCENE PROCESSED BY: | 236-PRINTS FOUND? ☐ Yes ■ No | 238-EVIDENCE ☐ Yes |
|---|---|---|
| | 237-PHOTOGRAPHED ☐ Yes ■ No | OBTAINED? ■ No |

| 239-APPROVING SUPERVISOR | 240-CODE # | 241-DATE APPROVED |
|---|---|---|
| Sergeant Caleb A. Johnson | RM0049 | 01/17/2024 |

**WITNESSES**

| 243-NAME: Last, First, Middle | 244-SEX: ☐ (U) Unk. ☐ (M) Male ☐ (F) Female | 245-AGE: ☐ (00) Unknown | 246-RACE: ☐ (U) Unk. ☐ (W) White ☐ (B) Black ☐ (I) American Indian ☐ (A) Asian/Pacific Islander |
|---|---|---|---|
| 247-RESIDENT ADDRESS: Street   City   State   248-Zip | 249-RESIDENT PHONE | 250-EMPL. PHONE | |
| 243-NAME: Last, First, Middle | 244-SEX: ☐ (U) Unk. ☐ (M) Male ☐ (F) Female | 245-AGE: ☐ (00) Unknown | 246-RACE: ☐ (U) Unk. ☐ (W) White ☐ (B) Black ☐ (I) American Indian ☐ (A) Asian/Pacific Islander |
| 247-RESIDENT ADDRESS: Street   City   State   248-Zip | 249-RESIDENT PHONE | 250-EMPL. PHONE | |

NARRATIVE:

CFS # 2024-000003

On 01/01/2024 just after 0000 hrs I Sgt. C. A. Johnson was made aware by Officer Poulin that Lt. Hylton with the FCSO had a car trying to get away from him. He advised that they were on Scuffling Hill Rd headed towards Franklin St. At this time we were unable to get updates from Lt. Hylton and there was no response from him via radio. I activated my emergency lights and sirens on Franklin St headed towards Scuffling Hill Rd. Deputy Moorman with FCSO then made dispatch aware that Lt. Hylton had one at gun point. When I turned onto Scuffling Hill Rd from Franklin St, I turned off my emergency equipment and began looking for Lt. Hyltons location. Officer Poulin then asked Dispatch if they knew where Hylton was now and they told us Highview Terrace/Scuffling Hill Rd. We then arrived on scene with him a short time later. When I arrived on scene I observed Lt. Hylton standing in front of his patrol vehicle with a hispanic male subject in custody. That subject was identified as ███████████████ . Officer Poulin arrived on scene just behind me where he approached the vehicle. I stood by with the suspect while Hylton and Poulin looked at the suspects vehicle. Deputy Wade with FCSO arrived on scene and took custody of the suspect where he searched his person. Officer Gardner also arrived on scene and assisted Poulin with searching the vehicle where two firearms were located. FCSO took possession of the suspect and all evidence.

SUPPLEMENT #1   Officer Joseph R. Gardner - RM0050   01/17/2024   11:52

On 1/1/2024, I, Officer J. Gardner was working my assigned patrol shift in the Town of Rocky Mount located in Rocky Mount, Virginia. At approximately 0011 hours I heard, via radio, that Franklin County Sheriff's Office Car 11 was conducting a traffic stop and had a subject at gun point. I marked en route and arrived on scene at approximately 0014 hours.

Upon scene arrival Lieutenant Hylton with the Franklin County Sheriff's Office already had the driver in custody. LT Hylton advised the subject was reaching for something in the passenger side floor area. Officer Poulin advised there was a gun on the passenger side floorboard. The male subject in custody was later identified as ███████████████ who was determined to be a convicted felon upon being ran by dispatch.

A search of the passenger side was conducted. Upon searching a .22LR revolver was located under the front passenger seat floorboard. The firearm was cleared and made safe. Upon clearing the firearm, I noticed the cylinders contained only spent shell casings. No live shell casings

JA294

**CONFIDENTIAL SUPPLEMENT NARRATIVE CONTINUATION**

| 226-PAGE # | 227-DATE | 228-INCIDENT NUMBER | 229-REPORTING OFFICER | 230-CODE # | 231-VICTIM NAME |
|---|---|---|---|---|---|
| 5 | 01/01/2024 | 2024-00036 | Sergeant Caleb A. Johnson | RM0049 | |

NARRATIVE:

were in the firearm at that time. A serial number was located on the revolver which was checked and ran through dispatch. Dispatch advised there were no hits on the serial number provided at that time.

An additional firearm was recovered in the same vicinity as the .22LR revolver. The firearm in question appeared to be a homemade bolt action style firearm. The firearm had no markings of a serial number and appeared to be put together by more than one crude component. The firearm appeared to be an altered firearm. Upon inspecting the chamber, a shell casing was seen, upon further inspection the shell casing was determined to be expended. The magazine/tube contained approximately 2-3 rounds of unexpended .22LR ammo. The firearm was cleared and made safe.

Upon searching the rest of the vehicle, the only addition evidence I recovered was a single unexpended .22LR round which was found on the driver's side floorboard. All evidence recovered was packaged and stored by the Franklin County Sheriff's Office. I cleared scene at 0055 hours with no further issues.

SUPPLEMENT #2    Officer Trey A. Poulin - RM0056    01/17/2024    12:16

On 01/01/2024, at approximately 0011 hours, I, Officer T. Poulin was on the phone with Lt. Hylton with the Franklin County Sheriff's Office. Lt. Hylton advised me that he was trying to catch up to a vehicle on South Main Street for a traffic stop. Lt. Hylton advised me that the vehicle was turning onto Scuffling Hill headed towards Franklin Street. I hung up the phone and monitored Lt. Hylton's radio traffic on my portable radio. Soon after I hung up the phone, Lt. Hylton advised traffic stop on the vehicle and he informed dispatch that the vehicle had blacked out the lights while moving. I was traveling on Franklin Street headed towards Scuffling Hill at this time. Dispatch asked Lt. Hylton if he was ok during the stop with no answer back from Lt. Hylton.

Deputy Moorman with the Franklin County Sheriff's Office advised Dispatch that Lt. Hylton had one subject had gunpoint. I informed Sgt. Johnson of what was transpiring with Lt. Hylton's traffic stop. I activated my emergency equipment and headed towards his last known location. I asked Dispatch again where Lt. Hylton's traffic stop was with no update. When I arrived on Scuffling Hill, Dispatch gave a stopping location of Highview Terrace Rd/ Scuffling Hill. I arrived on scene shortly after recieving the updated location. When I arrived on scene, I exited my car and observed a Hispanic male in handcuffs. I got a pass on from Lt. Hylton of what transpired before I arrived on scene. Lt. Hylton stated that the Hispanic male driver kept reaching on the passenger side of the vehicle. I walked up to the vehicle and shined my flashlight through the passenger side window. I observed what appeared to be at that time, a sawed off shotgun located in the floor board of the passenger side. Lt. Hylton ran the subject in custody for felony convictions in which he was a convicted felon. I opened the passenger side door in which the "sawed off shotgun" was in fact an altered weapon. The altered weapon was cleared and made safe by Officer Gardner. The altered weapon had a metal barrel, black weapon frame, and was a bolt action. The altered weapon did not have a serial number anywhere on the weapon and the weapon accepted .22 cal LR ammunition.

JA295

# CONFIDENTIAL SUPPLEMENT NARRATIVE CONTINUATION

| 226-PAGE # | 227-DATE | 228-INCIDENT NUMBER | 229-REPORTING OFFICER | 230-CODE # | 231-VICTIM NAME |
|---|---|---|---|---|---|
| 6 | 01/01/2024 | 2024-00036 | Sergeant Caleb A. Johnson | RM0049 | |

**NARRATIVE:**

Officer Gardner located a .22 cal Revolver that had a Serial number on the firearm. The Revolver was ran through dispatch in which no Hits came back on the firearm at that time. I also located a bag of .22 cal LR rounds in the same vicinity I located the .22 Cal Altered weapon. I assisted in searching the rest of the vehicle. I did not locate anything else inside the vehicle of evidentiary value. Nothing further to report.

JA296

**U.S. Department of Justice**
Bureau of Alcohol, Tobacco, Firearms and Explosives

**Report of Investigation**

| Title of Investigation: | Investigation Number: | Report Number: |
|---|---|---|
| MARTINEZ-CHAVEZ, Issac (Franklin County, VA) | 24-06817 | 10 |

## SUMMARY OF EVENT:

Information received from Franklin County Sheriff's Office (FCSO), Lieutenant (Lt.) Justin Hylton regarding the incident that occurred on January 1, 2024, involving Issac MARTINEZ-CHAVEZ.

## NARRATIVE:

1. On 12/19/2024, ATF-Roanoke Special Agents (SA) interview from Franklin County Sheriff's Office (FCSO), Lieutenant (Lt.) Justin Hylton, in reference to new or clarifying information regarding the incident being investigated, in Franklin County, VA, involving Issac MARTINEZ-CHAVEZ (DOB: 09/16/1986; SSN 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; FB# 60663TC0), on 01/01/2024.

2. The interview was conducted at the ATF-Roanoke Field Office. Present for the interview were the following: FSCO Lt. Justin Hylton; ATF SA Drew Effing and Adam Moody; Special Assistant United States Attorney (SAUSA) Juan Vega and Assistant United States Attorney (AUSA) Matthew Miller.

3. Prior to this interview Lt Hylton advised he reviewed his report and body worn camera (BWC) associated with this investigation. During this interview previously disclosed information from reports and BWC was referred to.

4. Lt. Hylton advised the following new or clarifying information:

5. Lt. Hylton caught up to MARTINEZ-CHAVEZ's vehicle on Scuffling Hill rd. and was within a couple of hundred feet of it. Lt. Hylton maintained visual on MARTINEZ-CHAVEZ vehicle the entire time from when the vehicle turned onto Scuffling Hill Rd, with the exception of a couple seconds, around the time when the vehicle first turned onto Highview Terrace, with the running lights still off.

6. Lt. Hylton referred to a map (shown below) and described how he remembered the vehicles running lights turned off while traveling on Scuffling Hill Rd. near the 2nd Knollwood intersection, which is where, within 1 or 2 seconds, Lt. Hylton activated his emergency equipment to indicate a traffic stop. At that point Lt. Hylton noticed MARTINEZ-CHAVEZ was still traveling at a high rate of speed. Within seconds of MARTINEZ-CHAVEZ pulling into 30 Highview Terrace, Lt. Hylton pulled behind the vehicle. The driver side door was opened, the marked lights [emergency equipment] were still running. Lt. Hylton did not recall if the vehicle's running or brake lights were on, on MARTINEZ-CHAVEZ's vehicle when stopped. Lt, Hylton recalled the streets being dark. The vehicle had been traveling on Scuffling Hill Rd. and Highview Terrace, both of which are public roadways.

| Prepared by:<br>Adam Moody | Title:<br>Special Agent | Signature: | Date:<br>12/23/2024 |
|---|---|---|---|
| Authorized by:<br>Keith Teehan | Title:<br>RAC | Signature: | Date:<br>12/23/2024 |
| Second Level Reviewer (optional): | Title: | Signature: | Date: |

ATF EF 3120.2 (10-2004)
For Official Use Only

JA297

| Title of Investigation: | Investigation Number: | Report Number: |
|---|---|---|
| MARTINEZ-CHAVEZ, Issac (Franklin County, VA) | 24-06817 | 10 |



7.   Lt. Hylton was driving a marked police vehicle but because he is a patrol Lt., his vehicle was not equipped with a vehicle/dash camera or automatic camera system activation. Patrol Deputy vehicles equipped with that system would initiate BWC and vehicle/dash camera upon activation of the vehicle emergency lights. Lt. Hylton had to manually activated his BWC, before it dropped to the ground.

8.   Lt. Hylton BWC never stopped recording; Lt. Hylton never turned it off. The BWC fell off to the ground, near the front driver's wheel, by the engine.  Background noise overheard on BWC after it fell off may have been vehicle engine noise.

9.   The defendant kept putting his hands in his pockets and had to be asked to take them out repeatedly. Hylton then warned MARTINEZ-CHAVEZ one time to comply, or he would be shot. The MARTINEZ-CHAVEZ then complied.

10.   Hylton picked up his BWC off the ground, after the driver was handcuffed.

11.   MARTINEZ-CHAVEZ's friend (FNU, LNU) tried to get into the driver's side of the vehicle. Lt. Hylton ordered the friend to back away and stay away. The individual made it to the car, but not in the car. Nothing was taken out or added to the vehicle. Lt. Hylton saw the friend's hands and noticed that he did not have anything in his hands.  Lt. Hylton did not close the driver side door.

12.   MARTINEZ-CHAVEZ communicated with Lt. Hylton in English without issues, and he did not ask Lt. Hylton to repeat or clarify anything.

13.   Lt. Hylton said he did not know whether MARTINEZ-CHAVEZ was hiding something or retrieving something in the vehicle upon coming to a stop. If he was retrieving something, he did not know what it was. Lt. Hylton ordered MARTINEZ-CHAVEZ out at gunpoint, because he was not taking any chances. Shortly after MARTINE-CHAVEZ told Lt. Hylton he had consumed one beer, Lt. Hylton thought MARTINEZ-CHAVEZ may have been trying to hide alcohol. Prior to approaching the vehicle with Office Poulin, he was not exactly sure what MARTINEZ-CHAVEZ was hiding or reaching for but believed it could have been a gun.

14.   Lt. Hylton said he asked MARTINEZ-CHAVEZ if he had a drivers license, MARTINEZ-CHAVEZ told him no. He did not have any state identification.

15.   Dispatch advised over the radio that MARTINEZ-CHAVEZ was wanted for a felony probation violation from Montgomery Co. When Lt. Hylton heard that MARTINEZ-CHAVEZ was wanted for a felony probation violation,

ATF EF 3120.2 (10-2004)
For Official Use Only

JA298

| Title of Investigation: | Investigation Number: | Report Number: |
|---|---|---|
| MARTINEZ-CHAVEZ, Issac (Franklin County, VA) | 24-06817 | 10 |

he thought it reasonable to believe that the MARTINEZ-CHAVEZ was a convicted felon.

16.   Lt. Hylton suspected numerus people were at the residence.

17.   Lt. Hylton said MARTINEZ-CHAVEZ did not ask him to have someone at the scene associated with him assume responsibility for the vehicle. MARTINEZ-CHAVEZ did not authorize him to leave the vehicle where it was parked.

18.   Lt. Hylton wrote his report documenting the incident at approx. 0220 hours on January 1st. Lt. Hylton wrote from memory, without the benefit of his BWC footage. Hylton did not have access to the BWC footage at the time.

19.   Lt. Hylton advised to his knowledge no FCSO tow sheet was filled out for this case.

20.   On the same date, SA Moody called Lt. Hylton and asked some follow-up questions.  Hylton was asked if the defendant's vehicle had not been searched prior to the tow, would he have done a full inventory search of the vehicle? Hylton said, "I would have." However, Hylton described how he was no longer on scene because he was busy completing other tasks involved in the investigation. Hylton said he could not say whether or not another officer/deputy would or would not have with a different set of circumstances.

21.   Hylton said that after he began to follow the defendant's vehicle, he maintained a visual on the vehicle, with the exception of a couple seconds, noted above. The vehicle appeared to continue in constant motion at a high rate of speed and did not stop. No one jumped out of the moving vehicle.

ATF EF 3120.2 (10-2004)
For Official Use Only

JA299

**U.S. Department of Justice**
Bureau of Alcohol, Tobacco, Firearms and Explosives

**Report of Investigation**

| Title of Investigation: | Investigation Number: | Report Number: |
|---|---|---|
| MARTINEZ-CHAVEZ, Issac (Franklin County, VA) | 24-06817 | 11 |

## SUMMARY OF EVENT:

Information received from Rocky Mount Police Department (RMPD) Officer Trey Poulin regarding the incident that occurred on January 1, 2024, involving Issac MARTINEZ-CHAVEZ.

## NARRATIVE:

1. On 12/19/2024, ATF-Roanoke Special Agents (SA) interviewed RMPD, Officer Trey Poulin, in reference to new or clarifying information regarding the incident being investigated, in Franklin County, VA, involving Issac MARTINEZ-CHAVEZ (DOB: 09/16/1986; SSN 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; FB# 60663TC0), on 01/01/2024.

2. The interview was conducted at the ATF-Roanoke Field Office. Present for the interview were the following: Officer Trey Poulin; ATF SA Drew Effing and Adam Moody; Special Assistant United States Attorney (SAUSA) Juan Vega and Assistant United States Attorney (AUSA) Matthew Miller.

3. Prior to this interview Officer Poulin advised he reviewed his written report and body worn camera (BWC) associated with this investigation. During this interview previously disclosed information from reports and BWC was referred to.

4. Officer Poulin advised the following new or clarifying information:

5. Officer Poulin said he was speaking to Franklin County Sheriff's Office (FCSO), Lieutenant (Lt.) Hylton when he arrived on scene and asked who was in the car, the defendant answered, however, Officer Poulin was talking to Lt. Hylton.

6. From outside of the vehicle Officer Poulin immediately recognized the firearm to be a sawed-off shotgun.

7. Officer Poulin described how he wore his BWC on his chest, which recorded in that general direction and not necessarily where he was looking, down at the floorboard, where the guns were.

8. Once Officer Poulin opened the door, he could see that the barrel appeared thinner than a shotgun. But still appeared to be a sawed-off firearm, unsure on caliber.

9. While Officer Poulin was opening the door, he heard over the radio, through dispatch, that the defendant was

| Prepared by: | Title: | Signature: | Date: |
|---|---|---|---|
| Adam Moody | Special Agent | *[signature]* | 12/23/2024 |
| Authorized by: | Title: | Signature: | Date: |
| Keith Teehan | RAC | *[signature]* | 12/23/2024 |
| Second Level Reviewer (optional): | Title: | Signature: | Date: |
| | | | |

ATF EF 3120.2 (10-2004)
For Official Use Only

JA300

| Title of Investigation:<br>MARTINEZ-CHAVEZ, Issac (Franklin County, VA) | Investigation Number:<br>24-06817 | Report Number:<br>11 |
|---|---|---|

wanted for a felony probation violation, out of Montgomery County. Officer Poulin thought that the defendant would have been convicted of a felony, due to the fact that he had a felony probation violation. Out of an abundance of caution, Officer Poulin later asked Lt. Hylton to run criminal history check on the defendant.

10.   Officer Poulin noted that the beep tone heard on the audio during BWC recording was aired by dispatch to notify officers of a wanted hit.

11.   Officer Poulin was shown a photograph. Officer Poulin said that photo accurately reflected what Officer Poulin saw that night, he recalled seeing the purple-colored paint roller next to the firearm on the floorboard. (screenshot from BWC footage, included below)



12.    Officer Poulin noted upon review that the written version of events in his report was in reverse, a mistake. Officer Poulin described how he wrote the report approximately 16 days later. The report showed approved on 1/17/2024. Officer Poulin said he remembered taking notes on an old paystub in his patrol car. He said he watched his BWC, and was not focused on time, or necessarily for preparation of an evidentiary hearing but he merely noted relevant facts as he understood them. He did not play and pausing the camera, but rather played through and took notes. He wrote the report referring to his notes within 15 minutes of completing notes. He did not have access to Lt. Hylton BWC or reports. Officer Poulin does not know where his paystub notes are.

13.    Officer Poulin also recalled, while on scene, instructing two people, having to yell at them to go back inside the residence. It appeared to him a lot of people were inside residence.

14.    Officer Poulin stayed with the vehicle until Cooks towing arrived to recover the vehicle.

15.    On the same date, SA Moody called Officer Poulin and asked a follow-up question.  Officer Poulin was asked if the defendant's vehicle had not been searched prior to the tow, would he have done a full inventory of the vehicle? Officer Poulin advised if it was his call/investigation he would have. However, those were not the circumstances and in addition FCSO was primary.

ATF EF 3120.2 (10-2004)<br>For Official Use Only

**U.S. Department of Justice**
**Drug Enforcement Administration**

Mid-Atlantic Laboratory
Largo, MD

## Chemical Analysis Report

ATF - Roanoke Office
310 First Street, Suite 500
Roanoke, VA 24011

**Case Number:** 24-06817
**LIMS Number:** 2024-SFL3-01972

### Observations, Results and Conclusions:

| Exhibit | Substance(s) Identified | Net Weight | Substance Purity | Amount Pure Substance |
|---|---|---|---|---|
| 4 | Methamphetamine | Residue | ---- | ---- |

**Remarks:**

The net weight represents the weight of all material, excluding the packaging.

### Exhibit Details:

**Date Accepted by Laboratory:** 03/25/2024          **Gross Weight:** 150.7 g          **Date Received by Examiner:** 12/05/2024

| Exhibit | No. Units | Pkg. (Inner) | Form | Reserve Wt. |
|---|---|---|---|---|
| 4 | 1 | Pipe | Residue | Residue |

**Remarks:**

### Exhibit Analysis:

**Sampling:**

Methamphetamine identified in 1 unit(s) tested.

| Exhibit | Summary of Test(s) |
|---|---|
| 4 | Gas Chromatography/Mass Spectrometry, Marquis Color Test |

The following summary of testimony is provided as required by Federal Rule of Criminal Procedure 16(a)(1)(G) and is a complete statement of my opinions, which are exclusive to and address only the exhibit(s) identified in this summary. I am employed by the U.S. Department of Justice, Drug Enforcement Administration (DEA) and was so employed when I conducted the examinations and analyses of the above referenced LIMS number. My qualifications to conduct the examinations and analyses, and to express an opinion as to the identity of the material contained in the exhibit(s) described above, are based on my knowledge, skill, experience, training, and education. See my Curriculum Vitae (which will be provided prior to the close of expert discovery) for additional information regarding my qualifications, including previous testimony offered in the last four years and any publications authored in the last ten years. The opinions described are based on the listed chemical, physical, and instrumental analyses, the results generated by those analyses, and my interpretation of those results set forth in the laboratory report and analyst notes. The manner and process by which I performed the analyses were, to the best of my knowledge, in accordance with the publicly available Analysis of Drugs Manual (ADM) and Laboratory Operations Manual (LOM), in effect at the time of analysis. These are generally available at: https://www.dea.gov/resources/documents?f%5B0%5D=publication_type%3A2596, or were otherwise disclosed upon request. I analyzed the material contained in the exhibit(s) which were submitted for analysis in the above referenced LIMS number. Refer to this laboratory report associated with the subject LIMS number. The analytical methods used in these analyses are validated and verified according to our quality assurance policy to ensure the methods are reliable and fit-for-purpose and the techniques utilized are widely accepted and employed in the scientific and forensic community. Summaries of instrumental methods are available at: https://www.dea.gov/resources/documents?f%5B0%5D=publication_type%3A2596. This report, its attachments, and the referenced documents are not an exhaustive or complete recitation of testimony that I may offer. In addition, I may offer opinions in response to questions posed during trial. Pursuant to Fed. R. Crim. P. 16(a)(1)(G)(v), I, the analyst, approve the foregoing disclosure, and reserve the right to amend as necessary to comply with Rule 16's obligations.

The terminology used in the preparation of this report is consistent with the current Department of Justice Uniform Language for Testimony and Reports for General Forensic Chemistry and Seized Drug Examinations.

**Analyzed By:** /S/ Rebecca J. Wang, Senior Forensic Chemist          **Date:** 12/12/2024
**Approved By:** /S/ Christine A. Haddix, Senior Forensic Chemist          **Date:** 12/13/2024

JA302



| | **Office of the Sheriff**<br>**County of Franklin, Virginia**<br><br>Written Directive<br><br>Authorizing Authority:<br><br>*Sheriff W.Q. "Bill" Overton, Jr.* |
|---|---|
| **SUBJECT: Traffic Enforcement / Control** | **NUMBER:   201.1** |
| **EFFECTIVE DATE:    9/1/2012** | |
| **AMENDED:** 4/2/2013, 2/25/2014, 05/07/2021, 12/08/2021, 06/17/2022, 6/27/2022 | This order is for internal use only and does not enlarge a deputy's civil or criminal liability in any way.  It should not be construed as the creation of a higher standard of safety or care in an evidentiary sense, with respect to third-party claims.  Violations of this directive, if proven, can only form the basis of a complaint by the Sheriff's Office, and then only in a non-judicial administrative setting. |
| **VLEPSC STANDARDS:**   *OPR.07.01, OPR.07.02, OPR.07.03, OPR.07.04, OPR.07.05, OPR.07.06, OPR.07.07, OPR.07.08, OPR.07.09, OPR.07.10, OPR.07.11, OPR.07.12*<br><br>**CALEA  STANDARDS:**  61.1.2,  61.1.4,  61.1.5,  61.1.7, 61.1.10, 61.3.2, 61.3.3, 61.4.2, 61.4.3 | |

Sub-headings: Use of radar; pacing vehicles; county decal enforcement; general traffic enforcement; uniform enforcement procedures; legislators/diplomatic officials; non-resident/military personnel; traffic crash investigation; hazardous highway conditions; approach violator vehicle; DUI; manual traffic control; funeral escorts; towing of vehicles.

## I.    PURPOSE

To establish guidelines for the use of basic traffic patrol procedures and strategies to assist   in the traffic enforcement role of the Operations Division.

## II.    POLICY

It shall be the policy of the Sheriff' Office to implement patrol techniques and strategies designed to effectively enforce traffic laws and regulations. Deputies shall enforce the traffic laws of the Commonwealth of Virginia and the County of Franklin in a uniform manner. Deputies conducting traffic stops, issuing parking citations, towing vehicles or involved in any other aspect of enforcing applicable traffic laws will conduct themselves in a professional and courteous manner.  While taking proper enforcement action, all members will attempt to educate violators and leave them with the impression that the member has performed a necessary task in a professional and courteous manner.

It is prohibited for any member of the Office of the Sheriff to base traffic stops on race, gender, ethnicity, etc. Traffic stops are solely based upon enforcing applicable traffic

JA303

laws in accordance with the Code of Virginia. The Office of the Sheriff prohibits practices that require officers to issue a predetermined number of citations, arrests or summonses. [1]

### III.    PROCEDURE

A.    RESPONSIBILITY AND FUNCTIONS

1.    As the traffic component of the Franklin County Sheriff's Office, deputies of the Operations Division have primary responsibility for enforcing traffic laws and regulations.

2.    This traffic enforcement responsibility is carried out primarily through the following patrol-related functions:

a.    Motor vehicle accident investigation;

b.    Apprehension of violators observed during patrol;

c.    Traffic control as required under certain emergency conditions;

d.    Enforcement actions tailored to high accident or high incident locations;

e.    Radar operations, during both directed and non-directed patrol;

f.    Other related functions as required or assigned.

B.    CONDUCTING VISIBLE TRAFFIC CONTROL

1.    Visible traffic patrol, either mobile or stationary, will be conducted by the district officer at his discretion, taking into account staffing needs.

2.    Officer will normally select areas for concentrated patrol based on knowledge of his assigned district to include:

a.    Areas statistically high in motor vehicle accidents;

b.    Areas where citizen complaints have been received regarding violations;

c.    Road hazards or potentially dangerous conditions at certain locations;

d.    Other pertinent factors.

3.    Field supervisors may address traffic problems in specific areas (as determined through complaints received, analysis of traffic data, or other means) by directing:

a.    Increased visible traffic patrol; and/or

b.    Establishment of stationary traffic monitoring posts.

201.1                              Page **2** of **34**

JA304

4. Routine visible patrol:

    a. Officers shall operate patrol vehicles in accordance with existing laws and Franklin County Sheriff's Office directives.

    b. Officers should always drive patrol vehicles in such a manner as to demonstrate exemplary driving behavior.

    c. Visible patrol by officers may take any of the following forms:

        1) Area patrol - involving mobile and stationary enforcement, at the officer's discretion, within the bounds of an assigned district.

        2) Line patrol - involving mobile enforcement concentrated along a particular section of roadway.

        3) Directed patrol -involving mobile or stationary enforcement especially targeted toward:

            a) A present location of limited size;

            b) Violations of predetermined type(s) specific to that area.

5. Fixed location observation and enforcement:

    a. Stationary observation posts may be used as a means to combat chronic traffic enforcement problems at specific locations.

    b. In those areas where a stationary observation post is necessary, officers should park their vehicles:

        1) in a conspicuous location; or,

        2) in such a manner that vehicle traffic flow is not impeded.

C. **UNMARKED VEHICLES AND COVERT PATROL**

1. Unmarked police vehicles may be used for traffic enforcement purposes.

2. All unmarked police vehicles used for traffic enforcement will be equipped with a mobile radio transceiver, emergency lights and siren.

3. No radar shall be used in situations commonly referred to as "speed traps."

## IV. USE OF RADAR – SPEED ENFORCEMENT

### A. COMMENTARY

Radar can be a great investigative tool and properly used will enhance traffic safety. It is not the intention of the Franklin County Sheriff's Office to issue a citation to every motorist who exceeds the speed limit. Our objective is to make

the highways of Franklin County safer for all citizens. This can be accomplished by warnings, (be they verbal or hand gestures) by the mere visible presence of the radar and marked patrol units, or by the issuance of citations for those who ignore the warnings. Before issuing a citation, an officer must be sure he has stopped the targeted violator, that the motorist in question was exceeding the speed limit in such a manner as to pose a risk to himself or the public, or he exceeded the speed limit to such a degree that only a citation is warranted, and/or in the judgment of the officer, the violator will ignore a verbal warning to maintain a safe speed in the future.

1.   Radar units may be used in either marked or unmarked police vehicles.

2.   Radar enforcement should normally be emphasized in areas where traffic speed has been identified as a consistent factor in motor vehicle accident occurrence and/or citizen complaints.

3.   As in other forms of mobile or stationary enforcement, officer will operate radar in such a manner as to enhance the safe, unobstructed flow of traffic.

4.   Prior to utilizing radar for enforcement purposes, deputies will be certified in Radar and trained in the proper use of radar systems currently maintained by the department.

5.   Officers operating radar units must be certified with the radar equipment and familiar with the area in which it is used.

   a.   Officers shall only use speed measuring devices approved and issued by the Franklin County Sheriff's Office.

   b.   The officer must be prepared to establish in court that the radar unit was operated properly.

      1)   The radar unit will be installed in the patrol vehicle according to operator's manual directions.
      2)   Operation of the radar unit will be in accordance with operator's manual directions.
      3)   Prior to use, radar unit calibration will be checked, according to operator's manual directions, by means of:

         a)   an internal calibration test;
         b)   tuning fork tests;
         c)   a moving calibration test.
         d)   In addition, the radar unit's internal calibration test will be conducted before and after each shift.

   d.   The officer must thoroughly understand the effective range and features of the radar unit used, so that his visual observations can support the speedometer readings.

201.1                          Page **4** of **34**

e.   Locations of area speed limit signs, pedestrian crosswalks, traffic hazards, and so forth should be noted for use in court.

6.   Radar maintenance:

a.   Officers utilizing radar will be responsible for:

1)   Prior to signing out a radar unit, checking the unit for missing or damaged components;

2)   Ensuring that the radar unit is kept clean and dry during use;

3)   Reporting any missing, damaged or malfunctioning radar components to their immediate supervisor prior to the end of that duty tour.

a)   Officers will note that problem in the equipment's log and report the problem to the shift supervisor. The shift supervisor will immediately remove the radar from further service.

b)   Non-functioning radar units will be returned to the Patrol Lieutenant or his designee.

b.   Radar unit tuning fork calibration will be checked every six months.

c.   Certificates of tuning fork calibration for each radar unit will be filed as follows:

1)   Calibration records and certificate *originals* will be maintained by the Patrol Lieutenant or his designee.

2)   *Copies* of current calibration certificates will be maintained by the Patrol Lieutenant or his designee and the General District Court Clerk's Office.

## V.   PACING VEHICLES

A.   <u>PACING VEHICLES TO DETERMINE SPEED</u>

1.   Prior to using a police vehicle for pacing the speed of a traffic violator, the officer will ensure that the vehicles speedometer has been calibrated**.**

2.   A target vehicle should be paced for a minimum distance of two tenths of a mile, when possible.

3.   Due to varying traffic conditions, the interval maintained between the police and target vehicles is left to the officer's discretion, although:

JA307

a.  The interval must remain constant once pacing has begun;

b.  The target vehicle must remain in clear view at all times during pacing.

## VII.  GENERAL TRAFFIC ENFORCEMENT

A.  <u>GENERAL</u>

1.  Hazardous, reckless, driving suspended and revoked violations will be in accordance with the ***Code of Virginia***. Deputies should issue charges when deemed appropriate. [5]

2.  Moving violations include any breach of traffic laws which occurs when the driver's vehicle is in motion. Non-moving violations include any breach of traffic laws involving a stationary vehicle, such as parking violations, paperwork violations, and vehicle equipment violations. [6,7] Both moving and non-moving violations are governed according to the Code of Virginia.

B.  <u>OFF-ROAD VEHICLE VIOLATIONS</u>

1.  Deputies are authorized to enforce violations by operators of Off-Road vehicles (i.e., dirt bikes, minibikes, and go-carts, and ATV's) who illegally operate such vehicles.

C.  <u>NON-MOVING VIOLATIONS - EQUIPMENT VIOLATIONS</u> [7]

1.  Enforcement of equipment violations, to include but not limited to vehicle registration, inspection stickers, window tint, and defective equipment, will be in accordance with the Code of Virginia. It is the policy of the Sheriff's Office to educate as well as enforce equipment laws.

D.  <u>PUBLIC CARRIER AND COMMERCIAL VEHICLE VIOLATIONS</u> [8]

1.  In addition to the laws governing the operation of passenger vehicles/private carriers, deputies are authorized to enforce all other applicable county and state traffic codes.  This shall include:

a.  Taking enforcement action against any driver, and/or the owner, of any public carrier or commercial vehicle found to be in violation of applicable law.

E.  <u>OTHER NON-HAZARDOUS VIOLATIONS</u>

1.  Will be enforced in accordance to state code or county ordinance.

F.  <u>MULTIPLE VIOLATIONS</u> [9]

201.1  Page **6** of **34**

JA308

1.    Deputies will issue individual summons for each violation of the traffic laws when charging a motorist with multiple violations. Discretion should be used in issuing warnings in the place of multiple summonses.

G.    NEWLY ENACTED LAWS AND/OR REGULATIONS [10]

1.    It is recommended that deputies advise motorists found in violation of newly enacted laws or regulations of the violation with verbal warnings. It is the policy of the Sheriff's Office to educate as well as enforce traffic laws.

H.    PEDESTRIAN AND BICYCLE VIOLATIONS [12]

1.    Deputies will enforce all applicable laws related to bicyclists and pedestrians who recklessly disregard traffic laws and/or create a hazard to themselves and others.

**VIII.    UNIFORM ENFORCEMENT PROCEDURES -** CHARGING VIOLATORS

A.    This section is intended to establish uniform procedures for the enforcement of traffic law violations in addition to procedures set forth in the department's *Arrest Procedures Policy*. Sworn personnel may exercise their discretion as to the type of enforcement action taken, include verbal warnings, issuance of summons or the actual physical arrest of the motorist as warranted by the circumstances and applicable law.

1.    In addition to moving violations, deputies will be observant of vehicles being operated with equipment/mechanical violations that might pose a danger to other motorists and/or pedestrians and take the appropriate enforcement action as necessary.

B.    WARNINGS [3]

1.  If a warning is given, the deputy will explain the reason for the stop and why no summons is being issued to the motorist.

2.  A warning citation should be filled out and explained to the violator.

3.  A copy will be given to the violator and the original will be turned in at the end of the shift to the Operations Division Captain.

4.  The drivers name will be entered into a database, in alphabetical order, that will be accessible to deputies.

5.  When a violator is stopped, the deputy can access this database to determine if this person has been stopped before for the same reason.

201.1                          Page **7** of **34**

JA309

6. The warning information in the database shall be kept for 6 months from date of issue and then purged.

C.  SUMMONS [2]

1.  If a summons is issued, the deputy will:

    a.  Complete one summons per charge, as applicable.
    b.  Ask the violator to sign the summons, give a copy of the summons to the violator explaining to them the instructional information found on the summons, the scheduled court appearance date, and other pertinent information relative to the specific charge(s) to include: [30]

        1)  Court appearance schedule
        2)  Whether court appearance is mandatory
        3)  Whether motorist may enter a plea or pre-pay by mail

2.  If the violator is under the influence of alcohol/drugs, has outstanding warrants on file, or is charged with one of the following violations, he will be arrested and brought before a magistrate.

    a.  Any traffic related felony.
    b.  When the motorist would present a danger to himself or to the public if released.
    c.  When there is articulated reason to believe that the accused will not appear in court.
    d.  When the accused refuses to sign the summons.
    e.  When the accused fails to provide their correct name and address.
    f.  When the accused's operator's license is suspended or revoked and there is reason to believe that the accused will continue to drive after being released.

        1)  Deputies may issue a summons and release a motorist found to be driving on a suspended or revoked license if the deputy can be reasonably assured that the accused will not operate the vehicle upon being released.  However, any motorist found to be driving on a suspended or revoked license shall be issued a DMV Suspension / Revocation / Disqualification Notice (State form DSA-10).

    g.  When the accused's operator's license is suspended or revoked due to an alcohol related offense.

3.  When a deputy stops a driver whom he believes to be mentally and/or physically incompetent to safely operate a motor vehicle, in addition to whatever Operations action is taken, the deputy shall complete a *DMV*

*Driver Review Request* form (State form DL-192) and forward it to the Department of Motor Vehicles.

D.    SUMMONS OF JUVENILES

1.    Any juvenile issued a summons for a moving violation shall be summoned to appear before the Juvenile Court.

2.    Except for those juveniles caught for driving without a valid operator's license, §16.1-302 of the Code of Virginia, allows juveniles to pre-pay all non-moving traffic infractions without appearing before a juvenile judge.

a.    Sworn personnel are to refer to the department's policy on *Juvenile Procedures* found in #204.0.

IX.    **LEGISLATURORS – DIPLOMATIC OFFICIALS**

A.    LEGISLATORS

1.    Members of Congress may not be detained for the issuance of a summons while they are in transit to or from the Congress of the United States.

2.    Members of the General Assembly of Virginia may not be detained for the issuance of a summons for a period of five days prior to or following a session of the General Assembly, or while the General Assembly is in session.

3.    If a member of either legislative body is stopped for a traffic infraction under the conditions listed above, they shall be identified and released immediately.  The deputy may then obtain a warrant for the observed violation and make arrangements to serve the warrant at a time when the legislator is not in transit to a session, or on official business.

a.    Exception: Legislators may be physically arrested during legislative sessions for treason, a felony, breach of the peace and driving under the influence

B.    DIPLOMATS

1.    Sworn personnel are to refer to the department's policy on *Diplomatic Immunity* found in # 109.0.

X.    **NON-RESIDENTS AND MILITARY PERSONNEL**

A.    NON-RESIDENTS

JA311

1.    When stopping a motorist who has a license issued by another jurisdiction, deputies shall be governed by §46.2-945 & §46.2-946 of the Code of Virginia, which describes the reciprocal provisions applicable to residents of jurisdictions participating in the Non-Resident Violator Compact.

    a.    Sworn personnel are to refer to the department's policy on *Arrest Procedures* for additional information (i.e. Reciprocal States)

B.    <u>MILITARY PERSONNEL</u>

1.    All military personnel assigned to military installations within the State of Virginia will be treated as state residents.

2.    Military personnel not assigned to in-state installations will be handled in accordance with the provisions of the Non-Resident Violator Compact (See §46.2-945 & §46.2-946).

    a.    Home state operators' licenses of military personnel do not expire until 90 days after their separation from active duty.

## XI.    TRAFFIC CRASH INVESTIGATIONS [13,11]

Traffic crash investigation within Franklin County is the primary function of the Virginia State Police.  Deputy Sheriff's may be required to intervene in certain situations, in which a Virginia State Police Trooper is unavailable or in need of assistance.

It is the policy of the Franklin County Sheriff's Office to respond to the scene of a traffic collision as outlined in this directive.

A.    <u>REQUIREMENTS FOR RESPONSE TO THE SCENE OF COLLISION</u>

1.    A uniform deputy will be dispatched to the scene of a motor vehicle crash in which a Virginia State Police Trooper is unavailable, to assist the State Police or render assistance to those involved in but limited to the following:

    a.    Death or Injury
    b.    Hit and Run
    c.    Impairment of an operator due to alcohol or drugs
    d.    Damage to public vehicles or property
    e.    Hazardous materials
    f.    Disturbance between principals
    g.    Major traffic congestion as a result of the accident
    h.    Damage to vehicles to the extent towing is required

B.    <u>RESPONSE AND INVESTIGATION PROCEDURES</u>

JA312

1. Should a Virginia State Trooper be unavailable, the deputy must take control of the scene:

   a. Positioning his vehicle in a manner that provides the best protection of the scene, identifying injured persons and providing emergency first aid as needed until relieved by medical services personnel.

   b. Notifying dispatch of the situation, requesting additional traffic support units, and a Virginia State Trooper.

   c. Ensuring that access is available for other emergency vehicles.

   d. Positioning flares/cones as needed. Deputies should be especially careful w/flares under these circumstances.

   e. Maintaining a flow of traffic, if possible, and assuring that spectators and their vehicles do not interfere with persons or vehicles engaged at the scene.

   f. Maintaining calm and order among the parties involved in the accident.

   g. Protecting and securing the accident scene and any physical evidence that may be present.

   h. On arrival of a Trooper, deputies should assist the State Police if needed.

2. Should a Trooper be unavailable, the Deputy dispatched to the scene will be in charge of the accident scene investigation unless otherwise directed by a supervisor.

   a. The investigating deputy shall determine the apparent severity of the crash and complete the proper accident report forms. Collisions resulting in death, personal injury, and/or damage in excess of the dollar amount set by the DMV, shall be completed on the standard Commonwealth of Virginia Police Accident Report (State Form FR-300), regardless of the location of the accident except on private property.

      1) If the crash/incident does not fall within one of the categories, the accident will be considered "minor". The deputy will not be required to fill out a FR-300 report but will ensure that the parties involved have all necessary information, and that a Department information report be filed.

201.1                                Page **11** of **34**

JA313

b.    The investigating deputy should maintain contact with the operators involved and obtain operators licenses and vehicle registrations. Operators should remain at the scene until the conclusion of the on-scene investigation, <u>unless they require medical attention.</u> In those instances, the deputy should ascertain where treatment will be administered and have the parties remain there until he is able to contact them to conclude the investigation.

c.    As soon as possible, the investigating deputy should record all accounts of all drivers and witnesses.

    1)    All statements will be written as they are given and at the time they are made.

    2)    All statements will be read by (or to) the person interviewed, if possible.

    3)    If the person interviewed refuses to sign the statement, or is unable to do so, the deputy will ask if the statement is accurate and then will note the response at the bottom of the statement.

    4)    If the witness requests additions, deletions, or changes in the statement, the changes will be made prior to the witness's signature.

    5)    The deputy will ensure that each driver has information pertaining to the other parties involved. This information shall include, but not be limited to, the name, address, date of birth, telephone numbers, operator's license and vehicle registration and name of insurance company of each party involved in the accident.

    6)    Accident reports will be considered incomplete until such time as all witnesses are interviewed, regardless of whether charges are placed.

d.    In all accidents requiring a state accident report, hit and run, leaving the scene and incidents involving damage to state/county property, written statements will be taken from all witnesses.

e.    The investigating deputy shall record all facts relating to the conditions and physical evidence found at the scene. These should include measurements of tire marks, positions of vehicles/pedestrians, and a record of photographs taken as required in all county equipment accidents or those involving fatalities.

201.1               Page **12** of **34**

3.    Removal of vehicles and debris

    a.    As soon as practical within the scope of the investigation, the deputies on the scene should provide for the resumption of the orderly flow of traffic.

    b.    Whenever possible, vehicles involved in the accident should be removed from the scene by the owner or by a wrecker service requested by the owner.  If no owner is present or no preference is stated, a wrecker service will be called in conjunction with current Sheriff's Office policies.

    c.    The investigating deputy will ensure that debris from the accident are cleared from the roadway by wrecker personnel or an appropriate county or state agency.

    d.    The investigating deputy will ensure that the appropriate public utility company (i.e., electric, telephone, cable TV, etc.) is notified if any of their property has been damaged or destroyed in the accident.  Prompt notification should be made if the damaged property poses any risk to vehicular and/or pedestrian traffic.

4.    Follow-up Investigations

    a.    Upon leaving the scene of the accident, the investigating deputy should interview injured parties who were transported to the hospital.  If the nature of the injuries does not allow an immediate interview, the deputy should ascertain from the attending physician the earliest time such an interview will be possible and conclude this part of the investigation at that time.

    b.    If necessary, canvass the immediate area of the accident to locate witnesses and conduct a further examination of vehicles involved and the scene noting condition of traffic control devices, roadway defects, etc.

5.    Conclusion of Investigation

    a.    The on-scene investigation should produce the principle causes of the accident, and the investigating deputy should make note of these conclusions.

    b.    If violations of law are found to be present, the deputy must note the same and may issue the appropriate summonses or arrest if warranted.

    c.    **In fatality cases, the investigating deputy must present the results of his investigation along with follow-up investigation to**

201.1                    Page **13** of **34**

JA315

**the Commonwealth Attorney's Office for determination concerning related charges.  With the exception of Driving Under the Influence, no traffic charges will be placed before review of the fatal accident investigation by the Commonwealth Attorney's Office**.

C.    REPORTING REQUIREMENTS

1.    *Virginia Code* requirements concerning the reporting of traffic accidents include:

    a.    § 46.2-371:  The driver of any vehicle involved in an accident resulting in death or injury shall immediately notify the law-enforcement officials.

    b.    § 46.2-373:  A law-enforcement officer investigating an accident resulting in injury or death or total property damage to an apparent amount of $1500 or more shall make a written report of it to DMV.

    c.    § 46.2-373:  Officers who investigate an accident for which a report must be made, either at the time of and at the scene of the accident, or thereafter and elsewhere, by interviewing participants or witnesses, shall within 24 hours AFTER COMPLETING the investigation forward a written report of the accident.

2.    Reports

It is the responsibility of the investigating deputy to turn in all related reports concerning the accident at the end of his shift to include:

    a.    The designated accident investigation report, to include all statements.

        1)    If this report is to be turned in incomplete, it must be done so with supervisory approval and must then be completed within 72 hours, unless there are extenuating circumstances.

    b.    Offense report in the event of hit and run, fatality or leaving the scene.

    c.    Summonses

    d.    Film for processing

    e.    Detailed reports concerning investigative findings for later prosecution when involved in felony or fatality type investigation.

JA316

f.      Reports of defects which contributed to the accident shall be noted on proper forms and turned in to a supervisor on duty to be forwarded to the appropriate agency.  Defects or hazards which present an immediate danger to safety shall be reported to Dispatch which shall notify the appropriate agency.

D.      ACCIDENTS INVOLVING DEATH OR SERIOUS INJURY

1.      The deputy dispatched to the scene will take control of the scene until relieved by a member of the Virginia State Police, if available.

2.      Accidents involving death or serious injury will be referred to the Virginia State Police for investigation.

E.      FIRE AND HAZARDOUS MATERIALS OR CHEMICAL SPILLS

Normally, this type of investigation will be investigated by the Public Safety Division.  However, when a situation arises and a Deputy must be dispatched to the scene, the following directive shall be followed.

1.      The deputy investigating the incident shall:

a.      Attempt to identify, by Department of Transportation placard or through the vehicle's operator, the contents of the vehicle containing the hazardous material.

b.      Notify dispatch of the situation and request the Fire Department, giving as much information as possible regarding the fire, hazardous material or chemical spill threat.

1)      Fire hazards and/or hazardous materials, as well as their clean up will be the responsibility of the fire department. Deputies will assist the fire department as they request.

c.      Isolate the accident from nonessential personnel.

d.      Avoid contact with any unidentified liquids or vapors leading or escaping from the accident vehicles.

e.      Refer to the department Policy and Procedures concerning Hazardous Materials.

F.      TRAFFIC CRASHES/INCIDENTS OCCURING ON PRIVATE PROPERTY

Normally, traffic crashes will be investigated by the Virginia State Police. However, when a situation arises and a Deputy must be dispatched to the scene of a crash, the following directive shall be followed.

201.1                                    Page **15** of **34**

JA317

1.      Deputies shall respond in the same manner when dispatched to accidents occurring on private property as to accidents on public roadways.

2.      Upon arrival at the scene the deputy shall eliminate any existing traffic hazards and, if necessary, request additional units and medical/fire assistance.

3.      <u>Accidents on private property shall be deemed workable if they involve a hit and run, injury or fatality</u>.  The investigating deputy shall complete the standard Commonwealth of Virginia Police Accident Report (State Form FR-300).

4.      If the accident does not meet the criteria as set forth in E-3 above, the deputy will not be required to fill out a FR-300 report, but will ensure that the parties involved have all necessary information, and that a Department information report be filed.

G.      CONTROL OF PROPERTY BELONGING TO CRASH VICTIMS

1.      Deputies coming into property belonging to crash victims shall:

a.      Return the items to the victim or family member at the crash site.
b.      If the situation does not allow onsite return, the property shall be logged into the Evidence and Property Room for safekeeping, pending return to the owner.

**XII.    HAZARDOUS HIGHWAY CONDITIONS** [14,18]

A.      At any time when a hazard exists, such as one listed below, the deputy shall request the dispatcher to notify the proper agency.  Hazards may be grouped into two categories.

1.      Hazards requiring immediate notification of the proper agency.

a.      Essential traffic light in need of repair
b.      Large holes in road
c.      Electrical power lines down
d.      Large debris, etc.
e.      Breaks in water, gas, or other utility mains
f.      Snow/ice on road
g.      Fire hazards needing immediate attention
h.      Downed essential highway signs

2.      Hazards requiring notification at beginning of next business day.

a.      Non-essential traffic lights in need of repair
b.      Small (non-hazardous) holes in roadway
c.      Streetlights and signs in need of repair

201.1                        Page **16** of **34**

JA318

    d.    Telephone/video cables down but not creating hazard
    e.    Dead animals in the road
    f.    Potential fire hazards not requiring immediate attention
    g.    Excessive growth of weeds, grass, etc.

3. Some hazardous situations may demand immediate notification of local radio stations in order to request immediate public service announcements. Normally, the Sheriff, or his designee shall contact local media for this purpose.

## XIII. APPROACH VIOLATOR VEHICLE [24]

Approach vehicles stopped for traffic law violations with utmost care to ensure safety and to be courteous while dealing with the motorist.

A. Deputies conducting traffic stops will conduct themselves in a professional and courteous manner.

B. Effecting a Vehicle Stop

1. Prior to making a vehicle stop all deputies will:

    a.    Advise Dispatch of their intention to stop a particular vehicle.
    b.    Locate the safest available location to stop the vehicle.
    c.    Provide Dispatch with:

        1)    The location of the stop
        2)    The vehicles license tag number and state (if not Virginia)
        3)    A description of the vehicle

    d.    Activate the unit's emergency lights and, when necessary, siren to signal the vehicle to stop.

    e.    Maintain a reasonable distance between the vehicle and the deputy's vehicle.

    f.    When stopping, the deputy should position his vehicle approximately one- and one-half car lengths behind the violator's vehicle. The vehicle shall be positioned so that it will offer some protection from oncoming traffic. This position shall be two feet outside and to the left of the violator vehicle. This position provides maximum safety to the violator, the officer, and all other traffic.

    g.    The officer shall leave the patrol vehicle and be continuously alert for any suspicious movement or actions on the part of the violator or other occupants in the violator's vehicle.

h.    The officer shall approach from the rear of the violator's car, looking into its rear seat and stop behind the trailing edge of the left front door.  This position shall be maintained if there are only occupants in the front seat of the vehicle.  From this position, the officer can communicate with the violator, keeping him in a slightly awkward position and at the same time keep all occupants of the vehicle in view.

2.    After stopping the vehicle, all deputies will:

a.    Focus the unit's auxiliary lights (spotlight, take down lights and alley lights) on the occupants of the vehicle, if applicable. Caution should be taken not to blind on-coming traffic.

b.    Approach the vehicle in such a manner as to be in a position to observe all occupants of the vehicle.

c.    Address the driver and passengers in a courteous, professional manner and:

1)    explain to the driver why the vehicle is being stopped;
2)    request that all occupants remain in the vehicle unless directed to do otherwise;
3)    request driver's operator's license and the vehicle registration;
4)    note any statements made by the driver;
5)    conduct a sobriety test, as necessary; and
6)    explain to the driver the action to be taken (i.e., warning, summons, arrest)
7)    All controversy incident to a traffic stop will be avoided. The deputy's conversation with the violator will be limited to:

(a)    Explain the nature of the violation,
(b)    The charges to be placed
(c)    What the individual must do in connection with attending court on the charge.

3.    If the driver and/or occupants are removed from the vehicle, they will be "patted down" before being placed in any law enforcement vehicle.

4.    Once the deputy has completed the stop, he will advise Dispatch:

a.    That his unit is back in service.

201.1                          Page **18** of **34**

JA320

**HIGH-RISK TRAFFIC STOPS** [24]

A. A high-risk traffic stop is defined as the stopping of a vehicle when the deputy has advanced knowledge or reasonable grounds to believe the vehicle contains a suspect or suspects that may be dangerous or may have committed a felony, he/she will notify dispatch immediately. The deputy will inform dispatch of the location, detailed description of the vehicle and a description of the occupants.

B. The deputy will keep the vehicle in view and request assistance in making the high risk stop. The deputy will keep all units informed of the location and direction of travel to facilitate their approach with minimal use of emergency equipment.

C. The suspect vehicle should not be stopped, unless absolutely necessary, until adequate support is available and in position. The following procedures will be used in effecting the stop:

   a. The deputy will plan to stop the suspect vehicle in a location which represents minimal damage to other citizens.

   b. When conditions are appropriate and enough support units are available, the deputy will move into position to the rear of the vehicle.

   c. The deputy will signal the violator to stop utilizing their emergency equipment.

   d. The violator will be stopped on the extreme right side of the road if possible.

   e. If the violator is known to be armed and dangerous, the deputy will have their weapon at the ready and accessible for immediate use.

   f. When the suspect vehicle is stopped, all sirens should be turned off and the PA system activated.

   g. The deputy will park their vehicle so that it provides maximum protection and cover.

   h. At night, all lights will be focused on the interior of the suspect vehicle, including spotlights, to the disadvantage of the violator.

   i. The initial deputy will remain behind the door and accessible to the PA system to begin giving commands to the suspect.

   j. Back up deputies will also take up cover and assist the initial deputy. Only the initial deputy will command the suspect by PA unless relieved by another deputy.

   k. The deputy will command all occupants by the PA system to place their hands where they can be seen by all deputies.

l.  The deputy will command the driver to turn off the vehicle and drop/throw the keys to the vehicle out of the driver's side window.

m.  The deputy will communicate to back up deputies which suspect, if more than one, will be commanded to exit the vehicle one at a time.

n.  Backup deputies may be needed to stop and control traffic around the area of a high risk stop. This should be completed before any suspect is asked to step out of the vehicle, if possible.

o.  The deputy in command will give each occupant commands to step out of the vehicle according to specific directions and into the appropriate search position, after which back up deputies will approach and assist in the search and detention of the suspect(s).

p.  If a PA system is not available, the initial deputy will give voice commands if they can be heard, if this fails, the deputy will approach the vehicle with caution, keeping all occupants in view and only to the point that they can be heard.

q.  All support deputies will cover the arresting deputy and remain available until all occupants have exited the vehicle, been detained and searched.

r.  All occupants should be separated, searched and secured using support deputies.

s.  When all occupants have been removed from the vehicle, support deputies will assist in approaching the vehicle with extreme caution to confirm on other occupants exist.

t.  Extreme caution must be exercised by deputies so as to not get within each other's line of fire.

u.  If the occupant(s) refuse to exit the vehicle, a supervisor will be notified.

v.  Only the appropriate level of force will be utilized to control the occupants.

w.  All arrestees will be searched and handcuffed according to departmental arrest procedures.

x.  An incident report will be completed by the initial deputy explaining the events leading up to, during and after the high-risk traffic stop.

## XIV.  DUI [4]

Persons charged with Driving Under the Influence of Alcohol (D.U.I.), or self-administered drugs (D.U.I.D.), will be arrested as set forth in the procedures below.

201.1                   Page **20** of **34**

JA322

A.    WARRANTLESS ARREST

1.    Deputies may arrest a person for driving under the influence of alcohol/drugs prior to obtaining a warrant under the following circumstances (pursuant to §19.2-81 of the Code of Virginia):

a.    The person charged must have committed the offense in the presence of the deputy, or
b.    When the person charged was involved in an accident and the arrest occurs within three (3) hours of the accident.  The arrest can occur at any location.

B.    ARREST WITH A WARRANT

1.    Deputies should obtain a warrant, prior to arrest, for the person to be charged under the following circumstances:

a.    When the person to be charged, willfully leaves the scene of a motor vehicle accident, or
b.    When the accused has been taken away from the accident scene to a hospital.
c.    A warrant will also be obtained when the accused, after being properly arrested, refuses to submit to a blood or breath test.
d.    If a search warrant is issued, blood shall be drawn for analysis by qualified personnel.

C.    FIELD SOBRIETY TESTS

1.    Deputies shall request that the accused submit to a series of at least three field sobriety tests.  The tests should include, but not limited to:

a.    The Walk and Turn
b.    The Finger Count
c.    The Leg Lift or Stork Test
d.    The A-B-C Recitation Test
e.    The horizontal gaze nystagmus (HGN) test (**only if trained in its use**)

2.    The Alcosensor shall be offered to the accused.  It is not mandatory that the accused submit to the Alcosensor Test.  (This pre-screening device should be administered last upon completion of the initial field sobriety tests.)

D.    IMPLIED CONSENT LAW [19]

201.1                                Page **21** of **34**

JA323

1.      If the accused is placed under arrest for Driving Under the Influence, the deputy shall advise the accused of the Implied Consent Law pursuant to §18.2-268.2 of the Code of Virginia.

    a.      The arresting deputy shall inform the DUI arrestee on a form provided by the Office of the Executive Secretary of the Supreme Court.

    b.      The arresting deputy shall sign the form acknowledging that they have read the form to the DUI arrestee.

2.      The accused, upon being charged with Driving Under the Influence, shall by law submit to a breath test.  The blood test will not be an option unless:

    a.      The breath test is unavailable; or

    b.      the accused is physically unable to submit to a breath test.

3.      The accused upon being charged with Driving Under the Influence, may be required to submit to a blood test to determine the drug or both drug and alcohol content of his blood if the arresting deputy has reasonable cause to believe the accused is under the influence of drugs or a combination of drugs and alcohol.

4.      If the accused refuses to submit to the appropriate test, he shall be taken before a magistrate and be charged with violation of §18.2-268.3 (Refusal of Test).

5.      The Implied Consent Law only applies if the suspect is arrested within three (3) hours of the offense.  For this reason, the time of the offense and the time of the arrest must be documented.

6.      If the subject refuses a blood or breath test at a medical facility, even if it is outside the deputy's jurisdiction, the deputy may issue a Virginia Uniform Summons for refusal on the premises of the facility in lieu of securing a warrant.

E.      BREATH TEST

1.      If the accused submits to a breath test, he will be transported to the Franklin County Jail where the breath test will be conducted using equipment and procedures approved by the Division of Forensic Science, by a licensed breathalyzer operator. The breath test shall be conducted in accordance with the Division of Forensic Science. [19]

F.      TRANSPORT OF IMPAIRED ARRESTEES [19]

JA324

Arrestees under the influence of alcohol or drugs should be observed closely during transportation for signs of distress or need of medical attention. Additional guidelines may be found in *#207.1, Prisoner Transport.*

G.    OBTAINING AND HANDLING THE BLOOD SAMPLE

**Blood is drawn for laboratory analysis when it is suspected that an individual was driving under the influence of a drug other than alcohol, when the breath test is unavailable, or when the suspect is physically unable to submit to a breath test. In this case, a search warrant for the blood sample is requested if no consent is given by the suspect.**

1.    If the accused is required to submit to a blood test, said blood test will be administered pursuant to §18.2-268.1 through .12 of the Code of Virginia.

2.    The arresting deputy will be required to observe and testify to the blood withdraw process and should note the following:

   a.    Person taking blood and their qualifications and/or title.
   b.    What the arm was cleaned with (soap and water).
   c.    Date and Time sample was taken.
   d.    How sample was taken (Sterile Syringe).
   e.    Obtain a copy of the nurse's license.

3.    Blood Specimen Collection Kits are provided by the Division of Forensic Science for collection of the blood samples.

   a.    The person withdrawing the blood must complete the Certificate of Blood Withdrawal:

   b.    Each Certificate of Blood Withdrawal will have a unique vial number (upper right-hand corner).  The ***arresting deputy*** shall record that number in his notes before the vial is sealed within the box.

   c.    After the analysis is completed, the testing laboratory will remove the Certificate of Blood Withdrawal, attach it to the Certificate of Analysis, and return it to court.  (The testing laboratory will dispose of the vial and box.)

4.    **MAILING OF SAMPLES -** The Arresting Deputy shall place the blood sample in the evidence locker.  The Evidence Custodian or other designated officer will transport to the lab or mail, using first class postage, to the address indicated.

201.1                        Page **23** of **34**

JA325

a. The "Request for Laboratory Examination" (RFLE) should indicate that the blood sample is to be tested for drugs and, when possible, it is to state which drugs to test for.

b. Copy of narrative page of IBR. (optional but helpful)

c. Specific instructions not included on the RFLE. In most cases involving special instructions deputies should follow up with a call to the toxicology section of the Division of Forensic Science.

G. JUVENILE OFFENDERS

1. Deputies charging juveniles with Driving Under the Influence will follow the same procedures for handling adult D.U.I./D.U.I.D. offenders with the following exceptions:

a. The accused juvenile will be taken before a juvenile intake officer where petitions are to be obtained.
b. A juvenile arrest form will be completed on the accused juvenile.
c. They may be released to either a parent or legal guardian.
d. The accused juvenile's court date will be set in Juvenile and Domestic Relations Court.

H. UNDERAGE CONSUMPTION OF ALCOHOL WHILE OPERATING MOTOR VEHICLE

1. It is illegal for any juvenile, or any adult under the age of twenty-one, to operate a motor vehicle after consuming alcohol. Any such person who is arrested for driving under the influence and has a BAC of .02 or greater, but less than .08, is in violation of §18.2-266.1.

I. ADMINISTRATIVE SUSPENSION OF DRIVERS LICENSE

1. The license and/or privilege to drive of the person arrested shall be administratively suspended if:
a. The breath test of the accused is .08 or higher; or

b. The accused refuses to submit to a breath test.

2. The arresting deputy shall:

a. Personally serve upon the person arrested a Notice of Administrative Suspension of Driver's License (State Form DC-201);

b,      Promptly take possession of the arrested person's driver's license if issued by the Commonwealth of Virginia (licenses issued by another state will <u>not</u> be taken, but shall be subject to suspension within Virginia);

c.      Promptly deliver to the magistrate, the driver's license taken by the deputy and a copy of form DC-201;

d.      Deliver to the magistrate a sworn report containing information that identifies the person whose license is being suspended and the grounds on which the deputy believed the person arrested was driving under the influence.  (State Form DC-311, Criminal Complaint)

e.      Notify Dispatch of the information regarding the person who has been administratively suspended so they can enter the information into VCIN.

3.      The arresting deputy must be prepared to appear in Court in the event the operator or owner of the vehicle requests a review of the administrative suspension.  The deputy will be notified by the Commonwealth Attorney's Office if a review has been requested and when the deputy must appear in court.  The deputy must be prepared to present his grounds for the arrest and impoundment, to include supporting documentation (license and registration information, DMV driver's record, etc.).

J.  <u>COMMERCIAL MOTOR VEHICLES</u>

1.      Driving Under the Influence while in operation of a Commercial Motor Vehicle (§46.2-341.24) is a class 1 misdemeanor.  Enforcement actions shall be handled in accordance to the Code of Virginia (see § 46.2-341.1 Title and the procedures set forth in § 46.2-341.26:1 through § 46.2-341.26:11).

2.      Driving a Commercial Motor Vehicle with a blood alcohol content equal to or greater than 0.04 but less than 0.08 shall be guilty of a class 3 misdemeanor (§46.2-341.29).

3.      Driving a Commercial Motor Vehicle with any alcohol in his blood as measured by a test administered pursuant to provisions of § 46.2-341.26:1 through § 46.2-341.26:11 shall be guilty of a traffic infraction.

4.      Preliminary Analysis of breath of commercial drivers to determine alcohol content (§ 46-2341.25). If the preliminary sample indicates that alcohol is present, or if the person refuses to provide a sample of his breath for

preliminary screening, such person shall then be subject to the provisions of § 46.2-341.26:1 through § 46.2-341.26:11.

a.    If the officer has probable cause to believe the operator has any amount of alcohol in his blood or the operator refuses (§ 46.2-341.26:3) the preliminary test, he shall be subject to implied consent §46.2-341.26:2 if arrested within 2 hours of the alleged offense.

b.    Out-Of-Service Order - In addition to any criminal and civil charges that may be issued, the magistrate shall issue a 24 hour Out-Of-Service Order pursuant to section D. of § 46.2-341.26:2 .

K.    TRAFFIC CHECKPOINTS

Procedures set forth in this policy are applicable during any traffic or sobriety checkpoint.

## XV.    MANUAL TRAFFIC CONTROL  [15]

To facilitate the orderly movement of traffic during a disruption of its normal flow, deputies shall direct traffic in the safest, most effective means possible.

A.    MANUAL DIRECTION OF TRAFFIC  [15]

1.    Deputies shall manually direct traffic at points and events determined to require other than ordinary traffic control.  Such points and events may include, but are not limited to:

a.    Accidents
b.    Parades-Festivals
c.    Hazardous material leaks
d.    Downed power lines
e.    Fires
f.    Sporting events
g.    Emergency weather conditions
h.    Schools, as designated by Sheriff Office Administration.

2.    When manually directing traffic, deputies shall:

a.    Wear an office issued or authorized reflective traffic vest at all times. [17]

b.    Position themselves as conspicuously as possible.

JA328

    c.    Position their vehicles, with emergency lights activated, in as highly visible location as possible.

    d.    Use clear, uniform, hand or flashlight, with cones, signals, supplemented with whistle blasts when necessary.

    e.    Use any traffic control device at their disposal (flares, cones, traffic lights etc.) to minimize danger to themselves and to aid in the flow of traffic. When utilizing the traffic light, deputies will manually control the frequency of light changes and traffic flow with access to the traffic light control box. Deputies should consider the following while utilizing traffic lights for manual control:

        1.    priority for traffic flow based upon effectiveness of mass vehicle movement, in addition to considerations for emergency vehicles access to pass;

        2.    how often the light frequency should change to continue an appropriate, but manageable, flow of traffic; and

        3.    considering the location, path of travel, and potential obstacles ahead in order to safely and effectively maintain traffic control.

        4.    deputies shall be responsible for removal of temporary control devices, or normal reactivation of traffic lights, upon completion of the manual control. [16]

    f.    NOT use any tobacco product while manually directing traffic.

3.    When directing traffic at fire scenes, deputies shall:

    a.    Cooperate with fire officials in establishing and maintaining a perimeter around the fire.

    b.    Direct the flow to prevent vehicles from driving over fire hoses.

    c.    Control parking and spectators to minimize their interference with the traffic flow and fire fighting units.

4.    Upon encountering a malfunctioning traffic light, deputies shall:

    a.    Advise Dispatch of the malfunction to be reported to the Virginia Department of Transportation.

JA329

b.        Manually direct traffic until a representative from VDOT arrives, if the malfunctioning light presents a traffic hazard and if the representative can respond in a reasonable amount of time.

## XVI.  FUNERAL ESCORTS/TRAFFIC [20]

1.      Criteria: All funeral procession escorts must be approved by Field Lieutenant, or Sergeant/his designee.

        a.     Funeral homes are responsible for coordinating with other agencies if the procession passes into another jurisdiction.

        b.     Funeral homes must inform all procession participants of any requirements and provide all equipment necessary.

2.    Deputy's responsibility

        a.     Deputies shall have the authority to refuse to start any escort which presents a hazard to the safety of either the Deputy or the public. If a deputy refuses to start a funeral escort for any reason, he must contact his supervisor.

        b.     Deputies shall choose the route to be taken based upon resources available, weather, time of day, traffic flow, road hazards, and any permits issued.

        c.     In the event the procession is larger than anticipated, the deputy in charge of the procession shall consider the following:

            (1)    completing the escort as requested;

            (2)    waiting until additional assistance can arrive;

            (3)    escorting a manageable number of vehicles to include the family vehicle and funeral coach.

            (4)    The requesting party may choose to proceed without benefit of an escort.

3. Vehicle requirements.

    a. Deputy

        (1) a police vehicle escorting or directing traffic for a funeral procession shall have emergency lights in operation at all times. Only marked

201.1                      Page **28** of **34**

police vehicles will be used for this request. Unmarked vehicles may be used on approval of supervision only and as a last resort due to safety reasons. If an unmarked is used, the deputy will use all precautions in the procession/directing traffic ensuring his/her safety. (i.e. positioning the vehicle in a manner to effect visibility and traffic control, adequate emergency lights, officer visibility, etc.) If these measures cannot be met by the unmarked unit assigned, this will not be feasible.

(2) The siren shall be used as appropriate to warn other drivers that the procession is proceeding through the area.

b. Other.

All vehicles participating in a funeral procession shall have their headlights illuminated.

## XVII.  TOWING VEHICLES

Vehicles will be towed by Deputies of the Franklin County Sheriff's Office in accordance with State Statutes and County Ordinances under the following conditions.

For vehicle to be stored at the Impound Lot, see Written Directive #118.0.

AUTHORIZATION

1.     Authorization to tow a vehicle where the owner/operator is arrested and:

a.    There is no one at the scene associated with the person arrested to assume responsibility for the vehicle and The owner/operator does not delegate the responsibility to a third person, nor authorize in writing for the deputy to leave the vehicle in a designated area such as a parking lot.

b.    There is someone with the owner/operator of the vehicle and this person is physically, mentally, or legally unable to assume responsibility for the vehicle.

c.    The vehicle is subject to administrative impoundment pursuant to §46.2-301.1.  In such instances, the vehicle cannot be left parked or released to a third party as stated above.

2.     When a stolen vehicle is recovered and all efforts to contact the owner have failed and other arrangements cannot be made, the deputy in the case will make sure the owner is advised as to the name of the wrecker company and the location where the vehicle is stored.

3.     When a vehicle is wrecked, abandoned or becomes a safety hazard.

201.1                         Page **29** of **34**

JA331

4.    Vehicle parked in a properly posted "No Parking-Tow Zone".

5.    When a vehicle interferes with the free ingress, egress, or movement on any entrance driveway or parking area.

a.    Improperly parked vehicles on private property are a civil dispute between the vehicle owner and the property owner.  The Sheriff's Office has no authority over the dispute other than to maintain the peace while the dispute is being resolved. Property owners may have the vehicle towed themselves. [22]

B.    Vehicles shall not be towed in the following circumstances:

1.    For minor traffic violations such as expired tags, inspection stickers, etc.

2.    From improperly marked or posted areas (temporary signs).

3.    Vehicles subject to possible confiscation which are over six years old or valued less than $1,000 unless special approval is granted by the shift supervisor on duty or the supervisor of the division responsible for the investigation.  The supervisor shall take into consideration the value and overall condition of the vehicle in making this decision.

D.    <u>REPORTS OF VEHICLES TOWED</u> [23]

1.    <u>The deputy towing the vehicle is required to complete a Vehicle Impoundment/Immobilization Report commonly referred to as a *"Tow Sheet"* and turn in all other reports relative to the removal of a vehicle</u>.  If the towing deputy indicates that the vehicle may **not** be released for a reason other than confiscation, an explanation must be written on the Tow/Impound Report explaining the circumstances dictating such action.

2.    The deputy towing the vehicle will conduct a stolen check (NCIC/VCIN) by using the vehicle identification number rather than using the license tag and make a notation on the tow sheet.

3.    Situations where vehicles are towed from private property and information is phoned into dispatch, the dispatch personnel on duty will make the stolen check and forward to the shift supervisor.

4.    Any vehicle that is towed and the owner is not with the vehicle, or it is operated by someone other than the owner, it will be entered into the VCIN by Dispatch.

E.    <u>INVENTORY OF VEHICLES</u> [23]

JA332

1.    Deputies will inventory all vehicles in which the deputy has summonsed a tow vehicle except in the case where the deputy assists a motorist whose vehicle is disabled, and a wrecker is requested by that person.

1.    Deputies will inventory the entire vehicle.  This will include the trunk/bonnet, glove boxes, and consoles.  Contents of boxes, luggage, cases, etc., will also be included in the inventory.  Absent exigent circumstances, locked area/luggage or containers should not be damaged to gain entry.  All locked luggage or containers should be secured in the trunk or placed in evidence and noted on the Vehicle Impoundment/Immobilization Report.

   a.    All efforts should be made to open closed containers without damage. If efforts fail, consider have a K-9 unit respond.

2.    Valuables located in the vehicle will be listed on the Vehicle Impoundment/Immobilization Report and secured within the vehicle, preferably located in the trunk, until such time as the owner is able to reclaim the property.

   a.    Only items of obvious value or contraband should be submitted to the Evidence and Property Room (i.e. jewelry, drugs, guns and cash.

SPECIAL TOWING SITUATIONS

A.    STOLEN VEHICLES

1.    In the case of a stolen vehicle, the basic steps described above for an impounded vehicle applies except for the vehicle seizure form.  Again, the tow charge must be forwarded with the Vehicle Impoundment form EPC.

   a.    If a vehicle is found to have no vehicle identification number, and ownership cannot be positively established, the vehicle should be treated as if stolen.

2.    If the vehicle has been stolen from outside of the county, secure the vehicle and notify that jurisdiction.  As a rule, this office does not process stolen vehicles for other agencies; however, this will be decided on a case by case basis and will be at the discretion of the Investigations Unit.

3.    When a vehicle stolen from Franklin County is recovered in another jurisdiction, it will be at the discretion of the on-duty supervisor whether or not to assign a deputy to proceed to that jurisdiction in order to process the vehicle.  If due to inadequate staffing level and/or distance to the other jurisdiction, the supervisor may request the other jurisdiction to secure the vehicle and refer the case to the Investigations Unit.

201.1                              Page **31** of **34**

JA333

4. Vehicles towed that are subject to confiscation will be stored in the Sheriff's Office Impound Lot.

   a. A Vehicle Impoundment/Immobilization Report must be completed at the time the vehicle is placed in the impound log. The keys (ignition, door and trunk) along with the Vehicle Impoundment/Immobilization Report, shall be forwarded to the EPC.

   b. If during the inventory of the vehicle valuables are discovered, the towing deputy will turn the property over to the Sheriff's Office EPC for safe keeping.  Loose personal items shall be secured in the vehicle's trunk, if possible.

   c. All vehicles placed in the impound lot shall be locked and windows closed.  At no time should any vehicle be left in the impound lot with keys remaining inside.

B. <u>SEIZED VEHICLES</u>

1. A seized vehicle is any vehicle which the Sheriff's Office takes possession of and which can be forfeited to the Commonwealth or sold at auction pursuant to the Code of Virginia, this office can seize vehicles only in the following circumstances:

   a. Vehicles used in the illegal transportation of alcohol (§4.1-336, §4.1-339, §4.1-311);
   b. Vehicles used in pre-arranged racing on the highway (§46.2-867);
   c. Game law violations (§29.1-524)
   d. Vehicles equipped with a smoke screen (§46.2-1087)
   e. Pursuant to a court order;
   f. Pursuant to a 30-day immobilization (§46.2-301.1 and §46.2-391.2).

2. Always read the entire statute to confirm the authority to seize any vehicle under a given set of circumstances. Upon evidence that the vehicle was being used for an illegal purpose as defined by state law, the vehicle should be seized and towed to the impound lot.

3. When a vehicle is seized, the following forms must be completed and turned in prior to end of tour of duty:

   a. Incident Report
   b. Impoundment/Immobilization form
   c. Dispatch should note vehicle information and storage location.
   d. Notice of seizure must be forwarded to the Sheriff by the following business day.

JA334

4.      Procedure for Seizing on Private Property [22]

     1.    Vehicles may be towed from private property as a result of the execution of a court order to seize a vehicle. The seized vehicle will be transported to the storage lot. If the vehicle is unlocked or opened by the wrecker operator, or if there is property of obvious value in plain view, an inventory must be conducted.
The following forms must be completed:

          a.    Levy/Seizure Form;
          b.    Inventory Form;
          c.    Report of Levied or Seized Vehicle

## C.    UNATTENDED / ABANDONED VEHICLES [21]

1.    Normally, unattended or abandoned vehicle are handled by the Virginia State Police. However, a deputy may order towed, at the owner's expense, any vehicle found on public property **unattended** by the owner/operator that:

     a.    Constitutes a traffic hazard, or
     b.    Is illegally parked, or
     c.    Has been left unattended for more than ten (10) days on public or private property without permission of the property owner, lessee, or occupant, or
     d.    Is immobilized by weather conditions or other emergency situation.

2.    The vehicle may be considered **abandoned** and towed at the expense of the owner if:

     a.    The vehicle lacks either a current license plate, a current county decal, or valid state inspection sticker, <u>and</u>

     b.    The vehicle has been in a specific location for four (4) days without being moved.

3.    No person shall leave any motor vehicle, trailer semi-trailer, or part or combination thereof unattended on or adjacent to any roadway if it constitutes a hazard. No person shall leave the same thereof longer than twenty-four (24) hours on or adjacent to any roadway outside the corporate limits of any city or town, or on an interstate highway or limited access highway, expressway or parkway inside the corporate limits of any city or town (§46.2-1209)

4.    Whenever a deputy has determined a vehicle to be abandoned, a report shall be completed. Notification of the owner will be attempted.

5.    Storage of Abandoned Vehicles

a. Abandoned vehicles seized pending disposition shall be towed to the towing company's storage facility.

b. Information from all abandoned vehicle Impoundment / Immobilization Reports must be forwarded to Dispatch to be entered into the Towed Vehicle Tracking System.

c. All abandoned Impoundment/Immobilization Reports are recorded in the abandoned vehicle log. Information recorded includes date of tow, tow sheet number, license number, make, color of vehicle, and registered owner's and lien holder's name and address, if available.

d. A letter is completed and mailed to the registered owner and lien holder within 15 days of the receipt of the tow sheet if the vehicle is stored in the Sheriff's Office Impound Lot. Each Impoundment/Immobilization Report is annotated with the date and certified receipt number of the letter. A copy of the letter is then attached to the report.

e. Each Towed Vehicle Report for an abandoned vehicle is then filed by the month it was towed.

D. <u>INOPERATIVE / JUNK MOTOR VEHICLES ON PRIVATE PROPERTY</u>

1. Complaints of inoperative / junk vehicles on private property shall be governed by county code.

[1] 61.1.2(a) CALEA
[2] 61.1.2(b) CALEA
[3] 61.1.2(c) CALEA
[4] 61.1.5(a) CALEA
[5] 61.1.5(b) CALEA
[6] 61.1.5(c) CALEA
[7] 61.1.5(d) CALEA
[8] 61.1.5(e) CALEA
[9] 61.1.5(f) CALEA
[10] 61.1.5(g) CALEA
[11] 61.1.5(h) CALEA
[12] 61.1.5(i) CALEA
[13] 61.3.2(a) CALEA
[14] 61.3.2(b) CALEA
[15] 61.3.2(c) CALEA

[16] 61.3.2(d) CALEA
[17] 61.3.2(e) CALEA
[18] 61.4.2 CALEA
[19] 61.1.10 CALEA
[20] 61.3.3 CALEA
[21] 61.4.3(a) CALEA
[22] 61.4.3(b) CALEA
[23] 61.4.3(c) CALEA
[24] 61.1.7(a) CALEA
[25] ~~61.1.3(a) CALEA~~
[26] ~~61.1.3(b) CALEA~~
[27] ~~61.1.3(c) CALEA~~
[28] ~~61.1.3(d) CALEA~~
[29] ~~61.1.3(e) CALEA~~
[30] 61.1.4(a)(b)(c)(d) CALEA

JA336

*Limited Official Use*

KQNAM: VA, AC MOODY, C, Y - Received 12/18/2024 11:28:21

SOURCE: NLETS - VADMVRH99

KR.VADMVRH99
09:28 12/18/2024 87561
09:28 12/18/2024 23037 VAATF0400
*071B003FIP
TXT
TRANSCRIPT OF DRIVER HISTORY RECORD AS OF 2024/12/18
            LAW ENFORCEMENT                                        PAGE 1

REQUESTED FOR:                          TRIAL DATE  REQUEST RECEIVED
AC MOODY

REQUESTED BY:                           TRIAL DATE  REQUEST RECEIVED
AC MOODY

     *** ATTENTION: FR REQUIRED - DOUBLE MINIMUM LIMITS FR44 ***

     *** ATTENTION: PREVIOUS DWI ***

                              BIRTH DTE: ██████      SEX: MALE
                              WEIGHT: 000    HEIGHT: 0 00
ROANOKE, VA 24012-4425                  EYES: *****    HAIR: *****

RESIDENT JURISDICTION: ROANOKE CITY

CUSTOMER NUMBER: ████████

   DRIVER LICENSE STATUS: REVOKED              DRIVER POINT BALANCE: 0
COMMERCIAL DRIVER STATUS: REVOKED

CONVICTED    ON 2023/02/06 DRIVING INFLUENCE DRUGS,2ND
           OFFENSE DATE: 2022/08/29
           CIRCUIT CT MONTGOMERY COUNTY
           DEMERIT PTS: 6     CODE SECTION: 18.2-266
           COUNSEL: COURT APPOINTED     DEFENDANT: PRESENT
           SUSP PERIOD: 3 YEAR(S)
           ASAP ENROLL DATE: 2023/02/24  ASAP COMPLETED DATE:
           ASAP REVOKED DATE:
           CDL HOLDER: NO

REVOCATION   ISS: 2023/02/22 TERM: 2026/02/04
           FOR DRIVE INFLU DRUGS ASAP 2ND
           CONVICTION: 2023/02/06 CIRCUIT COURT MONTGOMERY COUNTY
           ORDER DELIVERY DATE:          ORDER PENDING RESP
           IGNITION INTERLOCK INSTALLED:          PERIOD:
                 REMOVAL DATE:

KQMRI0303575KR.VAATF0400.OLN/D14400188477.ATN/AC MOODY

                                         PAGE 2
CUSTOMER NUMBER: ████████     NAME: ████████████

CONVICTED    ON 2019/04/04 FAIL STOP SCENE ACCIDENT/DEATH-FELONY
           OFFENSE DATE: 2018/05/02
           CIRCUIT CT FRANKLIN COUNTY
           DEMERIT PTS: 0     CODE SECTION: 46.2-894
           COUNSEL: COURT APPOINTED     DEFENDANT: PRESENT
           CDL HOLDER: NO

THIS IS TO CERTIFY, IN ACCORDANCE WITH SECTION 46.2-215 OF THE CODE OF
VIRGINIA, THAT THIS MACHINE PRODUCED TRANSCRIPT, TRANSMITTED BY ELECTRONIC
MEANS TO AC MOODY IS AN ACCURATE DEPICTION OF THE DRIVING RECORD OF
████████████████ DL NO, ████████, AS MAINTAINED BY THE
VIRGINIA DEPARTMENT OF MOTOR VEHICLES AS OF THE DATE PRINTED ABOVE.

                                 GERALD F. LACKEY
                                 COMMISSIONER

    PLEASE NOTE:  IT IS UNLAWFUL TO USE THE INFORMATION FURNISHED ON
THIS TRANSCRIPT FOR ANY PURPOSE OTHER THAN THAT STATED AS YOUR
REASON.

THIS ENDS TRANSMISSION.

JA337

```
** NOTICE **
INFORMATION OBTAINED FROM VCIN MAY BE USED FOR
CRIMINAL JUSTICE PURPOSES ONLY..

TRACKING: 12/18/2024, 11:28:21 EASTERN
- MKE: KR
- Source: NLETS
- From: VADMVRH99
- REF: BSR8FM49FK
- ISN: 071B003FJ0
```



**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
**ROANOKE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 7:24-CR-00011** |
| | : | |
| **ISAAC MARTINEZ-CHAVEZ** | : | |

**UNITED STATES' OPPOSITION TO**
**DEFENDANT'S UNCONSCIOUS BIAS JURY INSTRUCTION**

The United States opposes Isaac Martinez-Chavez's motion to instruct the jury on unconscious bias using the requested video. ECF #62. In his motion, Mr. Martinez-Chavez requests that the jury view a 10-minute, 53-second video promulgated by the District Court for the Western District of Washington. In the Government's view, the video is unnecessary because routine voir dire procedures are sufficient to address the Defendant's concerns, and there already exist commonly issued instructions that not only address prejudice and bias but also focus the jury on the evidence and law to the exclusion of other matters. Indeed, it is far from clear that a ten-minute video can have any sort of meaningful impact on unconscious bias. Additionally, the requested video may distract the jury from its duties to judge the case based upon the admissible evidence as instructed by the Court, meaning it is not only unhelpful but may prove to be counter-productive. The Defendant's motion should be denied.

\* \* \*

1

JA340

1.      Mr. Martinez-Chavez's motion requests that the video be played during the preliminary instructions prior to the beginning of voir dire. ECF #62.  As a threshold legal matter, the Court has broad discretion to determine what questioning during the voir dire process is sufficient to ensure a fair and impartial jury.  *U.S. v. Bowman*, 106 F.4 293, 302 (4th Cir. 2024).  The Constitution only mandates an exploration of racial (or similar) prejudice in the narrow circumstances where the prejudicial issues are "inextricably bound up with the conduct of a trial" or where "there is a 'reasonable possibility' that racial prejudice might influence the jury." *U.S. v. Barber*, 80 F.3d 964, 968 (4th Cir. 1996) (en banc) (*quoting Rosales-Lopez v. U.S.*, 451 U.S. 182, 189  (1981) (plurality opinion).  This case does not inextricably involve such issues or present any "reasonable possibility" of racial prejudice; it is a straightforward case involving the unlawful possession of firearms. The mere fact that Mr. Martinez-Chavez is a Mexican national, and the some of the jurors may not be, is not enough to require race-specific voir dire questions. *Id*. at 969 (explaining that, in *Rosalie-Lopez*, no such questions were required even though the case involved "a Mexican American charged with illegally bringing Mexican aliens into the country" who "cohabitated" with someone of a different race).

2.      Nevertheless, the Defendant seeks to introduce the concept of unconscious bias into the jury selection process by means of the requested video.  In support of its request, the Defendant refers to his status as a Mexican national and felon and notes that he had a pipe with drug residue on his person at the time of his arrest.  ECF #62 at p. 5.  In effect, Mr. Martinez-Chavez seems to argue that there is

2

JA341

a risk of race-based prejudice because he aligns with certain preconceived notions about Mexican immigrants.  But that does not mean a video about unconscious bias is necessary. Nothing precludes Mr. Martinez-Chavez's counsel from asking about potential biases or prejudices, or from requesting instructions that tell the jurors not to rely on prejudices or biases of any kind.

       3.     It is also not clear that the proposed video would even help address the underlying concern. The issue presents a practical problem: telling the jurors their own thoughts and instincts are rife with various kinds of bias—while also telling them to use their common sense to evaluate the evidence—risks paralyzing deliberations and inhibiting fruitful discussions, particularly when the issue is presented without any useful framework for identifying and mitigating unconscious bias. S*ee, e.g., United States v. Caldwell*, 81 F.4th 1160, 1176 (11th Cir. 2023) ("The district court reasonably determined that the video could cause jurors to question their ability to make judgments based upon their common sense and experience[,]" and it "would be harmful to jury deliberations to suggest to the jurors that they should be suspicious of their prospective colleagues' decisions based on the possibility of unconscious racial bias."). In fact, there is abundant evidence that confronting unconscious bias in this manner is neither helpful nor effective. *See*, *e.g.*, Francesca Gino & Katherine Coffman, *Unconscious Bias Training That Works*, Harvard Business Review, Sept-Oct 2021 ("Sending the message that biases are involuntary and widespread—beyond our control, in other words—can make people feel they're

3

JA342

unavoidable and lead to *more* discrimination, not less.") (emphasis in original)[1]; Frank Dobbin & Alexandra Kalev, *Why Diversity Programs Fail*, Harvard Business Review, July-Aug 2016 ("a number of studies suggest that [diversity training] can activate bias or spark a backlash.")[2] [3]; *Pena-Rodriguez v. Colorado*, 580 U.S. 206, 209 (2017) ("[M]ore pointed questions [about racial bias] could well exacerbate whatever prejudice might exist without substantially aiding in exposing it.").

4.      This video, in fact, risks doing more harm than good. There are a number of specific portions of the requested video that are problematic in the context of the specific facts of the case at hand.

Early on in the video a sign is shown reading, "WE SERVE WHITE'S only NO SPANISH or MEXICANS." *See*, requested video at 1:58. The speaker refers to this sign and similar images as "intentional, deliberate and harmful discrimination," before transitioning into a discussion about unconscious bias. The blatantly racist sign at 1:58 in the video is one of its most concerning aspects because calling attention to past prejudice based on the same Defendant's nationality may be unintentionally counter-productive. The video may serve to highlight the Defendant's nationality and

---

[1] Available at < https://hbr.org/2021/09/unconscious-bias-training-that-works>

[2] Available at < https://hbr.org/2016/07/why-diversity-programs-fail>

[3] *See also* Patrick Forscher, Calvin Lai, Jordan Axt, Charles Ebersole, Michelle Herman, Patricia Devine, & Brian Nosek, *A Meta-Analysis of Change in Implicit Bias*, Journal of Personality & Social Psychology, June 2019; Elizabeth Levy Paluck & Donald Green, *Prejudice Reduction: What Works? A Review and Assessment of Research and Practice*, Annual Review of Psychology, 2009, 60:339-67, at 348; Alexandra Kalev, Frank Dobbin, & Erin Kelly, *Best Practices or Best Guesses? Assessing the Efficacy of Corporate Affirmative Action and Diversity Policies*, American Sociological Review, 2006, Vol. 71 (August:589-617), at 604, 611.

4

ethnicity and possibility prejudice, distracting the jurors from the evidence and relatively straightforward facts in this case.

Later, around 8 minutes into the video, there is a discussion about jurors "checking in with themselves" *during the trial*. This is awfully close to implying that jury members should be making decisions *prior* to deliberations, contrary to the Court's other instructions. Furthermore, a fair reading of this portion of the video is that it *instructs* the jury members to consider the defendant's personal characteristics such as age, race, and gender in making its decisions, and then consciously reject those considerations. While that may be a useful exercise, in an academic or training setting, for identifying and combatting bias, telling jurors to expressly consider and rely on racial considerations at any point of their deliberations is enormously problematic and a likely a constitutional problem.

At about 9:24 minutes into the video, the video is accompanied by a written instruction on screen that the jury should "CAREFULLY EXAMINE OUR DECISIONS AND JUDGEMENTS AS JURORS." This could be misinterpreted in several ways, such as a directive from the Court to judge the case prior to deliberations, or misinterpreted as an instruction to the jury to reevaluate its ultimate findings of guilt or innocence at the close of the case. This problem is compounded by the next instruction provided on screen when it instructs the jury to "QUESTION OUR DECISIONS BY ASKING WHETHER THEY WOULD BE DIFFERENT IF THE WITNESS, LAWYER, OR PERSON ON TRIAL WERE OF A DIFFERENT RACE, AGE, OR GENDER." Video at 9:28. It is customary for the

5

JA344

Court to instruct the jury that it must withhold forming an opinion until all of the evidence is properly before it, and to withhold judgement until deliberations are completed. And yet the video's instructions seemingly conflict with these routine jury instructions, and there is no guidance in the video or otherwise as to when, how, and under what conditions the jury should be questioning its decisions. It's plausible that a jury member could understand this directive to mean the jury should question its ultimate decision on guilt or innocence due to the Defendant's race, rather than basing that decision on the evidence presented in court.

At around 10:15 minutes, the video instructs the jurors to discuss unconscious bias with the other jurors during deliberations. So rather than discussing the evidence in the case and the law as provided the Court, the video would have the jurors discuss a defendant's race, gender, age, or other protected characteristic and wonder how those characteristics could be impacting their appraisal of the defendant's guilt or innocence. That, again, is precisely what jurors should *not* be doing, and it's the sort of status-based discriminatory thinking that has no basis in a fair or impartial jury trial.

All in all, while the video is undoubtedly well-intentioned, it seems just as likely to inject unnecessary issues and problems unrelated to the evidence in the case as it is to address unconscious bias.

5.    Importantly, numerous courts have rejected requests to give unconscious bias instructions and found the more general instruction against being influenced by prejudice or bias sufficient. *See United States v. Maxwell*, 89 F.4th 671,

<div align="center">6</div>

<div align="center">JA345</div>

679–80 (8th Cir. 2023) ("The district court acted well within its discretion when it denied the proposed implicit bias instruction."); *United States v. Mitchell*, No. 22-12084, 2023 WL 3620913, at *5 (11th Cir. May 24, 2023) ("The charge the district court gave substantially covered the proposed [unconscious-bias] instruction, and the failure to give the instruction did not substantially impair Mitchell's ability to present an effective defense."); *see also United States v. Mercado-Gracia*, 989 F.3d 829, 841 (10th Cir. 2021); *United States v. Caldwell*, 81 F.4th 1160, 1176 (11th Cir. 2023); *United States v. Graham*, 680 F. App'x 489, 492–93 (8th Cir. 2017); *United States v. Sawyers*, 740 F. App'x 585 (9th Cir. 2018); *United States v. Nishida*, 2021 WL 3140331, at *2 (9th Cir. July 26, 2021); *United States v. Smith*, 2024 WL 3568887, at *1 (D. Md. July 29, 2024) (collecting district court decisions). And given that the video comes from the Western District of Washington, it is perhaps notable that even the Ninth Circuit has (on multiple occasions) found the instruction unnecessary.

## CONCLUSION

Undoubtedly, the Western District of Washington seeks to address perceived ills and promote the cause of justice, but it is not clear at all that these worthy goals are likely to be furthered if this Court grants the Defendant's request. Since routine voir dire questioning is more than adequate to address concerns about bias and prejudice and to ensure the selection of an impartial jury, the video is unnecessary and possibly counter-productive. Accordingly, the Defendant's motion should be denied.

7

JA346

Respectfully submitted,

ZACHARY T. LEE
Acting United States Attorney


Date: December 27, 2024.

*s/Juan L. Vega*
Special Assistant United States Attorney
VA State Bar No. 79165
U.S. Attorney's Office
310 First St., S.W., Ste. 906
Roanoke, Virginia 24011
540-857-2250 (phone)
540-857-2614 (fax)
Juan.vega2@usdoj.gov

*s/Matthew M. Miller*
Assistant United States Attorney
VA State Bar No. 43034
U.S. Attorney's Office
310 First St., S.W., Ste. 906
Roanoke, Virginia 24011
540-857-2250 (phone)
540-857-2614 (fax)
Matthew.miller2@usdoj.gov

8

JA347

**CERTIFICATE OF SERVICE**

I hereby certify that on December 27, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record.

<div align="right">

*s/ Juan L. Vega*
Assistant United States Attorney

</div>

9

JA348

CLERK'S OFFICE
U.S. DISTRICT COURT
AT ROANOKE, VA
FILED

December 27, 2024
LAURA A. AUSTIN, CLERK
BY: s/ M.Poff, Deputy Clerk

IN THE UNITED STATES DISTRICT
COURT FOR THE WESTERN DISTRICT
OF VIRGINIA ROANOKE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. 7:24-cr-00011 |
| v. | ) | |
| | ) | By: Elizabeth K. Dillon |
| ISAAC FIDEL MARTINEZ-CHAVEZ | ) | Chief United States District Judge |

**MEMORANDUM OPINION AND ORDER**

Pending before the court are three pretrial motions: (1) defendant's Motion to Dismiss Count One of the [Superseding] Indictment (Dkt. No. 57); (2) defendant's Motion to Suppress Evidence (Dkt. No. 59); and (3) the United States' Motion to Toll the Speedy Trial in Order to Litigate Pending Motions (Dkt. No. 66).[1] Defendant's Motion to Suppress Evidence (Dkt. No. 59) has been referred to Judge Michael F. Urbanski, and a hearing on the motion has been set for January 3, 2025. (Dkt. Nos, 70, 71.) For the following reasons, the court will deny defendant's Motion to Dismiss Count One of the Indictment and will deny Government's request for any extension of time to file a response to defendant's pending pretrial motions. Pursuant to 18 U.S.C. § 3161(h)(1)(D), the period between the filing of the defendant's pretrial motions and their resolution will be tolled for Speedy Trial purposes.

## I. DISCUSSION

First, the court will deny defendant's motion to dismiss count one of the superseding indictment, which charges him with unlawfully possessing a handgun and a rifle, in violation of 18 U.S.C. § 922(g)(1). Martinez-Chavez argues § 922(g)(1) is unconstitutional both facially and as applied under *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), and

---

[1] There are additional pretrial motions (Dkt. Nos. 62, 68, 72) that the court will address at the pretrial conference.

JA349

*United States v. Rahimi*, 602 U.S. 680 (2024).  (*See* Dkt. No. 57.)  However, the Fourth Circuit recently held that § 922(g)(1) is facially constitutional.  *United States v. Canada*, No. 22-4519, 2024 WL 5002188, at *2 (4th Cir. Dec. 6, 2024) ("Section 922(g)(1) is facially constitutional because it 'has a plainly legitimate sweep' and may constitutionally be applied in at least some 'set of circumstances.' (citing *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442 (2008))).  Additionally, the Fourth Circuit recently held that its precedent on as-applied challenges to § 922(g)(1) remains binding precedent after the Supreme Court's decisions in *Bruen* and *Rahimi*.[2]  *United States v. Hunt*, No. 22-4525, 2024 WL 5149611, at *1 (4th Cir. Dec. 18, 2024).  The court notes that defendant filed his motion prior to the Fourth Circuit's decision in *Hunt*, but it, nonetheless, binds this court.  As such, the court will deny defendant's motion to dismiss count one of the superseding indictment.

Second, as noted above, defendant's Motion to Suppress Evidence (Dkt. No. 59) has been referred to Judge Michael F. Urbanski.  (Dkt. No. 70.)  The United States has filed a response in opposition (Dkt. No. 75), and a hearing on the matter has been set for January 3, 2025 (Dkt. No. 71).

Lastly, the court will deny as moot the United States' request for any extension of time to file a response to defendant's pretrial motions.  (Dkt. No. 66.)  In its motion, the Government argues that three pretrial motions (Dkt. Nos. 57, 59, 62) are "substantive in nature and will require significant legal research, preparation, and witness coordination."  (*Id.* at 1.)  The Government requests for an extension of time until January 15, 2025, to prepare and file

---

[2] The Fourth Circuit precedent states that "a person who has been convicted of a felony cannot make out a successful as-applied challenge to Section 922(g)(1) 'unless the felony conviction is pardoned or the law defining the crime of conviction is found unconstitutional or otherwise unlawful.'" *United States v. Hunt*, No. 22-4525, 2024 WL 5149611, at *1 (4th Cir. Dec. 18, 2024) (citing *Hamilton v. Pallozzi*, 848 F.3d 614, 626 (4th Cir. 2017)).

2

JA350

responses to defendant's motions.  Furthermore, the Government recommends that the court set aside the first day of the jury trial, scheduled to begin on January 22, 2025, to hold an evidentiary hearing on the motion to suppress and to hear argument on the remaining motions.[3] (*Id.*)  Additionally, the Government requests the Speedy Trial clock be tolled from December 13, 2024, until final dispositions of these motions, pursuant to 18 U.S.C. § 3161(h)(1)(D).  Defendant has filed a response, opposing the requested extension for the Government to litigate the motions, but agreeing that the time between the filing of the defendant's pretrial motions and their resolution should be excluded for Speedy Trial purposes.  (Dkt. No. 67.)  On December 27, 2024, the Government filed responses to all three motions mentioned in its extension request.  (Dkt. Nos. 73, 75, 77.)  As such, the court will deny the Government's motion for any extension of time to file a response to defendant's pretrial motions as moot.  Pursuant to 18 U.S.C. § 3161(h)(1)(D), the period between the filing of the defendant's pretrial motions and their resolution is tolled for Speedy Trial purposes.[4]

---

[3]  Although the Government did not explicitly request a continuance of the jury trial in its motion, its recommendation would, in effect, delay the trial's commencement.  To the extent the Government is seeking a continuance of the jury trial in its motion (Dkt. No. 66), the court denies the request.

[4]  The Government "requests the court to toll Speedy Trial from December 13, 2024, until final disposition of these motions.  This motion, however, is unnecessary, and " the court need not issue an order, as the time is automatically tolled pursuant to 18 U.S.C. § 3161(h)(1)(D).  *See Bloate v. United States*, 559 U.S. 196, 203 (2010).

JA351

## II. CONCLUSION AND ORDER

For the foregoing reasons, it is hereby ORDERED as follows:

1. Defendant's Motion to Dismiss Count One of the [Superseding] Indictment (Dkt. No. 57) is DENIED; and

2. The United States' Motion to Toll the Speedy Trial in Order to Litigate Pending Motions (Dkt. No. 66) is DENIED AS MOOT given the automatic tolling under the Speedy Trial Act.

The jury trial is scheduled to begin on January 22, 2025, and will proceed as planned. The clerk is directed to send a copy of this memorandum opinion and order to all counsel of record.

Entered: December 27, 2024.

*/s/ Elizabeth K. Dillon*

Elizabeth K. Dillon
Chief United States District Judge

JA352

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**ROANOKE DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No.: 7:24-CR-11 |
| ISAAC FIDEL MARTINEZ-CHAVEZ | ) | |
| | ) | |

**RESPONSE TO DEFENDANT'S MOTION FOR AN ADVERSE JURY INSTRUCTION BASE ON SPOLIATION**

## I.    INTRODUCTION

The defendant, Isaac Fidel Martinez-Chavez ("Mr. Martinez-Chavez"), seeks an adverse jury instruction based on the spoliation of evidence: the recordings of radio communications between officers and with dispatch (collectively "dispatch recordings"). The government requests that the Court deny Mr. Martinez-Chavez's motion.

The three primary cases are as follows: California v. Trombetta, 467 U.S. 47, 489 (1984), Arizona v. Youngblood, 488 U.S. 51, 57-58 (1988), and United States v. Johnson, 996 F.3d 200, 215 (4th Cir. 2021).

Under Trombetta, the government violates due process when it destroys exculpatory evidence, the exculpatory value of the evidence was apparent before its destruction, and the nature of the evidence was such that the defendant would be unable to obtain comparable evidence by other reasonably available means. Bad faith is not required. The government asserts that there is no due process violation under Trombetta because the dispatch recordings were not exculpatory and comparable evidence could have been obtained by other reasonably available means. There is simply no basis in fact to claim that the dispatch recordings would be exculpatory.

1

JA353

Under Youngblood, the government violates due process when it acts in bad faith in failing to preserve the evidence. The government asserts that there is no due process violation under Youngblood because the government did not act in bad faith. The dispatch recordings were automatically purged by the computer system in accordance with a state-wide disposition schedule and no one had requested them, including the defense, until well after they were purged.

In Johnson, the Fourth Circuit relied upon a civil case to suggest, arguably in dicta, that the trial court consider on remand that an adverse inference instruction may be appropriate in a criminal case absent a due process violation. An instruction could be appropriate if the government knew the evidence was relevant to an issue at trial and the government's willful conduct resulted in its loss or destruction. Here, an instruction is not appropriate because the government did not know that the dispatch recordings were relevant to an issue at trial. The government further asserts that the dispatch recordings are in fact not relevant and that there is no real issue at trial. Mr. Martinez-Chavez's claim appears to rest on an unsupported conspiracy theory that Lieutenant Hylton made up the reason for the stop and made up the events that led to another officer seeing a sawed-off rifle in plain view from outside Mr. Martinez-Chavez's car. The defense theory is in direct opposition with the overwhelming evidence, including some provided by Mr. Martinez-Chavez himself, that corroborates Lieutenant Hylton's account of events.

## II.    EXPECTED TESTIMONY AND SUPPORTING FACTS

<u>The initial encounter with Mr. Martinez-Chavez and his driving conduct as reported by Lieutenant Hylton</u>

Lieutenant Justin Hylton works for the Franklin County Sheriff's Office (FCSO). On January 1, 2024, around 12:05 a.m., he was driving South on South Main Street in Rocky Mount when he saw a silver Kia, driven by Mr. Martinez-Chavez, travelling in the opposite direction

faster than the posted 45 MPH speed limit. He confirmed through radar that Mr. Martinez-Chavez was traveling at 60 MPH.  Lieutenant Hylton turned and followed the Kia. As Lieutenant Hylton approached the Kia, Mr. Martinez-Chavez "picked up speed," and turned onto Scuffling Hill Road. Lieutenant Hylton closed the distance. "As the car approached the second Knollwood Drive on Scuffling Hill [Road], the target vehicle[']s headlights and tail lights went out while still travelling."  Lieutenant Hylton decided to initiate a traffic stop "based on that driving behavior" and activated his emergency lights. With the Kia's lights still out, Mr. Martinez-Chavez made an "abrupt" right turn onto Highview Terrace off Scuffling Hill Road and pulled into a yard. Lieutenant Hylton pulled in behind the car with his emergency lights still activated.[1] Mr. Martinez-Chavez traveled in the dark, with his car lights off, on Scuffling Hill Road and on Highview Terrace, both of which are public roads.[2]

<u>The initial encounter with Mr. Martinez-Chavez and his driving conduct as corroborated by other officers</u>

Officer Trey Poulin was on the telephone with Lieutenant Hylton while Lieutenant Hylton was pursuing Mr. Martinez-Chavez. In real time, Lieutenant Hylton told Officer Poulin that "he was trying to catch up to a vehicle on South Main Street for a traffic stop." Lieutenant Hylton also told Officer Poulin, as it was happening, that "the vehicle was turning onto Scuffling Hill headed towards Franklin Street." Officer Poulin then "hung up the phone and monitored Lt. Hylton's radio traffic on my portable radio." Per Officer Poulin's report, Lieutenant Hylton "advised traffic stop on the vehicle and he informed dispatch that the vehicle had blacked out the lights while moving." Officer Poulin was traveling on Franklin Street and heading towards Scuffling Hill, which is where Lieutenant Hylton had followed Mr. Martinez-Chavez. Officer Poulin heard dispatch ask

---

[1] Gov Exh 1 - Lieutenant Hylton Police Report_Redacted, at 2.
[2] Gov Exh 3 - ATF ROI 10, Hylton interview, at para. 6.

3

Lieutenant Hylton "if he was ok during the stop with no answer back." Officer Poulin noted that "Deputy Moorman with the Franklin County Sheriff's Office advised Dispatch that Lt. Hylton had one subject [at] gunpoint." Officer Poulin then informed Sergeant Caleb Johnson of what was transpiring as Officer Poulin activated his emergency equipment and headed towards Lieutenant Hylton's last known location. [3]

In his report, Sergeant Johnson confirmed that Officer Poulin told him that Lieutenant Hylton "had a car trying to get away from him" and that "they were on Scuffling Hill Rd headed towards Franklin St." Sergeant Johnson also confirmed that they "were unable to get updates from Lt. Hylton and there was no response from him via radio." He too activated his emergency lights and sirens and headed towards Scuffling Hill Road. He too confirmed that Deputy Moorman made dispatch aware that Lieutenant Hylton had a person held at gun point. [4]

In his Report, Officer Joseph Gardner indicated that he "heard, via radio, that Franklin County Sheriff's Office Car 11 was conducting a traffic stop and had a subject at gun point." [5]

<u>Mr. Martinez-Chavez's admission of speeding</u>

Mr. Martinez-Chavez admitted to Lieutenant Hylton that he had been speeding by saying, "***I really. I only coming fast like that because I—***." Lieutenant Hylton interrupted Mr. Martinez-Chavez when he showed him the identification Lieutenant Hylton pulled out of his wallet. [6] Moments later, Mr. Martinez-Chavez admitted to his friend, in Spanish, that he had been speeding by saying, "***It's that I was coming fast, man***." [7]

---

[3] Gov Exh 2 - Poulin, Gardner, Johnson Police Reports_Redacted, at 5.
[4] <u>Id</u>., at 4.
[5] <u>Id</u>.
[6] ECF#59, Defense Exh 3, "Hylton's Body Worn Camera Recording," at 02:40.
[7] Gov Exh 7 - Transcription and translation of Defendant talking to male acquaintance. Stipulated by the defense as an accurate transcription and translation.

4

JA356

<u>Lieutenant Hylton's statements to other officers about the traffic stop</u>

Per Lieutenant Hylton's BWC footage, he informed officers about Mr. Martinez-Chavez's driving conduct shortly after they arrived. Officer Poulin arrived at Time 03:50 on Lieutenant Hylton's body warn camera (BWC). ***Two seconds after Officer Poulin arrived***, Lieutenant Hylton told him "I had him at 60 coming up South Main . . . He put the hammer on it . . . . He turned his lights out right down here. And then turned up in here real quick." [8] Later on in his BWC footage, Lieutenant Hylton told another officer, "as soon as he turned on Scuffling Hill he hammered it . . . . He blacked out before he got up here to Highview . . . . "[9] Shortly after, he said "I got him for reckless driving. He turned his lights out on the road."[10] After that, he said "he blacked out coming up here."[11] "I was trying to catch up to him  . . . he was 60 miles per hour on South Main Street . . . he was moving on pretty good . . . he hammered it . . . he blacked out"[12]

<u>Information about the incident from the Call For Service (CFS) Report</u>

The Franklin County CFS Report confirms that Lieutenant Hylton advised that he had a vehicle going on Scuffling Hill to Franklin Street that was trying to get away from him, and that the vehicle had blacked out and had turned on Highview Terrace. That report also indicates that the call type was both "suspicious vehicle" and "suspicious person."[13] In his report, Lieutenant Hylton wrote that he "decided to turn and follow the vehicle as I was looking for any DUI violators due to the holiday."[14]

---

[8] ECF#59, Defense Exh 3, "Hylton's Body Worn Camera Recording," at 03:52.
[9] <u>Id</u>. at 12:20-12:30.
[10] <u>Id</u>. at 18:07-18:11.
[11] <u>Id</u>. at 18:30-18:34.
[12] <u>Id</u>. at 19:58-20:30.
[13] ECF#72, Defense Exh. 5, at 4.
[14] Gov Exh 1 - Lieutenant Hylton Police Report_Redacted, at 2.

5

<u>Mr. Martinez-Chavez's apprehension and finding of firearms as reported by Lieutenant
Hylton</u>

Per Lieutenant Hylton's police report, Mr. Martinez-Chavez opened the driver's side door.
As Lieutenant Hylton shone his spotlight into the Kia, he saw Mr. Martinez-Chavez "leaning into
the passenger side of the car with arms extended, apparently reaching for something."  Lieutenant
Hylton drew his gun, took cover behind his car door, and ordered Mr. Martinez-Chavez to exit the
Kia and to show his hands. Mr. Martinez-Chavez would face Lieutenant Hylton, "turn away and
look at the car, and put his hands in his pockets." Lieutenant Hylton "warned the driver that if he
did not listen to what I was telling him to do that he could be shot." Mr. Martinez-Chavez finally
complied. Lieutenant Hylton notified the dispatcher of his location, of the tag of the car, and that
he had the driver at gunpoint. Lieutenant Hylton detained him and told him that he was not under
arrest. [15]

Lieutenant Hylton's BWC initially shows Lieutenant Hylton coming out from behind his
car door from where he had taken cover. Mr. Martinez-Chavez has his uncuffed hands up on the
rear of the Kia, which he parked on the grass and diagonally to the driveway.[16]



At Time 0:06, the BWC that Lieutenant Hylton had attached to his chest area fell to the
ground. Lieutenant Hylton had not deactivated it. It kept recording video footage of the ground.

---

[15] <u>Id.</u>, at 3.
[16] ECF#59, Defense Exh 3, "Hylton's Body Worn Camera Recording," at 0:00.

6

The audio recording captured noise from the patrol car engine and a conversation between Lieutenant Hylton and Mr. Martinez-Chavez.[17] Lieutenant Hylton can be heard telling Mr. Martinez-Chavez to keep his hands on the car. (Time 00:19). Lieutenant Hylton also asked Mr. Martinez-Chavez how much he had to drink to which Mr. Martinez-Chavez answered, "one beer." (Time 01:00). Lieutenant Hylton then asked for Mr. Martinez-Chavez's identification. (Time 01:10). Lieutenant Hylton picked his BWC off the ground (Time 02:18). He and Mr. Martinez-Chavez proceeded to talk in English about Mr. Martinez-Chavez's identification. Mr. Martinez-Chavez did not have a driver's license, nor did he have a state identification.[18]

<u>Mr. Martinez-Chavez's admission to knowing that at least one firearm was in the car</u>

Officer Poulin arrived and saw the sawed-off rifle from a position outside the passenger-side window. When he mentioned it, Mr. Martinez-Chavez can be heard saying, "sir, that's not mine . . . it's in the car, yeah I know."[19]

<u>Mr. Martinez-Chavez's apprehension and finding of firearms as relayed by Lieutenant Hylton to other officers at the scene</u>

Per Lieutenant Hylton's BWC footage, he informed officers about Mr. Martinez-Chavez's movements toward the firearms. Immediately after Officer Poulin saw the sawed-off rifle from outside the Kia, Lieutenant Hylton said, "yeah, he was reaching for something . .  that's what he was reaching for."[20] Shortly after the other officers arrived, Lieutenant Hylton told them, "he went for it . . . when I pulled in behind him, I saw him reaching across . . . I was in my doorway with my hands on . . . "[21] He told them, "when I put my lights in the car, I saw him reaching over here in the passenger compartment."[22] He later said, "I put my lights in there and I saw him reaching

---

[17] Gov Exh 3 - ATF ROI 10, Hylton interview, at para. 8.
[18] <u>Id</u>., at para. 14.
[19] ECF#59, Defense Exh 4, "Poulin's Body Worn Camera Recording," at 04:00-04:10.
[20] ECF#59, Defense Exh 3, "Hylton's Body Worn Camera Recording," at 04:35-04:50.
[21] <u>Id</u>., at 06:30-06:45.
[22] <u>Id</u>. at 12:30-12:35.

over in the passenger side . . . . I pulled him out at gun point . . . it would have been a sad day for him . . . . I don't want to hurt nobody . . . . it's my baby's birthday too and I'm going to see her on her birthday."[23]

<u>Mr. Martinez-Chavez's motives to speed and flee: Two smoking devices, no driver's license, outstanding warrants, felony convictions, and probation status</u>

Officers learned that Mr. Martinez-Chavez had an outstanding warrant for a felony probation violation out of Montgomery County and a separate one out of Ohio.[24] They learned that he was not licensed to operate a motor vehicle and that the Kia he was driving had the wrong license plates. They also found a glass smoking device on his person and another one in the trunk.[25] A Drug Enforcement Administration laboratory confirmed the presence of methamphetamine residue on the smoking device recovered from his person.[26]

<u>Other matters: Discovery requests, court records, and the purging of the dispatch recordings</u>

On March 14, 2024, a federal grand jury returned a true bill on two felony gun-related charges against Mr. Martinez-Chavez.[27] On March 21, 2024, the Franklin County General District Court entered an order of *nolle prosequi* on both of its felony gun-related charges against Mr. Martinez-Chavez.[28] On May 1, 2024, Mr. Martinez-Chavez sent the government a generic Discovery request. The Discovery letter requested evidence that may be "material to the preparation" of the defense but did not explicitly request dispatch recordings.[29]

---

[23] <u>Id</u>. at 20:28-20:50.
[24] <u>Id</u>. at 04:50-05:20.
[25] Gov Exh 1 - Lieutenant Hylton Police Report_Redacted, at 3-4.
[26] Gov Exh 4 - DEA Chemical Analysis Report
[27] ECF#1.
[28] Gov Exh 5 - Defendant's Franklin Co charges *nolle prosequi*.
[29] ECF#72, Exh 1, at 2.

JA360

On October 24, 2024, Mr. Martinez-Chavez expressed for the first time his <u>intent</u> to request "radio runs" or "dispatch calls," which he characterized as "**additional**" discovery.[30] He did not make the actual request until the undersigned counsel reminded defense counsel.[31] Nevertheless, the undersigned counsel immediately asked ATF Special Agent Adam Moody to procure the dispatch recordings, which he requested the following day, on October 25, 2024.[32] On December 12, 2024, the same day that the undersigned counsel reminded Mr. Martinez-Chavez about the request that he never submitted, Mr. Martinez-Chavez emailed the request for the dispatch recordings.[33]

If an evidentiary hearing is necessary, the government intends to call Melissa Cundiff to testify. She is the Franklin County dispatch communications records custodian.[34] According to Ms. Cundiff, the dispatch recordings in this case were automatically purged by the computer system six months after the event, in accordance with the Virginia Disposition Schedule.[35]

She explained that dispatch recordings (i.e., the actual audio recordings) fall under the "Dispatch (Communications) and Emergency Call Recordings: Not Retained as Evidence" category of the Virginia Records Retention and Disposition Schedule.

She further explained that written documentation that supports dispatch recordings fall under the "Dispatch (Communications) and Emergency Call Recordings: Supporting Documentation" category of the Disposition Record. Under the Disposition Schedule, such written

---

[30] Gov Exh 6 - Defense request for dispatch calls.

[31] Def. Mot., at 1 and ECF#72, Exh. 3.

[32] In preparation for submitting this response, the undersigned counsels and ATF SA Francesco Boccieri talked to Melissa Cundiff at 12:30 p.m. on December 30, 2024. The government will share a summary of that conversation, prepared by SA Boccieri, with defense counsel as soon as SA Boccieri prepares it. Ms. Cundiff is the Training and VCIN Coordinator and dispatch communications records custodian for the Franklin County Sheriff's Office.

[33] Gov Exh 6 - Defense request for dispatch calls.

[34] *supra* note 32.

[35] ECF#72, Defense Exh 4, Virginia records detention and disposition schedule, at 8.

documentation has a scheduled retention period of ten years after the event.[36] Written documentation is the Computer-Aided Dispatch (CAD) system, which is also known as the Call For Service (CFS) Report.

Had someone requested the dispatch recordings before the six-month period lapsed, Ms. Cundiff would have made a copy and submitted it to the requester. In this case, if Lieutenant Hylton had requested it, she would have given him a copy to place in his investigative case file. That case file would be categorized under "Investigative Case Files: Non-Serious Offenses – Unresolved" in the Disposition Schedule because it pertains to the officer's case file, the court case has not yet concluded, and the charge pertains to "weapons law violations." Per the Disposition Schedule, Lieutenant Hylton would have had to retain his investigative case file for 5 years "after creation."[37]

According to Ms. Cundiff, the 100 years retention period applies only to "Investigative Case Files: Serious Offenses – Unresolved." That includes evidence that officers request and place in their case files, whose court cases have not yet resolved, and that deal with crimes involving homicide, murder, manslaughter, kidnapping, abduction, arson, robbery, aggravated assault, sex crimes, rape, incest, or crimes against children. It does not include weapons or firearms.[38]

The first and only time that Ms. Cundiff received a request for dispatch recordings was on October 25, 2024, from Lieutenant Hylton for ATF, as requested by government counsel on behalf of Mr. Martinez-Chavez. If anyone had requested the dispatch recordings before they were automatically purged, Ms. Cundiff would have given them a copy. Had they been available, the government would have voluntarily collected them and provided them to Mr. Martinez-Chavez.

---

[36] Id., at 9.
[37] Id., at 15.
[38] Id., at 18.

10

JA362

### III.    LEGAL STANDARD

The two seminal cases are <u>Arizona v. Youngblood</u>, 488 U.S. 51, 57-58 (1988) and <u>California v. Trombetta</u>, 467 U.S. 47, 489 (1984). Under <u>Trombetta</u>, the government violates due process when it destroys exculpatory evidence, the exculpatory value of the evidence was apparent before its destruction, and the nature of the evidence was such that the defendant would be unable to obtain comparable evidence by other reasonably available means. <u>Trombetta</u>, 467 U.S. at 488-89. It does not matter whether the government acted in good faith. <u>United States v. Laurent</u>, 607 F.3d 895, at 900 (2010); <u>United States v. Johnson</u>, 996 F.3d 200, 215 (4th Cir. 2021). There is no obligation to preserve inculpatory evidence or evidence that would not be expected to play a significant role in the suspect's defense, and there is thus no due process violation if such evidence is not preserved. <u>Trombetta</u>, 467 U.S. at 488 (the government's constitutional obligation to preserve evidence "must be limited to evidence that might be expected to play a significant role in the suspect's defense").

However, where the government destroys evidence whose exculpatory value is only "potentially useful," the <u>Youngblood</u> test applies. <u>Youngblood</u>, 488 U.S. at 57-58. In such a case, the defendant must show the government acted in bad faith in failing to preserve the evidence. <u>Id</u>. ("We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.") The failure to preserve potentially useful evidence does not violate due process "unless a criminal defendant can show bad faith on the part of the police." <u>Illinois v. Fisher</u>, 540 U.S. 544, 547–48, 124 S. Ct. 1200, 1202, 157 L. Ed. 2d 1060 (2004)(noting that the Court has never held or suggested that the existence of a pending discovery request eliminates the necessity of showing bad faith on the part of police).

11

JA363

Courts routinely apply <u>Youngblood</u> and reject allegations of due process violations when there is no evidence of bad faith by the government. For example, in <u>United States v. Wright</u>, 333 Fed. Appx. 772, 778 (4th Cir. 2009), the government recorded a call between its confidential informant and eventual defendant, setting up a drug buy. The recording was subsequently lost by the law enforcement officer. The Court held there was no due process violation because the officer and the confidential informant testified as to the contents of the call which, if their testimony was believed, would have further inculpated the defendant. In <u>United States v. Davis</u>, 690 F.3d 912, 922 (8th Cir. 2012), the government deleted a buy video. The Court found no due process violation because the officers established it was "much more likely to provide inculpatory, rather than exculpatory evidence," and regardless there was no bad faith. <u>Id</u>. at 922-34. In <u>United States v. Jobson</u>, 102 F.3d 214, 218 (6th Cir. 1996), the government erased the tape of a dispatch call due to routine police department policy. The court found that the government may have acted negligently but not in bad faith, and because there was no evidence that the tape was exculpatory, there was no due process violation. <u>Id</u>. See also <u>United Sates v. Femia</u>, 9 F.3d 990, 993-94 (1st Cir. 1993)(government's destruction of tape recordings of conversations between defendant and alleged coconspirators did not violate due process, despite government's gross negligence in failing to preserve the tapes); <u>United States v. Thomas</u>, 2021 WL 6198083, n.1 (S.D. Miss. Dec. 30, 2021)(rejecting spoliation claim and collecting the following cases where the courts found no bad faith in the destruction of video and ESI): <u>United States v. Kennedy</u>, 720 F. Appx. 104, 109 (3d Cir. 2017)(finding no bad faith from the loss of dashcam video resulting from officer's failure to follow standard procedure); <u>United States v. Bloodworth</u>, 412 F. Appx. 639, 640 (4th Cir. 2011)(no bad faith where audio recordings of defendant's arrest were automatically purged by police software system); <u>United States v. Varner</u>, 261 F. Appx. 510, 518 (4th Cir. 2008)(a showing

12

JA364

of bad faith sufficient to implicate due process concerns requires more than a failure to follow prescribed procedures); United States v. Perry, No. 2:18-CR-113, 2019 WL 4935448, at *4 (E.D. Va. Aug. Sept. 23, 2019)(evidence established that dashcam video was lost as a result of the government's failure to follow standard procedures necessary to preserve it but did not prove bad faith).

Bad faith requires that the officer have intentionally withheld the evidence for the purpose of depriving the plaintiff of the use of that evidence during his criminal trial. United States v. Bloodworth, 412 F. App'x 639, 640 (4th Cir. 2011).

"The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the ***exculpatory value*** of the evidence ***at the time it was lost or destroyed***."(emphasis original) Holdren v. Legursky, 16 F.3d 57, 60 (4th Cir. 1994)(citing Youngblood, 488 U.S. at 56-57). The Fourth Circuit opined that at the time that the physicians disposed of the remaining semen, they did not know of any exculpatory value of the semen because the semen had not been tested for a blood grouping analysis.

In Johnson, the Fourth Circuit relied upon a civil case, Vodusek v. Bayliner Marine Corp., 71 F.3d 148 (4th Cir. 1995), to suggest, in what appears to be dicta for the trial court to consider on remand, that an adverse inference instruction may be appropriate in a criminal case when the government knew the evidence was relevant to an issue at trial and the government's willful conduct resulted in the loss or destruction. Johnson, 996 F.3d at 217.[39] The Court noted also that negligence is an insufficient basis for an adverse inference. Id. However, it is not clear whether a spoliation instruction is appropriate in criminal cases absent a due process violation. In Wright,

---

[39] Johnson, 996 F.3d at 217 (remanding for the district court to "assess anew" whether defendants are entitled to an adverse inference instruction if the court rejects their due process claim and discussing the possibilities of the evidentiary rule).

13

JA365

the Fourth Circuit noted "[w]e doubt [the civil standard for sanctions for spoliation of evidence] controls in the criminal context." Wright, 333 Fed. Appx. at 778.

When a party has a duty to preserve evidence and the destruction was done intentionally, the Court must then determine whether evidence was relevant and the destruction of the evidence prejudicial. Genuine Dubmax, Inc. v. Greektown LLC, 2021 U.S. Dist. LEXIS 65632, *10-11.

## IV.    ARGUMENT

### A.    The dispatch recordings are not exculpatory and comparable evidence could have been obtained by other reasonably available means. Therefore, there is no due process violation under Trombetta.

Under Trombetta, the destroyed evidence must be exculpatory and apparently so. Also, a defendant must be unable to obtain comparable evidence by other reasonably available means.

1. There is not reason to believe the dispatch recordings were exculpatory.

The dispatch recordings would have been consistent with what Lieutenant Hylton indicated in his report, which he wrote the night of the incident, and there is no reason to suggest otherwise. What he wrote in his report is corroborated by his BWC footage in which he, just minutes after-the-fact, explained to other officers what had transpired. Dispatch and other radio communication about Mr. Martinez-Chavez's driving conduct was confirmed by three other police officers who had the presence of mind to include this information in their reports. Officer Poulin's account is strong corroborating evidence. Lieutenant Hylton told him, as it was happening, that he was trying to catch up to a vehicle for a traffic stop. Officer Poulin then monitored radio communications and heard Lieutenant Hylton inform dispatch that the vehicle had blacked out its lights while moving. Officer Poulin then heard dispatch ask Lieutenant Hylton if he was ok, but Officer Poulin did not hear a response over the radio. Lieutenant Hylton was probably, at that exact moment, seeing Mr.

JA366

Martinez-Chavez reaching for something, drawing his service weapon, and ordering him out of his car.

Additionally, Mr. Martinez-Chavez's actions and statements support Lieutenant Hylton's account of events. When Mr. Martinez-Chavez finally stopped, he parked on the grass at an angle as if in haste. Mr. Martinez-Chavez admitted to both his friend and to Lieutenant Hylton that he had been speeding. Also, he had numerous motives to flee from Lieutenant Hylton. He was a convicted felon with two firearms in the car, which he admitted to knowing were in the car. He had a smoking device on his person with methamphetamine residue. He admitted to consuming alcohol on New Year's Eve. There were two warrants for his arrest, one being a felony probation violation from Virginia, and the other from Ohio. He did not have a driver's license. He was driving a car with the wrong plates.

Mr. Martinez-Chavez does not even offer a proffer as to what the dispatch recordings would have revealed, much less justify their relevance. He just makes a vague statement about Lieutenant Hylton's credibility and how Mr. Martinez-Chavez is prejudiced. How is the automatic purging of the dispatch recordings exculpatory? Mr. Martinez-Chavez does not say. Also, Mr. Martinez-Chavez makes no attempt to reconcile the overwhelming corroborating evidence. The defense would have the Court believe that Lieutenant Hylton is pulling people over when they have not committed traffic infractions, but there is no good reason to assert that. In fact, there is direct evidence to the contrary directly from Mr. Martinez-Chavez himself.

In short, there is nothing that indicates that the dispatch recordings are exculpatory. On the contrary, everything points to the inculpatory nature of the recordings. The spoliation does not compromise Mr. Martinez-Chavez's ability to present his case because it is not exculpatory.

15

2. <u>Comparable evidence could be obtained by other reasonably available means</u>.

Through the reports of other officers and through Lieutenant Hylton's statements to other officers, captured on BWC just minutes after the stop, Mr. Martinez-Chavez can reconstruct what the dispatch recordings would have revealed. Mr. Martinez-Chavez's admission to speeding lends credibility to what Lieutenant Hylton was relaying to Officer Poulin and to the dispatcher. The CFS Report provides additional confirmation. While not very detailed, this "supporting document" provides similar information to what Lieutenant Hylton offered in his report. It notes that the incident involved a suspicious vehicle/suspicious person, and that the person had turned off his car lights and was trying to get away Lieutenant Hylton. All of this, together, is comparable evidence that is available to Mr. Martinez-Chavez. The fact that it inconveniently supports Lieutenant Hylton's account of events does not make it incomparable to the dispatch recordings.

Because the dispatch recordings are not exculpatory (and certainly not apparently exculpatory) and because comparable evidence is reasonably available, there is no due process violation under <u>Trombetta</u>. Therefore, no adverse jury instruction is required.

**B.      Mr. Martinez-Chavez cannot show bad faith on the part of the police. Therefore, there is no due process violation under <u>Youngblood</u>.**

The <u>Jobson</u> case is instructive. It applied the <u>Youngblood</u> test in determining the defendant's claim that the prosecution's failure to preserve requested radio dispatch recordings violated his due process right to a fair trial. As with our case, the defendant was arrested and charged by state authorities. The state dropped the charge, but federal prosecutors indicted the defendant. In his motion to dismiss the indictment, the defendant asserted that the tape recordings would have corroborated his claim that he was not carrying a gun and that the police seized the gun elsewhere. <u>Id</u>. at 217.

16

JA368

It was the policy of the Detroit Police Department (DPD) routinely to erase and reuse tapes within 90 days after their use, which meant the tape had been erased on October 2, 1994. Id. at 218. The AUSA handling the case was on vacation when the defense requested this evidence and did not see the request until defense counsel showed it to him in court, three days after his return. The AUSA reached out to the officer on October 11, but by this time the tape had been erased. Id. at 217–18.

The Jobson court held that the District Court did not err in denying the defendant's motion to dismiss the indictment. The Jobson court found that there was no evidence that anyone in the DPD or the U.S. Attorney's Office suspected that the tape was exculpatory and that the tape was erased not as a result of malice, but rather of routine police department policy. "Though the government was negligent, perhaps even grossly negligent, in failing to preserve the tape, there is no evidence that it acted in bad faith." Id. at 218.

The Jobson court stated that even if the destruction of the tape had been in bad faith, the defendant would not prevail. The Due Process Clause does not impose "an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." Id. at 219 (citing Youngblood, 488 U.S. at 58). "The government's constitutional duty to preserve evidence is limited to evidence that possesses an exculpatory value which was apparent before the evidence was destroyed." Id. (citing Trombetta, 467 U.S. at 489).

The Jobson court found that there was no evidence of any kind that the dispatch tape would contain exculpatory information. It characterized the defendant's contention that the dispatch tape would have supported his claim, "mere speculation." Id. (citing Jones v. McCaughtry, 965 F.2d 473, 479 (7th Cir.1992) (no violation of due process where destroyed evidence was of only

17

JA369

speculative exculpatory value). Where "[t]here is no indication that there was anything exculpatory" about destroyed evidence, due process has not been violated. Id. (citing United States v. Braggs, 23 F.3d 1047, 1051 (6th Cir.1994).

The generic Discovery letter that Mr. Martinez-Chavez sent the government on May 1, 2024, requested evidence that may be "material to the preparation" of the defense but did not explicitly request dispatch recordings. There was no reason to think (and there still isn't) that those recordings are "material to the preparation" of the defense. At the time (and even now), officers, dispatch staff, and other employees would have no reason to believe that the dispatch and radio recordings were exculpatory.

As previously noted, on October 24, 2024, approximately four months after the recordings were automatically purged, Mr. Martinez-Chavez expressed for the first time his intent to request dispatch recordings. Even he characterized the dispatch recordings as "**additional**" discovery. Nevertheless, the following day, Special Agent Moody requested the dispatch recordings through Lieutenant Hylton. Ms. Cundiff received the request the same day, which demonstrates that responsiveness of state and federal law enforcement personnel. Even Mr. Martinez-Chavez acknowledged, in his motion, that the government "diligently endeavored to look for" the dispatch recordings.[40] Mr. Martinez-Chavez waited almost two more months before finally requesting these dispatch recordings.

As in the Jobson case, our case involves state court cases that were dropped, a firearms charge, and purged dispatch recordings. Just like the DPD, the Franklin County Sheriff's Office purged the dispatch recordings in accordance with policy. Likewise, there is no evidence that any

---

[40] Def. Mot, at 1.

government agent suspected the dispatch recordings were exculpatory or that they were purged because of malice and not simple routine policy.

Finally, even though there is not a scintilla of evidence in this case that the government acted negligently regarding the automatic purging of the dispatch recordings, the <u>Jobson</u> court noted that negligence or even gross negligence in failing to preserve recordings does not mean that the government acted in bad faith.[41]

It is Mr. Martinez-Chavez's burden to prove that the police acted in bad faith in failing to preserve the evidence. Because it fails to do so, there is no due process violation under <u>Youngblood</u>. Therefore, no adverse jury instruction is required.

**C.      The dispatch recordings are not relevant to any issue at trial. Therefore, Mr. Martinez-Chavez is not entitled to an adverse inference instruction.**

If the Court finds that a spoliation instruction is appropriate in criminal cases absent a due process violation, as suggested in dicta by <u>Johnson</u>, an instruction should not be granted regardless. While Franklin County's compliance with the regulatory requirements of the Disposition Schedule resulted in the purging of the dispatch recordings, an adverse inference jury instruction is not appropriate because the government did not know that the evidence was relevant to an issue at trial. In fact, the dispatch recordings are not relevant to any issue at trial.

1. <u>The dispatch recordings are not relevant to an issue at trial because it would have been inculpatory</u>.

Per Federal Rule of Evidence 401, evidence is relevant if (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.

---

[41] See also <u>United States v. Johnson</u>, 996 F.3d 200, 206 (4th Cir. 2021)(negligence is an insufficient basis for an adverse inference); See also <u>United Sates v. Femia</u>, 9 F.3d 990, 993-94 (1st Cir. 1993)(government's destruction of tape recordings of conversations between defendant and alleged coconspirators did not violate due process, despite government's gross negligence in failing to preserve the tapes).

JA371

The issue at trial that Mr. Martinez-Chavez raises is Lieutenant Hylton's credibility regarding the reason for the stop and what transpired during the initial 2 minutes and 18 seconds that his BWC fell to the ground. First, Mr. Martinez-Chavez mischaracterizes the evidence by claiming that there is no evidence, outside Lieutenant Hylton's testimony, that Mr. Martinez-Chavez was speeding.[42] But Mr. Martinez-Chavez is captured on BWC admitting to speeding to both his friend and to Lieutenant Hylton. Mr. Martinez-Chavez's attorneys had this information in April 2024. He also claims that Lieutenant Hylton did not turn his BWC on until Mr. Martinez-Chavez was already handcuffed.[43] But Mr. Martinez-Chavez is aware that at the beginning, Lieutenant Hylton's BWC shows Mr. Martinez-Chavez uncuffed with his hands on the Kia as Lieutenant Hylton comes out from behind his squad car door. Mr. Martinez-Chavez even offered this same video as one of its exhibits in its Motion to Suppress. Mr. Martinez-Chavez is aware that once the BWC fell to the ground, it did not stop recording. It recorded the dark ground but it also recorded the conversation that Lieutenant Hylton had with Mr. Martinez-Chavez (e.g., Lieutenant Hylton telling Mr. Martinez-Chavez to keep his hands on the car, asking him how much he had to drink, and requesting his identification). Having mischaracterized the evidence, Mr. Martinez-Chavez proceeds to invent an issue that could be resolved by the dispatch recordings, if they were still available.

As discussed above, there is no real issue. There is plenty of supporting evidence from other officers and from Mr. Martinez-Chavez himself, to corroborate Lieutenant Hylton's account of events. Together with Lieutenant Hylton's report, this supporting evidence makes it clear that the dispatch and radio communications recordings would have been inculpatory in nature. Therefore, as far as Mr. Martinez-Chavez is concerned, the existence of the dispatch recordings

---

[42] ECF#72, at 4.
[43] Id.

20

would not have any tendency to make a fact (that is favorable to the defense) more probable than it would be without the evidence. The second point (Rule 401(b)) is then moot. Therefore, the dispatch recordings would not be relevant to any issue at trial.

2. <u>The automatic computer purging of the dispatch recordings is not prejudicial to Mr. Martinez-Chavez</u>.

As discussed above, because the dispatch recordings would have been inculpatory, its purging cannot possibly hurt Mr. Martinez-Chavez's case. Therefore, the purging of the dispatch recordings is not prejudicial to Mr. Martinez-Chavez.

Because the government did not know that the dispatch records were relevant to an issue at trial, and because there is in fact no real issue at trial, the dispatch recordings are not relevant. Therefore, an adverse inference jury instruction is not appropriate.

## V.    CONCLUSION

The United States respectfully requests the Court deny Mr. Martinez-Chavez's motion for an adverse inference jury instruction.

Respectfully submitted,

ZACHARY T. LEE
Acting United States Attorney

Date: December 30, 2024.

*s/Juan L. Vega*
Special Assistant United States Attorney
VA State Bar No. 79165
U.S. Attorney's Office
310 First St., S.W., Ste. 906
Roanoke, Virginia 24011
540-857-2250 (phone)
540-857-2614 (fax)
Juan.vega2@usdoj.gov

21

JA373

*s/Matthew M. Miller*
Assistant United States Attorney
VA State Bar No. 43034
U.S. Attorney's Office
310 First St., S.W., Ste. 906
Roanoke, Virginia 24011
540-857-2250 (phone)
540-857-2614 (fax)
Matthew.miller2@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on December 30, 2024, I caused the foregoing Notice to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel for defendant.

*s/Juan L. Vega*
Special Assistant United States Attorney

22

JA374

# Franklin County Sheriff's Office

**CONFIDENTIAL**                    PRELIMINARY INVESTIGATIVE REPORT                    D.S.P. 102 - M

| Code Number | Reported By | Page No. | Origin | Date | Time | Case Number |
|---|---|---|---|---|---|---|
| VA0330000 | 0855 - Lt. Justin D. Hylton | 1 | 01 - Sheriff/Deputy Sheriff | 01/01/2024 | 0:11 | 2024-000003 |

**COMP**

| Comp No | NAME Last, First Middle | | Residence Phone | Business Phone |
|---|---|---|---|---|
| | ADDRESS Number/Street City State Zip | Race Sex Date of Birth SSAN | | |

**VICTIM**

| Vic No | NAME Last, First Middle | | Residence Phone | Business Phone |
|---|---|---|---|---|
| 1 | COMMONWEALTH OF VIRGINIA | | | |

ADDRESS Number/Street | Race | Sex | Resident Status | Date of Birth

City | State | Zip | Ethnic | SSAN

Victim Related Events: ■#1 ■#3 □#5 □#7 □#9 ■#2 □#4 □#6 □#8 □#10 | Victim Injury | Victim Relation to Acc/Susp: 1 2 3 4 5 6 7 8 9 10 | Justifiable Homicide

| Vic No | NAME Last, First Middle | | Residence Phone | Business Phone |
|---|---|---|---|---|

ADDRESS Number/Street | Race | Sex | Resident Status | Date of Birth

City | State | Zip | Ethnic | SSAN

Victim Related Events: □#1 □#3 □#5 □#7 □#9 □#2 □#4 □#6 □#8 □#10 | Victim Injury | Victim Relation to Acc/Susp: 1 2 3 4 5 6 7 8 9 10 | Justifiable Homicide

| Event No | Event | Code No | (A) Attempted | # Premises Entered | Type Security |
|---|---|---|---|---|---|
| 1 | Weapon Law Violations | 520 | ■ (C) Completed | | |

Occurred On □ Between ■ | Mo 01 | Day 01 | Yr 2024 | Time 0:11 | Day of Week MON | And | Mo 01 | Day 01 | Yr 2024 | Time 2:00 | Day of Week MON | Acc/Susp Used D | Criminal Activity P | Hate Crime 88 - None (No Bias)

| Event No | Event | Code No | (A) Attempted | # Premises Entered | Type Security |
|---|---|---|---|---|---|
| 2 | Drug Equipment Violations | 35B | ■ (C) Completed | | |

ADDRESS
30 HIGHVIEW TER, BEGIN | Acc/Susp Used D | Criminal Activity P | Hate Crime 88 - None (No Bias)

City ROCKY MOUNT | State VA | Zip | Type Location 13 - Highway/Road/Alley

**ACC. SUSP.**

| ASO No | NAME Last, First Middle | Alias AKA | Residence Phone | Business Phone |
|---|---|---|---|---|
| 1 ■A □S □O | ███████████ | ███████████ | | |

ADDRESS Number/Street ███████████ | Occupation PAINTER | Race W | Sex M | Date of Birth ████

City ROCKY MOUNT | State VA | Zip 24151- | Arrest Number 2024-000003 - 1 | SSAN ████████

| Height | Weight | Hair Color | Eye Color | Hairstyle | ARMED | Marks/Scars Location |
|---|---|---|---|---|---|---|
| 5'07" | 180 | BLK - Black | BRO - Brown | STR - Straight | Yes X No Unk / LH RH AB | Tattoo - Left - Elbow |

**ACC. SUSP. OTHER**

| ASO No | NAME Last, First Middle | Alias AKA | Residence Phone | Business Phone |
|---|---|---|---|---|
| 1 □A ■S □O | ███████████ | ███████████ | | |

ADDRESS Number/Street ███████████ | Occupation PAINTER | Race W | Sex M | Date of Birth ████

City ROCKY MOUNT | State VA | Zip 24151- | Arrest Number | SSAN ████████

| Height | Weight | Hair Color | Eye Color | Hairstyle | ARMED | Marks/Scars Location |
|---|---|---|---|---|---|---|
| 5'07" | 180 | BLK - Black | BRO - Brown | STR - Straight | Yes X No Unk / LH RH AB | Tattoo - Left - Elbow |

**VEH**

| Veh No | Year | Make | Model | Type | License Number | Year | State | Teletype Number |
|---|---|---|---|---|---|---|---|---|
| 1 | 2007 | KIA | | P - Passenger car | VYC3195 | 2025 | VA | |

VIN KNAFG526477112089 | Owner's Name O1 - ███████████ | Address ███████████, VA 24151

Released to Owner Date | Stored - Name Address | Stolen | Involved X
| | Recovered | Other

**DRUG**

| Type | Whole Quantity | Fractional Quantity | Measurement | Estimated Value |
|---|---|---|---|---|
| L - Amphetamines/Methamphetamine | 0 | .1 | GM - Gram | $1.00 |

JA375

## Franklin County Sheriff's Office

**CONFIDENTIAL**                  PRELIMINARY INVESTIGATIVE REPORT                  **D.S.P. 102 - M**

Page No.   2

| Scene Processed By | Prints Found ☐ Yes ■ No Photographed ☐ Yes ■ No | Type Evidence Taken | When Stored Initially |
|---|---|---|---|

### ARSON

| Loss Data | Value | Loss | Origin of Fire | Bomb Data |
|---|---|---|---|---|
| Structures | | | Incendiary ☐ | Explosive Data _____ |
| Contents | | | Undetermined ☐ | Incendiary Device _____ |
| Fixtures | | | Accidental ☐ | Threat _____ |
| Vehicles | | | Suspicious ☐ | Other _____ |
| Miscellaneous | | | | |

### PROPERTY

| Event Code | Prop. Code | Quantity | Description | Make/Model | Serial Number | P. Loss | Value | Recov. Date |
|---|---|---|---|---|---|---|---|---|
| 520 | 13 | 1 | Firearms (.22 Cal sawed off rifle) | unknown / unknown | none | 6 | | 01/01/2024 |
| 520 | 13 | 1 | Firearms (.22 cal revolver) | RG | L699622 | 6 | | 01/01/2024 |
| 35B | 11 | 2 | Glass Smoking Device | | | 6 | 2.00 | 01/01/2024 |
| 520 | 59 | | Firearm Accessories (.22 cal ammunition) | | | | | 01/01/2024 |
| | | | | | | | | |

| Jurisdiction Stolen | Jurisdiction Recovered | Number of Motor Vehicles Stolen | Number of Motor Vehicles Recovered |
|---|---|---|---|

### DEATH

| Next of Kin Notified Name | Address | Relationship | Physician Pronouncing Death(Name) |
|---|---|---|---|
| Attending Physician Name | Address | Reason for Treatment | Pronounced Death-Date | Time |
| Last Person to See Subject Alive Name | Address | | Date | Time |
| Rescue Unit at Scene Name | Address | Medical Examiner | Type Death |

**Summary**

On January 1, 2024 at approximately 00:05 while heading South on South Main Street near the intersection of Eastover Drive in Rocky Mount, I saw a vehicle headed North that appeared to be travelling faster than the posted 45 speed limit. After releasing the beam of my radar I obtained a reading of 60 miles per hour. I saw the target vehicle was a silver KIA. I decided to turn and follow the vehicle as I was looking for any DUI violators due to the holiday. As I turned and started approaching the target car, I noticed it had picked up speed as I saw it had turned off South Main Street and onto Scuffling Hill Road. I continued to close distance on the car and as the car approached the second Knollwood Drive on Scuffling Hill, the target vehicles headlights and tail lights went out while still travelling. I made the decision to initiate a traffic stop based on that driving behavior and activated my emergency lights. The target vehicle made an abrupt right turn on Highview Terrace off Scuffling Hill Road and pulled into a yard a 30 Highview Terrace where I pulled in behind the car with my emergency lights actviated. The drivers side door came open and

**Solvability Factors**

| YES NO | | YES NO | Exceptional Clearance (Status 8) |
|---|---|---|---|
| ☐ ■ a. Can a suspect be named? | | ☐ ■ g. Was there a unique or unusual M.O. employed? | ☐ (A) Death of Offender |
| ☐ ■ b. Is the suspect known? | | ☐ ■ h. Was there significant evidence? | ☐ (B) Prosecution Declined |
| ☐ ■ c. Can the suspect be identified? | | ☐ ■ i. Is property traceable? | ☐ (C) Extradition Declined |
| ☐ ■ d. Has the suspect been seen before? | | ☐ ■ j. Was there a minimum delay in reporting? | ☐ (D) Refuse to Cooperate |
| ☐ ■ e. Was there a witness to the crime? | | ☐ ■ k. Is there a significant reason to believe crime may be solved | ☐ (E) Juvenile, No Custody |
| ☐ ■ f. Can the suspect vehicle be identified? | | with a reasonable amount of investigative effort? | ■ (N) Not Applicable |

| CASE STATUS (Check One) | | | Case Closed (Status 4 or 8) ☐ Juvenile ■ Adult | Negative File Number |
|---|---|---|---|---|
| ■ 1 Active | ☐ 5 Inactive | ☐ 4 Closed Arrest | | |
| ☐ 2 Active - TOT O/A | ☐ 6 Inactive WOF | ☐ 8 Closed Exception | Ref. Other Case Number | |
| ☐ 3 Unfounded | ☐ 7 Closed Service | | | |

| Date/Time Notified 01/01/2024   0:11 | Date/Time Arrived at Scene 01/01/2024   0:11 | Date/Time Cleared Scene 01/01/2024   1:44 | Original Report ☐ Supplemental Report ☐ |
|---|---|---|---|

| Information Copies Furnished to: | Approving Supervisor | Date | Date Report Submitted 01/01/2024 |
|---|---|---|---|

JA376

# Franklin County Sheriff's Office

**CONFIDENTIAL**      **PRELIMINARY INVESTIGATIVE REPORT**      **D.S.P. 102 - M**

### NARRATIVE (CONTINUATION)

| Code Number VA0330000 | Reported By 0855 - Lt. Justin D. Hylton | Page No. 3 | Origin 01 - Sheriff/Deputy Sheriff | Date 01/01/2024 | Time 0:11 | Case Number 2024-000003 |
|---|---|---|---|---|---|---|

**Summary**

as I positioned my spot light in the car I saw the driver leaning into the passenger side of the car with arms extended, apparently reaching for something. I quickly exited my patrol car, drew my service weapon to high ready position, and using the door to my patrol vehicle as cover, began giving the driver commands to exit the vehicle and show me their hands. The driver was the only occupant I could see in the vehicle. I notified dispatch of my location, the tag of the car (VYC-3195) and that I had the driver had gunpoint.

After a brief moment the driver stood out of the door of the car and ,what appeared to be hesitantly, complied with my commands. I kept insisting on seeing the drivers hands while the driver would face me, turn away and look at the car, and put his hands in his pockets. I warned the driver that if he did not listen to what I was telling him to do that he could be shot. The driver finally complied and he was detained at that time. He was advised then that he was only detained and not under arrest.

After the driver was detained, he was patted down for weapons with none found. He advised his identification was in his wallet. He was idenitifed by a Mexico identification as ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ by his name and date of birth. During this time additional officers to include, Dep. Z. Wade (FCSO), Ofc. T. Poulin (RMPD), Ofc. J. Gardner (RMPD, Sgt. C. Johnson (RMPD), and Dep. M. Cawood (FCSO), arrived on scene to assist. A moment later, dispatch advised that ▮▮▮▮▮▮▮▮▮▮ was not licensed and had outstanding warrants out of Montgomery County, Virginia. The tag I had ran through dispatch did not return to the KIA. ▮▮▮▮▮ was advised by Dep. Wade of the warrants and that he was under arrest. Dep. Wade searched ▮▮▮▮▮▮▮▮▮ and found a glass smoking device on his person. Dep. Wade will supplement this report.

Upon knowledge of ▮▮▮▮▮'s warrants, I returned to the KIA to begin securing it for towing due to ▮▮▮▮ going to jail and the car not being registered properly. As Ofc. T. Poulin approached the passenger side of the car he alerted that he saw a firearm in the passenger floorboard. The firearm was retrieved by Ofc. Poulin and Ofc. Gardner and confirmed to be a .22 caliber bolt action rifle. The barrel had been sawn off to 10.5 inches long and there did not appear to be a serial number on the gun. The vehicle was subsequently searched where another firearm, a .22 Caliber RG revolver was located in the passenger compartment as well as additional .22 cal rounds. Ofc. Poulin stayed with the car until it was towed.

The evidence and ▮▮▮▮▮▮▮▮▮ was transported to the Sheriff's Office by Dep. Wade where Dep. Wade placed the evidence into temporary storage until I processed it. The following is the list of evidence

#1 .22 cal bolt rifle with sawed off 10.5 inch barrel

#2 .22 cal RG revolver SN L699622

#3 Glass smoking device found in ▮▮▮▮▮▮▮▮ possession

#4 .22 cal ammo removed from firarms and vehicel.

#5 Glass smoking device from backpack in trunk of car.

Items #1,2,3 have been processed for submission to the Department of Forensic Science for testing.

Item #4 will be held for court.

Item #5 was marked for destruction.

JA377

**Franklin County Sheriff's Office**

| CONFIDENTIAL | PRELIMINARY INVESTIGATIVE REPORT | D.S.P. 102 - M |
|---|---|---|

**NARRATIVE (CONTINUATION)**

| Code Number VA0330000 | Reported By 0855 - Lt. Justin D. Hylton | Page No. __4__ | Origin 01 - Sheriff/Deputy Sheriff | Date 01/01/2024 | Time 0:11 | Case Number 2024-000003 |
|---|---|---|---|---|---|---|

Summary

▓▓▓▓▓▓▓▓▓ was served on outstanding Montgomery County warrants as well as two counts of possession of firearm by felon and one count possess sawed off rifle obtained by this officer. Case will remain active as additional charges are pending lab analysis.

SUPPLEMENT #2   Lt. Justin D. Hylton - 0855   01/17/2024   10:05

After several attempts to locate data transfer from worn body camera, there have been issues in recovering the footage. Notification was made in refernce to the issues in the system. I have reached out to Sgt. C. Johnson with RMPD regarding accesibility to body cam data from Ofc. Poulin and Gardner and being able to provide that to SA Moody, ATF

JA378

# Franklin County Sheriff's Office

| CONFIDENTIAL | PRELIMINARY INVESTIGATIVE REPORT | D.S.P. 102 - M |
|---|---|---|
| | (CONTINUATION) | |

| Code Number | Reported By | | Origin | Date | Time | Case Number |
|---|---|---|---|---|---|---|
| VA0330000 | 0855 - Lt. Justin D. Hylton | Page No. _5_ | 01 - Sheriff/Deputy Sheriff | 01/01/2024 | 0:11 | 2024-000003 |

## Offense(s)

| Event No | Event | | Code No | ☐ (A) Attempted<br>☐ (C) Completed | # Premises<br>Entered | Type Security |
|---|---|---|---|---|---|---|
| 3 | Drug/Narcotic Violations | | 35A | | | |
| Type Location | | | Acc/Susp Used | Criminal Activity | Hate Crime<br>88 - None (No Bias) | |
| 13 - Highway/Road/Alley | | | D | P | | |

JA379

# INCIDENT REPORT

## COMMONWEALTH OF VIRGINIA

### INCIDENT

| 1-PAGE # | 2-ORI NUMBER |
|---|---|
| 1 | VA0330100 |

**3-INCIDENT NUMBER**
2024-00036

**4-DATE(S) OF INCIDENT**  5-R
01/01/2024

**7-TIME(S) OF INCIDENT**
00:11 - 00:53

**8-DAY(S) OF INCIDENT**
Monday

**9-DISPATCHER**
JWilliams - Williams, JoLacy

**10-TIME RECEIVED** 0:14

**11-TIME ARRIVED** 0:14

**12-REPORTING AREA** Town

**13-SOLVABILITY FACTORS:**
- ☐ (1) Suspect Named
- ☐ (2) Witness to Crime
- ☐ (3) Property Traceable
- ☐ (4) Unique M.O.
- ☐ (5) Suspect Identified
- ☐ (6) Susp. Vehicle Identified
- ☐ (7) Significant Evidence

**14-INTERNAL INCIDENT STATUS:**
- ☐ (1) Unfounded
- ☐ (2) Cleared by Arrest
- ☐ (3) Pending
- ☑ (4) Inactive

**16-EXCEPT. CLEAR. DATE**

**15-EXCEPTIONAL CLEARANCE STATUS:**
- ☐ (A) Death Of Offender
- ☐ (B) Prosecution Declined
- ☑ (C) Extradition Declined
- ☐ (D) Refused To Cooperate
- ☐ (E) Juvenile, No Custody
- ☐ (N) Not Applicable

**17-TEMP.:**

**18-WEATHER:** (Max. 1)
- ☐ (1) Clear ☐ (2) Cloudy ☐ (3) Rain
- ☐ (4) Snow ☐ (5) Other ☐ (6) Unk.

### OFFENSE

| 19-OFFENSE # | 20-UCR CODE | 21-OFFENSE STATUS: |
|---|---|---|
| 1 | 90Z | ☐ (A) Attempted ☑ (C) Completed |

**22-OFFENDER USED:** ☐ (N) Not Applicable ☐ (A) Alcohol ☐ (C) Cptr. Equip. ☐ (D) Drugs

**23-Burglary (220) Location 14&19:** # PREMISES ENTERED?

**24-FORCED ENTRY?** ☐ Yes ☐ No

**25-OFFENSE NAME**
All Other Offenses

**26-ADDRESS OF OFFENSE**
30 HIGHVIEW TER, BEGIN, ROCKY MOUNT, VA

**27-DIRECTION OF TRAVEL:** ☐N ☐S ☐E ☐W ☐UNK.

**28-LOCATION CODE** (Enter 1)
- ☐ (01) Air/Bus/Train Terminal
- ☐ (02) Bank/Savings & Loan
- ☐ (03) Bar/Night Club
- ☐ (04) Church/Synagogue/Temple
- ☐ (05) Commercial/Office Building
- ☐ (06) Construction Site
- ☐ (07) Convenience Store
- ☐ (08) Department Discount Store
- ☐ (09) Drug Store/DR's Office/Hospital
- ☐ (10) Field/Woods
- ☐ (11) Government/Public Building
- ☐ (12) Grocery/Supermarket
- ☐ (13) Highway/Road/Alley
- ☐ (14) Hotel/Motel/Etc.
- ☐ (15) Jail/Penitentiary
- ☐ (16) Lake/Waterway
- ☐ (17) Liquor Store
- ☐ (18) Parking Lot/Garage
- ☐ (19) Rental/Storage Facility
- ☐ (20) Residence/Home
- ☐ (21) Restaurant
- ☐ (22) School/College
- ☐ (23) Service/Gas Station
- ☐ (24) Specialty Store (TV,Fur,Etc.)
- ☐ (25) Other/Unknown

**29-WEAPON FORCE:** (Max. 3)
*( For 11-15, place "A" in space next to box if weapon was an Automatic.)*
- ☐ (11) Firearm (Type not stated)
- ☐ (12) Handgun
- ☐ (13) Rifle
- ☐ (14) Shotgun
- ☐ (15) Other Firearm
- ☐ (20) Knife/Cutting Instru. (Ax, etc.)
- ☐ (30) Blunt Object (Club, etc.)
- ☐ (35) Motor Vehicle (As weapon)
- ☐ (40) Personal Weapons (Hands, etc.)
- ☐ (50) Poison
- ☐ (60) Explosives
- ☐ (65) Fire/Incendiary Device
- ☐ (70) Narcotics/Drugs/ Sleeping Pills
- ☐ (85) Asphyxiation
- ☐ (90) Other
- ☐ (95) Unknown
- ☐ (99) None

**30-TYPE CRIMINAL ACTIVITY:** (Max. 3)
- ☐ (B) Buying
- ☐ (C) Cultivate/Manufacture/Publish
- ☐ (D) Distributing/Selling
- ☐ (E) Exploiting Children
- ☐ (O) Operating/Promoting/Assisting
- ☐ (P) Possessing/Concealing
- ☐ (T) Transport/Transmit/Import
- ☐ (U) Using/Consuming

**31-TYPE SECURITY:** (Max. 2)
- ☐ (A) Alarm/Audio
- ☐ (B) Alarm/Silent
- ☐ (C) Bars/Grate
- ☐ (D) Camera
- ☐ (E) Dog
- ☐ (F) Dead Bolt
- ☐ (G) Locked
- ☐ (H) Unlocked
- ☐ (I) Ext. Lights
- ☐ (J) Int. Lights
- ☐ (K) Fence
- ☐ (L) Guard
- ☐ (M) Neighbrhd. Watch
- ☐ (N) Other
- ☐ (O) None

**32-ENTRY/EXIT:** (Max. 2 entry, 2 exit)

En Ex
- ☐☐ (01) Front
- ☐☐ (02) Rear
- ☐☐ (03) Side
- ☐☐ (04) Attic
- ☐☐ (05) Vent/A.C
- ☐☐ (06) Window
- ☐☐ (07) Door
- ☐☐ (08) Patio/Sliding Dr.
- ☐☐ (09) Balcony/Fire Escape

En Ex
- ☐☐ (10) Attached Garage
- ☐☐ (11) Wall
- ☐☐ (12) Vehicle
- ☐☐ (13) Floor
- ☐☐ (14) Roof/Skylight
- ☐☐ (15) Hidden Within
- ☐☐ (16) Other
- ☐☐ (17) Unknown

**33-HOW LEFT SCENE:** (enter 1)
- ☐ (1) Auto
- ☐ (2) Truck
- ☐ (3) Van
- ☐ (4) Motorcycle
- ☐ (5) Bicycle
- ☐ (6) Foot
- ☐ (7) Moped
- ☐ (8) Other
- ☐ (9) Unknown

**34-WHICH OFFENDERS ARE RELATED TO THIS OFFENSE?:** (mark offender #s):
☐ #1 ☐ #2 ☐ #3 ☐ #4 ☐ #5 ☐ #6 ☐ #7 ☐ #8 ☐ #9 ☐ #10 others:

**35-BIAS MOTIVATED CRIME:**
88 - None (No Bias)

### VICTIM

| 36-VICTIM # | 37-NAME: Last, First, Middle | 38-SOC. SEC. NO. | 39-DATE OF BIRTH |
|---|---|---|---|
| 1 | | | |

**40-RESIDENT ADDRESS:** Street City State **41-ZIP**

**53-RELATIONSHIP OF THIS VICTIM TO OFFENDERS**
*(check relationship under appropriate offender number):*

| | #1 #2 #3 #4 #5 #6 #7 #8 #9 #10 | VICTIM WAS: |
|---|---|---|
| | ☐☐☐☐☐☐☐☐☐☐ | (SE) Spouse |
| | ☐☐☐☐☐☐☐☐☐☐ | (CS) Common-Law Spouse |
| | ☐☐☐☐☐☐☐☐☐☐ | (PA) Parent |
| | ☐☐☐☐☐☐☐☐☐☐ | (SB) Sibling |
| | ☐☐☐☐☐☐☐☐☐☐ | (CH) Child |
| | ☐☐☐☐☐☐☐☐☐☐ | (GP) Grandparent |
| | ☐☐☐☐☐☐☐☐☐☐ | (GC) Grandchild |
| | ☐☐☐☐☐☐☐☐☐☐ | (IL) In-Law |
| | ☐☐☐☐☐☐☐☐☐☐ | (SP) Stepparent |
| | ☐☐☐☐☐☐☐☐☐☐ | (SC) Stepchild |
| | ☐☐☐☐☐☐☐☐☐☐ | (SS) Stepsibling |
| | ☐☐☐☐☐☐☐☐☐☐ | (OF) Other Family Member |
| | ☐☐☐☐☐☐☐☐☐☐ | (AQ) Acquaintance |
| | ☐☐☐☐☐☐☐☐☐☐ | (FR) Friend |
| | ☐☐☐☐☐☐☐☐☐☐ | (NE) Neighbor |
| | ☐☐☐☐☐☐☐☐☐☐ | (BE) Babysittee (baby) |
| | ☐☐☐☐☐☐☐☐☐☐ | (BG) Boyfriend/Girlfriend |
| | ☐☐☐☐☐☐☐☐☐☐ | (CF) Child of Boyfriend/Girlfriend |
| | ☐☐☐☐☐☐☐☐☐☐ | (HR) Homosexual Relationship |
| | ☐☐☐☐☐☐☐☐☐☐ | (XS) Ex-Spouse |
| | ☐☐☐☐☐☐☐☐☐☐ | (EE) Employee |
| | ☐☐☐☐☐☐☐☐☐☐ | (ER) Employer |
| | ☐☐☐☐☐☐☐☐☐☐ | (OK) Otherwise Known |
| | ☐☐☐☐☐☐☐☐☐☐ | (RU) Relationship Unknown |
| | ☐☐☐☐☐☐☐☐☐☐ | (ST) Stranger |
| | ☐☐☐☐☐☐☐☐☐☐ | (VO) Victim was Offender |

**42-OCCUPATION** **43-RESIDENT PHONE**

**44-EMPLOYMENT PHONE**

**45-SEX:** ☐ (M) Male ☐ (F) Female ☐ (U) Unknown

**46-ETHNIC:** ☐ (H) Hispanic ☐ (N) Nonhispanic ☐ (U) Unknown

**47-AGE:** Exact Age _____
Range ___/___
- ☐ (NN) Under 24 Hrs. Old
- ☐ (NB) 1-6 Days Old
- ☐ (BB) 7-364 Days Old
- ☐ (99) Over 98 Yrs. Old
- ☐ (00) Unknown

**48-RACE:**
- ☐ (W) White ☐ (I) American Indian ☐ (U) Unknown
- ☐ (B) Black ☐ (A) Asian/Pacific Islander

**49-RES. STATUS:** ☐ (R) Resident ☐ (N) Nonresident ☐ (U) Unknown

**50-VICTIM TYPE:** ☐ (I) Individual ☐ (B) Business ☐ (F) Financial Institution ☐ (U) Unknown ☐ (G) Government ☐ (R) Religious ☑ (S) Society/Public ☐ (O) Other ☐ (L) L. E. Officer

**51-VICTIM INJURY:** (Max. 5) ☐ (M) Apparent Minor Injury
- ☐ (N) None
- ☐ (B) Apparent Broken Bones ☐ (O) Other Major Injury
- ☐ (I) Possible Internal Injury ☐ (T) Loss of Teeth
- ☐ (L) Severe Laceration ☐ (U) Unconsciousness

**52-THIS VICTIM RELATED TO WHICH OFFENSES?**
☐ #1 ☐ #4 ☐ #7 ☐ #10
☐ #2 ☐ #5 ☐ #8 others:
☐ #3 ☐ #6 ☐ #9

**AGGRAVATED ASSAULT/HOMICIDE CIRCUMSTANCES**

**54-Aggravated Assault/Murder:** (max. 2)
- ☐ (01) Argument
- ☐ (02) Assault On Law Enf. Officer
- ☐ (03) Drug Dealing
- ☐ (04) Gangland
- ☐ (05) Juvenile Gang
- ☐ (06) Domestic Violence
- ☐ (07) Mercy Killing
- ☐ (08) Other Felony Involved
- ☐ (09) Other Circumstances
- ☐ (10) Unknown Circumstances

**54-Negligent Manslaughter:** (enter 1)
- ☐ (30) Child Playing With Weapon
- ☐ (31) Gun-Cleaning Accident
- ☐ (32) Hunting Accident
- ☐ (33) Other Negligent Weapon Handling
- ☐ (34) Other Negligent Killings

**54-Justifiable Homicide:** (enter 1)
- ☐ (20) Criminal Killed by Private Citizen
- ☐ (21) Criminal Killed by Police Officer

**57-ADDITIONAL JUSTIFIABLE HOMICIDE CIRC.:** (enter 1)
- ☐ (A) Criminal Attacked Police Officer
- ☐ (B) Criminal Attacked Fellow Police Officer
- ☐ (C) Criminal Attacked Civilian
- ☐ (D) Criminal Attempted Flight from a Crime
- ☐ (E) Criminal Killed in Commission of a Crime
- ☐ (F) Criminal Resisted Arrest
- ☐ (G) Unable to Determine/Not Enough Information

### ADM

| 58-REPORT DATE | 59-DAY | 60-TIME (Military) | 61-REPORTING OFFICER | 62-CODE # | 63-APPROVING SUPERVISOR | 64-CODE # | 65-DATE APPROVED |
|---|---|---|---|---|---|---|---|
| 01/01/2024 | Mon | 0:11 | Sergeant Caleb A. Johnson | RM0049 | Sergeant Caleb A. Johnson | RM0049 | 01/17/2024 |

JA380

# INCIDENT REPORT
COMMONWEALTH OF VIRGINIA

**AD**

| 71-PAGE # | 72-DATE | 73-INCIDENT NUMBER | 74-ORI# ("B") | 75-REPORTING OFFICER | 76-CODE # | 77-VICTIM NAME |
|---|---|---|---|---|---|---|
| 2 | 01/01/2024 | 2024-00036 | VA0330100 | Sergeant Caleb A. Johnson | RM0049 | |

**OFFENDER / ARRESTEE**

| 78-ARRESTEE # | 79-NAME    Last,    First,    Middle, | | 80-AKA |
|---|---|---|---|
| | ▮▮▮▮ | | |

| 81-OFFENDER # | 82-RESIDENT ADDRESS    Street    City | State | 83-Zip | 84-DATE OF BIRTH |
|---|---|---|---|---|
| 1 | ▮▮▮▮ , VA | | 24012 | ▮▮▮▮ |

| 85-RESIDENT PHONE | 86-EMPLOYMENT/SCHOOL PHONE | 87-DRIVER'S LICENSE | 88-DR. LI. STATE | 89-SSN |
|---|---|---|---|---|
| (540) ▮▮▮ | (540) ▮▮▮ | | | |

| 90-ARREST LOCATION | 91-OCCUPATION | 92-PLACE OF EMPLOYMENT | 93-ARREST TYPE: ☐ (O) On View Arrest |
|---|---|---|---|
| | PAINTER | | ☐ (S) Summons/Cited   ☐ (T) Taken Into Cust. |

**94-SEX:** ■ (M) Male  ☐ (F) Female  ☐ (U) Unk.
**95-ETHNIC:** ■ (H) Hispanic  ☐ (N) Nonhisp.  ☐ (U) Unk.
**96-RACE:** ☐ (W) White  ☐ (B) Black  ☐ (I) American Indian  ☐ (A) Asian/Pacific Islander  ☐ (U) Unknown

**97-AGE:** EXACT AGE __37__  AGE RANGE: ___ to ___
☐ (99) Over 98 Yrs. Old  ☐ (00) Unknown

**103-MULT. ARREST INDIC.:** ☐ (M) Multiple  ☐ (C) Count Arrestee  ☐ (N) N/A
**104-DISPOSITION OF JUVENILE:** ☐ (H) Handled within Department.  ☐ (R) Referred outside Departmen

**105-WEAPONS AT ARREST:** (Max. 2) (Place "A" in blank if automatic)
☐ (01) Unarmed  ☐ (11) Firearm  ☐ (12) Handgun  ☐ (13) Rifle  ☐ (14) Shotgun  ☐ (15) Other Firearm  ☐ (16) Illegal Cutting Instr.  ☐ (17) Club / Blackjack / Brass Kn.

**98-RES. STATUS:** ☐ (R) Resident  ☐ (N) Nonres.  ☐ (U) Unknown

| 99-UCR ARR. CODE | 100-OFFENSE NAME | 101-ARREST DATE | 102-ARREST TRANSACT. # |
|---|---|---|---|
| | | | |

**106-TYPE ARREST ACTIVITY: (Max. 3)**
☐ (B) Buying  ☐ (C) Cultivate/Manufacture/Publish  ☐ (D) Distributing/Selling  ☐ (E) Exploiting Children
☐ (O) Operating/Promoting/Assisting  ☐ (P) Possessing/Concealing  ☐ (T) Transport/Transmit/Import  ☐ (U) Using/Consuming

**107-AR. DRUG TYPE: (Max. 3)**
☐ (A) "Crack" Cocaine  ☐ (B) Cocaine  ☐ (C) Hashish  ☐ (D) Heroin
☐ (E) Marijuana  ☐ (F) Morphine  ☐ (G) Opium  ☐ (H) Other Narcotics  ☐ (I) LSD
☐ (J) PCP  ☐ (K) Other Hallucinogens  ☐ (L) Amphetamines/ Methamphetamines  ☐ (M) Other Stimulants
☐ (N) Barbiturates  ☐ (O) Other Depressants  ☐ (P) Other Drugs  ☐ (U) Unknown Type Drug  ☐ (X) Over 3 Drug Types

| HEIGHT | WEIGHT | HANDEDNESS | BUILD | HAIR COLOR | HAIR STYLE | HAIR LENGTH | EYE COLOR | GLASSES | SKIN TONE |
|---|---|---|---|---|---|---|---|---|---|
| 5'05" | 175 | | MED - Medium | BLK - Black | STR - Straight | SRT - Short | BRO - Brown | | DBR - Dark Bro |

**OFFENDER / ARRESTEE**

| 78-ARRESTEE # | 79-NAME    Last,    First,    Middle, | | 80-AKA |
|---|---|---|---|
| | | | |

| 81-OFFENDER # | 82-RESIDENT ADDRESS    Street    City | State | 83-Zip | 84-DATE OF BIRTH |
|---|---|---|---|---|
| | | | | |

| 85-RESIDENT PHONE | 86-EMPLOYMENT/SCHOOL PHONE | 87-DRIVER'S LICENSE | 88-DR. LI. STATE | 89-SSN |
|---|---|---|---|---|
| | | | | |

| 90-ARREST LOCATION | 91-OCCUPATION | 92-PLACE OF EMPLOYMENT | 93-ARREST TYPE: ☐ (O) On View Arrest |
|---|---|---|---|
| | | | ☐ (S) Summons/Cited   ☐ (T) Taken Into Cust. |

**94-SEX:** ☐ (M) Male  ☐ (F) Female  ☐ (U) Unk.
**95-ETHNIC:** ☐ (H) Hispanic  ☐ (N) Nonhisp.  ☐ (U) Unk.
**96-RACE:** ☐ (W) White  ☐ (B) Black  ☐ (I) American Indian  ☐ (A) Asian/Pacific Islander  ☐ (U) Unknown

**97-AGE:** EXACT AGE _____  AGE RANGE: ___ to ___
☐ (99) Over 98 Yrs. Old  ☐ (00) Unknown

**103-MULT. ARREST INDIC.:** ☐ (M) Multiple  ☐ (C) Count Arrestee  ☐ (N) N/A
**104-DISPOSITION OF JUVENILE:** ☐ (H) Handled within Department.  ☐ (R) Referred outside Departmen

**105-WEAPONS AT ARREST:** (Max. 2) (Place "A" in blank if automatic)
☐ (01) Unarmed  ☐ (11) Firearm  ☐ (12) Handgun  ☐ (13) Rifle  ☐ (14) Shotgun  ☐ (15) Other Firearm  ☐ (16) Illegal Cutting Instr.  ☐ (17) Club / Blackjack / Brass Kn.

**98-RES. STATUS:** ☐ (R) Resident  ☐ (N) Nonres.  ☐ (U) Unknown

| 99-UCR ARR. CODE | 100-OFFENSE NAME | 101-ARREST DATE | 102-ARREST TRANSACT. # |
|---|---|---|---|
| | | | |

**106-TYPE ARREST ACTIVITY: (Max. 3)**
☐ (B) Buying  ☐ (C) Cultivate/Manufacture/Publish  ☐ (D) Distributing/Selling  ☐ (E) Exploiting Children
☐ (O) Operating/Promoting/Assisting  ☐ (P) Possessing/Concealing  ☐ (T) Transport/Transmit/Import  ☐ (U) Using/Consuming

**107-AR. DRUG TYPE: (Max. 3)**
☐ (A) "Crack" Cocaine  ☐ (B) Cocaine  ☐ (C) Hashish  ☐ (D) Heroin
☐ (E) Marijuana  ☐ (F) Morphine  ☐ (G) Opium  ☐ (H) Other Narcotics  ☐ (I) LSD
☐ (J) PCP  ☐ (K) Other Hallucinogens  ☐ (L) Amphetamines/ Methamphetamines  ☐ (M) Other Stimulants
☐ (N) Barbiturates  ☐ (O) Other Depressants  ☐ (P) Other Drugs  ☐ (U) Unknown Type Drug  ☐ (X) Over 3 Drug Types

| HEIGHT | WEIGHT | HANDEDNESS | BUILD | HAIR COLOR | HAIR STYLE | HAIR LENGTH | EYE COLOR | GLASSES | SKIN TONE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |

**SUBJECT DESCRIPTORS**

**OFFENDER #1:** Last,    First,    Middle  ▮▮▮▮

| FEATURE: | LOCATION: | BODY PART: | FEATURE DESCRIPTION: |
|---|---|---|---|
| Tattoo | LEFT | ELBO | |
| Tattoo | RIGH | ELBO | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

# INCIDENT REPORT
COMMONWEALTH OF VIRGINIA

## VEHICLE LEAD / VEHICLE

| 173-PAGE # | 174-DATE | 1754-INCIDENT # | 176-REPORTING OFFICER | | 177-CODE # | 178-VICTIM NAME |
|---|---|---|---|---|---|---|
| 3 | 01/01/2024 | 2024-00036 | Sergeant Caleb A. Johnson | | RM0049 | |

| 179-YEAR | 180-MAKE | 181-MODEL | 182-STYLE | 183-VIN | 184-LICENSE NUMBER | 185-STATE |
|---|---|---|---|---|---|---|
| | | | | | | |

| 186-OWNER'S NAME | 187-ADDRESS |
|---|---|
| | |

| 188-TOP/SOLID COLOR | 189-SECOND COLOR | 190-DISPOSITION OF RECOVERY: ☐ (I) Impounded  ☐ (R) Rel. To Owner | 192-SUSP. VEHICLE? ☐ Y  ☐ N | 193-TELETYPE NUMBER |
|---|---|---|---|---|
| | | | | |

| 179-YEAR | 180-MAKE | 181-MODEL | 182-STYLE | 183-VIN | 184-LICENSE NUMBER | 185-STATE |
|---|---|---|---|---|---|---|
| | | | | | | |

| 186-OWNER'S NAME | 187-ADDRESS |
|---|---|
| | |

| 188-TOP/SOLID COLOR | 189-SECOND COLOR | 190-DISPOSITION OF RECOVERY: ☐ (I) Impounded  ☐ (R) Rel. To Owner | 192-SUSP. VEHICLE? ☐ Y  ☐ N | 193-TELETYPE NUMBER |
|---|---|---|---|---|
| | | | | |

## PROPERTY

| 209-OF. CODE | 210-P. LOSS | 211-P. DES. | 212-QTY. | 213-DESCRIPTION (Include serial number, size, color, etc.) | 214-OWNER | 215-ITEM VALUE | 216-RECOV. DATE |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

| 217-TOTAL NUMBER VEHICLES STOLEN: | 218-TOTAL NUMBER VEHICLES RECOVERED: | 219-TOTAL VALUE STOLEN: | 220-TOTAL VALUE RECOVERED: |
|---|---|---|---|
| | | | |

## PROPERTY CODES

**210-PROPERTY LOSS:** (1) None  (2) Burned  (3) Counterfeited/Forged  (4) Damaged/Destroyed/Vandalized  (5) Recovered  (6) Seized  (7) Stolen, etc.  (8) Unk.

**211-PROPERTY DESCRIPTION:**

- (01) Aircraft
- (02) Alcohol
- (03) Automobiles
- (04) Bicycles
- (05) Buses
- (06) Cloths/Furs
- (07) Computer Hardware/Software
- (08) Consumable Goods
- (09) Credit Cards/Debit Cards
- (10) Drugs/Narcotics
- (11) Drug/Narc. Equipment
- (12) Farm Equipment
- (13) Firearms
- (14) Gambling Equipment
- (15) Heavy Equipment-Construction/Industry
- (16) Household Goods
- (17) Jewelry/Precious Metals
- (18) Livestock
- (19) Merchandise
- (20) Money
- (21) Negotiable Instruments
- (22) Nonnegotiable Instruments
- (23) Office-Type Equipment
- (24) Other Motor Vehicles
- (25) Purses/Handbags/Wallets
- (26) Radios/TVs/VCRs
- (27) Recordings-Audio/Visual
- (28) Recreational Vehicles
- (29) Structures-Single Occupancy
- (30) Structures-Other Dwellings
- (31) Structures-Commercial/Business
- (32) Structures-Industrial/Manufacture
- (33) Structures-Public/Community
- (34) Structures-Storage
- (35) Structures-Other
- (36) Tools-Power/Hand
- (37) Trucks
- (38) Vehicle Parts/Accessories
- (39) Watercraft
- (77) Other
- (88) Pending Inventory (of Property)
- (99) Special Category

## DRUG INFO.

| 222-DRUG TYPE | 223-WHOLE DRUG QUANTITY | 224-FRACTIONAL DRUG QUANTITY | 225-DRUG MEASUREMENT | 225-TYPE DRUG MEASUREMENT: |
|---|---|---|---|---|
| | | | | **WEIGHT** (GM) Gram (KG) Kilogram (OZ) Ounce (LB) Pound |
| | | | | **CAPACITY** (ML) Milliliter (LT) Liter (FO) Fluid Ounce (GL) Gallon |
| | | | | **UNITS** (DU) Dosage Unit (Pills, etc.) (NP) Number of Plants |

**222-DRUG TYPE:**

- (A) "Crack" Cocaine
- (B) Cocaine
- (C) Hashish
- (D) Heroin
- (E) Marijuana
- (F) Morphine
- (G) Opium
- (H) Other Narcotics
- (I) LSD
- (J) PSP
- (K) Other Hallucinogens
- (L) Amphetamines/Methamphetamines
- (M) Other Stimulants
- (N) Barbiturates
- (O) Other Depressants
- (P) Other Drugs
- (U) Unknown Type Drug
- (X) Over 3 Drug Types

## COMPLNT.

| NAME:   Last,          First,          Middle | SEX: ☐ (M) Male  ☐ (F) Female  ☐ (U) Unk. | AGE: _____ ☐ (00) Unknown | RACE: ☐ (W) White  ☐ (B) Black  ☐ (I) American Indian  ☐ (A) Asian/Pacific Islander  ☐ (U) Unknown |
|---|---|---|---|
| RESIDENT ADDRESS:  Street    City    State    Zip | | RESIDENT PHONE    EMPLOY'T. PHONE | |

JA382

# CONFIDENTIAL SUPPLEMENT

| 226-PAGE # | 227-DATE | 228-INCIDENT NUMBER | 229-REPORTING OFFICER | 230-CODE # | 231-VICTIM NAME |
|---|---|---|---|---|---|
| 4 | 01/01/2024 | 2024-00036 | Sergeant Caleb A. Johnson | RM0049 | |

| 234–SCENE PROCESSED BY: | 236-PRINTS FOUND? ☐ Yes ■ No | 238-EVIDENCE ☐ Yes |
|---|---|---|
| | 237-PHOTOGRAPHED ☐ Yes ■ No | OBTAINED? ■ No |

| 239-APPROVING SUPERVISOR | 240-CODE # | 241-DATE APPROVED |
|---|---|---|
| Sergeant Caleb A. Johnson | RM0049 | 01/17/2024 |

**WITNESSES**

| 243-NAME: Last, First, Middle | 244-SEX: ☐ (U) Unk. ☐ (M) Male ☐ (F) Female | 245-AGE: ☐ (00) Unknown | 246-RACE: ☐ (U) Unk. ☐ (W) White ☐ (B) Black ☐ (I) American Indian ☐ (A) Asian/Pacific Islander |
|---|---|---|---|
| 247-RESIDENT ADDRESS: Street  City  State  248-Zip | 249-RESIDENT PHONE | 250-EMPL. PHONE | |
| 243-NAME: Last, First, Middle | 244-SEX: ☐ (U) Unk. ☐ (M) Male ☐ (F) Female | 245-AGE: ☐ (00) Unknown | 246-RACE: ☐ (U) Unk. ☐ (W) White ☐ (B) Black ☐ (I) American Indian ☐ (A) Asian/Pacific Islander |
| 247-RESIDENT ADDRESS: Street  City  State  248-Zip | 249-RESIDENT PHONE | 250-EMPL. PHONE | |

NARRATIVE:

CFS # 2024-000003

On 01/01/2024 just after 0000 hrs I Sgt. C. A. Johnson was made aware by Officer Poulin that Lt. Hylton with the FCSO had a car trying to get away from him. He advised that they were on Scuffling Hill Rd headed towards Franklin St. At this time we were unable to get updates from Lt. Hylton and there was no response from him via radio. I activated my emergency lights and sirens on Franklin St headed towards Scuffling Hill Rd. Deputy Moorman with FCSO then made dispatch aware that Lt. Hylton had one at gun point. When I turned onto Scuffling Hill Rd from Franklin St, I turned off my emergency equipment and began looking for Lt. Hyltons location. Officer Poulin then asked Dispatch if they knew where Hylton was now and they told us Highview Terrace/Scuffling Hill Rd. We then arrived on scene with him a short time later. When I arrived on scene I observed Lt. Hylton standing in front of his patrol vehicle with a hispanic male subject in custody. That subject was identified as ██████████████. Officer Poulin arrived on scene just behind me where he approached the vehicle. I stood by with the suspect while Hylton and Poulin looked at the suspects vehicle. Deputy Wade with FCSO arrived on scene and took custody of the suspect where he searched his person. Officer Gardner also arrived on scene and assisted Poulin with searching the vehicle where two firearms were located. FCSO took possession of the suspect and all evidence.

SUPPLEMENT #1   Officer Joseph R. Gardner - RM0050   01/17/2024   11:52

On 1/1/2024, I, Officer J. Gardner was working my assigned patrol shift in the Town of Rocky Mount located in Rocky Mount, Virginia. At approximately 0011 hours I heard, via radio, that Franklin County Sheriff's Office Car 11 was conducting a traffic stop and had a subject at gun point. I marked en route and arrived on scene at approximately 0014 hours.

Upon scene arrival Lieutenant Hylton with the Franklin County Sheriff's Office already had the driver in custody. LT Hylton advised the subject was reaching for something in the passenger side floor area. Officer Poulin advised there was a gun on the passenger side floorboard. The male subject in custody was later identified as ██████████████ who was determined to be a convicted felon upon being ran by dispatch.

A search of the passenger side was conducted. Upon searching a .22LR revolver was located under the front passenger seat floorboard. The firearm was cleared and made safe. Upon clearing the firearm, I noticed the cylinders contained only spent shell casings. No live shell casings

**CONFIDENTIAL SUPPLEMENT NARRATIVE CONTINUATION**

| 226-PAGE # | 227-DATE | 228-INCIDENT NUMBER | 229-REPORTING OFFICER | 230-CODE # | 231-VICTIM NAME |
|---|---|---|---|---|---|
| 5 | 01/01/2024 | 2024-00036 | Sergeant Caleb A. Johnson | RM0049 | |

NARRATIVE:

were in the firearm at that time. A serial number was located on the revolver which was checked and ran through dispatch. Dispatch advised there were no hits on the serial number provided at that time.

An additional firearm was recovered in the same vicinity as the .22LR revolver. The firearm in question appeared to be a homemade bolt action style firearm. The firearm had no markings of a serial number and appeared to be put together by more than one crude component. The firearm appeared to be an altered firearm. Upon inspecting the chamber, a shell casing was seen, upon further inspection the shell casing was determined to be expended. The magazine/tube contained approximately 2-3 rounds of unexpended .22LR ammo. The firearm was cleared and made safe.

Upon searching the rest of the vehicle, the only addition evidence I recovered was a single unexpended .22LR round which was found on the driver's side floorboard. All evidence recovered was packaged and stored by the Franklin County Sheriff's Office. I cleared scene at 0055 hours with no further issues.

SUPPLEMENT #2   Officer Trey A. Poulin - RM0056   01/17/2024   12:16

On 01/01/2024, at approximately 0011 hours, I, Officer T. Poulin was on the phone with Lt. Hylton with the Franklin County Sheriff's Office. Lt. Hylton advised me that he was trying to catch up to a vehicle on South Main Street for a traffic stop. Lt. Hylton advised me that the vehicle was turning onto Scuffling Hill headed towards Franklin Street. I hung up the phone and monitored Lt. Hylton's radio traffic on my portable radio. Soon after I hung up the phone, Lt. Hylton advised traffic stop on the vehicle and he informed dispatch that the vehicle had blacked out the lights while moving. I was traveling on Franklin Street headed towards Scuffling Hill at this time. Dispatch asked Lt. Hylton if he was ok during the stop with no answer back from Lt. Hylton.

Deputy Moorman with the Franklin County Sheriff's Office advised Dispatch that Lt. Hylton had one subject had gunpoint. I informed Sgt. Johnson of what was transpiring with Lt. Hylton's traffic stop. I activated my emergency equipment and headed towards his last known location. I asked Dispatch again where Lt. Hylton's traffic stop was with no update. When I arrived on Scuffling Hill, Dispatch gave a stopping location of Highview Terrace Rd/ Scuffling Hill. I arrived on scene shortly after recieving the updated location. When I arrived on scene, I exited my car and observed a Hispanic male in handcuffs. I got a pass on from Lt. Hylton of what transpired before I arrived on scene. Lt. Hylton stated that the Hispanic male driver kept reaching on the passenger side of the vehicle. I walked up to the vehicle and shined my flashlight through the passenger side window. I observed what appeared to be at that time, a sawed off shotgun located in the floor board of the passenger side. Lt. Hylton ran the subject in custody for felony convictions in which he was a convicted felon. I opened the passenger side door in which the "sawed off shotgun" was in fact an altered weapon. The altered weapon was cleared and made safe by Officer Gardner. The altered weapon had a metal barrel, black weapon frame, and was a bolt action. The altered weapon did not have a serial number anywhere on the weapon and the weapon accepted .22 cal LR ammunition.

JA384

# CONFIDENTIAL SUPPLEMENT NARRATIVE CONTINUATION

| 226-PAGE # | 227-DATE | 228-INCIDENT NUMBER | 229-REPORTING OFFICER | 230-CODE # | 231-VICTIM NAME |
|---|---|---|---|---|---|
| 6 | 01/01/2024 | 2024-00036 | Sergeant Caleb A. Johnson | RM0049 | |

NARRATIVE:

Officer Gardner located a .22 cal Revolver that had a Serial number on the firearm. The Revolver was ran through dispatch in which no Hits came back on the firearm at that time. I also located a bag of .22 cal LR rounds in the same vicinity I located the .22 Cal Altered weapon. I assisted in searching the rest of the vehicle. I did not locate anything else inside the vehicle of evidentiary value. Nothing further to report.

JA385

**U.S. Department of Justice**
Bureau of Alcohol, Tobacco, Firearms and Explosives

# Report of Investigation

| Title of Investigation: | Investigation Number: | Report Number: |
|---|---|---|
| MARTINEZ-CHAVEZ, Issac (Franklin County, VA) | 24-06817 | 10 |

## SUMMARY OF EVENT:

Information received from Franklin County Sheriff's Office (FCSO), Lieutenant (Lt.) Justin Hylton regarding the incident that occurred on January 1, 2024, involving Issac MARTINEZ-CHAVEZ.

## NARRATIVE:

1. On 12/19/2024, ATF-Roanoke Special Agents (SA) interview from Franklin County Sheriff's Office (FCSO), Lieutenant (Lt.) Justin Hylton, in reference to new or clarifying information regarding the incident being investigated, in Franklin County, VA, involving Issac MARTINEZ-CHAVEZ (DOB: 09/16/1986; SSN 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; FB# 60663TC0), on 01/01/2024.

2. The interview was conducted at the ATF-Roanoke Field Office. Present for the interview were the following: FSCO Lt. Justin Hylton; ATF SA Drew Effing and Adam Moody; Special Assistant United States Attorney (SAUSA) Juan Vega and Assistant United States Attorney (AUSA) Matthew Miller.

3. Prior to this interview Lt Hylton advised he reviewed his report and body worn camera (BWC) associated with this investigation. During this interview previously disclosed information from reports and BWC was referred to.

4. Lt. Hylton advised the following new or clarifying information:

5. Lt. Hylton caught up to MARTINEZ-CHAVEZ's vehicle on Scuffling Hill rd. and was within a couple of hundred feet of it. Lt. Hylton maintained visual on MARTINEZ-CHAVEZ vehicle the entire time from when the vehicle turned onto Scuffling Hill Rd, with the exception of a couple seconds, around the time when the vehicle first turned onto Highview Terrace, with the running lights still off.

6. Lt. Hylton referred to a map (shown below) and described how he remembered the vehicles running lights turned off while traveling on Scuffling Hill Rd. near the 2nd Knollwood intersection, which is where, within 1 or 2 seconds, Lt. Hylton activated his emergency equipment to indicate a traffic stop. At that point Lt. Hylton noticed MARTINEZ-CHAVEZ was still traveling at a high rate of speed. Within seconds of MARTINEZ-CHAVEZ pulling into 30 Highview Terrace, Lt. Hylton pulled behind the vehicle. The driver side door was opened, the marked lights [emergency equipment] were still running. Lt. Hylton did not recall if the vehicle's running or brake lights were on, on MARTINEZ-CHAVEZ's vehicle when stopped. Lt, Hylton recalled the streets being dark. The vehicle had been traveling on Scuffling Hill Rd. and Highview Terrace, both of which are public roadways.

| Prepared by: | Title: | Signature: | Date: |
|---|---|---|---|
| Adam Moody | Special Agent | | 12/23/2024 |

| Authorized by: | Title: | Signature: | Date: |
|---|---|---|---|
| Keith Teehan | RAC | | 12/23/2024 |

| Second Level Reviewer (optional): | Title: | Signature: | Date: |
|---|---|---|---|
| | | | |

ATF EF 3120.2 (10-2004)
For Official Use Only

JA386

| Title of Investigation: | Investigation Number: | Report Number: |
|---|---|---|
| MARTINEZ-CHAVEZ, Issac (Franklin County, VA) | 24-06817 | 10 |



7.   Lt. Hylton was driving a marked police vehicle but because he is a patrol Lt., his vehicle was not equipped with a vehicle/dash camera or automatic camera system activation. Patrol Deputy vehicles equipped with that system would initiate BWC and vehicle/dash camera upon activation of the vehicle emergency lights. Lt. Hylton had to manually activated his BWC, before it dropped to the ground.

8.   Lt. Hylton BWC never stopped recording; Lt. Hylton never turned it off. The BWC fell off to the ground, near the front driver's wheel, by the engine.  Background noise overheard on BWC after it fell off may have been vehicle engine noise.

9.   The defendant kept putting his hands in his pockets and had to be asked to take them out repeatedly. Hylton then warned MARTINEZ-CHAVEZ one time to comply, or he would be shot. The MARTINEZ-CHAVEZ then complied.

10.   Hylton picked up his BWC off the ground, after the driver was handcuffed.

11.   MARTINEZ-CHAVEZ's friend (FNU, LNU) tried to get into the driver's side of the vehicle. Lt. Hylton ordered the friend to back away and stay away. The individual made it to the car, but not in the car. Nothing was taken out or added to the vehicle. Lt. Hylton saw the friend's hands and noticed that he did not have anything in his hands.  Lt. Hylton did not close the driver side door.

12.   MARTINEZ-CHAVEZ communicated with Lt. Hylton in English without issues, and he did not ask Lt. Hylton to repeat or clarify anything.

13.   Lt. Hylton said he did not know whether MARTINEZ-CHAVEZ was hiding something or retrieving something in the vehicle upon coming to a stop. If he was retrieving something, he did not know what it was. Lt. Hylton ordered MARTINEZ-CHAVEZ out at gunpoint, because he was not taking any chances. Shortly after MARTINE-CHAVEZ told Lt. Hylton he had consumed one beer, Lt. Hylton thought MARTINEZ-CHAVEZ may have been trying to hide alcohol. Prior to approaching the vehicle with Office Poulin, he was not exactly sure what MARTINEZ-CHAVEZ was hiding or reaching for but believed it could have been a gun.

14.   Lt. Hylton said he asked MARTINEZ-CHAVEZ if he had a drivers license, MARTINEZ-CHAVEZ told him no. He did not have any state identification.

15.   Dispatch advised over the radio that MARTINEZ-CHAVEZ was wanted for a felony probation violation from Montgomery Co. When Lt. Hylton heard that MARTINEZ-CHAVEZ was wanted for a felony probation violation,

ATF EF 3120.2 (10-2004)
For Official Use Only

JA387

| Title of Investigation: | Investigation Number: | Report Number: |
|---|---|---|
| MARTINEZ-CHAVEZ, Issac (Franklin County, VA) | 24-06817 | 10 |

he thought it reasonable to believe that the MARTINEZ-CHAVEZ was a convicted felon.

16.    Lt. Hylton suspected numerus people were at the residence.

17.    Lt. Hylton said MARTINEZ-CHAVEZ did not ask him to have someone at the scene associated with him assume responsibility for the vehicle. MARTINEZ-CHAVEZ did not authorize him to leave the vehicle where it was parked.

18.    Lt. Hylton wrote his report documenting the incident at approx. 0220 hours on January 1st. Lt. Hylton wrote from memory, without the benefit of his BWC footage. Hylton did not have access to the BWC footage at the time.

19.    Lt. Hylton advised to his knowledge no FCSO tow sheet was filled out for this case.

20.    On the same date, SA Moody called Lt. Hylton and asked some follow-up questions.  Hylton was asked if the defendant's vehicle had not been searched prior to the tow, would he have done a full inventory search of the vehicle? Hylton said, "I would have." However, Hylton described how he was no longer on scene because he was busy completing other tasks involved in the investigation. Hylton said he could not say whether or not another officer/deputy would or would not have with a different set of circumstances.

21.    Hylton said that after he began to follow the defendant's vehicle, he maintained a visual on the vehicle, with the exception of a couple seconds, noted above. The vehicle appeared to continue in constant motion at a high rate of speed and did not stop. No one jumped out of the moving vehicle.

ATF EF 3120.2 (10-2004)
For Official Use Only

JA388



**U.S. Department of Justice**
**Drug Enforcement Administration**

Mid-Atlantic Laboratory

Largo, MD

## Chemical Analysis Report

ATF - Roanoke Office
310 First Street, Suite 500
Roanoke, VA 24011

**Case Number:** 24-06817
**LIMS Number:** 2024-SFL3-01972

### Observations, Results and Conclusions:

| Exhibit | Substance(s) Identified | Net Weight | Substance Purity | Amount Pure Substance |
|---|---|---|---|---|
| 4 | Methamphetamine | Residue | ---- | ---- |

**Remarks:**

The net weight represents the weight of all material, excluding the packaging.

### Exhibit Details:

**Date Accepted by Laboratory:** 03/25/2024      **Gross Weight:** 150.7 g      **Date Received by Examiner:** 12/05/2024

| Exhibit | No. Units | Pkg. (Inner) | Form | Reserve Wt. |
|---|---|---|---|---|
| 4 | 1 | Pipe | Residue | Residue |

**Remarks:**

### Exhibit Analysis:

**Sampling:**

Methamphetamine identified in 1 unit(s) tested.

| Exhibit | Summary of Test(s) |
|---|---|
| 4 | Gas Chromatography/Mass Spectrometry, Marquis Color Test |

The following summary of testimony is provided as required by Federal Rule of Criminal Procedure 16(a)(1)(G) and is a complete statement of my opinions, which are exclusive to and address only the exhibit(s) identified in this summary. I am employed by the U.S. Department of Justice, Drug Enforcement Administration (DEA) and was so employed when I conducted the examinations and analyses of the above referenced LIMS number. My qualifications to conduct the examinations and analyses, and to express an opinion as to the identity of the material contained in the exhibit(s) described above, are based on my knowledge, skill, experience, training, and education. See my Curriculum Vitae (which will be provided prior to the close of expert discovery) for additional information regarding my qualifications, including previous testimony offered in the last four years and any publications authored in the last ten years. The opinions described are based on the listed chemical, physical, and instrumental analyses, the results generated by those analyses, and my interpretation of those results set forth in the laboratory report and analyst notes. The manner and process by which I performed the analyses were, to the best of my knowledge, in accordance with the publicly available Analysis of Drugs Manual (ADM) and Laboratory Operations Manual (LOM), in effect at the time of analysis. These are generally available at: https://www.dea.gov/resources/documents?f%5B0%5D=publication_type%3A2596, or were otherwise disclosed upon request. I analyzed the material contained in the exhibit(s) which were submitted for analysis in the above referenced LIMS number. Refer to this laboratory report associated with the subject LIMS number. The analytical methods used in these analyses are validated and verified according to our quality assurance policy to ensure the methods are reliable and fit-for-purpose and the techniques utilized are widely accepted and employed in the scientific and forensic community. Summaries of instrumental methods are available at: https://www.dea.gov/resources/documents?f%5B0%5D=publication_type%3A2596. This report, its attachments, and the referenced documents are not an exhaustive or complete recitation of testimony that I may offer. In addition, I may offer opinions in response to questions posed during trial. Pursuant to Fed. R. Crim. P. 16(a)(1)(G)(v), I, the analyst, approve the foregoing disclosure, and reserve the right to amend as necessary to comply with Rule 16's obligations.

The terminology used in the preparation of this report is consistent with the current Department of Justice Uniform Language for Testimony and Reports for General Forensic Chemistry and Seized Drug Examinations.

**Analyzed By:** /S/ Rebecca J. Wang, Senior Forensic Chemist      **Date:** 12/12/2024
**Approved By:** /S/ Christine A. Haddix, Senior Forensic Chemist      **Date:** 12/13/2024

DEA Form 113 November 2024

JA389

## Franklin County General District Court

 

## Traffic/Criminal Case Details

Franklin County General Di ▼

Name Search
Case Number Search
Hearing Date Search
Service/Process Search

Name Search
Case Number Search
Hearing Date Search
Service/Process Search

### Case/Defendant Information

| | | |
|---|---|---|
| Case Number : GC24000003-00 | Filed Date : 01/03/2024 | Locality : COMMONWEALTH OF VA |
| Name : MARTINEZ, ISAAC FIDEL | Status : Custody | Defense Attorney : NAFF, HUNTER |
| Address : ROCKY MOUNT, VA 24151 | AKA1 : MARTINEZ-CHAVEZ, ISAAC F | AKA2 : |
| Gender : Male | Race : White | DOB : 09/16/**** |

### Charge Information

| | | |
|---|---|---|
| Charge : USE SAWED OFF GUN OTHER PURP | Offense Tracking/Processing # : 067GM2400000001 | Summons # : |
| Code Section : 18.2-300 | Case Type : Felony | Class : 4 |
| Offense Date : 01/01/2024 | Arrest Date : 01/01/2024 | Complainant : HYLTON, LT; FCSO |
| Amended Charge : | Amended Code : | Amended Case Type : |

### Hearing Information

| Date | Time | Result | Hearing Type | Courtroom | Plea | Continuance Code |
|---|---|---|---|---|---|---|
| 03/21/2024 | 10:30 AM | Finalized | Preliminary | | | |
| 01/04/2024 | 01:00 PM | Continued | Bond | | | |
| 01/03/2024 | 08:30 AM | Continued | Arraignment | | | |

### Service/Process

### Disposition Information

| | | |
|---|---|---|
| Final Disposition : Nolle Prosequi | | |
| Sentence Time : 00Months 000Days 00Hours | Sentence Suspended Time : 00Months 000Days 00Hours | |
| Probation Type : | Probation Time : 00Years 00Months 000Days | Probation Starts : |
| Operator License Suspension Time : 00Years 00Months 000Days | Restriction Effective Date : | |
| Operator License | | |

JA390

Case 7:24-cr-00011-EKD-CKM  Document 80-5  Filed 12/30/24  Page 2 of 4
Pageid#: 656

| Restriction Codes : | | |
|---|---|---|
| Fine : | Costs : | Fine/Costs Due : |
| Fine/Costs Paid : | Fine/Costs Paid Date : | VASAP : |

Back to Search Results

Home | Virginia's Court System | Online Services | Case Status and Information | Court Administration | Directories | Forms |

Judicial Branch Agencies | Programs

Build #: 6.2.5.6

JA391

## Franklin County General District Court

 

## Traffic/Criminal Case Details

Franklin County General D⌄

Name Search
Case Number Search
Hearing Date Search
Service/Process Search

### Case/Defendant Information

| | | |
|---|---|---|
| Case Number : GC24000002-00 | Filed Date : 01/03/2024 | Locality : COMMONWEALTH OF VA |
| Name : MARTINEZ, ISAAC FIDEL | Status : Custody | Defense Attorney : NAFF, HUNTER |
| Address : ROCKY MOUNT, VA 24151 | AKA1 : MARTINEZ-CHAVEZ, ISAAC F | AKA2 : |
| Gender : Male | Race : White | DOB : 09/16/**** |

Name Search
Case Number Search
Hearing Date Search
Service/Process Search

### Charge Information

| | | |
|---|---|---|
| Charge : NONVIOL FELON POSS GUN W/I 10Y | Offense Tracking/Processing # : 067GM2400000000 | Summons # : |
| Code Section : 18.2-308.2 | Case Type : Felony | Class : 6 |
| Offense Date : 01/01/2024 | Arrest Date : 01/01/2024 | Complainant : HYLTON, LT; FCSO |
| Amended Charge : | Amended Code : | Amended Case Type : |

### Hearing Information

| Date | Time | Result | Hearing Type | Courtroom | Plea | Continuance Code |
|---|---|---|---|---|---|---|
| 03/21/2024 | 10:30 AM | Finalized | Preliminary | | | |
| 01/04/2024 | 01:00 PM | Continued | Bond | | | |
| 01/03/2024 | 08:30 AM | Continued | Arraignment | | | |

### Service/Process

### Disposition Information

| | | |
|---|---|---|
| Final Disposition : | Nolle Prosequi | |
| Sentence Time : 00Months 000Days 00Hours | Sentence Suspended Time : 00Months 000Days 00Hours | |
| Probation Type : | Probation Time : 00Years 00Months 000Days | Probation Starts : |
| Operator License Suspension Time : 00Years 00Months 000Days | Restriction Effective Date : | |
| Operator License | | |

JA392

Case 7:24-cr-00011-EKD-CKM    Document 80-5    Filed 12/30/24    Page 4 of 4
Pageid#: 658

| Restriction Codes : | | |
|---|---|---|
| Fine : | Costs : | Fine/Costs Due : |
| Fine/Costs Paid : | Fine/Costs Paid Date : | VASAP : |

Back to Search Results

Home | Virginia's Court System | Online Services | Case Status and Information | Court Administration | Directories | Forms |

Judicial Branch Agencies | Programs

Build #: 6.2.5.6

JA393

FEDERAL PUBLIC DEFENDER
WESTERN DISTRICT OF VIRGINIA
210 FIRST STREET, SW, SUITE 400
ROANOKE, VIRGINIA 24011
(540) 777-0880
FAX: (540) 777-0890

Beatrice Diehl                                                      Mary E. Maguire
Assistant Federal Public Defender                                  Federal Public Defender
(540) 777-0891 (Direct)                                            (540) 777-0895

December 12, 2024

Dear Juan Vega
Via email to juan.vega2@usdoj.gov

　　　　Re:　　US v. Martinez-Chavez additional discovery request

Can you provide the following discovery in this case:

1) Dispatch calls
2) 911 calls
3) Radio Runs

Sincerely,

Beatrice Diehl
Counsel for Mr. Isaac Fidel Martinez-Chavez

JA394

Gov Exh 4 - Transcription and translation of Defendant talking to male acquaintance
(Defendant telling friend to close car doors and windows (Hylton BWC))

## English

"Hey man. Come here, man. Close the car, yes? Come here. Close it. Close it. There's the key, man. Close them, the windows, man. Please. Close them. . . [inaudible] . . . It's that I was coming fast, man. Close it, man. Please. Close it, man. . . . [inaudible] . . .  Right now. Close it."

## Spanish

"Hey guey. Ven guey. Cierra el carro, no? Ven. Ciérralo. Ciérralo. Allí está la llave, guey. Ciérralos, los vidrios, guey. Porfavor. Ciérralos. . . [inaudible] . . . Es que venía rápido, guey. Ciérralo, guey. Porfavor. Ciérralo, guey. . . . [inaudible] . . .  Ahorita. Ciérralo."

IN THE UNITED STATES DISTRICT
COURT FOR THE WESTERN DISTRICT OF
VIRGINIA ROANOKE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | Criminal No. 7:24-cr-00011 |
| | ) | |
| | ) | |
| ISAAC FIDEL MARTINEZ-CHAVEZ | ) | |

DEFENDANT'S REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTION TO SUPPRESS EVIDENCE

Mr. Martinez replies to the Government's Response (ECF No. 75) to his Motion to

Suppress Evidence (ECF No. 59) as follows:

**1. Burden of proof is on the Government when it conducts a warrantless seizure.**

The Government argues that the defendant bears the burden of proof on a motion to

suppress, citing a case involving a defendant who alleged he was questioned without the

benefit of *Miranda* warnings. *See* "Response to Defendant's Motion to Suppress," (ECF No.

75, at p. 7, citing *United States v. Bowman*, 106 F.4th 293, 300 (4th Cir.), cert. denied, No. 24-

5591, 2024 WL 4529870 (2024)).

That is not the case before this Court. Rather, this case involves a warrantless search

by the Government. Because warrantless searches and seizures are generally presumed to be

unreasonable under the Fourth Amendment, the Government bears the burden of proving by

a preponderance of the evidence that such search or seizure is lawful. *See United States v. Napan*,

769 F. Supp. 2d 969, 971 n.2 (E.D. Va. 2011) (citing *Coolidge v. New Hampshire*, 403 U.S. 443,

455, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971) ("The burden is on those seeking the exemption

JA396

to show the need for it.")).

Here, the Government has made no argument that it had a warrant to search the car Mr. Martinez was driving, nor has it provided any evidence that any such warrant existed in its discovery productions. Therefore, the burden is on the Government to show that the search and seizure of the vehicle was lawful.

**2.** <u>**Hylton's admissions on body camera show he never conducted a traffic stop.**</u>

Hylton told the other officers at the scene that he made the conscious decision not to conduct a traffic stop for speeding because he wanted to go for something bigger, like a DUI. Instead, he elected to follow Martinez and "just see." *See* "Hylton's Body Worn Camera Recording," Exhibit 3 of Defendant's Motion to Suppress Evidence (ECF No. 59, at 0:19:25-0:19:38). Likewise, Hylton admitted that he did not perform a traffic stop on the basis of Martinez allegedly turning his lights off. He told the officers, "I mean I can't do anything as far as him turning. I got him for reckless driving; he turned his lights out on the road, but I didn't turn the lights on him then…He.. he.. was going for a gun." *Id.* at 0:18:15-0:18:54.

Furthermore, none of the officers ever pursued a traffic violation or issued a traffic ticket or summons.

The Government's arguments that Hylton could have theoretically conducted a traffic stop at any time on the basis that Martinez was speeding earlier or blacked out his lights while moving are irrelevant, because Hylton admits that he never in fact stopped Martinez for either act.

**3.** <u>**Body cam shows officers not motivated by concern for safety at time of search**</u>.

The Government makes the argument that Poulin "could seize and secure the sawed-

off rifle out of concern for safety" while also conceding that "officers did not necessarily conduct a protective search of the vehicle in order to seize the firearms" because they were seized on a plain-view seizure theory. *See* "Response to Defendant's Motion to Suppress," (ECF No. 75 at pp. 10-12).

Although Hylton made a concerted effort to repeatedly say on his body worn camera that Martinez was reaching for a gun *after* Poulin found a gun, the video evidence is bereft of any such observations by Hylton prior to Poulin's discovery of the gun. The body worn camera video shows that when Poulin reached the scene with another officer (as the first backup officers to arrive), Martinez was handcuffed, docile, and outside the reach of the car. When Poulin and his partner arrived, there was no commotion or sign that Hylton was concerned about safety issues, and Martinez was secured in handcuffs and did not display any aggression or resistance. At the point that Poulin arrived, Hylton no longer had his weapon drawn, Martinez was handcuffed and secured, and Hylton casually briefed Poulin on the situation by telling him that he had observed Martinez speed earlier on and decided to follow him. He told Poulin that he then observed Martinez pull into the yard with the car's lights blacked out. *See* ECF No. 75, Defense Exhibit 4, at 0:02:56-03:26.

At no point prior to the vehicle search did Hylton ever convey to Poulin that he saw Martinez reach for something, or that he suspected Martinez reached for or had a gun in the vehicle. Nor do officers ever ask Martinez whether he had a gun in the car. Instead, Hylton and Poulin began a general exploration of the car, apparently hoping to find evidence of a crime that could result in a bigger hit than a traffic violation. *See, generally*, ECF No. 75, Defense Exhibits 3 and 4.

JA398

The Government cites *Elston* and *Carico* for the proposition that, although the officers here did not conduct a protective sweep, they theoretically could have if they suspected Martinez was dangerous and could gain control of a weapon inside the vehicle, even if Martinez were restrained. *See* "Response to Defendant's Motion to Suppress," (ECF No. 75 at p. 11).

Because the Government specifies that the officers did not conduct a protective sweep, it concedes that the protective sweep exception to the warrant requirement does not apply here. Nevertheless, unlike Martinez's case, officers in *Elston* were called to the scene because the defendant was alleged to be driving around with a loaded gun in order to shoot somebody. *See Elston*, 479 F.3d at 315. In *Carico*, a firearm itself was likewise the reason for officers' presence on the scene. *See Carico*, 311 Fed. Appx. at 574. In contrast, here, Hylton claimed to have pulled Martinez over for a traffic violation and Martinez was handcuffed and secured by some of the numerous armed officers on the scene, away from the car.

Government now argues, after the fact, that the presence of other people at the scene created an environment "uncertain and fraught with potential risks." *See* "Response to Defendant's Motion to Suppress," (ECF No. 75 at p. 12). The body camera video shows that there are no people near the car at the time that officers search it. *See* ECF No. 75, Defense Exhibits 4, at 0:03:26-0:19:24. The video also shows that the only time when people are outside the home during the officers' search of the car, it involves two peaceful occupants of the home, who come out of the house and onto the front porch, several feet away from the officers. *Id.* at 08:08. At this time, another officer said to Poulin, "Who are those people in the house?" The video shows that Poulin was completely unconcerned and replied, without

JA399

looking up from his search, "I don't know. They can go back inside, too." *Id.* 07:50-07:55.

When the two individuals came out of the door and stood, unmoving on the porch, Poulin

yelled at them, "Get inside, man. Go inside. Go inside." One of the individuals calmly asked

from his location on the porch, "We were just wondering if y'all are going to leave the car."

Poulin responded, "No, the car is ours. Go inside, man." At this point, the two individuals

went back into their house as ordered. *Id.* at 08:08-08:16. That the homeowners would step

outside to find out what was happening is understandable, particularly since the officers were

present on the curtilage of their home. *See Collins v. Virgnia*, 584 U.S. 586 (2018) (holding

officers did not have a lawful right of access under the automobile exception to a vehicle

parked in the home's driveway).

The video evidence does not support the Government's post hoc attempt to leverage

the brief presence of the homeowners attempting to politely help their relative or friend secure

his car on their property – when multiple armed police surround the car and general area – as

a grave security risk justifying a protective sweep.

4. **Argument that officers towed car in accordance with policy is disingenuous.**

The Government argues that officers towed the car in accordance with their

department's guidelines. *See* "Response to Defendant's Motion to Suppress," (ECF No. 75 at

pp. 1, 18-20, citing Government Exhibit 6, "Traffic Enforcement/Control Policy"). That is

not true.

The Government provided its guidelines as Exhibit 6 in their reply motion (ECF No.

75). According to those guidelines, the presumption when it comes to towing vehicles is that

vehicles *not be* towed. *See id.* at pp. 29-30. The policy indicates that a vehicle should be towed

only when "[t]here is no one at the scene associated with the person arrested to assume responsibility for the vehicle." *Id.* at 29. Here, Martinez repeatedly tried to ask about his car and Poulin responded by telling him to "Be quiet!" "Shut up dude!" and told the other officers to "Tell that motherfucker to shut his mouth!" *See* ECF No. 75, Defense Exhibits 4, at 0:3:32 – 0:4:10. Martinez told the officers that his family stayed at the house where he was parked. *See* ECF No. 75, Defense Exhibits 3, at 0:2:29. As discussed earlier, two of the occupants of the house specifically asked about getting the car and Poulin told them to go back in the house and that the "car is ours." Martinez also asked officers if he could leave the car at the house and was told he could not, that it would be towed. *See* "Response to Defendant's Motion to Suppress," (ECF No. 75 at p. 19, fn. 30).

Furthermore, the video shows, and the reality is, that Mr. Martinez speaks very limited English. Midway through the incident, Officer Johnson read Martinez his *Miranda* rights. *See* "Officer Johnson's Body Worn Camera Recording," provided to the Court separately as Exhibit 4, at 0:11:00-0:11:30. After reading him his rights, Johnson asked Martinez, "Do you wish to speak to me?" and Martinez did not respond. Then Johnson said, "With these rights in mind, do you want to speak to me?" Again, Martinez did not answer. Then Johnson said, "I need a yes or a no." Martinez replied, "I don't know what is that." Johnson then said, "You don't know what yes or no is, or you didn't understand what I read to you?" Martinez answered, "I didn't understand." Johnson then said, "That is fine. I just won't ask you any questions then," and led Martinez to wait handcuffed inside his patrol vehicle. *Id.* at 0:11:30-0:11:44.

Despite all of this, the Government argues that Martinez never "authorized officers in

JA401

writing to leave the car where it was parked" nor "requested that someone at the scene associated with him assume responsibility for the car. Therefore, officers followed the policy. *See* "Response to Defendant's Motion to Suppress," (ECF No. 75 at p. 19). This is a disingenuous argument.

The Government attempts to argue, after-the-fact, that officers were required to impound the car under Va. Code § 46.2-301.1. *Id.* at fn. 30. However, we know from Officer Moody's report that the officers elected to impound the car over Martinez's objection on the basis that it was "improperly registered." *See* "Report of Investigation 9," attached as Exhibit 1, at p. 1 ("LE requested that the vehicle be towed due to evidence that the vehicle was improperly registered.") Additionally, the Government did not obtain Martinez's DMV record showing his license was revoked until December 18, 2024. *See* "Response to Defendant's Motion to Suppress," (ECF No. 75, Exhibit 7 at p. 1) (showing receipt date of 12/18/2024). To argue now that officers had no other choice but to tow the car Martinez was driving on account of his suspended license – which they learned about last week when they were writing their response motion – is a creative recreation of events attempting to show compliance with their towing policy.

Additionally, according to the department's towing policy, officers are required to inventory all vehicles that are towed. *See* "Response to Defendant's Motion to Suppress," (ECF No. 75, Government Exhibit 6, at pp. 30-31). Officers are required to complete an inventory of valuables on the Vehicle Impoundment/Immobilization Report. *Id.* at 31. In this case, the Government admits that none of the officers *actually completed* an inventory nor wrote a Vehicle Impoundment/Immobilization Report in accordance with the requirements of their

JA402

own policy. *See id.* at p. 20 ("The government acknowledges that the officers did not actually carry out an inventory search of Mr. Martinez-Chavez's Kia.")

**5. <u>Inevitable Discovery Doctrine does not apply.</u>**

The Government argues that officers would have inevitably discovered the guns and ammunition because they would have conducted a vehicle inventory prior to the vehicle being towed, after they found out Martinez was a felon or discovered the meth pipe in his pocket when they arrested him. *See id.* at 16-21.

The inevitable discovery doctrine applies only where evidence would have been lawfully discovered; mere speculation that evidence could have been discovered is insufficient. *United States v. Alston*, 941 F.3d 132, 138-140 (4th Cir. 2019). The inevitable discovery exception "involves no speculative elements but focuses on demonstrated historical facts." *United States v. Nix*, 467 U.S. 431, at 444 n.5 (1984).

"An inventory search of an automobile is lawful (1) where the circumstances reasonably justified seizure or impoundment, and (2) law enforcement conducts the inventory search according to routine and standard procedures designed to secure the vehicle or its contents. *United States v. Bullette*, 854 F.3d 261, 265 (4th Cir. 2017) (citing *Colorado v. Bertine*, 479 U.S. 367, 371-76 and *United States v. Brown*, 787 F.2d 929, 931-32 & n.3 (4th Cir. 1986)).

Here, the Government cannot rely on a theory of inevitable discovery by way of an inventory search because 1) they were not required to tow the vehicle, so its being towed was not inevitable and 2) they did not actually conduct an inventory when they were required to do so in this case. As argued above, according to this department's policy, the presumption is that officers would *not* have towed the vehicle in this case because it was towed on account of

JA403

the car being improperly registered. The presumption under the policy was for officers to permit Martinez's friends or family assume responsibility for the vehicle. Here, people at the house where the vehicle was parked attempted to assume responsibility for the vehicle and were told they could not because the Government now "owned" the vehicle. Additionally, Martinez himself asked if the car could be left at the house and was told it could not be. It was therefore not inevitable that the car would be towed. In addition, the fact that the officers here did not actually complete an inventory search of the vehicle as required by their policy makes it far from inevitable that they would have actually conducted an inventory according to their policy if they hadn't searched the car illegally.

Furthermore, the Government's argument that they would have searched the vehicle after finding out about Martinez's criminal history does not meet the requirements of inevitable discovery. Hylton's text to the Government in this case shows that he never found out about Martinez's criminal history during the search and seizure of the car. The argument that officers would have inevitably searched the car because they found out about Martinez's criminal history at a later time is too speculative. The car was not even registered to Martinez and would have been collected by its owner – his wife – by the time officers returned to search it.

Finally, the Government argues it would have inevitably searched the car for contraband after officers found a meth pipe on Martinez's person during their search of him incident to arrest. To support this argument, the Government cites *Wimer*[1] and *Baker*,[2] cases

---

[1] 2021 WL 5985015 (4th Cir. 2013).
[2] 719 F.3d 313 (4th Cir. 2013).

where officers found drugs on a defendant's person, which gave them probable cause to search the defendants' vehicles for additional contraband. In addition, the Government cites a North Carolina case, *Newell*,[3] for the proposition that a glass pipe alone provides probable cause to search a vehicle, when, in fact, that case included a final alert by a drug detection dog and the discovery by officers $31,000 in U.S. currency prior to the search of the vehicle. Finally, the Government cites *Valenite*,[4] a case where officers found there was probable cause to search a vehicle based on the passenger being impaired while getting out of the car, along with having a crack pipe on her person, and where the defendant gave suspicious responses to questions about vehicle ownership, and officers found a large sum of cash in defendant's pocket.

No such circumstances existed in Mr. Martinez's case. No drugs were ever found. Officers never even investigated possible impairment by Martinez from drugs or alcohol, apparently satisfied that he was sober based upon his demeanor and their interactions. While officers found a pipe on Martinez's person incident to arrest, they did not perform any field test for narcotics on the pipe, did not send the pipe to be tested for drugs until March 2024, and did not obtain the results until December 2024, in time for its reply motion. *See* "Chemical Analysis," attached as Exhibit 2 (showing methamphetamine reside but no quantifiable amount of methamphetamine on the pipe discovered).

It is not inevitable that officers would have (legally) searched the car Mr. Martinez was driving based on the pipe they found in his pocket. At the time of Martinez's arrest, officers stated that they would not pursue any action based on the pipes they found and would instead

---

[3] 2020 WL 8771861 (W.D.N.C. Nov. 12, 2020).
[4] 517 F. Supp. 2d 816 (W.D. Va. 2007).

pursue charges on the guns. For these reasons, the Government cannot sustain its argument that officers would have inevitably searched the car based on the pipe they didn't test for drugs until this month.

6. **Plain View Exception does not apply.**

A) Officers didn't know Martinez was a felon until appearance before the Magistrate

The Government concedes that Hylton did not obtain Martinez's criminal history until he printed it out for the Magistrate, well after the entire search and seizure were over. *See* "Response to Defendant's Motion to Suppress," (ECF No. 75, at p. 17). Moreover, the Government produced discovery on December 27, 2024, showing that dispatch never called Hylton back to definitely inform him that Martinez was a convicted felon. *See* "Text Communication between SAUSA Juan Vega and Hylton," attached as Exhibit 3. Officers' discovery of Martinez's felon status after the fact cannot be used to justify their warrantless search and seizure of the vehicle.

The Government's Reply essentially admits that officers conducted an unlawful search of the vehicle by opening the car door before knowing if Martinez was a felon, but that it doesn't matter because they didn't conduct an unlawful seizure of the car's contents at that point. *See* "Response to Defendant's Motion to Suppress," (ECF No. 75 at pp. 9-10, "Officer Poulin saw the sawed-off rifle and opened the Kia's door before he knew Mr. Martinez-Chavez was a felon," but "before he seized the guns, dispatch informed both officers that" Martinez was "wanted on a felony probation violation.") What the Government fails to reveal – until the last page of its motion, buried in footnote 33 – is that what officers heard, mid-illegal search, was dispatch relaying an *unverified* warrant out of Montogomery County. It was not

JA406

until minute 21:16 of Hylton's Body Worn Camera Recording – after officers completed their entire search of the vehicle, seized the guns and ammunition, and arrested Martinez – that dispatch verified the warrant (*See* ECF No. 75, Defense Exhibit 3, at 0:21:16).

What's more, the Government's assertion that Poulin knew Martinez was a felon when he seized the firearm based upon his overhearing that Martinez had an unverified warrant for a felony probation violation is not true. Apart from the fact that the warrant was unverified, in Virginia, a person can be on probation for a felony-grade offense without having been convicted of a felony. Under Va. Code § 18.2-251, first offenders can be placed on probation while the court defers proceedings. Under Va. Code § 19.2-298.02, a person may enter into a deferred disposition and be on probation for a felony offense before a final order of guilt is entered. When a person is under a deferred disposition in Virginia, they may be placed on probation for a felony while not having been adjudicated guilty of any offense. *See, e.g., Randolph v. Commonwealth*, 45 Va. App. 166 (2005) (deferred disposition did not constitute final judgment of conviction); *Commonwealth v. Cross*, 71 Va. Cir. 272 (2006) (first offender deferral did not constitute a criminal conviction or make defendant a convicted felon).

The Government's after-the-fact argument that officers knew Martinez was a felon at the time of the seizure is belied by the officers' own statements on the body worn camera video during the search and seizure. Hylton stated, "Hey, is he a felon?" "[R]un his criminal history, too, I've got a firearm." (*See* ECF No. 75, Defense Exhibit 3, at 0:05:46-0:05:51). Poulin said, "If he's not [a felon], he is now." *Id.* at 0:15:32.

For these reasons, officers could not conclude that Martinez was prohibited from possessing what appeared to be a firearm at the time they conducted their search and seizure

JA407

in this case.

     B)  <u>Officers were not lawfully in a place to view the gun or have lawful right of access</u>

The Government argues that "[t]here is no dispute that the first prong [of the plain view doctrine] is satisfied, given that Officer Poulin was standing outside the car when he first saw the sawed-off rifle." *See* "Response to Defendant's Motion to Suppress," (ECF No. 75 at p. 9). The defense disputes the Government's conclusion that the first prong of the plain view doctrine was satisfied. At the time that Poulin allegedly saw a gun in plain view from outside of the car, he stated, "[t]here's a fucking gun in here; open the car up." *See* ECF No. 75, Defense Exhibit 3, at 0:04:32). He then opened the car door to get a better look at the gun. *Id.*

The plain view doctrine provides an exception to the warrant requirement for the seizure of property, but it does not provide an exception for a search. *See United States v. Jackson*, 131 F.3d 1105, 1108 (4th Cir. 1997). Here, Poulin believed he saw a gun from the exterior of the car through its window at night, but he did not observe what he believed made the gun contraband until he opened the car door. The photographs the Government offers of the gun in "plain view" were all captured after Poulin opened the car door and were not taken from Poulin's lawful vantage point from outside the vehicle. An officer cannot rely upon the plain view exception when he conducts an unlawful search to discover whether what he is seeing is contraband.

In order for the plain view exception to apply, an officer must be lawfully in a place to plainly view the object and have a lawful right of access to the object itself. *See* "Defendant's Motion to Suppress Evidence" (ECF No. 59, at p. 7, citing *Horton v. California*, 496 U.S. 128 (1990). Here, the gun was not lawfully in Poulin's plain view when he opened the car door to

JA408

examine it, and Poulin did not have a lawful right of access to the car's interior.

C)  <u>Government wrongly concludes a gun is contraband because it appears sawed-off</u>

The Government argues that officers were entitled to seize the gun Poulin spotted because a sawed-off shotgun or sawed-off rifle is "presumptively unlawful." *See* "Response to Defendant's Motion to Suppress," (ECF No. 75, at p. 13). That is not true.

The Virginia statute in question states:

Article 6. "Sawed-Off" Shotgun and "Sawed-Off" Rifle Act.

**§ 18.2-299. Definitions.**

When used in this article:

"Sawed-off shotgun" means any weapon, loaded or unloaded, originally designed as a shoulder weapon, utilizing a self-contained cartridge from which a number of ball shot pellets or projectiles may be fired simultaneously from a smooth or rifled bore by a single function of the firing device, and which has a barrel length of less than 18 inches for smooth bore weapons and 16 inches for rifled weapons. Weapons of less than .225 caliber shall not be included.

"Sawed-off rifle" means a rifle of any caliber, loaded or unloaded, which expels a projectile by action of an explosion of a combustible material and is designed as a shoulder weapon with a barrel or barrels length of less than 16 inches or which has been modified to an overall length of less than 26 inches.

"Crime of violence" applies to and includes any of the following crimes or an attempt to commit any of the same, namely, murder, manslaughter, kidnapping, rape, mayhem, assault with intent to maim, disable, disfigure or kill, robbery, burglary, housebreaking, breaking and

JA409

entering and larceny.

"Person" applies to and includes firm, partnership, association or corporation.

**§ 18.2-300. Possession or use of "sawed-off" shotgun or rifle.**

A. Possession or use of a "sawed-off" shotgun or "sawed-off" rifle in the perpetration or attempted perpetration of a crime of violence is a Class 2 felony.

B. Possession or use of a "sawed-off" shotgun or "sawed-off" rifle for any other purpose, except as permitted by this article and official use by those persons permitted possession by § 18.2-303, is a Class 4 felony.

**§ 18.2-303. What article does not apply to.**

The provisions of this article shall not be applicable to:

(1) The manufacture for, and sale of, "sawed-off" shotguns or "sawed-off" rifles to the armed forces or law-enforcement officers of the United States or of any state or of any political subdivision thereof, or the transportation required for that purpose; and

(2) "Sawed-off" shotguns, "sawed-off" rifles and automatic arms issued to the National Guard of Virginia by the United States or such arms used by the United States Army or Navy or in the hands of troops of the national guards of other states or territories of the United States passing through Virginia, or such arms as may be provided for the officers of the State Police or officers of penal institutions.

**§ 18.2-303.1. What article does not prohibit.**

Nothing contained in this article shall prohibit or interfere with the possession of a "sawed-off" shotgun or "sawed-off" rifle for scientific purposes, the possession of a "sawed-off" shotgun or "sawed-off" rifle possessed in compliance with federal law or the possession

JA410

of a "sawed-off" shotgun or "sawed-off" rifle not usable as a firing weapon and possessed as a curiosity, ornament, or keepsake.

Under Virginia law, possession of a shotgun or rifle that has been sawed-off is not, in-and-of-itself, illegal. The Court of Appeals of Virginia clarified that the definition of a sawed-off shotgun or rifle as delineated in Va. Code § 18.2-299 is an element the Commonwealth is required to prove, rather than an affirmative defense. *See Dillan v. Commonwealth*, 28 Va. App. 340 (1998) (holding that the statutory definition of a sawed-off shotgun in § 18.2-299 required the Commonwealth to prove that the weapon possessed was at least .225 caliber as an element of an § 18.2-300(B) offense). The Virginia Court of Appeals observed that the "'Sawed-Off' Shotgun and 'Sawed-Off' Rifle Act" states in detail which weapons are prohibited, and that "[s]uch precision illustrates the legislature's intention that the fact finder examine each portion of the definition to determine whether a particular weapon falls within the purview of the Act." *Id.* at 346.

Therefore, viewing a shotgun or rifle that appears to be "sawed-off" is not an indication of contraband in Virginia, and a shotgun or rifle is not contraband merely because it is "sawed-off." Mere possession of a sawed-off shotgun by a citizen raises no presumption of an unlawful purpose. *See, e.g. Sandiford v. Commonwealth*, 217 Va. 117 (1976) (holding that presumption that possession of a sawed-off shotgun by an unnaturalized resident was unlawful violated defendant's constitutional rights) (quoting *Riley v. Commonwealth*, 213 Va. 273 (1972)).

From his view of the gun outside the window of the car at night, Poulin could not tell what the dimensions of the gun were, or even estimate the dimensions of the gun, until he opened the car door. He could not determine that the gun had been modified to an overall

JA411

length of less than 26 inches, that it had a barrel's length of less than 16 inches, or that it was originally designed as a shoulder-weapon. He could not determine that what he saw was a functioning gun. He could not see that the gun had not been registered in compliance with federal law. These characteristics do not constitute affirmative defenses to a prosecution under Va. Code § 18.2-300. Rather, they constitute the prerequisite foundation for a prosecution under the statute. None of these prerequisites were honestly apparent – even for the formulation of probable cause – from the exterior of the vehicle, prior to further inspection by officers from the interior of the vehicle, that is, outside the parameters of a plain view analysis under the law. In Virgina, ownership of a sawed-off shotgun or rifle raises no presumption of illegality. *See Sandiford, supra.*

**7.   Suppression is warranted to deter the Government's conduct.**

Since Mr. Martinez filed his Motion to Suppress in this case, the Government has produced multiple "reports of investigation" changing the officers' original reports in this case. Such re-imaginings are insincere and conflicting. Additionally, the Government failed to create body camera footage that would objectively show the traffic stop and initial interactions between Hylton and Martinez, in violation of the department's body worn camera policy. Although Hylton explained that he dropped his body camera, which could surely happen to anyone, he also failed to turn on his body camera when he initiated the stop. The footage we have shows only the events after the stop when Martinez was already handcuffed. At that point, the footage stops when Hylton apparently drops the camera. Additionally, Hylton failed to use a vehicle equipped with a dash camera, despite the fact that he was actively on patrol looking for drunk drivers on New Year's Eve. In addition, police failed to preserve the

JA412

dispatch recordings in this case despite the department policy requiring them to do so. Mr. Martinez respectfully asks the Court to consider these factors in its assessment of the Government's credibility at the suppression hearing.

Respectfully Submitted,

MARY MAGUIRE
Federal Public Defender
for the Western District of Virginia

*Heidi I. Bohn*
HEIDI I. BOHN
Virginia Bar No. 98916
Office of the Federal Public Defender
for the Western District of Virginia
210 First Street SW, Suite 400
Roanoke, VA 24011
(540) 525-8273

*Counsel for Isaac Martinez-Chavez*

JA413

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing document was electronically filed and

will be forwarded to the Office of the United States Attorney this 2nd day of January, 2025.

_Heidi I. Bohn_
HEIDI I. BOHN

JA414

**U.S. Department of Justice**
Bureau of Alcohol, Tobacco, Firearms and Explosives

**Report of Investigation**

| Title of Investigation: | Investigation Number: | Report Number: |
|---|---|---|
| MARTINEZ-CHAVEZ, Issac (Franklin County, VA) | 24-06817 | 9 |

# SUMMARY OF EVENT:

Information received regarding the vehicle (gray in color, 2007, Kia, Rondo, VIN: KNAFG526477112089), operated by Isaac MARTINEZ-CHAVEZ, involved in the traffic stop conducted by Franklin County Sheriff's Office, in Rocky Mount, Virginia, on 01/01/2024.

# NARRATIVE:

1. On 01/01/2024, Isaac MARTINEZ-CHAVEZ, a.k.a. Issac MARTINEZ-CHAVEZ (DOB: 09/16/1986; SSN 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; FB# 60663TC0), was arrested following a traffic stop by Franklin County Sheriff's Office (FCSO), in Rocky Mount, Virginia. Law enforcement (LE) identified MARTINEZ-CHAVEZ to be the operator and sole occupant of the vehicle. LE identified the vehicle as a gray in color, 2007, Kia, Rondo, VIN: KNAFG526477112089 ("KIA"). The Virginia Department of Motor Vehicle (DMV) recorded the registered owner of the vehicle as Maria Rodriguez CASTILLO with a customer address of 175 Samuel Ln, Rocky Mount, VA 24151, see attached DMV registration and title information.

2. On that same date, LE requested the vehicle be towed due to evidence that the vehicle was improperly registered. According to the FCSO dispatch report, Cooke Towing and Recovery responded to the scene and towed the vehicle at the reqeust of LE, see attached report.

3. The Virginia licenses plate affixed to the vehicle at that time was VYC3195. The registration associated with VYC3195 was identified by DMV as a white in color, 2001, Subaru, 4 door, VIN: 4S3BH645617306249 ("SUBARU"). The registered owner associated with VYC3195 was recorded by DMV as Maria Julia CHAVEZ MENDOZA with a customer address of 3319 Oliver Rd. NE, Roanoke, VA 24012, see attached DMV registration and title information. *(Agent Note: Correction made from ROI 1. Vehicle license plate VYC 3159 was queried in error, due to a typo concerning the last two numbers inverted (59). The information obtained related to that query, associated with a four (4) door Lexis, is believed to be unaffiliated to this investigation.)*

4. On 10/01/2024, SA Moody observed the SUBARU parked in front of 175 Samuel Ln, Rocky Mount, VA 24151, see attached photos.

| Prepared by: | Title: | Signature: | Date: |
|---|---|---|---|
| Adam Moody | Special Agent | | 10/07/2024 |
| Authorized by: | Title: | Signature: | Date: |
| Keith Teehan | RAC | | 10/07/2024 |
| Second Level Reviewer (optional): | Title: | Signature: | Date: |
| | | | |

ATF EF 3120.2 (10-2004)
For Official Use Only

JA415



**U.S. Department of Justice**
**Drug Enforcement Administration**

Mid-Atlantic Laboratory

Largo, MD

| | **Chemical Analysis Report** |
| --- | --- |

ATF - Roanoke Office
310 First Street, Suite 500
Roanoke, VA 24011

**Case Number:** 24-06817
**LIMS Number:** 2024-SFL3-01972

## Observations, Results and Conclusions:

| Exhibit | Substance(s) Identified | Net Weight | Substance Purity | Amount Pure Substance |
| --- | --- | --- | --- | --- |
| 4 | Methamphetamine | Residue | ---- | ---- |

**Remarks:**

The net weight represents the weight of all material, excluding the packaging.

## Exhibit Details:

**Date Accepted by Laboratory:** 03/25/2024          **Gross Weight:** 150.7 g                    **Date Received by Examiner:** 12/05/2024

| Exhibit | No. Units | Pkg. (Inner) | Form | Reserve Wt. |
| --- | --- | --- | --- | --- |
| 4 | 1 | Pipe | Residue | Residue |

**Remarks:**

## Exhibit Analysis:

**Sampling:**

Methamphetamine identified in 1 unit(s) tested.

| Exhibit | Summary of Test(s) |
| --- | --- |
| 4 | Gas Chromatography/Mass Spectrometry, Marquis Color Test |

The following summary of testimony is provided as required by Federal Rule of Criminal Procedure 16(a)(1)(G) and is a complete statement of my opinions, which are exclusive to and address only the exhibit(s) identified in this summary. I am employed by the U.S. Department of Justice, Drug Enforcement Administration (DEA) and was so employed when I conducted the examinations and analyses of the above referenced LIMS number. My qualifications to conduct the examinations and analyses, and to express an opinion as to the identity of the material contained in the exhibit(s) described above, are based on my knowledge, skill, experience, training, and education. See my Curriculum Vitae (which will be provided prior to the close of expert discovery) for additional information regarding my qualifications, including previous testimony offered in the last four years and any publications authored in the last ten years. The opinions described are based on the listed chemical, physical, and instrumental analyses, the results generated by those analyses, and my interpretation of those results set forth in the laboratory report and analyst notes. The manner and process by which I performed the analyses were, to the best of my knowledge, in accordance with the publicly available Analysis of Drugs Manual (ADM) and Laboratory Operations Manual (LOM), in effect at the time of analysis. These are generally available at: https://www.dea.gov/resources/documents?f%5B0%5D=publication_type%3A2596, or were otherwise disclosed upon request. I analyzed the material contained in the exhibit(s) which were submitted for analysis in the above referenced LIMS number. Refer to this laboratory report associated with the subject LIMS number. The analytical methods used in these analyses are validated and verified according to our quality assurance policy to ensure the methods are reliable and fit-for-purpose and the techniques utilized are widely accepted and employed in the scientific and forensic community. Summaries of instrumental methods are available at: https://www.dea.gov/resources/documents?f%5B0%5D=publication_type%3A2596. This report, its attachments, and the referenced documents are not an exhaustive or complete recitation of testimony that I may offer. In addition, I may offer opinions in response to questions posed during trial. Pursuant to Fed. R. Crim. P. 16(a)(1)(G)(v), I, the analyst, approve the foregoing disclosure, and reserve the right to amend as necessary to comply with Rule 16's obligations.

The terminology used in the preparation of this report is consistent with the current Department of Justice Uniform Language for Testimony and Reports for General Forensic Chemistry and Seized Drug Examinations.

**Analyzed By:** /S/ Rebecca J. Wang, Senior Forensic Chemist          **Date:** 12/12/2024
**Approved By:** /S/ Christine A. Haddix, Senior Forensic Chemist          **Date:** 12/13/2024

JA416

Text communication between SAUSA Juan Vega and Lieutenant Justin
Hylton (with ATF SA Adam Moody copied)
December 26, 2024



**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**


**CRIMINAL MINUTES - MOTION HEARING**


Case No.:  **7:24CR00011-001**          Date:  **1/3/2025**

Defendant:  **Isaac Fidel Martinez-Chavez, custody**          Counsel:  **Beatrice Diehl,  Heidi Bohn - FPD**


TIME IN COURT:  11:58-12:58, 1:06-2:37, 2:53-4:26, 4:28-4:59   4h 35m

PRESENT:      JUDGE:                  Michael F. Urbanski, SUSDJ
              Deputy Clerk:           Kristin Ayersman
              Court Reporter:         Mary Butenschoen
              U. S. Attorney:         Juan Vega, Matt Miller
              USPO:                   Brittany Davis via courtroom audio
              Case Agent:             Adam Moody, ATFE
              Interpreter:            Peter Floyd, sworn and used


**WITNESSES:**

| GOVERNMENT | DEFENDANT |
|---|---|
| 1.  Lt. Justin D. Hylton, Franklin County Sheriffs Office | 1. |
| 2.  Officer Trey A. Poulin, Franklin County Sheriffs Office | 2. |
| 3. | 3. |
| 4. | 4. |


**PROCEEDINGS:**

ECF 59 Motion to Suppress
No objection from parties to Judge Urbanski conducting this hearing.  The motion was referred by the presiding judge.
Opening statements by USA.
FPD moves to exclude witnesses, granted.
FPD opening statement.
USA calls Lt. Hylton, sworn.
USA moves in all exhibits filed under ECF 59, 75, 81 for the purposes of this motion– admitted without objection.
ECF 59-4 portions played (identified on video as Exhibit 3 Officer Hylton BWC).
ECF 75-4/US 4 – translated statement, no obj to translation by FPD.
ECF 75-7/US 7 - dfts driving record
ECF 81-4 – GO4_Sgt Johnson BWC 01012024_FULL_ns - video 1/1/24 Sgt Johnson BWC (not filed in ECF, disc filed prior to hearing)
Recess 12:58


JA418

Reconvene 1:06
Cross.
Dft Ex 1 – paper report not on ECF, m/r.
Video FSCO Justin Hylton BWC – also ECF 59-4.
Redirect.
USA calls Officer Poulin, sworn.
ECF 59-5 - Exhibit 4 Officer Poulin BWC.
ECF 75/US 8 – photo.
Cross.
ECF 59-5 – Exhibit 4 Trey Poulin BWC2-105751.mp4
Redirect.
USA rests.
Dft does not have any evidence.
Recess 2:37
Reconvene  2:53
Argument from the parties.
Recess 4:26
Reconvene 4:28
Court rules on the record denying motion, as stated, and will follow up with a written order.
JT set for 1/22-24/25.

JA419

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

**UNITED STATES OF AMERICA,**

                                **CASE NO: 7:24-cr-00011**
          Plaintiff,            January 3, 2025
                                Roanoke, VA
-v-                             Motion Hearing - (Excerpt)
                                Testimony and Ruling
**ISAAC FIDEL MARTINEZ-CHAVEZ,**

                                Before:
                                **HONORABLE MICHAEL F. URBANSKI**
                                U.S. DISTRICT COURT JUDGE
          Defendant.            WESTERN DISTRICT OF VIRGINIA
***************************************************************

APPEARANCES:

For the Plaintiff:

     **MATTHEW M. MILLER**
     **JUAN L. VEGA**
     United States Attorneys Office
     310 First Street, S.W. Room 906
     Roanoke, VA 24008
     540-857-2250
     matthew.miller2@usdoj.gov
     juan.vega2@usdoj.gov

For the Defendant:

     **BEATRICE DIEHL**
     **HEIDI BOHN**
     Office of the Federal Public Defender
     Western District of Virginia
     210 First Street SW, Suite 400
     Roanoke, VA 24011
     540-777-0891
     beatrice_diehl@fd.org
     heidi_bohn@fd.org

_____
                  Mary J. Butenschoen, RPR, CRR
               210 Franklin Road, S.W., Room 540
                   Roanoke, Virginia  24011
                   540-857-5100, Ext. 5312

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY; TRANSCRIPT
PRODUCED BY COMPUTER.

I N D E X

**WITNESS NAME**                                                              **PAGE**

For the Government:

**LIEUTENANT J.D. HYLTON**

  Direct Examination By Mr. Vega ............................. 4

  Cross-examination By Ms. Diehl ............................ 36

  Redirect Examination By Mr. Vega.......................... 72

**OFFICER TREY POULIN**

  Direct Examination By Mr. Vega ............................. 75

  Cross-examination By Ms. Diehl ............................ 86

  Redirect Examination By Mr. Vega.......................... 101

E X H I B I T S

**NUMBER**                                                                   **PAGE**

For the Government:

Exhibits to ECF 59, 75, and 81                                  16

For the Defendant:

1                                                               44

JA421

(Proceedings commenced 11:58 a.m.)

THE COURT:  Good morning.

COUNSEL:  Good morning.

THE COURT:  Ask the clerk to call the case.

THE CLERK:  All right.  This is the *United States of America v. Isaac Fidel Martinez-Chavez*, Criminal Action Number 7:24-cr-11, Defendant 1.  And the interpreter has been sworn.

THE COURT:  Okay, great.

(Proceedings not attached)

THE COURT:  All right.  Let's ask the government to call your first witness.

MR. VEGA:  Yes, Your Honor.  Lieutenant Hylton, please.

THE COURT:  Okay.  When Lieutenant Hylton comes up, if -- I don't know whether it's -- is it -- what's your title?  Is it Detective or Officer Poulin?  Is it Officer Poulin?

MR. POULIN:  That's correct.

THE COURT:  Officer Poulin, if you would step out while Lieutenant Hylton is testifying, that will be helpful.  Thank you.

Come on up and be sworn, sir.

THE CLERK:  If you will raise your right hand.

J.D. HYLTON, CALLED BY GOVERNMENT, SWORN

THE WITNESS:  Yes, ma'am, I do.

THE CLERK:  Thank you.

JA422

THE COURT:  Come on up and have a seat.

THE WITNESS:  Thank you, sir.

THE COURT:  Good afternoon.

THE WITNESS:  Good afternoon, Judge.

Thank you, ma'am.

THE CLERK:  Uh-huh.

DIRECT EXAMINATION

BY MR. VEGA:

Q    Hello, Lieutenant Hylton.

A    Hello, sir.

Q    Will you please identify yourself for the record?

A    Yes, sir.  Lieutenant J.D. Hylton, Franklin County
Sheriff's Office.

THE COURT:  Hold on a second.  If the interpreter
would like to move wherever you want to best provide the
interpretation, you may do so.

THE INTERPRETER:  Thank you, Your Honor.

BY MR. VEGA:

Q    Lieutenant Hylton, who do you work for, please?

A    Franklin County Sheriff's Office.

Q    And were you on duty on January 1, 2024, approximately
12:05 in the morning?

A    I was, Your Honor.

Q    And in uniform displaying your badge authority?

A    Similar to the uniform I'm wearing now minus the tie.

Hylton - Direct                                                          5

This is our nighttime uniform, black pants, black long-sleeve shirt.

Q    What drew your attention to the defendant, Mr. Martinez-Chavez?  What first drew your attention to him that evening?

A    The speed of the vehicle.

Q    Where were you?

A    South Main Street just outside the Town of Rocky Mount.  I had just left our sheriff's office when I encountered that vehicle.

Q    And this is in Virginia, right?

A    Yes, Your Honor.

Q    When you see the vehicle, do you remember the type of vehicle?

A    It was a silver Kia sedan.

Q    And can you tell us in what direction it was traveling compared to you?

A    By the opposite direction.  I was headed south.  That vehicle was headed north.  It's still South Main Street, but it was heading north on South Main Street, Your Honor.

Q    And what is the posted speed limit there?

A    45.

Q    And were you able to determine his speed?

A    It was 60 by radar.

Q    60 miles per hour?

JA424

A     Yes, Your Honor.

Q     And what action did you take when you clocked him at 60?

A     I just noticed the vehicle speeding.  After leaving the sheriff's office after midnight, I was hoping to find, maybe, a DUI driver.  I wasn't going to stop him just based off of his speed, but there were no other vehicles in the area so I decided to turn around and follow him just to establish -- to see the driving behavior to see if there was any -- maybe any impairment.

Q     And when you turned around to follow him, what did you observe next?

A     After I had turned around, he had already gotten out of my sight.  So by the time I had caught up to him, to me it appeared that he was still traveling in excessive speed and made some distance away from me.

Q     Were you able to close the distance?

A     I was.

Q     And what did you see him do?

A     When I got the vehicle, or what I thought to be the vehicle back in sight again, the only vehicle that I had seen after leaving the sheriff's office, the vehicle had appeared to have turned on Scuffling Hill Road off of South Main Street.  It's a four-way intersection there, and it was traveling up Scuffling Hill Road.

          THE COURT:  How do you spell Scuffling?

JA425

THE WITNESS:  S-C-U-F-L- -- F-F-L-I-N-G, Your Honor.

THE COURT:  Scuffling Hill Road, okay.

THE WITNESS:  Yes, Your Honor.

BY MR. VEGA:

Q    Once on Scuffling Hill Road, what happened there?

A    I continued to try to catch up to the vehicle.  We made our way up Scuffling Hill.  I guess approximately the entire distance from the turn would be maybe a mile.  At one point I saw the lights on the vehicle go out.  And with the speed and the distance, I decided to make a stop because at that point I felt like maybe the vehicle was trying to not be in my presence.

THE COURT:  When you saw the lights on the vehicle turn off -- you used the word "go out" -- where was that vehicle located?

THE WITNESS:  On the roadway still traveling up Scuffling Hill Road, Your Honor.

THE COURT:  So it's obviously after dark.

THE WITNESS:  Yes, Your Honor.

THE COURT:  Dark outside.  And so you see the car turn its light off, and at that point the car is still on Scuffling Hill Road.

THE WITNESS:  Yes, Your Honor.

THE COURT:  All right.  Go ahead.

JA426

BY MR. VEGA:

Q    And Scuffling Hill Road is a public highway in Virginia?

A    Yes, Your Honor, it is.

Q    At that point did you activate your emergency lights?

A    Shortly after that.  I had just come around a turn when I saw him turn his lights off.  It takes a moment to reach down again.  I was traveling with some speed.  The switch is on my console beside my leg, but, yes, it was shortly after that that I activated by lights.

Q    So a matter of seconds.

A    Yes, Your Honor.

Q    And then what happened?

A    That vehicle turned onto Highview Terrace.  I continued to Highview Terrace.  When I got on Highview Terrace, I saw the vehicle, got behind it with my lights activated.  It was already stopped in the grass at the residence there.

Q    And Highview Terrace, that's another public road or public highway in Virginia?

A    It is, Your Honor.

        THE COURT:  Well, if he's got his lights out, how can you see him?

        THE WITNESS:  I was closing in on him, Your Honor.

        THE COURT:  But he didn't have his lights on, right?

        THE WITNESS:  No, Your Honor, correct.

        THE COURT:  Okay.

JA427

BY MR. VEGA:

Q    Did you have your headlights on?

A    Yes, Your Honor.

THE COURT:  Did -- when you turned on your blue lights, did your -- does that activate your car's camera?

THE WITNESS:  As a patrol lieutenant, Your Honor, I didn't have an in-car camera system in my vehicle, just a body-worn camera.

THE COURT:  Okay.

THE WITNESS:  None of the patrol lieutenants had the in-car cameras because our primary function wasn't necessarily patrol duties and answering calls for service.  It was more supervisory.

BY MR. VEGA:

Q    Lieutenant Hylton, do me a favor.  If you are addressing me, please call me "Mr. Vega" or "sir," because we've got a transcript here, and if you are addressing -- if the Court asks you a question, then you can say "Your Honor."  That way we have a clear record in the transcript.

A    Yes, sir.

Q    Thank you.

You mentioned that the defendant then pulled into a -- pulled into a residence; is that right?

A    Yes, sir.

Q    Did he park in the driveway or -- or where?

A    In the yard.

Q    Was it at an angle or just did he pull in like -- pull in straight?

A    Kind of a slight angle right beside the driveway.  There were other vehicles in the driveway.

Q    And what happened next?

A    The driver's side door was open, and I saw the driver of the vehicle was leaning into the passenger side of the car.

Q    We'll pause there.

THE INTERPRETER:  Excuse me.  The interpreter did not hear that, Your Honor.  Could the interpreter please ask for a repetition.

THE COURT:  Yes, thank you.

Could you please repeat your last answer.

THE WITNESS:  Yes, Your Honor.  I saw the driver of the vehicle leaning into the passenger side of that car.

BY MR. VEGA:

Q    Lieutenant Hylton, did you maintain a visual of that car from the moment that you started following it?

A    From the time I got to Scuffling Hill Road, yes, sir.

Q    From the moment that you turned around to start following him?

A    No, sir.  By the time I saw the vehicle at Scuffling Hill Road, I maintained sight of it until we got right to Highview Terrace when it turned off.

JA429

Hylton - Direct                                              11

Q    So you go from South Main Street onto Scuffling Hill Road; is that right?

A    Yes, sir.

Q    Can you tell us how far from the corner of South Main Street on Scuffling Hill Road that you saw -- you made visual again with the defendant?

A    It was right there at the store area, which is right at the intersection.  It's a four-way intersection.  So you have -- once you come down South Main Street, maybe a tenth of a mile distance that you can see the store on South Main Street.  That's how I knew that was the direction that I needed to go if I was to follow that vehicle.  Again, there was no other vehicles, and that was the only one I saw going up Scuffling Hill.  Had I not seen it, I could have kept going South Main Street, turned on Orchard Avenue.

Q    Did you see the defendant stop at any point besides this residence?

A    No, sir, I didn't.

Q    Did you see anybody jump out or get out?

A    No, sir.

Q    And based on the speed of the car, it had been -- made sense for anybody to jump out?

A    No, sir.

Q    All right.  Let's go back to what you -- you were testifying to before, that the driver's side was -- door was

JA430

open and you saw the driver leaning toward the -- what was it, the front passenger area?

A    Yes, sir.

Q    And do you have a spotlight on him?  Is that how you were able to observe this?

A    Yes, sir.  There's one mounted to the driver's side on the column of the car.

Q    Okay.  So tell us what happened next.

A    I got out of my patrol vehicle and began giving him commands to step out from the vehicle.

Q    And did you draw your service weapon?

A    Yes, sir, I did.

Q    Why?

A    With the behavior that I felt that he was trying to get away from me, when I observed him reaching into the passenger side of the vehicle, I thought that he could be going for a weapon, and I wanted to eliminate that opportunity of one of us getting hurt.

Q    What happened next?

A    After a brief moment, he -- he stepped back.  He kept looking towards the car.  Eventually he stepped back to the vehicle, complied with my commands, and I detained him.

Q    When you say he stepped back, you mean he exited his car?

A    Yes, sir, to the rear of the car.

Q    You mentioned that he kept looking back.  Can you elaborate on that?

A    Just kind of glancing back towards the vehicle.

Q    And was his car door still open?

A    It was, yes, sir.

Q    What about his hands?  What can you tell us about his hands?

A    I didn't see anything in his hands.  Once he -- he came out of the car, he kind of reached in his pockets a little bit, and I told him to show me his hands.  And again, he -- a brief moment he complied; stepped back to the rear of his vehicle.  There was no -- no issues.

Q    Did you have to tell him numerous times to -- for him to show you his hands?

A    I believe I told him a couple of times to show me his hands.

Q    Did you at any point tell him that he would be shot?

A    I did.

        THE INTERPRETER:  Excuse me, Your Honor.  The interpreter did not hear the question.

        THE COURT:  Could you repeat the question and then we'll have the answer again.

        MR. VEGA:  Yes, Your Honor.

BY MR. VEGA:

Q    Did you at any point tell the defendant that he would be

JA432

shot if he did not show you his hands?

A    Yes, sir.

Q    You mentioned that he then stepped back to the rear of his car; is that right?

A    Yes, sir.

Q    And then at that point what did you do?

A    I approached him, and I was able to place him in handcuffs and detain him.

Q    Now, Your Honor -- the Court asked about a body-worn camera and the patrol vehicle activating body-worn camera. You did have that body-worn camera that day, right?

A    Yes, sir.

Q    But were you driving a patrol squad car without an in-car system?

A    I was.

Q    And can you explain to the Court what is an in-car system?

A    So the body-worn camera will -- they kind of work in sync, Your Honor. As you were explaining, the body-worn camera and the in-car camera, when it's working correctly, when you activate the lights, that entire system will activate. The body-worn camera is synced to the in-car camera by a docking station. So the way our in-car cameras are set up are by the emergency equipment activation or a speed activation. If our patrol cars hit 75 miles an hour, our body -- our in-car

cameras will also activate. Again, just -- it's a safety feature for us. It helps slow the guys down. They don't want the camera coming on. But in the event they are in a high speed, they don't have to worry about manually turning the camera system on.

Q    But in this case you had to manually turn it on?

A    That's correct. Actually, the only thing that I have in my car is a docking station. I don't have the equipment that will transfer data into the -- I guess our cloud system at the sheriff's office. So I dock mine in the car to charge it, or I have to manually take it into the sheriff's office into a docking station to download it from there.

Q    Okay. Lieutenant Hylton, we're going to go over your body-worn camera footage, which is under ECF Number 59, which is the defendant's motion to suppress. So this is actually Defendant's Exhibit. It is labeled Exhibit 3, but it's filed under 59-4.

MR. VEGA: Your Honor, at this time I do move into evidence all of the exhibits under ECF 59, which is the defendant's motion to suppress; as well as 75, which is the government's first response; and 81, which is the defendant's reply to the government's response.

THE COURT: Well, why don't we just take it exhibit by exhibit, okay? And so why don't we -- do you want --

Well, does the defense have any objection to that?

I'm happy to consider it all.

MS. BOHN: No, Your Honor. We thought it was already in evidence.

THE COURT: Okay. I'll admit all of the -- without objection, I'll admit all of the exhibits to ECFs 59, 75, and 81.

MR. VEGA: Thank you, Your Honor.

THE COURT: Thank you. But this one we have in front is Exhibit 3 to ECF 59, right?

MR. VEGA: It is labeled Exhibit 3, but it's under 59-4.

THE COURT: Okay. All right.

MS. BOHN: Your Honor, I just wanted to clarify that this is entered into evidence just for the purposes of this motion; is that correct?

THE COURT: Yes, for the purposes of this motion.

MS. BOHN: Super. Thank you, Judge.

(Government Exhibits to ECF 59, 75, and 81 admitted).

BY MR. VEGA:

Q    Lieutenant Hylton --

MR. VEGA: For the record, I'm pressing play.

And can we have the audio up, please?

(Video Played)

MR. VEGA: And I'm pausing it at 0 with 7 seconds.

JA435

Hylton - Direct                                                17

BY MR. VEGA:

Q    First of all, is this the first time that you turned on your body-worn camera?

A    Yes, sir.  That beep indicates the power activation on.

Q    Okay.  And were you taking cover behind your squad car at the time?

A    Behind the door, yes, sir.

Q    And at this -- at this point did you have your -- your gun drawn?

A    I did, yes, sir.

Q    And you mentioned earlier that the defendant had parked the silver Kia somewhat sideways on the grass.  Is that what we're looking at here?

A    Yes, sir, it is.

Q    And is that the defendant with his hands on the back of the Kia?

A    Yes, sir.

Q    And at this point have you made any physical contact with him?

A    No, sir, not yet.

Q    So he does not have any handcuffs at this point?

A    No, sir, he doesn't.

Q    So I am playing it now.

        (Video Played)

BY MR. VEGA:

JA436

Q    Pausing it at 11 seconds.  What just happened?

A    My body camera fell from its mount, from its mounting plate on my vest.

Q    Did you turn it off?

A    No, sir, I didn't.

Q    Did you deactivate it?

A    No, sir, I didn't.

Q    In fact, is it still recording the dark ground?

A    It is, yes, sir.

Q    And does it actually capture the noise from the squad car engine?

A    Yes, sir.

Q    And does it capture -- although it's very faint, does it capture some conversation that you had with the defendant?

A    Yes, sir.

Q    I will just ask you to listen very carefully, please.

          (Video Played)

BY MR. VEGA:

Q    Was that you saying "Hands on the car"?

A    Yes, sir.

          (Video Played)

BY MR. VEGA:

Q    Now just forward it to 57 seconds, and I'm going to let it play.  Listen again very carefully, please.

          (Video Played)

Hylton - Direct                                             19

BY MR. VEGA:

Q   Do you recall what you told him during that time and what you asked him and what he said back to you?

A   I asked him how much he had to drink, and he had told me one beer.

Q   And then listen again.

(Video Played)

BY MR. VEGA:

Q   What did you just say?

A   "Do you have any ID on you?"

Q   Did he have any identification on him?

A   He had a Mexico-issued identification.

Q   Did he have a valid driver's license on him?

A   No, sir.

Q   I'm going to fast-forward it now to when you pick up your body-worn camera.

(Video Played)

BY MR. VEGA:

Q   Okay.  So at this point your body-worn camera is back on your vest; is that right?

A   Yes, sir.

Q   And that's the -- it's just you and the defendant right there talking?

A   Yes, sir.

Q   And the gentleman that we're calling the defendant, is it

Hylton - Direct                                                    20

this gentleman over here in the courtroom today with the green

and the white?

A    Yes, sir.

Q    Now we're at 2 minutes and 36 seconds.  Please listen

carefully to what the defendant says to you.

         (Video Played)

BY MR. VEGA:

Q    Did you hear him say "I only come in fast like that

because I" --

A    I -- I couldn't --

Q    You couldn't hear?

A    I didn't pick that up what he was saying, and I can't

really understand it from the audio.

Q    Okay.  Let me just play that one more time, and I'll just

ask you to pay attention, please.

         (Video Played)

BY MR. VEGA:

Q    Did you hear him say "I was coming fast like that"?

A    Yes, sir.

Q    Now, shortly after this a male came out of the residence;

is that right?  Or came out of somewhere?

A    From the direction of the residence, yes, sir.

Q    Okay.  And there was a conversation between the defendant

and this male?

A    Yes, sir.

Q    And was that in Spanish?

A    Yes, sir.

Q    And you don't speak Spanish, do you?

A    No, sir, I don't.

Q    But the -- did that cause you to then interact with this male?

A    It did.

Q    2 minutes and 48 seconds, and I'm playing it for the Court.

        (Video Played)

BY MR. VEGA:

Q    Okay.  A couple of things here.

    Tell us what you observed with regard to this male that night.

A    When he started talking to Mr. Chavez, he began to approach the driver's side of the car.  He wasn't involved in my stop, so once I saw him approaching it I didn't know what the conversation was.  Again, I was there by myself.  I wasn't going to allow him to be involved in my investigation.

Q    You testified earlier that the driver's side door was open; is that right?

A    Yes, sir.

Q    And this male, did he approach from the driver's side? Was he toward the driver's side or was he toward the passenger side?

A    The driver's side.

Q    And what if anything did you see him try to do?

A    Just to approach the car.  I didn't see him with anything. Again, I was -- I was there by myself, so my safety awareness was, you know, pretty elevated, especially when somebody else is there in my investigation.  But I didn't see him mess with anything.  And he complied once I told him to back -- back away.

Q    And you said that you were on alert because you were there by yourself?

A    Yes, sir.

Q    Did you observe his hands to see whether he had anything in his hands?

A    I -- I didn't see anything, yes, sir, and I looked.

Q    You did not see anything in his hands.

A    Correct.

Q    Did you see him put anything in the car?

A    No, sir.

Q    Did you see him remove anything from the car?

A    No, sir.

Q    Did you see him close the car door?

A    No, sir.

Q    But later on we'll see that the car door was actually closed, right?

A    Correct.

Hylton - Direct                                                        23

MR. VEGA:  And Your Honor, at this point we're briefly showing ECF Number 75, which is the government's response, Government Exhibit 4, which is a translation and transcription that has been stipulated by the defense as -- as proper.  And the English translation, just for the record, is -- this is the defendant talking to this male friend and he says, "Hey, man.  Come hear, man.  Close the car, yes?  Come here.  Close it.  Close it.  There's a key, man.  Close them, the windows, man.  Please.  Close them.  It's that I was coming fast, man.  Close it, man.  Please.  Close it.  Right now close it."

THE COURT:  Is there any objection to that translation of that from the defense?

MS. BOHN:  We don't object to the translation. That's all.

THE COURT:  Thank you.

BY MR. VEGA:

Q    And Lieutenant Hylton, you were giving dispatch some identifying information from Mr. Martinez, right?

A    Yes, sir.

Q    Did you have to stop what you were doing, your conversation with dispatch, to address this male?

A    I did.

(Video Played)

BY MR. VEGA:

Q    So we're about at 3 minutes and 45 seconds, and you were talking to somebody; is that right?

A    That's correct.

Q    And Officer Poulin, was that the first officer at the scene?

A    Yes, sir.

Q    And he was there with Sergeant Johnson; is that right?

A    Yes, sir.

Q    And then you proceed to tell him that -- what happened with regard to the traffic offenses, right?

A    Yes, sir.

         (Video Played)

BY MR. VEGA:

Q    At this point it looks like in the video that you were making your way toward the silver Kia, right?

A    Yes, sir.

Q    And was the defendant left back with Sergeant Johnson?

A    He was, yes, sir.

Q    And then Officer Poulin, was he on the passenger side of the vehicle?

A    Yes, sir.

Q    And is that you with the flashlight shining inside?

A    Yes, and that's my body camera.

         (Video Played)

         THE COURT:  So now that door is shut.

Hylton - Direct                                          25

THE WITNESS:  Yes, Your Honor.

THE COURT:  I'm sorry, let's be clear.  At this point when you approach, the driver's side door is shut, correct?

THE WITNESS:  Yes, Your Honor.

THE COURT:  But when you first got there the driver's side door was open.

THE WITNESS:  Correct, Your Honor.

THE COURT:  Do you know how the driver's side door got shut?

THE WITNESS:  No, sir, I don't.

THE COURT:  Go ahead, Mr. Vega.

MR. VEGA:  Yes, sir.

THE COURT:  I'm sorry to interrupt.

MR. VEGA:  No.  Please, anytime.  It's your courtroom.

BY MR. VEGA:

Q    Why are you flashing your light into the front area of the car?

A    I'm looking to see what's in it.

Q    Who said, "There's a fucking gun in here, man"?

A    That was Officer Poulin.

(Video Played)

BY MR. VEGA:

Q    I'm pausing it at 4 minutes and 50 seconds.

Did you just unlock the passenger side door for Officer

JA444

Poulin?

A    Yes.

Q    And we just heard you say, "Yeah, go ahead."  Who were you talking to?

A    Can you play that again?

Q    Sure.

(Video Played)

BY MR. VEGA:

Q    Was that the dispatcher saying that the defendant was wanted by Montgomery County for a felony probation violation for dangerous drugs?

A    Yes, sir.  Both times I said "go ahead" was to dispatch. The beep that you hear is when I key up the microphone extension to my radio.

Q    So just as you unlooked the car door for Officer Poulin, that's when dispatch beeped you in and you said "go ahead," right?

A    Yes, sir.

Q    When you heard that there was a warrant for the defendant for felony probation violation, what did you assume with regard to his status as a felon?

A    That he'd already been convicted of a felony.

Q    And you later verified that?

A    Yes, sir.

Q    And we'll get into that verification in a moment.

JA445

(Video Played)

BY MR. VEGA:

Q    I'm pausing at 5 minutes and 40 seconds.

Did you follow up on that warrant for his arrest out of Ohio?  Do you know anything about that?

A    No, sir, it's a nonextradition.  So, I mean, whenever we get those there's no need to even look into them.  They are not going to do anything with them.

Q    Okay.

(Video Played)

BY MR. VEGA:

Q    You just asked dispatch "if you have his information run a criminal history too" because you have a firearm on him; is that right?

A    Yes, sir.

Q    And why did you ask for criminal history?

A    To verify.

Q    And is that -- is that required before you go before the magistrate?

A    It is.  Whenever we take someone, whether we're -- if I just arrested him for the outstanding warrant, the magistrate still wants the criminal history when they conduct the bond hearing for that subject.

Q    And up to this point, the front passenger door is -- is open now, yes?

A    Yes, sir.

Q    But nobody has touched any firearm, correct?

A    Not -- not that I'm aware of.

Q    And nobody has seen that second firearm, that smaller revolver, right?

A    No, sir.

(Video Played)

BY MR. VEGA:

Q    Okay.  Is that Officer Gardner?

A    Yes, sir.

Q    And did you just hear him say, "He's got two guns"?

A    Yes, sir.

Q    And is that the first time that you learned that he has two guns?

A    Yes, sir.

Q    And just to be clear, that was after that you learned that there was a warrant for his arrest on a felony probation violation, yes?

A    Yes, sir.

Q    And eventually there was a search incident to arrest Mr. Chavez where officers recovered a glass smoking device; is that right?

A    Yes, sir.

Q    And did -- did you put that glass smoking device into the property room in the Franklin County Sheriff's Office?

JA447

A    It was placed in there.

Q    Was that Officer Wade?

A    Yes, sir.

Q    And are you aware that the ATF took that glass smoking device and sent it to the DEA lab for analysis?

A    Yes, sir, I am.

        (Video Played)

BY MR. VEGA:

Q    Now was that Officer Poulin that you were talking to?

A    Yes, sir.

Q    And in the video you were telling him that "His buddy came out of the house and he tried to get in the car."

        Do you recall that?

A    Yes, sir.

        (Video Played)

BY MR. VEGA:

Q    And was that you confirming to Officer Poulin and Officer Gardner what you had seen?

A    Yes, sir.

Q    And now I'm skipping it to 8 minutes and 42 seconds.

        And did you -- did you search the trunk of the car?

A    Yes, sir.

Q    And that's what we're seeing here; is that right?

A    Yes, sir.

        (Video Played)

BY MR. VEGA:

Q    Do you recall who said that, "Get inside, man, go inside"?

A    That's Officer Poulin.

Q    Did you see the people that he was talking to?

A    I didn't.

         (Video Played)

BY MR. VEGA:

Q    Okay.  I'm pausing it at 9 minutes and 27 seconds.

     This is obviously your body-worn camera.  Is this the glass smoking pipe right in the middle of the body-worn camera?

A    Yes, sir, right -- right there beside the lighter.

Q    And that's on the hood, right?

A    Yes, sir, of my patrol car.

Q    And is this the one that was recovered off of his person?

A    Yes, sir, I believe that's the one that Deputy Wade took off of him.

Q    And did it have residue in it?

A    Yes, sir.

         (Video Played)

BY MR. VEGA:

Q    So you -- you mentioned that you searched the trunk.  Did you find another glass smoking device in the trunk?

         THE COURT:  All right.  Counsel approach.

JA449

(Discussion off the record)

BY MR. VEGA:

Q    Lieutenant Hylton, you mentioned that you found another glass smoking device?

A    Yes, sir, I did.

Q    Where was it?

A    In the back of the car in the -- the hatch compartment.

Q    And at minute 10 with 37 seconds, are you -- what's going on here in the video?

(Video Played)

THE WITNESS:  I believe that's where I was placing it on the hood.

BY MR. VEGA:

Q    Say it again, please?

A    Placing the other smoking device on the hood.

Q    And how does that smoking device that you found in the truck compare to the smoking devise that was on his person?

A    There was no residue in that one.

Q    Were they comparable?  Did they look the same?

A    Same design, yes, sir.

MR. VEGA:  Your Honor, I think we can skip some more of these questions that I have that were repetitive.

BY MR. VEGA:

Q    Lieutenant Hylton, did you throughout the rest of your body-worn camera footage, did you inform the other officers

Hylton - Direct                                                        32

about the defendant's driving conduct that night?

A    I believe I did, yes, sir.

Q    And you also informed the other officers about what you had seen him do when you shown the spotlight into his car?

A    Yes, sir.

Q    Did you at some point learn that the license plate on the silver Kia belonged to a different car?

A    Yes, sir.

Q    Did you at some point learn that the defendant's driver's license was revoked?

A    Yes, sir.

MR. VEGA:  Your Honor, right now I'm showing the Court ECF Number 75, Government Exhibit Number 7, which is the defendant's driving record showing that his status is revoked due to driving under the influence of drugs under 18.2-266 for a period of three years starting in -- on the 24th of February, 2023.  Therefore, on the 1st of January, 2024, he was under a revocation.

BY MR. VEGA:

Q    Did you leave Officer Poulin behind for -- to supervise the towing of the truck?

A    Yes, sir, I did.

Q    And was there an inventory conducted of the car?

A    No, sir, there wasn't.

Q    And before it was towed, did you and the other officers

JA451

search the car?

A    Yes, sir, we did.

Q    And besides the smoking device that you found in the trunk, did you find anything else that is noteworthy?

A    No, sir.

Q    Lieutenant Hylton, having seen the sawed-off rifle in plain view on the floor in the Kia, would you have conducted -- conducted --

MS. BOHN:  Objection leading, Your Honor.

THE COURT:  I'll sustain the objection.  Let's -- let's try to ask your questions in a nonleading fashion, please.

MR. VEGA:  Yes, Your Honor.

THE COURT:  That question also lacks foundation.  To be clear, there's no evidence from this witness that he saw what kind of weapon was on the floor of that vehicle before the passenger door was opened.

MR. VEGA:  Okay.

THE COURT:  He hasn't said -- did you see what the gun was before the passenger door was opened?

THE WITNESS:  No, Your Honor, I didn't.

BY MR. VEGA:

Q    Did you see where the gun was after it was opened?

A    Yes, sir.

Q    And with -- actually, I withdraw the question, Your Honor.

Lieutenant Hylton, I'm showing you what is ECF Number 81, which is the defense's response to the government's response that's under Exhibit 4.  It is Sergeant Johnson's black and white camera.

I'll just ask you to set this up for us.  Let me just play it for a minute.

(Video Played)

BY MR. VEGA:

Q    Okay.  What are we looking at here?

A    I'm at the driver's side of the silver Kia, and that is Officer Poulin at the back of it, at the rear of the vehicle.

Q    Okay.  Now I'll ask you to pay attention to what is being said between you and Officer Poulin.  And is this -- I mentioned Sergeant Johnson's body-worn camera, so just listen to what is being said.

(Video Played)

BY MR. VEGA:

Q    Did you hear the defendant say, "It's in the car, yeah, I know"?

A    Yes, sir.

MR. VEGA:  May I have a moment, Your Honor?

THE COURT:  Uh-huh.

BY MR. VEGA:

Q    Lieutenant Hylton, what is the purpose of an inventory search?

JA453

A     To find any valuables, anything that we don't want to leave in a vehicle if it's towed.  Valuables, firearms, money, things that we can secure in our evidence, whether someone is taken into custody or not.  We can do an inventory search and remove those items so they are secured.

Q     Did you find anything of value in the car besides the firearms and the smoking device?

A     No, sir.

Q     Did you also find ammunition?

          MS. DIEHL:  Objection, Your Honor, leading.

          THE COURT:  Sustained.

BY MR. VEGA:

Q     Do you know what -- forget it, we've got Officer Poulin.

      Did you find anything else that's of value?

A     No, sir.

          MR. VEGA:  Lieutenant Hylton, please answer defense counsel's says.

          MS. DIEHL:  Your Honor, I apologize for the delay. Would we be able to have a short bathroom break before cross-examination?

          THE COURT:  Let's take -- let's take a five-minute recess.

          MS. DIEHL:  Thank you, Your Honor.

          THE COURT:  While we're in recess, Officer, since you're in the midst of your testimony, please don't discuss

your testimony with anyone, including counsel for the United States.

THE WITNESS:  Yes, sir.

THE COURT:  Thank you.  We'll stand in recess for five to ten minutes.

(A recess was taken at 12:57 p.m. to 1:06 p.m.)

THE COURT:  Please be seated.  The witness is still under oath.  Cross-examination.

MS. DIEHL:  Yes, Your Honor, thank you.

CROSS-EXAMINATION,

Q    Good after- -- I think it's afternoon.

Good afternoon, Lieutenant Hylton.

A    Good afternoon, ma'am.

Q    We're going to start with the timeline of events, okay?

A    Okay.

Q    And when you write a report you try to write it chronologically, correct?

A    For the most part, yes, ma'am.

Q    Because you're explaining what happened for someone who wasn't there, right?

A    Yes, ma'am.

Q    And chronologically tends to make more sense, correct?

A    Correct.

Q    So you pull in behind Mr. Martinez-Chavez, correct?

A    Yes, ma'am.

Q    And he's still in the car, right?

A    Yes, sir.

Q    You're still in your car, right?

A    Yes, ma'am.

Q    And the driver's side door opens, correct?

A    Yes, ma'am.

Q    You're shining your spotlight into the car?

A    Correct.

Q    And you see him reaching for something, correct?

A    Yes, ma'am.

Q    You pull out your gun, right?

A    I step out of my vehicle.

Q    Okay.  So before you pull your gun out, you step out of your vehicle, right?

A    Yes, ma'am.

Q    Pull your gun out?

A    Correct.

Q    Point it at the car, right?

A    Yes, ma'am, a high ready position in case I have to use it in response to what he was doing.  A high ready is kind of not pointing it at him.

Q    You mean a -- let the record reflect that the witness made a high ready position, moved his hands up toward his chest.

A    Correct.

Q    And so you had your guns reached towards your chest,

JA456

correct?  You had your gun pulled up towards your chest, right?

A    Yes, ma'am.

Q    So then you yelled at Mr. Martinez-Chavez to exit the vehicle.

A    Yes, ma'am.

Q    And then he exited the vehicle, correct?

A    Correct.

Q    You told dispatch you had driver at gun point, right?

A    Yes, ma'am.

Q    And then Mr. Martinez-Chavez came out of the car, right?

A    Yes, ma'am.

Q    And that's when he complied with your command, right?

A    Correct.

Q    He exited the vehicle, right?

A    Yes, ma'am.

Q    And walked toward the back of the car.

A    Yes, ma'am.

Q    And as you mentioned on direct, there was some moments where he was putting his hands in his pockets, right?

A    Yes, ma'am.

Q    And you told him if he did not comply he would be shot, right?

A    Correct.

Q    Okay.  And then you eventually handcuffed him, correct?

A    Yes, ma'am.

Q    And patted him down, right?

A    Correct.

Q    Now, before we go into your body-worn camera of those events, like you said, you mentioned to dispatch that you had Mr. Martinez-Chavez pulled over, right?

A    Yes, ma'am.

Q    And at gun point.

A    Yes, ma'am.

Q    I want to talk briefly about the importance of dispatch. Dispatch, you have to call them whenever you're initiating a traffic stop, right?

A    Yes, ma'am.

Q    Okay.  Or initiating an investigation, correct?

A    Yes, ma'am.

Q    And that's to tell someone else where you are, right?

A    Correct.

Q    And what you're doing.

A    Yes, ma'am.

Q    And they record those conversations?

A    Yes, ma'am.

Q    And they enter information into a report, right?

A    Correct.

Q    And that's the CFS report, right?

A    Yes, ma'am, that is.

Q    And -- and you call dispatch not just to have a log of what you've done, but also for officer safety, right?

A    Absolutely.

Q    In fact, they check in on you periodically to make sure you're still safe, correct?

A    Yes, ma'am, they do.

Q    That's what some of those beeps we hear on the video are?

A    I -- I don't know that we heard any beeps from them checking in.

Q    But they check in on the radio.

A    They do, yes, ma'am.

Q    And you tell them that you're all clear, whatever police language is that you're good.

A    Yes, ma'am.

Q    Okay.  And you rely on these dispatchers, right?

A    Correct.

Q    You rely on the accuracy of the information, correct?

A    Yes, ma'am, we do.

Q    And you've seen CFS reports before, correct?

A    Yes, ma'am.

Q    And you saw the CFS report in this case, correct?

A    I have it, yes, ma'am.

Q    You have it.  And you have no reason to believe that that CFS report would be inaccurate, correct?

A    I haven't evaluated the actual dispatch report.  When we print those, generally when we put items into evidence, we have to have that CFS number.

Q    But it is part of the case file, right?

A    Correct, yes, ma'am.

Q    And you have reviewed it, right?

A    I don't know that I've reviewed in entirety the CFS dispatch report, no, ma'am.

Q    You made the call at 12:10:09, correct?  And before you look at that, would it refresh your memory of the exact time to review that CFS report?

A    I'm sorry, could you repeat that?

Q    Before you look at any documents right now --

A    Yes, ma'am.

Q    -- would it refresh your memory of the exact time to view that CFS report?

A    I -- I don't understand what you're asking me, of the --

Q    So do you -- do you remember the exact time you made the call?

A    To dispatch?  No, ma'am.

Q    Okay.  And would it help jog your memory if you saw that CFS report with those times?

A    I don't think it would jog my memory to remember an exact time I notified dispatch, no, ma'am.

Q    Okay.

A    Again, we -- they log things for those accurate times. Just like if it's a DUI stop, I would call into dispatch and ask them to log certain times.  So --

Q    And you would recognize that report if you saw it today, the CFS report, correct?

A    Yes, ma'am, I would.

MS. DIEHL:  Your Honor, I am pulling the CFS report that I do not believe has been submitted as an exhibit at this point in time, and I am going to -- I have a copy for the Court as well as for the prosecution.

THE COURT:  Okay.

MS. DIEHL:  If I could have a moment, Your Honor.

Just a moment, Your Honor, I apologize.

Provided opposing counsel.  And may I approach to provide for the Court, Your Honor?

THE COURT:  Yes, please.

MS. DIEHL:  And may I approach the witness, Your Honor?

THE COURT:  Yes, thank you.

BY MS. DIEHL:

Q    Lieutenant Hylton, I just handed you some paperwork. That's the CFS report, correct?

A    Yes.

Q    From this case?

A    Yes, ma'am.

JA461

Q    And you recognize this report?

A    Yes, ma'am, by CFS number.

Q    And if you could just briefly look through the five pages.

A    Okay.

THE COURT:  Can I ask you a question?

THE WITNESS:  Yes, sir.

THE COURT:  Do you speak Spanish?

THE WITNESS:  No, Your Honor.

THE COURT:  Do you understand it when it's spoken to you?

THE WITNESS:  No, Your Honor.

THE COURT:  Okay.  You and I are in the same boat.  I just wanted to ask that.  Go ahead.

BY MS. DIEHL:

Q    This report appears not to have changed in any way since you've seen it last, correct?

A    I didn't review it before.  Again, when I pull these I'm looking for a CFS or any information from any driver's license information, not necessarily what dispatch logs as far as times, if that makes sense.

Q    Yes, but you recognize it from the CFS report number, correct?

A    Yes, ma'am.

Q    And you have no reason to believe that it has been changed in any way since it was part of the file in your investigative

report.

A    Correct, no, ma'am.

MS. DIEHL:  May I approach the witness, Your Honor?

THE COURT:  Yes.

MS. DIEHL:  Your Honor, we ask to move into evidence for purposes of this hearing only the CFS report as the next defense exhibit in order.

MR. VEGA:  No objection, Your Honor.

THE COURT:  Well, I don't know what the next defense exhibit in order is.  Let's just call it -- since all of those were sort of introduced, let's just call this Defendant's Exhibit 1, okay?

MS. DIEHL:  Yes, Your Honor.  That makes it easy for me.

(Defendant's Exhibit 1 admitted)

MS. DIEHL:  And Your Honor, I took this away too soon from the witness.  May I approach again?

THE COURT:  Uh-huh.

MS. DIEHL:  Thank you.

BY MS. DIEHL:

Q    Sorry, Lieutenant Hylton.

A    Yes, ma'am.

Q    Lieutenant Hylton, I'm going to have you look at the top of the first page when it says "call when," if you would orient yourself to that portion.

Hylton - Cross                                                    45

A    Yes, ma'am.

        MS. DIEHL:  And can we -- oh, you don't have that up there.  Don't worry about it.

BY MS. DIEHL:

Q    And let me know when you find that.

A    I see it.

Q    Okay.  And that states that "call when 00:10:09," correct?

A    Yes, ma'am.

Q    And that means 12:10:09.

A    Correct.

Q    Okay.  I know we use military time, but just to clarify for the record.

A    Yes, ma'am.

        THE CLERK:  I'm sorry, Beatrice.  Are you trying to pull an exhibit up on the screen right now?

        MS. DIEHL:  We didn't previously upload it, so no, we're not doing it right now.  Thank you.

        THE CLERK:  Okay.

BY MS. DIEHL:

Q    Now Lieutenant Hylton, if you could please look near the bottom of that page where it starts saying the officer's names.  And find where it states "Lieutenant Hylton on scene."

A    Yes, ma'am.

Q    And that states you arrived on scene at 00:11:31,

correct?

A    Yes, ma'am.

Q    And again, that means 12:11:31, right?

A    Yes, ma'am.

Q    Please orient yourself to the second page near the top. Again, this is where it's still saying the officer's names. And indicates where it shows Officer Poulin arrived on scene?

A    Yes, ma'am.

Q    And that's 0:14:11, correct?

A    Yes, ma'am.

Q    12:14:11 p.m.

A    Yes, ma'am.  A.m.

Q    A.m., yes.

A    Yes, ma'am.

Q    A.m.  Now, between 11:31 when you arrived on scene and 14:11 when Officer Poulin arrived on scene, that's about a 2 minute and 40 second difference, you would agree.

A    Close, yes, ma'am.

Q    And from call when at 10:09 to when Officer Poulin arrived on scene, 14:11, that's about a 4 minute and 2 second difference, you would agree?

A    Yes, ma'am.

        MS. DIEHL:  May I approach, Your Honor?

        THE COURT:  Uh-huh.

        MS. DIEHL:  Thank you.

BY MS. DIEHL:

Q    Thank you, Officer Poulin -- or Lieutenant Hylton.

A    Yes, ma'am.

Q    Now I want to turn to the timeline of events on your body-worn camera.  And we are going to pull up Lieutenant Hylton's body-worn camera on the video.

        THE CLERK:  Can you see it, or no?

        MS. WOMACK:  It's on right here.  Can you see it?

        MS. DIEHL:  I cannot see anything.

        THE CLERK:  It got unplugged earlier, if you could just stick your finger back in there.

        MS. WOMACK:  Can you see it now?

        MS. DIEHL:  Oh, yes, I can see this.

        If you will hit play and then hit stop just for a second.  And stop.

BY MS. DIEHL:

Q    Now Lieutenant Hylton, this is when you activate your body-worn camera, correct?

A    Correct.

Q    Because your body-worn camera is already on, correct, just not activated?

A    Yeah, I -- I -- it's on, correct, yeah.  It's in a -- generally in a docking station charging when I'm not using it.  So the camera is on, it's just not active.

Q    Because it's required by policy to be on at all times,

correct?

A    Correct.

Q    And so to activate it you press a button, right?

A    Yes, ma'am, button on the front.

        MS. DIEHL:  Now, if we could please hit play and pause when I tell you.

        (Video Played)

        MS. DIEHL:  And pause.  Is there a way we can pause without stopping the visual?

        Apologies to the Court.  Technology is not my forte.

        THE COURT:  Mine either, so go ahead.

        MS. DIEHL:  May I have a moment, Your Honor?

        THE COURT:  Yes.

        (Video Played)

        MS. DIEHL:  Hit pause.

BY MS. DIEHL:

Q    That is blurry, but you watched the portion of the video before it paused, correct --

A    Yes, ma'am.

Q    -- Lieutenant Hylton?  Okay.

        And in this screenshot, Mr. Martinez-Chavez is behind his car, right?

A    Yes, ma'am.

Q    His hands are on the car, correct?

JA467

A    Correct.

Q    And the door is closed on the car, correct?

        MS. DIEHL:  If we could just go back and play that portion again.  Just go back to the beginning, it was a few seconds long.

        (Video Played)

        MS. DIEHL:  And pause.

BY MS. DIEHL:

Q    We can't see the door open, at the very least, correct?

A    I -- I -- I can't see much of anything there, no, ma'am.

Q    Okay.  Now, right where this paused, actually, that's when you dropped your body-worn camera, correct?

A    Yes, ma'am.

Q    Okay.  Now, if you will hit play, we're going to play this all the way until minute -- 2 minutes and 14 seconds.

        (Video Played)

        MS. DIEHL:  Please listen at 2:14.

BY MS. DIEHL:

Q    Did you hear what you said there at 2:14?

A    Sounded like I said, "Step back over here for me."

Q    Yes, and that's when you get him back to your car, correct?

A    Yes, ma'am.

        MS. DIEHL:  And if you will please hit play.

        (Video Played)

Hylton - Cross                                                    50

MS. DIEHL: And pause.

BY MS. DIEHL:

Q    And I know this seems obvious, but for the record, that's when you pick up your body-worn camera again, correct?

A    Yes, ma'am.

Q    Okay. And at this point Mr. Martinez-Chavez is handcuffed, correct?

A    Yes, ma'am.

Q    He's at the front of your vehicle?

A    Yes, ma'am.

Q    He's -- and you start going through his wallet momentarily, correct?

A    Yes, ma'am.

MS. DIEHL: If you will please hit play.

(Video Played)

MS. DIEHL: And pause.

BY MS. DIEHL:

Q    Now, the person walking to your vehicle is Officer Poulin, correct?

A    Yes, ma'am.

Q    As you mentioned on direct, he was the first on scene.

A    Yes, ma'am.

Q    So at least by 3 minutes and 44 seconds of your body-worn camera, Officer Poulin has arrived on scene, correct?

A    Yes, ma'am.

JA469

Q    Okay.  Now, in those first 3 minutes and 44 seconds of your body-worn camera, we don't see the moment you tell Mr. Martinez-Chavez to get out of the car, correct?

A    Correct.

Q    We don't see him reaching over into the side of the passenger seat, right?

A    Yes, ma'am.

Q    We don't see you shining your spotlight into the car, correct?

A    Correct.

Q    We don't see you yelling at him to show his hands, correct?

A    Correct.

Q    We don't hear you saying "comply or you're going to be shot," correct?

A    Correct.

Q    Now, according to that CFS report we just looked at, it took 2 minutes -- around 2 minutes and 40 seconds between you arriving on the scene and Officer Poulin arriving on the scene, correct?

A    According to the CFS report, yes, ma'am.

Q    Now, in those 3 minutes and 44 seconds, we also don't hear you telling dispatch that Mr. Martinez-Chavez was reaching for something, correct?

A    Correct.

MS. DIEHL:  If you will please hit play.

(Video Played)

MS. DIEHL:  And if you can pause.

BY MS. DIEHL:

Q    So what we just saw was you giving Officer Poulin kind of a rundown of what happened, right?

A    Yes, ma'am.

Q    Okay, giving him the basics that he needed to know, correct?

A    Yes, ma'am, just telling him what had happened.

Q    In that clip we didn't hear you tell Officer Poulin that you thought Mr. Martinez-Chavez was reaching for something, right?

A    No, ma'am, you didn't.

Q    We didn't hear you tell him he may be armed, correct?

A    I know he wasn't armed at that point because I had already patted him down for weapons when I detained him.

Q    And you didn't tell Officer Poulin he was armed at that point, correct?

A    No, ma'am.

Q    And you didn't tell him that you thought Mr. Martinez-Chavez might be dangerous at that point, correct?

A    Correct.

Q    You didn't tell Officer Poulin to look in the passenger seat to see what was there, correct?

JA471

Hylton - Cross                                                    53

A    No, ma'am.

Q    You didn't tell him be careful, there may be something dangerous in the car, correct?

A    Correct.

Q    You were discussing what you saw, right, regarding the car, the speed, correct?

A    Yes, ma'am.

          MS. DIEHL:  If you will hit play.

          (Video Played)

          MS. DIEHL:  Pause.

BY MS. DIEHL:

Q    So that was Officer Poulin saying there was a gun in the car, correct?

A    Yes, ma'am.

Q    And that's when you told him you thought Mr. Martinez-Chavez was reaching for something, correct?

A    Yes, ma'am.

Q    Okay.  Let's go back a little before the stop.  The roads. And correct me if I get the roads out of order.  I'm going to try very hard not to.

     When you first saw Mr. Martinez-Chavez speeding, you didn't pull him over, correct?

A    Correct.

Q    He was going about 15 miles per hour over the speed limit, right?

JA472

A      Yes, ma'am.

Q      On the Main Street?

A      Yes, ma'am.

Q      On South Main Street.

A      Right, yes, ma'am.

Q      And you didn't pull him over when he was speeding on Scuffling Hill, correct?

A      No, ma'am.

Q      You didn't pull him over when you first saw the lights go out.

A      I activated my emergency lights shortly after that, yes, ma'am.

Q      So you didn't have your lights on when you were following him on Main, correct?

A      No, ma'am.

Q      You didn't have your emergency lights when you were following him on Scuffling, correct?

A      Correct, initially, no, ma'am.  Initially I didn't have them on.

Q      You didn't have your emergency lights on when you were following him on Knollwood, correct?

A      He was never on Knollwood.

Q      Right when he passed Knollwood, correct?

A      No, ma'am, the first one I didn't.  Then it was Knollwood kind of makes a loop around Scuffling Hill, if that makes

JA473

sense.  There's one kind of closer towards the South Main Street.  There's a little subdivision in there, and then it comes back out again not far away from the Highview Terrace.

Q    So it looped.  It's a neighborhood drive.

A    Correct, yes.

Q    So there's a Knollwood 1, Knollwood 2.

A    Yes, ma'am.

Q    And you didn't put on your emergency lights at Knollwood 1.

A    Correct, I did not.

Q    And not at Knollwood 2.

A    Just past it.

Q    Just past it when he turned.

A    Right before he turned.

Q    Okay.  And you said you activated -- on direct that you activated your lights a few seconds after he turned off his lights, correct?

A    Yes, ma'am, I believe that's correct.

Q    And you reported that -- or you wrote that in your report as well, correct?

A    Yes, ma'am.

        MS. DIEHL:  Okay.  If we could please go to 18:05 of the body-worn camera.

        (Video Played)

        MS. DIEHL:  Pause.

BY MS. DIEHL:

Q    You just stated, "He turned his lights on the road, but I hadn't turned my lights on him then," correct?

A    Right, yes, ma'am.

MS. DIEHL:  We can take that down.  Thank you.

BY MS. DIEHL:

Q    So to be clear, when he -- actually, I'll withdraw that question, Your Honor.

Now, you never performed -- there was no speeding ticket in this case, correct?

A    No, ma'am, there wasn't.

Q    Okay.  And again, there is no video of the prior encounter when you were following him, correct?

A    No, ma'am.

Q    No body-worn camera, right?

A    No, ma'am.

Q    Or dash camera, correct?

A    Correct.

Q    And you didn't perform a field sobriety test on Mr. Martinez-Chavez.

A    No, ma'am.

Q    You didn't do it before you looked in the car, right?

A    No, ma'am.

Q    And you didn't do it after you found this glass device on his person, correct?

A    Correct.

Q    Regarding that glass pipe on his person, owning a glass pipe in and of itself is not illegal, right?

A    Correct.

Q    And you didn't field test it at the time, correct?

A    No, ma'am, I didn't.

Q    In fact, you didn't get the results until weeks or months later.

A    I didn't send it to the lab.

Q    Okay, so you --

A    No, ma'am.

Q    You never sent it to the lab.

A    No, ma'am, I didn't.

Q    By the time it was sent into the lab, it was out of your hands.

A    Yes, ma'am.

Q    And you can use those glass pipes for legal smoking, correct?

A    I -- I don't smoke.  I guess you can, though, yes, ma'am. I don't know.

Q    It is departmental policy that body-worn cameras should be activated during all law enforcement-related encounters and activities, correct?

A    Correct.

Q    And when you first were following Mr. Martinez-Chavez, it

JA476

Hylton - Cross                                              58

was because you thought he broke the law, right?

A    Yes, ma'am.

Q    Speeding is against the law.

A    Correct.

Q    Driving without your lights on is against the law.

A    Yes, ma'am.

Q    And when you first turned on your lights, you were doing so to indicate that he was being pulled over, right?

A    Correct.

Q    For him to stop.

A    Yes, ma'am.

Q    And that's a law enforcement-related activity, correct?

A    It is.

Q    You didn't activate your body-worn camera on South Main Street, correct?

A    Correct.

Q    You didn't activate your body-worn camera on Scuffling Hill Road.

A    Correct.

Q    Not when you passed the first Knollwood Drive.

A    No, ma'am.

Q    Or the second Knollwood Drive.

A    Correct.

Q    Didn't activate it when you turned onto Highview?

A    Yes, ma'am, Terrace, yes, ma'am.

JA477

Q    Highview Terrace.

A    Yes, ma'am.

Q    Okay.  And so you didn't activate it when you turned onto Highview Terrace.

A    No, ma'am.

Q    Didn't activate the body-worn camera when you were telling him to get out of the car.

A    No, ma'am.

Q    You didn't activate your camera when you were using deadly force on him.

A    Correct.

Q    And to be clear, deadly force is when -- can be when you point a gun at someone, correct?

A    Correct.

Q    Now we talked about briefly when Mr. Martinez-Chavez was by your car handcuffed, correct?

A    Yes, ma'am.

Q    And at that point he's detained, right?

A    Yes, ma'am.

Q    And at that point the car door is closed, correct?  The -- Mr. Martinez-Chavez's car door is closed, correct?

A    Yes, ma'am.

Q    And that is also when Officer Poulin comes, right?

A    Yes, ma'am.

Q    And shortly thereafter other officers follow.

A    Yes, ma'am.

Q    And before you go to look into Mr. Martinez-Chavez's car, there's at least one officer standing next to him, right?

A    Yes, ma'am.

Q    And another -- no officers leave him alone, correct?

A    Correct.

Q    From that point on there is always an officer with him, right?

A    I -- I believe so, yes, ma'am.

Q    It's important to write accurate reports, right, Off -- Lieutenant Hylton?

A    Yes, ma'am.

Q    You include as much information as is necessary, right?

A    Correct.

Q    Including all the relevant information, correct?

A    Yes, ma'am, sorry.

Q    And as we mentioned before, part of that is because people are reading this warrant there.  Correct?

A    Yes, ma'am.

Q    And they need to know what happened.

A    Correct.

Q    And the order of what happened, correct?

A    Yes, ma'am.

Q    Especially when it comes to searches.  That's important, right?

A    Yes, ma'am.

Q    Now you wrote a report in this case, clearly.

A    Yes, ma'am, I did.

Q    And you were accurate in that case, in that report, to the best of your ability.

A    For most of it.  I think there was one section in there that was -- that was out of line in the order of sequence.

Q    Right.  So there was a section that was out of order because you state that you patted him down, right?

A    Correct.

Q    And that you found out he was not licensed, correct?

A    Correct.

Q    That he had outstanding warrants?

A    Correct.

Q    That dispatch told you the tag didn't match the Kia, correct?

A    Correct.

Q    And that's when you went to search the car.

A    Correct.

Q    Because it was going to be towed.

A    Correct.  That's what was in the report.

Q    But that's not what happened, right?

A    Correct, yes, the --

Q    Not in that order, correct?

A    Yes, ma'am.  From the time that we found out he was

wanted, we had already approached the vehicle.

Q    So to be clear, what you wrote in that report, the timing of events was inaccurate, correct?

A    In that section, yes, ma'am.

Q    In that section the order was inaccurate.

A    Regarding those two, yes, ma'am.

Q    And you didn't write a supplemental report to correct that, correct?

A    No, ma'am.

Q    And in fact, that order was -- you've read not just your report, but the other supplements, correct?

A    No, ma'am.

Q    You have not read any supplements?

A    No, ma'am.

Q    Okay.  So you just read your few paragraphs?

A    Yes, ma'am.

Q    Okay.

A    I've only read mine.  I can't -- yes, ma'am.

Q    And this was -- this occurred, almost to the day, a year ago, right?

A    Yes, ma'am.

Q    And in this entire year you have not corrected the record, correct?

A    Correct.

Q    You actually, as we saw in that 3 minutes and 44 seconds,

JA481

told dispatch Mr. Martinez-Chavez's name and date of birth, right?

A    Yes, ma'am.

MS. DIEHL:  And then if we could actually pull up Lieutenant Hylton's body-worn camera at 4:15.

(Video Played)

MS. DIEHL:  And pause.

BY MS. DIEHL:

Q    From the beginning of that video, the 3 minutes and 44 seconds we played, and here, we have not heard anything about any outstanding warrants, correct?

A    Correct.

Q    We have not heard anything about Mr. Martinez-Chavez's license being revoked, correct?

A    Correct.

Q    We haven't heard anything about the -- the tag issue, correct?

A    No, ma'am.

MS. DIEHL:  Okay.  If we could hit play.

(Video Played)

MS. DIEHL:  Pause there.

BY MS. DIEHL:

Q    And what we just heard there was dispatch, the first time, they said they got a hit on Mr. Martinez-Chavez, correct?

A    Yes, ma'am.

Q    And at that point in time, that passenger side door is already open, correct?

A    Yes, ma'am.

MS. DIEHL:  Hit play, please.

(Video Played)

MS. DIEHL:  Pause there.

BY MS. DIEHL:

Q    And was that Officer Poulin asking if he's a convicted felon?

A    I'm not sure.

MS. DIEHL:  If we could go back to about 5:40.

THE INTERPRETER:  Your Honor, interpreter asks that the question be repeated.  Interpreter had a mental lapse there.

BY MS. DIEHL:

Q    That was Officer Poulin asking if he was a convicted felon, correct?

A    I'm not sure.

Q    And we'll go back to 5:40.  And if you -- there's about three minutes there -- or three seconds there, if you could listen to.

A    Yes, ma'am.

MS. DIEHL:  And we can hit play.

(Video Played)

BY MS. DIEHL:

Q    And that was Officer Poulin asking if he was a felon, correct?

A    Yes, ma'am.

          MS. DIEHL:  And hit play.

          (Video Played)

          MS. DIEHL:  And pause.

BY MS. DIEHL:

Q    Now that was you asking dispatch to run a criminal history on him, too, correct?

A    Correct, yes, ma'am.

Q    Because you got a firearm, right?

A    To verify that he -- he was a felon.

Q    To verify to make sure that he was, correct?

A    Correct, yes, ma'am.

Q    And I'm not going to play the whole body-worn camera.  I think we've seen most of it right now.  But throughout your body-worn camera, dispatch never confirms to you that Mr. Martinez-Chavez was a convicted felon, correct?

A    No, ma'am, they didn't.

Q    They did not.

     And you received his criminal history just prior to booking, correct?

A    Yes, ma'am, I picked it up from dispatch.

Q    So after you had left the scene.

A    Correct, yes, ma'am.

Q    I want to briefly discuss --

        MS. DIEHL:  And we can take that down.

BY MS. DIEHL:

Q    I want to briefly discuss the people from the house coming to the car.  I know you brought it up on direct, but there were a couple people that came out toward the car, right, near the beginning?

A    I -- I saw the one initially that came out when it -- it was myself and Martinez and then other gentleman come out, but I don't remember how many or who came back outside.  I know there was some conversation there with some people that had come back out.

Q    Okay.  So separating whatever happened when the other officer showed up, just when it was you and Mr. Martinez-Chavez, one person came out.

A    Yes, ma'am.

Q    And you told them to stay away from the car.

A    Yes, ma'am.

Q    Unless they wanted to get arrested.

A    Yes, ma'am.

Q    And they complied.

A    Yes, ma'am.

Q    He -- as you said on direct, he didn't open the car door.

A    No, ma'am.

Q    Didn't get in the car.

A    No, ma'am.

Q    Didn't put anything in the car.

A    I -- I -- I didn't see him put anything.

Q    Didn't rush toward you.

A    No, ma'am.  No, ma'am.

Q    Because if he did, that would have been a whole other issue, correct?

A    Yes, ma'am.

Q    You just went back to where they were.

A    Yes, ma'am.

Q    And -- and just to be clear, this is New Year's Eve, right?

A    It is.

Q    There are several cars in that front yard area, right?

A    Yes, ma'am, it was.

Q    So -- so the driveway was full, right?

A    I -- I believe it was.  I -- I think it was three or four vehicles there, best I remember.

Q    There was another car in the grassy area in front of Mr. Martinez-Chavez's?

A    I don't -- there was several vehicles there, yes, ma'am.

Q    And because later on, even though you weren't paying attention, you knew other people came out.  There was more than one person in that house, correct?

A    Yes, ma'am.

Q    And just to be clear, in that report you never wrote that someone approached the car, correct?

A    I don't think I did, no, ma'am.

Q    Now, you spoke to Special Agent Moody back here about this case a couple weeks ago, right?

A    Yes, ma'am.

Q    Before Christmas?

A    Yes, ma'am.

Q    And he was just asking some follow-up questions in preparation for this hearing, right?

A    Yes, ma'am.  He stayed in contact since the beginning of it, just --

Q    He stayed in contact?

A    Yeah, just updating with everything going on and serving subpoenas for court, so --

Q    Sure.  Has he stayed in contact with text messages or emails?

A    No, we actually come up here -- he would meet me in person to search subpoenas, and I came up here in person for trial prep with Mr. Vega and Agent Moody.

Q    And when you spoke with Special Agent Moody in December about this case, he was asking you about someone taking responsibility for the car, right?

A    Yes, ma'am.

Q    And you said Mr. Martinez-Chavez didn't ask someone at the

scene to assume responsibility for the car, correct?

A    He didn't.

Q    You didn't tell him he could do that, correct?

A    No, ma'am, I didn't.

Q    You never asked him if he wanted someone to get the car, right?

A    No, ma'am.

Q    He didn't authorize you to leave the car there, correct?

A    No, ma'am.

Q    And you didn't tell him that he could do that.

A    No, ma'am.

Q    Okay.  If he had asked you to leave the car there, pursuant to policy you wouldn't have been able to tow the car, correct?

A    The vehicle was improperly registered, it had been on the highway, so if I wanted to tow the vehicle at that point I could have towed it.  Had it been properly registered, his car, no issues with the vehicle, I could have left it.

Q    And you didn't have to tow it if it was improperly registered, correct?

A    No, ma'am.

Q    And if the car is towed, you are required to complete a tow sheet, right?

A    Yes, ma'am.

Q    And complete a stolen check using the vin of the car,

right?

A    Correct.

Q    And you would put that vin number and that check on the tow sheet, right?

A    Yes, ma'am.  There's a lot of information that goes on that sheet.

Q    To include the inventory of the car, right?

A    Yes, ma'am.

Q    And when you do an inventory of the car, pursuant to policy, you have to inventory the entire vehicle, correct?

A    Correct.

Q    And that includes glove boxes?

A    Correct.

Q    Other boxes in the car?

A    Yes, ma'am.

Q    Any luggage in the car?

A    Yes, ma'am.

Q    And as you mentioned on direct, you would mark any valuables located in that inventory search, right?

A    Correct.

Q    And the valuables would be on that tow sheet?

A    Yes, ma'am.

Q    And then they would be stored in the property room?

A    Yes, ma'am.

Q    And that's for several reasons.  One to keep a log of what

was found in the car, right?

A    Correct.

Q    But also if someone wanted their valuables back --

A    Correct.

Q    -- they could get them back?

A    Correct, unless it was -- someone was in custody and it was something they could take with them, money.

Q    Sure, but it -- but if grandma's Hope Diamond is in the car, you want to be able to document that that valuable is there, correct?

A    Yes, ma'am.

Q    You don't want anyone to say, "The officer stole my diamond ring."

A    Right.

Q    You didn't complete a tow sheet in this case.

A    No, ma'am, I didn't.

        THE COURT:  Was the car in fact towed?

        THE WITNESS:  Yes, sir, it was.

        THE COURT:  It was.

        THE WITNESS:  Yes, sir, it was towed.

        THE COURT:  But no tow sheet was completed.

        THE WITNESS:  Correct.

        MS. DIEHL:  Another important question I should have asked, Your Honor.

BY MS. DIEHL:

Q    And you called towing before you left the scene, correct?

A    I -- I may have.  I usually do that through dispatch.

Q    So you do that through dispatch.

A    Yes, ma'am, call dispatch and we have a rotation.  We don't call a specific wrecker.  We don't show any kind of favoritism toward that company.  So whoever is the next on rotation, we notify dispatch.  They call them.  And whoever it is, whoever they get in touch with on the rotation, dispatch will notify us who comes to get the car.

Q    And because dispatch is doing that, that should show up on that CFS report, correct?

A    It should, yes, ma'am.

        MS. DIEHL:  Thank you.  No further questions, Your Honor.

        THE COURT:  Thank you, Ms. Diehl.  Mr. Vega, any other questions?

        MR. VEGA:  Few questions, Your Honor, thank you.

                    REDIRECT EXAMINATION

BY MR. MILLER:

Q    Lieutenant Hylton, why didn't you write a speeding ticket or some other traffic violation in this case?

A    It's officer discretion.  He was already wanted on a felony violation at that point.  You know, we were looking at the possibility of the two guns.  What's -- what's the point?

I -- you know, I've been there almost 20 years.  Why stack charges like that?  It just -- no, sir.

Q    And did you arrest him also on the felony probation violation outstanding warrant?

A    Correct, yes, sir.

Q    In your report, when you wrote your report, did you write it with or without the benefit of your body-worn camera footage?

A    Without it.  I couldn't find the recording in our system, so we actually had to -- I had to have someone who is a little smarter with that system to locate it.

Q    Were you doing it from memory?

A    Yes, sir.

Q    And based on your training and experience, what conclusions, if any, did you draw when you encountered the defendant with a -- or any person, really, with the type of pipe, glass smoking device, that he had with residue?

            MS. DIEHL:  Objection, Your Honor.

            THE COURT:  Basis?

            MS. DIEHL:  Improper opinion.

            MR. VEGA:  Your Honor, the -- the defense brought up the point that a smoking device is something that can be used for noncriminal purposes.

            THE COURT:  Yeah, I'll allow the question.  Overrule the objection.

BY MR. VEGA:

Q    Did you get that or should I repeat that?

A    Could you repeat the question?

Q    Sure.  Based on your training and experience, what conclusions, if any, do you draw when you encounter an individual who possesses this type of glass smoking device that the defendant had?

A    I served three years as a narcotics investigator, two years as a supervisor over that unit.  Through my training and experience, it is a glass pipe used to smoke methamphetamine.

Q    The male who came out and you had a conversation with and you told him to stay away from the vehicle, why did you tell him to stay away from the vehicle?

A    Because he was approaching the car.  I'm not sure what Mr. Chavez was telling him.  Again, he was talking to me in English.  He was speaking to this gentleman in Spanish.  I was there by myself.  You know, I had one guy, now I have two, so I just didn't want him involved in what was going on there.

          MR. VEGA:  Thank you, Lieutenant Hylton.

          THE WITNESS:  Yes, sir.

          THE COURT:  Okay.  Call your next witness.

          Thank you, you may stand down.

          THE WITNESS:  Thank you, sir.

          THE COURT:  Call your next witness.

          MR. VEGA:  Officer Poulin, please.

I wanted to show video from here, please, Madam Clerk.

THE CLERK:  If you will raise your right hand, please.

TREY POULIN, CALLED BY GOVERNMENT, SWORN

THE WITNESS:  Yes, ma'am.

THE COURT:  Come on up and have a seat.  Good afternoon.

THE WITNESS:  Good afternoon, Your Honor.  How are you doing?

DIRECT EXAMINATION

BY MR. VEGA:

Q   Good afternoon.  Please identify yourself for the record.

A   Officer Trey Poulin, Rocky Mount PD.

Q   You said Rocky Mount?

A   Rocky Mount Police Department, yes, sir.

Q   And Poulin is P-O-U-L-I-N?

A   Yes, sir.

Q   And on January 21, 2024, did you respond to a call at Highview Terrace?

A   Yes, sir.

Q   Along with Officer Hylton?

A   Yes, sir, I did.

Q   And did you have any conversations with Lieutenant Hylton during the event?

A    I did, yes, sir.

Q    Now, this is before you actually arrived, right?

A    Yes, sir, I was on the phone call with him before.

Q    Can you tell the Court about the phone call that you had with Lieutenant Hylton?

A    It was just some plain talk, really, before he initiated the traffic stop.  Just, "Hey, how are you doing?  What are you doing?  Buddy, go home."  And then he stated something about a vehicle in front of him that he observed.  I hung up with him and monitored his radio traffic through my radio.

Q    Before you hung up with him, what else did he tell you about that vehicle?

A    He said that he had a vehicle passed him at a high rate of speed.  He went up Scuffling Hill and blacked out.

Q    Now you mentioned that you hung up the phone with Lieutenant Hylton, right?

A    Yes, sir.

Q    And you mentioned something about dispatch.  Can you tell us that?

A    Yeah, I was monitoring Franklin County dispatch through my radio through a scan option that we have on the radio.  I was monitoring his traffic through dispatch about the rest of the -- the vehicle like the details on the -- what he observed, what the tag was, where I was trying to get more details involving that vehicle.

Q    Did you hear the communication between Lieutenant Hylton and dispatch?

A    At first, yes.

Q    And was this immediately after you hung up the phone with Lieutenant Hylton?

A    Correct.

Q    And tell us about the communication that you heard between him and dispatch.

A    He told dispatch that he had a car at a high rate of speed turn onto Scuffling Hill.

Q    I'm sorry, I couldn't hear you.  Can you repeat that?

        THE COURT:  Yeah, could you talk up a little bit? That would be good

        THE WITNESS:  He had a car come off of South Main toward him.  He was going I think it would be southbound.  He had a car coming at him, so it would be coming into town onto South Main Street, turned left onto Scuffling Hill Road.  He said on South Main Street he was at a high rate of speed.  He turned left onto Scuffling Hill Road.  He said that the vehicle blacked out on Scuffling Hill Road, and that's when I hung up on him.  I started monitoring the sheriff's office channel at that time.

Q    Did you hear anything different or anything additional over the radio?

A    No, sir.

Q    But did they discuss the incident that was occurring?

A    Just that he was initiating a traffic stop with that vehicle, yes, sir.

Q    And then you eventually arrived at Highview Terrace?

A    Eventually, yes, sir.

Q    Officer Poulin, I'm going to play for you your body-worn camera, which is under ECF Number 59, and it's the defendant's motion to suppress.  It is labeled Exhibit 4, but it's filed under 59-5.

        MR. VEGA:  And push and play at 0 time.  Sorry, push and play at 3:16.

        (Video Played)

BY MR. VEGA:

Q    I'll ask you to pay attention here to -- to something that you may have said and the defendant may have answered.  Just pay attention here, please.

        (Video Played)

BY MR. VEGA:

Q    Okay.  What was that all about?

A    I was talking to Hylton.  I said, "Who -- who was in the car?"  As my body camera was facing Hylton in that direction, I asked him, "Who all was in the car?"  And he obviously didn't hear me.  He didn't respond back to me.  So I approached the passenger side.

Q    Who responded to you?

A      The suspect.

Q      And what did he say?

A      He said, "Nobody, just me."

Q      We're at 3 minutes and 30 seconds.

        (Video Played)

BY MR. VEGA:

Q    I'm pausing it at 3 minutes and 43 seconds.  And can you tell us what we're looking at here in the video?

A    I'm on the passenger side of the car that the suspect was in.

Q    Tell us something.  The body-worn camera, what direction is it pointed in relation to where you are looking?

A    Yes.  Your Honor, I was -- my body camera, we wear outer carriers on our vest.  This is not my normal vest that I wear, but we have a classified uniform.  It has a outer carrier that has a pocket that has a magnetic insert inside the pocket that the body camera clips onto my left pocket.  So when I'm facing straight, the body camera is kind of off-centered into my chest direction that I can't move that body camera.  Once it's on my pocket, it's on my pocket.

        So right -- right now, it's -- I'm -- I'm looking here in this direction about where the steering wheel is down.  My body camera is here.  It's facing I guess the direction of the vehicle on the interior.

Q    Again, we're at 3 minutes and 43 seconds.  Where are your

JA498

Poulin - Direct                                             80

eyes right now?

A    Right now they are where my flashlight beam is.  It's --
it's trying to look at the floor board and in the bottom
passenger side area of the vehicle.

Q    I'm playing it now.

        (Video Played)

BY MR. VEGA:

Q    Let's pause right there.  What did you identify it as?

A    I immediately identified it as a sawed-off shotgun.

Q    Was that your immediate impression of it?

A    Yes, sir, it was.

Q    Did you try to open the front passenger door at this
time?

A    Yeah, as soon as I saw it, I did.  It was locked.

        (Video Played)

        THE COURT:  Can I get you to play back about 15
seconds?

        (Video Played)

        THE COURT:  Before that I want you to start when you
were questioning him about where his camera is before he sees
the gun.  I just want to see that sequence uninterrupted if you
don't mind.

        MR. VEGA:  Yes, sir.

        (Video Played)

BY MR. VEGA:

Q    Officer Poulin, we're at 4 minutes and 1 second into your body-worn camera footage.  When you opened the door, did you see the revolver or the other firearm?

A    No, sir, I didn't.

Q    Did you see any ammunition at this point?

A    No, sir, I didn't.

             (Video Played)

BY MR. VEGA:

Q    Did you hear what the dispatcher said?

A    I'm sorry?

Q    Did you hear what the dispatcher said?

A    Could you play it one more time, please.

             (Video Played)

BY MR. VEGA:

Q    I got ahead of myself.  Did you hear what the dispatch just said?

A    Yes, sir.

Q    What did the dispatcher say?

A    Well, the first indication was the beep.  That means to us a wanted person.  And then dispatch does say that he's wanted out of Montgomery County on a probation violation, felony probation violation.

Q    So when you heard the beep, that indicates that it's a wanted person?

A    That's correct.

Q    And do you recall when you first heard the beep?

A    I do.

Q    When?

A    When I stepped away from the vehicle on the passenger side.

Q    You had already opened the door at that point?

A    That's correct.

Q    And what if anything did you assume based on what you heard from the dispatcher about the defendant's status as a felon?

A    If he's on felony probation and he's wanted for a violation of that probation, he's already been convicted of a felony.

                (Video Played)

BY MR. VEGA:

Q    I'm pausing it at 4 minutes and 24 seconds.

     Can you tell us what's in the front seat, front passenger seat?

A    It's a battery charger.

Q    What else is on the front passenger seat?

A    A screwdriver and some miscellaneous tools.

                (Video Played)

BY MR. VEGA:

Q    Is that Officer Gardner?

A    That's correct.

Q    And up to this point has either -- have you or Officer
Gardner touched the firearm, the sawed-off rifle?

A    No, sir.

Q    And up to this point has anybody seen the revolver?

A    No, sir.

(Video Played)

BY MR. VEGA:

Q    Did you hear what Officer Gardner just said?

A    Yes, sir.

Q    What was that?

A    That there's two guns.

Q    And is it the first time anybody identified the second
gun?

A    That's correct.

(Video Played)

BY MR. VEGA:

Q    I'm going to pause it there for a moment, and I'm going to
show you what is under ECF Number 75, and it is Government
Exhibit Number 8.

Can you tell us what we're looking at there?

A    The red circle has got -- has a revolver in the center.

Q    Do you see the -- the sawed-off rifle there?

A    Yes, sir.

Q    Can you describe it for the -- for the record?

A    It's a black in color, black frame in color, silver

Poulin - Direct                                                    84

metallic barrel with two silver pipe -- pipe straps.

Q    And you mentioned something about the -- the red circle.
What about it?

A    It has a revolver inside the red circle.

Q    What is this long purple thing, if you remember?

A    I do.  It was a purple paper holder that was beside the
rifle for the sawed-off gun.

Q    And eventually who retrieved the small gun?

A    Officer Gardner.

Q    And then who retrieved the sawed-off rifle?

A    I did.

Q    Did you find anything else that's gun related?

A    Just ammunition.

Q    Where did you find the ammunition?

A    Near -- near the sawed-off weapon.

Q    When you say near, can you give us more information?

A    I'd have to refer to my notes for the exact location of
the ammunition.

Q    So would looking at your notes refresh your recollection
of --

A    Correct.

Q    -- that night?

        MR. VEGA:  Your Honor, may I approach?

BY MR. VEGA:

Q    Do you remember now?

A    I do.

Q    Can you tell us where you found the ammunition?

A    In the front of the vehicle, the -- in the console area is what -- in the vicinity of it.

Q    When you say the console area, what do you mean?

A    The front of the vehicle.  Inside the front of the vehicle.

Q    How many consoles are there?

A    Should be one in every vehicle.

Q    And where is that console?

A    In the center between the driver's side and passenger side.

Q    Center console?

A    Correct.

Q    Did you have any encounter from anybody from the residence?

A    There was two subjects that I had encounter with.

Q    And what did you tell them?

A    They were -- they came out the door in the direction of the vehicle and myself.  I told them to get back inside. Actually yelled at them to get back inside.

Q    Do you have any idea how many people were inside the residence?

A    I have no clue, no, sir.

Q    Is it good law enforcement practice to take control of the

guns when there are people around?

A    Absolutely.

Q    And is it reasonable to assume that if there's a sawed-off rifle or sawed-off shotgun --

        MS. DIEHL:  Objection, Your Honor, leading.

        THE COURT:  I'm sorry, could you restate your question?  I -- I think it got interrupted by the objection.

        MR. VEGA:  Yes, Your Honor.

BY MR. VEGA:

Q    Officer Poulin, is it reasonable for you as a law enforcement officer to assume that there may be -- once you find a sawed-off rifle or a sawed-off shotgun that there could be ammunition or perhaps another firearm in the vehicle?

        MS. DIEHL:  Your Honor, we renew our objection.

        THE COURT:  Yeah, overruled.  I'll allow it.

        THE WITNESS:  Yes, sir, it is.

        MR. VEGA:  Just a moment, please, Your Honor.

        Officer Poulin, thank you.  Please answer defense counsel's questions.

        THE COURT:  Any cross?

        MS. DIEHL:  Yes, Your Honor.

        THE COURT:  Okay, Ms. Diehl.

        MS. DIEHL:  Thank you.

                      CROSS-EXAMINATION

BY MS. DIEHL:

Q    Good afternoon, Officer Poulin.

A    Hey, how are you?

Q    Good.  Thank you for asking.  How are you doing?

A    Doing well.

Q    Officer Poulin, this is not the first time you've written a report for an investigation, correct?

A    That's correct.

Q    Not the first time you've written a supplemental report, I imagine, correct?

A    Yes, ma'am.

Q    And it's important -- good report writing is important, right?

A    That's correct.

Q    You want to make sure you're accurate, correct?

A    Yes, ma'am.

Q    You want to make sure that you're including relevant facts?

A    Yes, ma'am.

Q    And you want to make sure that, to the extent possible, you put things in correct chronological order, correct?

A    Yes, ma'am.

Q    Because people -- this investigation is going to go to someone else, correct, someone who wasn't at the scene?

A    At the time I -- I did not know that, no, ma'am.

Q    It could, though, however, correct?

Poulin - Cross                                                    88

A    Yes, ma'am.

Q    You're not just investigating for fun.  Eventually it could go to trial, correct?

A    Yes, ma'am.

Q    Okay.  And the attorneys who are reading it weren't there at the scene, right?

A    Correct.

Q    And you were as accurate as possible in this case, correct?

A    I tried to be at the time, correct.

Q    And you wrote your supplemental report on January 17, 2024, right?

A    Correct.

Q    I going to ask a stupid lawyer question right now. January 17, 2024, is closer in time to the incident than we are now, right?

A    That's correct.

Q    So your memory is better back then, right?

A    Correct.

Q    And in fact, you watched your body-worn camera before you wrote your report, right?

A    That's correct.

Q    And that was to make sure that you were accurate in writing your report, right?

A    Correct.

JA507

Q    Helped refresh your memory because it had been about two weeks, right?

A    Correct.

Q    And in that report you detailed in chronological order what happened, right?

A    No, ma'am.

Q    You did not put in chronological order what happened?

A    There's approximately two series mistakes.  When I say series, I mean there's two in my report, at least two, that are out of order in my report.

Q    That's right.  You accidentally flipped them, right?

A    I did flip those.

Q    So you stated in your report that Lieutenant Hylton told you the driver kept reaching in the passenger side, correct?

A    Correct.

Q    And then you went to look in the car.

A    Right, those are flipped.

Q    Those are flipped.

A    Yes, ma'am.

Q    So that's a detail that's flipped, right?

A    Yes, ma'am.

Q    And that involves the search of the car, right?

A    Correct.

Q    That sentence, those two sentences.  That's right before you searched the car, right?

A     Before -- what's the question again?  I'm sorry.

Q     So when you're discussing going to look in the car in your report, that's the section where you're talking about going into the car and searching, right?

      I'm clear as mud, from your look.

A     I'm sorry, one more time.

Q     So you in your report documented the search of the car, right?

A     Correct.

Q     And documented how you came about searching the car, correct?

A     Correct.

Q     And so that specific section involving Lieutenant Hylton telling you that he kept seeing him reach in the passenger side was the part of your report where you were documenting why you went to search the car, correct?

A     Do you mind if I look at my notes?

Q     If it would refresh your memory, I have no objection.

A     Okay.  So to answer -- or try to answer the best I can, the sentence where it says "I walked up to the vehicle and shined my flashlight through the passenger side window," that should be the first -- that should be the first sentence in the series that I got flipped up, or mixed up.

Q     Because you did that before you were told that Mr. Martinez-Chavez was reaching.

A     That's correct.

Q     Thank you.

A     Yes, ma'am.

Q     You also wrote in the report that you found out
Mr. Martinez-Chavez was a convicted felon, correct?

A     Correct.

Q     And then you opened the door, correct?

A     Correct.

Q     And that was flipped.

A     Yes, ma'am, I opened the door.

Q     And then you found out --

A     Dispatch -- I don't know how close it was, but when
dispatch stated that he was wanted for felony probation
violation.

Q     You did not open the door before -- or after you were told
that?

            THE COURT:  Could you restate that question?  I think
you used both before and after.

            MS. DIEHL:  Yes, Your Honor.  I apologize.

BY MS. DIEHL:

Q     You did not open the door after you heard he was a
convicted felon, correct?

            THE COURT:  That question confuses me because of the
double negative.  Could you try it again?

            MS. DIEHL:  Yes, Your Honor.

BY MS. DIEHL:

Q    When you opened the door, you did not yet know that Mr. Martinez-Chavez was a convicted felon.

A    When I -- when I opened the door and said -- or confirmed that there was the gun on the floor board of the passenger side door, or on the passenger side interior of the vehicle, dispatch -- the tone of all things going, I don't know how to answer that a yes or no question, ma'am.

            MS. DIEHL:  If we could pull up Officer Poulin's body-worn camera at 4:17.

            (Video Played)

            MS. DIEHL:  I'm sorry, I gave you the wrong time. That was after.  If we could go back to about 3 minutes 30 seconds.

            (Video Played)

            MS. DIEHL:  And I probably went a little too far back, but we'll let it play.

            (Video Played)

            MS. DIEHL:  And if we could pause.

BY MS. DIEHL:

Q    So that beep we heard was that dispatch said there was a warrant, correct?

A    I'm sorry.

Q    That beep we heard was that dispatch said there was a warrant, correct?

JA511

A   There was a wanted person, yeah, that's what came up next.

Q   A wanted person.

A   Right, a wanted person.

Q   So you opened the door before the beep, correct?

A   Correct, okay.

Q   Okay.  You also had to have the car door unlocked to open it, correct?

A   I didn't unlock the car door, no, ma'am.

Q   You had to ask someone --

A   Yes, that's correct.

Q   -- to unlock --

A   I'm sorry.

        MS. DIEHL:  If you could please hit play.

        (Video Played)

        MS. DIEHL:  If you could hit pause.

BY MS. DIEHL:

Q   Now, that --

        THE COURT:  Was that police language, the last word that I just heard?

        THE WITNESS:  I'm sorry, sir?

        THE COURT:  Just -- never mind.

        THE WITNESS:  That was a cuss word.

        THE COURT:  That was a cuss word.

        MS. DIEHL:  That's a Navy word, Your Honor.

                              JA512

THE COURT:  There's a bunch of those, right?

THE WITNESS:  Yes, sir.

THE COURT:  And I bet you regret that now that it's all on video being played in the courtroom.

THE WITNESS:  Oh, yeah.  Yes, sir.

THE COURT:  Okay.  Well, I get that.  I get that. It's okay.

BY MS. DIEHL:

Q   Officer Poulin, that part of the video is what was played on direct, and you were asked what the dispatcher was saying. Do you remember that?

A   What's the question?

Q   Do you remember on direct that the prosecution was asking you what the dispatcher was saying in that moment, right?

A   In that exact moment or the -- or the moment that's coming up?

Q   In the moment we just played.

A   Okay.

Q   And that's when you hear that there was a felony probation violation, correct?

A   Yes, ma'am.

Q   And in that moment, as the Judge mentioned, you were yelling at Mr. Martinez-Chavez at the same time, right?

A   Correct.

Q   You were telling him to shut up, right?  Correct?

A    Correct.

Q    And at that point in time you did not yet have a criminal history on Mr. Martinez-Chavez, correct?

A    No, ma'am.

Q    Now, you still weren't positive that Mr. Martinez-Chavez was a felon at that point in time, correct?

A    What point in time?

Q    At the moment we just watched in the video --

A    Okay.

Q    -- you were not positive that he was a convicted felon, correct?

A    No, ma'am.

Q    In fact, you asked Lieutenant Hylton if he was a felon, correct?

A    I told him to check for felony warrants after the -- after we knew that there was a probation violation for -- felony probation violation.  I told him just to check with dispatch and just go ahead and print off a criminal history and check for felony convictions just to have it, is what I did.  But that was after -- that was after the --

Q    Sure.  And if we could keep playing.  I'll have you pay attention to -- we're going to play till it, but pay attention to minute 4:55.

          (Video Played)

          MS. DIEHL:  Pause there.

                              JA514

BY MS. DIEHL:

Q    And that was you asking Lieutenant Hylton if Mr. Martinez-Chavez was a felon, correct?

A    At 4:58, yes, it was.

Q    At 4:58.

A    I told him to check for warrants, felony --

Q    Now, as indicated in the screenshot right here, at that point the car was already unlocked, right?

A    Correct.

Q    The door was already open?

A    Correct.

Q    And you still were not sure that Mr. Martinez-Chavez was a felon, correct?

A    That is correct, I didn't know whether he was a felon or not.  At -- at this point that we're looking at, yes, I do, because we've heard it with dispatch that he was wanted for a felony probation violation.  The time before we heard the beep on the radio, we didn't know if he was a felon or not.

Q    So at this point you were sure, though.

A    Correct.

         MS. DIEHL:  If we could please go to body-worn camera 15:20.

         (Video Played)

BY MS. DIEHL:

Q    You stated, "Oh, he's a felon.  If he's not, he is now,"

correct?

A    Correct.

Q    Earlier in the video when the car door is first opened, you asked someone to take a photo, correct?

A    That's correct.

Q    Where is that photo?

A    Nobody had a photograph like a camera, so nobody took that photo. Instead I got my body camera off my chest and pointed it in the direction of the passenger side floor board so that way everything that I was looking at on the outside was captured on that body camera.

Q    So that's the only photo that you know of from this night, correct?

A    That -- from me, yes, ma'am.

Q    Based on what you saw through the window, how long was that gun?

A    I mean, I didn't measure it. I can't give you exact measurement, but I know it was -- I've hunted all my life, so I know what a 16-inch shotgun looks like -- or I mean a 16-inch rifle or a 28-inch shotgun looks like, and that immediately appeared to me as a sawed-off shotgun. That's what I saw when I approached the passenger seat. It kind of scared me. I don't know if you-all could tell that when I first saw it, but it startled me when I first saw it.

Q    How long have you been a police officer?

A    For seven years.

Q    Now, you mentioned on direct that a couple people came out of the house, correct?

A    Correct.

Q    You had to yell at them to go back inside?

A    Correct.

Q    To be clear, you're in the front yard of someone's home, right?

A    I think I was toward -- I was in the driveway, but in the front yard area, correct.

        MS. DIEHL:  If we could please play the body-worn camera at 8:11.

        (Video Played)

        MS. DIEHL:  Pause there.

BY MS. DIEHL:

Q    So when they had come out of the house, they didn't yell at you, right?

A    I wasn't sure.  I just looked up and saw two people, so...

Q    You didn't see them pointing any guns at you?

A    No, ma'am.

Q    They said, "We were just wondering if you-all want to leave the car," correct?

A    Correct.

Q    And you said, "No, the car is ours, go inside" --

A    Correct.

                        JA517

Q    -- right?  So at that point in time you decided that you were not going to leave the car there, correct?

A    Correct.  Actually, I didn't decide it.  I already knew that the car was not going to stay there from Lieutenant Hylton.

Q    So you already knew it was not going to stay there.

A    Correct.

Q    You already knew it was going to be towed.

A    Correct.

Q    And you personally didn't ask Mr. Martinez-Chavez if he wanted to leave the car there, correct?

A    I'm not going to ask him anything.  I didn't ask him anything, no, ma'am.

Q    Okay.  And similarly, you didn't ask if he was going to authorize someone else to pick it up, right?

A    In order to do that, you have to be the registered owner, and I did not ask him that.

Q    And you did not -- you personally did not do an inventory search of this car, correct?

A    Not an inventory search, no, ma'am.

Q    And you did not personally fill out a tow sheet for this car, correct?

A    No, ma'am.

Q    You did look through the car, correct?

A    Correct.

Q     Including the glove compartment?

A     Correct.

Q     You found things like watches in the glove compartment?

A     I searched the vehicle, yes, ma'am.

Q     And you found things like watches in the glove compartment, correct?

A     I didn't document that I found watches in my report, but if you could show me I could tell you.  I could -- from my memory --

Q     Absolutely, we'll go back, but something you just said, you didn't document what you found in the car, correct, other than the ammunition and the guns?

A     Of -- right, of the weapons is what I was searching for. It wasn't by call, wasn't my -- I wasn't primary officer on it. I have no power to do an inventory search of the vehicle.  If that was my call with these same circumstances, I would have done an inventory search, but it was not my call.  It was the sheriff's office.  I work for the Rocky Mount Police Department, so I can't fill their inventory sheet out for them.

      So I did find the gun in Virginia.  It's labeled for a sawed-off shotgun, in my opinion, what I thought that day, or at that time.  So that's a felony offense in Virginia, so I was searching for anything else after -- through the car involving shotguns or any kind of weapons or ammunition.

Q     So that's correct, my question.

A     Correct.

          MS. DIEHL:  If we could please play back from around,
let's say, 5 minutes.

          (Video Played)

          MS. DIEHL:  I think we went a little too far back.
Let's go to 6 minutes 30 seconds and hit play.

          (Video Played)

          MS. DIEHL:  If you would go forward about 15 seconds.
A little further.  And about 5 more seconds and hit play, and
we'll just let it go.

          (Video Played)

          MS. DIEHL:  If we could pause.

BY MS. DIEHL:

Q     So in those few minutes, we saw what appeared to be a
tablet, correct?

A     Correct.

Q     And at least two watches, right?

A     Correct.

          MS. DIEHL:  Thank you.  No further questions, Your
Honor.

          THE COURT:  Okay.  Any redirect of Officer Poulin?

          MR. VEGA:  Couple of questions, Your Honor.

                    REDIRECT EXAMINATION

BY MR. VEGA:

Q     Officer Poulin, the defense established that you wrote

JA520

your report on January 17, which is 16 days after this incident, right?

A    That's correct.

Q    Would you tell the Court about your process of how you wrote your report for this specific report.

A    Yes, sir.  I was actually in my patrol car.  I was working day shift in my patrol car, still responsible for the road, answering calls for services going through town as a sergeant that day.  So I'm still responsible for answering calls.

I pulled up the body camera since it had been a little bit to refresh my memory on the bigger sections that, you know, the events transpired.  I pulled up our -- our system that we have for body camera, got out a -- reached in my passenger side duty bag and grabbed an old pay stub.

I let the video play, took -- took some notes on what -- what had transpired as the video was playing.  I didn't stop it or pause it.  Took some notes.  I went to our system, RMS, and I started to conduct -- or to complete the report on RMS, and I did that in about 15 minutes, approximately 15 minutes, because I still had to answer calls for service that were coming in through 911 dispatch center.

MR. VEGA:  Thank you.  No further questions.

THE WITNESS:  Yes, sir.

THE COURT:  Thank you, Officer Poulin.  You may stand down, okay?

THE WITNESS:  Yes, sir.

THE COURT:  Does the government have any additional evidence to put on?

MR. VEGA:  No, Your Honor.

THE COURT:  Okay.  Does the defendant have any evidence you wish to put on?

MS. DIEHL:  No, Your Honor.

THE COURT:  Okay.  All right.  All the evidence is in.  The officers, if they want, can remain in the courtroom. They can remain or they can leave, whatever suits them.  There is no reason to sequester since no one is -- since we've concluded the evidence.

It's the defendant's motion to suppress.  Let's hear argument from the defendant.

(Interruption by court reporter)

(A recess was taken at 2:41 p.m. to 2:53 p.m.)

(Proceedings not attached)

(A recess was taken at 4:26 p.m. to 4:30 p.m.)

THE COURT:  Okay.  Court rules as follows:

This is an interesting case with a lot of arguments that are based, as in any Fourth Amendment case, on the specific facts and circumstances of this case.  I've watched the body-worn camera; I've read the briefs; heard the testimony that was presented here today.  And so let me take the various pieces bit by bit, and then I'll conclude as I conclude

First, there was reasonable articulable suspicion to make an investigatory stop.  The officer testified it was justified by both the speed and turning the lights off on the highway.

Although the defendant argues that the officer's credibility is questioned because at, for example, 18:05 of his audio tape he stated he didn't turn his light on.  I found both officers to be very credible.  I found their testimony to be consistent with what they -- what happened in the -- as evidenced in the body-worn cameras, and I -- I found absolutely no basis to suggest that they were making anything up.  I found their testimony to be consistent and credible.  To be sure, things a year later or things in a report versus a video might be a little different, but these -- I -- I found the officers to be credible, and I believe them to be truthful.

So I take the officer's statement at his word that the defendant's vehicle was speeding and he turned his lights off on the road, really sort of suggesting that he was attempting to elude him.  There is reasonable articulable suspicion of a crime being committed right there justifying the traffic stop.

The officer -- sure, at 18:05 he talks about when he turned his lights on and whether he turned his lights on or not that may be inconsistent with other things, but he over and over again throughout these videotapes, these videos, says the

same thing.  He was speeding; he went dark; I pulled him over; he was reaching over; and -- and look, lo and behold there's a gun here.

The video evidence and the testimony of the officers establishes that the gun was in plain view before the passenger's door was opened.

But before we can get there we have to decide -- so I have determined based on my -- my listening to the officers' testimony, my review of the videotapes, my review of the documentary evidence, even though there may be some small discrepancies raised by the defense, I found the testimony to be credible, and I believe that there was a valid investigatory stop for the two reasons Lieutenant Hylton mentioned.

The question then -- and I really thought Ms. Bohn did a very nice job.  Quite impressed, frankly, with both of these lawyers I've never seen before, both Mr. Vega and Ms. Bohn, and, of course, Ms. Diehl, who I have seen before.  But quite impressed by your command of the facts, your command of the case law, and your -- and your thoughtful arguments.  And the one that really -- that I really had to think about and really had to go back and watch that video again was, did the officers exceed the permissible scope of a traffic stop in this case.  And you know, I have had that case.  I had that case.

I had a case a few years ago in which I suppressed a search based on exceeding the permissible scope of a traffic

stop.  I ruled for the defense.  But that was a far different case than what we have here.  That was a case in which the officers -- the evidence showed that the officers were waiting for the drug dog to show up.  They were just waiting and waiting.  And it was a matter of 20 or 30 or 40 minutes or something like that for the drug dog to show up, that that search was impermissibly extended.

None of that happened here.  We watched Lieutenant Hylton, and I -- I wrote that opinion and I studied the evidence in that case, and I thought, yeah, that -- that was an impermissible extension of the -- of the traffic stop.  But that's not what happened here.

For the first 2 minutes and 18 seconds of Lieutenant Hylton's video, his body-worn camera falls on the ground and you can't see anything.  You can hear a little bit.  And Mr. Vega questioned Lieutenant Hylton about some aspects of that, what you could make out, and some of it clearly related to -- related to the purpose for the stop, like "How much did you have to drink," right?  That's plainly related to the purpose of the stop.

Questioning goes on for a couple of minutes.  He puts his body-worn camera back on, and they are right there trying to get his information to contact dispatch.  Completely legitimate, completely reasonable what an officer can do within the scope of the traffic stop.  That was at 3:20 -- around 3:20

he contacts dispatch, 33 seconds later Poulin shows up, and another officer shows up such that both of them go and -- and look at the car.

Within a few seconds they find the gun.  They start looking at the car at 4:17.  They -- they -- gun is announced at 4:33, and dispatch comes back at 4:52 and says he's got -- he's got an outstanding felony probation warrant, okay?

So with this tight timeframe of just a few minutes in which they are questioning about how much he had to drink, they are trying to establish his identity, they are radioing dispatch, the scope of the permissible stop is not exceeded.  That's clear.  The time is just too tight.  I -- I don't know of any court that has held --

Well, I mean, here the scope is just not exceeded.  They hadn't even heard back from dispatch here when the gun was found.  Period, end of story, scope is not exceeded.  So I wondered about that in the argument and thought about it, and after watching the evidence it's clear to me the scope of the permissible stop was not exceeded.

"Aha, but," the defense argues, "what are they doing with these flashlights if plain view doesn't apply unless it's inadvertent?"  Well, let me quote from *Texas v. Brown*, the case upon which the defendant relies, if I can find the spot.

What they were talking about on that inadvertent point stems from the plurality in the *Coolidge v. New Hampshire*

JA526

opinion.  And this -- the Supreme Court expresses some concern about whether or not that inadvertent part is -- is really necessary, and whether the *Coolidge* establishment of the test is appropriate.  But this is what it says in black and white in *Texas v. Brown* at page 739 to 740:  "It is likewise beyond dispute that Maples' action in shining his flashlight to illuminate the interior of Brown's car trenched upon no right secured to the latter by the Fourth Amendment."  The Court said in *United States v. Lee* that the "use of a searchlight is comparable to the use of a marine glass or a field glass.  It is not prohibited by the constitution."  Numerous other courts have agreed that the use of the artificial means to illuminate a darkened area simply does not constitute a search, and, thus, it triggers no Fourth Amendment protection.

So using the flashlights to look in the car and they see the gun, that does not violate the constitution.  I also don't think it's impermissibly extended the traffic stop because it's done before the time comes back from dispatch.  And of course, part of that was delayed a little bit because of while he was contacting dispatch those other folks came out and the defendant was -- was talking to them.

So I don't -- the visual -- the visualization of the gun in the car, to that point there's no violation of the constitution whatsoever.  Traffic stop is -- is lawful.  It doesn't exceed its permissible scope.  There's nothing wrong

JA527

with these officers, while waiting for the stuff to come back, to shine their flashlights in the car, particularly under the facts of this case where we already know that -- and I found it to be credible that Lieutenant Hylton saw the defendant lean over to the passenger seat.  I found that to be credible.  I realize the defendant challenges that credibility, but I found it to be credible.

And we also know that somebody came out to the car while they are standing there.  And while he is -- while Lieutenant Hylton is there by himself with the defendant, somebody comes out to the car in an exchange in Spanish and so forth.  That's why I asked him whether he spoke Spanish, to see whether he understood it.  We now know what he said.  The defendant was saying, "Shut the door, shut the door, shut the door."  That's what he was saying, right?  But Lieutenant Hylton didn't know that.

Now, once the gun is seen, the police are justified in opening the passenger door to conduct the protective sweep. The protective sweep exception plainly applies here.  The totality of the circumstances make this clear.  So I think that the plain view of the gun, which is clear -- they can do that constitutionally -- is seeing the gun is another fact which allows them to engage in the protective sweep

First, it's in the middle of the night, a little after 12, and you can see from the video cameras it's a dark

residential area.  The officer testified to evasive conduct of the defendant while driving: turned his lights off; pulled into the grass in the yard.  The office testified, and I found to be credible, that there was movements observed by him toward the passenger area.  And when Lieutenant Hylton and the defendant were still alone, a person comes out to the car, and there's an exchange in Spanish with the defendant and the officer tells him to go away.

Under these circumstances, and of course the Fourth Amendment cases are very fact-specific, the case law makes clear that under these circumstances that the -- what they did here in opening the car door was authorized under the protective search exception.

In *Michigan v. Long*, the Supreme Court, 463 U.S. 1051, 1983, said:  "In this case the officers did not act unreasonably in taking preventive measures to ensure that there were no other weapons within Long's immediate grasp before permitting him to reenter his automobile."  The Court rejected the argument that protective sweep was not justified where Long was under the officer's control.  The Court stated:  "Just as a Terry suspect on the street may, despite being under the brief control of a police officer, reach into his clothing and retrieve a weapon, so might a Terry suspect in Long's position break away from police control and retrieve both weapons from his automobile.  In addition, if a suspect is not placed under

arrest, he will be permitted to reenter his automobile, and he will then have access to any weapons inside.  Or, as here, the suspect may be permitted to reenter his vehicle before the Terry investigation is over and again may have access to weapons."

The defense argues, "Oh, they were going to tow this car.  They had planned to tow this car."  Well, the fact of the matter is, under the totality and the specific circumstance of this case, a protective sweep is justified and warranted and constitutional to search that car for guns under the case law. The Fourth Circuit has applied this in *United States v. Elston*, the Court stated -- that's 479 F.3d 314, 320 --

I mean, those officers, when they are four minutes there, when -- when they shine their lights in that car and they open that door, and they conduct that protective sweep, it's not my view of the evidence that it had been determined already that they were towing this car away.  I -- I don't find that to be supported by the evidence, and I believe a protective sweep is warranted here in this case.

In *Elston*, the Court said:  "Such a protective sweep is -- search is authorized even if the suspect is under police restraint at the time the search is conducted because the suspect may be able to escape such restraint or may later regain access to the vehicle if he's not arrested.  Elston contends that *Long* is inapposite here because Officer Hicks

JA530

testified that, even if he had not arrested Elston, he would not have allowed Elston to drive the truck due to Elston's intoxication."  Just like they were going to tow the car away scenario.  "Elston's assertion in that regard, however, misses the point.  *Long's* rationale that a suspect who is temporarily under police restraint might nonetheless, at some later point in the encounter, have the chance to retrieve a weapon from the vehicle.  Whether the suspect would be allowed to drive the vehicle away from the scene is immaterial to the *Long* inquiry.  Here, if the officers had not arrested Elston -- still a possibility during the *Terry* stop -- he would have been released from the officers' physical control, creating a risk that he could retrieve his 9 millimeter handgun from the truck.  Under the standard spelled out in *Long*, the officers were authorized to conduct a protect search of Elston's truck in conjunction with the *Terry* stop.  Elston's contrary contention is therefore without merit."

Looks, it's pouring out in the facts of this case.  At the time they shine their lights in and open the car door, they hadn't even heard that he's a felon yet.

I mean, this is -- this is -- there was -- there was no determination they were going to tow this car away at that point.  They didn't know where this case was going.  The case evolved as the stop evolved.  And plainly, plainly, the protective sweep doctrine applies.

Later in *United States v. Carico*, the Fourth Circuit -- well, in *Holmes* decided in 2004 -- interesting opinion written by Michael Luttig then with the Fourth Circuit talking about this issue says -- he's talking about the argument that, well, the protective search is not justified because there's no evidence that the defendant could have gained immediate control of the weapons.

And what Judge Luttig said in *Holmes* was:  "The premise of this argument may have merit: if there is no reasonable possibility that a suspect will gain access to the interior of his car during the period of the seizure or shortly thereafter, i.e., the time when he would pose a threat to the safety of law enforcement officers or others, it may be that *Long* would not permit the officers to conduct a protective search of the car.  However, we need not decide whether the Court's decision in *Long* included this caveat because, under the facts of this case, we concluded that it was well within the range of reason to believe that, after their release after the conclusion of the stop, the suspects would have access to the interior of the car.  We are also confident that it was reasonable to think that the suspects' access, in combination with their inherent dangerousness, would place the officers conducting the stop in jeopardy.  Thus, regardless of the extent to which the suspects were incapacitated at the time of the search, the search of the car was a reasonable measure to

protect the safety of the officers conducting the stop, and,
therefore, it was permissible under *Long*."

So too here.  These events are happening very
quickly, within -- within 4 or 5 -- within 4 minutes, 4 minutes
and 17 seconds, according to the body-worn camera of Lieutenant
Hylton, a gun is seen.  No, no, no.  No.  That they start
looking in the car.  Poulin shows up at 3:53; they start
looking in the car at 4:17; 4:33 the gun is seen; 4:52 dispatch
comes back and says this guy is wanted on a felony warrant.

At that point with this -- the events so fluid as
they were, given the testimony of trying to evade by darkening
his car, given the testimony of he's reaching something into
the passenger seat -- and granted, I find the officers to be --
the officer to be credible in that regard.  Given that
situation, there is -- there is no way that any reasonable
person could conclude that the officers would have been
unjustified in protecting themselves by conducting a protective
sweep.

In the words of the *Holmes* case, it was reasonable to
think that before -- before they learned that the defendant has
an outstanding felony warrant, they weren't sure they were
going to arrest him.  They didn't know what was going to
happen.  And so at that point it was reasonable for them,
before they made that decision, to engage in this protective
sweep given the other circumstances of that evening.

In *Carico*, another recent case, the Fourth Circuit said -- this was unpublished decision, again, out of this district, Judge Jones: "It is undisputed that *Carico* was stopped by law enforcement because an unauthorized weapon was visible in his vehicle. The officer was, therefore, permitted to perform protective search of the vehicle to secure the weapon." Citing *Elston*, in which it says, "Search of a vehicle in a Terry stop is authorized if the officer has a reasonable belief that the suspect is dangerous and maintain control of weapons in a vehicle even if the suspect is restrained at the time."

So at the time the protective sweep, the search is done, they had seen the gun. They had seen the gun before the door is opened. And that -- the fact that there is a gun in that car with all of the other facts and circumstances, it's plainly reasonable for these officers to search that vehicle to make sure that, should they decide to release the defendant, he not access that gun or somebody from the house come out and access that gun.

So under the particular facts of this case, as I must consider them under the Fourth Amendment, and as is evident from the testimony at this hearing, which I found credible, and the video evidence, which is consistent, I find that there was reasonable articulable suspicion to stop the defendant's car. I find that the scope of the traffic stop was not

JA534

unconstitutionally exceeded, that the gun was seen in the vehicle in plain view, and that the protective sweep exception just -- is justified to allow the opening of the driver's and the passenger doors.

Okay.  So protective sweep allows them to open the door.  And but before the door is opened, and this goes to the point made by the government, Officer Poulin is heard on Exhibit 4 video to clearly state that the gun was a sawed-off shotgun.  Poulin's identification of the gun he observes in plain view as a sawed-off shotgun before the door is even opened provides probable cause to conduct this search.  There's probable cause that in that car was an illegal weapon, the sawed-off shotgun.

I find the cases cited by the -- the *Riley* case and the other case cited by -- *Sandiford* and *Dillan* cited by the defendant not to be persuasive.  If an officer sees a sawed-off shotgun at a traffic stop inside a car, he is justified as -- that is another circumstance that justifies the protective sweep.  He's also in plain view constitutionally justified in seizing that weapon to determine whether or not it is indeed, as he suspects, illegal.  Officer Poulin clearly testified -- he clearly testified, "I thought that was an illegal gun and that's why I said that."  And they searched the car.

So I do think there's -- the government's argument on plain view I think has merit, and I think the fact that -- that

JA535

there may be exceptions under which a sawed-off shotgun can be owned in Virginia legally is beside the point.

Now, next:  After the passenger door is opened but before the gun is seized and the second gun is seen, dispatch advises that the defendant was wanted on a felony probation warrant out of Montgomery County.  This happens within a few seconds of the passenger door being opened.  Passenger door was -- the gun was seen at 4:33; the door is opened between 4:33 and 4:52; and at 4:52 dispatch advises, hey, he's wanted on a felony probation warrant.  At this point there is -- there is, as well, probable cause to believe the defendant is committing the crime of possession of a firearm by a prohibited person.  They don't have to establish with all the records.  They don't have to prove it beyond a reasonable doubt.  There's got to be probable cause here.  And when you get that from the dispatch with all of the other facts and circumstances, they can seize that weapon and they can search that car.  There's probable cause to see -- once dispatch lets them know --

You know, this thing kind of -- kind of is a cascade.  It's almost a staircase.  There's reasonable articulable suspicion for the stop.  The stop is not unreasonably extended.  During the traffic stop they see the gun.  That combined with all the other circumstances gives rise to them to be able to do a protective sweep.  And at the same time -- and then, while at the same time, while the door is open but before the gun is

seized, they find out he's -- he's got a felony warrant out for him.  They are justified in seizing that firearm and searching that car.  That -- I mean, there are so many reasons why what happened here was not unconstitutional.  So many.

In sum, the evidence adduced at this hearing does not support the defendant's argument that a violation of the Fourth Amendment occurred.  The defendant's motion to suppress the introduction of the two firearms and the ammunition is overruled.

I will try to put something down in writing as well. I -- I do want to compliment in really glowing terms the presentation made by counsel on both sides of this case, but I do not think -- and I think defense counsel did a really good job of trying to fashion an argument here, but I don't think this case is close.  I don't think the Fourth Amendment was violated, and I don't think it's close.  And it -- what these officers did was not unconstitutional.  It was not unreasonable.  And under the totality of the circumstances, the Court is convinced that the defendant's motion must be overruled.

But I thank you for your work and for your professionalism.  Thank you so much.  We'll stand adjourned.

I'm going to enter an order.  I may also, if the law clerks can get to it, put some of these thoughts down in a written opinion so that Judge Dillon knows where I went, okay?

JA537

So but thank you all.  Nice to see you.  We'll stand in adjournment for the day.

(The proceedings concluded at 4:59 p.m.)

**CERTIFICATE**

I, Mary J. Butenschoen, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Mary J. Butenschoen, RPR, CRR                1/9/2025

JA538

                    IN THE UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF VIRGINIA
                          ROANOKE DIVISION

**UNITED STATES OF AMERICA,**

            Plaintiff,          **CASE NO.: 7:24-CR-00011**
                                January 3, 2025
                                Roanoke, Virginia
                                Motion Hearing - (Excerpt)
-v -

**ISAAC FIDEL MARTINEZ-CHAVEZ,**    Before:
                                **HONORALBE MICHAEL F. URBANSKI**
                                U.S. DISTRICT COURT JUDGE
            Defendant.          WESTERN DISTRICT OF VIRGINIA
*************************************************************

APPEARANCES:

For the Plaintiff:

     **MATTHEW M. MILLER**
     **JUAN L. VEGA**
     DOJ-USAO
     310 First Street, SW, Room 906
     Roanoke, VA 24011
     540-676-2856
     juan.vega2@usdoj.gov
     matthew.miller2@usdoj.gov

For the Defendant:

     **BEATRICE DIEHL**
     **HEIDI BOHN**
     Office of the Federal Public Defender
     Western District of Virginia
     210 First Street SW, Suite 400
     Roanoke, VA 24011
     540-777-0891
     beatrice_diehl@fd.org
     heidi_bohn@fd.org

_____
                    Mary J. Butenschoen, RPR, CRR
                   210 Franklin Road, S.W., Room 540
                      Roanoke, Virginia  24011
                       540-857-5100, Ext. 5312
PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY; TRANSCRIPT
PRODUCED BY COMPUTER.

**INTERPRETER PRESENT**:  Peter Floyd

(Proceedings commenced 11:58 a.m.)

THE COURT:  Good morning.  Ask the clerk to call the case.

THE CLERK:  All right.  This is the *United States of America v. Isaac Fidel Martinez-Chavez*, Criminal Action Number 7:24-CR-11, Defendant 1.  And the interpreter has been sworn.

THE COURT:  Okay, great.

Good morning, folks.  We're here today.  Judge Dillon -- this case is set for trial later on this month, I think.  Judge Dillon has been occupied with other criminal matters, and in order to get this hearing held in a timely fashion and get a ruling out, she asked me to pick up this suppression hearing, so I have agreed to do so.  I think she may have entered an order referring it to me or something like that.

But is there any objection to this Court hearing this suppression hearing?  From the government?

MR. VEGA:  Your Honor, my name is Juan Vega, Special Assistant to the U.S. Attorney.  Pleasure to meet you, sir.  No objection from the government.

THE COURT:  How about from the defense?

MS. BOHN:  Your Honor, I'm Heidi Bohn with the public defender's office, and we do not have any objection.

THE COURT:  Okay.  Well, I don't think I've met

Mr. Vega or Ms. Bohn yet.  I don't think I have, so nice to make your acquaintance.

Let me just say I read all the memos that were filed, including the one that was filed yesterday by the defendant, and I've looked at all the videos in their entirety.  I'm sure you-all, as is typical at these hearings, will have aspects that you would like to point out to me during this argument.

I will say at the outset, just one of the things I noted, the defense argues in its most recent memo that -- on page 4, it says, "Because the Government specifies that the officers did not conduct a protective sweep, it concedes that the protective sweep exception to the warrant requirement does not apply here."

So I'm going to need to make sure that I understand from each of you which exceptions to the warrant requirement do apply here.  And because this was -- the opening of the car door was -- was without a warrant, I think the government has the obligation to establish that an exception applies.

And so how would you all like to proceed?  Is there any opening statement you'd like to make, or would you like to just proceed with evidence you'd like to present?

Mr. Vega?

MR. VEGA:  Yes, Your Honor, thank you.  Just a very brief opening statement, Your Honor.

THE COURT:  I'm happy to hear from you, happy to hear

from the public defender, and then we'll hear what evidence we have.

MR. VEGA:  Yes, Your Honor.  We have two witnesses here.  The first one is Lieutenant Hylton with a "Y," H-Y-L-T-O-N, and the other one is Officer Poulin, P-O-U-L-I-N, and those were the two primary officers that night from Franklin County.  And we intend to show through their testimony, and as well through the evidence that has already been filed by the defense and by the government, that the traffic stop was lawful, that there was a valid objective reason for the traffic stop, and that was that the defendant was speeding, 60 in a 45, and that he blacked out his lights on two public highways.

We also plan to --

THE COURT:  Well, the other thing they argue in their reply brief, for what it's worth, is that one of the officers concedes that it wasn't a traffic stop.  He didn't pull him over for speeding.  So we'll just have to flesh that out during the argument today.

MR. VEGA:  Yes, Your Honor.  And not to get into the argument here, you will hear testimony that the defendant fled from Lieutenant Hylton, and Lieutenant Hylton activated his lights and gave chase.  So there was a fleeing involved, and that's why Lieutenant Hylton was not actually able to initiate a traffic stop, but he did attempt to, as the defendant sped

away.

THE COURT:  Okay.

MR. VEGA:  And the exception, Your Honor, that we're primarily relying on is plain view, and Officer Poulin is the primary officer for that.  He'll testify that he was standing outside -- Your Honor did see the body-worn camera footage.  He was standing outside the silver Kia that the defendant was driving, and he -- Officer Poulin had his flashlight, was looking into the front passenger floorboard area, and he immediately says, "There's a gun in there."  And you will hear testimony from him saying that his immediate impression was that it was a sawed-off shotgun, which is prohibited under Virginia law, and we can argue that at the appropriate time that it is outright prohibited by Virginia law.  There are some affirmative defenses for it, but we'll get -- we'll get to that at the appropriate time.  And because it is -- the sawed-off shotgun is presumptively illegal in Virginia, Officer Poulin had the lawful right of access to that sawed-off rifle, and, therefore, he could open the door and seize it.

Now, what he did is, if you recall from the body-worn camera, he opened the door.  And just as he opened the door, he heard from dispatch that there was a felony probation violation -- warrant for felony probation violation.  You'll hear from both Lieutenant Hylton and Officer Poulin that they reasonably believed at that point that the defendant was a

convicted felon, and that gave them a probable cause to seize the weapon.  And now that they have got the probable cause that there's a felon in possession of a firearm, they could search the entire car looking for other firearms, as well as ammunition, which, of course, they did find the ammunition.

THE COURT:  Okay.  So there's three things we're talking about here:  First is the stop.  Second is the opening of the passenger door, the driver's door and the passenger door.  And then the third thing is the more fulsome search.  Correct?

MR. VEGA:  Yes, sir.

THE COURT:  Those are the three things, right?

Are you conceding, as the defense argues, that the protective sweep exception does not apply?

MR. VEGA:  Absolutely not, Your Honor.  When --

You saw on the body-worn camera -- we'll see it again in the footage -- that the individual comes out.  Lieutenant Hylton will testify that that individual, the defendant was talking to him.  That individual tried to get into the car where the firearms were.  And Lieutenant Hylton interrupted his conversation with dispatch to tell this individual to stay away from the car.  Lieutenant Hylton conveyed this information to Officer Poulin.

A little bit later, a couple of individuals come out, and Officer Poulin tells them to get back inside.  According to

the defense motion, there was a New Year's Eve party going on.

THE COURT:  Yeah, it was right after -- it was right after the new year.

MR. VEGA:  Yes, sir.  And it's reasonable to believe that there were alcoholic beverages being served, and so that a protective sweep is definitely, definitely appropriate in this case --

THE COURT:  Okay.

MR. VEGA:  -- to at least secure the firearms while the investigation continues.

THE COURT:  Okay.  Would -- is there any motion -- looks like there's some -- you've got two officers here who are going to testify.  I don't know if there's going to be any evidence from the defense.  Is there any motion to exclude the witnesses?

MS. BOHN:  Yes, Your Honor, we would make that motion.

THE COURT:  Okay.  While one officer is testifying, obviously, it would be appropriate for the other officer to be excluded.  Okay?

MR. VEGA:  Yes, sir.

THE COURT:  All right.  Anything else you want to say by way of opening?

MR. VEGA:  Your Honor, there's also -- we also plan to get into the inevitable discovery.

THE COURT:  Right, the inevitable discovery doctrine. But if the Court were to find an exception on the others, it doesn't have to reach inevitable discovery, right?

MR. VEGA:  That's really our argument.  We plan to present our strongest arguments to the Court first, and then, in the alternative, the other arguments.

THE COURT:  I'm happy to hear whatever you want to present.

Does the defense want to make any sort of opening statement?

MS. BOHN:  Just briefly, Your Honor.

THE COURT:  Okay.  I'm happy to hear from you.

MS. BOHN:  Thank you, Your Honor.

THE COURT:  It's Ms. Bohn, right?

MS. BOHN:  That's correct.

THE COURT:  Again, nice to make your acquaintance.

MS. BOHN:  Nice to meet you, Your Honor.

THE COURT:  We may have met.  I don't remember.

MS. BOHN:  I think we met in passing at the training, the seminar on --

THE COURT:  Okay, great.  Well, nice to see you in court.  Happy to hear from you.

MS. BOHN:  Thank you.  Good to see you as well, Your Honor.

Just briefly, our argument is basically that

Mr. Martinez had a right to privacy in the vehicle, the family vehicle he was driving, and that the police searched that vehicle without a warrant.

The exceptions that they claim apply, including plain view, protective sweep, and inevitable discovery, none of those actually work under the law, particularly in light of the details, the factual details that we can glean from the body-worn camera in this case.

And so for those reasons, the evidence seized, which included two guns and ammunition, for this prosecution should be suppressed.

THE COURT:  Okay.  Thank you for that, Ms. Bohn.
(Proceedings previously transcribed and filed at ECF 93)

THE COURT:  Is the interpreter okay?

THE INTERPRETER:  Yes, sir, thank you.

THE COURT:  Good.  No, you're working hard.

Let's see.  Is there any argument for -- from the government?

MR. VEGA:  Your Honor, I believe the defense will go first.

THE COURT:  I'm so sorry.  This is the defendant's motion, so I need to hear from the defendant first.

Thank you, Mr. Vega.

MS. BOHN:  Yes, Your Honor. We do have argument. Thank you, Your Honor.

At the beginning of the government's case, they told us that the issues before the Court today were the propriety of the traffic stop and that they are claiming a couple of exceptions to the warrant requirement, including the plain view exception and the protective sweep, as well as inevitable discovery. So I'm going to address each of those.

I know that we've briefed this, and so I'll try not to repeat too much from that, Your Honor. But I just want to start off by saying that the Supreme Court has held that an individual has a privacy right in a vehicle, in an automobile, and that was in *Preston v. United States*, 376 U.S. 364, 1964.

It went on to hold that a car's interior is subject to Fourth Amendment protection from unreasonable intrusions by police, and that was in *New York v. Class*, 475 U.S. 106, and that was in 1986.

And later on in the Supreme Court, Bond v. United States -- or I'm sorry, *Byrd v. United States*, the court went so far as to say that even the driver of a rental car could have a reasonable expectation of privacy, potentially, even when the rental agreement did not authorize him to drive it.

And so here I don't think there's any debate that Mr. Martinez was driving their family car, it was registered in his wife's name, and that he had a reasonable expectation of privacy in the vehicle for standing in this case.

Now, as far as the stop goes, Your Honor, I have two

arguments on the stop.  There was not a valid traffic stop, if you look at all of the evidence that is before the Court.  First of all, the legal standard as far as a stop goes is, in determining the propriety of a traffic stop, the Fourth Circuit analyzes, first, whether the police officer's action was justified at its inception; and then, secondly, whether the police officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop.  And that was from *United States v. Digiovanni*.

Here we have -- first of all, we have Officer Hylton's testimony about the traffic stop.  He testified today that he did not stop Mr. Martinez for speeding.  He -- he also testified that he, in fact, did not activate his lights when Mr. Martinez allegedly turned his lights off.  He said that he did activate his lights sometime later on.  And so -- and I think maybe the most powerful evidence is his testimony that the policy is that officers call dispatch to inform them when they are initiating a traffic stop.  And we don't have any -- any evidence of that happening from any of our reports that an actual traffic stop was initiated.

We -- we also just have Hylton's testimony that, sort of the purpose of following Mr. Martinez, he observed him speeding, and there just weren't a lot of cars around that night, and he was looking for a DUI.  And so he decided to go ahead and follow Mr. Martinez in the hope of kind of scoring a

good arrest that evening.

Now, secondly, as far as the legal standards go, we don't -- after -- after Officer Hylton stops Mr. Martinez, we don't see any actions really reasonably related to the scope of a traffic stop. Officer Hylton testified that he didn't issue any tickets. He didn't conduct a field sobriety test. He didn't send -- he didn't write a summons. And we see in the body camera video that he didn't ask any questions about speeding or turning the lights off. He didn't initiate any sort of DUI investigation.

And so not only do I think that he didn't, in fact, conduct a traffic stop, I think that he -- you know, the actions after the stop don't correspond; they are not reasonably related to the scope of a traffic stop.

And so we don't have a proper traffic stop in this case. And that's in and of itself enough for suppression, because if the initial traffic stop was illegal, or even the officer has exceeded the scope of the stop, then contraband seized from the vehicle is excluded under fruit of the poisonous tree in the Fourth Circuit, and citing to the Supreme Court in *Wong Sun*.

Our second point is -- and this is probably their best argument is plain view, but there's some definite problems with that argument when we look at the body camera video and the actual law on plain view.

So first of all, just to lay out the standard that came originally from *Texas v. Brown*, the first requirement for the plain view exception to apply is that police must lawfully make the initial intrusion.  Second, the officer must discover incriminating evidence inadvertently so that plain view is not used as a pretext.  And finally, it must be immediately apparent that the items are evidence of a crime or subject to seizure.

So in this case we have photographs of the weapons in the vehicle all taken after Officer Poulin opens the car door, and we got testimony from Officer Poulin and Officer Hylton definitively today that they did not know Mr. Martinez's criminal history at the point that they opened the car door. And both officers, likewise, testified that they inadvertently wrote in their reports that they did have his criminal history before they opened the door.  So they just both accidentally made that mistake in their report, which goes to their credibility, but it also goes to the invalidity of the plain view exception.

They also both testified that they made another mistake in their reports, which was that they -- they indicated that Martinez had reached over for something in the car and that that was -- that that happened before they searched the vehicle.  They both admitted today when they testified that that was -- they both coincidentally made that same mistake in

their reports.  And so their credibility on that issue is questionable.

So there's a lot of discussion about the sawed-off -- the sawed-off gun, and I think it's kind of deceptive in the sense that the sawed-off -- the Virginia statute on sawed-off guns, it doesn't actually make a sawed-off gun illegal.  The statute makes various specific requirements of a gun potentially illegal, whether that be the measurements, the caliber of the gun.  And I cited case law in the -- in the motions contrary to what the government has argued, that the presumption is not that sawed-off weapon is illegal in Virginia or indicative of criminal activity.

As far as the federal -- the federal law, a sawed-off weapon --

THE COURT:  They don't have to know its -- they don't have to measure it.  I mean, they just have to have probable cause to believe a crime has been committed to continue this search.  They don't have to have the measurements of the gun.  If the officer thinks it's an illegal sawed-off shotgun, as he plainly did even before the car door is open, isn't that sufficient probable cause for him to believe that a crime right there has been committed?  And that he can investigate it?

MS. BOHN:  I don't believe that's the case.  Under the federal law, that weapon would only be unlawful if it were not registered, and there's no way by looking at it --

THE COURT:  Well, okay.

MS. BOHN:  I just think there's no way in plain view you can tell if a gun is registered or not, Your Honor.

THE COURT:  But you have enough reason to know that -- by looking at it that that gun might be illegal.  He sees it.

MS. BOHN:  Also, Your Honor, I believe that he sees it plainly when the car door is open.

THE COURT:  No.  No, no.  Absolutely not.

He -- I noticed from this hearing, and it was very clear to me, he says, "It's a F'ing sawed-off shotgun" before that car door is opened.  That's clear.  And then once the door is opened, you can see it.  They've got pictures of it.  But he plainly says "It's a sawed-off shotgun" before the car door is opened.

So he sees a sawed-off shotgun in plain view.  Your argument is that doesn't give him any evidence to go further.  Please explain your argument to me.  Thank you.

MS. BOHN:  Yes, Your Honor.  I completely understand your argument, and --

THE COURT:  I'm not making an argument.

MS. BOHN:  I think the issue here is that, you know, he testified that he didn't know -- actually, specifically didn't know the dimensions of the gun, and that he assumed a sawed-off shotgun -- which it was not, it was a sawed-off

rifle -- was kind of, per se, illegal in Virginia, which is not the case under the case law.

And that --

THE COURT:  But it -- but it provides enough reasonable suspicion or probable cause for them to -- to go further.  You don't have to measure the thing, right?

MS. BOHN:  I mean, I guess it depends on like what you really saw from --

THE COURT:  If I see a hand grenade in the front of the car, okay?  Do I -- and I'm a law enforcement officer, do I have probable cause to open the door to look at it, or could it be possible that it's a trinket or something like that?  I mean, don't I have an obligation to go further?

MS. BOHN:  I think that's distinguishable, Your Honor, and, obviously, a hand grenade or something that could be an explosive device like that.  But as far as weapons, particularly in Virginia, that's just not the case.  People throughout history in Virginia, young men were required to carry a gun in Virginia, and the regulations on handgun possession -- or not handgun possession, but gun possession generally in Virginia are very specific --

THE COURT:  Fourth Circuit in *Walker v. Donahoe*, 3 F.4th 676 decided in 2021 says -- here was the argument:  The argument was made, well, you know, it's a gun.  That doesn't give you probable cause to do anything.  And the court said,

focusing on this decision out of the Fourth Circuit in *Black*, said, "Contrary to Walker's interpretation, the *Black* decision does not dictate that.  In a state like West Virginia where it's legal to openly carry a firearm, the act of openly carrying a firearm can never engender reasonable suspicion.  Indeed, *Black* explicitly allowed that the possession of a firearm, though lawful, can contribute to reasonable suspicion in the totality of the circumstances.  That is, the possession of a firearm, plus something more, may justify investigatory detention."

That also follows in the case of *United States v. Kelly* -- that's a Judge Dillon opinion from 2016 -- that allows consideration of possession of a weapon in determining whether there's reasonable suspicion.

So you got to consider all the facts and -- that's what -- that's what Fourth Amendment case law says, right?  You've got to consider the totality of the circumstances, okay?

So here you've got a guy who, based on the undisputed testimony of the officers, is driving fast away from a law enforcement vehicle and turns his lights off.  Turns his lights off on a road, on a highway, and pulls in -- and pulls into a driveway.

Then he leans over.  He's leaning over into the passenger seat, according to the testimony of Officer Hylton -- I think that's right.  Hylton; isn't that right?

Yeah, Hylton. And he instructs him to get out. While he's getting -- gathering his information, getting his driver's license out, relaying his information to dispatch, all within the reasonable scope of a traffic stop, another officer shows up. They looked in the car. They see a gun. Officer thinks it's a sawed-off shotgun.

Why isn't it reasonable to allow its introduction into evidence?

MS. BOHN: I think --

THE COURT: Under the whole -- also the other part is: While he's there by himself with the defendant, somebody comes out of that house and is going up to the car. And he's -- and the defendant is having a conversation with him in Spanish about it. And the officer tells him to go away, and he goes away.

So you've got a guy in the dark, under circumstances that suggest eluding and some sort of furtive movement in the passenger seat, and somebody comes out to the car, and he's having a conversation with him. They are talking to dispatch about trying to figure out who he is and what his information is. Officer Poulin comes up, looks in the car, and sees a gun.

Why isn't that constitutional under the Fourth Amendment?

MS. BOHN: I think there are a couple of reasons why it's not constitutional, Your Honor.

THE COURT:  Okay.  Tell me why you think.

MS. BOHN:  First is that the plain view exception requires that they have found the contraband inadvertently, and here, because they don't pursue any sort of traffic stop at all, they didn't -- they were seeking some sort of larger crime, something juicier than a traffic stop by their own -- Officer Hylton's own testimony.

THE COURT:  Isn't that argument that they exceeded the scope of the traffic stop?  Isn't that your argument?  That this was not a valid traffic stop?  And if it was valid, they exceeded the scope of it by looking in the vehicle?

MS. BOHN:  I do think that's our best argument, Your Honor.  But I do think that --

THE COURT:  I do, too.  I think that's your best argument as well.

MS. BOHN:  I do -- I do think it's significant that you're only supposed to -- because the Supreme Court has said, well, you know, ultimately, you're always going to see evidence in plain view.  And so there have to be some parameters around this exception.  And I think inadvertence is pretty significant, because in the original plain view case in *Texas v. Brown*, you know, officers conduct a license check, and that was determined to be legitimate.  And as the defendant is pulling out his license, it's in that exact moment this narcotics balloon that one of the officers had studied, you

know, falls to the floor.  So it's not as though they are doing a license check.  And maybe that's what you're getting at. That was a valid traffic stop, so that was fine.

But I also think there is an element of they weren't just searching around the back of the car for a big hit.  They saw the contraband while they were doing the license check inadvertently.  They weren't kind of looking around for it, as the body camera shows happening here.

And I also think, Your Honor, that the CFS reports that were introduced into evidence today don't support Officer Hylton's, sort of, after-the-fact description of Mr. Martinez reaching for something in the car, possibly a weapon.  Because in those reports there's four minutes between the initial phone call and Officer Poulin's arrival.  There's two minutes and 40 seconds between Officer Hylton and Officer Poulin's arrival. And then the body-worn camera starts --

THE COURT:  I'm sorry.  Would you repeat that?

MS. BOHN:  Yes, Your Honor.

So the CFS reports show that the -- there was the initial call to dispatch, and then Officer Poulin arrived.  And there was a four-minute time period between those two events.

Then there -- between the time that Officer Hylton arrived and Officer Poulin arrived, there were two minutes and 40 seconds.

And then the body-worn camera starts at -- there's

three minutes and 44 seconds, which gives us a 17-second period of time where, allegedly, Mr. Martinez reached for something; was ordered out of the car at gunpoint. Some of that would have been captured on the body-worn camera by that timeline.

And I also just think, you know, Officer Hylton testified today that, no, he did not write in his report that Mr. Martinez was reaching for a gun when the --

I think significantly when the -- when Officer Poulin arrives on the scene, the first thing, I think common sense would be, hey, I'm worried about the presence of a gun. I'm worried this guy was reaching for a gun for officer safety. But there was only just a casual conversation about, you know, an update on he was speeding at some point, I elected not to pull him over for that, but then he blacked out his lights.

And then they just kind of both go over and start searching the vehicle. And there is no one in the area; there's no one in the vicinity. And although there was testimony that, you know, someone came out of the car, Officer Hylton was clear that that individual didn't have anything in his hands. That's essentially his front yard. And he was polite. He didn't act in any way threatening.

Likewise, we saw in the video with the other two individuals -- presumably, the homeowners -- on the porch trying to find out if there is something they can do about the car, and they didn't have a weapon; they weren't threatening in

any way. And so this idea that Mr. Martinez was reaching for a weapon I think is an after-the-fact explanation that -- that didn't actually happen.

Which I -- I'd like to just also mention the protective sweep argument. In the government's opening, they mentioned that not only the -- the individuals at the house, but also the fact that there was a party going on, there's probably alcohol there, and so a protective sweep would somehow be justified. But that would just create a exception where you could have a protective sweep in a lot of circumstances. I just don't think that that -- the fact that a party is going on justifies a protective sweep.

And we don't have indicators in the body-worn camera or from the testimony that Mr. Martinez was violent or noncompliant. There's a little testimony about his having the hands in the pockets, but then he -- you know, when he was ordered not to do so, he was compliant in his handcuffs.

THE COURT: How long was it between the time that Officer Hylton pulled -- initiated the traffic stop, or pulled up in the driveway, and Officer Poulin found the gun?

MS. BOHN: Your Honor, I don't know that off the top of my head, but I can check my -- I bet I can find out.

THE COURT: Okay.

MS. BOHN: Your Honor, it's a little over four minutes.

THE COURT:  And what is going on during that period? What's going on during those four minutes?

MS. BOHN:  Well, if we go by the body camera, we just have the officers kind of searching the exterior of the vehicle.

THE COURT:  No, before that one goes on.

MS. BOHN:  Officer Hylton briefs Officer Poulin on the situation.

THE COURT:  And he also talks to the defendant --

MS. BOHN:  The defendant.

THE COURT:  -- looks at his wallet; gets his identification; radios it in to dispatch.  And then hears back from dispatch right at the same time that -- I mean, just -- just a hair after the door is opened, correct?  That he's wanted on a felony warrant out of Montgomery County, right?

MS. BOHN:  So first of all, that was a unverified warrant, Your Honor, and --

THE COURT:  Well, I mean, but that's what dispatch said.  Dispatch said he's wanted on a warrant out of Montgomery County and -- and that he was wanted out of Ohio on a warrant that they didn't -- that they weren't going to seek extradition on.  That's clear.  That happens.  You can hear that.  And it happens after they open the door.

What I'm concerned about is the period of time -- here's what I'm concerned about:  Was -- was the initial

traffic stop -- was the scope of the initial traffic stop unlawfully and unconstitutionally extended.  That's -- that is what this particular line of questioning that I have is focusing on, okay?

Did they exceed the scope?  Was -- what were they doing in those four minutes?  And was that conduct consistent with their investigation of a traffic stop?  I mean, these -- this officer testified that he saw the guy speeding.  He was -- he was -- he was interested in a -- in a DUI arrest rather than a speeding arrest, so he turns around.  He follows him.  He goes on at some side road, turns his lights off, which the officer then flicks on his blue lights and says -- comes after him.  So there's the traffic stop, okay?

The question that I have is:  In between then and the time the gun is found, is the legitimate scope of the traffic stop exceeded, okay?  So that's where I'm focused, and I'd like your best argument on that.

MS. BOHN:  Yes, Your Honor.  I do believe it's exceeded.  First of all, the opening of the car door is not a -- it's not a minor detour from a traffic stop.

THE COURT:  No, no, but he sees the gun before the door is opened.

MS. BOHN:  Right.

THE COURT:  He see the gun before the door is opened.  And Poulin, particularly on cross-examination, said, "I thought

it was an illegal. I thought it was an illegal sawed-off shotgun." I mean, he said that on the witness stand on cross.

So let's focus, just for the sake of my constitutional examination of what happened here in those few minutes, okay, I want to focus on the time between the initiation of the stop and the visualization of the gun in the car by Officer Poulin with both doors shut, okay?

MS. BOHN: Okay.

THE COURT: Was the Fourth Amendment violated by an unwarranted extension of the traffic stop during that period? Because we know the case law is you're only supposed to stop somebody long enough to accomplish what your -- the reason for your investigation, okay? So in other words, you can't use it as a fishing expedition. It's got reasonable confines; confined to what he was pulled over for, right?

MS. BOHN: Correct.

THE COURT: And so what's your -- is there an argument there that the scope of the traffic stop was unconstitutionally extended?

MS. BOHN: Yes, Your Honor.

THE COURT: Give me your best argument on that then.

MS. BOHN: Okay, Your Honor.

When the officers -- in their report, as you say, their stated reason for investigating Mr. Martinez is for a

traffic stop.  But the officers don't talk to Mr. Martinez.
They don't ask him questions about speed.  They don't talk to
him about having turned his lights off.  They don't at any time
pursue any kind of traffic investigation.

And so I know that you can have a pretext stop under
*Whren*.  I don't think this was a pretext stop under *Whren*,
because I don't think they ever did a legitimate traffic stop.
But even if you do have a pretext stop, you still have to
pursue the object of what you're pretending you're stopping the
person for.  So you have to, you know, ask questions about
speed.  If they really earnestly were concerned about DUI, they
ought to have done a Breathalyzer test or asked, you know,
additional questions about alcohol; performed a field sobriety
test.  They should have asked questions about the mechanics of
the car, about why he turned his lights off, to just
investigate further the purpose of the stop.  And at no time
did they ever investigate a traffic violation.

There's no evidence -- there's absolutely no traffic
tickets that were written.

THE COURT:  That -- he explained why that was.  He
explained that would be piling on.  I understand that's his
explanation, but I also understand that's your argument that
it's evidence that it was not a traffic stop.

MS. BOHN:  Right.  And I think more importantly for
what you're getting at, Your Honor, is just the fact that they

didn't ask any questions or pursue any investigation on the traffic stop itself.  And so --

THE COURT:  Well, again, goes back to my question. What happened during those four minutes then?  What did they do?  They were gathering his information to relay it into dispatch.  And they did that.  And isn't that legitimate, when you pull somebody over on a traffic stop, you want to find out -- you want to find out who you're dealing with.  And that's legitimate.  All the case law is -- is clear that you can do that.  He pulls him over for this violation.  He hadn't charged him yet, he hadn't questioned him about it, but he's figuring out who this person is.

And then only -- and at the same time they hear back from dispatch is when the gun is seen.  And so, basically, after that one could argue all bets are off as to the traffic stop because we've got a -- we've got an illegal sawed-off shotgun here, okay?

So I would like to play right now for me, if you could, I want to see the video of the -- of the lieutenant from the time he arrives until we hear the expletive-laden discovery of the sawed-off shotgun, okay?  I just want to play it because your argument has focused me on something, and I want to see what the evidence shows, okay?

MS. BOHN:  Absolutely.

THE COURT:  Okay.

MS. BOHN:  Yes, Your Honor.

THE COURT:  And I apologize for this, but I just want -- I want to be right about this.

MS. BOHN:  Absolutely.

(Video Played)

THE COURT:  Okay, I've seen enough.  We've gotten to the point in the video that I wanted to see between the time Lieutenant Hylton showed up and the time dispatch responded.

All right.  So let's hear what additional argument you have as to the -- whether or not the traffic stop was lawful, whether the scope was exceeded, plain view, and also the protective sweep, and then finally the inevitable discovery doctrine that they raise, okay?

So I'm sorry to interrupt your argument.  That was helpful to me.

MS. BOHN:  So Your Honor, I think it's at the point in that video where the officer is walking over to the car that we have the fishing expedition.  I mean, in part we have it based on the stop itself because Officer Hylton testified that he didn't initiate a terrific stop when Mr. Martinez turned his lights off.  He says that, you know, he pulled into the yard and then he at some point after that activated his lights.  And so --

THE COURT:  No, I think the officer's testimony was he -- he saw him turn his lights off, and at some point after

that he initiated his traffic lights.  And then -- and then Mr. Martinez pulls in the yard, and the officer pulls in behind him.

MS. BOHN:  Yes.  Thank you, Your Honor.

And so I -- and the fact that he didn't actually, you know, call in any sort of traffic violation also supports the argument that there wasn't a legitimate traffic stop here.

As I was saying earlier, when Officer Hylton walked over to the car, that was not in any way part of the stop.  At that -- at that point he's looking for other crimes.  And I know the government argued in one of their motions that, you know, "Oh, well, at least he was shining his flashlight over near the passenger side."  But that's not true if you look at the video.  He shines in the back first; looks over in the driver's side; looks over in the right.  So the story that he's looking for a possible gun in the driver's side just doesn't add up.

But more importantly, it does become a fishing expedition, and that is sort of what Hylton said his purpose was that evening, was hopefully to find something bigger. Throughout the -- throughout the interaction as more officers come in, everybody is excited about the big hit.  They wanted, you know, a big hit.  That was the goal of the evening, not a traffic violation.  And so I believe that their own statements support that this was a fishing expedition.

And I believe that they -- that he also ultimately already exceeded the scope of the traffic stop by using an unreasonable show of force. But yes, peering over -- walking over to the car, peering in the car, had nothing to do with speeding or lights. That was just looking for other crimes.

Just one other thing I wanted to mention on the plain view argument, Your Honor, was just that you mentioned that seeing this weapon, this sawed-off weapon, could, you know, give you reasonable suspicion. But -- but not probable cause. And so I know that in the -- in the plain view analysis, the totality of the circumstances matters, and the totality does not make a gun -- probable cause, you know, illegal without further investigation. And partly that's because because we can't really trust Officer Hylton's version of the events based on him changing his report and changing the story after the fact that the purpose of looking in the car was to see that there was a possible gun there.

I did want to touch on also, as you mentioned, the inevitable discovery argument. We know that the towing aspect of that can't work because the officers didn't -- didn't follow their towing policy, and that's a prerequisite for --

THE COURT: Not following a policy doesn't mean the same thing as a constitutional violation. You agree with that.

MS. BOHN: I do. I do, Your Honor. I don't think

that not following a policy necessarily rises to any kind of constitutional violation, but I do think that it's -- if you analyze inevitable discovery on the basis that they were going to do an inventory search, first of all, they didn't do an inventory search, even though their policy required them to do one in this specific case.

And so to say that they would have inevitably done an inventory search just doesn't work, because they didn't do one here. They didn't complete a tow sheet of any kind as they were required to do.

And also, they didn't -- they try to say, you know, now they have researched it and pulled his DMV records and it was mandatory that the car be towed. Well, you know, Officer Hylton testified today that he didn't research any sort of suspended license violations, anything like that at the time. We know that he had that suspended license based on the DMV report that the government, you know, discovered after the fact in preparation for this motion rather than at the time. And so it was certainly not a requirement that it be towed. In fact, the presumption is that it be not towed. And so inventory doesn't work.

As far as inevitable discovery based on the glass pipe, I don't think that works, either, because inevitable discovery is not just probable or likely. Inevitable discovery means it's inevitably going to be discovered. And so I think

with the glass pipe, the government argues, well, it's search incident to arrest.  They find a glass pipe; it seems to have residue on it.  The officers don't pursue an investigation on that at all.  They don't try to do any sort of field test on the pipe.  There is certainly not other evidence as in the cases that the government cited in its motions that there are other indicators of drug trafficking, like a huge quantity of cash, or other pieces that make that story inevitable that they would have towed the vehicle.  And so, you know, that the thing is possible is not the same thing as -- or even probable is not the same thing as inevitable.

And then as far as they would have found out -- you know, they -- they say they confirmed the warrant.  At the very end you hear dispatch say, yes, we've confirmed that warrant on the felony probation violation, but the officers testified that they didn't get Martinez's criminal history until at the time that they presented the case to the magistrate judge.  And so I don't think that they would have inevitably done a car search -- particularly since people at the house, you know, were apparently relations and friends, that an inevitable search of the car would have occurred when the criminal history records came out so late after his presentment to the magistrate.

And I -- I don't know that it matters because they would have inevitably arrested him, but I don't think that at

the time they arrested him they had probable cause to arrest him, because they only had an unverified warrant. I mean, that's just kind of another piece in this -- this whole story.

So in sum, Your Honor, I don't believe there was, based on all of the evidence that we've seen today and the testimony, an actual legitimate traffic stop.

To the extent that there was theoretically a traffic stop could have happened because speeding was observed or lights were turned off, officers exceeded the scope of that traffic stop by trying to investigate general criminal activity, which is the exact same thing the warrant requirement that the Supreme Court talks about is reason you have a warrant, is because we don't like it when people come around looking for criminal activity in general. That's why we have rules like the warrant requirements.

I don't think that there was probable cause for a plain view seizure of the gun, and so I -- I don't think there's enough -- especially given the credibility issues with the testimony, that there's enough totality of circumstances to allow that plain view exception to work here. Certainly wasn't an inadvertent finding, in any way, the gun; it was this detour of searching the car.

And then, you know, the evidence in the body cam video and the officers' testimony, they didn't perceive danger

after Mr. Martinez was handcuffed from any of the occupants of the house, who you could see politely kept their distance.  You had multiple officers with guns.  When the individuals came out of the house, Poulin doesn't even really look up from his search.  He's obviously not worried about safety concerns.  And so I don't think that the, you know, safety sweep is a legitimate exception.

And finally, the government hasn't shown, or the evidence doesn't show, that the discovery of the guns would have been inevitable based on some kind of inventory search that they didn't do and were -- but now claim they would have, or the pipe, which is not in and of itself enough evidence to say that -- to conclude that they would have inevitably searched the vehicle based on the pipe alone, even if it did have residue.  They certainly didn't pursue that investigation.

And then the criminal history records were verified just too late for the criminal history to be used as a mechanism to excuse the warrant requirement based on inevitable discovery, Your Honor.

Thank you very much.

THE COURT:  Thank you, Ms. Bohn.  I very much appreciate your thoughtful argument.

MS. BOHN:  Thank you.

THE COURT:  Let's hear from the government.

Mr. Vega.

MR. VEGA: Your Honor, I'll present our argument from strongest to not-so-strongest. And in fact, I may not even address the inventory search. I don't believe we even need to reach that at this point.

Traffic stop: Lieutenant Hylton had a valid objective reason for conducting a traffic stop. Using radar, he saw that the defendant was driving 60 miles per hour in a 40 -- in a posted 45-miles-per-hour zone. The defendant admitted to speeding, saying "I only come in fast like that because" before Lieutenant Hylton interrupted him. This was captured on body-worn camera. It was the defendant's own statement. We have testimony from Officer Hylton saying as much.

Officer Poulin also confirmed that he was on the phone with Lieutenant Hylton, who told him that there was a car that was speeding. And from the translation, Your Honor saw that the defendant himself was telling his friend that it -- that "I was coming fast." So there is valid objective reason for -- for conducting or attempting to conduct a traffic stop.

The defendant also blacked out the lights, something that is again confirmed by Officer Poulin.

THE COURT: What about the fact that the officer said, you know, "I wasn't intending on pulling him over for speeding." How can you argue that he was? The officer said on the video, "I wasn't looking for speeding. I was looking

for something more."

MR. VEGA:  Yes, Your Honor.

THE COURT:  How can you argue that it was a traffic stop for speeding?

MR. VEGA:  Sure, Your Honor.  Well, first of all, it was stop for another traffic infraction, which is blacking out the lights, which is --

THE COURT:  Yeah, I think that's consistent with the testimony, okay.

MR. VEGA:  And what Lieutenant Hylton said was, when he clocked him going 60 in a 45, New Year's night, he was more concerned about impaired drivers, something more serious like that.  So kudos to him for being concerned about that as opposed to simple speed, even though it's 15 miles per hour over.  He said that he decided to follow him anyway, and defendant sped away from him.  It looked like he was attempting to flee.  Lieutenant Hylton tried to catch up with him, and then that's when the defendant went all black.  And then Lieutenant Hylton said that it took him a few seconds to activate that light.

So we've got --

THE COURT:  So the initiation -- let's assume for the sake of argument that I agree with you that when you're driving down the highway on New Year's Eve night in the middle of the night that it is a traffic -- there is a -- a reasonable

articulable suspicion justifying a Terry stop when you're driving down the road and you turn your headlights out, okay? When the officer is looking for impairment, okay?

Let's assume for the sake of argument I agree with you, okay? Here's where my problem comes in: Where does the stop go from there, and did -- did -- the defendant argues this isn't a real traffic stop, it's all looking for more. And was the scope of -- of a legitimate traffic stop exceeded in this case under all the facts and circumstances?

MR. VEGA: Regarding the scope, no, Your Honor, and that is obvious in the body-worn camera. What we have in the body-worn camera is, when Lieutenant Hylton orders him out of the car, the camera falls.

THE COURT: Right.

MR. VEGA: We hear during that time three snippets of conversation asking -- Lieutenant Hylton asking him how much he's had to drink. The defendant says one beer. Asking him for his ID and then telling him to keep his hands on the car. That's what we heard.

THE COURT: There's actually two minutes and 18 seconds that go by when the body-worn camera is on the ground. And you can hear those snippets.

And officer -- the officer -- I'm sorry, Lieutenant Hylton. Lieutenant Hylton did testify to those snippets on redirect examination, I agree. A lot of it is you can't tell

what it is.

MR. VEGA:  Yes, sir.

THE COURT:  It's actually two minutes and 18 seconds of question, okay?  And we know at least some of it is how much have you had to drink and let's get your identification, okay?

MR. VEGA:  And he's also frisking him.

THE COURT:  Okay.  So there's two minutes and 18 seconds, all right?

Go ahead.

MR. VEGA:  And then once the camera is re -- not reactivated, but put back on to Lieutenant Hylton, the first thing that we see is that Lieutenant Hylton is talking to the defendant about his identification.  So that's still within the scope.

And then you hear Lieutenant Hylton talking to dispatch giving him --

THE COURT:  Three minutes and 20 seconds, he contacts dispatch.

MR. VEGA:  Yes.

THE COURT:  So that's three minutes and 20 seconds into the stop he contacts dispatch.  And some of that is interrupted because he's having to yell at these other people to get away from the car.

MR. VEGA:  Yes, sir.

THE COURT:  Clearly, that was, you know, somewhat

delayed because he was concerned about his -- the scene and his safety. He's out there in the middle of nowhere -- well, middle of nowhere. He's in Rocky Mount somewhere. It's dark, late at night, lots of cars there, and he's by himself. So he's right to be concerned about his safety; tell these people, you know, go away or you're going to get in trouble, you're going to get arrested, okay? He contacts dispatch at three minutes and 20 seconds, okay?

So after that, 22 seconds -- 33 seconds later at 3:53 Officer Poulin shows up, okay?

4:17, 24 seconds after that is when they are flashing the lights in the car. 24 seconds after Poulin shows. Because when Poulin shows there's another officer. There's two more officers who come. Poulin -- and Poulin at 4:33 is -- is -- 4:33 is when he announces -- 4:33 is when he announces "gun," right?

And then at 4:52, 19 seconds later, is when dispatch beeps in. I was doing as best I could getting these times off the video as we were just watching it, okay? But that's the timeline.

And so with that timeline, okay, the defendant argues that the Fourth Amendment is violated because these officers unconstitutionally extended the traffic stop beyond its legitimate scope. What is your response to that argument?

MR. VEGA: Going back to when the body-worn camera

was picked back up --

THE COURT:  2:18.

MR. VEGA:  Yes.  -- Lieutenant Hylton is talking to the defendant; he's asking about the identification.  The defendant tells him in English "it's the little black -- the little black one in there," and then you hear the defendant talking to the male friend.

At the same time Lieutenant Hylton is talking to dispatch giving the defendant's information.  He breaks away from that to address this male telling him to stay away from the car, et cetera, et cetera.  Comes back to dispatch and given some information.  We have Officer Poulin coming in.  And so far, and Your Honor heard from the body-worn camera, dispatch had not yet gotten back to Lieutenant Hylton about, hey, this is what we found on this guy.  Not yet.

So Lieutenant Hylton is waiting for that information to come back from dispatch.  As soon as Officer Poulin shows up, the first thing he says to him is he was going 60, puts the hammer on, started telling him about the incident.

Sergeant Johnson also showed up.  So at this point for the first time Lieutenant Hylton has somebody that he can -- he's got some backup.  So he leaves the defendant with Sergeant Johnson.

And the first thing -- the first thing that Lieutenant Hylton does while he's still waiting for the

dispatch to get back to him, the first thing he does is he walks over to the silver Kia along with Officer Poulin. And then as you saw from the body-worn camera, right away Officer Poulin sees what he identifies as a sawed-off shotgun. And still up to this point dispatch has not yet gotten back to Lieutenant Hylton based on the information that Lieutenant Hylton provided them.

THE COURT: Okay. Under -- under those facts -- I agree. That's a fair recitation of the facts. Under those facts, is the legitimate scope of the traffic stop exceeded such that the Fourth Amendment is violated?

MR. VEGA: Not by a second.

THE COURT: All right. What about the fact that the -- Ms. Bohn argued, look, if this is a real traffic stop, why didn't they phone it in the way they do -- as their policy requires? It's not a real traffic stop. He's out there trying -- fishing for something bigger. What do you say to that?

MR. VEGA: He was fishing for something bigger. He said so himself. And that's -- the subjective intent of the officer is not relevant here. What we do have is a valid objective reason -- two of them -- speeding and reckless driving and turning off the lights on public highways.

THE COURT: Well, if they are investigating speeding and reckless driving, what are they doing flashing their lights

inside the car?  Doesn't that unconstitutionally exceed the scope of the search?

MR. VEGA:  Not based on these facts, Your Honor.

Lieutenant Hylton pulled the defendant out at gunpoint because he saw the defendant leaning over with arms extended toward the front passenger area.  So that -- that gives them --

THE COURT:  Defendant argues, oh, you can't believe that.  It's inconsistent with his reports.

MR. VEGA:  And I think that is --

THE COURT:  They say that's not credible.

MR. VEGA:  That is the crux of the defense argument, that the officers are just not credible, they are making this up.

THE COURT:  Okay.  Let's hear the rest of your argument.

MR. VEGA:  That's for the traffic stop.

Our strongest argument, Your Honor, is the plain view.  Plain view doctrine.  Officer Poulin was lawfully in a place from which the object could be plainly viewed.  He was outside the car, outside the Kia, with a flashlight.  He was looking in.  And we heard testimony --

THE COURT:  What about the notion that Ms. Bohn argued, that there is a requirement under the plain view doctrine that the discovery must be inadvertent, and here the

discovery was not inadvertent?  It was they were deliberately looking for something.

MR. VEGA:  Well, in the defendant's own motion, they cite *Horton v. California*, 496 U.S. 128, 1990.  And the plain view doctrine allows for warrantless seizure of evidence if: One, the officer is lawfully in a place to plainly view the object; two, the officer has a lawful right of access to the object itself; and three, the incriminating character of the evidence is immediately apparent.  That's from defense motion citing a Supreme Court case.

THE COURT:  Okay.  So how do the facts here under your view meet -- meet the three requirements of the plain view doctrine?

MR. VEGA:  The first one, Your Honor, is that Officer Poulin was outside the vehicle with a flashlight.  He is in a lawful place.  And from there he saw what he identified as a sawed-off shotgun.  So that's the first one.  He's in a lawful place.  He has not opened anything yet.

The second one, and I'll spend some time on this, is the object's incriminating character must be immediately apparent.  It's a sawed-off shotgun, which is illegal in Virginia.  The defense -- the defense in its motion --

THE COURT:  Well, the defense argues it's only illegal under some circumstances.

MR. VEGA:  Per the defense, from its motion, they

write:  "In Virginia, ownership of a sawed-off shotgun or rifle raises no presumption of illegality."  And they cite two Supreme Court cases from Virginia.  And because this is our strongest argument, it's important for me to get the record straight with regard to these two Supreme Court cases from Virginia.

The first one is *Sandiford v. Commonwealth*, which is at 217 Va. 117 from 1976.  That case cites *Riley v. Commonwealth*, and I'll discuss that one, too.  That's the other one that the defense submitted.  *Riley v. Commonwealth* at 213 Va. 273, and this is from 1972.

The first one, here's what the code read at the time.  It's been repealed, but the code at the time read:  "Possession" -- and I'll read the relevant parts.  "Possession of a sawed-off shotgun shall be presumed to be for an offensive or aggressive purpose" -- and that's the critical language here.

"Possession of a sawed-off shotgun shall be presumed to be for an offensive or aggressive purpose when, one, it is in possession of an unnaturalized foreign-born person."  That's *Sandiford*.  "Or two, when it's in possession of a person who has been convicted of a crime of violence."  That's *Riley*.

In the *Sandiford* case, the *Sandiford* -- in the *Sandiford* case, Sandiford was indicted for possession of a sawed-off shotgun for an offensive or aggressive purpose.  So

there was a presumptive reason associated with this offensive or aggressive purpose.  And what the Supreme Court held in *Sandiford* is that the code created a presumption based upon mere possession by an unnaturalized foreign-born person.  By doing that, it denied Sandiford equal protection of due process, so then it reversed it.

*Riley*.  *Riley*, on the other hand, had nothing to do with that.  It had to do with the same code section, but it had to do with a person who was convicted of a crime of violence.  In this case, *Riley* said that "the code was unconstitutionally vague, because what constitutes an offensive or aggressive purpose is not sufficiently well-defined."

The court held that the statute is not unconstitutionally vague.  And the court held that "the presumptions in this case," the *Riley* case, "had a rational connection with the facts and circumstances, and, therefore, it was constitutionally valid."

The *Riley* court reversed the lower court because the lower court accepted impermissible hearsay, which the Commonwealth conceded; and that hearsay led to the element that is required for the presumption, which is that the defendant had previously been convicted of a crime of violence.

THE COURT:  Well, their argument is just seeing a sawed-off shotgun is not enough to establish a crime.

MR. VEGA:  That is not what these two cases say.  In

fact, the *Riley* court says, "One in possession of a sawed-off shotgun may rebut the evidentiary presumption" -- that is somebody convicted of a crime of violence -- that it's possession was for an unlawful purpose when the presumption arises, and then the burden goes forward with the evidence, then shifts to the defendant.  And that is what the *Riley* court says.

What is wrong here is the defense says that in Virginia -- based on these two cases, in Virginia, ownership of a sawed-off shotgun or a rifle raises no presumption of illegality.  That is 100 percent incorrect.

What *Riley* is saying is that the mere possession of a sawed-off shotgun by a citizen, whether natural or unnaturalized -- this is *Sandiford* now citing *Riley*:  "Mere possession of a sawed-off shotgun by a citizen, natural or unnaturalized, raises no presumption of an unlawful purpose"; of an unlawful purpose, which is the repealed old code, Virginia code.

We're not talking about an unlawful purpose and that purpose being offensive -- an offensive or aggressive purpose that is presumed because of somebody being born somewhere else or because they have a conviction of a crime of violence.

THE COURT:  In *Riley* the Court says, "The statute does not" -- I think this is the point they are getting at.  "The statute does not prohibit possession of all sawed-off

shotguns, nor does it create a conclusive presumption that the weapon is used for an offensive or aggressive purpose.  One in possession of a sawed-off shotgun may rebut the evidentiary presumption that its possession was for an unlawful purpose when the presumption arises.  The burden of going forward with the evidence then merely shifts to the defendant."

I guess their point is there can be circumstances under which possession of a sawed-off shotgun is lawful, right? And so, therefore, it violated the -- the Fourth Amendment to seek to open the car door, seize the gun, okay, seize that -- that gun under the plain view doctrine, because there can be circumstances under which a sawed-off shotgun is lawful.

What do you say to that?

MR. VEGA:  May I, Your Honor, talk about one more case, because that is part of my answer?

THE COURT:  Yes.  No, absolutely.

MR. VEGA:  The other case that they cite is another Virginia case.  And this is -- this is *Dillard v. Commonwealth*.

THE COURT:  Dillon?

MR. VEGA:  It's actually *Dillard*.

THE COURT:  Oh, is this 28 Va.App. 340?

MR. VEGA:  Yes, sir.

THE COURT:  Okay.  I'm happy to pull that up, too, while you're talking.  Go right ahead.

MR. VEGA:  So according to -- we agree -- obviously, we agree with *Dillard* here.  According to defense motion, the court of appeals clarified that the definition of a sawed-off shotgun or rifle as delineated in the code is an element that the Commonwealth is required to prove, rather than an affirmative defense.

We agree a hundred percent.  We never said that an element is -- is an affirmative defense that they have to prove.

In this case, in the *Dillard* case --

THE COURT:  It is *Dillard*, actually, yeah.

MR. VEGA:  This is an appeal.

THE COURT:  It's a case that came out of Roanoke.

MR. VEGA:  Yes, sir.

THE COURT:  My friend -- it was an appeal from my friend, Circuit Court Judge Jonathan M. Apgar, who is now retired.

MR. VEGA:  This is an appeal for a conviction of possession of a sawed-off shotgun in violation of the current code.  And now I'm reading from a decision here.  "At the conclusion of the Commonwealth's case-in-chief, Dillard moved to strike the evidence on the ground that the Commonwealth had failed to prove the shotgun was at least .225 caliber.  The trial court erred" -- excuse me.  "The trial court denied this motion ruling that .225 caliber requirement is an affirmative

defense."  And then the -- the court reversed.

Now, we must prove at trial, we must prove that this sawed-off rifle has on overall length of less than 26 inches or a barrel of a length of less than 16 inches.  We agree that is not -- that is not an affirmative defense.  That is an element that we have to prove at trial.

What we don't agree with is that the exceptions that are in the code to the illegal possession of a sawed-off shotgun or sawed-off rifle, such as having it for scientific purpose, we don't agree that those exceptions are elements that we must satisfy, or that an officer out in the field has to satisfy, before they develop probable cause to believe that it is contraband or something illegal.

That is our -- our position on this, that this is --

THE COURT:  Doesn't this also lead into protective sweep?

MR. VEGA:  It does.

THE COURT:  If the officers see a gun that's a sawed-off shotgun, aren't they justified under the case law to -- and under the -- all the totality of the circumstances in this case, the evasive conduct where he turns his lights off, the reach -- if you believe the officer, reaching over into the passenger seat, the -- the coming out, the guy is running from the house -- coming from the house and he's telling him to do certain things and they are having a conversation about it, and

then they see the gun.

Under those circumstances, doesn't that just fit squarely within the protective sweep exception?  Because, you know, sure, he's detained, but the case law is clear going back to -- going back to *Michigan v. Long*, that you don't have to -- just because the person is detained now doesn't mean that you cannot do a protective sweep.  You can do a protective sweep, because maybe they don't arrest him.  Maybe he -- he goes -- maybe they decide not to, and then he could go back and grab a gun and harm somebody.  That's clear Supreme Court and Fourth Circuit case law.

So can't you put the plain view sighting of the sawed-off shotgun and the protective sweep together to find this -- this search to be constitutionally lawful?

MR. VEGA:  Absolutely, Your Honor, and now I guess I'm taking a step into the protective sweep portion of it.

THE COURT:  I mean, I don't think -- I don't think they are islands in of themselves.  I think in this case the plain view of the gun adds another circumstance that -- that goes into the protective sweep calculus.  And it's just, okay, there's a gun here now.  We've got all these other things, and now there's a gun.  Does that justify the protective sweep?

MR. VEGA:  A hundred percent, especially under these facts where we already had one individual who was brazen enough to come forward to the car, and maybe even try to get into it;

and then we had a couple -- two other individuals.  They may be the nicest people in the world, but the officers don't know that.  It would be completely irresponsible for the officers to leave that sawed-off rifle, even if it's guarded by a police officer on the outside.  The protective sweep allows the officer to -- to disable that sawed-off rifle for protective purposes while they are conducting their investigation.  It also gives them the ability as they sweep to look for possible ammunition, which they found, and secure that as well until they complete their investigation.

THE COURT:  Okay.  What else would you like to say?

MR. VEGA:  Yes, Your Honor.  We could start going down the ladder here about when -- when they found out that the -- that he was a felon, and there was some talk about not knowing that he was a felon for sure, for sure.  Well, that's not what is required.  Absolute certainty is not required.

What they did have was probable cause to believe that he was a felon based on the dispatch saying that there was a active warrant for a felony probation violation.  That is what the law requires.  The standard is probable cause.

At that point --

THE COURT:  Poulin says there's a gun at 4:33 on that video.  At 4:52, 19 seconds later, dispatch says -- beeps, does the tone, and says there's a -- there's a felony probation warrant out of Montgomery County.

Isn't that sufficient at that point to -- to -- because they hadn't -- they hadn't gone in the car yet. The car door is open, but they hadn't done the search yet. But isn't that sufficient to justify the search under the Fourth Amendment?

MR. VEGA: It is, Your Honor. And just to dip my big toe into the inevitable discovery, even if -- let's say they were just standing outside the car looking in and they -- and nobody opened the door, and then they hear this, the dispatcher saying that there's an active warrant for felony probation violation.

At that point he had probable cause to believe that he's a felon, and there is what appears to be a firearm in there. And at that point -- at that point the --

THE COURT: That is a crime that is occurring in his presence.

MR. VEGA: And that's probable cause to search the car.

But in addition to that, it can also be inevitable discovery because they would have gone into the car to retrieve that gun, and they would have found the other one, and they would have found the ammunition.

THE COURT: All right.

MR. VEGA: Your Honor, I -- it's I guess the instinct of a lawyer to keep arguing, but I think we've made our

point.

THE COURT:  Thank you, Mr. Vega.

MR. VEGA:  Thank you, Your Honor.

THE COURT:  Let's hear if the defense has any response.  Mr. Vega went into *Sandiford*, *Riley*, and the *Dillard* case.  I'm happy to talk about the issue of what Virginia requires in that regard, and then I raised this issue about considering in tandem plain view and protective sweep.  Love to hear what the defense has to say about it.

MS. DIEHL:  Yes, Your Honor.

Your Honor, I will endeavor to be as brief as possible.

THE COURT:  Take your time.

MS. DIEHL:  Regarding *Sandiford* and *Riley*, my understanding of *Riley*, Your Honor, is that presumption occurs if someone is convicted of a dangerous felony.  And so at this point in time when they see the sawed-off shotgun, as we've discussed ad nauseam, and I know there's disagreement about that, it is not confirmed that Mr. Martinez-Chavez is convicted of a felony, nor a dangerous felony.  In fact, they don't even know what felony he is convicted of until he gets to the magistrate's office.

So that presumption of the legality under, I believe it's *Riley*, only occurs and would only be valid if they knew he was convicted of a dangerous felony.

THE COURT: But doesn't the officer seeing the gun in the car without opening the door give further justification to the protective sweep exception? That's the point I was trying to make with Mr. Vega. If -- can you -- can the -- not just plain view on its own, but seeing the gun in plain view justify -- further justify, be one of the facts and circumstances to justify protective sweep?

MS. DIEHL: I don't -- no, Your Honor.

THE COURT: Okay. I thought you'd say that. Tell me why.

MS. DIEHL: I think those are two very separate exceptions for a reason. And I think you have to look at them separately because the facts are different.

First, the timing matters. Because the protective sweep, they weren't looking in the car. They didn't walk over to the car, shine their flashlights, look in for the protective sweep. By the time they opened the door, it was no longer -- which is when the search occurs -- when part of the search occurs, they are no longer trying to protect themselves. And so one of the things I came up --

THE COURT: Yeah, but you're ignoring what the Supreme Court said in *Long*.

MS. DIEHL: No, I'm not, Your Honor. And here's the difference:

In *Michigan v. Long* they discuss the protective sweep

in that, well, the person can go back to the car anyway. And because they can go back to the car and drive, they have to check where the car is. But that's when the timing matters, because the officers had already decided -- and why I brought up the CFS report and everything -- they were going to tow the car.

They cannot have it both ways. They cannot say the car is ours, we're going to tow the car, but we need to check the car to make sure we're safe, because you could get back in the car. He wasn't getting back in the car. They had arrested him and decided they were towing the car.

THE COURT: He was not arrested.

MS. DIEHL: I'm sorry. You're right, Your Honor. He was detained. He had been detained and not arrested. But the officers had already determined that that car was not going with Mr. Martinez-Chavez, so that's where *Michigan v. Long* is eminently distinguishable.

Regarding both the protective sweep and the plain view doctrine, because the -- and the legality of the stop, I wanted to clarify just a couple of facts for the record, and then I will get off this soapbox.

We highlight the credibility of Lieutenant Hylton in several ways. The Court seems to be taking at -- Lieutenant Hylton's words at face value that he saw Mr. Martinez-Chavez turn off his lights, and that is why he pulled him over and in

a few seconds turned on his own emergency lights.  That's what he said in court.  That's what he originally says in the report.

But there's a reason why I cited the body-worn camera to him, Your Honor.  And it's at 18:05 of Lieutenant Hylton's body-worn camera where he says to the other officers, "I can't do anything as far as him turning," and then there's a pause. "He turned his lights out on the road, but I didn't turn the lights on him then."

If he thought he had a reason to pull him over because he turned his lights off, then why didn't he turn on his light, his own emergency lights then to pull him over?  He didn't.  He told the officers that.  He directly contradicted what he said in the report, and he directly contradicted what he said here today in court on his own body-worn camera immediately after the fact.

Additionally, Ms. Bohn brought up the fact that Officer Poulin and Lieutenant Hylton both had a change in their reports.  This really matters because they made the exact same mistake.  The exact same lines.  Lieutenant Hylton wrote it January 1 on the same night.  Officer Poulin wrote it December 17.  And those two lines involved the reasonability of the search.  They involved when they first heard that Mr. Martinez-Chavez was a felon, and they involved when Lieutenant Hylton told Officer Poulin that he thought he was

reaching for something, thus protective sweep.

It goes beyond credibility and reason that these two officers would make the exact same mistake two weeks later and never correct it when it involves the timing of the search. That goes to their credibility, along with Lieutenant Hylton's conversation at 18:05 on his body-worn camera that he didn't turn the lights on him.

And the other piece of credibility that Ms. Bohn mentioned, what I want to bring up to the Court and show --

THE COURT:  Can you play that -- can you play the 18:05 clip?

MS. DIEHL:  Yes.  Oh, yes, Your Honor, in a moment.

THE COURT:  Take your time.  Go ahead.

MS. WOMACK:  What time?

THE COURT:  18:05.

MS. DIEHL:  It's at 18:05, Lieutenant Hylton's.

THE COURT:  No, don't worry.  Finish your argument.

MS. DIEHL:  Apologies, Your Honor.  We would ask before the Court make any decision to watch that body-worn camera at that time.

THE COURT:  Does the government have it accessible?

MR. VEGA:  Yes, Your Honor, we can pull it up.

THE COURT:  Pull it up, 18:05.

And you may finish your argument while I'm waiting for that.

MS. DIEHL:  Thank you, Your Honor.

The government argues a couple things for protective sweep as well as the plain view totality of the circumstances, and that includes this whole cloth buy-in of Lieutenant Hylton's testimony that he saw Mr. Martinez-Chavez reaching for something, and that is why he pulled the gun.

But there is a reason I brought up the CFS report to him and why that timing matters.  I showed the first four minutes -- well, three minutes and 44 seconds -- from the time his body-worn camera turned on until the time Officer Poulin arrived on scene.  That matters, because that covers from the CFS report -- Lieutenant Hylton arrived on the scene until the time that Officer Poulin arrived on the scene, that covers just over two minutes.  If what happened happened as Lieutenant Hylton said, given that timeline, it would have shown up on the body-worn camera, but it didn't.  It's nowhere on the body-worn camera.  We do not see -- by the time his body-worn camera is already turned on, Mr. Martinez-Chavez is already at the back of the car with his hands up.  There is no indication that he's being -- the door is open, that he's being yelled at to get out.  And even if you take it all the way back to when the time of call first initiated -- time of call, not time arrived on scene.  But even at the most generous reading of that, that leaves 17 seconds of the encounter that wasn't covered by the body-worn camera.

I know these things happen fast, Your Honor, but for even taking it at the 17-seconds gap for the body-worn camera, that means that Lieutenant Hylton would have had to pull in, flash his spotlight in the car, see some sort of furtive movement, get so concerned that he gets out, holds the gun, yells at him to get out, he gets out, and backs to the back of his car.  That doesn't happen in just 17 seconds.

And so now that combined with the magically changing police reports, the fact we're about to see on the body-worn camera regarding the lights, and the fact that he didn't follow his own, quite frankly, policy -- officer's policy regarding inventory and whatnot, that is part of the totality of the circumstances we need to consider when we talk about plain view, or even the protective sweep.  Which if they needed to do a protective sweep, that's not why they were doing it, looking in the car, opening the car door, that kind of thing.  And that's why those two things are separate, because the timing matters.  The people coming out asking --

THE COURT:  Is protective sweep a subjective standard?

MS. DIEHL:  Yes, Your -- I mean, I believe it is the -- yes, Your Honor.  It is a subjective standard.  I -- it's an objective standard, Your Honor.

THE COURT:  It's an objective standard.

MS. DIEHL:  Yes, yes, it's an objective standard for

a reasonable office in that situation.

THE COURT:  That -- I think that's right.

MS. DIEHL:  Yes, yes.  Sorry, I was thinking toward the officer, but, yes, a reasonable officer.  And a reasonable officer in that period, again, assuming that the reaching over can at least not be verified by the body-worn camera and the timing of the CFS reports, the only danger is that people were potentially coming out.  But he told them go back in, and they went back in.  And nobody came back out until they had already done the search.  They had already done the search.  So when those people came back in -- and government mentions brazen enough to come to the car.  This was a car parked in their front yard at New Year's Eve, a bunch of cop -- it's not brazen that people would come out and say "what's going on, do you need help," especially to the --

Now we're at the 18-minute mark.

THE COURT:  Yeah, let's play that.

(Video Played)

THE COURT:  Okay, is that it?

MS. DIEHL:  Yes, that's it, Your Honor.

THE COURT:  Thank you.

MS. DIEHL:  And so he specifically says, "I didn't turn the lights on him then," and you see him sort of sputter and say, "Well, he -- he was reaching for something."  And so his credibility -- he's coming up with reasons why the search

was okay, why the protective search was okay.

And very briefly, and then I will sit down pending any questions, Your Honor.  Regarding plain view, Ms. Bohn had mentioned that the incriminating evidence needs to be seen inadvertently so it's not used as a pretext, right?  And in *Texas v. Brown,* which is 460 U.S. 730 from 2024, in that case plain view was okay.  And the facts are --

THE COURT:  From 2024?

MS. DIEHL:  What was that?

THE COURT:  2024?  You said from 2024.

MS. DIEHL:  Did I say that correctly?  That's not correct, Your Honor.  460 U.S. 730.  I don't have the year.

THE COURT:  That is not 2024.

MS. DIEHL:  No.  No, Your Honor.  But they had asked the sole occupant out of the vehicle for his driver's license.  At the same time he was reaching out of his pocket to hand the driver's license, he accidentally dropped a green party balloon.  The officer could see it from outside the vehicle and saw several small plastic viles, loose powder; opened the bag of party balloons and then found more illegal substances.

And basically they found that because it was inadvertent -- also because they viewed it from the exterior of the vehicle, which I understand the exterior of the vehicle here does not help us, but the inadvertent part does.  They weren't -- they were seeking to examine the driver's license

when they inadvertently saw what they knew from their training to be a drug party, and that's when they observed plastic viles and quantities of loose powder.

Here it's distinguishable because the police officers didn't inadvertently see something.  They went to the car specifically looking for something.  They were specifically looking for something illegal, which is not the protective sweep for which we already argued.

So I just wanted to clarify those few facts and argument.  And pending any other questions, Your Honor, nothing further.

THE COURT:  Thank you.

THE COURT:  Kristin, when is the trial in this case?

THE CLERK:  That's a good question, hold on.  Thinking January.  No, I'm sorry.  Yes, January 22.  22, 23, 24.

THE COURT:  Let me take a brief recess.

(Proceedings previously transcribed and filed at ECF 93)

**CERTIFICATE**

I, Mary J. Butenschoen, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/S/ Mary J. Butenschoen, RPR, CRR                7/22/2025

✎AO 187 (Rev. 7/87) Exhibit and Witness List

# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF VIRGINIA

USA
V
Isaac Fidel Martinez-Chavez

**EXHIBIT AND WITNESS LIST**

Case Number:  7:24CR00011

| PRESIDING JUDGE | | | PLAINTIFF'S ATTORNEY | | DEFENDANT'S ATTORNEY | |
|---|---|---|---|---|---|---|
| Michael F. Urbanski SUSDJ | | | Juan Vega, Matt Miller | | Beatrice Diehl, Heidi Bohn - FPD | |
| TRIAL DATES | | | COURT REPORTER | | COURTROOM DEPUTY | |
| 1/3/2025 | | | Mary Butenschoen | | Kristin Ayersman | |

| PLF NO | DEF NO | DATE OFFERED | MARKED | ADMITTED | DESCRIPTION AND EXHIBITS* AND WITNESSES | |
|---|---|---|---|---|---|---|
| | | 01/3/2025 | y | y | All exhibits filed under ECF 59, 75, and 81 for the purposes of this motion by USA | Hylton |
| ECF 59-4 | | 01/3/2025 | | | Identifed on video as Exhibit 3 Officer Hylton BWC | Hylton |
| ECF 75-4/US 4 | | 01/3/2025 | | | translated statement | Hylton |
| ECF 75-7/US 7 | | 01/3/2025 | | | dft driving record | Hylton |
| ECF 81-4 | | 01/3/2025 | | | GO4_Sgt Johnson BWC 01012024_FULL_ns | Hylton |
| | 1 | 01/3/2025 | | | report (paper copy not previously filed on ECF | Hylton |
| | ECF 59-4 | 01/3/2025 | | | Identifed on video as Exhibit 3 Officer Hylton BWC | Hylton |
| ECF 59-5 | | 01/3/2025 | | | Exhibit 4 Officer Poulin BWC video | Poulin |
| ECF 75/US 8 | | 01/3/2025 | | | photo | Poulin |
| | | | | | | |

* Include a notation as to the location of any exhibit not held with the case file or not available because of size.

Page 1 of 1

JA601

## Office of the Sheriff
## 70 East Court St. Suite 101 Rocky Mount , VA 24151

| Call Taker | CFS Report |
|---|---|
| 03 BLewis | CFS # - 2024-000003 |

### Base Information

Call When 01/01/2024 00:10:09 Create When 01/01/2024 00:11:31 Close When 01/01/2024 02:59:41 Disposition ARREST

| Priority | | Alarm 1 | Disciplines L | Assigned Disciplines L | Assigned Disciplines NP L |
|---|---|---|---|---|---|
| CallType SUSPICIOUS VEHICLE | EDL | | FDL | LDL | Primary Unit 11 |

### Location of Occurrence

| Address | HIGHVIEW TER / SCUFFLING HILL RD | 30 HIGHVIEW TER BEGIN, ROCKY MOUNT | Zip | County |
|---|---|---|---|
| Landmark | | ESN 1575 | Map Grid |

| EMS/Rescue M2 | | Fire DP1 | | Law | ROCKY MOUNT |
|---|---|---|---|---|---|
| Area | District | EMS Tract | CD-1-2-4 | Fire Tract | DP1-006 |
| Grid | Law Tract | RMPD | Report Tract | Work Area | |

Cross Street High   DEAD END

Cross Street Low  SCUFFLING HILL RD

From-To Directions

### Caller

| Address | 30 HIGHVIEW TER BEGIN, ROCKY MOUNT | Landmark | |
|---|---|---|---|
| Name | 11 | Caller Phone | How Received   OFFICER INITIATED |

### OCA Numbers

| Department | OCA Number | Unit | Note | Department | OCA Number | Unit | Note |
|---|---|---|---|---|---|---|---|
| ROCKY MOUNT POLICE DEPARTMENT | 2024-00036 | | | 1 SHERIFFS OFFICE PATROL | 2024-000003 | | |

### Dispositions

| Disposition | Assigned When | User | InActive | While Closed |
|---|---|---|---|---|
| INCIDENT REPORT | 01/01/2024 02:59:41 | BLewis | ☐ | ☐ |
| ARREST | 01/01/2024 02:59:41 | BLewis | ☐ | ☐ |

### Call Types

| Call Type | Assigned When | User | Assigned While Closed | InActive |
|---|---|---|---|---|
| SUSPICIOUS VEHICLE | 01/01/2024 00:52:22 | BLewis | ☐ | ☐ |
| SUSPICIOUS PERSON | 01/01/2024 00:11:31 | BLewis | ☐ | ☐ |

### Unit Times

| Unit | Department | Unit Type | When | Status \| Notes | User |
|---|---|---|---|---|---|
| 11 (HYLTON, JUSTIN D) | 1 SHERIFFS OFFICE PATROL | DEPUTY | 01/01/2024 00:11:31 | ON SCENE | BLewis |
| 36 (MOORMAN, MICHAEL A) | 1 SHERIFFS OFFICE PATROL | DEPUTY | 01/01/2024 00:11:35 | ENROUTE | BLewis |
| 62 (WADE, ZION T) | 1 SHERIFFS OFFICE PATROL | DEPUTY | 01/01/2024 00:11:36 | ENROUTE | BLewis |
| 124 (POULIN, TREY A) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 00:14:06 | ENROUTE | SSimms |

| CAD Report 44 | Page 1 Of 5 | 09/26/2024 14:01 |
|---|---|---|

DEFENDANT'S EXHIBIT

JA602

| Call Taker 03 BLewis | CFS Report CFS # - 2024-000003 | | | |
|---|---|---|---|---|
| 107 (JOHNSON, CALEB A) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 00:14:06 ENROUTE | SSimms |
| 124 (POULIN, TREY A) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 00:14.11 ON SCENE | SSimms |
| 107 (JOHNSON, CALEB A) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 00:14:14 ON SCENE | SSimms |
| 36 (MOORMAN, MICHAEL A) | 1 SHERIFFS OFFICE PATROL | DEPUTY | 01/01/2024 00:14:17 ON SCENE | SSimms |
| 62 (WADE, ZION T) | 1 SHERIFFS OFFICE PATROL | DEPUTY | 01/01/2024 00:14:20 ON SCENE | SSimms |
| 117 (GARDNER, JOSEPH R) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 00:14:51 ENROUTE | SSimms |
| 117 (GARDNER, JOSEPH R) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 00:14:59 ON SCENE | SSimms |
| 11 (HYLTON, JUSTIN D) | 1 SHERIFFS OFFICE PATROL | DEPUTY | 01/01/2024 00:16:36 SAFETY CHECK | SSimms |
| 36 (MOORMAN, MICHAEL A) | 1 SHERIFFS OFFICE PATROL | DEPUTY | 01/01/2024 00:19:46 CLEAR | MU |
| 124 (POULIN, TREY A) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 00:21:22 SAFETY CHECK | SSimms |
| 124 (POULIN, TREY A) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 00:21:23 SAFETY CHECK | BLewis |
| 107 (JOHNSON, CALEB A) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 00:21:23 SAFETY CHECK | BLewis |
| 117 (GARDNER, JOSEPH R) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 00:21:23 SAFETY CHECK | BLewis |
| 62 (WADE, ZION T) | 1 SHERIFFS OFFICE PATROL | DEPUTY | 01/01/2024 00:21:23 SAFETY CHECK | BLewis |
| 107 (JOHNSON, CALEB A) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 00:21:23 SAFETY CHECK | SSimms |
| 11 (HYLTON, JUSTIN D) | 1 SHERIFFS OFFICE PATROL | DEPUTY | 01/01/2024 00:22:41 SAFETY CHECK | SSimms |
| 62 (WADE, ZION T) | 1 SHERIFFS OFFICE PATROL | DEPUTY | 01/01/2024 00:22:49 IN CUSTODY | BLewis |
| 11 (HYLTON, JUSTIN D) | 1 SHERIFFS OFFICE PATROL | DEPUTY | 01/01/2024 00:25:23 SAFETY CHECK | BLewis |
| 124 (POULIN, TREY A) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 00:25:23 SAFETY CHECK | BLewis |
| 107 (JOHNSON. CALEB A) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 00:25:23 SAFETY CHECK | BLewis |
| 117 (GARDNER, JOSEPH R) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 00:25:23 SAFETY CHECK | BLewis |
| 11 (HYLTON, JUSTIN D) | 1 SHERIFFS OFFICE PATROL | DEPUTY | 01/01/2024 00:30:41 SAFETY CHECK | BLewis |
| 107 (JOHNSON, CALEB A) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 00:30:41 SAFETY CHECK | BLewis |
| 124 (POULIN, TREY A) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 00:30:41 SAFETY CHECK | BLewis |
| 117 (GARDNER, JOSEPH R) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 00:30:41 SAFETY CHECK | BLewis |
| 62 (WADE, ZION T) | 1 SHERIFFS OFFICE PATROL | DEPUTY | 01/01/2024 00:33:44 LEFT SCENE|TO MAG W/ 1 MALE | BLewis |
| 62 (WADE, ZION T) | 1 SHERIFFS OFFICE PATROL | DEPUTY | 01/01/2024 00:36:07 ARRIVED DEST|MAG OFFICE | BLewis |
| 11 (HYLTON, JUSTIN D) | 1 SHERIFFS OFFICE PATROL | DEPUTY | 01/01/2024 00:37:26 SAFETY CHECK | BLewis |
| 107 (JOHNSON, CALEB A) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 00:37:27 SAFETY CHECK | BLewis |
| 124 (POULIN, TREY A) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 00:37:27 SAFETY CHECK | BLewis |
| 117 (GARDNER, JOSEPH R) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 00:37:27 SAFETY CHECK | BLewis |
| 11 (HYLTON, JUSTIN D) | 1 SHERIFFS OFFICE PATROL | DEPUTY | 01/01/2024 00:40:03 ARRIVED DEST|MAG OFFICE | BLewis |
| 107 (JOHNSON, CALEB A) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 00:42:53 SAFETY CHECK | BLewis |

JA603

| Call Taker | CFS Report | | | | |
|---|---|---|---|---|---|
| 03  BLewis | CFS # - 2024-000003 | | | | |

| | | | | | |
|---|---|---|---|---|---|
| 124 (POULIN, TREY A) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 00:42:53 | SAFETY CHECK | BLewis |
| 117 (GARDNER, JOSEPH R) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 00:42:53 | SAFETY CHECK | BLewis |
| 124 (POULIN, TREY A) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 00:48:44 | SAFETY CHECK | BLewis |
| 107 (JOHNSON, CALEB A) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 00:48:44 | SAFETY CHECK | BLewis |
| 117 (GARDNER, JOSEPH R) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 00:48:44 | SAFETY CHECK | BLewis |
| 107 (JOHNSON, CALEB A) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 00:53:31 | CLEAR | MU |
| 124 (POULIN, TREY A) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 00:54:39 | SAFETY CHECK | BLewis |
| 117 (GARDNER, JOSEPH R) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 00:54:39 | SAFETY CHECK | BLewis |
| 117 (GARDNER, JOSEPH R) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 00:55:43 | CLEAR | SSimms |
| 124 (POULIN, TREY A) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 01:00:16 | SAFETY CHECK | SSimms |
| 124 (POULIN, TREY A) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 01:05:39 | SAFETY CHECK | SSimms |
| 124 (POULIN, TREY A) | ROCKY MOUNT POLICE DEPARTMENT | POLICE OFFICER | 01/01/2024 01:05:47 | CLEAR | BLewis |
| 62 (WADE, ZION T) | 1 SHERIFFS OFFICE PATROL | DEPUTY | 01/01/2024 01:44:14 | \|STACK ADD | BLewis |
| 62 (WADE, ZION T) | 1 SHERIFFS OFFICE PATROL | DEPUTY | 01/01/2024 01:44:14 | CLEAR\|Placing Unit On CFS 2024-000015 | BLewis |
| 62 (WADE, ZION T) | 1 SHERIFFS OFFICE PATROL | DEPUTY | 01/01/2024 01:44:55 | \|STACK CLEAR | BLewis |
| 11 (HYLTON, JUSTIN D) | 1 SHERIFFS OFFICE PATROL | DEPUTY | 01/01/2024 02:59:41 | CLEAR | BLewis |

## Incident Locations

| | | |
|---|---|---|
| Address: HIGHVIEW TER / SCUFFLING HILL RD | | User: BLewis |
| When: 01/01/2024 00:11:31   Latitude: | Longitude: | Source: None_Unknown  InActive: ☐ |

## Vehicle Person Information

| Name | | Eye | Hair | Hgt | Wgt | Race | Sex | Discipline L |
|---|---|---|---|---|---|---|---|---|
| DOB | OLN  VA | | | OID | | Unit  11 | | |
| Location | | | Description | | | | | Phone |
| | | | SERIAL NUMBER | | | | | |
| Type | | Tag VA | Tag Year 2024 | Tag Type | | User  BLewis | | When 01/01/2024 00:11:31 |
| Make/Model/Year/Color/VIN/Desc | | / / / / / | | | | | | Searched ☐ Consented ☐ |
| | | | K-9 UtilizationCONTACT | | | | | |

| Name | | Eye | Hair | Hgt | Wgt | Race | Sex | Discipline L |
|---|---|---|---|---|---|---|---|---|
| DOB | OLN  VA | | | OID | | Unit | | |
| Location | | | Description | | | | | Phone |
| | | | SERIAL NUMBER | | | | | |
| Type | | Tag VA  VYC3195 | Tag Year 2024 | Tag Type | PC | User  BLewis | | When 01/01/2024 00:12:47 |
| Make/Model/Year/Color/VIN/Desc | | 2001 / / 2001 / WHI / 4S3BH645617306249 /VALID, NEG OUTSTANDING. / | | | | | | Searched ☐ Consented ☐ |
| | | | K-9 UtilizationCONTACT | | | | | |

| | | | |
|---|---|---|---|
| CAD Report 44 | Page  3  Of  5 | | 09/26/2024 14:01 |

JA604

| Call Taker | | CFS Report | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 03 BLewis | | CFS # - 2024-000003 | | | | | | |

| Name | | Eye | Hair | Hgt | Wgt | Race | Sex | Discipline L |
|---|---|---|---|---|---|---|---|---|
| DOB | OLN VA | | | OID L699622 | | Unit | | |
| Location | | | Description 22 REVOLVER | | | | | Phone |
| | | | SERIAL NUMBER | | | | | |
| Type | Tag VA | | Tag Year 2024 | Tag Type | | User BLewis | | When 01/01/2024 00:35:20 |
| Make/Model/Year/Color/VIN/Desc | / / / / / | | | | | | | Searched☐ Consented☐ |
| | | | K-9 UtilizationCONTACT | | | | | |

| Name | | Eye | Hair | Hgt | Wgt | Race | Sex | Discipline L |
|---|---|---|---|---|---|---|---|---|
| DOB | OLN VA | | | OID | | Unit | | |
| Location | | | Description | | | | | Phone |
| | | | SERIAL NUMBER | | | | | |
| Type | Tag VA | UJB6018 | Tag Year 2024 | Tag Type PC | | User BLewis | | When 01/01/2024 00:35:59 |
| Make/Model/Year/Color/VIN/Desc | KIA / / 2007 / SIL / KNAFG526477112089 /EXP 9/30/23 NEG OUTSTANDING | | | | | | | Searched☐ Consented☐ |
| | | | K-9 UtilizationCONTACT | | | | | |

| Name | MARTINEZ-CHAVEZ, ISSAC F | Eye | Hair | Hgt | Wgt | Race | Sex M | Discipline L |
|---|---|---|---|---|---|---|---|---|
| DOB 09/16/1986 | OLN VA | | | OID | | Unit | | |
| Location | | | Description | | | | | Phone |
| | | | SERIAL NUMBER | | | | | |
| Type | Tag VA | | Tag Year 2024 | Tag Type | | User BLewis | | When 01/01/2024 01:45:50 |
| Make/Model/Year/Color/VIN/Desc | / / / / / | | | | | | | Searched☐ Consented☐ |
| | | | K-9 UtilizationCONTACT | | | | | |

## Wrecker(s)

| When: 01/01/2024 00:20:23 | User: BLewis | Wrecker: COOKE TOWING AND RECOVERY LLC | Reason: |
|---|---|---|---|
| Tag: | ☑Responded ☐Cancelled ☐Hold | Make: | Model: |
| Description: | | Tow To: | |
| Notes: | | | |

## Comment                                                              01/01/2024 00:52:10  01/01/2024 00:52:10

124 ADV HE HAD VEH GOING SCUFFLING HILL TO FRANKLIN ST POSS HONDA TRYING TO GET AWAY FROM HIM - 11 ADV THEY BLACKED OUT AND TURNED ON HIGHVIEW TERRACE - 36 ADV THINKS 11 HAS ONE AT GUNPOINT - 11 CONFIRMED ONE @ GUNPOINT - VYC3195

## Notes

BLewis 01/01/2024 00:20:27 L,O

30 MINS COOKS TOWING

BLewis 01/01/2024 00:21:12 L,O

.22 REVOLVER - 117

BLewis 01/01/2024 00:22:59 L,O

62 ADV 1 IN CUSTODY IN HIS VEH

BLewis 01/01/2024 00:33:33 L,O

62 ADV SIG 3 ENROUTE TO MAGISTRATE

BLewis 01/01/2024 00:37:34 L,O

LATE NOTE: SENT MONTGOMERY CO HIT & RECD REPLY

BLewis 01/01/2024 00:37:39 L,O

RECD PPWK VIA FAX

BLewis 01/01/2024 00:40:24 L,O

JA605

| Call Taker | CFS Report |
| --- | --- |
| 03  BLewis | CFS # - 2024-000003 |

PRINTED QH - 11 PICKED UP WARRANTS AND HX

**BLewis 01/01/2024 00:42:44  L,O**
LATE NOTE  11 ADV ORIGINAL TAG WAS ON KIA SW

**BLewis 01/01/2024 00:42:50  L,O**
124 ADV COOKS ON SCENE

**BLewis 01/01/2024 02:44:18  L,O**
SENT LOCATE

**BLewis 01/01/2024 02:44:32  L,O**
RECD SERVED CAPIAS FROM 62

**BLewis 01/01/2024 02:46:16  L,O**
FAXED PPWK BACK TO MONTGOMERY CO

**BLewis 01/01/2024 02:59:41  L,O**
ARREST - 11 ADV CLEAR ARREST. TAKING REPORT.

**BLewis 01/01/2024 03:01:23  L,O**
62 BROUGHT SERVED COPIES OF WARRANTS FOR SUBJ OBTAINED BY FCSO

**BLewis 01/01/2024 03:01:34  L,O**
NOTHING TO CLEAR IN VCIN/NCIC

**BLewis 01/01/2024 03:02:21  L,O**
PLACED ALL PPWK IN RECORDS BOX.

**JWilliams 01/17/2024 09:18:04  L,O**
PUSHED TO 107 FOR REPORT PER HIS REQUEST

JA606