IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

No. 25-4318

———————

UNITED STATES OF AMERICA,

*Appellee,*

v.

ISAAC FIDEL MARTINEZ-CHAVEZ,

*Appellant.*

———————

Appeal from the United States District Court
for the Western District of Virginia
at Roanoke
*The Honorable Elizabeth K. Dillon, Chief District Judge*

———————

BRIEF OF THE UNITED STATES

———————

Robert N. Tracci
Acting United States Attorney

Jonathan Jones
Assistant United States Attorney
310 First Street
Roanoke, Virginia 24011
(540) 857-2250

*Attorneys for the United States of America*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. ii

INTRODUCTION ............................................................................. 1

JURISDICTIONAL STATEMENT ...................................................... 2

STATEMENT OF THE ISSUES ......................................................... 2

STATEMENT OF THE CASE ............................................................ 3

SUMMARY OF THE ARGUMENT .................................................... 20

ARGUMENT ................................................................................... 22

    I.    The prosecutor's statements during closing argument did not prejudice Mr. Martinez-Chavez .............................. 22

    II.    The district court properly exercised its discretion to deny an adverse-inference instruction ............................... 40

        1.    The district court appropriately declined to give an adverse-inference instruction in the absence of a due process violation .............................................. 43

        2.    Even under *Johnson*'s framework, there was no abuse of discretion in declining to provide the spoliation instruction .............................................. 47

        3.    Any error was harmless ............................................. 55

CONCLUSION ................................................................................ 56

CERTIFICATE OF COMPLIANCE ................................................... 58

CERTIFICATE OF FILING AND SERVICE ...................................... 58

# TABLE OF AUTHORITIES

**Cases**

*Arizona v. Youngblood*, 488 U.S. 51 (1988) ................................ 40, 44, 46

*California v. Trombetta*, 467 U.S. 479 (1984).......................................... 40

*Illinois v. Fisher*, 540 U.S. 544 (2004)...................................................... 44

*Payne v. Taslimi*, 998 F.3d 648 (4th Cir. 2021) ...................................... 44

*RSM, Inc. v. Herbert*, 466 F.3d 316 (4th Cir. 2006).............................. 53

*United States v. Abu Ali*, 528 F.3d 210 (4th Cir. 2008) ......................... 55

*United States v. Basham*, 561 F.3d 302 (4th Cir. 2009) ........................ 38

*United States v. Bloodworth*, 412 F. App'x 639 (4th Cir. 2011) ....... 45, 52

*United States v. Campbell*, 347 F. App'x 923 (4th Cir. 2009)..... 30, 32, 33

*United States v. Chaudhri*, 134 F.4th 166 (4th Cir. 2025) .................... 42

*United States v. Cole*, 755 F.2d 748 (11th Cir. 1985) ............................ 25

*United States v. Cooper*, 827 F.2d 991 (4th Cir. 1987) .......................... 29

*United States v. Craddock*, 364 F. App'x 842 (4th Cir. 2010) .......... 24, 36

*United States v. Francisco*, 35 F.3d 116 (4th Cir. 1994)........................ 34

*United States v. Harris*, 498 F.3d 278 (4th Cir. 2007)........................... 37

*United States v. Harrison*, 716 F.2d 1050 (4th Cir. 1983)..................... 24

*United States v. Jacobs*, 215 F. App'x 239 (4th Cir. 2007) .................... 34

*United States v. Jobson*, 102 F.3d 214 (6th Cir. 1996) ..................... 45, 52

*United States v. Johnson*, 996 F.3d 200 (4th Cir. 2021)................. passim

*United States v. Lighty*, 616 F.3d 321 (4th Cir. 2010) ........................... 24

*United States v. Lopez*, 860 F.3d 201 (4th Cir. 2017) ....................... 24, 35

*United States v. Moore*, 11 F.3d 475 (4th Cir. 1993) ........................ 24, 26

*United States v. Morsley*, 64 F.3d 907 (4th Cir. 1995) ....................... 23, 24

*United States v. Myers*, 279 F. App'x 257 (4th Cir. 2008) ................ 24, 36

*United States v. Pupo*, 841 F.2d 1235 (4th Cir. 1988) ................ 25, 34, 36

*United States v. Raza*, 876 F.3d 604 (4th Cir. 2017) ....................... 42, 47

*United States v. Runyon*, 707 F.3d 475 (4th Cir. 2013) .................... 25, 34

*United States v. Sanchez*, 118 F.3d 192 (4th Cir. 1997) ........................ 25

*United States v. Varner*, 261 F. App'x 510 (4th Cir. 2008) .................... 45

*United States v. Woods*, 710 F.3d 195 (4th Cir. 2013) .......... 24, 26, 29, 30

*United States v. Wright*, 333 Fed. Appx. 772 (4th Cir. 2009) ..... 41, 44, 45

*Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148 (4th Cir. 1995) ............ 44

**Statutes**

18 U.S.C. § 3231 ................................................................................. 2

18 U.S.C. § 3500(b) ............................................................................ 51

28 U.S.C. § 1291 ................................................................................. 2

28 U.S.C. § 3742 ................................................................................. 2

**Rules**

Fed. R. Civ. P. 37(e)(2)(B) ................................................................. 46

# INTRODUCTION

Isaac Martinez-Chavez was driving around late at night on New Year's Eve with a short-barreled rifle, a revolver, and some ammunition. Because he is a felon, doing so was illegal. After trying to evade a police officer by turning off all his car's lights, he was caught, and officers found the guns under his passenger seat and the ammunition squirrelled away in his center console. He was indicted and convicted by a jury for unlawfully possessing a firearm as a felon, and for unlawfully possessing an unregistered short-barreled rifle.

Now Mr. Martinez-Chavez wants a new trial. He argues the prosecutor made improper statements during his closing argument. And he claims he was entitled to an adverse-inference instruction for spoliation of evidence because of missing dispatch calls he alleges were both relevant and willfully destroyed.

Neither claim warrants a new trial. Although certain of the government's remarks were improper, they did not prejudice Mr. Martinez-Chavez. The evidence against him was overwhelming and the few stray comments from the prosecutor did not trigger a conviction from a jury otherwise prepared to acquit. Similarly, the district court

appropriately declined to give an adverse-inference instruction for lost dispatch call recordings. It was hardly clear the dispatch calls would be relevant in a case where the defendant was caught red-handed with the guns in his car. And Mr. Martinez-Chavez could not show the recordings were willfully destroyed since they were automatically deleted in accordance with the applicable state retention policy.

Mr. Martinez-Chavez's convictions should be affirmed.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 18 U.S.C. § 3231. This Court has jurisdiction under 28 U.S.C. §§ 3742 and 1291 following a timely notice of appeal.

## STATEMENT OF THE ISSUES

1. Whether any error in the government's closing statement was harmless—that is, whether the jury would have convicted Mr. Martinez-Chavez had the prosecutor not called a defense alibi witness a "liar" and said the case was important to the government given that the evidence of guilt was both overwhelming and straightforward, and the alibi witness had already proven himself to be a liar (by, among other things, perjuring himself on the stand).

2. Whether the district court properly exercised its discretion in declining an adverse-inference or spoliation instruction where there was no due process violation, and where the dispatch call records at issue were deleted pursuant to a routine state retention and disposal policy. If not, whether any such error was harmless.

**STATEMENT OF THE CASE**

Late in the evening of December 31, 2023 (and into the next morning), Isaac Martinez-Chavez was driving his car. Officer Hylton, a local sheriff's deputy, was patrolling the streets, looking in particular for DUIs, when he flagged Mr. Martinez-Chavez's car on his radar speeding in the other direction. JA793-794. Officer Hylton flipped around and pursued the car. JA794

The car was initially out of Officer Hylton's sight after he turned around, but he soon spotted the car after it made a turn and he continued trying to catch up. JA794. He noticed the car picking up speed, and after following it briefly, the car's driver turned off its headlights and taillights (i.e., "blacked out"). JA795. Shortly after that, Officer Hylton turned on his emergency lights. The car then made a quick right turn and parked at a nearby house. JA796-797.

3

Officer Hylton pulled in behind the car and turned his spotlight on the car's interior. There was only one person in the car—Mr. Martinez-Chavez—and Officer Hylton saw him leaning over into the front passenger side of the car. JA797-798. As he later testified, "[i]t looked like he was reaching for something." JA798. Fearing the worst, particularly after the car had "blacked out" while he was in pursuit, Officer Hylton drew his gun and directed Mr. Martinez-Chavez to get out of the car. JA798-800; JA1460, at 6:23-6:41. Mr. Martinez-Chavez eventually did, but he kept feeling around in his pockets, and Officer Hylton repeatedly directed him to stop and keep his hands visible. JA799-801.

At that point, Officer Hylton notified dispatch and detained Mr. Martinez-Chavez in handcuffs. JA802. While Officer Hylton was looking at Mr. Martinez-Chavez's identification, Mr. Martinez-Chavez acknowledged he had been "coming fast like that . . . ." JA1460, at 2:43-2:50. Then, someone came out of the house and walked toward the car. JA803. Mr. Martinez-Chavez (speaking in Spanish) pleaded with the person to close the car door and told him he had been speeding. JA803;

4

JA1251.[1] Officer Hylton could not understand the conversation, but he told the person to stay back and not get involved. JA803-805.

A few other officers then arrived on scene, including Officer Poulin. JA806. Officer Poulin had been speaking on the phone with Officer Hylton when Officer Hylton saw Mr. Martinez-Chavez's car race by. JA877. After that call ended, Officer Poulin listened in on the radio to Officer Hylton's calls into dispatch. JA877-878. He heard Officer Hylton tell dispatch that Mr. Martinez-Chavez's car "blacked out," which raised serious officer-safety concerns. JA879-885. Officer Poulin quickly drove to the scene. JA885-886.

Once Officer Poulin arrived, he walked up to the passenger side of Mr. Martinez-Chavez's car—which was parked askew on the grass as though Mr. Martinez-Chavez had pulled in and parked in haste—while Officer Hylton approached the car's driver side. JA807-808; JA886-887. Officer Poulin asked Officer Hylton who was in the car, and Mr. Martinez-Chavez responded: "Nobody, just me." JA498. Officer Poulin

---

[1] From the English translation in JA1251: "Hey man. Come here, man. Close the car, yes? Come here. Close it. Close it. There's the key, man. Close them, the windows, man. Please. Close them. . . [inaudible] . . . It's that I was coming fast, man. Close it, man. Please. Close it, man. . . . [inaudible] . . . Right now. Close it."

flashed his light in the window and saw what he thought was a sawed-off shotgun; he told Officer Hylton there was a gun, and Officer Hylton said Mr. Martinez-Chavez had been reaching for something in the passenger seat when he was stopped. JA472; JA508; JA887-888; JA920; JA1461, at 6:30-6:40.



1260 (cropped)

Then, as the officers were unlocking and opening the door, they were advised by dispatch there was a warrant for Mr. Martinez-Chavez for a felony probation violation. JA445; JA500.

After seeing the gun and learning Mr. Martinez-Chavez was a felon, the officers searched the vehicle. They found two firearms: a short-barreled Marlin rifle and a revolver, along with ammunition in

the center console that could be used with either gun, and a glass pipe. JA447-450; JA809-810; JA864; JA894-896; JA905. When they searched Mr. Martinez-Chavez himself (incident to his arrest) they found another glass pipe with what later proved to be meth residue. JA389; JA447.

 

JA1255; JA1258 (cropped)

Most of the encounter was caught on officer bodycam—both Officer Hylton's and Officer Poulin's. But as Officer Hylton acknowledged, he did not activate his bodycam while pursuing Mr. Martinez-Chavez or (as department policy required) right when he pulled in behind him. JA848-849. Officer Hylton shined the spotlight, drew his gun, and directed Mr. Martinez-Chavez out of the car before activating his bodycam; as a result, the video begins with Mr. Martinez-Chavez standing at the back of his car in handcuffs. JA841-842. And early in the video, Officer Hylton's bodycam fell off its mount on his

chest piece. He eventually reaffixed it, but there was a brief period with only audio and no video. JA849-850.

Mr. Martinez-Chavez was indicted for unlawfully possessing a firearm as a felon, in violation of 18 U.S.C. § 922(g)(1) and unlawfully possessing an unregistered short-barreled rifle, in violation of 26 U.S.C. § 5861(d). JA20-21.

On May 1, 2024, a few weeks after the indictment, Mr. Martinez-Chavez's counsel sent a standard discovery letter, asking for all Rule 16 discovery materials, along with any *Brady*, *Giglio*, and *Jencks* materials. JA201-205. By that time, the government had recently provided a large portion of its discovery materials, and the letter did not include any requests for any specific items. Nearly six months later, on October 24, 2024, defense sent an email asking for a few specific discovery items, including the "radio runs (or dispatch calls) made by" Officer Hylton. JA206. The government directed its case agent to look for the materials, but the agent determined there were no longer any recordings because they would have been destroyed around six months after the incident—or roughly June 2024—pursuant to the Virginia Records Retention and Disposition Schedule. JA207. However, the

government did produce CFS (or "call for service) reports, which function as written logs of dispatcher/officer communications. JA207; JA234-237.

In advance of trial, Mr. Martinez-Chavez filed several motions, including a motion to suppress alleging the search of Mr. Martinez-Chavez's car was unlawful and a motion for an adverse-inference or spoliation instruction due to the dispatch calls that had been destroyed. JA119-134; JA195-200.

The suppression issue was assigned to a separate judge, JA540, and at the hearing on the motion to suppress (where Officer Hylton and Officer Poulin testified), Mr. Martinez-Chavez's attorneys previewed arguments about putative timing inconsistencies between the available bodycam and the CFS dispatch reports—namely, that comparing (1) the CFS report timing between Officer Hylton's call to dispatch and Officer Poulin's arrival on scene (roughly four minutes and two seconds) and (2) the time between Officer Hylton's bodycam being activated and the bodycam showing Officer Poulin arriving on scene (roughly three minutes and forty-four seconds) left only a relatively brief window (about eighteen seconds) for Officer Hylton to have shone his spotlight,

drawn his gun, and ordered Mr. Martinez-Chavez to get out of the vehicle and keep his hands out of his pockets. JA558-559. The judge was unmoved and found the timing claims unpersuasive; as Officer Hylton later explained at trial, he does not always give the dispatcher a specific time for each incident, so the CFS report just tracks when he is able to call in rather than the precise moment for any event. JA870-871. The judge also expressly found the officers credible in both an oral statement of reasons and a written opinion, crediting Officer Hylton's description of the encounter. JA523; JA683; JA692. The motion to suppress was denied. JA537 ("I mean, there are so many reasons why what happened here was not unconstitutional. So many.").

At the hearing on the request for an adverse-inference instruction, the government presented testimony from the custodian of the dispatch communication records. JA618. She explained that dispatch recordings are purged automatically after 180 days, in accordance with Virginia's records retention and disposition schedule, unless there is a specific preservation request. JA620-621; JA623-624. She also testified that Officer Hylton had requested the dispatch recordings on October 25 (a

day after defense counsel's email request), but they had already been automatically deleted. JA627-628.

Following the testimony, defense counsel acknowledged there was no bad faith on the government's part (and that the "government acted with due diligence" after the dispatch calls were specifically identified). Instead of making an argument premised on bad faith, defense counsel relied primarily on this Court's decision in *United States v. Johnson*, 996 F.3d 200 (4th Cir. 2021), and argued an adverse-inference instruction was appropriate because, in her view, the calls were relevant, and the government willfully destroyed them. JA634; JA640. To explain why the dispatch calls were potentially relevant to Mr. Martinez-Chavez's defense, defense counsel again raised the issue about timing disparities between the CFS reports and the bodycam videos as the reason. JA634-637. And she argued the government willfully destroyed the calls because the officers should have known they would be relevant but did not take steps to preserve them. JA640-641.

The district court denied the motion. It found unpersuasive the idea that modest timing discrepancies would undermine Officer

11

Hylton's and Officer Poulin's testimony. JA748 ("[T]hese minimal time discrepancies between the CFS Report and the BWC footage do not suggest anything nefarious when one understands how the CFS Report is created, which Martinez-Chavez overlooks."). And it found Mr. Martinez-Chavez had failed to satisfy either of the requirements in *Johnson*—there was no showing the government knew the dispatch recordings were relevant; and, given the recordings were automatically purged from the system, there was no willful destruction on the government's part. JA750-752.

The parties proceeded to trial. The government relied primarily on testimony from Officer Hylton and Officer Poulin (along with their bodycam videos) to establish the details of the encounter with Mr. Martinez-Chavez on New Year's Eve. Both officers provided consistent and self-corroborating testimony: Officer Hylton testified Mr. Martinez-Chavez was speeding, "blacked out" his car when Officer Hylton pursued him, and reached over into the passenger seat when Officer Hylton pulled in behind him. JA792-810. Officer Poulin testified he heard Officer Hylton tell dispatch he was pursuing a speeding car that had "blacked out" and after seeing the short-barreled rifle, Officer

Hylton told him Mr. Martinez-Chavez had been reaching for something. JA877-894; JA919-920.

Mr. Martinez-Chavez challenged the officers' credibility—pointing to, for example, the timing discrepancies with the CFS report, Officer Poulin's failure to initially activate his bodycam, and sequencing errors in both officers' reports. But Mr. Martinez-Chavez largely did not dispute that when Officer Poulin stopped him, he was alone in a vehicle with two guns and ammunition. Mr. Martinez-Chavez similarly did not dispute that the guns in the car were "firearms" under the statute, that the larger gun was an unregistered rifle, or that he had a prior felony conviction.

After the government rested, Mr. Martinez-Chavez called Olman Vallejos, a would-be alibi witness. But Mr. Vallejos's testimony, by even the most charitable interpretation, was a complete and utter farce. Mr. Martinez-Chavez's own counsel, when discussing Mr. Vallejos's testimony during closing arguments, labeled him a "crackhead" who was "clearly addled by the drugs that he smokes" and who "can't remember one question to the next" and "can't remember exactly what happened." JA1197. The district court, describing Mr. Vallejos at

sentencing, explained that it "frankly found him to be not a credible witness"; it also said that appraisal "probably doesn't come as a surprise to anyone who was attending that trial." JA1407.

On the stand, Mr. Vallejos's story was at times difficult to follow. But the gist of his tale was that unbeknownst to Mr. Martinez-Chavez he stashed the guns in Mr. Martinez-Chavez's car while they were driving around together on New Year's Eve. In particular, Mr. Vallejos testified:

- He and Mr. Martinez-Chavez were coming from a party at their boss's house, and that they had also partied there a week earlier on December 24. JA1088-1089; JA1090; JA1124-25. But he also said Mr. Martinez-Chavez had already had a falling out with their boss before either of those parties had occurred. JA1123-1124.

- He admitted he had been stealing from his boss due to alleged underpayment for his work as a mechanic (although he was also, at this time, living at his boss's mechanic shop); and when his boss found out, he tossed Mr. Vallejos out and burned his clothes and other belongings. JA1119-1121. At that point, Mr. Vallejos threatened his boss, telling him "You don't know who you're messing with." JA1123.

- He said he and Mr. Martinez-Chavez, near midnight on New Year's Eve, were driving together to go fix someone's car. JA1139-41.

- He said he put a jacket on while at the mechanic shop earlier that day. JA1141-1142. But while driving with Mr. Martinez-Chavez late that night, he found two guns in the coat—a short-

barreled rifle and a revolver. JA1094. He assumed the guns belonged to his boss since he had picked up the jacket at his boss's shop. Although he put the jacket on and took it off several times throughout the day, he not previously noticed there were two guns in it. JA1142.

- He said that upon realizing the guns were in his jacket, he pulled them out and hid them under the front passenger seat (where he was sitting). He said Mr. Martinez-Chavez, sitting a few feet away, did not notice him hiding not one, but two guns under the seat. JA1094; JA1099. He also said he "forgot" to tell Mr. Martinez-Chavez about the guns but also that he did not want Mr. Martinez-Chavez to know about the guns. JA1142-1143.

- Once he and Mr. Martinez-Chavez noticed the officers following them, he asked to be dropped off because he had some crack and did not want to be caught with it. JA1102. Apparently, he had been smoking crack that evening and could routinely be found smoking crack. JA1093; JA1125.

- He did not know anyone in the town where he was dropped off, so he called number of a random woman he did not know (but which was nonetheless saved in his phone) to come pick him up. JA1107; JA1136-1137.

Mr. Vallejos's testimony was itself internally inconsistent and illogical. It also contradicted other evidence in the case. Officer Hylton testified that no one had gotten out of Mr. Martinez-Chavez's car (although there was a brief period, while turning around, when he could not see the car). JA797. In addition, photographs of the car's interior made clear the front passenger area was covered with tools and even a

battery charger pack, effectively eliminating the possibility that someone had been sitting there just minutes before.



JA1236 (cropped)

The government also called a rebuttal witness, Deputy Edwin Alejando, to identify additional inconsistencies from earlier statements. Deputy Alejandro was a Spanish-speaking deputy who met with Mr. Vallejos a couple of times after the New Year's Eve incident. At their first meeting, Mr. Vallejos said there was drug activity at his boss's shop but never mentioned he had been in the car with Mr. Martinez-Chavez or that he had been wearing a jacket he got from his boss's

shop. JA1055-56. In the next interview, Mr. Vallejos said he was in the car with Mr. Martinez-Chavez; but he also said Mr. Martinez-Chavez called his wife (rather than Mr. Vallejos calling a random woman), and he described both guns as small (as opposed to a more sizeable sawed-off rifle). JA1060-1063.

But the coup de grace was the moment Mr. Vallejos was caught lying under oath in front of the jury. During cross-examination, Mr. Vallejos testified he never met with defense counsel before trial and had never previously seen the photos of the guns (that defense counsel showed him during the direct examination). JA1119. On re-direct, defense counsel, to be candid with the court and to avoid suborning perjury, clarified that Mr. Vallejos had met with defense counsel and they had shown him pictures of the guns in advance. JA1148; JA1152.

After Deputy Alejandro's testimony, the prosecutor and the defendant presented closing arguments. The prosecutor highlighted the evidence in the case and the clear proof that Mr. Martinez-Chavez knowingly possessed the guns that night. JA1159-1162; JA1172-1179. The prosecutor also explained precisely why Mr. Vallejos was not a credible witness, detailing inconsistencies and inaccuracies (including

the perjury) in his testimony. JA1163-1171. After explaining why the jury should not credit Mr. Vallejos, the prosecutor called him a "liar":

> There are only two people who know whether Vallejos was in the car. One of them was Vallejos, the liar; Vallejos, who under oath told you that he has no reason to lie, and then lied to your faces several times[.]

JA1172. Mr. Martinez-Chavez did not object to the prosecutor's characterization. Later, towards the close of his argument, the prosecutor noted the case was important both to Mr. Vallejos and the government:

> Again, thank you for your time. I appreciate your careful deliberation. This case is important not just to the defendant, but also to the government and to the law enforcement personnel. These folks are professionals who are out there protecting the community and taking felons, armed felons—
>
> . . .
>
> As I was saying, these law enforcement officers are professionals, and they are out there protecting the communities and removing armed felons, especially felons armed with sawed-off rifles, off the streets. Toward that end, I ask that you find the defendant guilty of all charges.

JA1179-1180. Mr. Martinez-Chavez objected to argument about the importance of the case to the government, but the district court overruled the objection. JA1179-1182.

Mr. Martinez-Chavez then presented his closing argument. His counsel claimed he did not know about the guns in the car and stridently accused the officers of a sloppy investigation and of fabricating key details to ensure Mr. Martinez-Chavez's conviction. JA1182-1204. She also pointed to the supposed timing disparities between the CFS reports and the admitted bodycam footage in effort to undercut the officers' credibility. JA1188-1190.

After the closing arguments, the district court instructed the jury. It specifically told the jury that:

> Statements (including opening statements), arguments (including closing arguments), questions, and comments by the lawyers are not evidence. If what a lawyer says, or a question the lawyer asks, is different from the evidence, the evidence is what matters and not what the lawyer said or asked.

JA1215-1216.

The jury convicted Mr. Martinez-Chavez on both counts. At sentencing, the district court imposed a below-Guideline sentence of 59

months. JA1414; JA1450. Mr. Martinez-Chavez then timely noticed this appeal. JA1458.

## SUMMARY OF THE ARGUMENT

1. Mr. Martinez-Chavez has not carried his burden to show the prosecutor's labeling Mr. Vallejos a "liar" satisfies the plain error standard. Although calling a witness a "liar" can be improper under certain circumstances, it did not prejudice Mr. Martinez-Chavez here. There was ample evidence of his guilt; he was found in the car with the two firearms and matching ammunition after trying to evade a police officer by speeding away and turning off his lights. Moreover, Mr. Vallejos's parade of inconsistencies and illogical claims made it clear to the jurors that he was not credible long before the prosecutor stood up to present a closing argument. Finally, allowing a conviction on straightforward proof of guilt does not impugn the fairness or integrity of the court, even if a prosecutor accurately called a witness a liar.

2. The comment about the case's importance to the government is similarly harmless—though reviewed under the typical harmlessness analysis rather than plain error. Again, the evidence clearly pointed to Mr. Martinez-Chavez's guilt; he largely acknowledged he was alone in

20

the car, when Officer Hylton stopped him, with the guns and ammunition. It was a relatively isolated statement, measuring out to no more than a few lines in a 22-page closing argument, and would not have prompted a conviction from a jury otherwise prepared to acquit Mr. Martinez-Chavez.

3. The district court did not abuse its discretion in declining to give an adverse-inference instruction due to the automatically deleted dispatch calls. Mr. Martinez-Chavez cannot meet the standard for showing a due process violation under *Youngblood* or *Trombetta* and, at least on appeal, does not even try. But absent a due process violation, there should be no spoliation instruction, particularly not on the basis of an out-of-date civil standard.

If the framework in *Johnson* does ultimately allow an adverse-inference instruction in contexts that do not involve due process violations, Mr. Martinez-Chavez failed to satisfy that standard. He cannot show the government knew the dispatch calls were relevant. Even defense counsel did not recognize their significance until months after they had been automatically purged, and no officer could reasonably have foreseen (much less affirmatively *known*) that Mr.

Martinez-Chavez's counsel would need the actual dispatch calls in order to parse out minute timing discrepancies between CFS reports and bodycam footage. Furthermore, there was no willful destruction on the government's part. The recordings were automatically deleted in accordance with the state's procedures for retention and disposal. No one affirmatively decided to destroy the recordings, nor did anyone consciously decline to intervene to ensure the calls would be destroyed.

## ARGUMENT

### I.     The prosecutor's statements during closing argument did not prejudice Mr. Martinez-Chavez

Mr. Martinez-Chavez first challenges a few comments from the prosecutor's closing argument—namely, when he called defense witness Mr. Vallejos a "liar," and when he told the jury the case was "important" to the government and the law enforcement officers involved. *See* Br. at 14-31. The government does not dispute those statements were improper. But his claims nonetheless fail because given the overwhelming and straightforward evidence against Mr. Vallejos, those missteps were harmless.

\* \* \*

Prosecutors do not enjoy free rein during closing arguments; they must hew closely to the evidence admitted at trial and the legal principles in play. They may not encourage the jury to decide the case on the basis of anything else. Straying outside those bounds may hinder a defendant's right, under the due process clause, to a fair trial.

But an improper comment only amounts to a due process violation—and therefore warrants relief—if it "prejudiced the defendant's substantial rights" in the sense that it altered or affected the outcome of the trial. *United States v. Morsley*, 64 F.3d 907, 913 (4th Cir. 1995).[2] To determine whether there is prejudice, this Court examines several factors:

(1) the degree to which the remarks had a tendency to mislead the jury and to prejudice the defendant;

(2) whether the remarks were isolated or extensive;

(3) the strength of the proof against the defendant;

(4) whether the comments were intended to divert the jury's attention to extraneous matters;

(5) whether defense counsel's improper conduct invited the remarks; and

(6) whether curative instructions were given.

---

[2] Throughout this brief, all internal quotation marks and citations are omitted unless otherwise noted.

*United States v. Harrison*, 716 F.2d 1050, 1052 (4th Cir. 1983); *United States v. Lighty*, 616 F.3d 321, 361 (4th Cir. 2010). The most important factor is the strength of the government's evidence. *See United States v. Woods*, 710 F.3d 195, 204 (4th Cir. 2013); *United States v. Craddock*, 364 F. App'x 842, 844–45 (4th Cir. 2010).

Notably, this Court, in applying that framework, has often found that improper comments did not actually prejudice defendants—a seeming recognition that a few stray comments will rarely overwhelm the rest of the prosecution. *See, e.g.*, *United States v. Lopez*, 860 F.3d 201, 215–16 (4th Cir. 2017); *Craddock*, 364 F. App'x at 844–45; *United States v. Myers*, 279 F. App'x 257, 258–59 (4th Cir. 2008). In fact, the cases cited by Mr. Martinez-Chavez about improper closing remarks by and large also found no prejudice to the defendant. *See* Br. at 16-20; *see also, e.g.*, *United States v. Moore*, 11 F.3d 475, 482 (4th Cir. 1993) ("We believe Moore has failed to establish that the error in this case affected his substantial rights, *i.e.*, affected the outcome of the trial."); *Morsley*, 64 F.3d at 913 ("Nonetheless, we conclude that . . . the error does not require reversal."); *Woods*, 710 F.3d at 204 ("And, most importantly, the statement did not prejudice Woods given the strength of competent

proof introduced against him that both overwhelmingly supported a finding of guilt and undermined his credibility."); *United States v. Cole*, 755 F.2d 748, 769 (11th Cir. 1985) ("[T]he prosecutor's comments [that the case was very important to the government] were improper. Nonetheless, these comments did not prejudicially affect any of the appellants' substantive rights."); *United States v. Runyon*, 707 F.3d 475, 515 (4th Cir. 2013) ("We are confident, however, that neither comment rendered the proceeding unfair[.]"); *United States v. Pupo*, 841 F.2d 1235, 1240 (4th Cir. 1988) (applying factors from *Harrison* and finding the improper comments did not prejudice the defendant); *United States v. Sanchez*, 118 F.3d 192, 198 (4th Cir. 1997) ("Even were we to accept that this single comment did constitute a form of forbidden "vouching," it could not have unfairly prejudiced Sanchez[.]").

Consistent with the typical harmlessness inquiry, the government bears the burden of showing the absence of any prejudice if the defendant objected at trial to the improper commentary. But if the defendant did not object, he bears the burden of establishing plain error—i.e., that there was an error that was plain, that it affected substantial rights (that is, altered the outcome), and it "seriously

affect[ed] the fairness, integrity or public reputation of judicial proceedings." *Moore*, 11 F.3d at 481.

*Statement that Mr. Vallejos is a liar*

Beginning with the prosecutor's remark about "Vallejos the liar," Mr. Martinez-Chavez never objected below, so it is reviewed only for plain error. In that sense, the government acknowledges it was improper and plainly so. This Court has previously said as much. *See Woods*, 710 F.3d at 202.

But Mr. Martinez-Chavez fails to carry his burden to show prejudice. The "liar" remark did not have any tendency to mislead the jury because by the time the prosecutor called Mr. Vallejos a liar, the record in the case plainly attested to his unreliability. After all, Mr. Vallejos was caught lying on the stand, a fact defense counsel exposed. JA1119; JA1148-1149. Moreover, Mr. Vallejos admitted to using cocaine all the time, including on the New Year's Eve at issue, JA1093; JA1125, meaning his recollection was unreliable. Even *defense counsel* described him as "clearly addled by the drugs that he smokes" and a "crackhead" who "can't remember one question to the next" and "can't remember exactly what happened." JA1197. He told a different story to the officers

26

the first time he met with them. JA1055-1064. He was a self-admitted thief, stealing from his boss. JA119-1122. And he had a clear motive to lie, both to protect his friend and associate, Mr. Martinez-Chavez, and to frame his boss, whom he had already threatened after a falling out. JA1117-1118; JA1123. The district court summed it up when it "frankly found him to be not a credible witness," and noted that conclusion "probably doesn't come as a surprise to anyone who was attending that trial." JA1407.

Plus Mr. Vallejos's story made little sense. He claimed he was going with his friend, Mr. Martinez-Chavez, to fix a car around midnight on New Year's Eve (as one does). JA1139-41. He also said he was at a party at his boss's house, together with Mr. Martinez-Chavez, on New Year's Eve and had been at an earlier party at his boss's house on Christmas Eve, even though Mr. Martinez-Chavez had, well before both holidays, had a falling out with their boss. JA1088-1089; JA1090; JA1123-25. He said he was wearing a particular coat, which he put on and took off multiple times during the day, but did not notice that there were *two guns* in it, including a foot-and-a-half long short-barreled rifle, until late into the evening. JA1094; JA1141-1142. He claimed he was

able, while sitting in the passenger seat of a car and while high on cocaine, to take two guns out of his coat (including, again, a short-barreled rifle) and hide them under the seat without the car's driver noticing. JA1094; JA1099. His story hinged on the notion that he was sitting on a seat covered with tools and a battery charger pack where no one could realistically fit, and that he hopped out of the car while the police were following, even though the trailing officer testified no one got out of the car. JA797; JA1236. He also claimed he called a woman he did not know, although her number was programmed into his phone, to come pick him up, even though he previously told the police that he used Mr. Martinez-Chavez's phone to call Mr. Martinez-Chavez's wife. JA1060-1063; JA1107; JA1136-1137.

Simply put, the weight of the evidence made clear Mr. Vallejos was not a reliable witness and no rational juror would have credited Mr. Vallejos's claims, irrespective of whether the prosecutor explicitly called him a liar.

The prosecutor's closing remarks also did not implicate this Court's concerns about calling witnesses liars. This Court has cautioned prosecutors from using that sort of language because: (1) it suggests

"the prosecutor's personal opinion has evidentiary weight"; and (2) it may imply "the prosecutor had access to extra-judicial information[.]" *Woods*, 710 F.3d at 203. But here, the prosecutor called Mr. Vallejos a liar only after reminding the jury about his earlier perjury and carefully explaining why Mr. Vallejos's testimony was illogical and inconsistent with the evidence adduced at trial. JA1163-1172. It was therefore clear to the jury that the prosecutor's statement about Mr. Vallejos was not simply personal opinion or based on non-record evidence, but rather the logical conclusion of a reasoned review of the evidence in this case. *See United States v. Cooper*, 827 F.2d 991, 995 (4th Cir. 1987) (Calling defense witnesses "liars" "was quite improper—although perhaps well-founded—but it most certainly was not reversible error[.]").

Moreover, the case against Mr. Martinez-Chavez was both straightforward and overwhelming. Officer Hylton testified about Mr. Martinez-Chavez speeding before turning off all his lights and "blacking out," which was corroborated by other evidence: Officer Poulin acknowledged hearing Officer Hylton advise about the car speeding and going dark, and Mr. Martinez-Chavez acknowledged he was speeding. JA793-797; JA877-879; JA1251. Officer Hylton (as recorded on bodycam

video) told Officer Poulin that Mr. Martinez-Chavez, after being pulled over, was reaching around in the passenger seat where the guns were. JA920; JA1460, at 4:30-4:40 and 6:24-41. One of the guns was easy enough to see that the officers could spot it just by looking through the window (making it hard to believe Mr. Martinez-Chavez did not know about it). JA887. Mr. Martinez-Chavez was the sole occupant in the car where the officers found the guns, along with .22 shells that could be used with the weapons and which Mr. Vallejos never claimed to have placed in the car. JA864; JA890; JA894; JA905. And at the scene, Mr. Martinez-Chavez pleads with a bystander to close the car's doors (indicating he knew about the contraband in the car and was worried the officers might easily spot it if the doors were left open). JA1251; JA1460 at 2:51. All told, it was simple to conclude he possessed, constructively or otherwise, the guns in the car. *United States v. Campbell*, 347 F. App'x 923, 929 (4th Cir. 2009) (No prejudice because "absent the Government's improper remarks, there was an abundance of competent proof establishing Campbell's guilt on both charges."); *Woods*, 710 F.3d at 205 (No prejudice where "a considerable portion of

the government's evidence directly contradicted Woods' theories of defense.").

Mr. Martinez-Chavez nevertheless seeks to dilute the strength of the government's case, claiming there were credibility issues due to putative timing inconsistencies between the bodycam and dispatch's CFS report. *See* Br. at 26-28. But as the government had explained, those alleged inconsistencies proved little; because the officers do not call dispatch the moment events occur, there was never any expectation that the CFS report would align with bodycam down to the second. JA870-871. Indeed, neither of the district court judges who dealt with this case found defense counsel's strident arguments about timing issues convincing. JA523-524 ("[E]ven though there may be some small discrepancies raised by the defense, I found the [officers'] testimony to be credible[.]"); JA748 ("[T]hese minimal time discrepancies between the CFS Report and the BWC footage do not suggest anything nefarious when one understands how the CFS Report is created, which Martinez-Chavez overlooks.").

Outside of the credibility challenges, the only counter to the government's evidence was Mr. Vallejos's implausible testimony, which

did not even account for the ammunition tucked away in the console that matched the guns. With or without the government's "liar" remark, the jury had no compelling reason to disregard the straightforward evidence of Mr. Martinez-Chavez as the person who possessed the guns when he was alone in a car with them. So at a minimum, the alleged timing disparities are insufficient to carry Mr. Martinez-Chavez's burden to show he was actually harmed by the prosecutor's statement.

In addition to the strength of the government's case and the absence of any tendency to mislead, the remaining considerations similarly fail to show prejudice. The remarks were relatively isolated, a sentence or two in the government's closing argument. JA1159-1180; *see Campbell*, 347 F. App'x at 929 ("[S]ix examples of the Government describing defense witnesses as liars" in an "expansive oral argument" was "not extensive" and did not prejudice the defendant.). The "liar" remarks also were not designed to divert the jury's attention to extraneous issues; instead they related to an important trial issue: Mr. Vallejos's lack of credibility as well as the implausibility of the tale he spun in Mr. Martinez-Chavez's defense. And the district court specifically instructed the jury *after* the parties' closing arguments that

"arguments (including closing arguments), questions, and comments by the lawyers are not evidence. If what a lawyer says . . . is different from the evidence, the evidence is what matters and not what the lawyer said or asked." JA1215-1216; JA1303; *see Campbell*, 347 F. App'x at 929 (standard jury instruction about attorney argument "significantly lessens the chance that the jury was misled by the Government's improper statements" even when given before closing arguments).

Finally, Mr. Martinez-Chavez has not shown that upholding his conviction seriously impacts questions of fairness or the public reputation of judicial proceedings. A prosecutor calling a witness a "liar" after that witness is caught lying under oath, even if improper, does not call into question the propriety of the entire proceedings. Nor is there anything unfair about a duly earned conviction and sentence on the basis of clear and overwhelming evidence of wrongdoing simply because of a stray (but accurate) remark about one witness.

*Statement that the case is "important" to the government*

Turning to the prosecutor's remark about the importance of the case "to the government and law enforcement personnel[,]" and officers' efforts to get rid of armed felons, JA1179-1180, the government likewise

does not argue the statement was proper. The jury is charged with finding facts, not weighing the government's interests in a conviction.[3] *See Pupo*, 841 F.2d at 1240 (telling the jury to make a "statement" against narcotics crimes was improper, but ultimately not prejudicial); *Runyon*, 707 F.3d at 515 (telling the jury to do its "duty" and "send a message to the community" was improper, but ultimately not prejudicial).

In this instance, Mr. Martinez-Chavez objected below, so the government is obligated to show harmlessness. Yet just like with the "liar" statement, these remarks did not prejudice Mr. Martinez-Chavez and trigger a conviction that otherwise would not have occurred.

---

[3] Mr. Martinez-Chavez also argues these statements constitute bolstering and vouching. *See* Br. at 20-23. That is wrong. Nothing about the statements vouched for any testimony because they did not hint at the prosecutor's personal belief in the testimony. And the statements did not bolster any witness testimony. Telling the jury that officers are trying to keep guns away from felons is not bringing in outside facts because the case involved testimony about officers doing just that—i.e., seizing firearms from a felon. *See United States v. Jacobs*, 215 F. App'x 239, 241 (4th Cir. 2007) (praising "the agent's hard work and diligence" in "uncover[ing] a large drug trafficking network" was neither vouching nor bolstering); *United States v. Francisco*, 35 F.3d 116, 120 (4th Cir. 1994) ("the prosecution may make fair inferences from the facts"; "closing argument is not merely a time for recitation of uncontroverted facts").

To begin, telling the jury the case matters to the government does not mislead the jury nor prejudice Mr. Martinez-Chavez. Unlike instructing the jury to "send a message to the community" or make a "statement" against narcotics, the prosecutor's remark here merely recited a fact, and an obvious one at that. Every reasonable juror will recognize, from the get-go, that the government cares about the outcome of the case. So just saying as much in closing argument is unlikely to have any discernable effect on the jury's actual deliberations. *Lopez*, 860 F.3d at 215 (no prejudice because, based on the evidence at trial, the "jury reasonably could have inferred the same conclusion" as the allegedly improper statement).

Moreover, as described above, the evidence against Mr. Martinez-Chavez was straightforward and overwhelming. *See supra* at 29-30. He was in the car, alone, with the guns; he had sped away and turned off his lights in an effort of escape the police; and when the police caught up to him, he was reaching over into the passenger area where the guns where. Beyond that, while Mr. Martinez-Chavez attorneys tried to attack the law enforcement officers' testimony, there was nothing that persuasively called any critical facts into question; and the alibi

witness, Mr. Vallejos, offered wholly unbelievable testimony that did little to help Mr. Martinez-Chavez's cause. In the face of that evidence, which any rational jury would likely find sufficient to convict, there is no basis for concluding that a brief reference to the government's interest in the case is what tipped the scales against Mr. Martinez-Chavez, or that in the absence of those remarks, the jury would have absolved him. *Cf. Craddock*, 364 F. App'x 842, 844–45 ("Most importantly, though, while the prosecution's vouching for the witnesses' credibility may have had an inherent tendency to mislead the jury, there was ample competent evidence to support Craddock's conviction."); *Myers*, 279 F. App'x 257, 258–59 (no prejudice where the Court found "the government's case very strong"); *Pupo*, 841 F.2d at 1240 (no prejudice where "evidence of guilt was not overwhelming," but "was adequate").

The statements were also relatively isolated. Even considering the 'important to the government' remarks together with the 'Vallejos is a liar' comments, they amount to only a handful of lines in a 22-page closing argument. JA1159-1180. They were not so prevalent as to overwhelm the vast array of legitimate comments on the evidence

establishing Mr. Martinez-Chavez's guilt. JA1159-80; *see United States v. Harris*, 498 F.3d 278, 293 (4th Cir. 2007) ("[T]he degree to which the remarks could have misled and prejudiced the jury was relatively small" because "[t]he case against Royal here was strong and the remark at issue was isolated.")[4].

Mr. Martinez-Chavez alludes to other allegedly untoward comments (although he does not separately identify them as a basis for relief) and argues that the combination of those statements with the 'liar' and 'importance' comments prejudiced him. *See* Br. at 25-26. But this small collection of statements does not show the improper commentary was extensive, or prompted a guilty verdict from a jury otherwise primed to acquit:

- He objected to the first remark, where the prosecutor suggested he had "never seen a police officer use" a gun like the revolver found in the car. JA1167. The district court sustained the objection and instructed the jury not to consider it. JA1167. Given that juries presumably follow instructions, *see*, *e.g.*,

---

[4] Abrogated on unrelated grounds.

37

*United States v. Basham*, 561 F.3d 302, 335 n.15 (4th Cir. 2009), there is no evidence this had any sort of adverse impact.

- The second remark was not improper at all. Noting Mr. Vallejos must have forgotten to say "he left the ammunition in the center console" is an example the prosecutor calling out the disparity (as he is permitted to do) in Mr. Vallejos's testimony between trying to claim the guns without taking any responsibility for the matching ammunition. JA1174-1175.

- The last statement about the officers having "probably" checked into Mr. Vallejos's story, although inartful, was modest and largely immaterial within the broader scope of the trial evidence. JA1171. Suggesting law enforcement officers engage in investigative work before bringing criminal cases is the sort of truism just about every lay juror already knows and accepts. It would not have prejudiced the jury's appraisal of Mr. Vallejos far-fetched testimony or Mr. Martinez-Chavez's guilt.

Plus, it is not as though this was the last thing the jury heard before convicting Mr. Martinez-Chavez. All of these statements were in the government's first closing argument, meaning the jury heard Mr.

Martinez-Chavez's counsel's efforts to reframe the case before deliberating. And again, after the closing arguments the district court instructed the jurors that "arguments" "by the lawyers are not evidence" and "the evidence is what matters and not what the lawyer said or asked." JA1215-1216; JA1303. "Taken together, all these instructions minimized any risk that the jury would render a decision based on the prosecution's . . . fleeting comments, as opposed to the overwhelming evidence[.]" *Runyon*, 707 F.3d at 515 (affirming conviction in light of various jury instructions—including standard instructions about attorney argument not being evidence).

* * *

Calling Mr. Vallejos a liar was improper, but it was also accurate and did not prejudice Mr. Martinez-Chavez or seriously call into question the fairness or integrity of the proceedings. Similarly, although noting the case was important for the government risked distracting the jury with an improper consideration, it was a brief aside and did not outweigh the substantial evidence against Mr. Martinez-Chavez. Like this Court has often done in challenges to closing argument, it should

affirm Mr. Martinez-Chavez's convictions on the ground that the improper remarks were harmless.

## II. The district court properly exercised its discretion to deny an adverse-inference instruction

Mr. Martinez-Chavez next challenges the district court's refusal to give an adverse-inference or spoliation instruction about dispatch recordings that had been deleted. But such an instruction was not appropriate—particularly for evidence that was not obviously relevant, nor likely to provide any exculpatory or impeachment value; and which had not been deleted intentionally or deliberately, but rather was purged in accordance with standard procedures prior to an express request from defense counsel.

\* \* \*

There are two flavors of due process violations when it comes to the destruction of evidence in criminal cases: (1) When the government destroys exculpatory evidence, whether or not it was acting in bad faith, and the evidence's exculpatory value was apparent before it was destroyed. *See California v. Trombetta*, 467 U.S. 479, 489 (1984). And (2) when the government, acting in bad faith, destroys potentially useful evidence. *See Arizona v. Youngblood*, 488 U.S. 51, 57-58 (1988).

In the event of either a *Trombetta-* or *Youngblood*-style violation, courts may provide adverse-inference instructions or even impose more serious sanctions—to the point of dismissing an indictment, where appropriate.

Outside of those contexts, it is unclear whether criminal defendants would be entitled to adverse-inference instructions in the wake of spoliated evidence. Civil litigants may get such an instruction under a slightly different standard, in accordance with Federal Rule of Civil Procedure 37. But this Court previously expressed skepticism that the same standard would apply in criminal cases. *United States v. Wright*, 333 Fed. Appx. 772, 778 (4th Cir. 2009) ("We doubt [the civil standard for sanctions for spoliation of evidence] controls in the criminal context.").

Nevertheless, roughly a decade after *Wright*, this Court remanded a criminal case and instructed the district court to consider whether an adverse-inference instruction should be given, even if the district court ultimately did not accept the defendant's due process claim. *United States v. Johnson*, 996 F.3d 200, 217 (4th Cir. 2021). The Court, relying on a civil decision, suggested in what appears to be dicta that an adverse-inference instruction "may be appropriate" against a party who

loses or destroys evidence where the "party knew the evidence was relevant to some issue at trial and that his willful conduct resulted in its loss or destruction." *Id*. The Court noted a finding of "bad faith" would always satisfy the "willfulness" requirement, but affirmed that willfulness is less than bad faith, and therefore "intentional conduct" that "contributed" to the loss or destruction of evidence may also be enough. *Id*. Negligence, however, was insufficient. *Id*.

Where a district court refuses to give a proffered instruction, this Court reviews that decision for an abuse of discretion. Notably, "a party challenging instructions faces a heavy burden, for we accord the district court much discretion to fashion the charge." *United States v. Raza*, 876 F.3d 604, 614 (4th Cir. 2017). It is an "error only if [the proposed instruction] (1) was correct, (2) was not substantially covered by the charge that the district court actually gave to the jury, and (3) involved some point so important that the failure to give the instruction seriously impaired the defendant's defense." *Id*. But even if there is an error, the Court reviews it for harmlessness. *United States v. Chaudhri*, 134 F.4th 166, 186–87 (4th Cir. 2025) (affirming conviction because failure to provide requested instruction was harmless).

**1. The district court appropriately declined to give an adverse-inference instruction in the absence of a due process violation**

Mr. Martinez-Chavez does not allege a due process violation, JA639-640; *see* Br. at 32, meaning the well-established standards in *Youngblood* and *Trombetta* for whether and when to interpose a sanction for the spoliation of evidence do not apply. Instead, he relies solely on the framework in *Johnson*. JA640. But the Court should not find an error where the district court declined to provide an adverse-inference instruction in a case with no due process violation.

*Johnson*'s discussion of spoliation remedies appears to be dicta. The *Johnson* Court vacated the district court's finding that the government did not violate due process in spoliating potentially critical evidence and remanded for the district court to reconsider the issue with an expanded record. *Johnson*, 996 F.3d at 216. Critically, the Court then noted that, because it was remanding the due process question, it "need not decide whether the court committed further error . . . by refusing to instruct the jury that it could draw an adverse inference" from the government's spoliation of evidence. *Id*. At the same time, it also instructed the district court to consider whether to

interpose an adverse-inference instruction, consistent with the civil standard described in *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148 (4th Cir. 1995), even in the absence of a due process violation. *Id.* at 217. In other words, it did flag the possibility of the civil-based framework for a non-due-process-based spoliation instruction, but it expressly abstained from formally deciding that question. It was not a necessary component of its decision on the merits. *Payne v. Taslimi*, 998 F.3d 648, 654 (4th Cir. 2021) ("Dictum is a statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding[.]").

Moreover, *Johnson*'s civil spoliation standard is a poor fit for criminal cases—which likely explains why this Court previously doubted it would apply. *See Wright*, 333 Fed. App'x. at 778. The government does not have "an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." *Youngblood*, 488 U.S. at 58; *see also Illinois v. Fisher*, 540 U.S. 544, 548 (2004). There is no obligation to preserve and produce everything that may possibly be

relevant. Yet that is precisely what *Johnson*'s rule, adopted from a different context, would require.

Indeed, this Court and others have routinely applied *Youngblood* and *Trombetta*'s due process analysis in comparable cases and declined to provide any sort of spoliation relief. *See, e.g., United States v. Bloodworth*, 412 F. App'x 639, 640 (4th Cir. 2011) (denying relief after finding no due process violation where potentially useful recording of defendant's traffic stop was automatically deleted); *United States v. Varner*, 261 F. App'x 510, 517-518 (4th Cir. 2008) (denying relief after finding no due process violation where DEA destroyed potentially exculpatory meth lab evidence); *Wright*, 333 Fed. App'x. at 777-78. (denying relief after finding no bad faith where call between defendant and informant was deleted, in part because there was otherwise testimony that the call was inculpatory); *United States v. Jobson*, 102 F.3d 214, 218 (6th Cir. 1996) (denying relief after finding no due process violation where dispatch calls were deleted as a result of "routine police department policy").

At a minimum, if there is to be civil spoliation standards in criminal cases, they should follow the current iteration of Federal Rule

of Civil Procedure 37, rather than the older framework described in *Johnson* (which cites to *Vodusek*, a 1995 case). Rule 37, as amended in 2015, provides that in situations where "electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost" the court, "upon finding the [spoliating] party acted with the intent to deprive another party of the information's use in the litigation may . . . instruct the jury that it may or must presume the information was unfavorable to the party[.]" Fed. R. Civ. P. 37(e)(2)(B). Among other virtues, this largely tracks the due process standard, requiring both "a duty to preserve" and an "intent to deprive." It is thus broadly consistent with the government's due-process-based preservation obligations. *Cf. Youngblood*, 488 U.S. at 57-58 (requiring bad faith for a spoliation sanction).

Without *Johnson*'s out-of-date civil standard—relying instead on *Youngblood* and *Trombetta* or Rule 37—Mr. Martinez-Chavez's claim fails. He does not allege a due process claim and foreswears any sort of bad faith or "intent to deprive" on the government's part. JA634 ("I don't think the government acted in bad faith . . . [the] government

46

acted with due diligence after we specifically requested this."). So there was no need and no justification for an adverse-inference instruction.

### 2. Even under *Johnson*'s framework, there was no abuse of discretion in declining to provide the spoliation instruction

*Johnson* set forth two necessary requirements for an adverse-inference instruction: (1) "a showing that the party knew the evidence was relevant to some issue at trial"; and (2) the party's "willful conduct"—as opposed to mere negligence—"resulted in its loss or destruction." *Johnson*, 996 F.3d at 217. Within the context of this Court's review for refused instructions, *see Raza*, 876 F.3d at 614, that means Mr. Martinez-Chavez must have made a satisfactory showing to the district court in order for the instruction to be "correct"; and this Court reviews the district court's evaluation of those efforts for an abuse of discretion. Even then, *Johnson* noted only that an instruction "may be appropriate" if those prerequisite circumstances exist, not that it must be given in every instance. *Johnson*, 996 F.3d at 217.

Mr. Martinez-Chavez fails both prongs of *Johnson*'s standard, meaning the instruction was not "correct." And correct or not, the absence of the instruction did not seriously impair his defense.

*First*, the district court did not abuse its discretion in refusing the instruction because Mr. Martinez did not make (and has not made) a showing that officers *knew* the dispatch recordings were relevant to this case. For the government and the officers involved, it was far from obvious the dispatch recordings would matter. After all, the officers' bodycam videos showed the short-barreled rifle in the car, the officers recovering both guns from the car, and Mr. Martinez-Chavez as the only occupant at the scene, JA1460-1461—which clearly establishes the material facts for Mr. Martinez-Chavez's unlawful and knowing possession of the firearms. Moreover, Officer Hylton's narrative about Mr. Martinez-Chavez speeding and turning off his lights was corroborated by Officer Poulin (who was listening in to Officer Hylton's communications with dispatch), and Mr. Martinez-Chavez himself acknowledged he was speeding. JA877-880; JA1251. It was (and is) a straightforward case with no obvious need for Officer Hylton's dispatch calls.

In fact, there is no compelling case the dispatch calls were relevant at all. Mr. Martinez-Chavez hoped the calls might show some sort of meaningful discrepancy he could use to impeach the officers.

JA634-637. But if they did not, they were not relevant; they were redundant of Officer Hylton's testimony. And there was never a compelling reason to believe the calls actually would show a discrepancy. Mr. Martinez-Chavez relied primarily on the bodycam timing and CFS reports to suggest something was amiss, but as noted above, this was never a persuasive theory because officers do not always call dispatch the moment events occur (and may instead summarize after), so the CFS reports necessarily will not be accurate down to the second. JA870-871. More likely than not, the dispatch calls would have corroborated Officer Hylton's and Officer Poulin's testimony and therefore been little more than cumulative evidence of Mr. Martinez-Chavez's guilt.

In any event, rather than making "a showing that the [government] knew the evidence was relevant[,]" *Johnson*, 996 F.3d at 217, Mr. Martinez-Chavez just notes on appeal that relevance itself "is a low bar." *See* Br. at 34. True enough; but that does not mean the officers necessarily knew the dispatch calls were relevant in such a simple case.

At best, Mr. Martinez-Chavez hints that the government could have known or should have known, rather than showing (as he is obligated to do) it did in fact know the dispatch calls were relevant. *See* Br. at 32-33. But even that inadequate claim fails. Indeed, his own defense counsel did not actually determine the dispatch calls could be relevant until being involved in the case for months. She sent a generic letter asking for discovery in May 2024, but did not specifically identify the dispatch calls as potentially relevant until nearly six months later, in October 2024, at which point they had already been destroyed pursuant to department policy. JA201-207; JA639 (defense counsel acknowledging "perhaps our [initial] discovery letter was not enough" to specifically request the dispatch calls).

More importantly, the tangled web of inferences necessary to stake out defense counsel's claim undermines any allegation the officers *knew* the dispatch calls were relevant. No officer could have foreseen that an enterprising defense counsel might try and parse out disparities of a matter of seconds as a basis for arguing that multiple officers just fabricated key points of their testimony. That is particularly true given that Mr. Martinez-Chavez's knowledge of the guns—the one element his

defense counsel hoped to attack using the dispatch calls—was never really in doubt; he was alone in his car with the guns (one of which was plainly visible on the floormat) and matching ammunition was tucked away in the center console. That he tried to evade the police and was seen reaching over in the passenger seat where the guns were is additional, supportive evidence of his knowledge, but it was not necessary to prove the government's case.

Mr. Martinez-Chavez also highlights that the dispatch calls likely qualified as *Jencks* material. But Mr. Martinez-Chavez has not raised a *Jencks* claim here and did not raise one below; in fact, Mr. Martinez-Chavez's counsel never once cited *Jencks* before the district court. Moreover, *Jencks* does not equal relevance. The statute requires the government to produce any statements that relate to a witness's testimony, 18 U.S.C. § 3500(b), a potentially capacious designation that may incorporate statements and information which are not strictly relevant. Indeed, the government routinely produces *Jencks* information that never sees the light of day at trial specifically because it is immaterial or redundant or cumulative. Mr. Martinez-Chavez thus

cannot meet his burden of showing the government *knew* dispatch calls were relevant by pointing to its obligations under *Jencks*.

***Second***, Mr. Martinez-Chavez has not shown that the loss of the evidence was willful or intentional, as opposed to merely negligent. Again, no one made a deliberate or intentional choice to destroy the dispatch recordings; they were simply deleted as an administrative matter after 180 days, in accordance with the state's retention and disposition schedule. JA619-621. By any metric, that conduct is, at worst, negligent. The district court did not abuse its discretion in finding no willful behavior where "the dispatch recordings were properly retained and automatically disposed of" pursuant to the applicable policy. JA752; *cf. Bloodworth*, 412 F. App'x at 640 (4th Cir. 2011) (rejecting spoliation challenge because "the record reveal[ed] that the recording was deleted automatically from the police department's software system[.]"); *Jobson*, 102 F.3d at 218 (There was no bad baith because no one "suspected that the tape was exculpatory" and it "was erased not as a result of malice, but routine police department policy.").

Mr. Martinez-Chavez's only counter is the idea that the automatic disposal of the recordings was actually willful because willful conduct

may involve disregarding a known legal duty—i.e., the government's obligation to preserve the recorded statements for purposes of *Jencks*. *See* Br. at 37-38. For that point, he cites to *RSM, Inc. v. Herbert*, 466 F.3d 316, 321 (4th Cir. 2006), but he ignores the opinion's actual language. *RSM, Inc.* did not hold that a court can find willfulness anytime a legal duty is unsatisfied; rather, this Court explained: "Thus, when evaluating omissions alleged to be deliberate, it is often necessary to ascertain *whether the failure to act resulted from a conscious consideration of the legal requirement to act.*" *Id.* at 322 (emphasis added). Mr. Martinez-Chavez offers no evidence (because there is none) that any government actor consciously considered recordings of seemingly immaterial dispatch calls in conjunction with the *Jencks* requirements and deliberately opted not to intervene. The fact that the government may have a legal duty, whether stemming from *Jencks* or Rule 16 or elsewhere, to preserve and produce certain materials does not transform inadvertence into willfulness; and it does not mandate an adverse-inference instruction for every oversight.

The upshot is that Mr. Martinez-Chavez failed to show an adverse-inference instruction was appropriate, even under the *Johnson*

standard. As a result, an adverse-inference instruction was not "correct," and the district court reasonably exercised its discretion not to provide one.

***Third***, the absence of the instruction did not seriously impair Mr. Martinez-Chavez's ability to present his defense.

Mr. Martinez-Chavez never presented a specific instruction to the district court. So, for the sake of this appeal, the government presumes a relatively standard adverse-inference instruction—i.e., the jury may presume the dispatch calls would have been favorable to the defense. With or without that instruction, he could (and did) point to the timing disparities, the policy violation regarding the bodycam footage, and make nefarious insinuations about the officers' response in an effort to challenge their credibility. JA1182-1204. With or without that instruction, he could (and did) argue he was unaware of the guns in the car because they had previously been placed there without his knowledge. JA1182-1204. In other words, he made his defense arguments unimpaired.

He complains that the absence of the instruction blunted the impact of his arguments. *See* Br. at 40. But it is not clear that is true—

an adverse-inference instruction would not have removed the guns from Mr. Martinez-Chavez's car or made Mr. Vallejos's absurd tales any more believable. And if all he can say is that he believes an adverse-inference instruction could have made an argument a bit more persuasive, that does not mean it "seriously" impaired his defense or prevented him from meaningfully presenting his case to the jury. The real problem for Mr. Martinez-Chavez was that, instruction or no, the evidence at trial did not support his spin on the facts of the case

### 3. Any error was harmless

Even if the district court abused its discretion in refusing to offer an adverse-inference instruction, the error was harmless. That is, it did not "substantially sway" the outcome. *United States v. Abu Ali*, 528 F.3d 210, 231 (4th Cir. 2008).

As the government has emphasized throughout this brief, the evidence against Mr. Martinez-Chavez was both very strong and very straightforward. He could not deny he had been caught alone, in his car, with two guns and ammunition matching the two guns. Those facts alone provide a compelling case of his guilt. On those facts alone, it is difficult to come up with persuasive excuses as to why or how Mr.

Martinez-Chavez did not knowingly possess the guns. Unsurprisingly then, the explanations he did offer were pretty flimsy, and depended upon the uncorroborated, unbelievable testimony of an unreliable witness who was caught perjuring himself on the stand.

Ultimately, the minutiae about CFS reports and missing dispatch calls does little to move the needle. Discrepancies about Mr. Martinez-Chavez turning his lights off or rummaging through the passenger seat does not make the undisputed facts any less probative of his guilt, so an adverse-inference instruction highlighting those issues (and telling the jurors they could presume missing dispatch calls were favorable to the defense on that score) would not have altered the jury's calculus. Mr. Martinez-Chavez unquestionably had two guns and matching ammunition with him in his car, no matter what Officer Hylton may have said to dispatch, so the presence or absence of the spoliation instruction did not alter the outcome.

## CONCLUSION

For all of the foregoing reasons, the government respectfully requests that this Court affirm Mr. Martinez-Chavez's conviction.

Respectfully submitted,

ROBERT N. TRACCI
Acting United States Attorney

/s/ *Jonathan Jones*
Jonathan Jones
Assistant United States Attorney
United States Attorney's Office
310 1st Street SW, Suite 906
Roanoke, VA 24011
(540) 857-2250
jonathan.jones2@usdoj.gov

## CERTIFICATE OF COMPLIANCE

This brief has been prepared using Microsoft Word, 14-point, Century Schoolbook font, and is in compliance with Fed. R. App. P. 32(a)(7)(B).

This brief contains approximately 10,711 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I understand that a material misrepresentation can result in the Court striking the brief and imposing sanctions.

/s/ *Jonathan Jones*
Assistant United States Attorney

## CERTIFICATE OF FILING AND SERVICE

I certify that on December 4, 2025, I electronically filed the foregoing Response Brief of Appellee with the Clerk of the Court using the CM/ECF System, which will send notification to counsel of record.

*/s/ Jonathan Jones*
Assistant United States Attorney
